IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4100
Washington, DC 20530,

STATE OF MINNESOTA
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131,

and

STATE OF NEW YORK
28 Liberty Street
New York, NY 10005,

            *Plaintiffs*,


            v.


UNITEDHEALTH GROUP INCORPORATED
9900 Bren Road East
Minnetonka, MN 55343,

and

CHANGE HEALTHCARE INC.
3055 Lebanon Pike
Nashville, TN 37214,

            *Defendants*.

## COMPLAINT

UnitedHealth Group (United), which owns the largest health insurer in the United States,

proposes to acquire Change Healthcare (Change), the leading source of key technologies that

United's health insurance rivals rely on to compete with United. By ensuring accuracy, avoiding overpayments, and reducing administrative waste, Change's technologies save United's rivals tens of billions of dollars each year and reduce healthcare costs for American families. Through these technologies, Change also has access to vast amounts of competitively sensitive data about United's rivals—data that reveals how their plans are designed and how they calculate payments to providers, for example—and holds "unfettered" rights to use much of this information. United is keenly aware of Change's data rights; its former CEO viewed acquisition of these rights as an essential reason for the acquisition of Change. Indeed, United recognized that it could use this data to extract intelligence about its health insurance rivals, despite acknowledging that this would trigger "Payer and provider sensitivity and competitive concerns." Tellingly, while United has long coveted its rivals' claims data, it has gone to great lengths to safeguard its own claims data from competitors, recognizing that "someone specifically going out and getting all of that information" on "how the plans work" is "not a good thing from a competitive standpoint."

Because Change's products are so widely used, including by many healthcare providers, United's health insurance rivals would not be able to prevent their data from being routed through Change post-transaction. Therefore, United's proposed acquisition of Change, with its rivals' competitively sensitive data, would allow United to co-opt its rival insurers' innovations and their competitive strategies and reduce their incentives to pursue those innovations and strategies in the first place. The proposed acquisition would also allow United to use its control over Change's technologies to disadvantage its health insurance rivals by raising their costs and denying or delaying their access to innovations and quality improvements to products and services supplied by Change.

Ultimately, this substantial lessening of competition would result in higher cost, lower quality, and less innovative commercial health insurance for employers, employees, and their families.

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................. 4

II.     DEFENDANTS AND THE PROPOSED TRANSACTION ........................................ 10

III.    BACKGROUND .................................................................................................. 13

    A.   COMMERCIAL HEALTH INSURANCE ................................................................... 13
    B.   OVERVIEW OF CLAIMS SUBMISSION AND EDI CLEARINGHOUSES....................... 14
    C.   OVERVIEW OF CLAIMS EDITING SOLUTIONS ...................................................... 20

IV.     RELEVANT MARKETS ...................................................................................... 23

    A.   THE SALE OF FIRST-PASS CLAIMS EDITING SOLUTIONS IN THE UNITED STATES IS A RELEVANT MARKET ............................................................................................ 23
    B.   THE SALE OF COMMERCIAL HEALTH INSURANCE TO NATIONAL ACCOUNTS IN THE UNITED STATES IS A RELEVANT MARKET.......................................................... 24
    C.   THE SALE OF COMMERCIAL HEALTH INSURANCE TO LARGE GROUP EMPLOYERS IN VARIOUS LOCAL MARKETS IS A RELEVANT MARKET ........................................ 26

V.      ANTICOMPETITIVE EFFECTS............................................................................ 28

    A.   THE PROPOSED TRANSACTION WOULD LIKELY SUBSTANTIALLY REDUCE COMPETITION IN THE RELEVANT HEALTH INSURANCE MARKETS BY GIVING UNITED ACCESS TO ITS RIVALS' COMPETITIVELY SENSITIVE INFORMATION ................................................. 29
    B.   THE PROPOSED TRANSACTION IS LIKELY TO SUBSTANTIALLY REDUCE COMPETITION IN THE RELEVANT HEALTH INSURANCE MARKETS BY GIVING UNITED THE ABILITY AND INCENTIVE TO RAISE ITS RIVALS' COSTS ................................................................. 34
    C.   THE PROPOSED TRANSACTION WOULD LIKELY SUBSTANTIALLY LESSEN COMPETITION AND TEND TO CREATE A MONOPOLY IN FIRST-PASS CLAIMS EDITING SOLUTIONS ........... 37

VI.     THE MERGER SHOULD BE ENJOINED ............................................................ 38

VII.    ABSENCE OF COUNTERVAILING FACTORS ..................................................... 38

VIII.   JURISDICTION, VENUE, AND COMMERCE ...................................................... 40

IX.     VIOLATIONS ALLEGED ................................................................................... 41

X.      REQUEST FOR RELIEF ..................................................................................... 42

## I.      INTRODUCTION

1.      Health insurance helps protect American families from the financial risks associated with sickness and injury. It also facilitates access to the U.S. healthcare system, thereby improving health outcomes and affecting the lives of hundreds of millions of people living in the United States. Each year, Americans visit a doctor or hospital more than one billion times and spend more than four trillion dollars on healthcare—almost one-fifth of the U.S. gross domestic product. Roughly 155 million people, or almost half of all Americans, get their health insurance through an employer. Employers count on competition between health insurers to provide affordable, high quality, and innovative health plans to meet the needs of employees and their families. United's proposed acquisition of Change threatens this competition.

2.      United is a behemoth in the healthcare industry. A serial acquirer that has purchased more than 35 healthcare companies over the last 10 years, United operates, among other things: the largest health insurance company in the United States; a large network of physician groups, outpatient surgical centers, and other healthcare providers, including over 53,000 physicians across 15 states; a pharmacy benefit manager (PBM) that handles over a billion prescriptions every year; and a healthcare technology business that facilitates, among other things, the transmission, analysis, and review of health insurance claims.

3.      Change is the leading independent supplier of technologies used by healthcare providers to submit health insurance claims, and by health insurance companies to evaluate and process these claims. It is not owned by any healthcare provider or health insurer. Change operates the nation's largest electronic data interchange (EDI) clearinghouse, which transmits data between healthcare providers and insurers, allowing them to exchange insurance claims, remittances, and other healthcare-related transactions. The claims and remittances are referred to

as "claims data." The claims data shows, among other things, the treatment an individual receives and the insurance coverage that they have, and provides a window into the inner workings of the health insurers and their plans. Change also sells a license to its separate state-of-the-art claims editing technology that enables health insurers to process, in real time, millions of healthcare claims each day to ensure compliance with their health insurance policies.

4. Nearly all of United's major health insurance rivals rely on Change's EDI clearinghouse and claims editing technology to compete with United's commanding health insurance business, and they have leveraged these tools to save billions of dollars each year. Change's technologies are critical tools that allow United's health insurance rivals to keep healthcare costs down for their members and pay providers' claims quickly so they can compete more effectively with United and one another for health insurance customers.

5. Change is the leading independent provider of technology used to transmit and review health insurance claims. As Change told analysts in 2019 "the SCALE, size, and independence of our business is a competitive advantage." It has access to a vast trove of competitively sensitive claims data that flows through its EDI clearinghouse—over a decade's worth of historic data as well as billions of new claims each year. According to United, 50 percent of all medical claims in the United States pass through Change's EDI clearinghouse. Change's self-described "pervasive network connectivity," including approximately "900,000 physicians, 118,000 dentists, 33,000 pharmacies, 5,500 hospitals and 600 laboratories," means that even when United's health insurer rivals choose not to be a Change customer, health insurers have no choice but to have their claims data pass through Change's EDI clearinghouse. Not only does Change process vast amounts of competitively sensitive claims data, but it also has secured "unfettered" rights to use over 60 percent of this data for its own business purposes including, for

example, using claims data for healthcare analytics. Additionally, through its claims editing product, Change has access to the proprietary plan and payment rules for all of United's most significant health insurance competitors.

6.     Change has access to claims data and health insurers' proprietary plan and payment rules. Health insurers consider this information to be competitively sensitive. This data is especially valuable because it can be used to understand how an insurer designs its plans for particular employers, and glean insights into the plans' payment and operational rules.

7.     United operates its own EDI clearinghouse and offers a competing claims editing technology through OptumInsight, its healthcare technology business. But United's major rival health insurers rely on Change for its innovative, high-quality products, including claims editing technology and EDI clearinghouse, avoiding United's claims editing and clearinghouse products to protect their competitively sensitive data from their largest rival. United is well aware of its rivals' reluctance to use United's EDI clearinghouse and claims editing products. OptumInsight euphemistically refers to this reluctance as the "'U'-factor,"—a reference to United's insurance business. An internal strategy document discussing the competitive perception of OptumInsight's claims editor put it bluntly: "health plans don't typically want to go with Optum because Optum is a competitor."

8.     United, for its part, actively avoids placing its own competitively sensitive claims data in the hands of its actual or potential health insurance competitors. United requires its business units to limit the disclosure of data outside of United "to the minimum necessary." And its internal policies reflect the competitive importance of claims data to UnitedHealthcare (United's health insurance business) and to the commercial health insurance industry generally. For example, United will not permit its business units to license claims data to a third-party

unless it is justified "as being in the best interests of the Enterprise [United] (taking into account all business segments)." United also restricts data licenses to third-parties if they are "primarily for the benefit of a significant competitor." United implements these policies to protect its financial interests.

9.     Although it carefully safeguards its own claims data, United covets its rivals' claims data and has long sought to acquire Change for this reason. United executives repeatedly expressed in ordinary course business documents that a purchase of Change was motivated by the desire to acquire Change's access to claims data. For example, in evaluating whether to acquire Change, the "primary question" from United's then-CEO concerned Change's "data rights." He viewed Change's rights to proprietary claims data as "the foundation" to the business case for acquiring Change. United's consultants from McKinsey & Company (McKinsey) confirmed Change's extensive rights to claims data, reporting that Change "connects to over 70% of all payers, providers, pharmacies, and physician organizations"; it enjoys the "broadest and deepest datasets in several categories"; and it "has unrestricted access under HIPAA guidelines." McKinsey also pointed to Change's "High volume of claims," "Breadth across multiple networks," and "Direct customer contracts" as particularly advantageous.

10.     United saw similar advantages to acquiring Change's claims editing technology. An early United analysis of the deal shows that it understood that by acquiring Change it would gain access to the proprietary plan and payment rules of rival health insurers, specifically the "claim edits of a large number of non-UHC payers (Humana, Anthem, Aetna, Cigna, Blues)."

11.     United's proposed $13 billion acquisition of Change would fundamentally alter the health insurance industry, reducing its competitiveness. Unless enjoined, the proposed transaction would give United access to and control of sensitive business information about its

health insurance rivals. In particular, United would gain unprecedented access to a vast trove of its health insurance rivals' competitively sensitive claims data through Change's secondary-use rights, something United wants but has not attained previously. By acquiring Change, United will have the ability to diminish competition in the health insurance industry by applying machine learning to rival insurers' claims data, stealing rival insurers' best ideas, and reducing its rivals' incentives to innovate, among other things. Such competitive harm, including harm to innovation, reduces the American public's access to high-quality, affordable health insurance plans that meet their healthcare needs.

12.     Post-transaction, United also would have a strong incentive to use this data to weaken its health insurance rivals' competitiveness. The competitive insights that United would obtain by acquiring Change would allow United to slow its rivals' innovations, reverse-engineer its rivals' proprietary plan and payment rules, preempt their competitive strategies, and compete less vigorously for certain customers by understanding which employer groups pose more risk and have higher costs of treatment. This course would prove profitable to United while harming competition.

13.     United's own deal documents validate these concerns. For example, in conducting due diligence on the deal for United, McKinsey concluded that United could "Utilize transactions intelligence (*i.e.*, clinical utilization) from multiple [healthcare] providers / payers to optimize benefit design" for its own health insurance business. In later documents, United's deal team reiterated this point and observed that United could use Change's "multipayer claims data to track procedure pricing," acknowledging the antitrust risk with this opportunity by stating that United would likely need to "closely assess antitrust concerns on use/sharing of pricing information."

14.     United's proposed acquisition of Change also would allow United to use its control over Change's technologies to disadvantage its health insurance rivals by raising their costs and reducing or withholding quality improvements and innovations from rivals that rely on Change's technologies. For example, Change sees potential value to incorporating certain claims editing functionality into its EDI clearinghouse. If United acquires Change, it would have a powerful incentive to deny such innovations to its health insurance rivals, depriving them of Change's technologies, as part of a strategy to disadvantage its health insurance rivals and expand its already large base of health insurance customers. Even modest increases in the number of customers, or members, have big implications for a health insurer's profitability. According to United, gaining 100,000 new health plan enrollees means tens of millions of dollars in profits for United. For these reasons, this transaction violates Section 7 of the Clayton Act because it may likely substantially lessen competition in the market for the sale of commercial health insurance to national accounts and large group employers.

15.     United's proposed acquisition of Change also would eliminate significant head-to-head competition between United and Change to supply first-pass claims editing solutions, which are software and services health insurers use to help adjudicate claims. Today, United and Change compete to supply first-pass claims editing solutions to health insurers. As the United pricing team explained, "[Change] is our big competitor for this product. We have been approving 20%-25% discounts consistently when [Change] is in the mix." But United's proposed acquisition of Change would give United over 75 percent share of the market for first-pass claims editing solutions and eliminate this competition, leaving insurers at the mercy of a vertically integrated monopolist that has every incentive to raise prices and reduce quality and

innovation. This transaction violates Section 7 of the Clayton Act because it tends to create a monopoly in the market for the sale of first-pass claims editing solutions.

16.     In sum, by placing Change's EDI clearinghouse and first-pass claims editing tools, including the accompanying competitively sensitive data, in United's hands, United's acquisition of Change is likely to substantially lessen competition in the markets for commercial health insurance and claims editing solutions. The proposed acquisition threatens to reduce competition among U.S. commercial health insurers, thereby harming health insurance customers (employers) and their individual members, all of whom rely on competition between United and its rivals to keep healthcare affordable. For the reasons set forth below, United's proposed acquisition of Change is unlawful and must be stopped.

## II.     DEFENDANTS AND THE PROPOSED TRANSACTION

*UnitedHealth Group and its Subsidiaries*

17.     United is one of the ten largest companies by revenue in the United States. Today, United is a vertically integrated healthcare enterprise with a portfolio of wholly owned subsidiaries comprising a massive healthcare ecosystem. These subsidiaries include, but are not limited to: (a) the largest U.S. health insurer, UnitedHealthcare; (b) one of the largest PBMs, OptumRx; (c) a significant provider network, Optum Health; and (d) an advanced healthcare technology business, OptumInsight. United generated $288 billion in revenue in 2021. It is headquartered in Minnetonka, Minnesota and incorporated under Delaware law.

18.     UnitedHealthcare is the largest commercial health insurer in the United States. It provides health insurance to employers in all 50 states and the District of Columbia. In 2021, UnitedHealthcare recorded $223 billion in revenue. That same year, UnitedHealthcare's national

accounts and large group employer commercial health insurance plans had about 23 million members and generated an estimated $31 billion in revenue.

19.    United's OptumRx subsidiary markets itself as "one of the three largest participants in the pharmacy benefit management (PBM) sector." In 2021, it filled 1.4 billion prescriptions. In 2021, OptumRx generated $91 billion in revenue.

20.    United's Optum Health subsidiary employs or manages healthcare providers, mostly focused on primary care. Optum Health's network included 53,000 providers serving over 19 million individuals in 2021, and it continues to grow through the acquisition of physician groups. In 2021, Optum Health generated approximately $54 billion in revenue.

21.    United's OptumInsight subsidiary provides healthcare analytics, technology, and services. OptumInsight supplies many of UnitedHealthcare's healthcare technology needs. In 2021, OptumInsight generated $12 billion in revenue, the majority of which was from products and services sold to UnitedHealthcare.

22.    United's OptumInsight subsidiary sells a first-pass claims editing solution called Claims Edit System (CES) that is used by UnitedHealthcare as well as some small and midsize insurers. United's major health insurance competitors in the markets for large group employers and national accounts generally do not use CES, because they do not want to expose their proprietary plan and payment rules to a United-owned company. OptumInsight also has an EDI clearinghouse that primarily processes insurance claims and other transactions for UnitedHealthcare. OptumInsight's EDI clearinghouse is UnitedHealthcare's managed gateway, meaning it is the exclusive EDI clearinghouse through which UnitedHealthcare accepts claims.

*Change Healthcare*

23.     Change is a leading independent healthcare technology company. It provides healthcare analytics, software, services, and data to providers, insurers, and other software and services firms in the healthcare industry. Change markets itself as a valuable partner for insurers, working together "hand-in-glove" to innovate and problem-solve. In a 2021 filing with the Securities and Exchange Commission, Change stated that it provides "collaborative benefits of a mission-critical partner to the healthcare industry" and offers a "consistent track record of innovation." In 2021, Change generated $3.4 billion in revenue. Change is headquartered in Nashville, Tennessee and incorporated under Delaware law.

24.     Change sells the market-leading first-pass claims editing solution, called ClaimsXten. Health insurers have realized a collective $12 billion in savings per year from using ClaimsXten.

25.     Change also operates the nation's largest EDI clearinghouse, which connects approximately 5,500 hospitals, 900,000 physicians, and 2,400 government and commercial health insurers. Change's internal business documents recognize that it "offers the largest medical EDI network in the U.S." and that "over two-thirds of transactions are managed by our clearinghouse solutions." In light of its vital technology, Change has concluded that the "healthcare system, and how payers and providers interact and transact, would not work without Change Healthcare." Change captures the claims data that flows through its EDI clearinghouse, and maintains data going back to 2012 representing 211 million unique patients covered by many different health insurers.

*The Proposed Transaction*

26.      United has considered an acquisition of Change for many years. As early as 2015, United recognized that "All Paths Lead to [Change]." On January 5, 2021, United agreed to acquire Change for approximately $13 billion (the Proposed Transaction). At the same time as they agreed to the Proposed Transaction, United and Change entered into a side agreement, requiring United to immediately increase its purchases of products and services from Change, ensuring that even if this transaction fails to proceed, United will pay Change approximately $60 million more per year than it did before the agreement was signed.

### III.      BACKGROUND

#### A.      Commercial Health Insurance

27.      Most Americans obtain commercial health insurance from their employers, which contract with health insurers to offer health insurance plans to their employees. Employees, and their covered spouses and dependents, that receive health insurance through an insurer's plan are called the health insurer's members.

28.      Health insurers routinely categorize employer-customers based on the employer's number of employees. In the vast majority of U.S. states, "large group" insurance is health insurance that is sold to employers with more than 50 employees (under the laws of four states, the threshold for large group insurance is employers with more than 100 employees). Within large group employers, insurers recognize a subset of the largest employers, those with employees spread across more than one state, as "national accounts."

29.      When selling commercial health insurance to national accounts and large group employers, health insurers compete on many factors, such as price, cost containment, claims adjudication (including claims editing and processing speed), clinical programs, customer service, care management, wellness programs, and reputation. Insurers also compete on the

breadth and quality of their network of healthcare providers, including doctors and hospitals, because most people seek medical care close to where they live or work.

30.     UnitedHealthcare is the nation's largest commercial health insurer. It has the largest market share among national accounts, covering approximately one out of every five Americans insured through a national accounts employer. It is also one of the largest health insurers serving large group employers in many local markets throughout the United States.

**B.     Overview of Claims Submission and EDI Clearinghouses**

1.     Claims Data and EDI Clearinghouses

31.     EDI clearinghouses enable providers and health insurers to transmit claims data electronically. EDI clearinghouses are sometimes described as the data "pipes" that connect providers and insurers.

32.     Claims processing typically involves a series of data transmissions between providers and health insurers. When an insured individual goes to a healthcare provider to receive care, the provider will generally first confirm the individual's health insurance coverage by sending an eligibility inquiry to the insurer. Once the insurer verifies the individual's insurance policy, the provider treats the individual (the patient) and then submits a medical claim to the insurer to receive payment. The claim contains information about the treatment, including the facility where the patient was treated, the patient's diagnosis, the services provided, and the provider's charge for the service.

33.     Upon receipt, the health insurer "adjudicates the claim" and determines what services are covered by applying its claims editing process. The claims editing process uses software to review the claim against the provider's contract with the insurer, clinical guidelines, and the patient's health plan policies to determine whether to accept the claim. If the health

insurer accepts the claim, it determines the amount it will pay and sends the provider a remittance.

34.     Each of the foregoing transactions is typically transmitted via an EDI clearinghouse, as depicted below:



35.     Historically, providers and health insurers used paper claims, faxes, and phone calls to communicate about eligibility, claims, and remittances. This approach was time consuming, error prone, labor intensive, and costly. Large national health insurers receive millions of claims every day, making it infeasible for most insurers to rely on paper claims submissions.

36.     EDI clearinghouses eliminate the high costs and delays of paper claims and telephone calls. They significantly reduce the time it takes health insurers to receive claims and

send remittances, leading to faster reimbursement for providers. Today, over 95 percent of all medical claims are transmitted electronically through EDI clearinghouses.

37.     Healthcare providers often use a single EDI clearinghouse that is integrated with the provider's other software, such as claims management, billing, or electronic health records software. Providers want their claims to be transmitted quickly and accurately to health insurers. A provider can sometimes connect directly to an insurer, without using an EDI clearinghouse. Because most providers submit claims to multiple insurers, however, establishing a direct connection with each insurer is less efficient and imposes more administrative burden than using a single EDI clearinghouse to submit claims to all insurers.

38.     Some health insurers use a single clearinghouse as a "managed gateway" that serves as the exclusive access point through which all of an insurer's claims data must pass. Other insurers establish relationships with multiple EDI clearinghouses. Health insurers want their EDI clearinghouse(s) to transmit data in a cost-effective manner and to give providers a quick and seamless exchange of claims data.

39.     When a provider's EDI clearinghouse is not directly connected with a patient's health insurer, claims data must flow through more than one EDI clearinghouse. The industry

calls this transmission between clearinghouses a "hop." United depicted how hops occur, and the difficulties of disintermediating Change's EDI clearinghouse, in an internal document:



40.     Each EDI clearinghouse through which claims data passes has access to all of the information contained in the claims data. To use that data, a clearinghouse must have "secondary-use" data rights. A clearinghouse can obtain secondary-use rights from *either* the health insurer *or* provider. The data can then be analyzed to learn about an insurer's plan and policy design, the costs of claims it pays, its provider network, and its proprietary payment rules.

> 2.     Change's EDI Clearinghouse Has Unmatched Breadth, Providing a Vital Avenue for Transmission of Health Insurers' Claims and Claims Data to Providers

41.     Change operates the largest EDI clearinghouse in the nation, transmitting over 14 billion total transactions (medical and other) through its EDI clearinghouse every year. According to United, over 50 percent of U.S. medical claims pass through (or touch) Change's EDI clearinghouse, making it a vital link between providers and insurers. In 2019, Change told potential investors that the "Change Healthcare network is by far the broadest and deepest network in the country." In that same presentation, Change explained that it achieves "flywheel effects" through its scale and data, creating compounding value.

42.     Change's EDI clearinghouse is thought to be used by more providers than any rival clearinghouse. Thus, even if a health insurer does not have a direct connection to Change's EDI clearinghouse, a significant portion of that insurer's claims and claims data will "hop" to Change's EDI clearinghouse because of Change's extensive provider connections.

43.     As an independent EDI clearinghouse that is not owned by a health insurer, Change works closely with its health insurer customers to improve healthcare technology and reduce costs. For example, Change is developing a tool that would give providers faster confirmation of claim acceptance. Providers would be paid faster, and health insurers would spend fewer resources and adjudicate claims more quickly. Health insurers are projected to realize significant additional savings by implementing this tool. Change also has a "Strategic Advisory Council" that maintains its close relationships with its insurer customers. But for the Proposed Transaction, Change would continue to have strong incentives to develop innovations that benefit its provider and health insurer customers alike, and the healthcare system more broadly.

       3.    <u>Change's Broad Data Repository and Data Rights Are at the Heart of the Proposed Transaction</u>

44.     Change sees and collects the claims data that flows through its EDI clearinghouse. Change has accumulated a massive data set of claims data, unique in its breadth, going back to 2012. Its data set includes claims data from virtually all of UnitedHealthcare's most significant rivals and is growing rapidly. In 2019, for example, Change's executives told their board that three billion new claims are added each year. As United has recognized, Change "maintains the highest volume of claims and penetration across EDI companies" and its access to United's health insurance rivals' data "differentiates" Change from United.

45.     Change also has secured from providers and health insurers the right to use much of this claims data for its own business purposes, provided that certain personally identifiable information has been removed. The claims data that flows through Change's clearinghouse includes competitively sensitive information about health insurers' plans and policies.

46.     United's desire to acquire this wealth of claims data from Change was a driving motivation for the Proposed Transaction. In the period leading up to the acquisition, United executives repeatedly expressed in ordinary course business documents that the Change purchase was motivated by the desire to acquire Change's rights to claims data. United's due diligence led it to conclude that Change had secondary-use rights to over 60 percent of the claims data that passes through its EDI clearinghouse.

47.     While United desires claims data from its rivals, it closely guards its own claims data to ensure that competitors cannot gain access. United requires its business units to limit the disclosure of data outside of United "to the minimum necessary" and restricts data licenses to third parties if the licenses primarily benefit a significant competitor. Indeed, OptumInsight's CEO testified that OptumInsight would continue its policy of licensing UnitedHealthcare's claims data only to non-competitors, such as pharmaceutical companies. United's internal policies reflect the competitive importance of data to UnitedHealthcare and to the commercial health insurance industry generally.

    4.   United Operates Its Own EDI Clearinghouse Primarily for Its Own Use

48.     United owns an EDI clearinghouse through its OptumInsight subsidiary. This EDI clearinghouse serves as the managed gateway for all incoming claims to UnitedHealthcare.

49.     Until 2020, United marketed its EDI clearinghouse to healthcare providers and health insurers. Today, however, United claims that it no longer markets its EDI clearinghouse services to non-United providers, and only provides services to a handful of legacy health

insurers in addition to UnitedHealthcare itself. Instead, United's EDI clearinghouse routes most non-UnitedHealthcare claims to the second-largest EDI clearinghouse after Change.

### C.     Overview of Claims Editing Solutions

#### 1.     Claims Editing Technology

50.     After a provider sends a claim to a health insurer, the insurer must review the claim for errors and determine whether and how much to pay the provider for the healthcare service rendered to the patient. Large health insurers receive millions of healthcare claims each day, so they must quickly determine whether the claim should be paid under the health plan's terms. Health insurers' overriding goal is to ensure that claims are paid accurately (according to the plan's policies) and promptly. By ensuring that claims are paid accurately, insurers protect their members from overpaying and reduce administrative costs for processing claims. Health insurers also seek to reduce overall medical costs, while avoiding erroneously rejecting claims or delaying payment so as to not frustrate providers and members.

51.     In an effort to meet these goals, most health insurers purchase a claims editing solution from a third-party vendor. Claims editing solutions comb through each insurer's numerous rules, or "edits," to apply the relevant rules and automatically evaluate claims for errors. This software, for example, could apply edits to deny a claim for an individual lab test code when the test is part of a bundled lab panel on the same claim. Health insurers determine which edits to apply, including some edits that the insurer develops on its own and others developed in collaboration with a claims editing solution vendor, such as Change.

52.     When healthcare claims are adjudicated, they first go through primary, or "first-pass," editing. Health insurers rely on first-pass claims editing solutions to review every claim received.

53. Claims are processed in real time during the first-pass claims editing phase, *i.e.*, the claim is immediately sent to the claims editing solution and is processed within milliseconds. This first-pass claims editing solution determines whether claims should be paid, rejected, or flagged for further review.

54. Once the first-pass claims editing solution reviews a claim, some claims go through a "second-pass" claims editing solution to find issues that may not have been identified. Unlike first-pass claims editing, second-pass claims editing does not typically occur in real time and is only applied to a subset of claims.

55. Health insurers prefer to edit claims as early as possible in the review process. Denying a claim that is not covered by the plan prior to payment is generally less costly than trying to recover money from a provider after the claim has already been paid. First-pass claims editing solutions are particularly important to large health insurers, which need high-speed claims editing solutions that can process millions of claims a day in real time. First-pass claims editing solutions save patients and health insurers billions of dollars each year by reducing costs and preventing overpayment, which makes healthcare more affordable for Americans than it would be otherwise.

56. First-pass claims editing solutions vendors often develop long-term relationships with health insurers, working together to create custom edits that are tailored to each health insurer's plans, policies, operating rules, and provider contracts. This extensive customization and strong collaboration create greater savings for the health insurer but also make switching claims editing solutions time consuming, costly, and disruptive to the insurer's business.

57.     Health insurers must update their claims editing rules frequently to stay current with changing regulatory and compliance guidelines, evolving treatment protocols, and their own changing health plan policies.

58.     Health insurers develop their own proprietary custom edits, and custom edits are a dimension of competition among insurers. Effective edits reduce medical and administrative costs to the health insurer and increase provider and member satisfaction by ensuring appropriate medical treatment while also processing claims quickly and accurately. Prior to implementing a particular edit in the claims adjudication process, an insurer must determine whether the benefits (*e.g.*, reduction of medical or administrative costs) will outweigh any risks (*e.g.*, making the health insurer less attractive to providers and members, both of which could switch to a competing insurer).

59.     A health insurer's edits provide important insight into how the insurer adjudicates its claims. The information contained in claims edits—such as health plan policies and methodologies for calculating reimbursements—is very competitively sensitive. Claims edits are one means by which insurers differentiate themselves from their competitors.

> 2.     Change and United Are the Top Two Vendors of First-Pass Claims Editing Solutions

60.     Change is the top vendor of first-pass claims editing solutions, with a market share of over 50 percent. Change is viewed as the "gold standard, market-leading solution" for claims editing, and its ClaimsXten product is used by nine of the top ten health insurers—all but UnitedHealthcare. In 2020, Change reported that its first-pass claims editing solution saved its health insurer customers $10–$15 billion per year.

61.     United's CES product is Change's most significant competitor in first-pass claims editing, with a market share of over 25 percent.

22

62.     Change's and United's first-pass claims editing solutions collectively serve 38 of the top 40 health insurers in the country. If allowed to merge, they would have a combined market share of at least 75 percent.

63.     Change's independence stands in contrast to United. United's largest health insurer rivals do not purchase claims editing solutions from United because they do not want to share their edits, which embody their proprietary plan and payment rules, with a competitor. Internally, United refers to its health insurer rivals' desire to avoid buying products from United as the "U-Factor." Before the Proposed Transaction, health insurers could avoid United by buying Change's first-pass claims editing solution. If this transaction is allowed to proceed, this alternative will vanish, and United's health insurance rivals would have no choice but to use a United-owned first-pass claims editing solution.

## IV.    RELEVANT MARKETS

### A.    The Sale of First-Pass Claims Editing Solutions in the United States Is a Relevant Market

64.     United and Change compete for the sale of first-pass claims editing solutions in the United States.

####     1.    The Sale of First-Pass Claims Editing Solutions is a Relevant Product Market

65.     The sale of first-pass claims editing solutions is a relevant product market under Section 7 of the Clayton Act.

66.     First-pass claims editing solutions, which include the first-pass claims editing software as well as the associated services, apply real time edits (*i.e.*, rules) early in the claims review process. There are no reasonable alternatives to first-pass claims editing solutions.

67.     First-pass claims editing solutions are distinct products from second-pass claims editing solutions. First-pass claims editing solutions quickly process a high volume of claims in

real time using each health insurer's full library of edits, whereas second-pass claims editing

solutions typically involve a narrower set of edits applied to a subset of claims and cannot

process in real time.

68.    Vendors, such as United and Change, and their health insurer-customers

distinguish between first- and second-pass claims editing solutions in the ordinary course of

business.

69.    The sale of first-pass claims editing solutions satisfies the well-accepted

"hypothetical monopolist" test set forth in the Department of Justice and Federal Trade

Commission's *Horizontal Merger Guidelines* ("Horizontal Guidelines"). A hypothetical

monopolist selling first-pass claims editing solutions would likely impose a small but significant

and non-transitory price increase without losing sufficient sales to render that price increase

unprofitable.

        2.    <u>The United States Is the Relevant Geographic Market for the Sale of First-Pass Claims Editing Solutions</u>

70.    The United States is the relevant geographic market for the sale of first-pass

claims editing solutions under Section 7 of the Clayton Act. A hypothetical monopolist of first-

pass claims edit solutions in the United States could profitably impose a small but significant and

non-transitory increase in price. Such a price increase would not be defeated by substitution

away from first-pass claims editing solutions in the United States or by arbitrage, for example,

by purchasing first-pass claims editing solutions outside of the United States. Thus, this

geographic market satisfies the hypothetical monopolist test.

**B.**    **The Sale of Commercial Health Insurance to National Accounts in the United States Is a Relevant Market**

71.    UnitedHealthcare competes in the sale of commercial health insurance to national

accounts throughout the United States.

24

1.   The Sale of Commercial Health Insurance to National Accounts Is a Relevant Product Market

72.     The sale of commercial health insurance to national accounts is a relevant product market under Section 7 of the Clayton Act.

73.     National accounts are distinct customers with unique characteristics. They typically require a provider network covering multiple states, undertake a lengthy procurement process that involves requests for proposals to select health insurance plans, hire large consulting firms to aid in evaluating and selecting an insurer or insurers, and want flexible and customized benefit designs. UnitedHealthcare and other insurers have dedicated business units focused on selling and marketing to national accounts. UnitedHealthcare also maintains separate profit and loss statements for national accounts. UnitedHealthcare charges different prices and offers different plan benefits for national accounts than it does for other types of commercial health insurance customers.

74.     The sale of commercial health insurance to national accounts satisfies the well-accepted "hypothetical monopolist" test. Under the Horizontal Guidelines, relevant markets may be defined around a group of customers that could be profitably targeted for price increases. Because health insurance is a significant employment benefit, a hypothetical monopolist of commercial health insurance sold to national accounts would likely impose a small but significant and non-transitory price increase without losing sufficient sales to render that price increase unprofitable. In response to the price increase, few national accounts would stop buying commercial health insurance for their employees. Similarly, few national accounts would self-supply insurance and build their own provider networks by contracting directly with doctors and hospitals and processing all of their employees' healthcare claims themselves. Because arbitrage

(the reselling of a product from one customer to another) is impossible, national accounts could

not avoid a price increase by buying health insurance from other employers.

2.   The United States Is a Relevant Geographic Market for the Sale of
Commercial Health Insurance to National Accounts

75.   The United States is a relevant geographic market under Section 7 of the Clayton

Act for the sale of commercial health insurance to national accounts. National accounts

headquartered in the United States seek health insurers with nationwide provider networks and

have similar nationwide insurer options.

76.   This geographic market satisfies the hypothetical monopolist test, as national

accounts headquartered in the United States do not have reasonable substitutes to purchasing

commercial health insurance from insurers doing business in this country. National accounts

would not close their offices and move their companies to different countries in response to a

small but significant and non-transitory increase in the price of commercial health insurance.

**C.   The Sale of Commercial Health Insurance to Large Group Employers in
Various Local Markets Is a Relevant Market**

77.   UnitedHealthcare competes in the sale of commercial health insurance to large

group employers in local markets throughout the United States.

1.   The Sale of Commercial Health Insurance to Large Group Employers Is a
Relevant Product Market

78.   The sale of commercial health insurance to large group employers is a relevant

product market under Section 7 of the Clayton Act.

79.   Large group employers are a distinct set of customers. As set by state law, large

group consists of employers with more than 50 employees (or, in four states, more than 100

employees). Health insurers that sell to them do not need to follow various regulatory

requirements applicable to small groups, including limitations on factors that can be used in

determining rates and other licensing and rate-filing requirements. UnitedHealthcare and other health insurers have dedicated business units focused on selling and marketing to large group employers. UnitedHealthcare regularly distinguishes large group employers in its business reviews and strategic plans. UnitedHealthcare charges large group employers different prices and offers different plan benefits than it does for other types of commercial health insurance customers.

80.     The sale of commercial health insurance to large group employers satisfies the well-accepted "hypothetical monopolist" test set forth in the Horizontal Guidelines. Because large group employers offer health insurance to attract and retain employees, a hypothetical monopolist of commercial health insurance sold to large group employers would likely impose a small but significant and non-transitory price increase without losing sufficient sales to render that price increase unprofitable. In response to the price increase, few large group employers would stop buying commercial health insurance for their employees. Similarly, large group employers are unlikely to build their own provider networks and administer their health plans themselves. Large group employers cannot avoid a price increase by purchasing commercial health insurance from other employers.

2.     The Relevant Geographic Markets for the Sale of Commercial Health Insurance to Large Group Employers

81.     The relevant geographic markets for the sale of commercial health insurance to large group employers are the core-based statistical areas (CBSAs) that are metropolitan statistical areas (MSAs) in the United States. These areas include more than 285 million people—over 85 percent of all Americans. Each CBSA that is an MSA is a relevant geographic market for the sale of commercial health insurance to large group employers under Section 7 of the Clayton Act.

82.     When purchasing commercial health insurance, large group employers want health insurers to offer healthcare provider networks in the areas where their employees live and work. In each of these CBSAs, large group employers do not view insurance companies that lack a meaningful provider network in that area as reasonable substitutes for those that offer such a network.

83.     Each of these markets satisfies the "hypothetical monopolist test" for the sale of commercial health insurance to large group employers. In each of these CBSAs, large group employers are unlikely to move their offices to a different area in response to a small but significant and non-transitory increase in the price of commercial health insurance.

## V.     <u>ANTICOMPETITIVE EFFECTS</u>

84.     The Proposed Transaction would likely substantially lessen competition and harm consumers in the aforementioned relevant markets in three ways.

- *First*, by giving United broad access to its health insurer rivals' competitively sensitive information through Change's first-pass claims editing solution and EDI clearinghouse, the Proposed Transaction is likely to substantially lessen competition in the markets for the sale of commercial health insurance to national accounts and large group employers.

- *Second*, United's acquisition of Change's first-pass claims editing solution and EDI clearinghouse would enable United to raise the costs of its health insurance rivals, reducing their ability to compete with UnitedHealthcare. This would likely substantially lessen competition in the markets for the sale of commercial health insurance to national accounts and large group employers. Post-transaction, United could raise its health insurance rivals' costs through means such as denying or

delaying their access to innovations that would provide greater efficiency in claims processing.

- *Third*, United and Change are the two most significant competitors in the first-pass claims editing solutions market, with a combined market share of at least 75 percent. The Proposed Transaction would eliminate head-to-head competition between United and Change and tend to create a monopoly in that market. The Proposed Transaction is presumptively unlawful under longstanding Supreme Court precedent and the Horizontal Guidelines.

As a result, the Proposed Transaction would likely harm millions of Americans by leading to lower-quality, less innovative, and more costly commercial health insurance.

### A. The Proposed Transaction Would Likely Substantially Reduce Competition in the Relevant Health Insurance Markets by Giving United Access to Its Rivals' Competitively Sensitive Information

85.     Through its first-pass claims editing solution and EDI clearinghouse, Change has access to vast quantities of competitively sensitive information from United's health insurance rivals. By acquiring Change, United would obtain that competitively sensitive information and could use it to lessen the competition it would otherwise face absent the Proposed Transaction.

1.     United Gaining Access to Its Health Insurance Rivals' Competitively Sensitive Information Through Change's First-Pass Claims Editing Solution Is Likely to Substantially Lessen Competition in the Sale of Commercial Health Insurance to National Accounts and Large Group Employers

86.     As the first-pass claims editing vendor of choice for United's largest health insurance rivals, Change works with its health insurer-customers to incorporate the insurers' proprietary edits into the customer's claims editing solutions. Change's first-pass claims editing solution is known to drive the highest savings for health insurers—a figure between three and eight percent of annual total claim costs. These savings yield cost savings for national accounts

and large group employers, which often subsidize their employees' healthcare costs. These savings also translate into cost savings for employees and their families, who in turn pay lower health insurance premiums. Thus, the custom edits applied by Change's ClaimsXten product affect a plan's cost structure. An insurer's custom edits also provide a roadmap to its health plan and reimbursement policies and its risk allocation methodologies. For these reasons, insurers view their custom edits as competitively sensitive.

87.     Custom edits affect competition in the national accounts and large group markets. National accounts and large group employers evaluate and choose health insurers on their cost-containment strategies. These strategies are embodied, in part, in the health insurer's customized edits. Health insurers can differentiate themselves from rivals by implementing innovative edits that help their employer-customers combat unnecessary costs and make healthcare more affordable for employees and their families.

88.     United currently does not have access to its most significant rivals' customized claims edits because these health insurer rivals use Change's first-pass claims editing solution rather than United's offering. Post-transaction, United would have access to its health insurer rivals' proprietary edits through ClaimsXten. With this data, UnitedHealthcare would have the ability to disadvantage its rivals, including by mimicking their innovative policies to make their rivals' healthcare plans less attractive to customers (relative to UnitedHealthcare). This would reduce the rivals' incentives to innovate in claims edits, which would also reduce innovation in commercial health insurance plan and provider network design. As a result, United would no longer independently pursue commercial health insurance innovation as it would have absent this inside information of its rivals.

89.     Innovation competition among health insurers would likely decline, because rival insurers would know that United could identify and appropriate the innovation through its access to the innovator's competitively sensitive edits. This harm to innovation would reduce competition in the sale of commercial health insurance to national accounts and large group employers, resulting in less affordable or lower quality plans.

90.     Because there is no viable alternative to a first-pass claims editing solution, and with the merged firm having over 75 percent of that market, health insurer rivals would have little choice but to use the merged firm's first-pass claims editing solutions and expose their competitively sensitive information to United. Moreover, switching first-pass claims editing solutions is a significant undertaking and it would be difficult and risky for United's insurer rivals to switch away from ClaimsXten, even if a comparable solution were available.

2.     <u>United Gaining Access to Rivals' Competitively Sensitive Information Through Change's EDI Clearinghouse Is Likely to Substantially Lessen Competition in the Sale of Commercial Health Insurance to National Accounts and Large Group Employers</u>

91.     The Proposed Transaction would allow United to use much of the data flowing through Change's market-leading EDI clearinghouse. United would gain the ability to use its health insurance rivals' competitively sensitive information to advantage itself and diminish competition in the sale of commercial health insurance to national accounts and large group employers.

92.     Switching EDI clearinghouses is a significant undertaking for health insurers and would be difficult and resource intensive.

93.     Even health insurers that decide not to contract directly with Change could not escape the consequences of United's ownership of Change by "going around" Change's EDI clearinghouse. This is because health insurers cannot avoid routing many EDI transactions

through Change's EDI clearinghouse. Change has over one million connections with providers, and those providers' claims will "hop" from Change to the insurer's EDI clearinghouse even if the health insurers seek to avoid doing business with Change and its EDI. A health insurer is unlikely to be able to respond to the Proposed Transaction by inducing all of its in-network providers to directly connect with the insurer or shift volume away from Change's EDI clearinghouse. Finally, even if health insurer rivals could avoid Change going forward, they could do nothing about the decade's worth of historic data, representing billions of claims, that Change has collected as an independent company.

94.     Today, United has limited access to the competitively sensitive information of its health insurer rivals that is obtained through EDI clearinghouses. Through ownership of Change's EDI pipes, however, United would have access and the right to use the claims data of health insurer rivals. United could use this competitively sensitive information when making decisions related to UnitedHealthcare's plan designs, benefits, provider network designs, and coverage terms. United already applies artificial intelligence and machine learning capabilities to its own claims data to, among other things, optimize its claims processing capabilities and generate administrative and medical cost savings. Post-transaction, United would be able to apply these artificial intelligence and machine learning capabilities to the claims data of its insurer rivals, giving itself exclusive competitive intelligence about its rivals, learning both from the historic and new claims data. At the same time, United would likely deny its health insurer rivals access to this pool of data, as well as to United's claims data and any insights gained from it. It would be difficult and improbable for those rivals to replicate the decade of historical data or the immense volume of data collected each day from competing insurers.

95.     Using the claims data from Change's EDI clearinghouse, United could also reverse engineer its insurer rivals' claims edits, even if it did not also own ClaimsXten. This access would reveal key insights about health insurer rivals' health plan policies, including plan design and reimbursement methodologies. These information asymmetries would distort competition, leaving health insurer rivals less able to compete for large group and national accounts customers.

96.     United would likely also use this EDI information advantage to identify which national accounts and large group employers are better insurance risks (and thus most profitable). United could then bid on the most profitable accounts and groups with the benefit of its one-sided inside look at its competitors' claims data. United's asymmetric use of this competitively sensitive information to selectively bid on the most profitable national accounts and large employer groups, while avoiding bids on riskier accounts and groups, would create a less-competitive market for commercial health insurance.

97.     United's rival health insurers would perceive United as having the strong motivation to use the rival insurers' data obtained through Change, and United would indeed have that motivation because the profits in the relevant health insurance markets are significantly larger than the profits for Change's EDI clearinghouse.

98.     United's newfound ability to access rivals' competitively sensitive information obtained from Change's EDI clearinghouse would harm innovation in the national accounts and large group markets. United would be in a position to identify and poach profitable innovations in plan design, benefits, provider network design, reimbursement design, and coverage terms from its competitors without bearing the cost and development risks. Faced with this prospect,

health insurer rivals would forgo innovation rather than subsidize United in competition against them.

**B.     The Proposed Transaction Is Likely to Substantially Reduce Competition in the Relevant Health Insurance Markets by Giving United the Ability and Incentive to Raise Its Rivals' Costs**

99.     Acquiring Change would give United the ability and incentive to raise its health insurance rivals' costs. Change's first-pass claims editing solution and EDI clearinghouse, which many of United's rivals use to compete against United, are critical inputs in the provision of health insurance. Given the great financial reward of obtaining national accounts and large group customers from its rivals, United would be incentivized to use its control over Change to weaken its rivals and thereby reduce competition in the relevant health insurance markets.

1.     Acquiring Change's Claims Editing Solution Would Give United the Ability and Incentive to Raise Its Rivals' Costs

100.     United's largest health insurer rivals rely on Change's ClaimsXten claims editing solution as a critical input that delivers billions of dollars in medical cost savings. Currently, Change has the incentive to make its claims editing innovations available to all its insurer-customers, and without the Proposed Transaction that incentive would continue; ClaimsXten itself was originally an innovation created by working with one of Change's insurer-customers. National accounts and large group employers—and their employee-members—benefit from these savings through lower premiums, medical expenditures, and copayments. After the transaction, United could raise its health insurer rivals' costs by charging higher prices for first-pass claims editing solutions or by delaying or withholding service, updates, or innovations that its rivals would have had absent the transaction.

101.     These concerns are especially acute because United recognizes that insurers have few options other than Change for first-pass claims editing solutions. Even where an insurer has

other options, switching to a new vendor is costly, time-consuming, and disruptive. It would take competitors years to recreate the breadth of Change's library of edits and develop the necessary capability to shift a large health insurer to a new platform.

102.    Because the profits in the relevant health insurance markets are significantly larger than the profits in the first-pass claims editing market, United would have the incentive to raise its rivals' costs to lessen the competition it would otherwise face in the relevant health insurance markets, even if it meant it lost some first-pass claims editing customers.

103.    Because United will have the ability and incentive to increase its health insurer rivals' costs, the Proposed Transaction is likely to substantially lessen competition in the sale of commercial health insurance to national accounts and large group employers.

2.    Acquiring Change's EDI Clearinghouse Would Give United the Ability and Incentive to Raise Its Rivals' Costs

104.    As an independent company, Change is incentivized to pursue EDI clearinghouse innovations that benefit all health insurers using its product. As Change noted, "being neutral allows us to work on use cases that benefit the entire healthcare system." Absent the transaction, an independent Change would be well positioned, including through Change's existing provider relationships, to pursue certain innovations. Post-transaction, however, United would have the incentive to weaken its health insurer rivals by withholding or delaying their access to such innovations. This would render the insurer rivals less-effective competitors, thereby harming competition in the relevant health insurance markets.

105.    United could use its control of Change's EDI clearinghouse as additional leverage in dealing with UnitedHealthcare's rivals by threatening to suspend service to those rivals—by "dropping them to paper" and sending those claims via paper rather than through the EDI clearinghouse—unless they concede to United's demands. "Dropping to paper" would have dire

35

consequence for insurers' competitiveness given the costs, time, and loss of accuracy associated with processing claims without an EDI clearinghouse. This also would lead to provider and member frustration with the insurers, resulting in reputational harm to the insurers. Post-transaction, United would have the incentive and ability to exploit its rivals' fear of this threat to soften the competition UnitedHealthcare faces in its national accounts and large group businesses. The threat of being dropped to paper would give United significant leverage when negotiating contractual provisions, including provisions for claims data rights.

106.    The merged firm would have substantial incentive to use Change's EDI clearinghouse to raise health insurer rivals' costs. The profits obtained by UnitedHealthcare from gaining national accounts and large group employers from its rivals would be greater than the loss of profits from withholding EDI innovations or from losing customers that decline to purchase EDI clearinghouse services from the merged firm.

107.    The Proposed Transaction would degrade the health insurance choices available to employers. National accounts and large group customers would have to either: (1) choose a UnitedHealthcare rival and suffer reduced levels of service due to lower-quality EDI clearinghouse service, or (2) choose UnitedHealthcare as their insurer and likely pay higher prices for poorer quality than would have been the case in a market with a competitive, independent Change. Either way, national accounts and large group employers—and their enrollees—would be worse off without an independent Change; innovation would be reduced and competition among health insurers would be lessened.

**C.**     **The Proposed Transaction Would Likely Substantially Lessen Competition and Tend to Create a Monopoly in First-Pass Claims Editing Solutions**

108.     United's acquisition of Change would eliminate important competition between them for the sale of first-pass claims editing solutions, resulting in health insurer-customers facing higher prices, lower quality, and reduced access to claims-editing innovations.

      1.     <u>The Proposed Transaction Is a Presumptively Illegal Combination of the Two Leading First-Pass Claims Editing Solutions</u>

109.     The Supreme Court has held that mergers that significantly increase concentration in already concentrated markets are presumptively anticompetitive and, therefore, presumptively unlawful. Courts often use the Herfindahl-Hirschman Index (HHI), as described in the Horizontal Guidelines, to measure market concentration. HHIs range from 0, in markets with no concentration, to 10,000, in markets where one firm has 100 percent market share. According to the Horizontal Guidelines, mergers that both increase the HHI for a given market by more than 200 and result in an HHI above 2,500 are presumed to be anticompetitive.

110.     Change and United are the largest and second largest vendors of first-pass claims editing solutions, with a combined market share of at least 75 percent. The Proposed Transaction would increase the HHI by at least 2,000 points and result in a post-merger HHI of at least 6,400, making the transaction presumptively anticompetitive.

      2.     <u>The Proposed Transaction Would Eliminate Head-to-Head Competition Between United and Change in the Sale of First-Pass Claims Editing Solutions</u>

111.     United and Change compete vigorously against each other in the market for first-pass claims editing solutions. Three months before the transaction was announced, United executives described Change as the "#1 competitor for first pass" claims editing, and noted that United was "[s]econd behind Change for primary editing."

112.     United and Change often compete head-to-head to win customers' contracts. This competition has resulted in lower prices to insurers for first-pass claims editing solutions. For example, United regularly approves 20-25 percent discounts for customers when competing with Change. In a 2019 bid, United gave an insurer a "sweetheart deal to win them away" from Change. Similarly, Change executives and sales representatives have recommended and approved discounts as high as 30 percent in response to price pressure from United. Due to the "U-Factor," United's customers generally consist of small and mid-size insurers, but even United's largest health insurance competitors will get quotes from OptumInsight in an attempt to gain a competitive discount from Change.

113.     Health insurers rely on the competition between United and Change to secure reduced pricing, better contract terms, and higher-quality and innovative products. If allowed to proceed, the Proposed Transaction would eliminate this intense competition for first-pass claims editing solutions, leading to higher prices and reduced quality and innovation.

## VI.     THE MERGER SHOULD BE ENJOINED

114.     In each of the relevant markets, the Proposed Transaction is likely to substantially lessen competition, resulting in lower quality, less innovation, or higher prices.

115.     A substantial lessening of competition in any relevant market is a violation of Section 7 of the Clayton Act and is sufficient for the Court to enjoin the Proposed Transaction in its entirety.

## VII.     ABSENCE OF COUNTERVAILING FACTORS

116.     The Proposed Transaction is unlikely to generate verifiable, merger-specific efficiencies in the relevant markets sufficient to prevent or outweigh the significant anticompetitive effects that are likely to occur.

117.    New entry or expansion by existing first-pass claims editing solutions is unlikely to prevent or remedy the transaction's likely anticompetitive effects in the relevant markets. There are high barriers to entry, such as technical capabilities, the resources needed to develop and maintain edit libraries, and experience with sophisticated health insurers. Customers also face high switching costs when choosing a new first-pass claims editing solution.

118.    New entry or expansion by existing EDI clearinghouses is also unlikely to prevent or remedy the transaction's likely anticompetitive effects in the relevant markets. There are high barriers to entry, such as technical capabilities and the resources needed to establish relationships with providers and insurers and develop a deep repository of claims data. Moreover, because United's rivals cannot disintermediate Change's EDI clearinghouse, entry or expansion would not ameliorate the competitive harm.

119.    Restoring competition is the key to any effective antitrust remedy. The only acceptable remedy for an anticompetitive merger is one that completely resolves all of the competitive problems created by the merger. Defendants bear the burden of showing that any remedy they propose meets these standards. United has proposed divesting Change's ClaimsXten business in an attempt to remedy the anticompetitive effects of this merger. Change has had some discussions with potential buyers, but has not entered into a purchase agreement. Defendants have not proposed any remedy that would preserve competition and prevent the anticompetitive effects of this merger.

120.    Efforts to cordon off a health insurance rival's competitively sensitive information obtained from Change's EDI clearinghouse and first-pass claims editing solutions through information firewalls would be insufficient to protect against the risk of United accessing and using this information. This is especially true given (1) United's longstanding interest in

acquiring this competitively sensitive data; (2) the frequent movement of employees, including senior executives, between Optum and United subsidiaries who would be in a position to gain insights into United's health insurance rivals while working for Optum and bring those insights to any future work for UnitedHealthcare; and (3) the regular enterprise-wide planning that United conducts, which involves its business unit executives from United, Optum, and UnitedHealthcare.

## VIII.   JURISDICTION, VENUE, AND COMMERCE

121.    Plaintiff United States brings this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

122.    Plaintiffs Minnesota and New York, by and through their respective Attorneys General, bring this action in their respective sovereign capacities and as *parens patriae* on behalf of the citizens, general welfare, and economy of their respective States under their statutory, equitable, or common law powers, and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

123.    Defendants are both engaged in, and their activities substantially affect, interstate commerce. United sells health insurance and healthcare technology to customers across the United States and owns healthcare practices in many states. Change sells critical healthcare technology to health insurers, healthcare providers, and other customers across the United States. Defendants' sales have a substantial effect on interstate commerce. The Court therefore has subject-matter jurisdiction over this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

124.     The Court has personal jurisdiction over each Defendant. Defendants transact business within this District and have agreed not to contest personal jurisdiction in this District.

125.     Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391.

## IX.     VIOLATIONS ALLEGED

126.     Plaintiffs incorporate the allegations of paragraphs 1 through 125 above.

127.     Unless enjoined, United's proposed acquisition of Change is likely to substantially lessen competition, and tend to create a monopoly, in interstate trade and commerce in the relevant markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

128.     The acquisition would likely have the following anticompetitive effects, among others, in the relevant markets:

      i.    United would gain the ability and incentive to obtain and use its rivals' competitively sensitive information, harming the competitive process in the sale of commercial health insurance to national accounts and large group employers;

      ii.    United would gain the ability and incentive to raise its rivals' costs, harming the competitive process in the sale of commercial health insurance to national accounts and large group employers;

      iii.    competition between United and Change in the sale of first-pass claims editing solutions would be eliminated prices of first-pass claims editing solutions would likely increase to levels above what would prevail absent the transaction, and the quality of first-pass claims editing solutions would

41

likely be reduced compared to what would prevail absent the transaction; and

iv.  competition and innovation in the relevant markets would be reduced generally.

## X.     REQUEST FOR RELIEF

129.   The Plaintiffs request that the Court:

a.     adjudge and decree United's acquisition of Change to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

b.     permanently enjoin Defendants from consummating United's proposed acquisition of Change or from entering into or carrying out any other agreement, understanding, or plan by which Change would be acquired by, acquire, or merge with United;

c.     award each Plaintiff an amount equal to its costs incurred in bringing this action on behalf of its citizens; and

d.     grant Plaintiffs such other relief as the Court deems just and proper.

Dated: February 24, 2022

Respectfully Submitted,


**FOR PLAINTIFF UNITED STATES OF AMERICA:**


_____/s/ Doha G. Mekki_____
DOHA G. MEKKI
Principal Deputy Assistant Attorney General
Antitrust Division


_____/s/ Carol L. Sipperly_____
CAROL L. SIPPERLY
Acting Deputy Assistant Attorney General
Antitrust Division


_____/s/ Craig W. Conrath_____
CRAIG W. CONRATH
Director of Civil Litigation


_____/s/ Eric D. Welsh_____
ERIC D. WELSH (DC Bar ##998618)
Chief
Healthcare and Consumer Products Section


_____/s/ Jill C. Maguire_____
JILL C. MAGUIRE (DC Bar #979595)
Assistant Chief
Healthcare and Consumer Products Section

_____/s/ Bindi R. Bhagat_____
BINDI R. BHAGAT
BENJAMIN ABLE
JOSEPH ADAMSON
JARED T. BOND
MARKUS BRAZILL
JANET J. BRODY
JESSICA N. BUTLER-ARKOW (DC Bar# 430022)
TRAVIS R. CHAPMAN
VITTORIO E. COTTAFAVI
JEREMY C. KEENEY (DC Bar #1029015)
A. MAYA KHAN
GRACE LEE (DC Bar # 198304)
JOHN D. LINDERMUTH
GARRETT M. LISKEY (DC Bar #1000937)
RICHARD MOSIER (DC Bar #492489)
MARK ROHAN (DC Bar# 177193)
SPENCER SMITH (DC Bar # is 1720226)
DAVID M. STOLTZFUS
EMMA WAITZMAN (DC Bar #1738427)
JENNIFER A. WAMSLEY (DC Bar# 486540)
Trial Attorneys

U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4100
Washington, DC 20530
Telephone: (202) 598-8681
Fax: (202) 307-5802
Email: Eric.Welsh@usdoj.gov

**FOR PLAINTIFF STATE OF MINNESOTA:**

KEITH ELLISON
Attorney General
State of Minnesota


_____/s/ Elizabeth Odette_____
ELIZABETH ODETTE (MN Bar #0340698)
Assistant Attorney General
James W. Canaday (MN Bar #030234X)
Deputy Attorney General
Jason Pleggenkuhle (MN Bar #0391772)
Assistant Attorney General
Katherine Moerke (MN Bar #0312277)
Assistant Attorney General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
elizabeth.odette@ag.state.mn.us
Telephone: (651) 757-1028
james.canaday@ag.state.mn.us
Telephone: (651) 757-1421
jason.pleggenkuhle@ag.state.mn.us
Telephone: (651) 757-1147
katherine.moerke@ag.state.mn.us
Telephone: (651) 757-1288

*Attorneys for Plaintiff State of Minnesota*

**FOR PLAINTIFF STATE OF NEW YORK:**

LETITIA JAMES
Attorney General

_____/s/ Christopher D'Angelo_____
Christopher D'Angelo (D.C. Bar No. 502220)
Chief Deputy Attorney General, Economic Justice Division
Christopher.D'Angelo@ag.ny.gov
Elinor R. Hoffmann, Chief, Antitrust Bureau
Elinor.Hoffmann@ag.ny.gov
Amy McFarlane, Deputy Chief, Antitrust Bureau
Amy.Mcfarlane@ag.ny.gov
Olga Kogan, Assistant Attorney General
Olga.Kogan@ag.ny.gov
Benjamin Cole, Assistant Attorney General
Benjamin.Cole@ag.ny.gov
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8262

*Attorneys for Plaintiff State of New York*