## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:22-cv-0481 (CJN) |
| UNITEDHEALTH GROUP INCORPORATED, *et al.*, | |
| *Defendants*. | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* TO STRIKE EXHIBITS, AND PROHIBIT DEFENDANTS FROM INTRODUCING UNTIMELY PRODUCED DOCUMENTS, ANY RELATED EVIDENCE, AND ANY SUMMARIES THEREOF

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 3

LEGAL STANDARD ..................................................................................................... 7

ARGUMENT .................................................................................................................. 8

I.      Plaintiffs' Motion Violates Local Rule 7's Meet-And-Confer Requirement. ................... 8

II.     Plaintiffs Cannot Show That The Production Of Signed Contractual Commitments Were Untimely Or Prejudicial. ..................................................... 9

III.    Plaintiffs Cannot Show That The Production Of Publicly-Available And Other Limited Documents Was Untimely Or Prejudicial. ......................................... 14

       A.     RFPs for Trial Documents. ........................................................................ 15

       B.     Duplicate Documents (DX-0194; DX-0199; DX-0220; DX-0224; DX-0233) ...................................................................................................... 15

       C.     Recently Created Documents (DX-0213; DX-0223; and DX-0234 to DX-0239) ...................................................................................................... 15

            1.    Rule 1006 Summaries. ..................................................................... 16
            2.    Divestiture Employee Census ........................................................... 16
            3.    June 2022 Industry Presentation ....................................................... 17
            4.    Customer Transitions from Change to Availity .................................. 17
            5.    Documents Not Responsive to RFPs .................................................. 17

CONCLUSION .............................................................................................................. 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

**Page(s)**

*Abbott GmbH & Co. KG v. Yeda Rsch. & Dev. Co.*,
   576 F. Supp. 2d 44 (D.D.C. 2008) ........................................................................8

*Burns v. Levy*,
   2019 WL 6465142 (D.D.C. Dec. 2, 2019) .....................................................7, 8, 13

*Docker v. Hall*,
   2018 WL 11424781 (S.D. Miss. Feb. 8, 2018) .......................................................10

*English v. Washington Metro. Area Transit Auth.*,
   293 F. Supp. 3d 13 (D.D.C. 2017) .........................................................................8

*Iweala v. Operational Techs. Servs., Inc.*,
   2010 WL 11583114 (D.D.C. Apr. 13, 2010) .........................................................10

*Lurensky v. Wellinghoff*,
   271 F.R.D. 345 (D.D.C. 2010) .............................................................................10

*Mobile Telecomms. Techs., LLC v. United Parcel Serv., Inc.*,
   2015 WL 11199065 (N.D. Ga. Mar. 25, 2015), *R. & R. adopted*, 2015 WL
   11199151 (N.D. Ga. Apr. 21, 2015) ......................................................................10

*Navajo Nation v. Urb. Outfitters, Inc.*,
   2016 WL 3475338 (D.N.M. Feb. 9, 2016) .........................................................9, 13

*Oak Creek Inv. Props., Inc. v. Am. Elec. Power Serv. Corp.*,
   2020 WL 5089391 (W.D. Ark. Aug. 28, 2020) ....................................................12

*United States ex rel. Morsell v. NortonLifeLock, Inc.*,
   567 F. Supp. 3d 248 (D.D.C. 2021) ..................................................................7, 8

*United States v. AT&T, Inc.*,
   310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) ...........2, 11, 12, 14

*United States v. Baker Hughes Inc.*,
   908 F.2d 981 (D.C. Cir. 1990) (Thomas, J.) ........................................................11

*United States v. Philip Morris USA Inc.*,
   2022 WL 1101730 (D.D.C. Apr. 13, 2022) ..........................................................14

*United States v. Philip Morris USA, Inc.*,
   219 F.R.D. 198 (D.D.C. 2004) ..........................................................................9, 13

*Zrihan v. Wells Fargo Bank, N.A.*,
   2014 WL 348197 (D. Ariz. Jan. 31, 2014) ..............................................................................12

**Rules**

D.D.C. L. Civ. R. 7(m) ..........................................................................................................8

Fed. R. Civ. P. 26 ..................................................................................................................10

Fed. R. Civ. P. 37 ..................................................................................................................7

Fed. R. Evid. 1006 ................................................................................................................16

**<u>INTRODUCTION</u>**

Plaintiffs' motion *in limine* seeks to exclude plainly relevant evidence of contractual commitments, offered by UnitedHealth Group Incorporated (UHG) and executed by Change Healthcare Inc.'s (Change) customers, related to post-transaction data protection, EDI performance standards, and the marketing of innovations and insights (if any).  It also lumps in a hodgepodge of publicly-available web pages and other documents not called for by Plaintiffs' discovery requests, the production of which does not prejudice Plaintiffs in any concrete way. Plaintiffs' motion is without merit and does not even bother to attach (or meaningfully describe) the exhibits they seek to exclude.

*First*, Plaintiffs seek to exclude any evidence of UHG's contractual commitments offered to tens of thousands of Change customers, despite the fact that:

- UHG and Change discussed these commitments with the Department of Justice—upon request—and produced a written description of these commitments before the complaint was filed in February 2022;

- UHG and Change included a description of the commitments they were willing to offer in their answers to the complaint;

-  UHG and Change produced the template letter and contractual commitments to be sent to Change's customers, along with a mailing list for all customer recipients, in May 2022 on the same date they were finalized for distribution;

- Plaintiffs had the opportunity to ask fact witnesses about these commitments during discovery and, in fact, questioned UHG's CEO, Change's CEO, and the parties' Rule 30(b)(6) representatives about them; and

- Plaintiffs received the actual letters sent to Change's customers in early-June 2022.

Although Plaintiffs' motion does not mention it, the only "new" information introduced by DX-0214 and DX-0767 were pre-paid postage envelopes and the signatures and identities of customers who executed the contractual amendments included in those commitment letters.  It was eminently reasonable for UHG and Change to wait until they had a critical mass of customer responses to

produce the pre-paid postage envelopes and signature pages at issue.  There is no conceivable prejudice from the production of this information, which directly bears on the Court's evaluation of the future state of the market.  *See United States v. AT&T, Inc.*, 310 F. Supp. 3d 161, 217 n.30, 241 n.51 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).  Plaintiffs' request to exclude DX-0214 and DX-0767 therefore should be denied.

**Second**, the sixty-seven other Change exhibits (DX-0171 to DX-0197 and DX-0199 to DX-0239) were timely produced along with UHG's and Change's exhibit list on June 30, 2022. Plaintiffs argue that all were responsive to their First and Second Set of Requests for Production (RFPs), which requested materials "that you expect to use in any hearing, motion, or trial in this [l]awsuit," but all of the documents at issue were identified as potential exhibits only shortly before they were added to the exhibit list.  The overwhelming majority of the exhibits are publicly-available websites and other documents not responsive to any of the Plaintiffs' First Set of RFPs; a handful that were responsive are duplicates of documents otherwise produced; and the only remaining documents were created shortly before they were added to the exhibit list.  It should have been obvious to Plaintiffs that many of these were not untimely produced: more than half are publicly available, many were already cited in UHG's and Change's letters to Plaintiffs during the investigation, and others were on their face not untimely, including DX-0213, a presentation which states on the first slide that it was presented at a conference held June 26-29, 2022, just days before it was produced.  Had Plaintiffs engaged in the required meet-and-confer process before filing this motion, they would have learned information, like date of creation, for the other documents that would have made clear that none were untimely.

## FACTUAL BACKGROUND

Far from being dropped into Plaintiffs' laps after the close of fact discovery, UHG and Change have been transparent for months about the customer commitments they were willing to make to Change's EDI and data solutions customers.

In an effort to alleviate Plaintiffs' concerns about the transaction, UHG informed Plaintiffs in early 2022 that it would make commitments to Change's customers related to data protection, EDI performance standards, and innovations and insights (if any) derived from medical EDI data. UHG mentioned these commitments in a meeting with Plaintiffs on February 17, and the next day Plaintiffs asked for a description of "any additional commitments, such as those that [UHG counsel] mentioned yesterday, that the parties are willing to make to ensure that [UHG] would not use Change's EDI clearinghouse to advantage itself relative to rival insurers." *See* PX596 at UHG-LIT-01672120.   UHG responded on February 21, describing the "amendments to customer contracts" it was willing to make to address Plaintiffs' concerns:

- **Firewall Policies**: For Change's EDI customers, UHG agreed to maintain commercially reasonable firewall policies, and "provide Change medical EDI network customers with a copy" of such policies "for the protection of CSI."  UHG further agreed to "provide an annual report to each such customer certifying compliance (or identifying company-specific violations, if any) with UHG's policies."

- **Performance Guarantees**: "To the extent not already included within Change's contracts with its customers, UHG will offer an amendment to ensure that Change's medical EDI transaction processing is not degraded post-transaction."

- **Non-Discrimination in Innovations**: "To the extent that UHG develops new products and services or improves upon existing products and services ('innovations') by using medical EDI transaction data from non-UHG entities that have permitted such use, and such innovations are commercially viable, UHG will make these innovations available as soon as reasonably practical and on a non-discriminatory basis to non-UHG entities."

- **Data Insights**: "To the extent Change's contracts permit, and consistent with Change's current practices, UHG will make available to non-UHG entities at commercially reasonable rates aggregated, de-identified data received through Change's medical EDI network . . . ."

*See* 6/16/22 Witty Dep. Ex. 27; Witty Dep. Ex. 28.  Three days later—and without explaining why these commitments would not resolve their concerns—Plaintiffs filed suit.  *See* Compl. (ECF No. 1)

UHG stood by those proposed commitments in answering the complaint.  UHG's answer specifically stated: "in an effort to address [Plaintiffs'] concerns—as speculative and implausible as they were—UHG agreed to make binding commitments to its customers."  UHG's Answer (ECF No. 37) ¶ 14.  "In particular, UHG agreed to: (1) not alter Change's current practice of making certain aggregated, de-identified data available externally to the marketplace; (2) maintain its robust firewall processes—and extend them to Change's business—to protect sensitive customer data and provide information to customers to allow them to verify those firewall processes; (3) continue to process EDI transactions consistent with industry standards and in the most efficient, contractually available manner; and (4) consistent with Optum's current business practices, make any new products or services developed using medical EDI transaction data available to the marketplace."  *Id.*  As UHG explained, "[b]ecause UHG has no intent or economic incentive to do otherwise, all of those commitments are sleeves off UHG's vest."  *Id.*

The process of drafting and coordinating the sending of those commitments, which includes a meaningful contractual amendment applicable to tens of thousands of customers, understandably took some time.  But nearly a month before the close of fact discovery, on May 27, 2022, UHG and Change provided Plaintiffs a template of the ***exact*** text of the letters and proposed amendments they would send to Change's customers, along with lists of ***all*** customers to which the commitments would be sent.  *See* 5/27/22 Email from L. Oliver to T. Chapman et al. (attaching commitment templates and distribution lists); PX700.  The template for Change's EDI customers states:

- **Firewall Policies**: "UHG will maintain commercially reasonable firewall and information security policies to protect Customer's Confidential Information from being disclosed to UHG's health insurance, health plan administrative services, or health care provider business.  Upon request, which shall be made no more than once annually, UHG agrees to conduct a review of Customer's Confidential Information … and to provide a report to Customer identifying any violations of UHG's firewall and information security policies relating to the disclosure of Customer Confidential Information and the corrective actions undertaken to resolve such violations."

- **Performance Guarantees**: "UHG agrees to provide medical EDI clearinghouse services at levels consistent with Change's current medical EDI clearinghouse network service level and all applicable industry standards and regulations."

- **Non-Discrimination in Innovations**: "If the UHG subsidiary into which Change's medical EDI clearinghouse business is integrated or operated develops new products and services, or improves upon existing products and services, by using Change's medical EDI clearinghouse transaction data, and if that subsidiary makes such products and services available to a UHG entity outside of a limited pilot or development trial, it also will make such products and services available to Customer as soon as reasonably practicable and at commercially reasonable rates."

*See id*.  The template for Change's data solutions customers also stated that UHG would "continu[e] Change's business of making aggregated or de-identified data, and insights and benchmarking derived from it, available in the marketplace in the same manner as Change does today."  *See* DX-0168.  UHG and Change produced the actual letters sent to Change's EDI and data solutions customers on June 9, almost two weeks before the close of fact discovery.  *See* DX-0168; DX-0169.

Plaintiffs conducted discovery on these commitments over the course of several weeks and introduced them in exhibits in the depositions of UHG's CEO, *see* 6/16/22 A. Witty Dep. Tr. 350:19-361:14 & Exs. 26-28, Change's CEO, *see* 6/13/22 N. de Crescenzo Dep. Tr. 45:21-61:21 & Exs. 2-4, and Steve Yurjevich, OptumInsight's COO, who was named as UHG's corporate representative on the topic of "[a]ll remedies offered by United to address any alleged or actual competitive effects of the [t]ransaction, such as the [d]ivestiture or [b]ehavioral [r]emedies."  Mr. Yurjevich was prepared to, and did, answer all of Plaintiffs' questions about this topic, *see* 6/21/22

S. Yurjevich (UHG Rule 30(b)(6)) Dep. Tr. 221:19-228:5 & Ex. 32.  Plaintiffs likewise questioned Change's Rule 30(b)(6) representative, Michael Trotti, about the commitments, *see* 6/8/22 M. Trotti (Change Rule 30(b)(6)) Dep. Tr. 170:25-177:21 & Ex. 19, with ***Plaintiffs*** choosing "not [to] ask[] any questions about any individual customers" on the "675-page" list they had received, *id.* at 171:5-177:21.

The principal focus of this motion is Plaintiffs' effort to exclude ***any*** evidence related to commitments offered by UHG to Change's customers, including DX-0214 and DX-0767.  DX-0214 is a compilation of 2,225 documents reflecting customers' responses to the templates, including 658 responses that were received by Change after the close of fact discovery.  *See* Pls.' Mot. *in Limine* to Strike Exs., & Prohibit Defs. from Introducing Untimely Produced Docs., Any Related Evid., & Any Summaries Thereof ("Mot.") (ECF No. 72-1) at 4 & n.1.  More specifically, DX-0214 contains (1) pre-paid postage envelopes that were returned to Change by its customers and (2) executed contract amendments (which are identical to the templates Defendants produced to Plaintiffs on May 27).  *See, e.g.*, DX-0214.  Change received the executed amendments on a rolling basis, and a critical mass was produced on June 30, just nine days after the close of fact discovery.  DX-0767 is a summary exhibit of the responses Change has received.  *See* DX-0767.

Certain other materials at issue in Plaintiffs' motion include:

- publicly-available web pages not called for by Plaintiffs' document requests, *see* DX-0171; DX-0173 to DX-0191; DX-0193; DX-0196 to DX-0197; DX-0201 to DX-0208; DX-0211; DX-0215; DX-0222; DX-0232;

- a 2004 patent for real-time claim processing, DX-0209;

- a draft press release (publicly available in final form) describing a 2020 ethics award received by Change, DX-0211;

- contract supplements, *see* DX-0200; DX-0216 to DX-0217; DX-0219; DX-0221; DX-0225 to DX-0228; DX-0231;

- a data elements spreadsheet and claims submission statistics, *see* DX-0172; DX-0192;

- a series of presentations, including a medical network presentation, a real-time settlement competitive landscape presentation, and a presentation from a public conference, *see* DX-0194; DX-0212; DX-0213

- a KLAS software and services report, *see* DX-0220;

- a divestiture financial model, confidential information memorandum about the divestiture, and employee census, *see* DX-0199; DX-0224; DX-0233;

- data integrity council documents and materials and Change's artificial intelligence and machine-learning compliance policy, *see* DX-0210; DX-0229; DX-0230; and

- summary exhibits based on previously-produced documents and certain transaction data, *see* DX-0234 to DX-0239.[1]

On July 13, Plaintiffs filed their motion to exclude these documents. Plaintiffs' motion does not attach the documents or describe them in any meaningful detail. Nor did Plaintiffs meet and confer with UHG and Change before filing their motions. This opposition follows.

## LEGAL STANDARD

A federal district court has "inherent authority" to entertain motions *in limine* to address evidentiary issues in advance of trial. *United States ex rel. Morsell v. NortonLifeLock, Inc.*, 567 F. Supp. 3d 248, 258 (D.D.C. 2021). This extends to motions to exclude evidence on timeliness grounds, which are addressed by interlocking provisions of Federal Rules of Civil Procedure 26 and 37. *See id.*; *Burns v. Levy*, 2019 WL 6465142, at *18 & n.14 (D.D.C. Dec. 2, 2019). Rule 26(e) requires a party to supplement its discovery responses with material, undisclosed information "in a timely matter." *See* Fed. R. Civ. P. 26(e)(1). Rule 37(c)(1) in turn prohibits a party from using information that it "fail[ed] to provide" as required by Rule 26(e), "unless the failure was substantially justified or is harmless." *See* Fed. R. Civ. P. 37(c)(1). "[P]reclusion of evidence is

---

[1]   Plaintiffs appear to have erroneously requested exclusion of DX-0195, Cigna's public comments on the U.S. Department of Health & Human Service's ("HHS") proposed transparency rules, which was used as Exhibit 5 in the Rule 30(b)(6) deposition of HHS on June 10, before the close of fact discovery.

an extreme sanction," not to be undertaken lightly.  *See Morsell*, 567 F. Supp. 3d at 271 (citation

omitted); *accord Burns*, 2019 WL 6465142, at *18.

<u>**ARGUMENT**</u>

**I.      Plaintiffs' Motion Violates Local Rule 7's Meet-And-Confer Requirement.**

Plaintiffs' motion fails at the outset because it violates Local Civil Rule 7(m).  Local Civil

Rule 7(m)—which Plaintiffs concede governs here—provides: "[b]efore filing any nondispositive

motion in a civil action, counsel shall discuss the anticipated motion with opposing counsel in a

good-faith effort to determine whether there is any opposition to the relief sought and, if there is,

to narrow the areas of disagreement."  *See* D.D.C. L. Civ. R. 7(m); Mot. (ECF No. 72-1) at 1

("Pursuant to Rule 7 of the Rules of the United States District Court for the District of Columbia

. . . [Plaintiffs] respectfully move the Court to strike . . . portion[s] of Defendants' exhibit list

. . . .").  To ensure compliance with that obligation, Local Civil Rule 7(m) further requires a party

"include in its motion a statement that the required discussion occurred, and a statement as to

whether the motion is opposed."  D.D.C. L. Civ. R. 7(m).

Plaintiffs did not even try to comply with their meet-and-confer obligations, nor did they

include in their motion a statement that those obligations were satisfied—both independent reasons

to deny Plaintiffs' requested relief.  "Courts in this District have previously denied non-dispositive

motions for failure to comply with Local Civil Rule 7(m)," including motions *in limine*.  *See*

*English v. Washington Metro. Area Transit Auth.*, 293 F. Supp. 3d 13, 16 (D.D.C. 2017) (collecting

cases); *Abbott GmbH & Co. KG v. Yeda Rsch. & Dev. Co.*, 576 F. Supp. 2d 44, 47-49 (D.D.C.

2008).  Plaintiffs have not offered any justification for failing to meet and confer with UHG and

Change, and their motion should be denied.

## II.     Plaintiffs Cannot Show That The Production Of Signed Contractual Commitments Were Untimely Or Prejudicial.

The Court should not exclude DX-0214 and DX-0767.  Plaintiffs' motion ignores that the documents in question were being created during the discovery period itself and that UHG and Change have been clear with Plaintiffs for at least five months that they were undertaking a process to create, distribute, and produce the contractual commitments at issue.

Even before the complaint was filed in February 2022, Plaintiffs received a written description of the contractual commitments UHG and Change intended to provide Change's customers.  *See* Witty Dep. Ex. 27.  Then, with almost a month left in fact discovery, Plaintiffs received the exact template (and actual copies) of the letters sent, as well as a mailing list for all EDI and data solutions customers that would receive the letters.  *See* Witty Dep. Ex. 28; DX-0168; DX-0169.  Plaintiffs had the opportunity to (and did) question UHG's and Change's witnesses about these commitments, and in fact, Plaintiffs ***introduced*** them as deposition exhibits.  *See* 6/16/22 A. Witty Dep. Tr. 350:19-361:14 & Exs. 26-28; 6/13/22 N. de Crescenzo Dep. Tr. 45:21-61:21 & Exs. 2-4; 6/21/22 S. Yurjevich (UHG Rule 30(b)(6)) Dep. Tr. 221:219-228:5 & Ex. 32; 6/8/22 M. Trotti (Change Rule 30(b)(6)) Dep. Tr. 170:25-177:21 & Ex. 19.

A little over three weeks after UHG and Change produced the template letters, Plaintiffs received the documents at issue in this motion: pre-paid postage envelopes and executed copies of contractual amendments the templates of which Plaintiffs had received over a month before.  There is no credible argument that Plaintiffs were unaware of the terms of UHG's and Change's proposed commitments or that many customers would accept them.  *See, e.g.*, *United States v. Philip Morris USA, Inc.*, 219 F.R.D. 198, 202 (D.D.C. 2004) ("Defendants were clearly and unquestionably aware of the existence of these advertisements and publications and their relationship to the comprehensive factual picture which the Government intends to present at trial."); *Navajo Nation*

*v. Urb. Outfitters, Inc.*, 2016 WL 3475338, at *3 (D.N.M. Feb. 9, 2016) ("Plaintiffs state that these documents were similar to a group of documents that Defendants produced at the outset of discovery, which belies Plaintiffs' contention that they were surprised by the documents."). The documents were "being created during the discovery period itself," and UHG and Change worked diligently to track, collect, and produce as many executed contractual commitments as possible. *See Docker v. Hall*, 2018 WL 11424781 (S.D. Miss. Feb. 8, 2018); *Mobile Telecomms. Techs., LLC v. United Parcel Serv., Inc.*, 2015 WL 11199065, at *3 (N.D. Ga. Mar. 25, 2015), *R. & R. adopted*, 2015 WL 11199151 (N.D. Ga. Apr. 21, 2015).

By proceeding in this fashion, UHG and Change acted in good faith and in full compliance with the Federal Rules and the Case Management Order. UHG and Change obviously could not have produced such documents before they were created, *see Iweala v. Operational Techs. Servs., Inc.*, 2010 WL 11583114, at *1-2 (D.D.C. Apr. 13, 2010); *Lurensky v. Wellinghoff*, 271 F.R.D. 345, 349 (D.D.C. 2010) ("Defendant cannot produce what it does not have."), and their discovery responses were appropriately supplemented as documents were created and a critical mass of responses from customers was received, *see* Fed. R. Civ. P. 26 advisory committee's notes to 1993 amendment ("Supplementations need not be made as each new item of information is learned but should be made at appropriate intervals during the discovery period, and with special promptness as the trial date approaches."). The Case Management Order, moreover, required only that the parties "make ***good-faith efforts*** to ***substantially*** complete responsive productions" within 28 days of a request for production. *See* Scheduling & Case Management Order (ECF No. 42) ¶ 14(a)(i) (emphases added). UHG and Change complied with that obligation, producing information about the commitment process as it became available and executed contractual amendments after a substantial amount were received and collected.

Plaintiffs' claim that they "were denied the opportunity to explore and test the[se] documents in depositions," Mot. at 4, therefore falls flat.  Plaintiffs *did* in fact question UHG's Rule 30(b)(6) representative about the commitments, including on whether UHG was "going to make any changes to the[] commitments" and whether "any additional commitments [were] being considered."  *See* 6/21/22 S. Yurjevich (UHG Rule 30(b)(6)) Dep. Tr. 227:20-228:5.  UHG confirmed that because "this document has been sent out to customers, . . . we would not be making changes" and that no additional commitments were under consideration.  *See id.*  Plaintiffs asked similar questions of Change's Rule 30(b)(6) representative, explicitly stating they had received "a 675-page PDF listing various customers," but would "not be asking any questions about any individual customers."  *See* 6/8/22 M. Trotti (Change Rule 30(b)(6)) Dep. Tr. 171:5-177:21.  It thus was *Plaintiffs* that made the strategic choice not to question UHG or Change in detail about the substance of the commitments, to whom they were sent, or any other matter related to responses or interactions with individual Change customers.

The reason is obvious and underscores why the production of DX-0214 resulted in no prejudice: Plaintiffs are not suggesting that the executed amendments in DX-0214 and reflected in DX-0767 are materially different from the template they received a month before the close of discovery (apart from the customers' signatures), nor are they making the fanciful claim that UHG and Change failed to send the letters.  The only aim of Plaintiffs' motion, therefore, appears to be the exclusion of the only marginally "new" information introduced by DX-0214 and reflected in DX-0767: evidence that the proposed amendments were actually signed.  That gambit is not consistent with the "comprehensive inquiry into future competitive conditions" required by the Clayton Act, and Plaintiffs' motion should be denied.  *See United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 165 (D.D.C. 2018); *see also United States v. Baker Hughes Inc.*, 908 F.2d 981, 988

11

(D.C. Cir. 1990) (Thomas, J.) ("Predicting future competitive conditions in a given market, as the statute and precedents require, calls for a comprehensive inquiry.").

As recognized in *United States v. AT&T Inc.*, 310 F. Supp. 3d 161 (D.D.C. 2018)—where the Department of Justice unsuccessfully moved to exclude commitments evidence on other grounds—contractual offers "have real-world effect" that factor into experts' analysis of a transaction and market conditions. *See AT&T*, 310 F. Supp. 3d at 217 n.30. Commitments like the ones offered here put a merging party's "money where [its] mouth is" and ensure there is at least a risk of significant "reputational costs" for "retreat[ing] from the commitment[s]" made to market participants. *See id.* at 241 n.51. Such costs can "imperil future negotiations in a marketplace with repeat players." *See id.* Plaintiffs therefore cannot credibly maintain they were "prevented" from addressing DX-0214 in their pre-trial brief, which will have been filed 20 days after the production of these materials, or that they "relied on a theory of the case now altered." Mot. at 10 (citations omitted). Plaintiffs have known the substance of the commitments at issue since before they filed this lawsuit, and still have ample opportunity to explore the significance of those signed commitments through expert testimony, exactly as happened in *AT&T*.

Finally, Plaintiffs have not explained the actual prejudice they have allegedly suffered (*i.e.*, the questions they would have asked, the information they did not receive, etc.). Courts will not impose the extreme sanction of preclusion based upon vague and sweeping assertions of prejudice. *See, e.g.*, *Zrihan v. Wells Fargo Bank, N.A.*, 2014 WL 348197, at *5 n.4 (D. Ariz. Jan. 31, 2014) (denying preclusion where "the parties' briefing fails to provide the [c]ourt with sufficient information to conduct a Rule 37(c)(1) analysis"); *Oak Creek Inv. Props., Inc. v. Am. Elec. Power Serv. Corp.*, 2020 WL 5089391, at *3-4 (W.D. Ark. Aug. 28, 2020) (rejecting a "broad[] claim that '***any*** evidence produced after the discovery deadline should be excluded'" without a specific

articulation of prejudice).  That is all Plaintiffs have offered here: there is hardly any "new information" in DX-0214 or the summary exhibit in DX-0767, and Plaintiffs had the exact text of commitments themselves nearly a month before the close of discovery, *see* DX-0168; DX-0169. *See, e.g.*, *Philip Morris*, 219 F.R.D. at 202; *Navajo Nation*, 2016 WL 3475338, at \*3.  There is no basis to conclude that the production of DX-0214 or the summary exhibit in DX-0767 was prejudicial in any way, and Plaintiffs' motion should be denied.

None of the remaining facts cited by Plaintiffs warrant the extreme sanction of preclusion either.  *See Burns*, 2019 WL 6465142, at \*18.

***Egregiousness.***  Plaintiffs marshal little-to-no evidence establishing any "egregious" conduct.  Plaintiffs' primary support for their contention that UHG and Change "knew they should produce documents related to commitments" is an email ***producing*** the exact text of the proposed amendments and a list of customers that would receive them.  *See* Mot. at 8.  That does not establish discovery misconduct—just the opposite, and the template production, along with the production of the letters themselves before the close of discovery, *see* DX-0168; DX-0169, gave Plaintiffs ample opportunity to depose UHG's and Change's Rule 30(b)(6) representatives.

***Deterrence.***  There is no "deterrence" achieved by precluding DX-0214 and, by extension, the summary contained in DX-0767 because there is no evidence that UHG or Change acted with the purpose or intent of keeping evidence from Plaintiffs.  *See Navajo Nation*, 2016 WL 3475338, at \*3 (declining to impose Rule 37(c)(1) sanction where "Plaintiffs have failed to make any showing that Defendants acted in bad faith or willfully").  To the contrary, UHG and Change have repeatedly informed Plaintiffs about the contractual commitments they intended to offer and made productions of materials as the process moved forward.

***Prejudice to the Judicial System.***   Plaintiffs likewise are incorrect that there is any prejudice to the judicial system.  Nothing about the production of DX-0214 "has interfered with the Court's ability to preside over an orderly and efficient discovery process." Mot. at 10 (citations omitted).  If anything, the exclusion of this evidence would prejudice the Court's ability to assess the future state of the market on a full record, which weighs heavily in favor of its admission.  *See AT&T*, 310 F. Supp. 3d at 217 n.30, 241 n.51.

***Proportionality.***   Finally, Plaintiffs' requested sanction is far out of proportion to any alleged harm Plaintiffs have suffered.  As explained above, Plaintiffs have not demonstrated any prejudice stemming from the introduction of pre-paid postage envelopes and executed contractual commitments, unsigned copies of which Plaintiffs had received nearly a month earlier.  *See United States v. Philip Morris USA Inc.*, 2022 WL 1101730, at *4 (D.D.C. Apr. 13, 2022) ("The central Rule 37 requirement is that 'any sanction must be just,' and given the Court's 'broad discretion' on the matter, it should be guided by the 'concept of proportionality' between the offense and the sanction." (citations omitted)).

## III.   Plaintiffs Cannot Show That The Production Of Publicly-Available And Other Limited Documents Was Untimely Or Prejudicial.

Plaintiffs contend that sixty-seven other Change documents produced with the exhibit list should be excluded because they should have been produced earlier in response to a combination of RFPs listed in their Exhibit 3.[2]  But the documents at issue either were created only shortly before they were added to the exhibit list, are not responsive to Plaintiffs' RFPs, are simply screenshots of public websites, or are duplicates of previously-produced documents.

---

[2] DX-0170 contains privileged information and inadvertently was included on Defendants' exhibit list.  Because Change has since clawed back DX-0170, Plaintiffs have acknowledged that their request to exclude that document is moot.  *See* Pls.' Notice that Defs. Have Mooted Part of Pls.' Mot. *in Limine* (ECF No. 76).

### A.    RFPs for Trial Documents.

Plaintiffs claim that all of the identified exhibits should have been produced in response to Plaintiffs' Second Set of RFPs, which call for documents "that you expect to use in any hearing, motion, or trial in this [l]awsuit."  Change only identified these documents as potential trial exhibits several days before they were listed on UHG's and Change's exhibit list, and Change could not have been expected to produce what it had not yet identified.  *See* Decl. of Preston Miller ¶ 4.

### B.    Duplicate Documents (DX-0194; DX-0199; DX-0220; DX-0224; DX-0233)

A number of exhibits challenged in Plaintiffs' motion—DX-0194; DX-0220; DX-0223; DX-0224; and DX-0233—are ***exact*** duplicates of previously produced documents: DX-0194 was produced at CHNG-008317710; DX-0199 at CHNG-011238172; DX-0224 at CHNG-012833508; DX-0233 at CHNG-013956209; and DX-0220 was produced ***three*** times in earlier productions, with the new exhibit differing only because it is color rather than black and white, *see* CHNG-007002214 to CHNG-007002442; CHNG-009549740 to CHNG-009549968; CHNG-001818332 to CHNG-001818560.  This cannot be a surprise to Plaintiffs, who already used duplicates of some of these documents in depositions, including DX-0224—the Confidential Information Presentation for the ClaimsXten divestiture—which was Exhibit 3 to the June 6, 2022 Carolyn Wukitch Deposition.

### C.    Recently Created Documents (DX-0213; DX-0223; and DX-0234 to DX-0239)

The remainder of Change's June 30 production cannot be untimely because these documents were created only after discovery closed on June 21 or after Change had completed its document collections and productions in response to Plaintiffs' RFPs.  *See* Decl. of Preston Miller ¶ 3.

1.    *Rule 1006 Summaries.*

Exhibits DX-0192 and DX-0235 to DX-0239 are all summary exhibits under Federal Rule of Evidence 1006, which permits the use of summaries, charts, or calculations "to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. DX-0235 to DX-0237 are calculations of volume loss based on transaction counts from Change's EDI network; DX-0238 to DX-0239 summarize contractual data rights provisions for certain Change customers; and DX-0192 is a calculation of EDI transaction volume lost by submitter as a result of the loss of Centene, a payer customer. In each case, Change produced to Plaintiffs all documents and data underlying the Rule 1006 summaries, and with the exception of a few contracts produced with the exhibit list, Plaintiffs have had this data and information for several months. Plaintiffs therefore cannot claim any prejudice from a lack of opportunity to "test" these documents: Rule 1006 contains just one requirement—that "[t]he proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Fed. R. Evid. 1006. Because those exhibits are based on data produced months ago, UHG and Change met this requirement, and in fact used nearly identical calculations in advocacy to the Plaintiffs much earlier in their investigation. *See* Feb. 12, 2021 Memorandum from Bates White to DOJ.

2.    *Divestiture Employee Census*

DX-0233 is a snapshot of Change's employee census for the ClaimsXten business as of June 29, 2022. Plaintiffs received earlier versions of the census in previous productions and used those versions in their depositions (*e.g.*, 6/6/22 C. Wukitch Dep. Exs. 13-14). Because the census is a document that is updated periodically, the more recent the document, the more accurate it is. In order to have the most accurate information in its exhibit, Change created DX-0233, which

reflects the most recent version of the employee census.  Plaintiffs cannot, and do not, articulate any prejudice, and DX-0233 should not be excluded.

       3.    *June 2022 Industry Presentation*

Exhibit DX-0213 is a presentation by third-party industry participants at the June 2022 Healthcare Financial Management Association conference.  The first page of this document indicates it was presented at a conference held from June 26-29, 2022, a week after the close of fact discovery and only a few days before it was produced to Plaintiffs.  It is self-evident that the production of this document was not untimely, and Plaintiffs should withdraw their challenge.

       4.    *Customer Transitions from Change to Availity*

DX-0234 is a document created on June 29, 2022 at the direction of Cindy Klain, a Change employee and testifying witness.  It was prepared by Change employees under Ms. Klain's direction to provide examples of the implementation timelines for customers seeking to transition to Availity's EDI clearinghouse.  It is intended to be used as a demonstrative at trial.

       5.    *Documents Not Responsive to RFPs*

Nor can Plaintiffs exclude DX-0172, DX-0200, DX-0216 to DX-0219, DX-0221, and DX-0224 to DX-0231, as those exhibits are not responsive to the RFPs Plaintiffs have identified.

***Customer Contracts (DX-0200, DX-0216 to DX-0219, DX-0221, DX-224 to DX-0231).***
Plaintiffs contend in their motion that the identified contracts would have been responsive to either RFP No. 7 or RFP No. 10.  These RFPs, however, request only "data."[3]  Plaintiffs' RFPs also

---

[3] RFP No. 7 requests "[d]ata sufficient to show which providers, payers, and submitters have or had a Direct connection with Change, including the transaction type for which they have the Direct connection and the time periods of such Direct connections."  RFP No. 10 requests "[a]ll data relating to Change's contractual rights to use Claims Data, including the name and all identifying information for the customer granting data rights (e.g., submitter ID, payer ID, TIN, NPI, parent-level entity, and affiliates), the time period for which Change has or had data rights, and the scope and categorizations of any data rights."

instructed Change to produce responses to data specifications "in an electronically sortable and searchable format (e.g., Excel or delimited text files)." *See* Mot. Ex. 1 at Instr. No. 13. Many of Plaintiffs' other RFPs specifically requested only "data," only "documents," or "documents and data." Moreover, Change had already produced its top 100 contracts in response to the Department of Justice's Second Request, which specifically requested "contracts." There is thus no reasonable construction of these RFPs that would call for the production of these contracts.

*ClaimsXten Data Fields Description (DX-0172).* DX-0172 is a document given to new ClaimsXten customers that describes the data fields used by Change's claims editing product. Plaintiffs argue this document is responsive to RFP No. 22, which requests "[d]ocuments sufficient to show all current or potential Change products or services that perform or will perform any Claims Edits, including all current or potential Change products or services that rely or may rely on the same source code, rules engine, content, or library of health insurer rules or edits as Change's Claims Editing products or services, or Claims Edits." But DX-0172 does not "show" a product at all; it shows a list of data fields that are used by a product. DX-0172 thus is not responsive to RFP No. 22.

*Descriptions of Change's Data Integrity Council.* Plaintiffs likewise are wrong that DX-0229 and DX-0230 are responsive to RFP No. 17, which requests certain information related to "(a) the Transaction, (b) the Lawsuit, (c) the investigation preceding the Lawsuit, (d) any proposed Divestiture, or (e) any actual or proposed commitments or agreements, including those referenced in Paragraph 14 of United's General Response in its Answer to the Complaint." Change Healthcare's Data Integrity Council is a standalone business initiative unrelated to any of the listed subjects, and documents on this subject therefore are not responsive to this RFP.[4]

---

[4] In addition, Plaintiffs month ago vetted and approved Change's Technology Assisted Review model, which was used to respond to Plaintiffs' RFPs. That model did not identify these

***Publicly-Available Documents and Documents Not In Agreed Upon Custodial Files.***
Nor are DX-0171, DX-0173 to DX-0191, DX-0195 to DX-0197, DX-0201 to DX-0209, DX-0215, DX-0222, and DX-0232 responsive to any of Plaintiffs' RFPs, as they are publicly-available documents not from the files of any agreed-upon custodian.  The documents themselves were captured from public websites immediately prior to production on June 30, and in fact, many of the underlying websites were cited over 6 months ago in UHG's and Change's submissions to Plaintiffs during the investigation phase, obviating any risk of prejudice.  These include DX-0171, DX-0175, and DX-0222 (cited in UHG's and Change's September 7, 2021 Letter from P. Miller to B. Bhagat & M. Brazill) and DX-0176 to DX-0191 (cited in UHG's and Change's January 3, 2022 document entitled "UHG's Acquisition of Change Healthcare Will Delivery Important Benefits to the Healthcare Industry Without Harm to Competition," provided to the Department of Justice).  The remaining exhibits (DX-0193 and DX-0210 to DX-0212) are from individuals at Change who are not named custodians; their documents thus were not called for by Plaintiffs' RFPs.  *See* Mot. Ex. 1 at App. A.

## CONCLUSION

Plaintiffs' effort to manufacture a dispute to exclude plainly relevant evidence fails on every score.  The Court should deny Plaintiffs' motion *in limine* and reject any effort to exclude DX-0214, DX-0767, or any of the remaining exhibits identified in Plaintiffs' motion.

---

documents for production, and thus they would not have been produced under the parties' agreement even if responsive to other RFPs.

Dated:  July 20, 2022

Respectfully submitted,

By:  */s/ Craig S. Primis*
    Craig S. Primis

Matthew J. Reilly, P.C. (D.C. Bar No. 457884)
Craig S. Primis, P.C. (D.C. Bar No. 454796)
Richard Cunningham (D.C. Bar. No. 1644119)
K. Winn Allen, P.C. (D.C. Bar No. 1000590)
T.J. McCarrick (D.C. Bar. No. 219283)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone:  (202) 389-5000
Facsimile:  (202) 389-5200
matt.reilly@kirkland.com
craig.primis@kirkland.com
rich.cunningham@kirkland.com
winn.allen@kirkland.com
tj.mccarrick@kirkland.com

Alexia R. Brancato (D.C. Bar No. 1018763)
**KIRKLAND & ELLIS LLP**
600 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
alexia.brancato@kirkland.com

Charles Loughlin (D.C. Bar. No. 448219)
Justin W. Bernick (D.C. Bar. No. 988245)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone:  (202) 637-5600
Facsimile:  (202) 637-5910
chuck.loughlin@hoganlovells.com
justin.bernick@hoganlovells.com

*Counsel for Defendant UnitedHealth Group
Incorporated*

Sara Y. Razi (D.C. Bar No. 473647)
Abram J. Ellis (D.C. Bar No. 497634)
Nathaniel Preston Miller (D.C. Bar No. 1021557)
**SIMPSON, THACHER & BARTLETT LLP**
900 G Street, NW
Washington, DC 20001
Telephone:  (202) 636-5500
Facsimile:  (202) 636-5502
sara.razi@stblaw.com
aellis@stblaw.com
preston.miller@stblaw.com

David I. Gelfand (D.C. Bar No. 416596)
Daniel P. Culley (D.C. Bar No. 988557)
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
2112 Pennsylvania Ave, N.W.
Washington, DC 20037
Telephone:  (202) 974-1500
Facsimile:  (202) 974-1999
dgelfand@cgsh.com

*Counsel for Defendant Change Healthcare Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 20th day of July 2022, a copy of the foregoing Defendants' Opposition to Plaintiffs' Motion *in Limine* to Strike Exhibits, and Prohibit Defendants from Introducing Untimely Produced Documents, Any Related Evidence, and Any Summaries Thereof was electronically transmitted to the Clerk of Court using the CM/ECF system, which will transmit notification of such filing to all registered participants.

/s/ *Craig S. Primis*

Craig S. Primis, P.C. (D.C. Bar No. 454796)