# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *et al.*,

    *Plaintiffs*,

    v.

UNITEDHEALTH GROUP INCORPORATED,
and CHANGE HEALTHCARE INC.,

    *Defendants*.

Civil Action No. 1:22-cv-00481 (CJN)

**FILED UNDER SEAL**

**[REDACTED VERSION]**

## PLAINTIFFS' PRETRIAL BRIEF

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................ 1

II.     DEFENDANTS AND THE PROPOSED TRANSACTION ...................................... 5

        A.      Defendants ...................................................................................................... 5

        B.      The Proposed Transaction .............................................................................. 8

III.    LEGAL STANDARDS ............................................................................................ 8

IV.     INDUSTRY BACKGROUND ............................................................................... 11

        A.      Commercial Health Insurance....................................................................... 12

        B.      Overview of Claim Submission and Clearinghouses.................................... 13

                1.      Claims Data and Clearinghouses ...................................................... 13

                2.      Secondary-Use Data Rights in Clearinghouses ............................... 16

                3.      Change's Clearinghouse Has Unmatched Breadth, Providing a Vital
                        Avenue for Transmission of Health Insurers' Claims and Claims Data to
                        Providers. ......................................................................................... 17

                4.      Change's Broad Data Repository and Data Rights Are at the Heart of the
                        Proposed Transaction....................................................................... 19

                5.      United Operates Its Own Clearinghouse Primarily for Its Own Use........ 20

        C.      Change and United Dominate the Market for First-Pass Claims Editing Solutions
                ........................................................................................................................ 21

V.      THE EFFECT OF THE TRANSACTION "MAY BE SUBSTANTIALLY TO LESSEN
        COMPETITION"....................................................................................................... 23

        A.      Relevant Markets .......................................................................................... 23

                1.      The Sale of First-Pass Claims Editing Solutions in the United States is a
                        Relevant Market............................................................................... 25

                        a.      First-Pass Claims Editing Solutions is a Relevant Product Market.
                                ................................................................................................ 25

                        b.      The United States is a Relevant Geographic Market for First-Pass
                                Claims Editing ........................................................................ 28

2.      The Sale of Commercial Health Insurance to National Accounts in the
        United States is a Relevant Market. ........................................................ 29

        a.      The Sale of Commercial Health Insurance to National Accounts is
                a Relevant Product Market. ............................................................ 29

        b.      The United States is a Relevant Geographic Market for the Sale of
                Commercial Health Insurance to National Accounts................... 31

        c.      Economic analysis establishes that the Sale of Commercial Health
                Insurance to National Accounts is a Relevant Market................. 31

3.      The Sale of Commercial Health Insurance to Large Groups in Various
        Local Markets are Relevant Markets. ...................................................... 32

        a.      The Sale of Commercial Health Insurance to Large Groups is a
                Relevant Product Market. .............................................................. 32

        b.      Local Markets are Relevant Geographic Market for the Sale of
                Commercial Health Insurance to Large Group Employers........... 34

        c.      Economic analysis shows that the Sale of Commercial Health
                Insurance to Large Group Employers are Relevant Markets. ....... 34

B.      The Proposed Transaction May Substantially Lessen Competition by Creating a
        Presumptively Illegal Combination of the Two Leading First-Pass Claims Editing
        Solutions. ............................................................................................................... 35

        1.      The Proposed Transaction Would Eliminate Head-To-Head Price and
                Quality Competition Between United and Change in the Sale of First-Pass
                Claims Editing Solutions. .......................................................................... 37

        2.      The Proposed Transaction Would Eliminate Head-To-Head Innovation
                Competition Between United and Change in the Sale of First-Pass Claims
                Editing Solutions....................................................................................... 39

C.      The Proposed Transaction May Substantially Lessen Competition in the Sale of
        Commercial Health Insurance to National Accounts and Large Group Employers
        by Giving United Control Over Rivals' Competitively Sensitive Information
        Through Change's Clearinghouse.......................................................................... 43

        1.      After the Proposed Transaction, United's Access to Rivals' Competitively
                Sensitive Information Through Change's Clearinghouse Would Allow
                United to Harm Competition and Reduce Competitive Incentives of Its
                Rivals. ...................................................................................................... 46

2.      HHS Transparency Regulations Would Not Eliminate the Harm from
United's Access to Rival Insurers' Claims Data........................................ 52

D.      The Proposed Transaction May Substantially Reduce Competition in the Sale of
Commercial Health Insurance to National Accounts and Large Group Employers
by Giving United the Ability and Incentive to Raise its Rivals' Costs Through
Change's Clearinghouse. ....................................................................... 54

E.      The Proposed Transaction Would Cause Similar Vertical Harms in First-Pass
Claims Editing ...................................................................................... 57

VI.    DEFENDANTS' JUSTIFICATIONS FOR THE PROPOSED TRANSACTION FAIL  62

A.      Defendants Cannot Rebut Plaintiffs' Prima Facie Case That the Proposed
Transaction Will Substantially Lessen Competition in First-Pass Claims Editing.
............................................................................................................ 62

B.      Defendants' Proposed Divestiture of ChangeXten Will Not Restore Competition
in the Market for First-Pass Claims Editing. ........................................... 64

C.      United's Purported Firewall Policies Will Not Mitigate the Harm to Competition
Caused by United's Acquisition of Change's Data Rights ......................... 68

D.      United's So-Called "Customer Commitments" Will Not Mitigate the Harm to
Competition Caused by United's Acquisition of Change's Data Rights........... 73

E.      Defendants' Vaguely Claimed Efficiencies Cannot Save this Transaction......... 74

VII.   TRIAL PRESENTATION ............................................................................. 76

VIII.  CONCLUSION ............................................................................................ 78

APPENDIX A ..................................................................................................... 79

# TABLE OF AUTHORITIES

**Cases**

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962). ............................................... 9, 10, 23, 24

*California v. Am. Stores Co.*, 495 U.S. 271 (1990). ....................................................................... 9

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)......................................... 68

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972)................................................................ 64

*Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997). ............................................................ 45

*FTC v. Advocate Health Care Network*, 841 F.3d 460 (7th Cir. 2016). ...................................... 27

*FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004). ............................................... 23, 36

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998) ................................................ 62

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989). ............................................................. 9

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001). ........................................................ passim

*FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160 (3d Cir. 2022). .................................. 27

*FTC v. Lockheed Martin Corp.*, No. 1:22-cv-00174-RDM (D.D.C. Jan. 27, 2022). .................. 45

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967). .................................................................... 9

*FTC v. Sanford Health*, 926 F.3d 959, 964 (8th Cir. 2019)......................................................... 27

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016). .......................................................... 37

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015). ...................................... 11, 25, 62, 64

*FTC v. Tronox, Ltd.*, 332 F. Supp. 3d 187 (D.D.C. 2018).......................................................... 24

*FTC v. University Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991). ................................................ 75

*FTC v. Wilh. Wilhemsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018)............................... 75

*Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986). ...................................................... 69

*In re Nvidia Corp.*, No. 9404 (F.T.C. Dec. 2, 2021)................................................................... 45

*Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012). ............................................................ 45

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015). ................................................................ 45

*Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 63 F.3d
    1540 (10th Cir. 1995)................................................................................................................. 45

*Premier Elec. Const. Co. v. National Elec. Contractors Ass'n*, 814 F.2d 358 (7th Cir. 1987).... 45

*ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559 (6th Cir. 2014)........................................... 27

*Sprint Nextel Corp. v. AT&T, Inc.*, 821 F. Supp. 2d 308 (D.D.C. 2011)..................................... 54

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775 (9th Cir. 2015).
    .......................................................................................................................................... 27, 74

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953). .......................................... 24

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017). .............................. 10, 11, 24, 64

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir.
    2017). ................................................................................................................................ passim

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017). ............................................ passim

*United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019)............................................... passim

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990)....................................... 10, 11

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011). ................................ passim

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963). ............................................ 9, 24

*Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657
    (S.D.N.Y. 2002).......................................................................................................................... 54

**Statutes**

15 U.S.C. § 18.......................................................................................... 9, 11, 25, 43

**Other Authorities**

Assistant Attorney General Jonathan Kanter Delivers Remarks on Modernizing Merger
  Guidelines (Jan. 18, 2022) ......................................................................... 44
Assistant Attorney General Jonathan Kanter Delivers Remarks to the N.Y. State Bar Association
  Antitrust Section (Jan. 24, 2022) ............................................................... 72
Assistant Attorney General Makan Delrahim Delivers Keynote Address at American Bar
  Association's Antitrust Fall Forum (Nov. 16, 2017). ................................... 72
S. REP. NO. 1775 at 4298 (1950)......................................................................... 9
Statement of Chair Lina M. Khan, Commissioner Rohit Chopra, and Commissioner Rebecca
  Kelly Slaughter on the Withdrawal of the Vertical Merger Guidelines (Sept. 15, 2021)......... 44
U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, HORIZONTAL MERGER GUIDELINES (2010).
  .............................................................................................................. passim
U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, VERTICAL MERGER GUIDELINES (2020). ...............
  ................................................................................................... 44, 45, 46
U.S. DEP'T OF JUSTICE, ANTITRUST DIVISION, MERGER REMEDIES MANUAL (2020) ................. 72

**Treatises**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Laws* (4th and 5th eds., 2015–2021)..... 45, 55

**Regulations**

Hospital Price Transparency, 84 Fed. Reg. 65524 (January 1, 2021). ........................................ 52
Transparency in Coverage, 85 Fed. Reg. 72158 (January 11, 2021)........................................... 52

## I.        INTRODUCTION

UnitedHealth Group ("United") owns the largest health insurer in the United States, UnitedHealthcare, as well as other healthcare companies. Now, United wants to take over Change Healthcare ("Change"), an independent healthcare technology company that works with many of United's most significant health insurer rivals to help them compete with United. United's proposed merger with Change would hurt competition in two ways.

First, it would give United a virtual monopoly (94 percent) of a key tool (a "first-pass claims editing solution") that health insurers use to determine whether a claim should be paid. United and Change both sell such a tool. Change's tool, ClaimsXten, is used by nine of the top ten health insurers—all but UnitedHealthcare.[1] United's executives describe Change as the "#1 competitor for first pass" and write that United is "Second" behind Change's ███████████ first-pass claims editing solution.[2] Competition between them is fierce and regularly benefits customers in the form of better pricing and quality. They often offer discounts as high as 30 percent for customers, or other (in their own words) "sweetheart" deals to win a customer away from each other.[3] Without competition, the costs of those services would increase. Further, customers would no longer benefit from the fierce competition that has driven innovation and improved the quality of these products.

Second, United would control Change's data clearinghouse, which United's rivals use to

---

[1] PX029 at 3.

[2] PX208 at UHG-2R-0017648819—820 ("Change . . . continues to be our #1 competitor for first pass" and CES is "[s]econd behind Change for primary editing"); PX328 at 7 ███████ ████████████████████████████████.

[3] PX327 at 1; PX034 at CHNG-000408828; PX107 at UHG-2R-0016217066.

compete with United. Change operates the largest data clearinghouse in the nation, one that transmits medical claims information and connects with more providers and insurers than any other. United's insurance rivals, directly or indirectly, use this interchange. For over half of the medical claims that it processes, Change has secondary-use rights which allow it to use the data for purposes other than processing claims for payment.

The proposed merger would give United power to regulate access, terms, and quality of the clearinghouse to its rivals that are customers of Change. And it would give United the ability to use its rivals' competitively sensitive information. United would have secondary-use data rights to ▮▮▮▮▮▮▮▮▮▮▮ commercial medical claims in the country.[4] These include claims data for UnitedHealthcare's strongest rivals, such as ▮▮▮▮▮▮▮▮▮▮▮.[5]

United intensely wants Change's claims data and data rights. Access to Change's secondary-use data rights for its claims data was "the foundation by which the business case was made" for United's $13 billion acquisition.[6] From this data, United could learn rival health insurers' (i) utilization management tools, (ii) negotiations of reimbursement rates with healthcare providers, (iii) healthcare provider network design, and (iv) the rules used to approve claims.[7] This type of information is ▮▮▮▮▮▮▮▮▮▮ for competition among health insurers.[8] With inside information about how its rivals compete, United could copy, co-opt, or forestall its

---

[4] Expert Report of Gautam Gowrisankaran, dated June 10, 2022 ("Gowrisankaran Report"), ¶ 178.

[5] *See, e.g.*, Golden (United) Dep. 142:17–143:3, 214:5–20.

[6] Wichmann (United) CID Dep. at 275:2–12.

[7] *See* Expert Report of Benjamin Handel, dated June 10, 2022 ("Handel Report"), ¶ 104–123.

[8] ▮▮▮▮▮▮▮▮▮▮▮

competitors' moves. The data's competitive significance is beyond reasonable dispute as current practice highlights. UnitedHealthcare's largest health insurance rivals do not grant OptumInsight secondary-use data rights, in order to keep their sensitive data from being shared with UnitedHealthcare. Similarly, United refuses to license UnitedHealthcare's data to firms that could use the data to compete with United.

But as a result of the proposed transaction, United could use its power and control over Change's data relating to its rival health insurers to harm competition. Today, Change touts itself as a ███████████████████████████████ with connections to 900,000 physicians and ████ insurers.[9] If the merger proceeded, however, Change would lose its independence, and United's rivals would not be able to disentangle their data from Change. According to United's internal documents, it has already identified opportunities to use the exact data and data rights that United seeks to acquire from Change to gain a competitive edge for United's own health insurance business. This is a key reason why United agreed to pay $13 billion to buy Change. With this asymmetric flow of competitively sensitive information, United could disadvantage its rivals, learning of their proprietary innovations and leading to price increases and quality reductions. As a result, United's competitors would also have less incentive to innovate and improve their own products, knowing that United would be able to see and steal those innovations for itself. The transaction would also give United total control over Change's services and the power to disadvantage United's competitors in many ways, including increasing costs, degrading quality, and withholding innovations.

Recognizing that the transaction obviously violates the antitrust laws, Defendants have

---

[9] PX248 at CHNG-001141426, -428.

offered flawed remedies. They propose to sell only a narrow sliver of Change, excluding important assets from parts of the business that United wants to keep. Currently, Change's first-pass claims editing business is part of integrated offerings and a suite of payment accuracy products and services that United is not willing to divest. United is also unwilling to divest an important innovation being undertaken by Change today using ClaimsXten—████████ ████████—viewed by the CEO of Change as █████████ and ████ to its future.[10] Many other resources currently supporting Change's first-pass claims editing business would not transfer as part of the divestiture, leaving the divested product weaker and less competitive than it is today.

Equally as flawed, United chose to try to sell the assets to a private equity company that is wholly unfamiliar with operating a claims-processing business. The divested business and its private equity owner would have neither the same competitive capabilities nor the incentives to invest in pursuing innovations that Change is currently developing for its customers. The prospective buyer is already planning ████████████████████████████████████ ████████ And United's rushed sales process to divest this business in response to Plaintiffs' concerns about the transaction underscores the flaws in this purported remedy. This divestiture simply would not replace the competition lost if this transaction is allowed to proceed.

Defendants will also argue that their purported "firewalls" and "commitments" to Change's customers (United's rivals), regarding United's use of their competitively sensitive information, are sufficient to allay any concerns on that issue. Firewalls will not work here. First,

---

[10] *See* PX543 at CHNG-000002923 ███████████████████████████████ ████████████████████████████; PX544 at CHNG-011516107 ████████████ ███████████████████████████████████████████████

the proposed firewall does not protect the sensitive data. At most, it prevents United from using data obtained from its competitors, but the data and the secondary-use rights at issue in many instances come from healthcare providers or channel partners—not health insurance competitors to UnitedHealthcare. Second, firewalls are not structural, so United would still receive access to some of its rivals' most sensitive information. Third, they do not change any incentive United would have to exploit that competitively sensitive information for the benefit of UnitedHealthcare, which is far more important to United's bottom line than OptumInsight or Change. Fourth, firewalls do nothing to address the reduced incentive that United's rivals would have to innovate knowing United would have access to data about their innovations. Fifth, the firewall promises are illusory as they could be changed at any moment. Finally, the firewalls would not resolve the competitive harm caused by the denial or delay of clearinghouse innovations to providers and insurers.

For the reasons discussed here, the proposed transaction between United and Change—in either its "original" form or with Defendants' purported "fixes"—violates Section 7 of the Clayton Act and should be permanently enjoined.

## II.   DEFENDANTS AND THE PROPOSED TRANSACTION

### A.   Defendants

*UnitedHealth Group.* United is not only the country's largest health insurer and one of its largest integrated healthcare companies—it is one of the ten largest companies by revenue in the United States. United's revenue in 2021 topped $287 billion.[11]

United is a serial acquirer and has bought more than a dozen companies in just the last

---

[11] PX830 at USDOJ-008-00001477.

ten years.[12] It operates the largest U.S. commercial health insurer (UnitedHealthcare or "UHC"). UnitedHealthcare's revenue in 2021 was approximately $222 billion.[13] United is also vertically integrated on several dimensions—it operates a series of companies that provide services to health insurers, generally using the Optum brand. This includes one of the largest pharmacy benefit management vendors (OptumRX), a significant provider network (OptumHealth), and a major healthcare technology business (OptumInsight). OptumInsight operates Claims Editing System (referred to by United as "CES"), Optum's first-pass claims editing solution, that directly competes with Change. OptumInsight also operates a clearinghouse that primarily processes insurance claims and other transactions for UnitedHealthcare. OptumInsight generated $12 billion in revenue for United in 2021, the majority of which came from products and services sold to other United subsidiaries, including UnitedHealthcare.

UnitedHealthcare generates a majority of CES's revenue. While some small and mid-size health insurers use United's CES for their first-pass claims editing needs, many of United's major health insurance competitors do not because they fear exposing their proprietary plans and payment rules to a company owned by United.[14] Optum recognizes the obstacle to growth it faces due to the "U-factor"—a euphemism for the reluctance that other large insurers have in dealing with Optum because Optum is owned by United.[15] Optum's clearinghouse is similarly focused on servicing UnitedHealthcare; it is the exclusive clearinghouse through which

---

[12] Witty (United) Dep. 261:22–262:2; 263:15–21.

[13] PX830 at USDOJ-008-00001478.

[15] *See, e.g.*, PX335 at 7.

UnitedHealthcare accepts claims from providers.[16]

    ***Change.*** Change Healthcare is a leading independent healthcare technology company that provides healthcare analytics, software, services, and data to a broad swath of customers across the healthcare industry, including both health insurers and healthcare providers. Change's market-leading first-pass claims editing solution, ClaimsXten, generates billions of dollars in savings for health insurers each year by utilizing a health insurer's proprietary business adjudication rules—also known as "claims edits"—to reduce medical and administrative costs. Change also operates a clearinghouse, which links healthcare providers, including hospitals and physicians, to health insurers. Change's clearinghouse transmits the vast majority of healthcare claims in the United States. Change has "secondary-use" rights, often referred to as "data rights," for much of the claims data that flows through its clearinghouse. This means that Change can use the data for other purposes, besides simply moving the data through the EDI pipes. Change's data set, which dates back to 2012, represents 211 million unique patients, covered by many different health insurers.[17] United would step into Change's shoes and own this data and the data rights as a result of the proposed transaction.

    Change's status as an independent company—one that sells products to both health insurers and healthcare providers, but that is owned by neither—is a significant part of its value to customers.[18] Today, Change is a close and valuable partner for insurers, working together

---

[16] Mckinney (United) Civil Investigative Demand ("CID") Dep. 61:12–17.

[17] PX141 at 6.

[18] *See, e.g.*, PX248 at 4 ███████████████████████████████ ; PX249 at CHNG-000083369 ███████
████████████████████████████████████████

"hand-in-glove" to innovate and problem solve to cut healthcare costs.[19] Change has the incentive to treat its customers fairly, and not to benefit one health insurer over another or to otherwise harm competition in the health insurance markets. United's bid to acquire Change would turn these incentives upside-down, putting Change—and the benefits it brings to its customers and to competition—under the control of the largest health insurer in the country.

### B.    The Proposed Transaction

United began considering how to buy Change, with its data and data rights, as early as 2015.[20] On January 5, 2021, United agreed to acquire Change for approximately $13 billion. Defendants recently agreed to extend the date by which the proposed transaction must close to December 31, 2022. Knowing that the transaction violates the antitrust laws, Defendants offered to divest a portion of Change's first-pass claims editing business, ClaimsXten, and make certain promises on information safeguards to Change's customers. As discussed in *infra* Section VI.B, these proposals fall far short of curing the harms to competition posed by the proposed transaction. In further recognition of the risk that the merger would be found unlawful under the antitrust laws, Change demanded—and United agreed—that United would pay Change $650 million if the deal does not go through.

## III.  LEGAL STANDARDS

Section 7 of the Clayton Act prohibits acquisitions "where in any line of commerce . . . in any section of the country, the effect of such acquisition may be substantially to lessen

---

█████████████████████████████████████.

[19] PX718 at CHNG-001845632; *see also* PX726.

[20] PX769 at UHG-2R-0003193016 ███████████████████████████████████.

competition, or to tend to create a monopoly." 15 U.S.C. § 18. The same standards apply to mergers that combine direct competitors (horizontal mergers) or mergers that combine firms in related markets (vertical mergers). *See FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967) ("All mergers are within the reach of [Section] 7, and all must be tested by the same standard, whether they are classified as horizontal, vertical, conglomerate, or other.").

Section 7 "creates a relatively expansive definition of antitrust liability," which "subjects mergers to searching scrutiny." *California v. Am. Stores Co.*, 495 U.S. 271, 284-85 (1990). As the Supreme Court has noted, the use of the word "may" in the statute conveys the concept of reasonable probability—"a necessary element in any statute which seeks to arrest the restraints of trade in their incipiency and before they develop into full-fledged restraints violative" of the antitrust laws. *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 n.39 (1962) (quoting S. REP. NO. 1775 at 4298 (1950)). To establish a Section 7 violation, Plaintiffs must show that "a pending acquisition is *reasonably likely* to cause anticompetitive effects." *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 49 (D.D.C. 2011) (emphasis added). This does not require that the merger will result in certain harm, but rather, that there is a reasonable probability that the proposed merger may substantially lessen competition. *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019); *see also Brown Shoe*, 370 U.S. at 323 (stating that merger review is concerned with "probabilities, not certainties"); *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989) ("A certainty, even a high probability, need not be shown," and "doubts are to be resolved against the transaction."). This reflects Congress's intention to "arrest anticompetitive tendencies in their 'incipiency.'" *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 362 (1963) (citing *Brown Shoe*, 370 U.S. at 317).

"A burden-shifting analysis applies to consider the merger's effect on competition."

*United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017). This analysis often begins

with defining relevant markets in which competitive concerns arise. *See, e.g.*, *United States v.*

*Aetna Inc.*, 240 F. Supp. 3d 1, 18 (D.D.C. 2017). In a merger between direct competitors, which

involves horizontal theories of harm, "[i]f the government can 'show that the merger would

produce a firm controlling an undue percentage share of the relevant market, and would result in

a significant increase in the concentration of firms in that market,' that creates a 'presumption

that the merger will substantially lessen competition." *Aetna*, 240 F. Supp. 3d at 18 (quoting *FTC*

*v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001). With such a showing, the government

"establish[es] a prima facie case of anticompetitive effect." *United States v. Baker Hughes Inc.*,

908 F.2d 981, 983 (D.C. Cir. 1990). In a merger involving vertical theories of harm, there is no

immediate change in relevant market share and thus no presumption of anticompetitive effect

through a change in market concentration, so plaintiffs make their prima facie case through case-

specific evidence of a danger of future competitive harm. *See Brown Shoe*, 370 U.S. at 329;

*AT&T*, 916 F.3d at 1032 ("[T]he government must make a fact-specific showing that the

proposed merger is likely to be anticompetitive.") (marks and citation omitted). Evidence of a

price increase is not required to establish a violation of Section 7, as "[v]ertical mergers can

create harms beyond higher prices for consumers, including decreased product quality and

reduced innovation." *AT&T*, 916 F.3d at 1045.

Once the plaintiff makes a prima facie case, the burden shifts to the defendants to

produce evidence to rebut the case. *See Anthem*, 855 F.3d at 349. "The more compelling the

[plaintiffs'] prima facie case, the more evidence the defendant must present to rebut it

successfully." *Baker Hughes*, 908 F.2d at 991.

For vertical mergers, the defendants' burden is to "present evidence that the prima facie

case 'inaccurately predicts the relevant transaction's probable effect on future competition' . . . or to 'sufficiently discredit' the evidence underlying the prima facie case." *AT&T*, 916 F.3d at 1032 (quoting *Anthem*, 855 F.3d at 349); *Baker Hughes*, 908 F.2d at 982 (stating that defendants in a merger challenge have the burden to produce evidence tending to rebut the government's prima facie case).

Where defendants put forth a proposed divestiture as a cure to the competitive harms posed by the transaction, the defendants have the burden, as part of their rebuttal case, to show that their proposal would restore the loss of competition in the relevant market. *Aetna*, 240 F. Supp. 3d at 60. This requires more than simply showing that a divestiture is likely to occur: the defendants must establish that the proposed divestiture would "replac[e] the <u>competitive intensity</u> lost as a result of the merger." *Id.* (quoting *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 72 (D.D.C. 2015)) (emphasis in original).

If defendants are able to make a rebuttal, the burden shifts to the plaintiff to produce additional evidence of anticompetitive effects. The plaintiffs bear the ultimate burden of persuasion. *See Anthem*, 855 F.3d at 350 (citing *Baker Hughes*, 908 F.2d at 983).

At trial, Plaintiffs will demonstrate that the effect of the proposed transaction "may be substantially to lessen competition" in the health insurance markets and the market for first-pass claims editing, thus violating Section 7. 15 U.S.C. § 18.

## IV.   INDUSTRY BACKGROUND

The proposed transaction is likely to hurt competition in the commercial health insurance markets, in which United will use Change's assets to disadvantage its competitors; and in the first-pass claims editing solutions market, in which Change and United share a near-monopoly. To help illustrate why those harms are likely, this section will provide a brief, general overview

of the commercial health insurance industry. This section then describes the claims submission process and clearinghouses, and claims editing solutions industry, all of which are essential components of the modern health insurance industry.

### A.    Commercial Health Insurance

Most Americans obtain health insurance from employers. Commercial health insurance sold to employers is regulated by state and federal laws. *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 187 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017). State laws draw a distinction between health insurance sold to "small group" employers (employers with two to 50 or up to 100 employees) and "large group" employers (employers with more than 50 or 100 employees). *Id.* at 187–88. Large group employers are further segmented. Industry participants, including United, generally refer to employers with more than 5,000 employees eligible for their employer's health insurance plans and with employees in multiple states as "national accounts." The health insurance markets at issue in this case are the sale of commercial health insurance to large group employers and to national accounts employers; markets already recognized by a court in this district in *Anthem*, 236 F. Supp. 3d 171, 193–206, 254–259, *aff'd*, *Anthem*, 855 F.3d at 353, 367–369.

UnitedHealthcare is the nation's largest commercial health insurer. It is among the largest health insurers serving large group employers, including national accounts, in the United States. Further, UnitedHealthcare has the largest market share among national accounts, where it covers approximately one out of every five Americans insured through national accounts employers.[21]

Most large group and national accounts employers purchase "administrative service only"

---

[21] PX040 at 5.

plans from United and its competitors, while some purchase "fully-insured" plans.[22] Among other services, both types of plans include claims administration services and access to networks of "healthcare providers" (hospitals, doctors, and other healthcare professionals), which is an essential component of any commercial health insurance plan.

Health insurers selling to national accounts and large group employers compete on multiple dimensions, such as price; payment integrity; plan design; accurate and timely claims editing and processing; customer service; utilization management; and breadth and quality of their network of healthcare providers. These are competitive factors that are reflected in the health insurer's data and generally are important to large group and national accounts employers, as many relate to quality of healthcare and efforts to lower medical costs or "premiums."

Given these numerous competitive facets, purchasing healthcare coverage is often a complex process, particularly for larger employers, which have different needs and typically demand more customization than smaller employers. To navigate this area, larger employers often work with consultants to choose an appropriate health insurer, rather than brokers.

### B.    Overview of Claim Submission and Clearinghouses

#### 1.    Claims Data and Clearinghouses

Health insurers and healthcare providers use clearinghouses—the "data pipes" that connect insurers and providers—to electronically transmit claims for payment, remittance advice (an explanation from an insurer to provider about claim payment), eligibility information (information about a patient's insurance coverage under a health plan), and other administrative information (collectively, "claims data").

---

[22] *See* Appendix A for commonly used terms used in the healthcare industry.

Historically, healthcare providers and health insurers used paper claims, faxes, and phone calls to communicate about eligibility, claims, and remittances. This approach was time consuming, error prone, labor intensive, and costly because large national health insurers receive millions of claims every day. Clearinghouses, which eliminate the high costs and delays of paper claims and telephone calls, have become an essential service to insurers and providers, giving Change leverage as a large clearinghouse. Clearinghouses significantly reduce the time it takes health insurers to receive claims and send electronic remittance advice, leading to faster reimbursement for providers. Today, over 95 percent of all medical claims are transmitted electronically through clearinghouses.[23]

As depicted below, Figure 1 demonstrates how health insurers generally use clearinghouses to process medical claims.



Figure 1

It typically starts when an individual visits a healthcare provider to receive care. The

---

[23] PX093 at UHG-2R-0003725109; PX304 at UHG-2R-0004215711; PX308 at 112.

provider uses the clearinghouse to ask the health insurer about the individual's health insurance coverage. The health insurer then uses the clearinghouse to tell the provider whether the individual is covered under the health insurer's plan and the scope of coverage. After treating the individual (now patient), the provider uses the clearinghouse to submit a claim to the health insurer for payment. The claim contains information about the patient, provider, the facility where the patient was treated, the patient's diagnosis, if any, the services provided, and the healthcare provider's charge for the service.

Once it receives the claim, the health insurer acknowledges receipt, confirms that the claim is compete, and begins the process of "adjudicating the claim," which will determine if it accepts and pays the claim. At this stage, the insurer uses a claims editing solution, such as ClaimsXten or CES, to determine what services are covered by the patient's health plan by comparing the claim against numerous rules (or "edits"). If the health insurer accepts the claim, it determines the amount it will pay and sends the healthcare provider an electronic remittance advice—information on claim payment—using the clearinghouse. At this stage the health insurer may also reject or modify the claim.

Healthcare providers often use a single clearinghouse, either by contracting directly with the clearinghouse or by contracting with a "channel partner" for clearinghouse services. Channel partners are vendors that offer to providers work flow solutions, such as revenue cycle software, that are integrated with clearinghouse services. Through partnerships with clearinghouse vendors, channel partners function as a re-seller of clearinghouse services and submit claims on behalf of a healthcare provider that uses their products.

As for health insurers, some use a single clearinghouse as a "managed gateway" that serves as the exclusive access point through which all of an insurer's data must pass. Other

insurers establish relationships with multiple clearinghouses. In either case, health insurers want clearinghouses to transmit data in a cost-effective manner and to enable a quick and seamless exchange of claims data with providers.

There is no single clearinghouse that connects to every health insurer and healthcare provider. When a healthcare provider's clearinghouse is not directly connected with a patient's health insurer, claims data must flow through more than one clearinghouse, which is referred to as a "hop." These other clearinghouses are often referred to as "trading partners," because clearinghouses enter into contracts, which define their bi-lateral trading partnership, with one another. Put differently, even if a healthcare provider or health insurer does not directly contract with a particular clearinghouse, the claims data may still flow through that clearinghouse by virtue of trading partners and hops, as shown in Figure 2.



Figure 2

### 2.    Secondary-Use Data Rights in Clearinghouses

When a transaction flows through a clearinghouse, the clearinghouse gains access to all of the information contained in the claims data, including competitively sensitive information of

a health insurer or healthcare provider. To *use* that data for purposes other than providing

clearinghouse services, a clearinghouse must have secondary-use data rights.[24] Secondary-use

data rights allow a clearinghouse to remove certain information that identifies the individual (a

process known as "deidentification" which is governed by the Healthcare Insurance Portability

and Accountability Act of 1996 ("HIPAA")) and then use the now-deidentified data for other

business purposes. For example, Change's standard data rights language allows Change to █████

███████████████████████████████████████████████████████████[25] Under this language,

Change could, for example, analyze these deidentified claims data to gain valuable insights as to

a health insurer's plan and policy design, its underwriting, the costs of claims it pays, its provider

network design, and its proprietary payment rules.

A clearinghouse may obtain secondary-use data rights directly from the insurer or

provider via its contract for clearinghouse services, or alternatively, indirectly from trading

partners or channel partners where they have acquired data rights.[26]

> **3.** **Change's Clearinghouse Has Unmatched Breadth, Providing a Vital Avenue for Transmission of Health Insurers' Claims and Claims Data to Providers.**

Change operates the largest clearinghouse in the nation, transmitting over 14 billion

transactions through its clearinghouse every year. According to United, Change has access to

---

[24] Suther (Change) CID Dep. 27:23–28:11.

[25] *E.g.*, PX165 at CHNG-011136501; *see also* Suther (Change) CID Dep. 136:4–11.

[26] For example, Change commonly obtains secondary-use data rights from its contracts with channel partners, which the channel partner obtained via its contracts with its provider customers. *See, e.g.*, Suther (Change) CID Dep. 114:20–115:23, 120:6–17; Klain (Change) Dep. 212:19–213:12.

approximately ████████ U.S. patient records—representing about 211 million unique

patients—making Change's clearinghouse a vital link between providers and insurers.[27]

Change's documents back this up. In 2019, Change told potential investors that the "Change

Healthcare network is by far the broadest and deepest network in the country."[28] Change

explained in that presentation that it achieves "flywheel effects"—compounding value—through

this massive scale and data.[29] Change internally estimated that it ████████████████

████████████████████████████████████████ [30]

      In ordinary-course documents, Change emphasizes the reach of its clearinghouse and the

breadth of its clearinghouse's connections with insurers and providers.[31] Change believes—and

told prospective customers—that it connects to ███████████ of U.S. medical providers.[32]

Even if a health insurer does not have a direct connection to Change's clearinghouse, a

significant portion of that insurer's claims and claims data may pass through Change's

clearinghouse because of Change's extensive provider connections (directly or through channel

partners) and contracts with trading partners. As a large clearinghouse that connects to both

---

[27] PX004 at 6; PX021 at 7; PX085 at 7; PX089 at 10; PX090 at 7; PX091 at 8; PX095 at 12; PX098 at 7; PX123 at 9; PX209 at 6; PX301 at 5; PX302 at 7; PX310 at 6; PX338 at 10; PX366 at 8 and 22; PX367 at 7; PX605 at 7; PX799 at 6; PX803 at 14; *see also* PX003 at 28; PX084 at 29; PX204 at 26; PX205 at 14.

[28] PX047 at 63; PX136 at 63; PX172 at 3; PX273 at 145; PX372 at 144; PX531 at 145; *see also* PX048 at 16 ("Change Healthcare has arguably built one of the broadest and deepest data assets in the industry.").

[29] PX172 at 3.

[30] PX469 at CHNG-012208777.

[31] *E.g.*, PX250 at 7; PX822 at USDOJ-008-000000375.

[32] PX469 at CHNG-012208778.

insurers and providers, commonly through trading and channel partners, there are significant difficulties of disintermediating Change's clearinghouse.

As an independent clearinghouse that is not owned by a health insurer, Change works closely with its insurer customers to improve healthcare technology and reduce costs. The proposed transaction jeopardizes Change's strong incentives to develop innovations that benefit its provider and health insurer customers alike, and the healthcare system more broadly.

      **4.**      **Change's Broad Data Repository and Data Rights Are at the Heart of the Proposed Transaction.**

Change has accumulated a massive set of claims data, unique in its breadth, that goes back to 2012. Its data set contains claims data involving virtually all of UnitedHealthcare's most significant rivals. This data includes competitively sensitive information about health insurers' plans and policies. Change also has secured from healthcare providers, health insurers, channel partners, and trading partners secondary-use rights to use much of this claims data for Change's own business purposes.

United's desire to acquire Change's wealth of claims data and data rights was a driving motivation for the proposed transaction. In the period leading up to the proposed transaction, in ordinary course business documents, United executives repeatedly expressed that the Change purchase was motivated by their desire to acquire Change's secondary-use rights to claims data.[33] For example, United's then-CEO, David Wichmann, stated he was ███████ by Change's "data rights," which was the "primary question" about Change.[34] After due diligence, United

---

[33] *E.g.*, PX119 at 2, PX085 at 10; PX664; PX945; PX360 at 12, 15, 17; PX368 at 3.

[34] PX001 at 2; PX119 at 2; PX082 at 1; *see also* Wichmann (United) CID Dep. 274:21–275:14.

concluded that Change had secondary-use rights to over 60 percent of the claims data that passes through Change's clearinghouse.[35]

While United desires claims data from its rivals, it closely guards its own claims data to ensure that competitors cannot gain access. United requires its business units to limit the disclosure of data outside of United "to the minimum necessary."[36] United also restricts data licenses to third parties if the licenses primarily benefit a significant competitor. A United executive testified that using United's data to compete against United was a ███████████ [37] Indeed, OptumInsight's former CEO testified that OptumInsight would continue its policy of licensing UnitedHealthcare's claims data only to non-competitors, such as pharmaceutical companies.[38] United's internal policies and practices reflect the competitive importance of claims data to UnitedHealthcare and to the commercial health insurance industry generally.

### 5.     United Operates Its Own Clearinghouse Primarily for Its Own Use

United owns a clearinghouse through its OptumInsight subsidiary. This clearinghouse serves as the managed gateway for all incoming claims to UnitedHealthcare. Prior to 2020, United marketed its clearinghouse to providers and insurers, but United claims that it no longer markets its clearinghouse services to non-United providers, and provides services to only a handful of legacy health insurers in addition to UnitedHealthcare itself. United's clearinghouse routes most non-UnitedHealthcare medical claims to ████████████████████████

---

[35] PX664 at 3; PX945 at 2; PX027 at 2, 3, 6.

[36] PX775 at UHG-2R-0003901382.

[37] Golden (United) Dep. 394:14–15.

[38] Hardy (United) CID Dep. 326:8–330:4.

███████████████████████████████████████████████████████████

### C.    Change and United Dominate the Market for First-Pass Claims Editing Solutions

As described earlier, large health insurers receive millions of healthcare claims each day and use claims editing solutions to process them efficiently and accurately, allowing the insurer to protect members from overpaying, reduce overall medical costs, and avoid frustrating providers and members with erroneous claim rejections. First-pass claims editing solutions automatically apply a pre-determined set of "edits" (*i.e.*, rules) to claims, preferably as early in the claims process as possible. Within milliseconds, first-pass claims editing software can determine whether claims should be paid, rejected, or flagged for further review. Some insurers may apply another round of edits, through "second-pass" claims editing, for additional savings.

Applying these edits efficiently saves health insurers and their customers billions of dollars each year. The edits reflect the health insurers' efforts to ███████████████████ ██████████████████████████████████████████████ [42] Because of their commercial importance—and because they can be customized by the insurer or the vendor—the edits are considered to be proprietary. Long-term relationships are common because of the time required to tailor the claims editing solutions to each health insurer's plans, policies, operating

---

[39] Mckinney (United) CID Dep. 63:8–64:12, 64:18–65:7; *see also* PX160 at 20, 49.

[40] *See* PX778 at 41; PX779 at 41; PX304 at 436; PX305 at 16.

[41] ████████████████████████████████████████████████████████

[42] ████████████████████████████████████████████████

rules, and healthcare provider contracts.[43] █████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████.[44]

      Change is the top vendor of first-pass claims editing solutions, and is viewed as the "gold standard, market-leading solution" for claims editing.[45] Its ClaimsXten product is used by nine of the top ten health insurers—all but UnitedHealthcare.[46] Change estimates that its first-pass claims editing solution saves its health insurer customers a collective ███████ per year.[47] United's CES product is Change's most significant competitor in first-pass claims editing. In fact, Change's and United's first-pass claims editing solutions collectively serve 38 of the top 40 health insurers in the country.[48] Defendants repeatedly identify each other as their primary competitors in the market for first-pass claims editing solutions, and consistently compete against each other to win contracts from customers.[49] If allowed to merge, the combined entity would have a near monopoly position in the market for first-pass claims editing. *See infra* Section V.B.

      Change's independence stands in contrast to United. United's main health insurer rivals

---

[43] *See* PX029; Turner (Change) CID Dep. 55:15–56:11.

[44] ██████████████████████████████████████████████████████

[45] PX329 at UHG-2R-0004690925.

[46] PX029 at 3; *see also* Turner (Change) CID Dep. 233:7–11.

[47] PX241 at 19; PX708 at 6; PX029 at 3; PX411 at 6; PX937 at 9; *see also* PX822 at 8.

[48] PX481 at 5; PX480 at 3.

[49] *See, e.g.*, PX327 at 1; PX481 at 3.

do not purchase claims editing solutions from United because they do not want to share their

edits, which embody their proprietary plan and payment rules, with a competitor.[50] Before the

proposed transaction, health insurers could avoid United by buying Change's first-pass claims

editing solution. If this transaction is allowed to proceed, this alternative would vanish, and

United's health insurance rivals would have no choice but to use a United-owned first-pass

claims editing solution.

## V.     THE EFFECT OF THE TRANSACTION "MAY BE SUBSTANTIALLY TO LESSEN COMPETITION"

### A.     Relevant Markets

Courts may begin their analysis under Section 7 by looking to relevant markets to assess

the effects of the proposed transaction. Relevant markets are defined by "reasonable

interchangeability of use or the cross-elasticity of demand between the product itself and the

substitutes for it." *Brown Shoe*, 370 U.S. at 325. "Market definition" assesses "whether two

products can be used for the same purpose, and if so, whether and to what extent purchasers are

willing to substitute one for the other." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 119

(D.D.C. 2004) (marks and citation omitted). Assessing a relevant market has two dimensions:

product and geographic area. *Anthem,* 236 F. Supp. 3d at 193; *see also* U.S. DEP'T OF JUSTICE &

FED. TRADE COMM'N, HORIZONTAL MERGER GUIDELINES (2010), *available at*

https://www.justice.gov/atr/file/810276/download [*hereinafter* "HORIZONTAL MERGER

GUIDELINES"]. A "key question" for courts in assessing a relevant market is whether particular

products "are sufficiently close substitutes" such that the substitution of one could "constrain any

anticompetitive . . . pricing" in the other. *H&R Block*, 833 F. Supp. 2d at 55. That is to say, a

---

50 █████████████████████████████████████████████

relevant market is one in which the loss to competition would matter—one that could be monopolized. "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Brown Shoe*, 370 U.S. at 336. This is because "[t]he 'market,' as most concepts in law and economics, cannot be measured by metes and bounds." *Anthem,* 236 F. Supp. 3d at 193 (quoting *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611 (1953)); *see also FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018) (recognizing that some "fuzziness is inherent in bounding any market").

The boundaries of a product market "may be determined by examining such practical indicia as industry or public recognition of the [relevant market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. 325. (Collectively, these various practical indicia are often called the "*Brown Shoe* factors".) In evaluating the *Brown Shoe* factors, courts "pay close attention to the defendants' ordinary course of business documents" and may also rely on testimony from industry participants, as well as the parties' experts. *H&R Block*, 833 F. Supp. 2d at 52; *Aetna*, 240 F. Supp. 3d at 21. Courts also give substantial weight to economic analysis in defining markets. *See, e.g.*, *Anthem*, 236 F. Supp. 3d at 198–99.

A relevant geographic market identifies "where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." *Philadelphia Nat'l Bank*, 374 U.S. at 357. As with a product market, the relevant geographic market must "correspond to the commercial realities of the industry and be economically significant." *Brown Shoe*, 370 U.S. at 336-37. In some instances, this can encompass the entire United States, or a smaller subsection of the country. *Id.*

Markets may also be defined using the "hypothetical monopolist" test set out in the Horizontal Merger Guidelines, which asks whether a hypothetical monopolist with control over a set of substitutable products or in a contested geography could "profitably raise prices on those products" by applying at least a "small but significant and non-transitory increase in price" on at least one product sold by the merging firms. *Sysco*, 113 F. Supp. 3d at 33; HORIZONTAL MERGER GUIDELINES § 4.1. Those products or geographies would then constitute a relevant market.

At trial, the Defendants' own documents, testimony from industry participants, and analyses by an economic expert will show that the sale of first-pass claims editing solutions in the United States, as well as the sale of commercial health insurance to national accounts in the United States and to large group employers in core-based statistical areas that are also metropolitan statistical areas,[51] constitute the appropriate relevant markets in this case.[52]

1.  **The Sale of First-Pass Claims Editing Solutions in the United States is a Relevant Market.**

    a.  **First-Pass Claims Editing Solutions is a Relevant Product Market.**

Market definitions should reflect business realities. *See, e.g.*, *Sysco*, 113 F. Supp. 3d at 37. First-pass claims editing solutions are a distinct product market and are not interchangeable

---

[51] As discussed, the D.C. Circuit and the District Court for the District of Columbia have previously recognized that that the sale of commercial health insurance to national accounts and to large group employers is a relevant market for the purpose of a Section 7 analysis. *See Anthem*, 855 F.3d at 349.

[52] By the plain language of Section 7, Plaintiffs need only show competitive harm in one relevant market. *See* 15 U.S.C. § 18; *see also Anthem*, 855 F.3d at 349. In a vertical merger, competitive concern in a relevant market may flow from a related product that is positioned vertically or is complementary to the products and services in the relevant market. (*See infra* Section V.C). Plaintiffs need not define a market for a related product, nor are Plaintiffs required to show market power over any related product. (*See id.*)

with second-pass claims editing solutions. Both the *Brown Shoe* factors and the "hypothetical monopolist" test support this conclusion, showing that the sale of first-pass claims editing solutions is the appropriate relevant product market.

    *First*, industry participants recognize that first-pass claims editing solutions perform a function that is essential, and that they have replaced the possibility of doing that function manually. Moreover, industry participants—including Defendants—treat first-pass claims editing solutions as distinct from second-pass claims editing solutions. Both United and Change distinguish between markets for the "primary" and "secondary" phase of claims editing in the ordinary course of business, calculating market shares separately for each, and recognizing distinct competitors in first-pass claims editing solutions versus second-pass.[53]

    *Second*, first-pass claims editing solutions have characteristics and uses that distinguish them from second-pass claims editing solutions. Specifically, first-pass claims editing solutions generally implement an insurer's full library of claims edits, while second-pass solutions typically implement a narrower set of edits over the claims they process.[54] First-pass claims editing solutions also review claims and implement edits in real-time, while second-pass editing solutions typically perform these processes over batches of claims.[55] Customers, particularly large health insurers, typically also use first-pass claims editing solutions for different purposes than second-pass claims editing solutions. Health insurers generally contract with one vendor to

---

[53] *See, e.g.*, PX479 at 18; PX477; PX708 at CHNG-000304215, -218.

[54] PX245 at CHNG-004582346; PX716 at CHNG-001702204 (comparing primary and secondary editing).

[55] PX479 at 18; PX245 at CHNG-004582345; Turner (Change) CID Dep. 83:25–85:9.

conduct first-pass claims editing in real-time, while they may use multiple second-pass claims editing solutions to—as the name suggests—perform a second review, looking for additional savings in a smaller subset of claims.[56]

*Third*, first- and second-pass claims editing solutions are also priced distinctly. First-pass claims editing solutions are priced on a per-transaction basis, through a perpetual license fee between the insurer or provider customer and the vendor.[57] By contrast, second-pass claims editing solutions are typically priced on a contingency basis.[58]

Plaintiffs' economic expert, Dr. Gautam Gowrisankaran of Columbia University, will also explain that economic analysis leads to the conclusion that the sale of first-pass claims editing solutions is a relevant product market in which to analyze the effects of the proposed transaction. Dr. Gowrisankaran applied the test from the Horizontal Merger Guidelines[59] and determined that a hypothetical monopolist would find it profitable to impose a small but significant, non-transitory increase in prices. His analysis will show that first-pass claims editing solutions are priced significantly below the billions of dollars in annual savings these products generate for health insurers, and that even after a small price increase, health insurers would

---

[56] Turner (Change) CID Dep. 44:2–16.

[57] PX477; PX329 at UHG-2R-0004690866; PX314 at UHG-2R-0004819469.

[58] PX329 at UHG-2R-0004690871; Turner (Change) CID Dep. 178:18–179:7.

[59] The Horizontal Merger Guidelines have been endorsed by Circuit Courts across the country, including the D.C. Circuit. *See Heinz*, 246 F.3d at 716, 718; *see also FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 167 (3d Cir. 2022); *FTC v. Sandford Health*, 926 F.3d 959, 964 (8th Cir. 2019); *FTC v. Advocate Health Care Network*, 841 F.3d 460, 465 (7th Cir. 2016); *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015); *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565 (6th Cir. 2014).

continue to realize substantial savings from paying for first-pass claims editing solutions.[60] Based on Dr. Gowrisankaran's analysis, even if ClaimsXten were to increase its fees by ten percent, the savings to insurers would still be 42.3 times larger than the fees.[61] Dr. Gowrisankaran will also explain that because first-pass claims editing solutions are costly to develop and maintain, it is unlikely that even large health insurers would turn to self-supplying first-pass claims editing solutions.[62] Finally, Dr. Gowrisankaran will explain that ordinary course business documents confirm that Optum and Change's price competition regularly leads to large discounts for customers,[63] and that a hypothetical monopolist who does not face this competition could profitably increase prices by at least the same amount for these customers.[64]

> ### b. The United States is a Relevant Geographic Market for First-Pass Claims Editing

The United States is a relevant geographic market for first-pass claims editing. The U.S. healthcare system is unique and highly regulated, and very different from healthcare systems outside of the United States. ClaimsXten and CES are not sold outside of the United States, and customers would not purchase software used outside of the United States in response to a small

---

[60] Gowrisankaran Report ¶¶ 149–150.

[61] Gowrisankaran Report ¶ 151.

[62] Gowrisankaran Report ¶¶ 152–153; *see also* ███████████████████

[63] *See also infra* Section V.B.1 (describing head-to-head competition between United and Change in first-pass claims editing solutions, and the discounts and benefits offered to customers as a result).

[64] Gowrisankaran Report ¶ 154.

but significant non-transitory price increase in first-pass claims editing solutions.[65]

> **2.     The Sale of Commercial Health Insurance to National Accounts in the United States is a Relevant Market.**

The *Anthem* Court has already recognized—and the evidence in this trial will confirm—that the sale of commercial health insurance to national accounts in the United States constitutes a relevant antitrust market. 236 F. Supp. 3d. at 193–206, *aff'd*, *Anthem*, 855 F.3d at 353, 369.

> **a.     The Sale of Commercial Health Insurance to National Accounts is a Relevant Product Market.**

The evidence will show that health insurers that sell commercial health insurance to national accounts customers, which are defined as employers with over 5,000 employees, compete with each other and that the national accounts market is distinct from other health insurance markets, including the large group health insurance markets.

*First,* there is broad industry recognition that the sale of commercial health insurance to national accounts customers is a distinct product. For example, UnitedHealthcare's ordinary course documents ████████████████████████████████.[66] Similarly, industry participants, such as other health insurers and consultants, also distinguish the national accounts market.[67]

---

[65] Gowrisankaran Report ¶ 155.

[66] *See, e.g.*, PX040; PX116; *see also Anthem*, 236 F. Supp. 3d at 196–97.

[67] *See, e.g.*, PX117; PX040; *see also Anthem*, 236 F. Supp. 3d at 196–97; ████████████████ ████████████; Golden (United) Dep. 138:23–142:16.

*Second*, national accounts customers have unique needs. They typically require a healthcare provider network covering multiple states;[68] undergo a lengthy competitive procurement process that involves requests for proposals to select health insurance plans;[69] are more likely to hire large consulting firms to aid them in evaluating and selecting a health insurer;[70] are more likely to want customized health plans to meet particular needs;[71] and are most likely to purchase administrative services only plans.[72] Health insurers attract national accounts customers based on price; accurate and timely claims editing and processing; payment integrity; clinical programs; customer service; utilization management; and breadth and quality of their network of healthcare providers, among other factors.[73]

Given the unique nature of national accounts customers, both UnitedHealthcare[74] and other industry participants, including other health insurers,[75] manage the national accounts

---

[68] ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛; *see also* Golden (United) Dep. 189:23–190:19.

[69] Golden (United) Dep. 147:19–149:9; ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

[70] Golden (United) Dep. 45:3–47:16, 147:19–148:12; *see also* ⬛⬛⬛⬛⬛⬛⬛ *Anthem*, 236 F. Supp. 3d at 196.

[71] ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ Golden (United) Dep. 132:1–21, 145:23–146:12; Choate (United) CID Dep. 139:18–140:2; *see also Anthem*, 236 F. Supp. 3d at 196.

[72] Golden (United) Dep. 132: 1–4, 144:12–15; ⬛⬛⬛⬛⬛⬛⬛ *see also Anthem*, 236 F. Supp. 3d at 201–02, 251.

[73] Golden (United) Dep. 188:18–201:5 ⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛

[74] *See, e.g.*, PX792; Golden (United) Dep. 144:16–19.

[75] *See, e.g.*, ⬛⬛⬛⬛⬛⬛⬛ *see also, Anthem*, 236 F. Supp. 3d at 196–97.

segment separately from other lines of business. For example, UnitedHealthcare and other health insurers have dedicated business units focused on selling and marketing to national accounts customers.[76] UnitedHealthcare and other health insurers also maintain separate profit and loss statements for national accounts customers.[77]

*Lastly*, UnitedHealthcare is able to charge different prices and customize plan benefits for national accounts versus other types of commercial health insurance customers.[78]

### b. The United States is a Relevant Geographic Market for the Sale of Commercial Health Insurance to National Accounts.

National accounts customers headquartered in the United States seek commercial health insurance from health insurers with nationwide provider networks and have similar nationwide insurer options.[79] National accounts customers headquartered in the United States do not have reasonable substitutes to purchasing commercial health insurance from health insurers doing business in this country. National accounts customers would not close their offices and move their companies to different countries in response to a small, non-transitory price increase.

### c. Economic analysis establishes that the Sale of Commercial Health Insurance to National Accounts is a Relevant Market.

At trial, Dr. Gowrisankaran will explain that he has performed the hypothetical monopolist test for the sale of commercial health insurance to national accounts in the United States, adopting a definition accepted by courts in previously litigated cases, applying an

---

[76] Golden (United) Dep. 145:2–5, 145:16–22, 146:24–147:5; *see* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[77] Golden (United) Dep. 147:14–18; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[78] *See* Golden (United) Dep. 62:9–17; 64:13–65:9.

[79] *See* Gowrisankaran Report ¶ 99.

approach accepted in a prior litigated case, and using data from United. The results show that a hypothetical monopolist over the sale of commercial health insurance to national accounts would likely profitably impose at least a small, non-transitory price increase.[80] Even in the face of that small price increase, however, national accounts customers are unlikely to self-supply or not provide any health insurance to their employees.[81] Therefore, the sale of commercial health insurance to national accounts in the United States is a relevant market.

### 3. The Sale of Commercial Health Insurance to Large Groups in Various Local Markets are Relevant Markets.

The evidence in this trial will confirm that the sale of commercial health insurance to large groups in various local markets constitute relevant antitrust markets.

### a. The Sale of Commercial Health Insurance to Large Groups is a Relevant Product Market.

The evidence will show that health insurers that sell commercial health insurance to large group employers compete with each other and that large group employer markets are distinct from other health insurance markets, including the national accounts market. The *Anthem* Court recognized a similar market. 236 F. Supp. 3d. at 254–259, *aff'd*, *Anthem*, 855 F.3d at 367–369 (holding that large group employers, which includes national accounts, is an appropriate relevant product market).

*First*, there is a broad industry recognition that the sale of commercial health insurance to large group customers is distinct. For example, UnitedHealthcare's ordinary course documents

---

[80] Gowrisankaran Report ¶ 101.

[81] Gowrisankaran Report ¶ 102–103.

███████████████████████████████████████████████████

████████████ Similarly, industry participants, such as other health insurers, consultants, and brokers, distinguish the large group employer market from other commercial health insurance markets, such as national accounts or small group.[84]

*Second*, large group customers have distinct needs. Large group employers issue request for proposals to insurers but may undergo a shorter competitive procurement process than compared to national accounts;[85] are more likely to work with brokers, rather than consulting firms to aid them in evaluating and selecting a health insurer;[86] and are likely to purchase fully-insured and administrative services only plans.[87] Health insurers attract large group customers based on price; payment integrity; plan design; accurate and timely claims editing and processing; customer service; utilization management; and breadth and quality of their network of healthcare providers, among other factors.[88]

Given the unique nature of large group customers, health insurers, including UnitedHealthcare, manage the large group employer segment separately from other lines of

---

[82] *See, e.g.*, PX156 at UHG-2R-0018054359–61; Golden (United) Dep. 116:16–117:3.

[83] PX293; *see also* Golden (United) Dep. 77:25–78:5, 116:20–117:3.

[84] Golden (United) Depo. 45:3–47:16, 211:11–212:9.

[85] Golden (United) Dep. 135:9–136:1.

[86] Golden (United) Dep. 134:15–135:20, 147:19–22, 149:10–150:22.

[87] Golden (United) Dep. 132:3–6.

[88] Golden (United) Dep. 149:10–153:23, 155:12–18, 156:25–160:17, 165:2–17, 166:22–167:6, 173:6–174:18, 174:19–175:4, 175:13–25, 176:2–183:22, 184:11–188:17; *see also* Golden (United) Dep. 164:3–6.

business.[89] For example, UnitedHealthcare has dedicated business units focused on selling and marketing to large group customers.[90] UnitedHealthcare also maintains separate profit and loss statements for large group customers.[91]

*Lastly*, UnitedHealthcare is able to charge different prices and offer different plan benefits for large group employers in contrast to small group employers.[92]

### b. Local Markets are Relevant Geographic Market for the Sale of Commercial Health Insurance to Large Group Employers.

The relevant geographic markets for the sale of commercial health insurance to large group employers are core-based statistical areas ("CBSAs") that are metropolitan statistical areas ("MSAs") in the United States.[93] In each CBSA, large group employers do not view insurance companies that lack a meaningful provider network in that area as reasonable substitutes for those that offer such a network.[94] In each CBSA, large group employers are unlikely to move their offices to a different area in response to a small, non-transitory price increase.[95]

### c. Economic analysis shows that the Sale of Commercial Health Insurance to Large Group Employers are Relevant Markets.

At trial, Dr. Gowrisankaran, will explain that he has performed the hypothetical

---

[89] *See* Golden (United) Dep. 125:7–126:23; ███████████████████

[90] Golden (United) Dep. 126:24–128:20.

[91] Golden (United) Dep. 130:15–131:3.

[92] *See, e.g.*, Golden (United) Dep. 161:13–162:10.

[93] Gowrisankaran Report ¶¶ 122–125; *see also* Appendix A.

[94] *See* McMahon (United) CID Dep. 92:8–20.

[95] Gowrisankaran Report ¶ 126.

monopolist test for the sale of commercial health insurance to large group employers that are not national accounts in CBSAs that are also MSAs, applying an approach accepted in prior litigated cases, and using data from United. The results show that a hypothetical monopolist over the sale of commercial health insurance to large group employers in a CBSA that is also an MSA would likely profitably impose at least a small, non-transitory price increase.[96] Even in the face of that price increase, however, large group customers are unlikely to self-supply or not provide any health insurance to their employees.[97] Therefore, the sale of commercial health insurance to large group employers in CBSAs that are also MSAs are relevant markets.

### B.    The Proposed Transaction May Substantially Lessen Competition by Creating a Presumptively Illegal Combination of the Two Leading First-Pass Claims Editing Solutions.

After the government has properly defined relevant markets, it can establish a prima facie violation of Section 7 as to a horizontal merger by showing that the transaction would "produce a firm controlling an undue percentage share of the relevant market, and [would] result[] in a significant increase in the concentration of firms in that market," creating "a presumption that the merger will substantially lessen competition." *Heinz*, 246 F.3d at 715 (citation omitted).

Courts use two different measures of market concentration to establish the presumption: (1) the percentage of the relevant market that would be controlled by the merged firm, or (2) the Herfindahl-Hirschmann Index ("HHI"), which uses thresholds in the Horizontal Merger Guidelines to assess a presumption of anticompetitive harm. *See, e.g.*, *Philadelphia Nat'l Bank*, 374 U.S. at 364 (finding a relevant market unduly concentrated where the merging parties

---

[96] Gowrisankaran Report ¶ 126.

[97] Gowrisankaran Report ¶¶ 126, 130–131.

controlled 30% of the market); *Arch Coal*, 329 F. Supp. 2d at 124 (using HHI figures to establish the presumption of anticompetitive harm). HHI figures are calculated by summing the squares of the individual firms' market shares. "Mergers resulting in highly concentrated markets [HHI above 2,500] that involve an increase in the HHI of more than 200 points will be presumed to be likely to enhance market power." HORIZONTAL MERGER GUIDELINES, § 5.3. By either measure, the combination of United's CES and Change's ClaimsXten easily surpasses the threshold necessary to create a presumption of undue concentration.

Allowing United to acquire Change's ClaimsXten would result in a near-merger to monopoly in first-pass claims editing. A combination of United and Change would create a presumptively illegal combination of the *only* two significant competitors in the market for first-pass claims editing solutions, which Defendants concede by their proposed divestiture. The merger would substantially lessen competition in the market for first-pass claims editing solutions. United's CES and Change's ClaimsXten service 38 of the 40 largest health insurers in the United States.[98] While a small number of other sellers offer first-pass claims editing solutions, none of these alternatives are even closely comparable to the products offered by the Defendants, and thus are not a competitive constraint to United and Change.

Dr. Gowrisankaran will testify that, post-merger, United would control 93.9 percent of the market for first-pass claims editing solution—nearly a literal monopoly position and easily meeting the legal tests for a monopoly share.[99] The proposed transaction would also significantly increase concentration in this already highly concentrated market: the estimated pre-merger HHI

---

[98] PX481 at 5; PX480 at 3; Root (United) Dep. 51:16–59:19.

[99] Gowrisankaran Report ¶ 264.

in the market for first-pass claims editing is 5,254, while the estimated post-merger HHI is 8,831, a difference of 3,577.[100] This staggering HHI change far exceeds the thresholds sufficient to create a presumption of anticompetitiveness under the Horizontal Merger Guidelines. *See* HORIZONTAL MERGER GUIDELINES, § 5.3; *Heinz*, 246 F.3d at 716 (finding that a merger that would increase HHI by 510 points from 4,775 created a presumption of anticompetitive effects by a "wide margin").

> **1.    The Proposed Transaction Would Eliminate Head-To-Head Price and Quality Competition Between United and Change in the Sale of First-Pass Claims Editing Solutions.**

The market shares and concentration levels in first-pass claims editing that would result from a combination of United and Change establish, on their own, Plaintiffs' prima facie case. This evidence shifts the burden to Defendants to rebut the presumption of illegality. But Plaintiffs' case extends beyond market concentration data. By removing a strong competitor from the market for first-pass claims editing, the proposed transaction would eliminate head-to-head competition between United and Change, harming customers who benefit from this competition today. "Mergers that eliminate head-to-head competition between close competitors often result in a lessening of competition." *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 131 (D.D.C. 2016). These mergers can have "unilateral effects," meaning that "the acquiring firm will have the incentive to raise prices or reduce quality after the acquisition, independent of competitive responses from other firms." *H&R Block*, 833 F. Supp. 2d at 81.

Here, United and Change compete vigorously against each other in the market for first-pass claims editing, identifying each other as their "main" or "primary" competitor generally and

---

[100] Gowrisankaran Report ¶ 264.

in the context of specific bids. Defendants' ordinary course business documents are replete with such references, including United's executives describing Change as "our #1 competitor for first pass" and writing that United is "Second behind Change," ███████████████████ █

United and Change offer price discounts or additional value to customers to win a contract when bidding against each other. Insurers benefit from this existing head-to-head competition between United and Change in first-pass claims editing, and use this competition to secure pricing and other concessions on contracts. Specifically, United ███████████ approves "20 to 25 percent discounts" for customers when competing with Change.[102] Similarly, Change executives have approved discounts of thirty percent, ████████████████████████ ████████████████ with United's Optum.[103] █████████████████████████ ██████████████████████████████████████████████████ █

In a 2019 bid, United gave an insurer a "sweetheart deal to win them away" from Change.[105] There are numerous other examples of this direct, head-to-head competition between Change and United, clearly showing that customers benefit from the competitive constraint each company imposes on the other.[106]

---

[101] PX208 at UHG-2R-0017648819—820 ("Change . . . continues to be our #1 competitor for first pass" and CES is "[s]econd behind Change for primary editing"); PX328 at 7 ████████ ██.

[102] PX483 at 37; PX327 at 22; *see also* Root (United) Dep. 96:1–6; 96:14–97:2.

[103] PX034 at CHNG-000408828–829; PX226 at CHNG-000408828.

[104] PX035 at CHNG-000469267–268; PX 228 at CHNG-000469267–268.

[105] PX107; PX331; PX486.

[106] *See, e.g.*, PX106 ████████████████████████████████████ ████████████████████████████████████████████ ; PX333 (same); PX484

Change and United compete head-to-head on quality. They have introduced product

improvements to respond to competition from one another. █████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████ █████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████ United similarly has pursued strategies to improve its claims editing

product offerings for customers in response to competition presented by Change, █████████

████████████████████████████████████████████████████████████████████

█████████████████████████████[109]

### 2. The Proposed Transaction Would Eliminate Head-To-Head Innovation Competition Between United and Change in the Sale of First-Pass Claims Editing Solutions.

In addition to eliminating head-to-head price and quality competition between United and

Change, the proposed transaction would also eliminate innovation competition between United

and Change. United and Change are separately pursuing similar innovations in claims editing as



████████████████████████████████████████████████████████████████
██████████████████ PX034 at CHNG-000408829 █████████████████████
███████████████████████████████████████████ PX226 at CHNG-
000408829 (same); PX035 ████████████████████████████████████████████████
PX228 (same).

[107] PX037 (emphasis in original).

[108] PX238 ████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████.

[109] PX487.

part of creating a unified payment integrity platform. Both have ongoing plans to bring better and faster service to their customers. Rather than simply focusing on selling individual products, Change and United are each pursuing strategies to become platform companies.[110] These strategies would allow products that are "on the platform" to access capabilities of other products without needing to re-develop those capabilities for each product. Customers would benefit from these platform strategies ████████████████ from the centralized data contained on the platform, including the ease of testing new solutions, controlling costs, and reducing vendor complexity.[111]

████████████████████████████████████

███████████████████████████████████████████

This would result in quicker claim determinations for insurer and provider customers, generating greater—and faster—savings for these customers.

███████████████████████████████

████████████████████████████████

█████████████████████████████████

███████████████████████████████

███████████████████████████

[110] *See, e.g.*, PX284; Root (United) Dep. 196:11–197:19; 198:11–199:25.

[111] PX047 at CHNG-007270882; Root (United) Dep. 198:11–199:25.

[112] PX047 at CHNG-007270859–861; Root (United) Dep. 198:11–199:25; Gopalkrishnan (Change) Dep. 59:14–60:5.

[113] Gopalkrishnan (Change) Dep. 60:12–63:21; 81:5–82:10; 84:8–21; 177:18–178:20.



---

[114] Gopalkrishnan (Change) Dep. 59:14–60:5, 166:4–167:16, 170:9–171:6.

[115] PX394 at 6; PX396 at 4; Gopalkrishnan (Change) Dep. 52:24–53:24.

[116] PX288 at 7; *see also* Gopalkrishnan (Change) Dep. 136:19–137:8.

[117] *See* PX396 at 15.

[118] *See* PX543 at CHNG-000002923  PX544 at CHNG-011516107 .

[119] Schmuker (United) Dep. 76:2–79:10, 96:23–97:18); Root (United) Dep. 190:6–13, 190:23–191:4. *See also* PX496 at 4.



████████████████████████████████████████████████████████

███████████████████████████

In short, Change and United are pursuing competing innovation strategies that offer the prospects of dramatically improved service for customers. The parallels in the competing strategies are clear. █████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

But if the merger were allowed, United would no longer face competition from Change to continue developing this type of innovation. While other companies may attempt to create ████ ████████████████████████████, they are likely to face significant difficulties, particularly without strong capabilities across multiple dimensions in payment integrity, including first-pass claims editing, claims pricing, and payments, in addition to a clearinghouse with many provider connections—all of which Change has.[123] ██████████████████

████████████████████████████████████

---

[120] PX112 at 11, 12, 16, 20; PX334 at 10, 11, 15, 19; *see also* Root (United) Dep. 191:5–192:3, 200:17–202:1.

[121] PX344; *see also* Schmuker (United) Dep. 210:19–23.

[122] PX546 at CHNG-009695651. *See also* PX545 at CHNG-005152403 ███████████████████ ████████████████████████████████████.

[123] PX394 at 28–29; PX396 at 20, 21, 23; PX340.

████████████████████████████ [124] United is one of the few others with such capabilities due to the breadth of its product suite. If the merger were allowed, United would face less competition to develop these innovations. Insurer customers would not benefit from competition between the two, and would not have an independent alternative to Optum.

***

A combined United and Change would control 93.9 percent of the market for first-pass claims editing solutions. Ordinary course documents show that the two companies consistently compete head-to-head for customer contracts and in competitive innovations. All in all, it is clear that the proposed transaction would substantially lessen competition in the market for first-pass claims editing solutions. Indeed, it would tend to create a monopoly in that market. Defendants cannot rebut this case, *see infra* Section VI, and the proposed transaction should be enjoined on this basis.

C. **The Proposed Transaction May Substantially Lessen Competition in the Sale of Commercial Health Insurance to National Accounts and Large Group Employers by Giving United Control Over Rivals' Competitively Sensitive Information Through Change's Clearinghouse.**

In a vertical merger, Plaintiffs establish their prima facie case through a "fact-specific showing that the proposed merger is likely to be anticompetitive." *AT&T*, 916 F.3d at 1033 (quotation omitted). Section 7 prohibits any merger that may substantially harm competition in "*any* line of commerce" in "*any* section of the country." 15 U.S.C. § 18 (emphasis added). By the plain language of the statute, a plaintiff need only show competitive harm in one relevant market. *See Anthem*, 855 F.3d at 349. Here, the evidence will show that the relevant markets in which

---

[124] PX289 at CHNG-012166479; PX395 at CHNG-000169368 ████████████████████
████████████ .

competition will be substantially harmed by the vertical aspect of the proposed transaction are

the markets for the sale of commercial health insurance to national accounts and large group

employers.

    In a vertical merger, competitive concern in a relevant market may flow from a "related

product" in a different market that is "positioned vertically or is complementary to the products

and services in the relevant market," such as an input, a means of distribution, or a complement.

U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, VERTICAL MERGER GUIDELINES (2020) at 3,

*available at* https://www.justice.gov/atr/page/file/1290686/download [hereinafter "VERTICAL

MERGER GUIDELINES"].[125] Because a related product is by definition *related to* a relevant

antitrust market, Plaintiffs need not define a market for a related product using the hypothetical

monopolist test or any other test designed to define a relevant product market. (*See supra* Section

V.A.) Nor are Plaintiffs required to show that Defendants have market power over any relevant

market or any related product in order to establish that the proposed transaction will violate

---

[125] Although the FTC recently withdrew its approval of the Vertical Merger Guidelines,
concluding that they contained flaws with respect to purported procompetitive benefits of
vertical mergers, this FTC decision does not undermine the principles on which Plaintiffs rely
here. *See* Statement of Chair Lina M. Khan, Commissioner Rohit Chopra, and Commissioner
Rebecca Kelly Slaughter on the Withdrawal of the Vertical Merger Guidelines (Sept. 15, 2021),
at 2, *available at* https://www.ftc.gov/system/files/documents/public_statements/1596396/
statement_of_chair_lina_m_khan_commissioner_rohit_chopra_and_commissioner_rebecca_kell
y_slaughter_on.pdf. To the contrary, the FTC majority reaffirmed that "raising rivals' costs" and
"misuse of competitively sensitive information" are "important mechanisms by which vertical
mergers can lessen competition." *Id.* at 6. The DOJ "shares the FTC's substantive concerns" that
the Guidelines "overstate the potential efficiencies of vertical mergers and fail to identify
important relevant theories of harm" and, together with the FTC, is reviewing the guidelines to
address these issues. Assistant Attorney General Jonathan Kanter Delivers Remarks on
Modernizing Merger Guidelines (Jan. 18, 2022), *available at* https://www.justice.gov/opa/
speech/assistant-attorney-general-jonathan-kanter-delivers-remarks-modernizing-merger-
guidelines.

Section 7.

The potential competitive harms from a vertical merger extend beyond the possibility of increased prices for customers, "including decreased product quality and reduced innovation." *AT&T*, 916 F.3d at 1045. Such anticompetitive effects arise from "structural or behavioral consequences, such as increased entry barriers, the elimination of unintegrated rivals by foreclosure, or the raising of rivals' costs." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1000a (4th and 5th eds., 2015–2021).

Two "common types" of harm to competition from vertical mergers—both found in this case—arise when, as a result of the transaction, the post-merger firm (1) gains access to its rivals' competitively sensitive information, or (2) can raise rivals' costs for an input.[126] *See* VERTICAL MERGER GUIDELINES at 4. Here, United's acquisition of Change, including its clearinghouse (the related product), is likely to lead to both types of competitive harm in the relevant markets for the sale of commercial health insurance to national accounts and to large group employers.

Where a vertical merger gives the combined entity the ability to use rivals' sensitive business information that was unavailable to the company prior to the merger, such use may

---

[126] In two recent vertical merger cases, the merging parties abandoned the proposed transactions where the government alleged, as here, that the acquisitions would harm competition by giving the acquiring firms access to their rivals' competitively sensitive information and enabling the acquiring firms to raise their rivals' costs. *See* Complaint ¶¶ 9, 14, *FTC v. Lockheed Martin Corp.*, No. 1:22-cv-00174-RDM (D.D.C. Jan. 27, 2022), ECF No. 31-1; Complaint ¶¶ 8–10, *In re Nvidia Corp.*, No. 9404 (F.T.C. Dec. 2, 2021). In non-merger contexts, courts have long recognized that actions that anticompetitively raise rivals' costs may violate the Sherman Act. *See, e.g.*, *McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir. 1997), *overruled on other grounds*, *Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012); *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 63 F.3d 1540, 1553 n.12 (10th Cir. 1995); *Premier Elec. Const. Co. v. National Elec. Contractors Ass'n.*, 814 F.2d 358, 368 (7th Cir. 1987).

result in anti-competitive effects. *See* VERTICAL MERGER GUIDELINES at 10. For example, the merged firm could use its rivals' competitively sensitive information to "moderate its competitive response to its rival's competitive actions," including taking steps that discourage its rivals from taking procompetitive actions, or causing its rivals to refrain from doing business with the merged firm out of concern that their competitively sensitive information will be misused. *Id.* Either course of action can result in the merged firm's rivals becoming less effective competitors, especially where they cannot effectively avoid the merged firm or if they face higher prices or reduced quality due to fewer options in a particular market. *Id.*

> **1.    After the Proposed Transaction, United's Access to Rivals' Competitively Sensitive Information Through Change's Clearinghouse Would Allow United to Harm Competition and Reduce Competitive Incentives of Its Rivals.**

Here, the proposed transaction would give the nation's largest health insurer, UnitedHealthcare, access to its rivals' competitively sensitive information. United is willing to spend $13 billion to acquire Change precisely because of Change's access to vast amounts of data and rights to use those data, including data that Change obtains from providers and channel partners for claims submitted to UnitedHealthcare's competitors. If United acquires such data rights, it would gain access to other health insurers' competitively sensitive information. These data rights would allow United to substantially harm competition in the relevant health insurance markets. United could use the data to figure out the inner workings of its rival insurers' competitive strategies—such as how they put together their networks, who are their best (and worst) customers, and what are the details of how they handle reimbursements. With this inside information, United could co-opt or forestall competition from rivals. Faced with this one-sided situation, rivals would not be as willing or able to be vigorously competitive. They would be less willing to spend money to develop a process or an innovation if United could quickly copy it.

United admits that claims data is ███████████████████████████████.[127] As a vertically integrated business that earns most of its revenues from its health insurance business, United has an incentive to appropriate the confidential strategies of UnitedHealthcare's rivals. This is because UnitedHealthcare's business dwarfs OptumInsight, with or without Change. (UnitedHealthcare's revenue in 2021 was more than $222 billion, compared to OptumInsight's $12 billion.[128]) If United had the rights to mine its competitors' claims data for the benefit of UnitedHealthcare, then United would do so. But today, United lacks the vast competitively sensitive claims data that passes through Change's clearinghouse and, crucially, lacks secondary-use rights to use that data—or other claims data it may have today—for the benefit of its health insurance business.[129] This transaction would give United those rights and thus enable United to harm competition in the large group and national accounts insurance markets.[130]

This proposed transaction would give United a staggering amount of secondary-use rights. Change now has secondary-use rights for nearly sixty percent of the claims data

---

[127] *See*, *e.g.*, McMahon (United) CID Dep. at 59:10–68:4; Golden (United) Dep. at 385:15–387:4, 395:1–24.

[128] *See* PX830 at USDOJ-008-000001478 (UnitedHealthcare's revenue in 2021 was more than $222 billion, compared to OptumInsight's $12 billion); *see also* PX823 at USDOJ-008-000000731 (Change's total revenue in 2021 was just over $3 billion); PX156 at UHG-2R-0018054359.

[129] Today, United has access to some other insurers' claims data through United's clearinghouse and payment integrity products, but generally does not have secondary-use rights for those data.

[130] This issue relates to claims data, not clinical data. United already has rights to use clinical data, which flows from some provider customers that purchase analytic products and it has rights to use UHC's claims data from its national accounts and large group employer customers. But it is the rights to use administrative claims data relating to UHC's rivals—which United generally lacks today—that will allow United to reduce competition in the at-issue health insurance markets.

transmitted through its EDI network.[131] Defendants' expert acknowledges that Change's data rights include ███████████ the claims that Change touches.[132] Given the breadth of Change's network (*supra* at Section IV.B.3), the proposed transaction would give United secondary-use rights to ██████████████ commercial medical claims in the country.[133] These include claims data for UnitedHealthcare's strongest rivals, such as ████████████████████ — companies that compete head-to-head with United for national accounts and large group employers.[134] Change's secondary-use rights are also "unfettered," meaning that today, Change can use them for any purpose that it deems lawful. If the transaction proceeds, United would enjoy equally unfettered rights to its rivals' claims data.

The proposed transaction would harm competition because the merged firm would have different incentives from either United or Change today. United views Change's data as one of Change's ████████████[135] As a profit-maximizing firm, United will have every incentive to use the confidential sensitive information that it receives from Change pertaining to United's competitors for United's benefit. United would be able to reverse engineer and glean insights as to confidential, proprietary, and competitively sensitive information from rival health insurers, such as their insurance plan and healthcare provider network policies as well as their reimbursement methodologies for the commercial insurance markets at issue. United's internal

---

[131] PX027 at UHG-2R-0006509714–715.

[132] Expert Report of Kevin Murphy, dated July 1, 2022 ("Murphy Report"), ¶ 92.

[133] Gowrisankaran Report ¶ 178.

[134] Gowrisankaran Report ¶ 178; *see also* Golden (United) Dep. 142:17–143:3, 211:15–212:3.

[135] PX120.

documents confirm that United has identified opportunities to use "multipayer claims" data—the

exact data and data rights that United seeks to acquire from Change—to adjust its products

████████████████████████████████████████████ and to "track procedure pricing

[and] contracting."[136] United was interested in ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████[137]

    Health insurers that compete with United acknowledge the competitive sensitivity of the

claims data that United would gain the right to use as a result of the proposed transaction. ██



    As Dr. Benjamin Handel of the University of California, Berkeley, an expert in

healthcare economics and the analysis of healthcare claims data, will testify, United could use

---

[136] PX054 at 2.

[137] PX944 at UHG-2R-0003671293.

[138] ████████████████████████

[139] ███████████████

[140] ████████████████████████████

claims data to learn important facts about how rival health insurers compete, such as their: (i) utilization management tools, (ii) negotiations of reimbursement rates with healthcare providers, (iii) healthcare provider network design, and (iv) claims edits.[141] United also could use claims data to understand which employer groups pose more risk and have higher costs of medical treatment, or to identify high-value providers. Making use of these insights would let United co-opt their competitors' successful strategies and reduce health insurer rivals' incentives to innovate and compete in the first place—especially as they come to understand that their competitive strategies will be co-opted by United.[142] Ultimately, United's access to this information would reduce the vigor of competition among health insurers because UnitedHealthcare's health insurer rivals would have reduced incentives to innovate.

United has the capacity to derive these insights from claims data because of United's sophisticated machine learning capabilities, which United has deployed across the entire company.



By combining United's sophisticated artificial intelligence and machine-learning

---

[141] *See* Handel Report ¶¶ 104–123.

[142] *See* Gowrisankaran Report ¶¶ 206–214.

[143] PX271 at UHG-2R-0018070257; *see also* PX267 at UHG-2R-0001800943.

[144] Handel Report ¶ 88.

techniques with Change's data assets from competing health insurers, United would gain the

ability to reverse engineer rival health insurers' proprietary claims edits and glean other

competitive insights.

United's health insurance competitors would be unable to avoid such competitive harm

because health insurers would be unable to disintermediate Change, with its vast number of

healthcare provider connections. After the proposed transaction, United would have the

secondary-use rights granted by healthcare providers, channel partners, and trading partners,

including claims data relating to claims submitted to UnitedHealthcare's rivals. Even if those

insurer rivals themselves do not grant Change data rights for those claims, the providers and

channel partners have frequently done so. Those providers and channel partners would not have

an incentive to switch away from Change under United's ownership, and United's insurance

competitors would be not be able to control whether United has the right to use their claims data

flowing through Change's pipes.[145]

This competitive harm results from a central motivation for United's entering into this

proposed transaction. From the beginning, Change's immense volume of claims data and rights

to use that data were central to United's decision to try to acquire Change. United identified this

data as ███████████████████████████████████████████████.[146] As

United's then-CEO, David Wichmann, testified, access to Change's secondary-use rights was

_____

[145] Today, UnitedHealthcare's largest health insurance rivals do not grant OptumInsight data rights. Similarly, United refuses to license data to firms that could use the data to compete with United. This refutes any suggestion by Defendants that secondary-use rights are of limited competitive value.

[146] PX151 at UHG-2R-0003246975.

"*the foundation by which the business case was made*" for the merger.[147] As United prepared to enter into the transaction, ███████████████████████████████████████ ██████████████████████████████████████.[148] As United's documents show, Change's data—and how those data can benefit UnitedHealthcare—are at the heart of this transaction.

### 2.    HHS Transparency Regulations Would Not Eliminate the Harm from United's Access to Rival Insurers' Claims Data.

Defendants argue that provider rate information is no longer competitively sensitive because the U.S. Department of Health and Human Services' ("HHS") transparency rules—the Hospital Price Transparency Rule[149] and the Transparency in Coverage Rule[150]—require health insurers to publish proprietary pricing information.[151] The clearest reason why this argument is

───────────────

[147] Wichmann (United) CID Dep. 275:2–14 (emphasis added).

[148] PX027 at UHG-2R-0006509714.

[149] By January 1, 2021, the Hospital Price Transparency Rule requires certain hospitals to post machine-readable files of prices for all "items and services," including—among other thing— health-insurer specific negotiated rates, with gross charges, and discounted prices consumers pay. Hospital Price Transparency, 84 Fed. Reg. 65524, at 65525 (January 1, 2021); PX836; *see also* 86 Fed. Reg. 63458 (January 1, 2022); PX837. Hospitals must also disclose pricing information for 300 shoppable services in a consumer-friendly format. *Id.*

[150] The Transparency in Coverage Rule requires certain health insurers to disclose in machine-readable files (1) their in-network negotiated rates and billed charges for all items and services and (2) the allowed amounts paid for out-of-network providers. Transparency in Coverage, 85 Fed. Reg. 72158 (January 11, 2021); PX842. They must also provide plan participants with cost-sharing information in a consumer-friendly form. *Id.* A third part of the rule, requiring disclosure of pharmaceutical negotiated rates and historical prices has been deferred pending further rulemaking. Wu (HHS) Dep. 99:5–14. This final rule is in effect, and HHS announced that it will begin enforcement on July 1, 2022. *See* Wu (HHS) Dep. 223:15–19.

[151] Gehlbach (United) Dep. 249:15–22; PX296; PX793.

wrong is United's own actions—United is willing to spend $13 billion for Change, and Change's data rights are a "foundation" for the deal. If United could get the same information from the transparency rules, it would not need to buy Change for its data rights.

In fact, the transparency rules do not obviate the competitive harm from this transaction. The transparency rules do not require disclosure of provider rate information for all health insurers and all health plans.[152] More importantly, the medical claims data to which United would obtain data rights contains numerous pieces of competitively sensitive data that the transparency rules do not require to be published.[153]

For example, the transparency rules do not require the disclosure of data elements that underlie claims data, such as historical cost of care, actual amounts paid to providers after adjudication, historical claims volumes by service, health insurer claims adjudication policies, health insurer network or benefit designs, and claims edits.[154] But United would be able to learn such competitively sensitive information from Change's claims data. Transparency—if it applied to everybody—might have benefits. But the proposed transaction enables a one-sided disclosure of competitively sensitive information. It would be like a card game in which one player—and one player only—can see the cards in their opponents' hands. It is understandable why United might want that, but it is not likely to bring out the best in the game.

The transparency rules also are limited because health insurers may comply with the rules

---

[152] *See* Wu (HHS) Dep. 62:2–12; 248:13–250:16. For example, the Transparency in Coverage Rule is limited because it does not apply to short-term duration plans, grandfathered plans, and certain kinds of limited health insurance. *See* Wu (HHS) Dep. 62:2–12.

[153] Wu (HHS) Dep. 248:13–250:16.

[154] Handel Report ¶ 62; *see also* ███████████████████████

by providing only the bare minimum.[155] ██████████████████████████



████████████████████████████████████ United's

internal document states that it should ███████████████████████████

████████████████████████[157] So it is likely that United will disclose,

██████████████████████████████████████.[158]

Therefore, even if United (and other health insurers) comply with the transparency rules, and if

the merger were allowed, United would still gain one-sided access to a wealth of other

competitively sensitive information, resulting in harm to the relevant markets.

> **D.**   **The Proposed Transaction May Substantially Reduce Competition in the Sale of Commercial Health Insurance to National Accounts and Large Group Employers by Giving United the Ability and Incentive to Raise its Rivals' Costs Through Change's Clearinghouse.**

A vertical merger may also reduce competition by "foreclosing competitors of the

purchasing firm in the merger from access to a potential source of supply, or from access on

competitive terms." *Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F.

Supp. 2d 657, 673 (S.D.N.Y. 2002). The merger may result in rivals "paying more to procure

necessary inputs." *Sprint Nextel Corp. v. AT&T, Inc.*, 821 F. Supp. 2d 308, 330 (D.D.C. 2011).

As discussed in *supra* Section V.C, Plaintiffs are not required to show that the combined entity

will have market power in any relevant market or over any related product in order to establish

that the proposed transaction violates Section 7. Rather, the harm to competition in a vertical

---

[155] Gehlbach (UHG) Dep. 252:11–253:9.

[156] PX793.

[157] PX296.

[158] PX298.

merger can arise from the combined entity withholding innovations from a competitor. *See AT&T*, 916 F.3d at 1045 ("Vertical mergers can create harms beyond higher prices for consumers, increasing decreased product quality and reduced innovation."); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 1000a (4th and 5th eds. 2015–2021) ("Incrementally raising a rival's costs," including through practices "that make[] it more costly for a competitor to do business," may ultimately lead to "a point where a rival can no longer compete and is forced to exit the market," resulting in a foreclosure of competition). If United is able to acquire Change's clearinghouse, it will have the ability and incentive to withhold necessary innovations from its health insurer rivals, among other harms, ultimately raising their costs to compete in the relevant markets for the sale of commercial health insurance to national accounts and large group employers.

As an independent company, Change is incentivized to pursue clearinghouse innovations that benefit all health insurers using its product.[159] Absent the transaction, an independent Change would be well-positioned, including through Change's existing healthcare provider relationships, to pursue certain innovations, such as ███████████████████████ ███████ and to have the incentive to distribute innovations broadly.[160]

███████████████████████████████████████████████

███████████████████████████████████ For example, as mentioned above,

---

[159] PX136; PX273; PX372; PX531; PX047; PX048; PX841; Joshi (Change) CID Dep. 206:13–218:13.

[160] Gowrisankaran Report ¶ 240.

[161] Gowrisankaran Report ¶ 51.

Change plans ███████████████████████████████████████

████████████████████████████████████████████████

████████[162] Change projects that such innovations could eliminate ██████████████████

████████████████████████████, benefitting health insurers,

providers, and patients.[163] Similarly, United is developing a competing product—███████████████

████████.[164] Post-transaction, however, United would be less likely to pursue significant

innovation without competition from Change. United also would have the incentive to weaken its

health insurer rivals by withholding or delaying their access to such innovations, rendering health

insurer rivals less effective competitors—always a step behind. The result would be harm to

competition in the relevant health insurance markets.[165]

　　　　United could use its control of Change's clearinghouse as additional leverage in dealing

with UnitedHealthcare's rivals by threatening to suspend service to those rivals—by "dropping

them to paper" and sending those claims via paper rather than through the clearinghouse—unless

they concede to United's demands.[166] "Dropping to paper" would lead to negative consequences

for insurers' competitiveness, given the costs, time, and loss of accuracy associated with

processing claims without a clearinghouse.[167] Post-transaction, United would have the incentive

---

[162] Gowrisankaran Report ¶ 53.

[163] Gowrisankaran Report ¶ 54.

[164] Gowrisankaran Report ¶ 55.

[165] Gowrisankaran Report ¶ 240.

[166] *See, e.g.*, PX013; *see also* PX162 at UHG-2R-0000268463; PX163 at UHG-2R-0000329186; Mckinney (United) CID Dep. 209:9–16.

[167] *See, e.g.*, McMahon (United) CID Dep. 282:1–9, 282:13–287:14, 288:11–294:4; PX157 at

and ability to exploit its rivals' fear of this threat to soften the competition UnitedHealthcare

faces in its national accounts and large group businesses, giving United significant leverage

when negotiating contractual provisions.[168]

The merged firm would have substantial incentive to use Change's clearinghouse to raise

health insurer rivals' costs relative to UnitedHealthcare. The profits obtained by

UnitedHealthcare from gaining national accounts and large group employers from its rivals

would be greater than the loss of profits from withholding clearinghouse innovations or from

losing customers that decline to purchase clearinghouse services from the merged firm.[169]

By eliminating Change as an independent innovator through the proposed transaction,

health insurers would have to either: (1) deal with United on United's terms due to threats to

drop to paper or (2) substitute with lower quality products with higher costs, thereby giving

United the opportunity to gain an unfair material advantage in the relevant health insurance

markets.[170] As a result, health insurers would be worse off without an independent Change;

innovation would be reduced and competition among health insurers would be lessened.

 **E.**  **The Proposed Transaction Would Cause Similar Vertical Harms in First-Pass Claims Editing**

The proposed transaction's vertical harms are not limited to the combination of United

and Change's clearinghouse. In combining United and Change, the proposed transaction would

bring together CES and ClaimsXten which, in addition to the near-monopoly in first-pass claims

---

UHG-2R-0000765164; *see also* PX706 at CHNG-000156881.

[168] *See* PX084 at UHG-2R-0002836353; PX003.

[169] *See* Gowrisankaran Report ¶¶ 252–257.

[170] Gowrisankaran Report ¶¶ 252–253, 257.

editing solutions, would also substantially lessen competition in the sale of commercial health insurance to national accounts and large group employers. Defendants argue that the divestiture of ClaimsXten to TPG would eliminate this concern: a divestiture which has yet to occur, and which does not cure the harms posed by this transaction (*see supra* Section VI.B). Should the divestiture not be completed, United's ownership of ClaimsXten would give United the ability to use its rivals' competitively sensitive information, and would also give United the ability and incentive to raise its rivals' costs.

Claims edits are competitively sensitive information.[171] They express an insurer's proprietary business logic around whether to pay or deny a claim, and provide a roadmap to an insurer's health plan and reimbursement policies, as well as its risk allocation methodologies.[172] Insurers spend considerable time and money to develop their custom edits, which can be complex, and which help them drive large—and critical—savings.[173] Custom edits ultimately affect a health insurance plan's costs, and ClaimsXten is known to drive high savings for health insurers—approximately between three and eight percent of annual total claim costs, which translates to billions of dollars for large health insurers.[174] These cost savings, in turn, translate

---

[171] *See* Witty (United) CID Dep. 152:21–153:5; Wichmann (United) CID Dep. 154:14–22; Choate (United) CID Dep. 177:24–179:4; ███████████████████████████████ ██████████

[172] *See* ███████████████████████████████████████████ Choate (United) CID Dep. 177:24–179:4; Root (United) Dep. 49:21–24.

[173] *See* Yurjevich (United) CID Dep. 120:5–12; Turner (Change) CID Dep. 110:10–112:5, 119:10–122:7; *see also* PX029 at 3.

[174] *See* PX314 at UHG-2R-0004819473; PX030 at CHNG-003530348; PX220 at CHNG-003530348; Turner (Change) CID Dep. 127:12–23 ████████████████████████████████ ████████████████████████; 131:2–132:4 ██████████████████████████

into cost savings for health insurance members.[175] The development and implementation of custom edits also directly affect competition in the relevant health insurance markets by differentiating the ways that health insurers are reducing administrative costs for customers, or through differences in the way health insurers will pay claims.[176] National accounts and large group employers evaluate and select health insurers based on their cost-containment and affordability strategies, which are embodied, in part, through an insurer's custom edits.[177] Insurers can differentiate themselves by implementing—with the help of first-pass claims editing vendors—innovative custom edits.[178]

United currently does not have access to its most significant rivals' custom claims edits, because those rivals—including Aetna, Anthem, and Cigna—use Change's ClaimsXten rather than United's CES.[179] Access to its rivals' claims edits would enable United to disadvantage these rivals, including by mimicking their innovative policies to make other health plans less attractive to customers in comparison to UnitedHealthcare.[180] Specifically, United could



---

[175] Witty (United) CID Dep. 60:8–61:6.

[176] *See, e.g.,* ███████████████████████████████████

[177] ████████████████████████████████

[178] *See, e.g.,* ████████████████████████████████████
████████████████████████████ Witty (United) CID Dep. 132:7–17.

[179] PX481 at 5; Yurjevich (United) CID Dep. 196:11–16; PX086 at 6 ███████████████
████████████████████

[180] *See* Gowrisankaran Report ¶ 277; *see also* Gowrisankaran Report ¶ 214.

implement its rivals' proprietary claim edits into its own first-pass claims editing software.[181] This would, in turn, reduce United's health insurance rivals' incentives to continue to develop innovative claims edits,[182] which would ultimately reduce innovation in health plan and healthcare provider network design as well as reimbursement methodologies.

United's ownership of ClaimsXten would also give United the ability and incentive to raise costs for rivals using ClaimsXten.[183] As a starting point, United could increase the price of ClaimsXten and CES, causing an immediate price increase for the use of their first-pass claims editing solutions. United's largest health insurer rivals rely on ClaimsXten as a critical input that saves them billions of dollars per year in medical cost savings.[184] Change currently has the incentive to work "hand-in-glove" with these health insurer-customers to develop and deliver innovations that drive further savings.[185] National accounts and large group employers (as well as their members) benefit from these savings through lower premiums and co-payments, and through increased medical savings.[186]

If United owns ClaimsXten, United could raise its health insurer rivals' costs by delaying

---

[181] Handel Report ¶¶ 119-23; Gowrisankaran Report ¶ 214; Turner (Change) CID Dep. 220:8–223:21 ██████████████████████████████████████████████████████████ ██████████████████████████████████████████ PX400 at 1.

[182] *See* ████████████████████████████

[183] Gowrisankaran Report ¶¶ 273–276.

[184] *See* PX314 at UHG-2R-0004819473; PX030 at CHNG-003530348; PX220 at CHNG-003530348; Turner (Change) CID Dep. 127:12–21, 131:2–132:4.

[185] PX718 at 5; PX726.

[186] PX029 at 3; Turner (Change) CID Dep. 110:10–112:5, 119:10–122:7.

or withholding services, updates, or innovations that its rivals would have otherwise received from ClaimsXten absent the transaction.[187] Given the very few other options in the market for first-pass claims editing and the high costs of switching, these health insurer rivals—now customers—would have no choice but to remain with United and bear the increase in costs or reduction in service.[188] Even if a health insurer were to switch to another vendor, it would bear the high costs, in terms of time and expense, to recreate the breadth of Change's library of edits and develop the capabilities needed, particularly for a large health insurer, to shift to a new platform.[189]

Profits in the relevant health insurance markets are significantly larger than in the market for first-pass claims editing solutions.[190] United would have the incentive to raise its rivals' costs in first-pass claims editing because it would ultimately lessen the competition United would otherwise face in the relevant health insurance markets—even if it meant losing some first-pass claims editing customers. As a result, the proposed transaction is likely to lessen competition in the sale of commercial health insurance to national accounts and large group employers.

---

[187] *See* Gowrisankaran Report ¶¶ 275–276.

[188] *See* Gowrisankaran Report ¶¶ 274–276.

[189] Gowrisankaran Report ¶ 274.

[190] Gowrisankaran Report ¶ 273.

## VI.   DEFENDANTS' JUSTIFICATIONS FOR THE PROPOSED TRANSACTION FAIL

### A.   Defendants Cannot Rebut Plaintiffs' Prima Facie Case That the Proposed Transaction Will Substantially Lessen Competition in First-Pass Claims Editing.

To rebut Plaintiffs' prima facie case that the proposed transaction will substantially lessen competition by creating a near-monopoly in first-pass claims editing, Defendants must show that market concentration data is "not an accurate indicator of the merger's probable effect on competition" in first-pass claims editing. *Sysco*, 113 F. Supp. 3d at 72. Defendants cannot do so.

New entry or expansion into first-pass claims editing will not replace lost competition as a result of the transaction. *See H&R Block*, 833 F. Supp. 2d at 73 (stating that to rebut the government's case, defendants should show that entry by new firms or expansion by existing firms will "fill the competitive void that will result" from the merger); *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 55 (D.D.C. 1998) (stating that entry must be (1) timely, (2) likely, and (3) sufficient to replace the lost competition).

Although other first-pass claims editing vendors exist, they are much less significant than Change's ClaimsXten and United's CES. █████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

---

[191] PX032 at CHNG-000058435; PX329 at 232██████████████████████████
███████████████████████████████████████████████████
          *see also* ███████████████████████████████████████████████
██████████████████████████████████████

█████████████████████████████████████ ██████████████████

███████████████████████████████████████████

███████████████████████████ [193] As such, there are no meaningful competitors in the first-pass claims editing solutions market aside from United and Change. While some small and mid-sized health insurers may be able to utilize claims editing solutions from second-pass claims editing vendors in a first-pass position, those options are not viable for large health insurers, which receive a large volume of claims and, in many cases, have developed extensive custom edits that must be applied to these claims. Second-pass claims editing vendors do not provide the same features and functionality as those offered by first-pass claims editing solutions, which are able to process the volume of claims coming to large health insurers and implement a vast library of edits against them.

Furthermore, entry or expansion in first-pass claims editing is unlikely given significant barriers. Dr. Gowrisankaran's analysis shows that rapid and meaningful entry or expansion would not be timely, likely, or sufficient to offset the anti-competitive effects of the proposed transaction.[194] New entrants seeking to break into the market for first-pass claims editing would need to develop sophisticated software, and to demonstrate the ability to reliably process millions of transactions in real-time, without causing provider abrasion. To the extent that a new entrant could even attempt this, such an undertaking would be extremely expensive and take many years. To this end, recent entrants into first-pass claims editing ████████████ have not found

---

[192] PX330 at UHG-2R-0015627519.

[193] PX105.

[194] Gowrisankaran Report ¶ 260.

meaningful success with customers.[195]

The high costs insurers would face in switching to a new first-pass claims editing solution also undercuts the likelihood that new entry or expansion would meaningfully replace any lost competition, and also reduces the likelihood that insurers will shift to self-supplying a first-pass claims editing solution. Developing and maintaining a homegrown first-pass claims editing solution is a ▮▮▮▮▮▮▮▮ investment, which is not feasible for most health insurers and why health insurers overwhelmingly elect to purchase third party claims editing software today.[196]

## B. Defendants' Proposed Divestiture of ChangeXten Will Not Restore Competition in the Market for First-Pass Claims Editing.

Recognizing the obvious ways in which the transaction violates the antitrust laws, Defendants have purported to fashion their own antitrust remedy by agreeing to sell the ClaimsXten product to a private equity buyer, TPG. According to Defendants, this divestiture would fix the competitive harm in the first-pass claim editing market. Defendants have the burden to show that the proposed divestiture would "restore [the] competition" lost by the merger. *Sysco*, 113 F. Supp. 3d at 72 (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972)); *see also Aetna*, 240 F. Supp. 3d at 60 (merging parties "bear the burden" of introducing divestiture evidence in their "rebuttal" case). To do so, defendants must prove that the divestiture will "replac[e] the *competitive intensity* lost as a result of the merger." *Aetna*, 240 F. Supp. 3d at 60 (quoting *Sysco*, F. Supp. 3d at 72). As the evidence will show, Defendants cannot meet this standard for several reasons.

_____

[195] PX330 at UHG-2R-0015627519.

[196] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also* Gowrisankaran Report ¶¶ 152–153; 260.

*First*, the divested company would lack the assets required to replicate ClaimsXten's competitive positioning today. The divestiture buyer, TPG, acknowledges that this transaction would be a ███████████████████████.[197] Today, ClaimsXten is one part of an end-to-end payment accuracy suite that includes products outside the scope of the proposed divestiture.[198] Customers achieve significant benefits from ClaimsXten being part of a broad end-to-end suite of payment accuracy products.[199] But after the divestiture, ClaimsXten would have to operate as a standalone business. ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████[200] Such a complex carveout poses significant, unacceptable risks.

*Second*, TPG would lack the incentive and ability to replace the innovative products that Change would develop involving ClaimsXten going forward. As a private equity firm, TPG seeks to maximize its short-term returns on ClaimsXten to flip it to a new owner. Unlike Change today, TPG would not be motivated to make significant investments in developing new or innovative products that may become commercialized outside of TPG's narrow investment horizon. ███████████████████████████████████

---

[197] *See, e.g.*, Rhodes (TPG) Dep. 33:1–14.

[198] *See, e.g.*, PX555 at 6.

[199] *See, e.g.*, PX414 at 11.

[200] ████████████████████████████████████
████████████████████████████████████████
████████████████████████████ *See* PX418; *see also, e.g.*, PX558.



[REDACTED]

[REDACTED] [202]

Even if TPG wanted to innovate with ClaimsXten, it would be unable to replicate Change's position in the marketplace and the innovations Change is positioned to introduce. Today, Change has an enterprise-wide strategy [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] (*See supra* Section V.B.2.) TPG, which would lack most of the products involved in [REDACTED] would be able to market ClaimsXten as only a point solution, without the same end-to-end value. TPG would also lack the ability to move forward with Change's strategy of innovating by [REDACTED]

[REDACTED]

*Third*, the new company's ability to invest in innovation would be blunted by the debt burden it must assume to complete the acquisition. [REDACTED]

[REDACTED]

---

[201] [REDACTED] *See* PX649 at 18.

[202] *See* PX747 at 29.

[203] *See* PX284.

▬▬▬▬▬▬▬▬▬▬▬.[204] These obligations would limit the available capital for research and development to maintain ClaimsXten's strong competitive position, especially if the business falters because of its inability to replicate Change's pre-merger competitive positioning. ▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬

▬▬[205] Greater research and development investments would be delayed for years while TPG tries to sell the asset to a buyer with long-term plans. Competition from ClaimsXten may be permanently set back.

*Fourth,* TPG lacks the experience necessary to compete as effectively as Change would if the transaction did not take place. ▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬.[206] Without such a track record, Defendants cannot show that it is likely that TPG will operate the divested business as effectively as Change has operated it historically.

United selected TPG as a buyer in a rushed sale process that underscores TPG's deficiencies. ▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬

---

[204] *See* Raj (TPG) Dep. 39:14–16, 46:16–19.

[205] *See* Raj (TPG) Dep. 46:20–47:10.

[206] *See* Rhodes (TPG) Dep. 29:5–21; Raj (TPG) Dep. 84:7–85:3.

[207] *See, e.g.*, PX553, PX554.

████████████████████████████████████████████ Unsurprisingly, in light of the fact that United was unilaterally selecting a company to become its primary competitor in first-pass claims editing going forward, Defendants' priority in selecting TPG as a buyer was not whether TPG is positioned to compete as vigorously as Change does today.

In sum, regardless of whether the divestiture is a good deal for TPG, it is bad for innovation and competition. It does not come close to restoring the lost competition caused by the proposed transaction.

### C.    United's Purported Firewall Policies Will Not Mitigate the Harm to Competition Caused by United's Acquisition of Change's Data Rights

Defendants have also purported to create a "behavioral" remedy to address the harm to competition from United's access to Change's competitively sensitive information by creating information "firewalls" between UnitedHealthcare and OptumInsight. In other words, Defendants assert that notwithstanding the competitively sensitive information and associated rights that United will amass by acquiring Change's clearinghouse, United's policies will limit the use of that information. Defendants' contention fails because none of United's internal policies that United describes as its "firewalls" would sufficiently protect against United's use of Change's competitively sensitive information about United's insurance rivals to harm competition.

Merger law focuses on market structure, not speculation about whether companies will maintain and adhere to promises. United is a profit-maximizing firm, and under basic principles of antitrust law, "[c]ompanies with multiple divisions must be viewed as a single actor." *AT&T*, 916 F.3d at 1043; *see also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984) ("The officers of a single firm are not separate economic actors pursuing separate economic interests . . . ."). Courts rightly view defendants' "promises about post-merger

behavior" with skepticism. *Heinz*, 246 F.3d at 721; *see, e.g.*, *H&R Block*, 833 F. Supp. 2d at 82

("While the Court has no reason to doubt that defendants would honor their promise, this type of

guarantee cannot rebut a likelihood of anticompetitive effects in this case."). Particular

skepticism is warranted because United lacked *any* singular firewall policy until ████████—

months after Plaintiffs brought suit—when United tailor-made a new policy for the purpose of

trying to address the issues in this litigation.[208] *See Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381,

1384 (7th Cir. 1986) ("Post-acquisition evidence that is subject to manipulation by the party

seeking to use it is entitled to little or no weight."). Until then, United pointed to a hodge-podge

of "data policies" relating to confidentiality, which related to such matters as general antitrust

compliance, confidentiality, security, and HIPAA compliance.[209] ████████████████

████████████████████████████████████████████████

████████████████ Furthermore, United cannot show that any of those pre-existing

policies would address the use of competing insurers' claims data for the benefit of

UnitedHealthcare. This is hardly surprising because, without the proposed transaction, United

does not have data rights that are at all comparable to Change's—certainly not for United's main

health insurance competitors.

---

[208] PX599.

[209] *See* PX677; Dumont (United) 30(b)(6) Dep. 160:12–160:20 ████████████████

████████████; *see also* PX598; Witty (United) Dep. 30:11–32:17 ████████

████████████, 38:3–40:4 ████████████

████████████, 40:22–41:17 ████████████

████████████.

[210] PX676.

[211] PX600 at UHG-LIT-00671329.

Moreover, the policy that United enacted during this litigation for the purpose of bolstering its defenses falls far short of any meaningful remedy for the anticompetitive effects of the proposed transaction. At the outset, this new policy *permits* the use of so-called ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ for any purpose permitted in Change's agreements with its customers.[212] As shown, nearly sixty percent of Change's agreements give Change unfettered secondary-use rights for data from its customers. (*See supra* Section V.C.1.) Further, while United's new made-for-litigation policy claims to prohibit ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ even that provision does not address the concerns here. ▮▮▮▮▮▮▮▮ ▮▮▮▮▮ in many instances are healthcare providers or channel partners—not health insurance competitors to UnitedHealthcare. Change typically obtains secondary-use rights from healthcare *providers* like hospital systems, not from UnitedHealthcare's health insurer competitors. This system works today without harming competition because of Change's independence from health insurers. But if the transaction were to go forward, nothing in the policy would prevent United's use of their claims data to benefit UnitedHealthcare. Even if the policy were otherwise adequate to address the harm to competition, nothing would stop United from modifying or rescinding its own policy at any time.

Beyond these deficiencies in United's existing policies, United cannot credibly assert that it will maintain and implement adequate safeguards in the future. United can change its firewall policies post-merger if it so chooses, because it will still have the incentive and ability after the

---

[212] PX599 at UHG-LIT-01343683; Witty (United) Dep. 55:5–10.

[213] PX599 at UHG-LIT-01343683.

transaction to use Change's data rights for the benefit of UnitedHealthcare. As shown, one of United's major reasons for agreeing to spend $13 billion to acquire Change is to gain access to Change's data rights. (*See supra* Section V.C.1.) These data rights were what "excited" United's then-CEO about Change, they were a key consideration in United's decision to acquire Change, and business documents from the transaction's due diligence period are replete with discussion of how important these data rights will be.[214] They were ultimately the "foundation by which [United's] business case was made" for this transaction.[215] ███████████████████████

████████████████████████████████████████

████████████████████████████████████████ Just after this transaction was announced, United talked about how to share data across its businesses.[218] If the transaction is allowed to proceed, United would have a powerful incentive to prioritize profits over policies and to use Change's data, for which United is paying an enormous sum as part of this proposed transaction.

Further, United's employees frequently rotate throughout the company, and executives of the business units often meet together to discuss operational results and strategies. ████████████████████████████████████████

---

[214] *See also* PX001, PX082, PX161, PX366, PX945.

[215] Wichmann (United) CID Dep. 275:2–12.

[216] PX357.

[217] PX353 at UHG-2R-0001820042.

[218] PX353.

████████████████████████████████████████████ United moves its key

employees around the entire company. For example, United's current CEO, Sir Andrew Witty,

was simultaneously CEO of Optum for some time.[220] Other key United employees have gone

back and forth between UnitedHealthcare and Optum during their career. Optum and

UnitedHealthcare executives regularly meet to discuss results and make strategic plans for the

future. These personnel changes and close coordination between business units give little reason

to believe that any firewall would be effective or lasting. Nothing in United's made-for-litigation

"firewall policy" would effectively prevent such sharing of information.[221]

---

[219] Witty (United) CID Dep. 241:14–22, 242:10–14.

[220] Witty (United) CID Dep. 25:2–13.

[221] Defendants have suggested that because antitrust enforcers have occasionally resolved merger cases with consent decrees that include firewall provisions among other relief, Defendants' self-made "policy" should be deemed to address the competitive harm here. Far from it. Firewalls and other "behavioral" conditions are rarely appropriate remedies for an illegal merger, as the United States has long recognized. *See, e.g.*, Assistant Attorney General Jonathan Kanter Delivers Remarks to the N.Y. State Bar Association Antitrust Section (Jan. 24, 2022), *available at* https://www.justice.gov/opa/speech/assistant-attorney-general-jonathan-kanter-antitrust-division-delivers-remarks-new-york ("Experience shows that it is often impossible to craft behavioral remedies that anticipate the complex incentives that drive corporate decision-making."); U.S. DEP'T OF JUSTICE, ANTITRUST DIVISION, MERGER REMEDIES MANUAL at 4 (2020), *available at* https://www.justice.gov/atr/page/file/1312416/download ("Conduct remedies substitute central decision making for the free market" and "require the merged firm to ignore the profit-maximizing incentives inherent in its integrated structure"); *id.* at 15 ("Firewalls are infrequently used because, no matter how well crafted, the risk of collaboration in spite of the firewall is great."). When firewalls have been included in consent decrees, they have proven "difficult to monitor and enforce" and "presume that the Justice Department should serve as a roving ombudsman of the affairs of business." Assistant Attorney General Makan Delrahim Delivers Keynote Address at American Bar Association's Antitrust Fall Forum (Nov. 16, 2017), *available at* https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-keynote-address-american-bar.

**D.    United's So-Called "Customer Commitments" Will Not Mitigate the Harm to Competition Caused by United's Acquisition of Change's Data Rights.**

In another "behavioral" promise, Defendants rely on so-called "commitments" that United and Change recently sent to Change's customers concerning use of their confidential information after the transaction closes.[222] United offered these commitments ███████ ████████████████████████████ well after Plaintiffs filed suit and barely two months before trial. Like the purported firewall policy, these commitments are a transparent—and failed—attempt to improve Defendants' litigation chances. They come nowhere close to addressing the competitive harms that would result from the proposed transaction.

First, as shown above, merging parties may not rebut a structural harm to competition by a mere promise of good behavior. Moreover, by their own terms, United's commitments are purportedly made to "Change's EDI customers."[223] But the customers from which Change obtains data rights are providers such as hospital systems, not *insurers* that compete with UnitedHealthcare. Change also obtains a meaningful portion of its data rights from channel partners that sell information technology to providers. United's commitments to Change's customers provide no protection to UnitedHealthcare's health insurance rivals. The commitments to Change's current customers ████████████████████████████████ ████████████████ are vague. It would be difficult, if not impossible, for any party to prove that they were breached.

Moreover, the purported commitments also do not address harms related to reduced

_____

[222] *See* DX682, DX686.

[223] DX686 at UHG-LIT-01910893.

innovation. 

Accordingly, if United makes any other innovations to the medical clearinghouse, customers will not have any assurance of receiving those innovations.

Furthermore, United's commitments do not tie United down to any particular policies. Instead, the vague terms used in the commitment letters will give United flexibility to change its policies for the benefit of United.

### E. Defendants' Vaguely Claimed Efficiencies Cannot Save this Transaction.

"The Supreme Court has never expressly approved an efficiencies defense to a § 7 claim." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 778-89 (9th Cir. 2015); *see Anthem*, 855 F.3d at 353 ("it is not at all clear that [efficiencies] offer a viable legal defense to illegality under Section 7") (citing *Procter & Gamble*, 386 U.S. at 580). Even if there were such a defense (which the Supreme Court has not recognized and the D.C. Circuit has questioned), there is nothing about the facts of this case that should cause the Court to recognize it here. *See Sysco*, 113 F. Supp. 3d at 82 ("The court is not aware of any case, and

---

[224] DX686 at UHG-LIT-01910893. Other vague terms in United's purported commitment include █████████████ *Id.*

[225] *See* PX655.

Defendants have cited none, where the merging parties have successfully rebutted the government's *prima facie* case on the strength of the efficiencies."). Moreover, as the D.C. Circuit holds, "once it is determined that a merger *would* substantially lessen competition, expected economies, however great, will not insulate the merger from a [S]ection 7 challenge." *Anthem*, 855 F.3d at 355 (quoting *FTC v. University Health, Inc.*, 938 F.2d 1206, 1222 n.29 (11th Cir. 1991)).

To be cognizable in a merger case, potential efficiencies must be found, based on "close judicial scrutiny," *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 72 (D.D.C. 2018), to be both: (i) "reasonably verifiable by an independent party," *H&R Block*, 833 F. Supp. 2d at 89, and not "mere speculation and promises about post-merger behavior," *Heinz*, 246 F. 3d at 721; and (ii) "merger-specific," meaning "efficiencies that cannot be achieved by either company alone" absent the merger. *Id.* at 721–22. "Efficiencies are inherently difficult to verify and quantify and it is incumbent upon the merging firms to substantiate efficiency claims." *H&R Block*, 833 F. Supp. 2d at 89 (quotation omitted). Otherwise, "the efficiencies defense might well swallow the whole of Section 7 of the Clayton Act because management would be able to present large efficiencies based on its own judgment and the Court would be hard pressed to find otherwise." *Id.* at 91.

In this case, Defendants and their proffered economic expert, Kevin Murphy, make ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████[226]

Defendants fail, however, to provide a reliable basis to verify these supposed efficiencies or to

---

[226] *See* Murphy Report ¶¶ 102–12.

show that they are merger-specific. ██████████████████████████████████

██████████████████████████████████████████████████████████

████████ Such generalities offered by defendants fall far short of rebutting Plaintiffs' showing

of harm to competition.

## VII.   TRIAL PRESENTATION

As with most civil trials, the evidence will consist primarily of documents, live witnesses,

and deposition designations.

*Documents.* This trial will involve a significant number of the Defendants' own

documents. Because Defendants, like most large corporations, extensively use email, electronic

messaging platforms, presentations, and memoranda in conducting their business, those

ordinary-course business documents reflect their understanding of key issues. Recognizing this,

Defendants tried to distance themselves from their documents, during discovery; they are likely

to continue trying to do so at trial. The reasons are obvious: those documents show that the

proposed transaction is likely to cause substantial harm to competition in the markets alleged,

that United can gain access to and use its health insurance rivals' competitively sensitive

information through Change's first-pass claims editing solution and Change's clearinghouse, that

United will have the ability and incentive to raise its health insurance rivals' costs through

Change's clearinghouse, as Plaintiffs allege, and that Defendants' crafted-for-litigation

documents do not alleviate concern but actually heightens it.

*Live Witnesses.* The live witness at trial generally will be of three kinds: defendants' own

employees, experts, and third-party industry witnesses.[227]

_____

[227] Plaintiffs expect few actual readings (or showings) of deposition designations at trial but
some submissions will be made to the Court to establish certain largely non-controversial factual

<u>Industry witnesses.</u> Plaintiffs will present testimony of a number of third-party industry fact witnesses in this case. These witnesses have spent their careers in the healthcare industry and thus have views that are particularly well informed. Plaintiffs' healthcare provider witnesses will testify about the difficulties of switching clearinghouse vendors and how they believe United's use of claims data would impact their ability to negotiate with United, post-merger. Plaintiffs' healthcare insurer witnesses will provide important facts to the Court regarding competition in the large group and national accounts insurance markets, the importance of ClaimsXten and its clearinghouse, and the value of an independent Change, from which the Court will be able to conclude that the proposed transaction is likely to harm competition.

<u>Defendants' employees.</u> The testimony of the defendants' employees will be of two very different types. *First*, Plaintiffs will use concessions made and documents written by many of these employees to support their case. *Second*, Defendants will call their employees to spin a different narrative, trying to explain away prior admissions in their documents and testimony, in an attempt to support allowing the challenged merger to proceed.

<u>Experts.</u> Plaintiffs will call two expert witnesses at trial—an economic expert, Dr. Gautam Gowrisankaran from Columbia University, and an expert in data and analytics, Dr. Benjamin Handel from the University of California, Berkeley. Both Dr. Gowrisankaran and Dr. Handel have provided expert reports setting forth their opinions.

***Deposition Designations***. To efficiently present their case, Plaintiffs will offer testimony through designations of the depositions of Defendants' current or former employees that will provide the Court important additional facts and admissions as to important issues.

---

assertions, to provide evidentiary foundations for the admission of documents, or as party admissions.

## VIII.   CONCLUSION

As this trial brief has laid out, the evidence at trial will show that the effects of United's proposed acquisition of Change may be substantially to lessen competition in the markets for first-pass claims editing solutions in the United States, as well as for the sale of commercial health insurance to national accounts in the United States and to large group employers in local markets. Accordingly, the Court should permanently enjoin United from acquiring Change.

Dated: July 20, 2022                                           Respectfully Submitted,

*/s/ Elizabeth Odette*                                         */s/ Eric D. Welsh*
Elizabeth Odette                                              Eric D. Welsh (D.C. Bar No. 998612)
James W. Canaday                                              Jill C. Maguire (D.C. Bar No. 979595)
Jason Pleggenkuhle                                            Travis R. Chapman
Katherine Moerke                                              A. Maya Khan
Office of the Minnesota Attorney General                      Grace Lee (D.C. Bar No. 198304)
Consumer, Wage and Antitrust Division                         John M. Briggs
445 Minnesota Street, Suite 1400                              United States Department of Justice
St. Paul, Minnesota 55101-2131                                Antitrust Division
Telephone: (651) 728-7208                                     450 Fifth Street, NW, Suite 4100
Email: elizabeth.odette@ag.state.mn.us                        Washington, DC 20530
                                                              Telephone: (202) 598-8681
*Counsel for Plaintiff State of Minnesota*                    Email: eric.welsh@usdoj.gov

*/s/ Olga Kogan*                                              *Counsel for Plaintiff United States of America*
Olga Kogan
Christopher D'Angelo (D.C. Bar No. 502220)
Elinor R. Hoffmann
Amy E. McFarlane
Benjamin J. Cole
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8262
Email: olga.kogan@ag.ny.gov

*Counsel for Plaintiff State of New York*

**APPENDIX A**

This appendix defines some commonly used in the health insurance industry, which appear in this brief and which the Court is likely to hear at trial.

**"ASO" - Administrative Services Only/Self-Insured/Self-Funded Plans** – Health plans in which the employer covers the medical costs, thereby taking on the risk of uncertain medical costs, and pays the health insurer an ASO fee to administer the claims. Larger employers tend to purchase ASO plans because they are able to spread the risk of the medical costs across their employees.

**ASO Fee** – The amount the employer will pay the health insurer to administer the ASO health insurance plan it offers to its employees.

**"CBSA" - Core Based Statistical Area** – A collection of MSAs and micropolitan statistical areas that consist of one or more economically interconnected counties, as measured by commuting patterns, that are located around an urban center consisting of at least 10,000 people.

**Eligible Employees –** Employees that are eligible for medical benefits as determined by the employer.

**Fully-Insured Plans** – Health plans in which the health insurer covers medical costs, thus bearing the risk of member's medical costs and pricing premiums according to those risks. Smaller employers tend to purchase fully-insured plans because they cannot spread the risk of medical costs across their employees.

**Large Group –** Employers with more than 50 or 100 employees.

**Members/Covered Lives** – Employees enrolled under a health insurance plan.

79

**"MSA" - Metropolitan Statistical Area** – Geographic areas defined by the U.S. Office of Management and Budget, and constitute one type of CBSA. MSAs consist of one or more economically interconnected counties, as measured by commuting patterns, that are located around an urban center consisting of at least 50,000 people.

**National Accounts** – Employers with more than 5,000 employees. Some health insurers may use different employee thresholds and may include a requirement that employees reside in more than one state or that employees be eligible employees.

**Premium** – The amount an employer pays to a health insurer to be covered under a fully-insured health insurance plan.

**Provider Network** – Insurers create networks via contracts with healthcare providers. In these contracts, healthcare providers agree to accept payment for services supplied to plan members at a discount in return for the volume of patients that the health insurer will deliver to them as in-network providers. Members who receive care from out-of-network providers face higher fee schedules with no discounts, so the breadth and depth of a health insurer's network factors heavily into an employer's decision to select a certain health insurer.

**"RFP" – Request for Proposals** – The procurement process that an employer undergoes to obtain health insurance. This is a process typically used by large employers.

**Small Group** – Employers with two to 50 or up to 100 employees. In all but four states, a "small group" employer is defined by state law as an employer with two to 50 employees. In the four remaining states, small group employers are defined by state law as having up to 100 employees.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 20, 2022, this filing was served on all Plaintiffs and Defendants' outside counsel of record by email as listed in the Scheduling and Case Management Order (ECF No. 42).

*/s/ Eric D. Welsh*
Eric D. Welsh (D.C. Bar No. 998618)
Travis R. Chapman
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4100
Washington, DC 20530
Telephone: (202) 353-9006
Fax: (202) 307-5802
Email: eric.welsh@usdoj.gov