**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>             *Plaintiffs*,<br><br>v.<br><br>UNITEDHEALTH GROUP<br>INCORPORATED, *et al.*,<br><br>             *Defendants*. | Civil Action No. 1:22-cv-0481 (CJN)<br><br>**[REDACTED VERSION]** |

<u>**AMENDED PRETRIAL BRIEF OF DEFENDANTS UNITEDHEALTH GROUP**</u>
<u>**INCORPORATED AND CHANGE HEALTHCARE INC.**</u>

## TABLE OF CONTENTS

**Page**

**INTRODUCTION**................................................................................................. 1

**FACTUAL BACKGROUND**.................................................................................. 5

    A.    The Market for Commercial Health Insurance ...................................... 6

    B.    Claims Editing Software ........................................................................ 8

    C.    Electronic Data Interchange.................................................................. 9

    D.    OptumInsight ...................................................................................... 11

    E.    Change Healthcare .............................................................................. 15

    F.    The Transaction .................................................................................. 17

    G.    Procedural Background........................................................................ 19

**LEGAL STANDARD** ......................................................................................... **20**

**ARGUMENT** ...................................................................................................... **23**

**I.**    **Plaintiffs' Horizontal Theory Fails To Establish A "Likely" Or "Substantial" Lessing Of Competition In Any Relevant Market.** ....................................... **23**

**II.**    **Plaintiff's Vertical Theories Fail To Establish A "Likely" Or "Substantial" Lessening Of Competition In Any Relevant Market.** .................................... **30**

    A.    Market Facts and Years of UHG Conduct Refute Plaintiffs' Data Misuse Theory of Harm.......................................................................... 31

           1.    UHG's firewall policies prevent anti-competitive access to EDI claims data. ........................................................................ 32

           2.    UHG's multi-payer business model prevents anti-competitive use of EDI claims data. ................................................................ 40

           3.    UHG's commitment to maintain its firewalls wholly undermines Plaintiffs' data misuse theory........................................................ 42

           4.    Plaintiffs' data misuse theory relies on speculation and flagrant mischaracterization of Optum's documents.............................. 43

5.     Plaintiffs overstate the incremental value of Change's EDI claims data in light of the significant data already available in the marketplace. ............................................................. 49

6.     Plaintiffs cannot show market power in the EDI market that would prevent customers and partners from switching EDI vendors. ................. 50

B.     Plaintiffs' Harm-to-Innovation Theory Is Speculative and Wholly Unsupported in the Record. ................................................................. 51

1.     UHG is committed to making EDI-related innovations available on a multi-payer basis. ..................................................... 53

2.     Optum's transparent network and Change's real-time settlement initiatives are not developed technologies. ................................. 55

3.     Optum's transparent network and Change's real-time settlement initiatives are not substitutes. ............................................... 56

4.     Many other companies are developing products similar to the transparent network and real-time settlement. ........................... 58

5.     The transaction will yield substantial benefits. ........................................ 59

C.     Plaintiffs Have Abandoned Their Baseless Service Degradation Theory. ........... 61

D.     Plaintiffs Cannot Prove Harm to Competition or Consumers Under Any Theory. ............................................................................................... 62

**CONCLUSION** ..................................................................................................... **64**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

**Page(s)**

*Am. Hosp. Ass'n v. Azar*,
    468 F. Supp. 3d 372 (D.D.C. 2020) (Nichols, J.) ............................................................49, 50

*Atlanta Channel, Inc. v. Solomon*,
    2021 WL 4243383 (D.D.C. Sept. 17, 2021) ...........................................................................45

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)...........................................................................................................20, 21

*Certain Underwriters at Lloyd's, London v. Sinkovich*,
    232 F.3d 200 (4th Cir. 2000) ..................................................................................................46

*Comcast Cable Commc'ns, LLC v. FCC*,
    717 F.3d 982 (D.C. Cir. 2013) (Kavanagh, J., concurring) ....................................................53

*FTC v. Arch Coal, Inc.*,
    329 F. Supp. 2d 109 (D.D.C. 2004).............................................................................21, 22, 46

*FTC v. Arch Coal, Inc.*,
    No. 1:04-cv-00534-JDB (D.D.C. July 7, 2004), ECF No. 67...........................................23, 24

*FTC v. RAG-Stiftung*,
    436 F. Supp. 3d 278 (D.D.C. 2020) ................................................................................ *passim*

*Kloth v. Microsoft Corp.*,
    444 F.3d 312 (4th Cir. 2006) ..................................................................................................52

*Logan v. Cooper Tire & Rubber Co.*,
    2011 WL 5245373 (E.D. Ky. Nov. 2, 2011)...........................................................................46

*Palmer v. Rice*,
    2005 WL 1278262 (D.D.C. May 27, 2005).............................................................................45

*In the Matter of The Coca-Cola Co.*,
    No. C-4305 (FTC)....................................................................................................................40

*United States v. AMC Ent. Holdings, Inc.*,
    No. 1:16-cv-02475-RDM (D.D.C. Dec. 20, 2016), ECF No. 3 ...........................................3, 40

*United States v. AT&T, Inc.*,
    310 F. Supp. 3d 161 (D.D.C. 2018) ................................................................................ *passim*

*United States v. Baker Hughes Inc.*,
908 F.2d 981 (D.C. Cir. 1990) (Thomas, J.).............................................................20, 21, 22, 23

*United States v. CVS Health Corp.*,
No. 1:18-cv-02340-RJL (D.D.C. Feb. 13, 2019), ECF No. 56...................................3, 6, 7, 39

*United States v. Evangelical Cmty. Hosp.*,
No. 4:20-cv-01383-MWB (M.D. Pa. Aug. 31, 2021), ECF No. 52...................................3, 39

*United States v. Gibson*,
636 F.2d 761 (D.C. Cir. 1980) ............................................................................................45

*United States v. Liberty Latin Am. Ltd.*,
No. 1:20-cv-03064-TNM (D.D.C. Nov. 9, 2020), ECF No. 11..........................................3, 39

**Statutes**

15 U.S.C. § 18........................................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 30............................................................................................................35, 38

Fed. R. Evid. 602 ..................................................................................................................45

Fed. R. Evid. 701 ..................................................................................................................45

**Other Authorities**

16 C.F.R. § 802.65 ................................................................................................................64

ABA Section of Antitrust Law, *Antitrust Law Developments* 587 (6th ed. 2007) .......................47

Dennis A. Yao & Susan S. DeSanti, *Innovation Issues Under the 1992 Merger
Guidelines*, 61 Antitrust L.J. 505 (1993)..........................................................................52, 53

Michael H. Riordan & Steven C. Salop, *Evaluating Vertical Mergers: A Post-
Chicago Approach*, 63 Antitrust L.J. 513 (1995) ...................................................................31

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
Principles and Their Application* ¶ 975g (2022) ....................................................................52

Richard T. Rapp, *The Misapplication of the Innovation Market Approach to
Merger Analysis* Antitrust L.J. 19 (1995) ..............................................................................52

S. Rep. No. 81-1775 (1950) ...................................................................................................21

**INTRODUCTION**

UnitedHealth Group's ("UHG") proposed acquisition of Change Healthcare ("Change") will benefit consumers, foster competition, and reduce cost and friction in the healthcare system. Change offers a suite of over 20 products that complement and enhance those offered by UHG today. Together, the combined companies will accelerate the development of products that will remove waste from the industry's antiquated and byzantine payment process; will foster technologies that give evidence-based, point-of-care insights directly within the workflow of clinicians; and will simplify and accelerate physician billing and patient payment processes, lowering surprise billings and financial burdens. The result will be a better healthcare experience for consumers at a lower cost.

But UHG and Change do not need to establish the pro-competitive *bona fides* of their merger to prevail. Instead, the burden is squarely with Plaintiffs to prove that the combination is likely to lessen competition substantially. And on that score, Plaintiffs' case falls woefully short.

Plaintiffs' lone horizontal theory—premised on the combination of Optum's and Change's first-pass claims editing solutions—fails from the start. UHG has agreed to divest Change's claims editing business (ClaimsXten) to TPG Inc.—a private equity firm with extensive experience investing in healthcare technology. TPG's strong history investing in healthcare and technology, success in executing carve-out transactions, leading access to capital, and specific plans to grow and innovate the ClaimsXten business qualify TPG as an excellent divestiture buyer that will ensure that ClaimsXten remains a market-leading solution in the claims editing space, preserving post-merger competition.

Plaintiffs' case thus boils down to "vertical" merger theories of the kind that have not been successful in a half century. Plaintiffs' first theory is that one UHG subsidiary (Optum) will conduct competitive intelligence on the claims data passing through Change's Electronic

1

Data Interchange ("EDI") and provide that competitively sensitive information to another UHG subsidiary (UnitedHealthcare or "UHC").  UHC allegedly will then use that information to poach its insurer rivals' innovations, thereby discouraging those rivals from innovating in the first place.  Plaintiffs' second theory is that owning Change's EDI clearinghouse will give UHG the ability to raise its rivals' costs, either by denying them access to new innovations derived from claims data, or by directly slowing or eliminating their EDI transactions.  Both theories lack record support, rely almost entirely on speculation, and are weaker than the last high-profile vertical-merger case that the Department of Justice tried and lost in this District.  As the court made clear in *United States v. AT&T, Inc.*, 310 F. Supp. 3d 161 (D.D.C. 2018), antitrust enforcers are not entitled to a Clayton Act injunction simply because they have concerns about what ***might*** happen in some imaginable version of the future.  Rather, to justify the drastic remedy of enjoining a merger, Plaintiffs must point to record evidence establishing that a challenged transaction is "likely" to lessen competition "substantially," given the state of the market, the record in the case, and evidence-based predictions about what is "probable" to happen in the future.  Plaintiffs' case does not come close to meeting that standard.

*First*, there is no plausible reason—much less a "likely" one—to believe that Optum will misuse health insurers' claims data flowing through Change's EDI pipes to provide competitive intelligence to UHC.  *Contra, e.g.*, Compl. (ECF No. 1) ¶¶ 11-13, 91-98.  Like all of its vertically integrated competitors, UHG maintains robust firewalls preventing competitively sensitive information, including claims data, from being shared between Optum and UHC.  Optum's healthcare data analytics business, OptumInsight, has long had access to rival insurers' claims data, because it has long provided products and services to those rival insurers.  But there is no evidence that OptumInsight has ever used that data to provide competitive intelligence to UHC.

Nor would UHG tolerate future noncompliance with its firewalls: there are clear economic, legal, and reputational consequences that would stem from misusing customer data, and doing so would imperil the over ███████ in annual revenue that, OptumInsight currently receives from non-UHC payer customers.  UHG also has offered contractual commitments to Change's EDI customers to maintain its proven firewalls and granted annual review rights so customers can see for themselves that UHG's firewalls are working.

The Department of Justice has previously recognized that similar economically motivated firewalls, including in the healthcare industry, are sufficient to protect competitors' data, and there is no reason to believe those same protections are not adequate here. *See, e.g.*, *United States v. Evangelical Cmty. Hosp.*, No. 4:20-cv-01383-MWB (M.D. Pa. Aug. 31, 2021), ECF No. 52; *United States v. Liberty Latin Am. Ltd.*, No. 1:20-cv-03064-TNM (D.D.C. Nov. 9, 2020), ECF No. 11; *United States v. AMC Ent. Holdings, Inc.*, No. 1:16-cv-02475-RDM (D.D.C. Dec. 20, 2016), ECF No. 3; *United States v. CVS Health Corp.*, No. 1:18-cv-02340-RJL (D.D.C. Feb. 13, 2019), ECF No. 56.  Indeed, nearly all of UHC's major competitors are part of vertically integrated companies that also guard competitors' data through firewalls.

***Second***, there is no basis to believe that UHG will take steps to raise its rivals' costs, either by hoarding innovations or by delaying or denying their EDI transactions.  Optum is a fiercely multi-payer business that has provided ████████ in products and services to health insurers besides UHC.  Nothing about the transaction will change Optum's multi-payer business model and, in fact, the entire thesis for the transaction is to ***expand*** Optum's multi-payer, multi-provider offerings.  This is reflected in UHG's prior conduct, its deal documents, and basic economy theory: Optum makes more money selling products to third parties than it would make by exclusively providing them to UHC.  Plaintiffs have no evidence to the contrary.

Moreover, in the contractual commitments made to Change's EDI customers, UHG also has promised that Optum will continue to offer innovations to all payers and providers, including innovations developed in whole or in part through the use of claims data available on Change's EDI network, and it will continue to provide EDI services consistent with industry standards.

Plaintiffs' allegations to the contrary rely on the type of unsupported speculation that doomed the government's case in *AT&T*.  There is a complete failure of proof on each of Plaintiffs' core theories: there is no evidence of any intention to misuse competitors' claims data to provide competitive intelligence to UHC; there is no evidence of any prior firewall violations resulting in abuse of competitors' claims data already in Optum's possession; there is no evidence of any intent to hoard innovations or discard Optum's longstanding business model of making products and services available to third parties; and there is no evidence of any intent, or even ability, to slow down or eliminate competitors' EDI transactions.  Nor can Plaintiffs show how either of their core vertical or horizontal theories actually harm competition or consumers in any relevant market.  The merger promises significant benefits to customers in the form of lower total cost of care and improved clinical outcomes, and there is no evidence—only speculation—that these customers would be be harmed.

Equally troubling is Plaintiffs' inability to muster support from almost anyone in the healthcare industry.  Of the over 200 entities Plaintiffs contacted during their investigation, only four have employees who are appearing at trial; only two are from major commercial health insurers; and one of those insurer-affiliated witnesses is a former employee who is not authorized to speak on the company's behalf and whose knowledge is stale.  Their testimony, to the extent there even is any concerning UHG's intentions, will be based on speculation and a complete lack of knowledge about Optum's or Change's internal plans or policies pre- and post-merger, just

like the testimony rejected in *AT&T*.  To be clear, other payers also were deposed in this matter, but that testimony was unremarkable, speculative, and often affirmatively harmful to Plaintiffs' case.  Directly contrary to Plaintiffs' theories, rival payers affirmed that: ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

Some antitrust merger cases are close; this one is not.  After 18 months of investigation and litigation, dozens of depositions, and tens of millions of pages of documents produced by UHG and Change, Plaintiffs' theories come nowhere close to showing a "likely" or "probable," much less a "substantial," lessening of competition.  It is beyond time for the deal to proceed, and Plaintiffs' request for injunctive relief should be denied.

## FACTUAL BACKGROUND

The commercial-health-insurance market is highly complex and highly competitive.  It is a dynamic marketplace full of well-funded, vertically integrated entities always looking for ways to increase efficiencies and improve patient care.  UHG is one such company.

UHG has two primary business segments: UHC and Optum.  UHC and Optum are segregated, independent businesses that serve different needs within the commercial health insurance marketplace.  UHC is a health insurance business that competes with other major insurers, such as Anthem, Aetna, Cigna, and local Blue Cross Blue Shield affiliates across the country.  UHC covers 26 million people, offers plans for individuals, employers, and small businesses, and provides Medicare and Medicaid services.  *See* PX830 at USDOJ-008-000001446, USDOJ-008-000001449 to 1452.

Optum is a family of three companies—OptumHealth, OptumRx, and OptumInsight—that provide a broad range of healthcare-related services to health insurers, care providers, state governments, and life-science companies.  DX-0782 at 9.  OptumHealth offers care delivery, care management, wellness and consumer engagement, and health financial services.  PX830 at USDOJ-008-000001447.  OptumRx provides a diversified array of pharmacy care services.  *Id.* OptumInsight utilizes data analytics to provide software solutions for healthcare business needs, including revenue cycle management, solutions-based care programs, and payment integrity services. *Id.*

## A.     The Market for Commercial Health Insurance

The purpose of commercial health insurance is simple: to provide healthcare coverage to everyday Americans.  A majority of Americans' health insurance needs are met by employer-sponsored plans, through which employers partner with health insurers—called "payers"—to develop plans tailored to their employees' needs.  To help develop these plans, payers typically categorize their employer-customers based on the number of employees and their geographic distribution.  These categories include national accounts and large group accounts.  National accounts refer to large employers with a multi-state geographic footprint and headcount, which UHC (and some other payers) generally define as multi-state employers covering over 5,000 lives.  *See, e.g.*, 5/17/22 W. Golden Dep. Tr. 34:7-35:12, 141:13-142:7.  ██████████████  ████████████████████████████████  Large group accounts refer to smaller groups of employers—those with more than 50 employees in multiple states (or, in some jurisdictions, over 100 employees), as defined by UHC and other large payers.  *See, e.g.*, *id*.

Employer groups have the option to choose either a self-funded administrative-service-only ("ASO") plan or an insurer-funded, fully-insured plan.  *See id.* at 55:25-56:24.  Under an ASO plan, an employer covers its members' medical costs, but pays a fee for administration of

the plan and to access, among other things, a payer's provider network. *See id.* at 55:25-56:17. Key factors that employers consider in choosing an ASO plan include the level of administrative fee, the strength of provider network, and the customizability of services offered. *See id.* at 175:8-179:24. Under a fully-insured plan, an employer pays a premium to a payer in exchange for the payer covering member medical costs, providing benefits to plan members, and administering the plan. *See id.* at 55:25-56:17. Key factors in choosing a fully-insured plan include pricing/affordability, the strength of provider network, and plan design. *See id.* at 189:1-9, 189:14-191:20; 11/30/21 T. Choate Dep. Tr. 118:10-122:15. National account customers very rarely choose fully-insured plans. ASO plans constitute the "vast majority" of plans for these large customers. *See* 5/17/22 W. Golden Dep. Tr. 144:12-15, 132:1-21 ("[N]ational accounts works almost exclusively in self-funding.").

The commercial health insurance market is extremely competitive among payers. *See* 7/11/22 Expert Report of K. Murphy ("Murphy Rpt.") ¶ 78 & Ex. 5. Exact shares depend on the market segment, but UHC reaches between ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███ . *See* Murphy Rpt. ¶¶ 78-79 & Ex. 5; PX820 Ex. 3. Shares of large group accounts in more localized markets vary and are more difficult to calculate, but generally speaking, ██████ ███████████████████████ has the leading share, often by a considerable margin. *See* Murphy Rpt. ¶ 80; PX820 ¶ 136; 5/17/22 W. Golden Dep. Tr. 142:17-143:3, 214:12-20.

To provide quality and cost-effective benefit plans payers rely on a variety of technology solutions and data analytics to improve their products, whether purchased or self-designed. Two of those products form the basis for Plaintiffs' complaint: claims editing software and EDI.

These are separate products that perform different functions for claims submissions within the health insurance system.

### B.   Claims Editing Software

The first product at issue is claims editing.   Claims editing software automatically identifies certain errors when a provider's payment request does not meet a payer's reimbursement requirements, whether because of incorrect coding, medical necessity, or other payer standards.   *See* PX208 at UHG-2R-0017648784.   Claims editing software thus contains various rules, such as not reimbursing the same procedure twice, and provides "edits" that implement a payer's standards and policies.   Certain edits are developed by third-party vendors (*e.g.*, OptumInsight or Change) and made generally available to customers; other "custom" edits are developed for specific payers.   *See* 12/9/21 E. Schmuker Dep. Tr. 88:7-17.

There are two primary types of claims editing solutions—first-pass and second-pass— both of which ensure clinical and administrative accuracy in the claims payment process.   First-pass claims editing solutions automatically process millions of claims per day for healthcare payers as part of the claims adjudication process.   *See* 11/29/21 M. Turner Dep. Tr. 43:23-44:16. Second-pass claims editing solutions may be used in the pre-adjudication phase, but more often are used in the post-adjudication phase and can involve manual review and edits.   *See* 6/16/22 L. Lautzenhiser Dep. Tr. 123:7-124:8.

The claims editing software market is also competitive.   The primary competitors— specifically in the first-pass solutions market—are Change (through its ClaimsXten business), OptumInsight, Cotiviti, Zelis, and Burgess/HealthEdge.   DX-0413 at UHG-2R-0000122681. ClaimsXten has been on the market for many years, has a high customer retention rate, and is widely considered to be the leading claims editing offering.   *See* DX-0739 at 6.   Claims editing software is a small share of the overall administrative cost of selling commercial insurance: using

UHC as a benchmark, Change's first-pass claims editing fees would comprise just ███ of UHC's administrative costs.  *See* Murphy Rpt. Ex. 20.

### C.    Electronic Data Interchange

EDI is the primary way of transmitting medical claims and remittance advice between providers and payers.  Claims and remittances sent through EDI must use standardized message formats for fields and codes and comply with industry-wide operational standards.  EDI is commonly referred to as the "pipes" that connect payers and providers, and facilitate payment of medical claims.  The data transmitted through an EDI network includes coverage status, medical claims, reimbursement requests, and remittance information.  As relevant here, there are two primary types of EDI transactions: (i) 837 transactions, which are claims providers submit to payers in order to receive payment for their services; and (ii) 835 transactions, which are payer responses to provider claim submissions that inform providers how a particular claim has been adjudicated.  *See* 1/19/22 P. McKinney Dep. Tr. 105:4-106:1.

On the provider side, providers typically file claims by submitting the claim directly in a payer's portal or using revenue-cycle management ("RCM") software to do so.  *See* 11/22/21 M. Peresie Dep. Tr. 236:17-237:2.  When a provider submits a claim directly to a payer portal, no EDI transaction is involved.  *See* DX-0447 at UHG-2R-0003101797.  Some RCM vendors also directly connect to payers, so again, no EDI transaction is involved—███████████████ ████████████████████████████████████████████, DX-0836 ¶¶ 9-10.  In other cases, however, RCM systems submit claims to payers through an "EDI clearinghouse," which serves as a connection pathway (again, sometimes referred to as a "pipe") between payers and providers.  *See* DX-0447 at UHG-2R-0003101797.

On the payer side, payers can and do maintain connections with multiple (sometimes many) EDI networks.  This creates many different pathways, or pipes, for a claim to reach a

payer.  *See* 11/22/21 M. Peresie Dep. Tr. 197:9-198:16.  Payers also may engage an EDI clearinghouse as a "managed gateway," providing a single entry point for EDI submissions to that particular payer.  *See id.* at 84:10-85:9.  Change's EDI network is not a managed gateway for any payers identified by Plaintiffs as rivals of UHC for national accounts and large group employers; in fact, none of the ████████████ in the United States use Change as their sole, or managed gateway, EDI connection.  Murphy Rpt. ¶¶ 154-73 & Table 11.  To facilitate the transmission of claims to entities (providers or payers) to which an EDI vendor may not be connected, EDI clearinghouses have agreements to transmit claims they receive from other EDI clearinghouses on behalf of such EDI's clearinghouse; when a claim is sent under one of these agreements, it is sent through a "hop."  *See* 1/19/22 P. McKinney Dep. Tr. 66:10-13, 66:20-68:5; 11/22/21 M. Peresie Dep. Tr. 94:9-95:2.

EDI is essentially a "commoditized" service with vendors competing on price.  *See, e.g.*, DX-0069; 11/22/21 M. Peresie Dep. Tr. 205:24-206:8; 1/19/22 P. McKinney Dep. Tr. 103:12-104:4; DX-0418 at UHG-2R-0000326149.  Contractual relationships allow for a monthly flat fee for EDI services (a model more often used by providers) or per-transaction fees (a model more often used by payers).  *See* 11/22/21 M. Peresie Dep. Tr. 129:17-130:6, 131:14-132:2; 1/19/22 P. McKinney Dep. Tr. 105:4-12.  In many cases, payers and EDI clearinghouses contract for a "free" EDI model.  *See* 1/19/22 P. McKinney Dep. Tr. 103:1-104:4; DX-0815 at CHNG-007391816.  Some of the largest payers operate under the free model because connecting to large payers is more important for providers than it is for payers to be connected to every provider. *See* Murphy Rpt. ¶ 163.

These aspects of EDI make the clearinghouse market highly competitive.  In addition to Change, EDI competitors include Availity, Waystar, Trizetto, SSI Group, nThrive, Office Ally,

Ability, and Zelis, among others.  *See* DX-0445 at UHG-2R-0002976381; DX-0624; Murphy Rpt. ¶ 64 & Ex. 4; DX-0176; PX820 Ex. 7.  EDI transaction fees are a microscopic portion of overall administrative costs in the sale of commercial insurance.  *See* Murphy Rpt. Ex. 20 (EDI's fees would make up just ███ of UHC's administrative costs).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████.  *See* 6/15/22 A. Chennuru Dep. Tr. 183:10-184:18.

### D.    OptumInsight

OptumInsight uses data analytics to provide a variety of services to its customers, the largest of which are payers and providers.  For payers, OptumInsight provides payment integrity services (including claims editing), risk and quality services, analytic platforms, and consulting services to improve clinical and administrative performance.  DX-624 at UHG-LIT-0122643. For providers, OptumInsight provides analytics and consulting to assist in revenue cycle management, 5/24/22 E. Schmuker Dep. Tr. 26:6-9; software to assist payers in assessing health risk and quality metrics, 12/7/22 R. Hardy Dep. Tr. 163:15-164:16; and solutions for value-based care programs, Murphy Rpt. ¶ 46.  Finally, as for EDI, OptumInsight has contracted with a separate EDI vendor, ███████, to handle some EDI traffic that OptumInsight collects.  12/7/21 T. Gustin Dep. Tr. 181:13-19; *see* DX-0524.  OptumInsight still provides managed gateway services for UHC, as well as for certain legacy customers, but the vast majority of OptumInsight's "non-UHC EDI volume" goes through ██████.  *See* 12/7/21 T. Gustin Dep. Tr. 181:13-19, 183:23-184:13.

Although UHC is one of OptumInsight's payer customers, OptumInsight is "fiercely multi-payer."  *See* 12/10/21 D. Wichmann Dep. Tr. 155:25-156:17; *see also* 1/19/22 P. McKinney Dep. Tr. 59:17-60:1; 4/21/22 C. Hasslinger Dep. Tr. 187:3-188:2.  As the evidence

will show, of the roughly top 200 payers (on an entity-wide basis) in the United States, most of them do business with OptumInsight, including nine out of the ten largest insurers.  Optum's multi-payer commitment also means that OptumInsight deals at "arm's length" with UHC, *see* 12/21/21 A. Witty Dep. Tr. 266:20-267:25, and that UHC does not receive special discounts, *see, e.g.*, DX-0409; DX-0410 at UHG-2R-0000101652.

Because OptumInsight provides legacy EDI services and claims editing services to payers across the industry, it already receives substantial amounts of competitively sensitive payer information, including claims, member, and provider data.  *See* DX-0624; Murphy Rpt. ¶ 120.  Through its EDI services alone, in 2021, OptumInsight received claims from over ███████ different providers and sent claims to over ██████ non-UHC payers (on a plan basis). Murphy Rpt. ¶ 119.  This included ████████ non-UHC payer claims per month, including from UHC competitors like ████████████████████████████.  *Id*.  Optum also receives competitively sensitive information through its payment integrity services, including its claims editing solution, CES.  For instance, OptumInsight today provides certain ████████ ███████████████████████████████████, *see, e.g.*, DX-0472 at UHG-2R-0004420987 to 4420988;  provides ███████████████████████ ████████████████████████████████████████████ ██, *see* PX583; DX-0015; and ████████████████████████████████, *see, e.g.*, DX-0308; DX-0377.  All told, OptumInsight has the "[l]argest collection of claims and [electronic medical record] data in the industry," DX-0749 at 3, extending to "nearly 270 million deidentified lives," DX-0782.

OptumInsight does not share with UHC either the claims data it receives from external customers, or competitive intelligence or insights that could be gleaned from that data.

OptumInsight's business model, financial success, and reputation depend on providing products and services to external customers, including many that compete with UHC.  *See* DX-0816 ("No competitor to UHC wants to work with Optum if there was any risk of that leading to a loss of competitiveness . . . .").  Accordingly, it is "[f]undamental and core to [Optum's] strategy" that it "maintain[] the integrity and trust . . . of these customers that their data will not be utilized in a manner that they don't authorize."  12/10/21 D. Wichmann Dep. Tr. 156:18-157:25.

OptumInsight has always worked "to the best of [its] ability" to "ensure that . . . this data is never shared."  *Id.*  Consistent with UHG's longstanding commitment and culture of ethical business practices, OptumInsight employees are prohibited from sharing external customer data with UHC absent legitimate reasons and permissions for doing so.  DX-0780 at 18-20.  As UHG's CEO previously stated, protecting competitively sensitive information is "a religion we really operate by."  DX-0816.

Fortifying this culture of integrity are UHG's firewalls and data-usage policies, which prohibit OptumInsight from sharing—and UHC from accessing—competitively sensitive information of Optum's payer-customers.  UHG has a 23-year track record of ensuring that competitively sensitive information and personal health information are sufficiently protected.  DX-0664 at UHG-LIT-01779311.  The fundamental and default principle of UHG's firewalls is that UHG personnel cannot access a customer's competitively sensitive information unless it is required for them to perform services for the customer.  *Id.* at UHG-LIT-01779312.

UHG had these policies in place prior to this action, *see id.*, but to eliminate any doubt on a go-forward basis, UHG updated its policies to make clear, in no uncertain terms, that those protections would extend to new assets following the merger.  These policies provide:

- "The disclosure of External Customer CSI to UHG business units that are competitors of such External Customers is strictly prohibited";

- "The use of External Customer CSI to benefit UHG business units that are competitors of such External Customers is strictly prohibited"; and

- "UHG employees may not access External Customer CSI unless such access is necessary to perform their job responsibilities."

DX-0654 at UHG-LIT-01343683.  As an additional backstop, UHG has an antitrust compliance policy that also prohibits the sharing of competitively sensitive information between UHG business units.  *See* DX-0529 at UHG-2R-0017320326; DX-0527 at UHG-2R-0018175027.

In addition to internal policy controls, UHG's contracts with its payer customers reflect and require commitments to data privacy.  For example, most of UHG's contracts forbid use of raw claims data: de-identification is almost always a prerequisite to secondary-use rights.  UHG strictly prohibits attempts at re-identification.  Over the years, Optum has cultivated trust with its customers through audits—performed by both Optum and Optum's customers—to confirm compliance with these contractual obligations.  12/2/21 P. Dumont Dep. Tr. 21:7-12.

UHG follows its policies and contractual obligations to the letter and will continue to do so following the merger.  12/10/21 D. Wichmann Dep. Tr. 155:25-157:25.  To ensure compliance across the company, UHG has an "advanced and sophisticated technology architecture and infrastructure" of internal firewalls that prevent the sharing of competitively sensitive information across business units.  *Id.*  There is no evidence that UHG has breached its firewalls to obtain the competitively sensitive information or claims data of Optum's payer-customers for the benefit of UHC.  Following an in-depth review of its own compliance,



.  *See* DX-0780 at 18-19.                .  *Id.* at 19.

E.     **Change Healthcare**

Change was founded in 2007 and combined with McKesson Corp.'s technology business in 2017 to create the healthcare technology company as it exists today.  Murphy Rpt. ¶ 50.  Change has three primary business units, each providing a variety of healthcare solutions.  The first is its software and analytics solutions segment, which "help[s] improve financial performance, payment accuracy, clinical decisions, revenue cycle management ('RCM'), value-based payment, provider / consumer engagement, imaging, and clinical workflows."  *See* DX-0774 at 11.  This segment serves payers (commercial and governmental), providers (hospitals, health systems, and physicians/other providers), and IT vendors.  The second is its technology-enabled services segment, which include "RCM services, value-based care, consumer engagement, payment services, pharmacy benefits administration, third-party administration services and healthcare consulting."  *Id.* at 12.  This segment serves payers (commercial and governmental), providers (hospitals, health systems, and physicians/other providers), IT vendors, retail pharmacies, and reference labs.  The third is its network solutions unit, which offers solutions that "enable financial, administrative and clinical transactions, electronic business-to-business and consumer-to-business payments, and provide aggregation / analytics capabilities for clinical and financial data."  *Id.*  This is the segment that houses Change's EDI business and serves payers (commercial and governmental) and providers (hospitals, health systems, and physicians/other providers).

Change's EDI or "medical network" transmits medical claims data from payers and providers, either directly (including through Change's own back-end RCM products) or indirectly, though channel partners or trading partners.  ██████████████████████████

████████████████████████████████████████████████████████████

██████████   *See*  Murphy Rpt. ¶ 66 & Table 7.  Channel partners are RCM, electronic medical

record ("EMR"), and other practice management software vendors that submit claims on behalf of providers and aggregate claims.  *See, e.g.*, 5/19/22 M. Peresie Dep. Tr. 90:14-21; 11/22/21 M. Peresie Dep. Tr. 49:3-24, 63:16-64:3.  Trading partners are other EDI clearinghouses from which Change sends and receives claims ("hops").  *See* 11/22/21 M. Peresie Dep. Tr. 31:24-32:6, 48:23-49:24, 59:11-14.  ████████████████████████████████████████,

*see id.* at 158:16-24, ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████.  *See* Murphy Rpt. ¶ 54 & Table 6.  ████████████

████████████████████████████████████████████.  *See* Murphy Rpt. Exs. 16-17.

As with Optum, Change customers may or may not provide "secondary use" rights in their data.  Change's default position is that no secondary use rights attach to a customer's claims data unless specifically permitted by contract, and Change never walks away from a deal if the customer declines to give data rights.  5/12/22 K. Joshi Dep. Tr. 298:21-299:9.  Change only uses the data as permitted by applicable law and contract, and has policies to ensure that appropriate confidentiality protections are applied.  1/19/22 T. Suther Dep. Tr. 56:20-57:23.

Change's ClaimsXten product (which will be divested if the merger moves forward) is a market-leading claims editing solution.  ClaimsXten focuses primarily on its first-pass claims editing functionality, which is the "gold standard" and "market leading solution" in that space. *See* PX314 at UHG-2R-0004819522.  ClaimsXten and related divestiture assets are used by ████ ████████ commercial health insurance payers and by ████████████████████████████. *See* DX-0616 at UHG-LIT-01112228.  ClaimsXten's Q2 revenue for 2022 was ████████████████

16

███████████████████████████████.  *See id.*  ████████████████████

██████████████████████████████.  *See* Murphy Rpt. Table 6.

ClaimsXten is entirely separate from Change's EDI network.  Customers, including

payers, can and frequently do purchase claims editing and EDI services separately, and bundling

is not a significant feature of the market for these products.  12/7/21 T. Gustin Dep. Tr. 189:3-13;

5/31/22 R. O'Reilly Dep. Tr. 120:5-17.

### F.      The Transaction

On January 6, 2021, UHG announced that it had agreed to acquire Change.  After due

diligence, Change proved to be an attractive asset with approximately numerous products

"complementary" to Optum's current business model.   *See* PX096 at UHG-2R-0004290040.

Change also boasted a talented management team, excellent customer relationships, and an

impressive technology culture.  *See id.*  The integration of Change's culture and strong product

portfolio present a unique opportunity to generate clinical innovation at sufficient scale.   *See*

DX-0739 at 7, 10.  From a financial perspective, Change also showed consistent, positive year-

over-year growth in each of its three business units and an average EBITDA margin of ████.

*See id.* at 15.

There are specific, near-term synergies that map onto each of the transaction's broader

goals.  In terms of complementary offerings, Change has a widely adopted technology product,

called InterQual, that integrates evidence-based clinical criteria directly into clinician workflows.

*Id.* at 5, 10, 32.  Optum does not have any similar commercial products in this area but can pilot

innovative approaches to providers for improved clinical outcomes and ultimate cost savings.

*See id.*; *see also* DX-0762 at 1-2.  Change's InterQual capability was a key strategic asset in

UHG's decision to pursue the acquisition.   *See* 11/30/21 C. Rudolph Dep. Tr. 195:21-196:8;

12/8/21 R. Musslewhite Dep. Tr. 239:16-240:2.  Together, the combined companies will be able

to more quickly and effectively bring to market tools that can assist providers in furnishing the best evidence-based health care and improve clinical outcomes for patients.

Similarly, the merger will drive simplification of payments to providers in immediate and meaningful ways. For example, one cause of higher transaction costs is the large number of provider payments that are still made by paper check. DX-0762 at 13. Manual payment systems like paper checks create unnecessary transaction costs for providers and payers, including additional fees. *Id.* at 13-14. Change has been trying to convert providers to electronic payment systems, but its efforts have slowed because Change does not have access to its own automated clearinghouse ("ACH") to execute direct deposits. *Id.* at 14. Optum, on the other hand, does have its own ACH called OptumPay. *Id.* Post-transaction, by integrating Optum's and Change's offerings, the combined company will be able to offer the providers that partner with Change the ability to use ACH payments without burdensome administrative hoops.

Finally, the transaction will eliminate overhead costs simply by reducing duplicative infrastructure and corporate overhead. *Id.* at 16-17. These savings, as the evidence will show, will allow the joint organization to invest more in the continued improvement and updating of Change's technology, which will further lower administrative costs across the healthcare system. *See id.* at 17.

In addition to the near-term synergies, UHG and Change see the transaction as an exciting long-term opportunity to speed and expand OptumInsight's efforts to remove waste from the industry's antiquated and byzantine claims submission process. Even incremental improvements, like those described above, can have very positive effects on the quality of care and contribute to more affordability, reduced costs, and better access for patients. *See, e.g.*, *id.* at 1-2, 7.

### G.       Procedural Background

Notwithstanding the pro-competitive rationale for the deal and the absence of any evidence of misconduct, the Department of Justice and its state attorney general counterparts decided to pursue this case.[1]   Before filing this lawsuit, Plaintiffs—led by the Department of Justice—conducted an exhaustive 14-month investigation into the proposed transaction. Plaintiffs left no stone unturned: UHG and Change produced 6.8 million documents, totaling 28.9 million pages from over 150 custodians; Plaintiffs deposed 23 witnesses from UHG and Change, and they also contacted over 200 third parties.   One focus of the investigation was the claims editing piece of the transaction, which was the only part of the deal that could conceivably pose horizontal antitrust problems; but the investigation also encompassed vaguely defined and shifting concerns about the claims data flowing through Change's EDI network.

UHG worked with Plaintiffs each step of the way to try to address their concerns.   As to claims editing, UHG agreed to divest Change's ClaimsXten business.   As to EDI, although Plaintiffs' concerns were unfounded, UHG endeavored to address those too.   UHG committed to Plaintiffs that it: (i) would not alter Change's practice of making aggregated, de-identified data available to the market; (ii) would maintain its robust firewall processes and extend those processes to Change's business to protect sensitive customer data; (iii) would continue to process EDI transactions consistent with industry standards; and (iv) would make available to payers and providers alike products or services developed (if any) using Change's medical EDI data.

Plaintiffs nevertheless sued to block the transaction.   Compl. (ECF No. 1).   Plaintiffs asserted three violations of Section 7 of the Clayton Act, 15 U.S.C. § 18: (i) the transaction

---

[1]    Ten other state attorneys general from California, Colorado, Iowa, Illinois, Indiana, Massachusetts, Mississippi, Nevada, Tennessee, and Washington joined the investigation, but declined to take part in Plaintiffs' lawsuit.

would tend to create a monopoly in the first-pass claims editing solutions market by combining UHG's and Change's first-pass claims editing products; (ii) UHG's acquisition of Change's EDI network would substantially lessen competition in the markets for the sale of commercial health insurance to national accounts and large group employers; and (iii) acquiring Change's EDI network would allow UHG to raise its rivals' costs by denying or delaying their access to innovations or slowing or stopping their EDI transactions.   Compl. (ECF No. 1) ¶¶ 84-113. Since filing suit, Plaintiffs have conceded that they "did not rely, in whole or in part, on . . . (if any exist) economic analyses or models for allegations included in the complaint."  *See* DX-0751 at 8; *id.* at 4 ("Plaintiffs continue to maintain that they did not 'rely in whole or in part' on their own economic analyses or models (if any) to support the allegations of the complaint or the press release . . . .").

Plaintiffs again pursued extensive discovery during the litigation phase: Plaintiffs received over 300,000 additional documents, totaling over 1.9 million pages from UHG and over 540,000 additional documents, totaling over 2.7 million pages from Change.  The parties also received over 40,000 documents, totaling nearly 300,000 pages from third parties, and have conducted approximately 40 additional depositions.

## **LEGAL STANDARD**

Section 7 of the Clayton Act prohibits a merger if, "in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition."  15 U.S.C. § 18.  This language has long been interpreted to prohibit transactions only where harm is probable or likely: the "mere possibility" of harm to competition is not enough.  *E.g.*, *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 189-90 (D.D.C. 2018) (citations omitted), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 984 (D.C. Cir. 1990) (Thomas, J.); *see also Brown Shoe Co. v.*

*United States*, 370 U.S. 294, 323 (1962) ("[N]o statute was sought for dealing with ephemeral possibilities.  Mergers with a probable anticompetitive effect were to be proscribed by this Act."); *Brown Shoe*, 370 U.S. at 323 n.39 (explaining the Clayton Act "would not apply to the mere possibility but only to the reasonable probability" of anticompetitive effect (quoting S. Rep. No. 81-1775 (1950), *as reprinted in* 1950 U.S.C.C.A.N. 4293, 4298)); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 115 (D.D.C. 2004) ("Section 7 deals in probabilities not ephemeral possibilities." (citation omitted)).

        To carry their burden, then, Plaintiffs must marshal sufficient evidence that the challenged "transaction is likely to lessen competition" in a substantial way.  *See, e.g.*, *Baker Hughes*, 908 F.2d at 984-85; *AT&T*, 310 F. Supp. 3d at 189-90 (citation omitted); *accord Arch Coal*, 329 F. Supp. 2d at 115.  This standard demands a "reasonable probability" of competitive harm, *see AT&T*, 916 F.3d at 1032 (citation omitted), which must be "'sufficiently probable and imminent' to warrant relief," *see Arch Coal*, 329 F. Supp. 2d at 115 (citations omitted).  *See also, e.g.*, *Brown Shoe*, 370 U.S. at 323 & n.39; *Baker Hughes*, 908 F.2d at 984 & n.5; *AT&T*, 310 F. Supp. 3d at 189-90.

        "[A]ntitrust theory and speculation cannot trump facts," and Plaintiffs must make their case "on the basis of the record evidence relating to the market and its probable future."  *AT&T*, 310 F. Supp. 3d at 190 (quoting *Arch Coal*, 329 F. Supp. 2d at 116-17).  Evidence that "it could be ***possible*** to act in accordance with" Plaintiffs' "theories of harm is a far cry from evidence that the merged company is ***likely*** to do so," let alone "succeed in generating anticompetitive harms as a result."  *Id.* at 210 (emphases added).

        In evaluating a proposed transaction, "[n]othing less than a comprehensive inquiry" into the "structure, history[,] and probable future" of a market is expected, keeping in mind that "the

Clayton Act protects 'competition,' rather than" competitors.   *See id.* at 165, 190 (citations

omitted); *see also* U.S. Dep't of Just. & Fed. Trade Comm'n, Vertical Merger Guidelines §§ 1-2

(2020) (DX-0776).   A federal district court performs that inquiry by using a familiar burden-

shifting framework.   *See, e.g.*, *AT&T*, 916 F.3d at 1032; *Baker Hughes*, 908 F.2d at 982-83.

Under that framework, Plaintiffs must "establish a *prima facie* case that the merger is likely to

substantially lessen competition."   *AT&T*, 916 F.3d at 1032.   The burden then "shifts to the

defendant[s]" to discredit the evidence supporting the *prima facie* case or to "present evidence

that the *prima facie* case 'inaccurately predicts the relevant transaction's probable effect on

future competition.'"   *Id.* (citation omitted); *Baker Hughes*, 908 F.2d at 991; *Arch Coal*, 329 F.

Supp. 2d at 116.   A "fairly weak *prima facie* case" "requires less of a rebuttal showing by

defendants."   *See Arch Coal*, 329 F. Supp. 2d at 158.   If sufficient evidence exists to rebut the

*prima facie* case, the burden shifts back to Plaintiffs to produce "additional evidence of

anticompetitive effects."   *AT&T*, 916 F.3d at 1032 (citation omitted).

In a typical horizontal merger case, antitrust enforcers establish harm to competition by

showing increased market concentration, which triggers a "'presumption' that [a] merger will

substantially lessen competition"; this "short-cut" is unavailable in a vertical merger case, where

antitrust enforcers must make a "'fact-specific' showing" that the proposed merger is likely to be

anticompetitive.   *See AT&T*, 310 F. Supp. 3d at 192 (citations omitted).   Plaintiffs have "the

ultimate burden of proving a Section 7 violation by a preponderance of the evidence," and a

"failure of proof in any respect will mean the transaction should not be enjoined."   *Id.* at 189

(citations omitted).

## ARGUMENT

I.   **Plaintiffs' Horizontal Theory Fails To Establish A "Likely" Or "Substantial" Lessing Of Competition In Any Relevant Market.**

The sole basis for Plaintiffs' claim that the transaction is "presumptively" anticompetitive is the allegation that the combination of Optum's and Change's claims editing products "tend to create a monopoly in first-pass claims editing solutions."  *See* Compl. (ECF No. 1) § V.C. & ¶¶ 108-13 (capitalization omitted).  The merger, Plaintiffs warn, will combine the two largest competitors in the first-pass claims editing market—Optum's CES business, which Plaintiffs claim has over ███ market share, and Change's ClaimsXten business, which Plaintiffs claim has over ███ market share.  *See id.* ¶¶ 60-61; PX820 ¶ 15 & Ex. 5.  Standing alone, the creation of an entity with a 90% combined market share might establish a "presumption" that the transaction is anticompetitive by creating "undue concentration in the" first-pass claims editing market.  *See Baker Hughes*, 908 F.2d at 982.

But this depiction challenges an imaginary transaction.  Pursuant to a signed divestiture agreement between UHG and TPG, Change will sell its ClaimsXten business—along with its purported ███ market share and a $2.2 billion price tag—to TPG, a respected private equity firm with experience in the healthcare technology space.  The divestiture resolves the alleged anticompetitive concerns with any horizontal overlap, and Plaintiffs cannot redefine the transaction to sidestep the obvious competitive implications of the divestiture.

A federal court tasked with evaluating a merger must first "defin[e] the transaction that is being challenged."  *See* Mem. Op. at 3, *FTC v. Arch Coal, Inc.*, No. 1:04-cv-00534-JDB (D.D.C. July 7, 2004), ECF No. 67 (*Arch Coal* MIL Order).  Although "there is a lack of clear precedent providing an analytical framework for addressing the effectiveness of a divestiture that has been proposed to remedy an otherwise anticompetitive merger," it is clear that a "transaction" being

challenged under the Clayton Act can include multiple agreements related to the disposition of the relevant business. *See Arch Coal* MIL Order at 5 ("[T]he transaction that is the subject of the FTC's challenge is properly viewed as the set of two transactions involving the acquisition of Triton by Arch and the immediate divestiture of the Buckskin mine to Kiewit.").

The only threshold legal question is who bears the burden of addressing the competitive impact of a proposed divestiture. Under one line of cases, it is Plaintiffs' burden to show that the combined effect of a transaction and divestiture will be to lessen competition substantially. *See Arch Coal* MIL Order at 6. This approach makes particular sense where, as here, a plaintiff affirmatively challenges a divestiture's ability to address competitive concerns related to a transaction: in such a case, it is really the transaction ***and*** the divestiture that are subject to scrutiny under the Clayton Act. *See id.* at 4–5 ("[T]he FTC . . . issued its administrative complaint challenging the merger *after* 'determin[ing] that the competitive concerns posed by Arch's acquisition of Triton were not remedied by Arch's offer to sell the Buckskin mine to Kiewit.' Thus, the FTC has assessed and is in reality challenging the merger agreement including the Buckskin divestiture." (second set of brackets in original) (citation omitted)).

Under a different line of case law, it is Defendants' "burden to show that a proposed divestiture will replace the merging firm's competitive intensity." *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 304 (D.D.C. 2020). Factors bearing on a proposed divestiture's adequacy include "the likelihood of the divestiture; the experience of the divestiture buyer; the scope of the divestiture[;] the independence of the divestiture buyer from the merging seller[;] and the purchase price." *RAG-Stiftung*, 436 F. Supp. 3d at 304.

Although Plaintiffs should bear the burden of proving that the transaction and divestiture, taken together, will substantially lessen competition, the differing approaches are ultimately

immaterial because Defendants prevail under either standard.  The robust divestiture package offered here ensures that all assets and personnel needed to preserve competition in the first-pass claims editing market will transfer to TPG, and TPG intends not only to maintain the quality of the ClaimsXten tool, but also to enhance it through increased investments in research and development efforts.

*Likelihood of Divestiture.*  The divestiture of ClaimsXten to TPG is a virtual certainty if the merger goes forward.  UHG and TPG have entered a definitive purchase agreement, all conditions of which have been satisfied, except those that will be satisfied at closing or that relate to the resolution of this case.  *See* DX-0198 § 5.1.  TPG already has secured financing commitments to help cover the $2.2 billion purchase price for ClaimsXten.  *See id.* § 4.19(f); 6/15/22 N. Raj Dep. Tr. 39:2-16, 40:6-21.  TPG is a highly motivated buyer committed to shepherding the divestiture to closing, ██████████████████████████████████ ████████████████████████████████████████████████████████████████████.  *See* 6/15/22 N. Raj Dep. Tr. 149:25-150:18; 6/20/22 J. Rhodes Dep. Tr. 173:12-174:11.  The record is clear that there are no "significant obstacles to closing," UHG and TPG have "agreed to use all commercially reasonable efforts" to satisfy all closing conditions, and TPG is "capable of closing financially."  *See RAG-Stiftung*, 436 F. Supp. 3d at 304-05.

*Buyer Experience.*  TPG's experience with similar transactions confirms its commitment to this divestiture.  TPG has a strong history with healthcare technology and carve-outs; leading access to capital for healthcare investment; and ███████████████████████████████ ██████████████████████████.  *See, e.g.*, 6/20/22 J. Rhodes Dep. Tr. 240:22-241:11.

TPG is a very experienced carve-out investor in the healthcare and technology space.  *See id.* at 36:15-22.  In the last 5 years alone, TPG has executed high-profile carve-outs of Boomi (a

cloud integration platform) from Dell, CarePort (an end-to-end healthcare coordination platform) from AllScripts, and Wind River (a software platform and developer for critical infrastructure companies) from Intel. *See* PX595 at CHNG-013781322; 6/20/22 J. Rhodes Dep. Tr. 310:24-311:8. TPG's most active areas of growth and investment are in healthcare and technology companies, and it currently has over ██████ in total equity deployed in the healthcare space, including in health services, healthcare providers, medical products, and healthcare IT and software. *See* DX-0617 at UHG-LIT-01118036 to 1118037. TPG's operational and investment experience in healthcare technology extends to companies like Convey Health Solutions (a healthcare IT company), LifeStance (a behavioral healthcare company), WellSky (a web-based EMR healthcare and care coordination company), IQVIA (a healthcare data and analytics company), and Allogene (a clinical-stage biotechnology company). *See* 6/20/22 J. Rhodes Dep. Tr. 259:16-19; DX-0617 at UHG-LIT-01118036 to 1118038. TPG even has experience with businesses that interact with first-pass claims editing through its ownership of payers and providers. *See* 6/20/22 J. Rhodes Dep. Tr. 30:25-31:14; *see also id.* at 55:7-19 ████████
████████████████████████████████████████████████████
████████████████████████████████████.

TPG premises its investment strategy on committing to innovating and growing the investment's existing product lines. *See id.* at 52:18-53:10. TPG historically has increased post-acquisition research and development spend in acquired healthcare companies by an average of ████. *See* DX-0617 at UHG-LIT-01118036. Keeping with this tradition, TPG has developed a thesis and plan to accelerate investment in ClaimsXten to drive additional growth, in significant part through new product innovation. *See* 6/15/22 N. Raj Dep. Tr. 34:19-35:12. ████████
████████████████████████████████████████████████████

█████████████████████ .  *See* DX-0402 (████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████ ).  TPG expects these investments to ███████████████████████████████

*see* 6/15/22 N. Raj Dep. Tr. 147:18-148:10, and create ███████████████████████

███████████████████████████ *see* 6/20/22 J. Rhodes Dep. Tr. 21:1-10.  Of course,

UHG and Change need not prove that the divestiture business will be ***more*** competitive, but

TPG's track record and plan to increase R&D spending leaves no doubt that the divestiture

business will remain at least as competitive as it is today.

Equally important, TPG will support its monetary investment with investments in human

capital.  ████████████████████████████████████████████████████████████

███████████████████████████████ .  *See* 6/15/22 N. Raj Dep. Tr. 143:1-8.  This

includes longtime ClaimsXten leader, Carolyn Wukitch, who for the past four years has served

as the Senior Vice President and General Manager of Network and Financial Management (the

business unit that includes ClaimsXten), ████████████████████████████████ .  *See*

6/6/22 C. Wukitch Dep. Tr. 14:3-12, 118:12-17.  Drawing on the existing management team's

"wealth of experience is an important component in helping [TPG] replace [the] competitive

intensity" in first-pass claims editing.  *See RAG-Stiftung*, 436 F. Supp. 3d at 305.  TPG also plans

to deepen ClaimsXten's talent pool.  TPG has consistently grown the employee footprint of the

companies it acquires, and it intends to do so with ClaimsXten.  Consistent with its strategic

vision for the company, TPG plans to build out a team that will drive innovation in data analytics

to support the growth and delivery of value to customers.

The divestiture of ClaimsXten to TPG thus is a paradigmatic example in which a private equity buyer is equal, or even superior, to a "strategic" buyer.  *See* DX-0777 at 24-25.  As the Department of Justice has recognized, financial buyers like TPG have "flexibility in investment strategy," are "committed" to strategic acquisitions, and are "willing to invest more when necessary"—all factors that are indicative of an exemplary divesture buyer.  *See id.*  TPG brings all of this, and then some, to the table, and its plan for ClaimsXten ███████████████████ ███████████████████████  *See* DX-0617 at UHG-LIT-01118045.  TPG is committed to ClaimsXten's existing management team and to increasing investment for long-term growth and innovation.  The divestiture therefore will ensure ClaimsXten remains a market-leading claims editing solution and preserves competition in this space, and Plaintiffs have no meaningful evidence to the contrary.

*Scope of Divestiture.*  The divesture also guarantees that, post-acquisition, TPG will have the necessary assets to maintain ClaimsXten's status as a best-in-class claims editing tool.  The divestiture package includes all aspects of the ClaimsXten technology, infrastructure, customer relationships, and management team, providing that the assets transferred to TPG shall include

███████████████████████████████████████████████

██████████  *See* DX-0198 at § 2.6.  This removes "any remaining doubt" about ClaimsXten's sustainability under TPG's stewardship, and by extension, any probability that the proposed transaction will substantially lessen competition.  *See, e.g.*, *RAG-Stiftung*, 436 F. Supp. 3d at 306.

*Independence of the Divested Assets.*  ClaimsXten's ability to function as a standalone business unit further underscores the adequacy of the divestiture.  The operation of the ClaimsXten business does not hinge on technical, coding, editing, or other dependencies

associated with Change's EDI or any other Change business.  As TPG's managing partner, Jeff

Rhodes, testified, ClaimsXten ███████████████████████████████████████

███████████████████████████████████████████ compared to other carve-outs TPG

has undertaken.  *See* 6/20/22 J. Rhodes Dep. Tr. 39:6-22.  ███████████████████

███████████████████████████████████████████████████████████

█████████████████████████.  *See* 6/15/22 N. Raj Dep. Tr. 60:11-22.  █████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████ *See id.* at 60:11-61:6; *see*

*also id.* at 61:7-12 ████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████; 6/6/22 C. Wukitch Dep. Tr. 73:2-8, 74:19-22.

     ████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████, no aspect of the ClaimsXten business will depend upon the

merged UHG-Change entity for its operation.  *See* DX-0198 Ex. B § 1.6.  ███████████

███████████████████████████████████████████████████████████

█████, *see* 6/15/22 N. Raj Dep. Tr. 70:24-71:22, at which point ClaimsXten will be a stronger

claims editing competitor than it is today.  Post-divestiture, the management team will be ██████

███████████████████████████████, rather than other aspects of Change's business.  *See*

6/20/22 J. Rhodes Dep. Tr. 61:1-10.  TPG's post-divestiture vision for ClaimsXten easily

satisfies the Department of Justice's own definition of a "standalone business" and will ensure

that ClaimsXten continues its record of "demonstrated success competing in the relevant

market." *See* DX-0777 at 8-9; DX-0198 § 3.8 (███████████████████

████████████████████████████████████████████████

██████ ).

    ***Purchase Price.***  Nor is there any serious argument that the divestiture did not command

an adequate purchase price.  TPG will buy ClaimsXten for $2.2 billion, at an EBITDA multiple

of ██████████████████████████████████████████████

████████████████████████████████████████████████

██████ .  The $2.2 billion TPG will pay for ClaimsXten thus reflects not only the thoroughness

of TPG's ███████████ and █████████ due diligence process, but also the attractiveness of the

ClaimsXten business and the fairness of the purchase price.  *See* 6/15/22 N. Raj Dep. Tr. 311:13-

313:15.

    TPG is "a good-faith purchaser that intends to compete effectively in [first-pass claims

editing] and grow the business," and ClaimsXten is a business that essentially has operated as an

independent business for years.  *See RAG-Stiftung*, 436 F. Supp. 3d. at 307-08.  The divestiture

solves any horizontal problem with the proposed transaction, and Plaintiffs cannot show any

concentration or substantial lessening of competition in the market for first-pass claims editing.

## II.    Plaintiff's Vertical Theories Fail To Establish A "Likely" Or "Substantial" Lessening Of Competition In Any Relevant Market.

    "[U]nlike horizontal mergers," antitrust enforcers bringing vertical challenges "cannot

use a short cut to establish a presumption of anticompetitive effect . . . because vertical mergers

produce no immediate change in the relevant market share."  *AT&T*, 916 F.3d at 1032.  Plaintiffs

must make "a 'fact-specific' showing that the effect of the proposed merger 'is likely to be

anticompetitive,'" which "is 'necessarily both highly complex' and 'institution specific.'"

*AT&T*, 310 F. Supp. 3d at 192 (citations omitted).  That showing is complicated by the general

"recognition among academics, courts, and antitrust enforcement authorities alike that 'many vertical mergers create vertical integration efficiencies between purchasers and sellers.'"  *Id.* at 193 & n.19 (quoting Michael H. Riordan & Steven C. Salop, *Evaluating Vertical Mergers: A Post-Chicago Approach*, 63 Antitrust L.J. 513, 519 (1995)).  Indeed, as the Department of Justice has noted, vertical mergers are less likely than horizontal mergers to create competitive problems, often because such mergers "benefit consumers through the elimination of double marginalization."  *See* U.S. Dep't of Just. & Fed. Trade Comm'n, Vertical Merger Guidelines § 1 (2020) (DX-0776).  That is a considerable understatement: the Department of Justice has not prevailed in a vertical merger case since the Nixon administration, and this is not the case that should break that streak.  None of Plaintiffs' theories establish likely and substantial harm to competition, and Plaintiffs' request for an injunction should be denied.

### A.    Market Facts and Years of UHG Conduct Refute Plaintiffs' Data Misuse Theory of Harm.

Plaintiffs' primary theory of harm turns on the following daisy-chain of allegations: (i) Change has the largest EDI network, from which payers and providers cannot "disintermediate"; (ii) post-transaction, Optum will be able to access individual claims information from rival payers through Change's EDI network; (iii) Optum might turn over some de-identified form of that claims data to UHC or analyze the data and provide competitive intelligence to UHC; (iv) UHC will use rival payers' claims data or insights generated by Optum to co-opt or steal rivals' practices and innovations, whether in plan design, network design, claims edits, pricing, or underwriting; and (v) that will cause UHC's sophisticated, well-funded competitors to forgo innovations in the first place, thus harming competition in the commercial-insurance markets for national accounts and large group accounts. *See* Compl. (ECF No. 1) ¶¶ 11-12, 85-98.  To describe this theory is to discredit it, and on every score Plaintiffs' chain of inferences fail.

1.     *UHG's firewall policies prevent anti-competitive access to EDI claims data.*

UHG's firewall policies are the beginning and end of Plaintiffs' data-access theory. UHG maintains industry-standard firewall policies that prohibit Optum from sharing competitively sensitive information with UHC.  And those policies work.  There is no evidence showing that Optum intends to breach or alter its firewall policies or that it historically has failed to protect competitor claims data or other sensitive competitive information.

***UHG's Firewall Policies.***  UHG has maintained policies for decades that prevent UHG businesses from improperly sharing their customers' competitively sensitive information.  Those policies warn employees to "[a]void disclosing customer or supplier information to other" UHG business units and to "[e]xercise caution when communicating with another [b]usiness [u]nit that is a competitor of a customer."  DX-0529 at UHG-2R-0017320327.  The reason is clear: "[d]isclosure might give the other [b]usiness [u]nit an unfair advantage over its competitors or might negatively affect the ability of a competitor of another [b]usiness [u]nit to compete."  *Id.* UHG's policies thus prohibit the very use of claims data hypothesized by Plaintiffs, regardless of what secondary-use rights exist in Change's EDI customer contracts.

In May 2022, Optum issued a consolidated firewall policy specifically addressing the transaction with Change, and prohibiting the use of competitively sensitive information obtained from customers of OptumInsight or Change.  *See* DX-0654.  This policy was nothing new: it was a specific application of UHG's longstanding principles to avoid any doubt about its position on the use of medical claims data acquired through the transaction.  This policy declares:

- "The disclosure of External Customer CSI to UHG business units that are competitors of such External Customers is strictly prohibited";

- "The use of External Customer CSI to benefit UHG business units that are competitors of such External Customers is strictly prohibited"; and

- "UHG employees may not access External Customer CSI unless such access is necessary to perform their job responsibilities."

*Id.* at UHG-LIT-01343683.  UHG's firewall policy also limits employees' ability to access external customers' competitively sensitive information and where such information may be stored.  *See id.*

What is more, UHG's policies work.  Because it has long offered products and services to a variety of payers and providers (including payers that compete with UHC), for years Optum has received substantial amounts of rival payers' claims data, medical records, adjudication rules, contract information, and other competitively sensitive information.  This is true of both OptumInsight and OptumHealth, the latter of which is a care delivery business that directly contracts and transacts with virtually all of UHC's payer competitors.  There is no evidence that Optum has ever provided that confidential information directly to UHC, or analyzed that information (at UHC's behest or otherwise) to provide UHC with competitive insights or intelligence.  *See, e.g.*, DX-0780 at 18-20; DX-0779 at 6-12.  To the contrary, based on a review of available data logs and employee interviews, ███████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████.  *See, e.g.*, DX-0780 at 18-20; DX-0610; DX-0611; DX-0612; DX-0613; DX-0614; DX-0615; *see* 7/1/22 C. Tucker Report (Tucker Rpt.) ¶ 23 ██████████████████████████████████████████████████████████████ ████████████████████████  Notwithstanding almost two years of investigation and litigation

discovery, Plaintiffs have not identified a single instance in which Optum misused a customer's sensitive information to benefit UHC either.[2]

Local "Blues." Optum provides services to "Blue" plans that insure nearly ███████ members. For example, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ See DX-0472 at UHG-2R-0004420988. Crucially—and in direct conflict with Plaintiffs' theory in this case—████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████ and have rated Optum as ████████████████████████████ Id. (emphasis added). ████████████████

████████ likewise has provided claims information to Optum, totaling ████████████

████████ Id. at UHG-2R-0004420989. ███████████████████████ does not ████████

████████████████████████████ and, at the start of the parties' contractual relationship,

██████████████████████████████████████████████ Id. at UHG-2R-0004420988. ██████████████████████ has ████████████████████████████████████

████████████████████████████████████ for Blue-affiliated plans, including ████████████████████████████ Id. at UHG-2R-0004420989. In

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

their judgment ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████ *Id.* at UHG-2R-0004420991 (emphasis omitted).

    <u>Anthem.</u>  Anthem, a multi-state insurer with a Blue Cross Blue Shield license in fourteen

states, is another major competitor of UHC ███████████████████████

███████████████████████████████████████████████

███████████████████████. *See, e.g.*, PX583; DX-0015. ███████████████

███████████████████████████████████████████████

███████████████████████████████████████. *See* DX-0015 at

ANTHEM-DOJ-0028786; *see also* DX-0016 at ANTHEM-DOJ-0028795-96 ████████████

███████████████████████████████████████████████

████████  ████  ████████████  ████████  ████████  ████  ██████  ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

████.  In another blow to Plaintiffs' theory, ████████████████████████

███████████████████████████████████████. *See, e.g.*,

DX-0729 at USDOJ-001-000001353 ████████████████████████

████████████████████████; 6/15/22 A. Chennuru (Anthem Rule 30(b)(6)) Dep. Tr.

30:19-31:1 ████████  ████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████.

<u>Aetna.</u>  UHC competitor Aetna also has contractual relationships with Optum, ████

████████████████████████████████████████████████████████████.  Aetna has

engaged Optum to █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████  DX-0308 at SPEC-18-00000253 (emphasis added). ██

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████  *Id.* at SPEC-18-

00000257.  ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████  *Id.*  ███████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████  ███████████  ███████████████  ██████

████████████████████████████████████████████████████████████████████████████

███████████████████████████  *Id.* at SPEC-18-00000257-58.  There is no evidence

that Optum ever misused this information or competitive insights from it to improve UHC's

insurance plans.

<u>Optum's Incumbent Service.</u>  Through its legacy EDI business, Optum touches

█████████████████████████  claims and clinical records on an annualized basis, *see* DX-0782 at

13, ███████████████████████, *see* DX-0824 to DX-0830.  Although this includes a substantial number of claims from other payers, *see* Murphy Rpt. at Table 10, Plaintiffs have not alleged—and UHG is not aware of any instance in which—rival insurers' claims were harvested to benefit UHC's commercial health insurance business.

Plaintiffs offer no persuasive response to this "past is prologue" point.  If Plaintiffs' theory were correct, one would expect UHG to already be mining the nearly ████████ claims flowing across Optum's EDI network and the enormous amounts of competitively sensitive information Optum has access to through other services.  Or at the very least, one would expect payers to throttle back on innovations in their health plans as a result of Optum's broad access to their claims data.  Neither harm has come to pass, which is strong evidence that Plaintiffs' theory of harm is speculation and nothing more.

***Other Payers' Firewall Policies.***  Plaintiffs' response—that UHG's "firewalls would be insufficient to protect against the risk of [UHC] accessing and using this information," Compl. (ECF No. 1) ¶ 120—is meritless.  UHG's policies are consistent with the policies of other vertically integrated health insurers whose non-insurance affiliates receive and protect rivals' claims data using firewalls.  Plaintiffs' suit ignores that this is simply how the industry works.

Anthem and its subsidiaries, for example, maintain firewall policies nearly identical to UHG's.  *See, e.g.*, DX-0026 (Anthem Diversified Business Group); DX-0022 (Beacon Health Options); DX-0023 (myNexus); DX-0024 (AIM Specialty Health); DX-0025 (Legato Health Technologies); DX-0028 (CareMore Health); DX-0029 (IngenioRx); DX-0030 (Meridian). These subsidiaries include behavioral health organizations, pharmacy benefit managers, cost containment companies (subrogation), and health benefit managers, among others.  Anthem, like UHG, █████████████████████████████████████,



■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.  *See, e.g.*, 6/15/22 A. Chennuru (Anthem Rule 30(b)(6)) Dep. Tr. 11:21-12:3, 12:19-13:8, 13:20-15:2, 25:9-24.

UHC's other vertically integrated payer competitors also use similar firewalls to protect competitor data.  Cigna's Evernorth business, for instance, ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■  *See* DX-0837 ¶¶ 4, 6.  Cigna's firewall policy ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■  *See* DX-0244 at CI-LIT-CHNG-00001043.  ■■■■■■■■■■■■■■■■■■■■■■■■■■  *See* DX-0837 ¶ 7.  According to Cigna's in-house counsel, ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■  *See id.* ¶ 9.  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.  *See, e.g.*, 6/3/22 K. Dill Dep. Tr. 172:7-20 ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.

Aetna's experience is no different.  Aetna is owned by CVS Health, which also owns CVS Caremark, a pharmacy benefits manager that negotiates reimbursement rates and pricing with payer customers, *i.e.*, Aetna's largest competitors.  CVS Health protects competitor information with policies and firewalls like UHG's, which prevent information from inside CVS Caremark from coming into Aetna and vice-versa.  6/16/22 L. Lautzenhiser (Aetna) Dep. Tr.

29:23-31:8.  These policies have successfully prevented competitive information from being shared between CVS Health's various lines of business.  *See id.* at 27:5-10, 28:7-29:6.

This "real-world evidence" of other vertically integrated companies successfully using firewalls to prevent the exchange of rival payer data between their insurance and non-insurance businesses if significant and "further undermines the persuasiveness of" Plaintiffs' case.  *See AT&T*, 310 F. Supp. 3d at 215-19.  It is one thing for Plaintiffs to shrug off UHG's firewall policies; it is another thing entirely to dismiss unbroken industry practice, something that would require extraordinary proof that Plaintiffs do not have here.

**Plaintiffs' Prior Support for Firewalls.**  Plaintiffs' newfound skepticism of firewalls is also difficult to square with the Department of Justice's historic support for such remedies.

In the past two years alone, the Department of Justice has pointed to firewall policies on multiple occasions to justify the consummation of a merger—over objections about the sharing of competitively sensitive information.  *See* United States' Resp. to Public Comments on Proposed Final Judgment at 15-16, *United States v. Evangelical Cmty. Hosp.*, No. 4:20-cv-01383-MWB (M.D. Pa. Aug. 31, 2021), ECF No. 52 (stating concerns about information sharing were "unwarranted" where "a firewall . . . prevent[ed] competitively sensitive information from being disclosed between" entities); United States' Resp. to Public Comments on Proposed Final Judgement at 32, *United States v. CVS Health Corp.*, No. 1:18-cv-02340-RJL (D.D.C. Feb. 13, 2019), ECF No. 56 ("The United States investigated this possibility and determined that CVS is commercially incentivized to maintain firewalls because . . . customers could switch to an alternative PBM if their information were not kept confidential. . . .  CVS already handles sensitive consumer data from Caremark's PBM business."); *see also* United States' Competitive Impact Statement at 12, *United States v. Liberty Latin Am. Ltd.*, No. 1:20-cv-03064-TNM

(D.D.C. Nov. 9, 2020), ECF No. 11; United States' Competitive Impact Statement at 14, *United States v. AMC Ent. Holdings, Inc.*, No. 1:16-cv-02475-RDM (D.D.C. Dec. 20, 2016), ECF No. 3. Moreover, the very case cited by Plaintiffs' economist as an example of his data misuse theory— *In the Matter of The Coca-Cola Co.*, No. C-4305 (FTC)—was ***resolved*** with a firewall remedy, and Plaintiffs offer no record evidence that this remedy was ineffective or inadequate. *See* PX820 ¶ 188 & n.382.

Plaintiffs have not offered any principled distinction between the firewall policies in those cases and the ones here, calling into question whether Plaintiffs' decision to challenge this transaction is based on the record evidence or simply a change in policy.

2.   *UHG's multi-payer business model prevents anti-competitive use of EDI claims data.*

Plaintiffs' theory also conflicts with Optum's business model.  Optum's business strategy is fiercely multi-payer and its success depends upon the sale of products to non-UHC health insurers.  Optum well knows that other payers would not do business with it if Optum did not adequately protect their data, particularly from misuse by UHC.  From a dollars and cents perspective, non-UHC health insurers bought ███████ in products and services from OptumInsight in 2021, accounting for over ████ of OptumInsight's total revenue.  And of course, Optum's other businesses, particularly OptumHealth, receive billions more from non-UHC payers.  It defies basic economics and common sense to think that UHG would risk all of that to do what Plaintiffs' expert theorizes it might do—namely, pick up a few hundred thousand transient new members for UHC's commercial insurance business for the duration of a single contract.  *Compare* PX820 ¶ 209, *with* 12/10/21 D. Wichmann Dep. Tr. 156:18-157:25 ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████    ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████.

That is one of the lessons of *AT&T*.  Rejecting the theory that "the merged [AT&T-TimeWarner] entity would have *any* incentive to foreclose rivals' access to HBO-based promotions," the court explained that any "promotion-withholding theory conflicts with HBO's business model, which remains 'heavily dependent' on promotion by distributors."  *AT&T*, 310 F. Supp. 3d at 250-51.  As here, the Department of Justice "fail[ed] to explain why AT&T would jeopardize—much less jettison—the promotional model on which HBO 'absolutely depends,'" leading the court to conclude the Department of Justice's theory was "gossamer thin."  *Id.*  That conclusion applies with even more force in this case: there is no evidence that UHG intends to withhold innovations from rivals, and Plaintiffs have wholly failed to explain why it would be in UHG's economic interest to do so.

Optum's ability to operate a multi-payer EDI clearinghouse without substantially lessening competition is confirmed by the experience of other market participants.  Most significantly, there is no evidence that ██████████████████████████████████████████ ████████████████████████████████████ has ever given its payer-owners access to rivals' medical claims data.  Like Optum, ████████████ is a ███████████████ and ██████████████ EDI clearinghouse that processes claims for ████████████████████ totaling ████████████ ████████████████████████ *See* DX-0019 at ANTM_DOJSUB_00006071.  Specifically, ████████████ ███████████████████████████████████████████████████ ████████ ████████████ ██████ ████████ ████████ ██ ████ ██████.  *See id.* at

ANTM_DOJSUB_00006086;  6/15/22  A.  Chennuru  Dep.  Tr.  183:12-184:18. 

. *See* 6/15/22 A.

Chennuru Dep. Tr. 187:2-23, 188:15-191:23.

. *See id.* at 191:24-192:13, 193:6-17.

In opposition, Plaintiffs offer almost nothing.  Despite claiming that UHC could expect to capture over ▮▮▮▮ of its rivals' members, Plaintiffs have not suggested how that would happen: they have not spelled out what specific data UHC would use to compete with other payers; what networks UHC would target; how it would modify its own networks and offerings; how (if at all) UHC would adjust its prices; or whether other payers would adapt to match any of these changes.  Indeed, Plaintiffs have not identified a single national or large group account, in a single network, that UHC would win at the expense of other payers post-transaction due to access to medical claims data on Change's EDI network.

3.   *UHG's commitment to maintain its firewalls wholly undermines Plaintiffs' data misuse theory.*

Contrary to Plaintiffs' speculation that UHG might alter its firewalls post-transaction, UHG has offered contractual commitments to Change's customers about protection of competitively sensitive information.  *See* DX-0682; DX-0686.  Specifically, "UHG will maintain commercially reasonable firewall and information security policies to protect Customer's Confidential Information from being disclosed to UHG's health insurance, health plan administrative services, or health care provider businesses."  DX-0686 at UHG-LIT-01910893. And UHG's promise is supported by an annual review right requiring UHG to provide upon

request a report "identifying any violations of UHG's firewall and information security policies relating to the disclosure" of confidential information "and the corrective actions undertaken to resolve such violations." *Id.* These commitments "will have real-world effects" and are proof that UHG is willing to put its money where its mouth is. *See AT&T*, 310 F. Supp. 3d at 241 n.51.

Once again, *AT&T* is instructive. There, "shortly after the filing of" of the Department of Justice's lawsuit, AT&T made binding arbitration offers to "approximately 1,000 video distributors," committing to (i) engage in binding arbitration in the event AT&T and a distributor "fail[ed] to agree upon renewal terms" and (ii) "continue to provide carriage on the same terms and conditions in effect at the expiration of its existing contract." *AT&T*, 310 F. Supp. 3d at 184. Combined, these commitments "guarantee[d] that no blackout of [ ] content can occur once arbitration is invoked." *Id.* The court in *AT&T* concluded these commitments had "real-world effects," including an "influence [on] affiliate negotiations" and and that it was unlikely "AT&T would (much less could) retreat from [them] in light of the apparent reputational costs of doing so—costs that would imperil future negotiations in the marketplace with repeat players." *Id.* at 241 n.51. The same is true here: nothing suggests that UHG intends to walk back its commitments, and Plaintiffs have not identified any gap or inadequacy in the commitments that would allow for a substantial lessening of competition under their data-access theory of harm.

4. *Plaintiffs' data misuse theory relies on speculation and flagrant mischaracterization of Optum's documents.*

Plaintiffs' primary response to this evidence is to point to unsubstantiated fears from less-than-a-handful of competitors and to twist preliminary due diligence documents discussing conceivable (but not planned) uses of data. This is straight from the Department of Justice's *AT&T* playbook—just with fewer witnesses and weaker documents—and it does not add up to an antitrust violation here.

***Third-Party Speculation.***  As an initial matter, it is telling how few industry participants are willing to support Plaintiffs' case.  Of the over 200 entities Plaintiffs contacted (or were contacted by) in the investigation phase, only ***four*** will appear live at trial (with a few more appearing by deposition designation).  Only ***two*** of UHC's competitors will offer live testimony, less than one third of the line-up of the senior executives that offered testimony in *AT&T*.  And only ***one*** of those will even speak about EDI or Plaintiffs' vertical theories at all.  To be clear, other payers were deposed in this matter, but that testimony was often affirmatively harmful to Plaintiffs' case.  ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████.  It also bears emphasis that not a single large group or national account employer (the consumers that Plaintiffs allege will be harmed) has been called to support Plaintiffs' allegations.  The industry's silence speaks volumes, and Plaintiffs cannot stitch together a case from speculative and out-of-context testimony of a few market outliers.

That is doubly so given the nature of the third-party testimony here.  The core testimony Plaintiffs seek to introduce is third parties' speculation about what UHC could do with competitors' claims data, which Plaintiffs claim will chill other payers from innovating in competing for health insurance business.  *See, e.g.*, 6/3/22 K. Dill Dep. Tr. 154:8-155:10 ("Q. Hypothetically, what, if anything, could you or other teams within Cigna do if given access to Cigna's competitors' claims data that flow through EDI clearinghouse? . . .  [A.] So a super hypothetical because I certainly wouldn't do it myself.  But I would imagine if somebody wanted

-- got ahold of a very detailed EDI claim file or EDI transmission with all that data in it . . . you could pretty much figure out the secret sauce with how they compete very easily, if you chose to do it."); 6/16/22 L. Garbee Dep. Tr. 107:24-110:18.

Put differently, Plaintiffs' theory, on the thinnest of records, is that rivals will stop improving upon their commercial insurance plans based on the mere ***fear*** that UHG's firewall policies will be violated, even if they are not.  This is not a viable theory of harm.  The Clayton Act does not permit an injunction just because a few competitors have a vague, psychic discomfort with the transaction, and it is difficult to gauge "just how much weight to give . . . proffered third-party competitors' concerns about [a] challenged merger."  *See AT&T*, 310 F. Supp. 3d at 211.  "[T]here is a threat that such testimony reflects self-interest rather than genuine concerns about harm to competition," "particularly in the context of a vertical merger case where, as here, upstream customers are downstream competitors."  *Id.*; *see also id.* at 214 ("Especially in view of the fact that the third-party competitor witnesses have an incentive to oppose a merger that would allow AT&T to increase innovation while lowering costs, such testimony falls far short of persuasively 'show[ing]' that this merger threatens' to harm competition by allowing Turner to wield increased bargaining leverage." (brackets in original) (citation omitted)).

Witnesses who cannot even satisfy Federal Rules of Evidence 602 and 701 should not be the basis for enjoining a $13 billion transaction.  "Unadorned testimony about a hypothetical set of facts the witness did not observe is in no way 'based on [a] witness's perception,'" *Atlanta Channel, Inc. v. Solomon*, 2021 WL 4243383, at *5 (D.D.C. Sept. 17, 2021) (citation omitted), nor is it based on a witness's personal knowledge.  *See also United States v. Gibson*, 636 F.2d 761, 764 (D.C. Cir. 1980); *Palmer v. Rice*, 2005 WL 1278262, at *5 (D.D.C. May 27, 2005);

*Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203-04 (4th Cir. 2000); *Logan v. Cooper Tire & Rubber Co.*, 2011 WL 5245373, at *3-4 (E.D. Ky. Nov. 2, 2011).  Yet that is all Plaintiffs offer here—"speculative concerns" about how third parties ***think*** UHG "might act . . . after the merger," unsupported by any "analysis or data."  *See AT&T*, 310 F. Supp. 3d at 212.  Customers and competitors do not "have the expertise to state what *will* happen" post-transaction, and their concerns are "not a persuasive indication" that the transaction will harm competition.  *See Arch Coal*, 329 F. Supp. 2d at 145-46.

 Despite Plaintiffs' best efforts to elicit self-serving admissions, there simply is no evidence to substantiate the fear that UHG will misuse competitor claims data or that the mere specter of improper access will chill innovation.  Contrary to Plaintiffs' harm-through-chilling hypothesis, Plaintiffs' payer witnesses unequivocally testified that they would continue to compete for, and innovate in, the commercial health insurance business just as they had before the transaction.  *See* 6/3/22 K. Dill Dep. Tr. 168:20-169:3 ("Q. If UnitedHealthcare acquires Change Healthcare, you are not going to offer your national accounts worse discounts on provider rates, are you?  A. Not based on the acquisition, no."); *id.* at 169:14-170:6 ("Q. You are not going to complete less aggressively after UnitedHealthcare acquires Change Healthcare? . . . [A.] So in my personal opinion, I don't think we ever compete less for any reason.  Right.  We always go at it really hard.  That's our job. . . .  Q. You are going to keep going as hard as . . . you can in the future, after the acquisition?  A. Always.  Always."); 6/16/22 L. Garbee Dep. Tr. 131:3-131:13 ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████.

"To date, no court has invalidated a transaction solely because it reduced competition in an innovation market." *See* ABA Section of Antitrust Law, *Antitrust Law Developments* 587 (6th ed. 2007).  Respectfully, this Court should not be the first—and certainly not on this record.

***Mischaracterized Deal Documents.***   Plaintiffs' attempts to spin early due diligence documents fare no better.  It is true that, as part of the due diligence process, UHG tried to learn the nature and scope of Change's secondary-use rights in its customers' medical claims data, as any data analytics company would.  But not a single document supports Plaintiffs' theory that the primary driver of the transaction was the acquisition of medical claims data earmarked for the benefit of UHC's commercial health insurance business.

Over and over again, UHG's due diligence documents make clear that the anticipated benefits of the transaction would be multi-payer, consistent with Optum's business model.  UHG's pre-diligence documents theorized potential ██████████████████ ████████ and ██████████ opportunities in, among other things, ██████████████ ████████████████████████████████████████████████████████████████ ██████████████████████.  *See* PX207.  The ████████████████████████ ██████ thus was designed to ████████████████████████████████████████ ██████████████████████████████████████████████████████.  *See* PX026 at UHG-2R-0003913677.  Contrary to Plaintiffs' theory, UHG was ***skeptical*** about the volume of data rights it would acquire through the transaction.  In due diligence materials in the weeks leading up to the transaction, UHG openly acknowledged that ████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████.  *Id.* at UHG-2R-0003913678.  Indeed, UHG expected there was ██████████████████████████████████ meaning ████

███████████████████████████████████████████████████

████████████████████████. *See id.*

Far from suggesting that Change's medical claims data would be a treasure trove for UHC, UHG recognized the limitations on its ability to use such data.  Again, just weeks before the transaction was signed, a memo to UHG's then CEO recognized: ████████████████

███████████████████████████████████████████████████

████████████  PX664 at UHG-2R-0018222213 (emphasis added).  UHG acknowledged in that same memo the ████████████████████████████████████████████

█████████████████████████████████████  *Id.* at UHG-2R-0018222214. Since then, UHG has worked to alleviate any such concerns, reiterating that its firewall policies prevent Optum and UHC from sharing competitor claims data, *see* DX-0664, and offering contractual commitments to customers about the firewalls, data security policies, and products and services that UHG will make available post-transaction, *see, e.g.*, DX-0765; DX-0766.

There is no smoking gun document showing—or even suggesting—that the purpose of the transaction was to launder competitors' claims data, or intelligence gleaned or developed from that data, for UHC.  Plaintiffs cannot establish an antitrust violation by asking the Court to squint at otherwise innocuous documents and construe them in the worst possible light, and Plaintiffs do not have a shred of evidence that UHG intends to use the transaction as a beachhead to benefit UHC's commercial insurance business.  *See AT&T*, 310 F. Supp. 3d at 210 ("[E]vidence indicating defendants' recognition that it could be possible to act in accordance with the [g]overnment's theories of harm is a far cry from evidence that the merged company is likely to do so (much less succeed in generating anticompetitive harms as a result).").

5.      *Plaintiffs overstate the incremental value of Change's EDI claims data in light of the significant data already available in the marketplace.*

In any event, Plaintiffs dramatically overstate the value of the claims data available through Change's EDI network given the large volumes of claims and other healthcare data widely available to all payers.  Defendants acknowledge that Change's EDI claims data contains at least some information that is not otherwise available.  But that is not the question.  The question is whether the incremental information available on Change's EDI network is so critical, so unique, and so valuable, that it would compel UHG to jettison its firewalls, breach its contracts, ignore its customer commitments, and abandon its longstanding and successful multi-payer business model.  Change's EDI claims data is not entirely unique:

- *Commercial Aggregators.*  Data aggregators, including Avalere, Health Verity, Komodo, Stratasan, LexisNexis/Health Market Science, and Blue Health Intelligence make billions of medical claims available in de-identified form, from which UHG and other payers can (and do) develop insights.  *See* Tucker Rpt. ¶¶ 36-37 (Figures 1 & 2).

- *RFP Process.*  Payers competing for national and large group employer accounts receive significant amounts of claims information from insurance brokers, including Aon, which run requests for proposals for such accounts.  Payers then take that data, re-adjudicate it, and use it to develop competitive proposals.  This includes a sampling of an incumbent payer's adjudicated claims data, which allows payers to pressure test their position with respect to discounts, among other things, in a relevant market.  5/17/22 W. Golden Dep. Tr. 187:1-188:17, 235:5-236:24; 6/7/22 T. Gehlbach Dep. Tr. 153:5-19.

- *HHS Transparency Rules.*  HHS's transparency rules require payers to make publicly available in-network and out-of-network machine readable files, disclosing, on a provider-by-provider basis: insurer name; plan information; 14-digit Health Insurance Oversight System identifier; billing codes; negotiated rates (including national provider identifiers, tax identification numbers, and place of service codes); underlying fee schedule rates; derived amounts; reimbursement arrangements other than fee-for-service arrangements; and billed charges.  *See* DX-0733.  Hospitals likewise must publish machine-readable files disclosing: inpatient items and services; outpatient items and services; gross charges for each item and service; and payer-specific negotiated charges by specific plan and payer.  *See* DX-0734.  As the Court has observed elsewhere, "[t]he fact that these charges will be revealed . . . severely undermines [any] argument that negotiated rates constitute trade secrets."  *See Am. Hosp. Ass'n v. Azar*, 468 F. Supp. 3d 372, 394 n.24 (D.D.C. 2020) (Nichols, J.).  That observation applies with equal force to the other information that must be disclosed to consumers and the public, severely

undercutting Plaintiffs' argument that much of the financial information UHG allegedly will use post-transaction is competitively sensitive. *See* Tucker Rpt. ¶¶ 32-40.

- ***All Payer Claims Databases.*** Payer information is publicly disclosed through state-administered all payer claims databases ("APCDs"), including the conditions a patient had, the services provided, and negotiated rates, among other information. As even Plaintiffs' expert acknowledges, in some states, like Utah, APCDs "contain[] patient-identifiable claims information, such as a unique member ID, date of birth, the level of coverage, the service received, the negotiated amount, the billed amount, the amount paid by the health insurance plan, and the claim status." 6/10/22 B. Handel Expert Report ¶ 63.

The point of all of this is not to suggest there is perfect symmetry between this publicly available information and what UHG would obtain through the transaction. The point is that, even recognizing there are differences, Plaintiffs never explain why the incremental data from Change's EDI network would make all the difference in UHC gleaning insights about its rivals that would enable it to win new business, much less at a level that would cause Optum to change its entire business model. *See* 6/15/22 A. Chennuru Dep. Tr. 120:16-121:7 ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████. This is a basic gap in proof that Plaintiffs cannot fill with speculation or innuendo, particularly far-flung theories that UHC will steal and misuse this data to harm its competitors.

      6.    *Plaintiffs cannot show market power in the EDI market that would prevent customers and partners from switching EDI vendors.*

Finally, there is no evidence that customers cannot switch away from Change's EDI network (or threaten to do so) in the event of actual or perceived data misuse. That is because Change does not have enough power in the EDI market to prevent customers from changing clearinghouses. On the payer front, ***none*** of the ██████████ exclusively rely on Change for

EDI services, with insurers like ███████████████████████████████████ ████████████████████████████████████████ significantly reducing their use of Change's EDI network or disintermediating from it altogether.  *See* Murphy Rpt. ¶¶ 153-60, 169.  On the provider front, most provider volume comes through RCM or EMR vendors that use more than one EDI vendor, ███████████████████████████████ ████████████████████████████████████████████, 6/14/22 C. Spady Dep. Tr. 215:6-216:1, ███████████████████████████████████, 6/6/22 J. Mincher Dep. Tr. 10:10-11:4.  The vast majority of payers' and providers' medical claims therefore can easily be routed around Change.  Change certainly has won claims volume through quality pricing and service, but EDI is a commodity business, and reallocating volumes to other EDI networks is easily accomplished.  Plaintiffs have not explained why the small fraction of claims that could not instantly be re-routed (approximately ████ of claims volume where Change provides RCM or managed gateway services to payers) would make a substantial competitive difference or how that small share of claims data could be effectively used to reverse engineer information about competitors' plans or claims edits on a market-wide basis.

## B. Plaintiffs' Harm-to-Innovation Theory Is Speculative and Wholly Unsupported in the Record.

Plaintiffs also fall far short of proving that UHG will raise its rivals' costs by denying or delaying access to innovations developed with medical claims data from Change's EDI network.

Plaintiffs allege in the broadest possible terms that, after the transaction, UHG "would have the incentive to weaken its health insurer rivals by withholding or delaying their access to" "certain innovations."  *See* Compl. (ECF No. 1) ¶ 104.  The only tangible innovations identified by Plaintiffs are "transparent network" or "real-time settlement" efforts to "shift" claims edits to "the left," which Plaintiffs allege will reduce friction in the healthcare system, improve accuracy,

and speed up payment by implanting payment integrity solutions directly in the EDI stream. *See, e.g.*, PX820 ¶¶ 224-51. So far, so good—these are **pro-**competitive innovations that will improve the healthcare experience of payers, providers, and patients. The problem, according to Plaintiffs, is that UHG will withhold these innovations from rival health insurers, leaving large group employers' and national account customers' health insurance plan providers with only one (expensive) choice for more innovative solutions, instead of a choice between UHG and Change solutions. *See id.* ¶¶ 252-55, 224; Compl. (ECF No. 1) ¶ 107.

Plaintiffs' theory is baseless. It leverages a speculative theory of harm that conflates different and undeveloped products, and ignores UHG's economic incentives and plans to make innovations available on a multi-payer basis, just as Optum does today.

Judging the effect of a transaction on innovation is a notoriously difficult enterprise. *See Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006) ("[T]he harms that the plaintiffs have alleged with respect to the loss of competitive technologies are so diffuse that they could not possibly be adequately measured."); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 975g (2022). "Innovation is intangible, uncertain, unmeasurable, and often even unobservable, except in retrospect," *see* Richard T. Rapp, *The Misapplication of the Innovation Market Approach to Merger Analysis*, 64 Antitrust L.J. 19, 27 (1995), and the problem in assessing such harms "is not one of discovery and specific evidence, but" something more fundamental: "the nature of the injury claimed," *see Kloth*, 444 F.3d at 324.

"In the context of merger analysis," "it is typically difficult to predict and appropriately value how innovation would proceed with or without the merger." *See* Dennis A. Yao & Susan S. DeSanti, *Innovation Issues Under the 1992 Merger Guidelines*, 61 Antitrust L.J. 505, 508

(1993).   So, even conceding that a merger can conceivably lessen competition by stifling innovation, U.S. Dep't of Just. & Fed. Trade Comm'n, Horizontal Merger Guidelines §§ 1, 6.4 (2010), "the relatively speculative nature of the relevant evidence about innovation capabilities make it difficult to approach th[o]se issues with any confidence," *see* Yao & DeSanti, *supra*, at 508.   Plaintiffs' theory of harm—which centers on innovations not yet in existence—thus represents a "potentially dangerous" and "avant-garde application of merger enforcement under Section 7 of the Clayton Act" because it is "based upon a surmise about whether the combination will advance or retard technical progress."   *See* Rapp, *supra*, at 43-44.   "Economists and lawyers [generally] do not have the means to predict whether the combination of projects" will yield moonshot technological innovations, and to prevail on such a theory, *see id.* at 44, and Plaintiffs should be expected to offer substantial and unequivocal evidence, including expert testimony, on the nature, stage of development, and technological feasibility of any innovation they allege will be developed (and then withheld) from the market.

1. *UHG is committed to making EDI-related innovations available on a multi-payer basis.*

Plaintiffs' claims still fails at the outset because of Optum's aggressive multi-payer business model.   Plaintiffs' innovation theory essentially argues that, post-transaction, UHG will innovate too much and share too little.   This goes against the grain of conventional antitrust wisdom.   *See Comcast Cable Commc'ns*, *LLC v. FCC*, 717 F.3d 982, 990 (D.C. Cir. 2013) (Kavanagh, J., concurring) ("Vertical integration and vertical contracts in a competitive market encourage product innovation, lower costs for businesses, and create efficiencies—and thus reduce prices and lead to better goods and services for consumers.").   But it also also ignores that the entire purpose of the transaction was to increase Optum's multi-payer footprint, including with respect to the transparent network.   Presentations discussing the transparent network are

replete with references to the fact that the product would need to be widely sold to payers and providers for the solution to work.  *See, e.g.*, DX-0412 at UHG-2R-0000109762 ███████. The testimony is similarly unequivocal ████████████████████████



███████. *See* 5/24/22 E. Schmuker Dep. Tr. 86:19-87:19.

Moreover, UHG's synergy models—which provide the revenue targets to which the transparent network development team will be held accountable—are expressly predicated on multi-payer sales of innovations.  *See, e.g.*, DX-0720; DX-0466; DX-0557 ██████████

██████████████. Those anticipated sales make sense "as a matter of economic theory," because "selling products that include innovations would be more profitable for UHG than withholding them."  *See* Murphy Rpt. ¶ 208.  Plaintiffs cannot show that any un-projected benefit from foreclosure would outweigh the projected benefit from multi-payer sales, dooming any reliance on Plaintiffs' vertical math model, which itself is unclear in its articulation of the specific innovation UHG will withhold and wrong in its assertion that UHG has an incentive to deny innovations to rivals.  *See id.* ¶ 208; *see also id.* ¶¶ 222-37.

Basic economic logic therefore dictates that UHG stands to gain more by making the transparent network available to the external market than by hoarding it for UHC, *see id.* ¶¶ 232-38, never mind the billions in potential losses UHG would suffer by playing favorites with Change or Optum services.  *See AT&T*, 310 F. Supp. 3d at 250-51.  "The entire premise of the

proposed merger"—the development and sale of multi-payer, multi-provider services—thus "provides yet another reason to reject" Plaintiffs' theory of innovation-related harm.  *See id.* at 243-44; *see also id.* at 250-51 ("[T]he Government has failed to show that the merged entity would have *any* incentive to foreclose rivals' access to HBO-based promotions.  This is because the Government's promotion-withholding theory conflicts with HBO's business model, which remains 'heavily dependent' on promotion by distributors.").

Once again, UHG has put its money where its mouth is.  In addition to the binding firewall commitment it has offered to Change's customers, UHG also has made a series of promises related to products, services, and innovations developed or improved using EDI clearinghouse data, *see* DX-0682; DX-0686:

- *Innovation*: UHG agrees that for any products or services, or improvements to products or services, developed "using Change's medical EDI clearinghouse transaction data . . . [it] will make such products and services available to [c]ustomer[s] as soon as reasonably practicable and at commercially reasonable rates."

- *De-Identified/Aggregated Data*: UHG committed to Change's data solutions customers that it will continue "making aggregated or de-identified data, and insights and benchmarking derived from it, available in the marketplace, in the same manner as Change does today."

These commitments put to rest any notion that UHG will hoard post-transaction innovations to itself, and Plaintiffs have no persuasive response other than bald statements of disbelief.

        2.    *Optum's transparent network and Change's real-time settlement initiatives are not developed technologies.*

Plaintiffs' innovation theory also fails for the basic reason that they cannot show the "transparent network" or "real-time" settlement will become a reality.  Both technologies are in a nascent stage of development.  As to the transparent network, UHG's witnesses have testified that it is more of an idea or framework than an actual product.  *See, e.g.*, 5/24/22 E. Schmuker Dep. Tr. 139:23-140:17.  As to real-time settlement, Change's witnesses have unequivocally

testified that the functionality is far from complete and there is not an offering in the market. *See, e.g.*, 6/3/22 S. Gopalkrishnan Dep. Tr., 34:24-35:8, 276:2-277:10; 6/13/22 N. de Crescenzo Dep. Tr. 352:13-353:19.  Like the transparent network, real-time settlement has been described as a "concept" that was "not . . . very advanced," *see* 6/3/22 S. Gopalkrishnan Dep. Tr. 33:25-34:23, 34:34-35:8; 6/13/22 N. de Crescenzo Dep. Tr. 352:15-16, 18-22.  Change's R&D budget bears this out, with less than 1% of the company's proposed R&D spend dedicated to the development of the real-time settlement project.  *See* Murphy Rpt. ¶ 212 n.307.  For these reasons, Plaintiffs are incorrect to suggest that these products are (or will be) close substitutes for each other, and it is "highly speculative" to make such a suggestion given that both "are products in development."  *Id.* ¶ 212.

It is true that these sorts of innovations were a reason UHG considered acquiring Change, with deal documents highlighting the acquisition as ██████████████████████████ ████████████████   *See* DX-0525 at UHG-2R-0014535881; DX-0449 at UHG-2R-0003128143.  But it is a long walk from a ███████████████ to fully developed product and technology.  More recent deal documents recognize the aspirational nature of any transparent network efforts, *see generally* PX605, underscoring the failure of proof in Plaintiffs' case: it is their burden—not UHG's or Change's—to show the technological feasibility of the game-changing innovation underpinning their theory of harm.  Plaintiffs cannot do so, and their innovation theory should be rejected as a result.

   3.   *Optum's transparent network and Change's real-time settlement initiatives are not substitutes.*

Even assuming these innovations were developed and withheld from the market, Plaintiffs' theory proceeds from the misimpression that, without the merger, Change's real-time

settlement initiative would have identical characteristics to, and compete with, UHG's transparent network.  That premise is fundamentally wrong.

The focus of Change's real-time settlement concept is the provider (not the payer), *see* 5/12/2022 K. Joshi Dep. Tr. 162:17-163:9, ███████████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████████. *See* Murphy Rpt. ¶¶ 214, 218; *see also* 6/3/2022 S. Gopalkrishnan Dep. Tr. 33:25-34:23 (describing real-time settlement as an effort that "allows *providers* to get paid in realtime when the claims being settled in realtime versus having to take 30 to 60 days between providers and payers" (emphasis added)).  UHG's transparent network, on the other hand, is a more comprehensive solution ██████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ *See* 5/24/22 E. Schmuker Dep. Tr. 76:2-5, 109:1-8, 111:4-112:16; *see also* Murphy Rpt. ¶ 214.  To do so, the transparent network █████████████████████████████████████████████████████████████████████

████████████████████ 5/24/22 E. Schmuker Dep. Tr. 111:4-9.

The transparent network and real-time settlement therefore differ not only in scope (the whole claims adjudication process for transparent network, only payment for real-time settlement), but also in focus (providers *and* payers for transparent network, only providers for real-time settlement).  ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████████ which is a prerequisite to Plaintiffs' innovation claim.  *See* Murphy Rpt. ¶ 213.



4.    *Many other companies are developing products similar to the transparent network and real-time settlement.*

Even if Optum's transparent network and Change's real-time settlement were successfully developed (which is uncertain), and even if the products were substitutes (which they are not), Plaintiffs' claims would still fail because they do not define a market in which these products operate or show that UHG would have substantial power in that market.

Recognition of clinical and administrative waste in the healthcare system is widespread, PX820 ¶ 225, and many companies are working to reduce these types of waste in ways similar to Optum and Change.  An internal Change document identifies several competitors as part of the "Competitive Landscape" for real-time settlement, including: ███████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████ DX-0212 at CHNG-013946582.  Other companies innovating in this space include: ██████████, *see* 6/3/22 S. Gopalkrishnan Dep. Tr. 101:21-102:22, 103:9-17, 224:9-225:12, 277:11-278:6, ████ which already has a product that facilitates access to medical records to resolve pre-authorization issues and claims denials, Murphy Rpt. ¶ 219, and a partnership between ████████████████, *id.* The list goes on.  *See id.* at. ¶ 220.

In such a dynamic, fragmented, and competitive environment, UHG will not have substantial market power.  Plaintiffs' theories of UHG withholding innovations from competing payers assumes that UHG is the only game in town (or something close to it).  The record,

however, discloses that payers could turn to other sources of supply, denying UHG the profits of its innovations without giving UHC a cost advantage over rival payers.

5. *The transaction will yield substantial benefits.*

Finally, despite effectively conceding that the transaction will yield important synergies and innovations, Plaintiffs short-sell the deal's substantial benefits. Plaintiffs cannot have it both ways. Any innovation resulting from UHG's acquisition of Change not only will benefit UHG, but all others in the healthcare system—payers, providers, and patients. At its core, the long-term goal of the transaction is to ████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████ DX-0746 at 2, with each of these enhancements sweeping broadly across the healthcare landscape. In particular, as explained below, the purpose of the acquisition is to benefit payers, providers, and patients through clinical alignment, claims accuracy, and payment simplification. *See id.* at 6.

Clinical alignment, achieved through Change's InterQual product and direct integration into the electronic medical records workflow, will █████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████ *Id.*; *see also* DX-0739 at 5, 10, 32. Plaintiffs have not even attempted to challenge this critical, pro-competitive synergy that motivated UHG to pursue the transaction. *See* 11/30/21 C. Rudolph Dep. Tr. 196:1-8. For payers, clinical alignment will lead to a decreased total cost of care, █████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████ DX-0747 at 8. This increased insight through workflow integration for providers will allow for decision-making to be guided by better ██████████████████████████ ███████████████████████ *Id.* Patients, then, will have improved satisfaction from payers

and providers working hand-in-hand to provide ███████████████████████████ ████████ rather than working in silos.  *Id.*

Streamlining and simplifying claims administration will improve accuracy by automation.  In turn, this improved accuracy—whether through a transparent network in particular or Change's capabilities more broadly—helps eliminate the over $115 billion in addressable administrative waste plaguing the American healthcare system.  *See* DX-0746 at 3. For payers, improved claims processing resulting from the transaction reduces the ███████ ███████████ and the ██████████████████████████████████████ and for providers, fewer denials accordingly lowers administrative costs while increasing revenue.  *See* DX-0747 at 7.  And for patients, along with the pass-through benefit of any administrative savings, their experience will be enhanced through ████████████████████████████ ████████████████████████████████  *See* DX-0746 at 6.

Payment simplification will also flow from the transaction.  Combining Optum's and Change's capabilities would ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████  DX-0746 at 6.  This █████████████████████ would ████████ ████████████████████████████████████████████████████ ████████  PX605 at UHG-2R-0003658393.  Payers, of course, benefit from streamlining their methods of payment and the lessened administrative burden as a result.  And for providers, accelerated payment mechanisms leads to faster collection, as well as lower administrative costs, from a reduction of ██████████████████████████████  *See* DX-0747 at 9. Patients will also benefit from the ████████████████████████████████████████

from providers—specifically, ███████████████ and ████████████████

███████. *See id.*

### C.      Plaintiffs Have Abandoned Their Baseless Service Degradation Theory.

Plaintiffs' final theory—that UHG will somehow degrade rival payers' EDI transmissions

post-transaction—is even more far-fetched.  As an initial matter, and despite its prominence in

the complaint, Plaintiffs appear to have abandoned this theory, mentioning it sparingly, if at all,

in their expert reports.  Throwaway references to the mere possibility that UHG can impact EDI

performance cannot form the basis for a cognizable theory of vertical harm without facts to

support them.  *See* Murphy Rpt. ¶ 206 ("By choosing not to address this allegation [that UHG

will raise its rivals' costs], Dr. Gowrisankaran implicitly acknowledges that it would not be

profitable for UHG to withhold Change's EDI from rival payers after the merger because it does

not have substantial market power in EDI and because EDI does not represent a large share of

the value payers offer their customers.").

In any event, Plaintiffs' theory fails on the merits because it is premised on technological

impossibility and economic irrationality.  No technological mechanism exists to slow or degrade

the quality of EDI transactions for particular claims intended for particular payers.  *See* 1/19/22

P. McKinney Dep. Tr. 214:6-215:2.  This alone makes Plaintiffs' theory not only speculative, but

illusory.

Moreover, UHG has no economic incentive to harm its EDI business, undercut the value

proposition of the transaction, or destroy its own reputation.  To reiterate, Optum has a proven

track record as a committed multi-payer company, meaning its incentives—and contractual

obligations—are aligned to provide the best possible product to its customers.  *See* DX-0833

████████████████████████████████████████████████████; DX-0686 at

UHG-LIT-01910893 ██████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████.

Finally, even if UHG had the technological capability to degrade rivals' EDI transactions, UHG would lose customers by using it for that nefarious purpose.  Because of the fierce competition in the EDI market, ███████████████████████████████████ DX-0831 at UHG-2R-0005645777.  It is a product that is ████████████████████████████████ ████████████████████   11/30/21 K. Joshi Dep. Tr. 195:4-16.   That competition and commoditization makes any capturing of rivals' customers difficult, especially considering that EDI clearinghouses have had to seek additional methods of delivering value beyond claim transmission.   DX-0835.   Multiple payers—██████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████—have significantly reduced their use of Change's EDI network or stopped using it altogether, confirming that the cost of switching EDI vendors is not so prohibitively expensive that it would make a competitive difference.  *See* Murphy Rpt. ¶¶ 153-60, 169.  Thus, even if it were technically possible to reduce quality (it is not), and even if UHG decided to do so (it will not), the "strategy" Plaintiffs' conjecture is a surefire loser for UHG.

### D.    Plaintiffs Cannot Prove Harm to Competition or Consumers Under Any Theory.

It is not sufficient for Plaintiffs to speculate that UHG might misuse customer data or withhold innovations from rivals.  Instead, Plaintiffs can only establish a *prima facie* violation of the Clayton Act by "identifying the relevant product and geographic market and [ ] showing that the proposed merger is likely to substantially lessen competition in that market."  *AT&T*, 310 F. Supp. 3d at 191.  On this score, Plaintiffs offer only theory, not meaningful record evidence.

With respect to data, Plaintiffs must show that post-merger, EDI claims data would be shared with UHC—despite years of Optum strictly adhering to its firewall policies—**and** that sharing such data would harm competition and consumers in the alleged large group and national account markets. Plaintiffs' data seems to be that UHC could "reverse engineer" rivals' innovations using EDI claims data, and that rival payers would simply give up and stop innovating as a result. But there is no evidence that the EDI data available through Change's EDI network would actually impact UHC's ability to compete for employer group customers, and Plaintiffs' own third-party payer witnesses have testified that they would not stop innovating, flatly contradicting Plaintiffs' theory. Plaintiffs thus fail to carry their burden under the Clayton Act on their data-access theory.

With respect to innovation, Plaintiffs must prove that post-merger, Optum would withhold innovations from its payer customers—despite years of selling multi-payer solutions—**and** that failing to share such innovations would harm competition in the alleged large group and national account markets. Plaintiffs therefore must show that both Optum and Change would be successful in developing their transparent network and real-time settlement initiatives, that the combined entity will withhold these innovations that otherwise would have been made available to competing payers in a world without the merger, and that those competitors will be foreclosed from competing for employer group customers because they lack those innovations. Plaintiffs cannot these dots. It would make no sense to block a merger on the theory that products that ***do not even exist*** (and may never exist) will become so critical to competition in a downstream market that competition will be substantially lessened. "[A]ntitrust theory and speculation cannot trump facts," and here, no facts support Plaintiffs' speculation that sharing data or

withholding innovation would reduce competition in the alleged relevant markets so as to violate the Clayton Act.

## **<u>CONCLUSION</u>**

This is not a close case.  Plaintiffs' claims are built on speculation and hypothesized harms that run counter to economic theory, UHG's business model, and common sense, and even if they were somehow plausible (they are not), Plaintiffs still would fall well short of proving a likely and substantial lessening of competition in the post-merger world.  Defendants therefore request that the Court: (i) grant judgment in their favor; (ii) deny Plaintiffs' request for a permanent injunction and permit Defendants to consummate the transaction; and (iii) order UHG to divest Change's ClaimsXten business to TPG, *see* 16 C.F.R. § 802.65 (exempting divestiture parties from making a new HSR filing when a divestiture is made pursuant to "an order from . . . any Federal court in an action brought by the Federal Trade Commission or the Department of Justice.").

Dated:  July 22, 2022

Respectfully submitted,

By:  */s/ Craig S. Primis*
    Craig S. Primis

Matthew J. Reilly, P.C. (D.C. Bar No. 457884)
Craig S. Primis, P.C. (D.C. Bar No. 454796)
K. Winn Allen, P.C. (D.C. Bar No. 1000590)
Richard Cunningham (D.C. Bar. No. 1644119)
T.J. McCarrick (D.C. Bar. No. 219283)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone:  (202) 389-5000
Facsimile:  (202) 389-5200
matt.reilly@kirkland.com
craig.primis@kirkland.com
winn.allen@kirkland.com
tj.mccarrick@kirkland.com

Alexia R. Brancato (NY0467)
**KIRKLAND & ELLIS LLP**
600 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
alexia.brancato@kirkland.com

Charles Loughlin (D.C. Bar. No. 448219)
Justin W. Bernick (D.C. Bar. No. 988245)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone:  (202) 637-5600
Facsimile:  (202) 637-5910
chuck.loughlin@hoganlovells.com
justin.bernick@hoganlovells.com

*Counsel for Defendant UnitedHealth Group Incorporated*

Sara Y. Razi (D.C. Bar No. 473647)
Abram J. Ellis (D.C. Bar No. 497634)
Nathaniel Preston Miller (D.C. Bar No. 1021557)
**SIMPSON, THACHER & BARTLETT LLP**
900 G Street, NW
Washington, DC 20001
Telephone:  (202) 636-5500
Facsimile:  (202) 636-5502
sara.razi@stblaw.com
aellis@stblaw.com
preston.miller@stblaw.com

David I. Gelfand (D.C. Bar No. 416596)
Daniel P. Culley (D.C. Bar No. 988557)
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
2112 Pennsylvania Ave, N.W.
Washington, DC 20037
Telephone:  (202) 974-1500
Facsimile:  (202) 974-1999
dgelfand@cgsh.com

*Counsel for Defendant Change Healthcare Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 22nd day of July 2022, a copy of the foregoing Amended Pretrial Brief of Defendants UnitedHealth Group Incorporated and Change Healthcare Inc. was electronically transmitted to the Clerk of Court using the CM/ECF system, which will transmit notification of such filing to all registered participants.

/s/ *Craig S. Primis*
Craig S. Primis, P.C. (D.C. Bar No. 454796)