UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITEDHEALTH GROUP INCORPORATED, *et al.*, <br><br> *Defendants*. | Civil Action No. 1:22-cv-0481 (CJN) |

**<u>DEFENDANTS' OPPOSITION TO PLAINTIFFS' DAUBERT MOTION TO EXCLUDE CERTAIN TESTIMONY OF DEFENDANTS' EXPERT KEVIN MURPHY BASED ON INCORRECT LEGAL STANDARD</u>**

**INTRODUCTION**

Though styled as a challenge under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Plaintiffs' motion in reality seeks a premature legal opinion that antitrust enforcers need not show substantial power in an upstream market to prevail on a vertical merger claim under Section 7 of the Clayton Act, 15 U.S.C. § 18. Regardless of whether such a showing is required—which will be addressed, if at all, in post-trial briefing—Change Healthcare Inc.'s ("Change") power, or lack thereof, in the market for EDI clearinghouse services at minimum is ***relevant*** to the Court's "comprehensive inquiry" into the "structure, history and probable future" of the products at issue. *See United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 189–90 (D.D.C. 2018) (citations omitted). Change's power or lack of power in the EDI clearinghouse market bears directly on whether the post-merger entity could successfully raise rival insurers' costs. As Dr. Murphy's report explains, insurers and providers could avoid the price increases, degraded services, and misuses of data hypothesized by Plaintiffs by switching, or threatening to switch, to alternative EDI clearinghouses, to say nothing of the fact that many of UnitedHealthcare's ("UHC") largest rivals do not even use Change to transmit significant amounts of their claims data. For Plaintiffs' vertical harm theories to work, payers and providers cannot have comparable alternatives to Change's EDI network, as economic authorities and Plaintiffs' own expert acknowledge. This core evidence about market structure and incentives is plainly relevant, and Plaintiffs' motion should be denied.

**BACKGROUND**

Plaintiffs' motion seeks to exclude certain trial testimony from Dr. Kevin Murphy—a "very eminent" industrial organizational economist, by the admission of Plaintiffs' own testifying expert, 7/25/22 G. Gowrisankaran Dep. Tr. 82:23-83:6, and the George J. Stigler Professor of Economics at the University of Chicago Booth School of Business. In evaluating the likelihood of the

1

anticompetitive effects alleged by Plaintiffs, Dr. Murphy considered the degree of competition among EDI suppliers—*i.e.*, the relative market power of the businesses selling EDI clearinghouse services that are "upstream" from the commercial health insurance market for large group employers and national accounts. *See* 7/1/22 K. Murphy Report ¶ 23. As Dr. Murphy explained, economics suggests that "UHG would only have an incentive to engage in [anticompetitive] conduct if," among other things, "Change had substantial market power in EDI," *id.* ¶¶ 23, 29, because without such power, "downstream rivals can substitute to alternative suppliers of the upstream input," resulting in "large losses in sales" for the merged entity, *id.* ¶¶ 95, 101.

Dr. Murphy specifically cited "considerable market evidence that Change does not have substantial market power in EDI network services" given the fierce competition among EDI clearinghouses such as Availity, Waystar, Trizetto, SSI Group, nThrive, Office Ally, Ability, and Zelis. *See id.* ¶¶ 31, 36, 64 & Ex. 4. According to Dr. Murphy's analysis, of UHC's twenty-four largest competitors, twelve do not use Change at all, and eleven others multi-home by using Change and a host of other EDI clearinghouses. *See id.*, Table 11. This competition is reflected in prices for EDI services, which Dr. Murphy explains have been falling, sometimes even to zero. *See id.* ¶¶ 31, 61. Dr. Murphy thus concludes: "From an economic perspective, this suggests that the services are undifferentiated" or commoditized, facts that imply that other payers have options to use EDI clearinghouses other than Change's service. *Id.* ¶ 63.

At no point did Dr. Murphy opine, nor will he testify at trial, that Plaintiffs are **legally** "required to show" upstream power in the market for EDI clearinghouse services to prevail on their vertical merger theories. *Contra* Mot. (ECF No. 108-1) at 2. Instead, Dr. Murphy will describe the market conditions that must exist for Plaintiffs' theory of post-merger harm to be

likely and probable as an economic matter, and will evaluate whether those conditions are factually present.

## ARGUMENT

Plaintiffs' motion to exclude certain portions of Dr. Murphy's testimony should be denied. Dr. Murphy uses standard economic tools to analyze market power in the sale of EDI clearinghouse services, evaluating Change's pricing over time, its market share among top payers, and customer switching and multi-homing among EDI clearinghouse providers. These aspects of the market structure for EDI services directly counter Plaintiffs' theories of vertical harm, and their effort to recast Dr. Murphy's testimony as requiring a legal showing of substantial market power falls flat.

Upstream market power is relevant to Plaintiffs' burden of establishing likely or probable anticompetitive effects in a downstream market. Plaintiffs acknowledge that "the Supreme Court's vertical merger precedents" "look[] to a variety of factors to determine whether there is a reasonable probability that the vertical combination will result in anticompetitive harm," *see* Mot. (ECF No. 108-1) at 5–6, but they gloss over the fact that one such factor is market "structure," with "the shares of the market controlled by the industry leaders" being "the primary index of market power," *see Brown Shoe Co. v. United States*, 370 U.S. 370, 322 n.38 (1962). Confirming the relevance of "the number of competing sellers and their market shares" to a Section 7 claim, the Second Circuit in *Fruehauf Corp. v. FTC*, 603 F.2d 345 (2d Cir. 1979) explained:

> [W]e are unwilling to assume that any vertical foreclosure lessens competition. Absent very high market concentration or some other factor threatening a tangible anticompetitive effect, a vertical merger may simply realign sales patterns, for insofar as the merger forecloses some of the market from the merging firms' competitors, it may simply free up that much of the market, in which the merging firm's competitors and the merged firm formerly transacted, for new transactions between the merged firm's competitors and the merging firm's competitors.

*Id.* at 352 n.9, 353. Other courts are in accord. *See, e.g.*, *Crouse-Hinds Co. v. InterNorth, Inc.*, 518 F. Supp. 416, 431–32 (N.D.N.Y. 1980) (identifying "market power possessed by the merged

3

enterprise, and the strength and number of competing suppliers and purchasers" as relevant factors); *see also Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co.*, 826 F.2d 1235, 1246 (3d Cir. 1987); *Crane Co. v. Harsco Corp.*, 509 F. Supp. 115, 124–25 (D. Del. 1981).

These precedents track basic economic theory, and even Plaintiffs' own economist, Dr. Gowrisankaran, acknowledges that upstream competition factors into the competitive analysis of vertical mergers. *See* 7/17/22 G. Gowrisankaran Rebuttal Report ¶ 60 ("[E]conomic theory predicts that any incentive to raise rivals' cost would be muted or potentially stamped out by the degree of competition[.]"); *id.* ¶ 101 ("The vertically integrated firm's ability to [profit from raising rivals' costs] is determined by whether rivals could turn to substitutes to avoid its actions."). Dr. Gowrisankaran testified at his deposition: "[I]n economist terms, when there's a lot of substitutes in these upstream markets, so there's substitute products to which rivals could turn, then a firm's -- a vertically integrated firm's ability to raise rivals' costs would be much more muted than in the case where the[re] were not substitute products to which its rivals could turn." *See* 7/25/22 G. Gowrisankaran Dep. Tr. 148:14–149:6.

The degree to which a post-merger entity would have upstream market power drives whether downstream rivals can constrain anticompetitive behavior, and it is telling that Plaintiffs fail to cite a single piece of economic literature to support their argument. To provide just a few economic sources that acknowledge that market power is a critical component of any competitive effects analysis:

- Michael Riordan, *Competitive Effects of Vertical Integration*, in HANDBOOK OF ANTITRUST ECONOMICS 147 (2008): "Economic analysis demonstrates that the competitive effects of vertical integration depend on the structure of the upstream and downstream markets. Among the most important elements of market structure is the market power of firms in the relevant industries."

- Russell Pittman, *Three Economist's Tools for Antitrust Analysis: A Non-Technical Introduction*, in COMPETITION AUTHORITIES IN SOUTH EASTERN EUROPE (2017): "This

reminds us of the broader point that vertical mergers are likely to be harmful to competition only in the presence of significant market power at *both* levels."

- Serge Moresi & Steven C. Salop, *vGUPPI: Scoring Unilateral Pricing Incentives in Vertical Mergers*, 79 ANTITRUST L.J. 185, 201–02 (2013): "When downstream firms have access to production technologies that permit them to substitute away from the input of the upstream merging firm to other suppliers, the market power of the upstream merging firm will be lessened, both before and after the merger. . . . These [substitution and diversion] effects will reduce the incentive to engage in input foreclosure, perhaps very substantially."

- Daniel P. O'Brien, *The Antitrust Treatment of Vertical Restraints: Beyond the Possibility Theorems*, in THE PROS AND CONS OF VERTICAL RESTRAINTS (2008): "I note at the outset that all of the anticompetitive theories of vertical restraints require the presence of market power in either the upstream or downstream market."

- Daniel P. O'Brien, *The Economics of Vertical Restraints in Digital Markets*, in THE REPORT ON THE DIGITAL ECONOMY (2020) ("Generally, market power at one or both levels is necessary but not sufficient for harm to arise from vertical restraints or mergers."

Thus, regardless of whether Plaintiffs must show substantial power in an upstream market to prevail on their vertical theories, the absence of market power is certainly ***relevant*** to the plausibility of Plaintiffs' claims. Plaintiffs' claims are premised on the notion that, post-merger, UHG will degrade the quality of its rivals' EDI transactions and harvest their data, with rivals being unable to "disintermediate" from Change's network. *See* 7/17/22 G. Gowrisankaran Rebuttal Report ¶¶ 10, 70. Dr. Murphy's testimony rebuts Plaintiffs' position and speaks to rivals' ability to dramatically reduce (even if not eliminate) UHG's access to other payers' claims data and EDI transactions post-merger. This is a classic battle of the experts, and the Court need not resolve in this motion the question of whether upstream market power is a required legal element of a vertical claim under Section 7. *See Harris v. Koenig*, 815 F. Supp. 2d 6, 10 (D.D.C. 2011) ("While Defendants may disagree with that legal theory, resolution of this disagreement will occur at the merits stage of the litigation and not pursuant to a Rule 702 motion."); *In re Se. Milk Antitrust Litig.*, 2010 WL 5102974, at *2 (E.D. Tenn. Dec. 8, 2010) ("[I]t would be inappropriate to determine the correct 'legal standard'—e.g., the parameters of the relevant geographic market—

and thus convert a *Daubert* motion into an ersatz motion for summary judgment."), *R. & R. adopted*, 2011 WL 2693541 (E.D. Tenn. July 11, 2011). The only question is whether the challenged testimony "will 'assist the trier of fact to understand the evidence or to determine a fact in issue,' not whether the testimony satisfies the [party]'s burden on the ultimate issue at trial," which Dr. Murphy's testimony undoubtedly will. *See Ambrosini v. Labarraque*, 101 F.3d 129, 135 (D.C. Cir. 1996) (citation omitted); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 260 (2d Cir. 2016) (similar).

## **CONCLUSION**

Defendants respectfully request that the Court deny Plaintiffs' motion to exclude portions of Dr. Murphy's testimony.

Dated:  August 10, 2022

Matthew J. Reilly, P.C. (D.C. Bar No. 457884)
Craig S. Primis, P.C. (D.C. Bar No. 454796)
K. Winn Allen, P.C. (D.C. Bar No. 1000590)
Richard Cunningham (D.C. Bar. No. 1644119)
T.J. McCarrick (D.C. Bar. No. 219283)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone:  (202) 389-5000
Facsimile:  (202) 389-5200
matt.reilly@kirkland.com
craig.primis@kirkland.com
winn.allen@kirkland.com
tj.mccarrick@kirkland.com

Alexia R. Brancato (NY0467)
**KIRKLAND & ELLIS LLP**
600 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
alexia.brancato@kirkland.com

Charles Loughlin (D.C. Bar. No. 448219)
Justin W. Bernick (D.C. Bar. No. 988245)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone:  (202) 637-5600
Facsimile:  (202) 637-5910
chuck.loughlin@hoganlovells.com
justin.bernick@hoganlovells.com

*Counsel for Defendant UnitedHealth Group Incorporated*

Respectfully submitted,

By:  */s/ Craig S. Primis*
     Craig S. Primis

Sara Y. Razi (D.C. Bar No. 473647)
Abram J. Ellis (D.C. Bar No. 497634)
Nathaniel Preston Miller (D.C. Bar No. 1021557)
**SIMPSON, THACHER & BARTLETT LLP**
900 G Street, NW
Washington, DC 20001
Telephone:  (202) 636-5500
Facsimile:  (202) 636-5502
sara.razi@stblaw.com
aellis@stblaw.com
preston.miller@stblaw.com

David I. Gelfand (D.C. Bar No. 416596)
Daniel P. Culley (D.C. Bar No. 988557)
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
2112 Pennsylvania Ave, N.W.
Washington, DC 20037
Telephone:  (202) 974-1500
Facsimile:  (202) 974-1999
dgelfand@cgsh.com

*Counsel for Defendant Change Healthcare Inc.*

7

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 10th day of August 2022, a copy of the foregoing Defendants' Opposition to Plaintiffs' Daubert Motion to Exclude Certain Testimony of Defendants' Expert Kevin Murphy Based on Incorrect Legal Standard was electronically transmitted to the Clerk of Court using the CM/ECF system, which will transmit notification of such filing to all registered participants.

/s/ *Craig S. Primis*
Craig S. Primis, P.C. (D.C. Bar No. 454796)
