# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| *Plaintiffs*, | |
| v. | 1:22-cv-00481 (CJN) |
| UNITEDHEALTH GROUP INCORPORATED, and CHANGE HEALTHCARE INC., | **FILED UNDER SEAL** |
| *Defendants*. | **[REDACTED VERSION]** |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
## OF THE UNITED STATES, STATE OF MINNESOTA, AND STATE OF NEW YORK

Dated: August 31, 2022

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 1

II. BACKGROUND ................................................................................................. 25

    A. The Parties ............................................................................................ 25

    B. The Proposed Merger ......................................................................... 27

III. LEGAL STANDARD ........................................................................................ 29

IV. THE MERGER IS AN ILLEGAL VERTICAL MERGER BECAUSE UNITED WOULD GAIN THE ABILITY, AND HAVE AN INCENTIVE, TO USE RIVALS' COMPETITIVELY SENSITIVE INFORMATION ........................................... 35

    A. Proposed Findings of Fact ................................................................ 36

        1. The Relevant Markets Are Proven and Undisputed ...................... 36

            (a) Competition to Sell Commercial Health Insurance ........................... 37

            (b) Sale of Commercial Health Insurance to National Accounts is a Relevant Market ................................................................... 43

            (c) Sale of Commercial Health Insurance to Large Group Employers in Local Markets Are Relevant Markets ........................... 45

        2. The Related Product Is EDI Clearinghouse Services ..................... 47

        3. With the Merger, United Would Gain Access and Rights to Rivals' CSI, and Would Be Incentivized to Use It ........................ 52

            (a) Change Has Access to Vast Quantities of CSI ................................. 52

            (b) United Would Gain Legal Rights to Rivals' CSI ............................. 56

            (c) Change's Data Rights are the Foundation of the Proposed Merger ... 70

            (d) United Could Glean Useful Insights from Rivals' CSI that United Could Exploit to Harm Competition .................................. 75

            (e) United Would Have an Incentive to Use Rivals' CSI ....................... 90

            (f) United's Use of Rivals' CSI Would Increase Prices and Decrease Innovation ............................................................. 95

        4. Defendants' Proposals Would Not Resolve this Illegality ............. 97

            (a) Neither Law nor Contract Would Restrict United from Gaining Insights from Rivals' Claims Data ........................... 98

            (b) The Proposed Firewalls Would Not Rectify the Harm Here ........... 101

            (c) Purported "Commitments" Would Not Rectify the Harm Here ...... 105

            (d) United's Past Data Governance Practices Undermine Its Promises of Future Protection .................................................. 109

|        | B.    |     | **Proposed Conclusions of Law** ........................................................ **114** |
|        |       | 1.  | Relevant Markets ........................................................ 114 |
|        |       | 2.  | Related Products ........................................................ 114 |
|        |       | 3.  | The Merger Is Unlawful ........................................................ 115 |
|        |       |     | (a) The Government Has Established Its Prima Facie Case that the Merger Harms Competition. ........................... 118 |
|        |       |     | (b) Defendants Have Failed to Rebut the Government's Prima Facie Case ........................................ 119 |
|        |       |     | (c) Defendants' Promises Are Not Legally Cognizable Remedies ....... 125 |

**V.    THE MERGER IS ILLEGAL BECAUSE UNITED WOULD GAIN THE ABILITY AND INCENTIVE TO RAISE ITS RIVALS' COSTS ........................................... 127**

|        | A.    |     | **Proposed Findings of Fact** ........................................................ **127** |
|        |       | 1.  | The Relevant Markets Are Proven and Undisputed ................... 128 |
|        |       | 2.  | United Would Gain the Ability to Raise Rivals' Costs ................. 128 |
|        |       |     | (a) Pre-Merger, United and Change Compete to Deliver Integrated Platforms to Health Insurers ....................... 129 |
|        |       |     | (b) Post-Merger, United Would Gain the Ability to Withhold or Delay EDI-Related Innovations to Health Insurer Rivals by Controlling the Only Scaled Integrated Platform ............... 132 |
|        |       | 3.  | United Would Have an Incentive to Raise Rivals' Costs ............ 135 |
|        |       | 4.  | Raising Rivals' Costs Would Harm Competition ...................... 140 |
|        |       | 5.  | Post-Merger United Would Have the Ability and Incentive to Raise Rivals' Costs for ClaimsXten, Harming Competition ............... 142 |
|        |       | 6.  | Defendants' Proposed "Commitment" Cannot Remedy this Illegality ....... 143 |
|        | B.    |     | **Proposed Conclusions of Law** ........................................................ **145** |
|        |       | 1.  | Relevant Markets and Related Products .......................... 145 |
|        |       | 2.  | The Merger Is Unlawful ........................................................ 145 |
|        |       |     | (a) The Government Has Established Its Prima Facie Case that the Merger Harms Competition ........................... 146 |
|        |       |     | (b) Defendants Have Failed to Rebut the Government's Prima Facie Case ........................................ 149 |

**VI.   THE MERGER IS AN ILLEGAL HORIZONTAL MERGER BECAUSE IT WOULD CREATE A NEAR-MONOPOLY ........................................... 151**

|        | A.    |     | **Proposed Findings of Fact as to the Proposed Merger** ................... **151** |
|        |       | 1.  | The Relevant Market Is Proven and Undisputed ................... 151 |

2.  The Merger Would Produce a Firm Controlling 94% of the Relevant Market ................................................................................... 154

3.  The Merger Would Result in a Significant Increase in Concentration ........ 155

4.  The Merger also Would Result in a Loss of Head-to-Head Competition ................................................................................... 156

B.  **Proposed Conclusions of Law as to the Proposed Merger** ................................ 158

1.  The Merger Is Presumptively Illegal ...................................... 158

C.  **Proposed Findings of Fact as to the Proposed Divestiture** ................................ 160

1.  TPG Was Not Selected for Ability to Replace Today's Competitive Intensity ................................................................................... 161

2.  The Divestiture Will Not Replace Today's Competitive Intensity Because TPG Will Be Unable to Replicate Change's Longstanding Competitive Strategy ........................................... 163

3.  TPG also Will Be Unable to Replace Innovation Competition Between Change and Optum ........................................... 172

4.  Divestiture to TPG Poses a Material Risk of Degrading Future Competitive Positioning of ClaimsXten ...................... 175

5.  Divestiture to TPG Poses a Material Risk of Degrading the Asset Because TPG Lacks the Support System ClaimsXten Has at Change ........ 176

D.  **Proposed Conclusions of Law as to the Proposed Divestiture** ......................... 177

1.  Defendants' Proposed Divestiture Fails to Rebut the Presumption of Illegality; the Merger Is Illegal and Should Be Enjoined .......................... 177

VII.  NONE OF DEFENDANTS' REMAINING ARGUMENTS, INCLUDING AS TO PURPORTED "EFFICIENCIES," SAVE THE TRANSACTION .................... 185

A.  **Proposed Findings of Fact** ................................................... 185

B.  **Proposed Conclusions of Law** .............................................. 187

VIII.  CONCLUSION .................................................................... 190

# TABLE OF AUTHORITIES

**Cases**

*Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989)............................................ 9

*Brown Shoe Co.* v. *United States*, 370 U.S. 294 (1962) ....................................................... passim

*Chicago Bridge & Iron* v. *FTC*, 534 F.3d 410 (5th Cir. 2008)........................................ 148, 184

*Copperweld Corp.* v. *Indep. Tube Corp.*, 467 U.S. 752 (1984)............................................. passim

*Ford Motor Co.* v. *United States*, 405 U.S. 562 (1972)....................................................... passim

*FTC* v. *Advocate Health Care Network*, 841 F.3d 460 (7th Cir. 2016)........................................ 31

*FTC* v. *Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998) ......................................... passim

*FTC* v. *CCC Holdings*, 605 F. Supp. 2d 26 (D.D.C. 2009)....................................... 182, 188, 189

*FTC* v. *Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989)........................................... 5, 31

*FTC* v. *H.J. Heinz Co*., 246 F.3d 708 (D.C. Cir. 2001)...................................................... passim

*FTC* v. *PPG Indus., Inc.*, 798 F.2d 1500 (D.C. Cir. 1986) .......................................... 3, 118

*FTC* v. *Procter & Gamble Co.*, 386 U.S. 568 (1967)............................................................ passim

*FTC* v. *RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020) ........................................ 160, 178

*FTC* v. *Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) ..................................................... passim

*FTC* v. *Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ........................................... 24, 116

*FTC* v. *Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000) ............................................... 21, 158

*FTC* v. *Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ......................................................... passim

*FTC* v. *Tronox Ltd.*, 332 F. Supp. 3d 187 (D.D.C. 2018)....................................................... passim

*FTC* v. *Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984)................................................ 148

*FTC* v. *Weyerhaeuser Co.*, 665 F.2d 1072 (D.C. Cir. 1981) ................................................. 3, 118

*FTC* v. *Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018) ....... 24, 187, 188, 189

iv

*GMG Cap. Invs., LLC* v. *Athenian Venture Partners I, L.P.*, 36 A.3d 776 (Del. 2012)............. 150

*Hosp. Corp. of America* v. *FTC*, 807 F.2d 1381 (7th Cir. 1986)......................... 30, 121, 148, 184

*In re Union Carbide Corp.*, 1961 WL 65409 (F.T.C. 1961) ....................................................... 30

*Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*, 551 U.S. 877 (2007).................................... 9

*OKC Corp.* v. *FTC*, 455 F.2d 1159 (10th Cir. 1972).................................................................. 179

*Osborn ex rel. Osborn* v. *Kemp*, 991 A.2d 1153 (Del. 2010).................................................... 150

*ProMedica Health Sys., Inc.* v. *FTC*, 749 F.3d 559 (6th Cir. 2014)........................................... 125

*Sprint Nextel Corp.* v. *AT&T, Inc.*, 821 F. Supp. 2d 308 (D.D.C. 2011).................................... 147

*St. Alphonsus Med. Ctr.-Nampa Inc.* v. *St. Luke's Health Sys., Ltd.*, 778 F.3d 775 (9th Cir. 2015) ................................................................................................................................ passim

*Steves and Sons, Inc.* v. *Jeld-Wen, Inc.*, 988 F.3d 690 (4th Cir. 2021)........................................ 18

*United States* v. *AT&T, Inc.*, 310 F. Supp. 3d 161 (D.D.C. 2018) ...................................... 31, 124

*United States* v. *AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019) ............................................. passim

*United States* v. *Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ............................................. passim

*United States* v. *Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) ............................................. passim

*United States* v. *Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) ..................................... 36, 114

*United States* v. *Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990)..................................... passim

*United States* v. *Bertelsmann Se & Co. Kgaa*, 21-cv-02886 (D.D.C. Aug. 17, 2022) ......... 24, 188

*United States* v. *Container Corp. of Am.*, 393 U.S. 333 (1969) ...................................................... 3

*United States* v. *Dean Foods Co.*, No. 2:10-cv-59 (E.D. Wis. July 29, 2011) .......................... 181

*United States* v. *Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005)............................................. 115

*United States* v. *E. I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) (*du Pont I*) ... 31, 119, 120

*United States* v. *E. I. du Pont de Nemours & Co.*, 366 U.S. 315 (1961) (*du Pont II*) ........... passim

*United States* v. *Falstaff Brewing Corp.*, 410 U.S. 526 (1973) ......................................... 5, 29, 31

*United States* v. *Gen. Dynamics Corp.*, 415 U.S. 486 (1974) ............................................. 33, 148

*United States* v. *H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ................................ passim

*United States* v. *Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam) ........... 179

*United States* v. *Penn-Olin Chem. Co.*, 378 U.S. 158 (1964) .................................................. 2, 29

*United States* v. *Phila. Nat'l Bank*, 374 U.S. 321 (1963). ..................................................... passim

*United States* v. *Topco Assocs.*, 405 U.S. 596, 610 (1972) ...................................................... 188

*Yankee Entm't & Sports Network, LLC* v. *Cablevision Sys. Corp.*, 224 F. Supp. 2d 657 (S.D.N.Y. 2002) .................................................................................................................... 147

**Statutes**

Clayton Act Section 7, 15 U.S.C. § 18 ............................................................................... passim

H. R. Rep. No. 1191, 81st Cong., 1st Sess. 11........................................................................ 116

**Other Authorities**

*The FTC's Merger Remedies 2006-2012: A Report of the Bureaus of Competition and Economics* (Jan. 2017) ................................................................................................. 179

*U.S. Dep't of Justice & Fed. Trade Comm'n*, Horizontal Merger Guidelines  ...... 45, 47, 159, 187

*U.S. Dep't of Justice*, Merger Remedies Manual................................................ 122, 180, 181, 182

*U.S. Dep't of Justice*, Vertical Merger Guidelines ............................................................... passim

*U.S. Dep't of Justice*, Antitrust Division Policy Guide to Merger Remedies (June 2011)......... 125

*In the Matter of Dollar Tree, Inc.*, FTC Docket No. C-4530 (Sept. 16, 2015)........................... 181

**Secondary Sources**

Daniel F. Spulber, "Competition Policy and the Incentive to Innovate: The Dynamic Effects of Microsoft v. Commission," 25 YALE J. ON REG. 247 (2008) ............................................... 9

## I.   INTRODUCTION

1.     This case involves an illegal proposed merger between UnitedHealth Group ("United"), one of the largest companies in the United States and the owner of the nation's largest health insurer, and Change Healthcare, Inc. ("Change"), the nation's largest electronic data interchange ("EDI") clearinghouse.  Today, Change is a proudly "independent" healthcare data and information technology company that sits, in its own words, at the "center of the healthcare ecosystem" in the United States[1] and has "no economic incentives" to favor any insurer.[2]  By acquiring Change, United would gain control of this critical infrastructure, giving it a long-term proprietary advantage that would distort competition among health insurers for years to come.

2.     United wants to buy Change because of its position at the center of the healthcare ecosystem.  Data is the future of healthcare.  Change owns the largest EDI clearinghouse, which transmits incredibly valuable information comprised of about half of all commercial medical claims in the United States[3]—containing millions of data points that can be mined for competitive insights, fully consistent with all of the legal, contractual, and other obligations that govern United now and will govern it in the foreseeable future.  Change's EDI network is "by far the broadest and deepest in the country,"[4] and Change transmits as many commercial medical claims as the next two largest clearinghouses *combined*.[5]  And, crucially, Change has "unfettered" rights to use over half of those data.

3.     Section 7 of the Clayton Act prohibits acquisitions, including mergers, "where in

---

[1]    **PX-250** at 7; **PX-175** at -777.

[2]    **PX-176** at -779; *see also* **PX-175** at -777.

[3]    **8/9A**, 78:3-80:10 (Gowrisankaran); PX-820 ¶¶ 185-187, Ex. 8; **PX-1015** at 45, 46.

[4]    **PX-273** at -881.

[5]    **PX-1015** at 43.

any line of commerce or in any activity affecting commerce in any section of the country, the effect

of such acquisition…may be substantially to lessen competition, or to tend to create a monopoly."

15 U.S.C. § 18.  As the Supreme Court has made clear, Section 7 must be construed to require

"reasonable probability," not "certainty."  *United States* v. *Penn-Olin Chem. Co.*, 378 U.S. 158,

175 (1964); *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962) ("Congress used the words

'*may* be substantially to lessen competition' . . . to indicate that its concern was with probabilities,

not certainties.").[6]  This legal framework, which applies to horizontal and vertical mergers,[7]

recognizes the demand of Congress to "arrest anticompetitive tendencies in their 'incipiency.'"

*United States* v. *Phila. Nat'l Bank*, 374 U.S. 321, 362-63 (1963).  "A most important [] factor" in

evaluating a vertical merger under *Brown Shoe* is "the very nature and purpose of the

arrangement."  *See Brown Shoe*, 370 U.S. at 329 .

4.     By the nature and purpose of this transaction, United would take control of an

enormous and ever-growing source of competitively sensitive information ("CSI") about its

insurance rivals.  As United's CEO at the time it agreed to purchase Change, David Wichmann,

testified candidly at his deposition, United's gaining access to Change's data rights for the claims

data flowing over its clearinghouse was "the foundation by which the business case was made to

---

[6]   *See also FTC* v. *H.J. Heinz Co.*, 246 F.3d 708, 713-14 (D.C. Cir. 2001); *United States* v. *Baker Hughes Inc.*, 908 F.2d 981, 988 (D.C. Cir. 1990) (Section 7 assessment of a merger's probable effect on competition requires a "comprehensive inquiry" into "future competitive conditions in a given market").

[7]   In 1950, Congress passed the Celler-Kefauver Anti-Merger Act "to make plain that [Section] 7 applied not only to mergers between actual competitors, but also to vertical and conglomerate mergers whose effect may tend to lessen competition in any line of commerce in any section of the country."  *Brown Shoe*, 370 U.S. at 317

pursue the transaction."[8]   While United's executives at trial downplayed the importance of Change's data and how United would use it, the ordinary-course transaction documents and common sense tell a different story.  Change's data and data rights remained a key focus of the deal team throughout the evaluation of the transaction;[9] ultimately, United agreed to pay $13 billion to acquire Change.

5.      After the merger, United would have both the ability and a powerful incentive to use data about its rivals to glean competitively sensitive insights that it could deploy to its advantage and to the detriment of its rivals.  In a trial where many facts were disputed, there should be no dispute that United is a profit-maximizing enterprise that will use Change's data assets as much as it possibly can to maximize profits and attempt to justify Change's $13 billion purchase price.  This showing is sufficient to establish that the merger is likely to harm competition.  *See Ford Motor Co.* v. *United States*, 405 U.S. 562, 571 (1972) (holding vertical acquisition violated Clayton Act in part because defendant "would have every *incentive*" to act in an anticompetitive manner by maintaining barriers to entry) (emphasis added).[10]

6.      United contends that its corporate culture, reputational concerns, or internal data

---

[8]    **8/4A**, 63:2-64:23 (Wichmann); **PX-1009** at 6.

[9]    *See infra* Part IV.A.3.c.

[10]   *Accord U.S. Dep't of Justice*, Vertical Merger Guidelines, at 2 (agencies focus on "firms' abilities and incentives following a vertical merger").  The D.C. Circuit has held that the transfer of competitively sensitive information between competitors harms competition.  *FTC* v. *PPG Indus., Inc.*, 798 F.2d 1500, 1508 (D.C. Cir. 1986) (Bork, J.) (concluding that a divesture would not "fully restore competition" if preceded by the transfer of competitively sensitive information); *FTC* v. *Weyerhaeuser Co.*, 665 F.2d 1072, 1085-86 (D.C. Cir. 1981) (concluding same with respect to hold separate order); *see also U.S. Dep't of Justice*, Vertical Merger Guidelines, at 10; *cf. United States* v. *Container Corp. of Am.*, 393 U.S. 333, 336-37 (1969) (concluding that an agreement to exchange price information violated Section 1 of the Sherman Act).

management policies would deter it from using Change's data rights in ways that would likely disadvantage its rivals and harm competition, but this is a red herring.  Even if the assurances of United's executives are credited, they do not change the fact that United *also* has a powerful incentive to find ways to use its rivals' data to its advantage.  And the law is clear that promises not to behave anticompetitively—no matter how sincerely offered—cannot save a merger that creates an incentive for the merged firm to harm competition.  *United States* v. *H&R Block*, *Inc.*, 833 F. Supp. 2d 36, 82 (D.D.C. 2011) (rejecting offer to freeze prices because, while there was "no reason to doubt that defendants would honor their promise, this type of guarantee cannot rebut a likelihood of anticompetitive effects in this case"); *Cardinal Health, Inc.*, 12 F. Supp. 2d at 65 ("Defendants' guarantees alone cannot cure the likely anti-competitive effects of the mergers."); *see also FTC* v. *H.J. Heinz Co.*, 246 F.3d 708, 721 (D.C. Cir. 2001) (where merger reduces competition structurally, courts view "promises about post-merger behavior" with skepticism).

7.    Moreover, corporate executives, strategies, and the "tone from the top" may change,[11] while this merger would be permanent.  United's shareholders will continue to demand that United deliver financial results, and decisions about how to use Change's data as part of that process will be left to United's sole discretion.[12]  In fact, United's documents show that United already advantages its insurer, UnitedHealthcare, in relation to its rivals,[13] and deal documents for

---

[11]    **8/10P**, 65:14-66:4 (business plans are not set in stone and may change when not profitable and/or with new leadership), 68:8-14 (tone from the top may change with a new CEO as they will make whatever decisions they think appropriate), 78:16-79:2 (United is a publicly-traded, for-profit company and Mr. Witty must answer to United's board and shareholders) (Witty).

[12]    **8/10P**, 68:5-12 (Witty).

[13]    *See, e.g.*, **PX-615** at -326; **8/10P** 83:7-13, 83:19-84:3; 93:10-13 (Witty).

this transaction show a similar intention.[14]  Indeed, United's current CEO has already opened the door to using Change's data by admitting that United may do so on an "anonymized" basis—and nothing would prevent United from reassessing how it could use Change's data after the spotlight of litigation has been extinguished.  Allowing the transaction to proceed on this basis is precisely the type of risky bet that has no support in statute or precedent, and United's promises cannot overcome this risk.  *See FTC* v. *Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989) (Posner, J.) ("[T]he statute requires a prediction, and doubts are to be resolved against the transaction.") (citing *Phila. Nat'l Bank*, 374 U.S. at 362-63); *United States* v. *Falstaff Brewing Corp.*, 410 U.S. 526, 555-58 (1973)); *Brown Shoe*, 370 U.S. at 323 (noting that the Clayton Act is concerned with "probabilities, not certainties").

8.      The merger at issue in this case is illegal under Section 7 on three independent grounds, each of which is a sufficient basis to enjoin the transaction.  *First*, the merger is an illegal vertical merger because it would give United the ability and incentive—consistent with law and contract—to learn its rivals' competitively sensitive information and use that information to reduce competition in the markets for national accounts and large group commercial health insurance. *Second*, the merger is an illegal vertical merger because it would give United, through its control of Change's EDI clearinghouse, the ability and incentive to raise rivals' costs to compete, harming competition in these same commercial insurance markets.  *Third*, as Defendants effectively admit, the merger on its face is unlawful because it would "tend to create a monopoly" in first-pass claims editing, and Defendants have failed to carry their burden of showing that the proposed divestiture would preserve the competitive intensity that would exist absent the merger.  Because under any

---

[14]   *See infra* Part IV.A.3.c.

of these three theories the effect of the transaction "may be substantially to lessen competition, or to tend to create a monopoly," the merger should be enjoined.  15 U.S.C. § 18.

    **A.**    **The Merger Substantially Lessens Competition by Giving United the Ability and Incentive to Use its Rivals' Competitively Sensitive Information.**

    9.    If the Court permits this merger to proceed, United would inherit Change's legal rights, gaining—for the first time—rights to use substantial amounts of its rivals' claims data. Change has access to vast quantities of claims data for multiple payers, including for all of United's principal rivals in the commercial national accounts and large group health insurance markets. More importantly, Change enjoys broad legal rights to "deidentify" and "use" more than half of those data, many of which relate to United's rivals.[15]  While Defendants claim that United has "long had access to rival insurers' claims data," (ECF 90 at 2), the evidence shows the opposite: that United generally lacks the legal *right to use* its rivals' claims data.[16]  The merger would change this.

    10.    **The evidence at trial establishes that data rights of this type would be *useful to United.***  United could apply data analytics to Change's deidentified data to learn proprietary and competitively sensitive insights about its major rivals.  These insights include the way its rivals control utilization, negotiate with providers, build networks, and pay claims—all crucial dimensions of competition among insurers.  In addition, United would be able to use claims data

---

[15]  **8/9A**, 87:14-88:7 (Gowrisankaran); **PX-1015** at 44, 49, 54; **8/3A,** 15:13-16:14 (Suther); **PX-27** at -715.

[16]  United's attempts to secure such rights have failed; it sought data rights from health insurer-customers, but all of them removed the language that would have given United (Optum) such rights.  **8/4P,** 121:10-20 (Yurjevich); **PX-1018** (261:10-22) (Chennuru) (Anthem does not give Optum data rights). United's acquisition of Equian did not give United rights to rival insurers' data.  **8/4P**, 136:1-22 (Yurjevich).

to inform its underwriting decisions: the data would enable it to pick off healthier groups, leave unhealthy groups to its rivals, and reduce competition for people most in need of health insurance.[17]  Defendants' expert concedes that these data contain a level of information not found through public or commercially available sources.[18]  This one-sided information advantage in the hands of the nation's largest health insurer threatens to alter the competitive dynamics in the relevant commercial health insurance markets across the nation.

11. **The evidence also establishes that United has an *incentive* to use the data. Change's data rights have loomed large in this transaction.**  In seeking to acquire Change, United's leadership sought to secure a "proprietary advantage" from Change's data rights, pressing the deal team for more information about Change's data assets and for potential use cases for Change's "multipayer" claims datasets.[19]  United's then-CEO, who recommended acquiring Change to the board of directors, told a fellow executive that "if we have data rights," he would be "excited," but "[i]f it's just a commodity exchange," he would be "not as interested."[20]  The deal team assessed Change's data assets for United's leadership, and their  "[t]akeaway" was that acquiring Change would "greatly increase[] [United's] access to healthcare data," particularly with respect to "[m]ultipayer claims data."[21]  United, in its own words, recognizes that "what differentiates" the data Change has from what United already possesses is "diverse payer

---

[17]  *See infra* Part FOF ¶¶ 74-75, 164-166.

[18]  **8/12,** 56:13-58:1, 58:12-60:23, 62:13-63:10 (Tucker).

[19]  **8/5A**, 116:8-16 (Musslewhite); **PX-82** at 1; **PX-944** at -296.

[20]  **8/5A**, 112:18-114:14 (Musslewhite); *see also* **8/4P**, 140:6-142:13 (Yurjevich); **PX-303** at -140 (Dave [Wichmann]: Data rights, main question"); **PX-82** at 1.

[21]  **PX-944** at -293.

representation."[22]  And United sees data as an "enterprise asset" and Change's data and data rights as a strategic asset of the enterprise.[23]   United and its executives today are driving United increasingly to share data across the entire enterprise, to the benefit of United as a whole.[24]

12.    **United's own documents and testimony show not only _that it intends_ to use Change's multipayer claims data, but _how it intends_ to use it: to advantage itself in its own utilization management practices, benefit design, provider negotiations, and underwriting.**[25] By exercising Change's data rights, United could co-opt the best innovations of its major insurance rivals.  For example, United could use Change's claims data to learn its rivals' custom claims edits, "piggybacking" on its rivals' efforts to develop proprietary edits that "differentiate[] [them]" and give them a "competitive advantage."[26] This would reduce the benefit that rivals obtain from innovations and, in turn, reduce their incentives to innovate in commercial large group and national accounts markets.[27]  This is particularly true over the long term, because rivals are likely to get fewer payoffs from innovation if United engages in free-riding.[28]   On this record, United's

---

[22]  **PX-58** at -714; **8/5P**, 9:11-14 (Dumont).

[23]  **8/10A**, 52:9-53:1 (Schumacher); **PX-360** at -081, -088, -092 ("Integrate Change data assets to provide knock-on value" and "Maximize value of acquired data"); _see also_ **PX-306** at -987 (showing that United has been interested in securing "broader rights" to data since at least 2016).

[24]  **PX-615** at -271, -273, -433; **8/10P**, 86:23-24 (Witty); _see also_ **8/10A**, 18:15-19:12 (Schumacher); **PX-351** at -078.

[25]  **PX-204** at -069; **8/4P**, 45:1-15 (Hasslinger).

[26]  **8/1A**, 128:8-129:1 (Garbee).

[27]  **8/9A**, 75:5-17 (Gowrisankaran); _U.S. Dep't of Justice_, Vertical Merger Guidelines at 10 (noting that, when a firm can use competitively sensitive information to "preempt or react quickly to a rival's procompetitive business actions ," the rival "may see less competitive value in taking procompetitive actions").

[28]  **8/9A**, 75:5-17 (Gowrisankaran); **8/1A**, 128:21-129:1 (Garbee).  As the Supreme Court has recognized in the patent context, losing protection for innovations creates an incentive to

argument that it would not have an incentive to use its rivals' data up to the bounds of its legal limitations is unsupportable.

13.      **Moreover, nothing now (or proposed in the future) prevents United from having the *ability* and *incentive* to use insights from the data here.**  At trial, Defendants focused on rebutting the supposed contention that United can be expected to break the law or violate internal policies.  Although the evidence shows failures in United's compliance,[29] this is ultimately a straw man.  The Government is not required to prove any such violations to establish a claim under Section 7, nor is that the Government's argument.  Rather, the overriding point is that United could and would exploit competitively sensitive information from Change's claims data *even while complying* with these obligations.

14.      Firewalls.  Defendants' proposed firewall policy—issued in the shadow of this litigation, in May 2022—would not adequately safeguard the competitively sensitive information United would gain legal rights to use through this merger.  The plain language of that policy would not prevent United from using rivals' claims data.  This is because Change obtains rights to the data of its largest insurance rivals from *providers*, not insurers, and UnitedHealthcare (an insurer) is not a United business unit that competes with *providers*.[30]  This is unlikely to be an oversight

---

innovate less.  *See, e.g.*, *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc*., 489 U.S. 141, 146 (1989) (stating that the Constitution's "Patent Clause itself reflects a balance between the need to encourage innovation and the avoidance of monopolies which stifle competition without any concomitant advance in the 'Progress of Science and useful Arts'"); *see also Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*, 551 U.S. 877, 890 (2007) (free-riding on competing retailers' services reduces those retailers' incentives to invest in services); Daniel F. Spulber, Competition Policy and the Incentive to Innovate: The Dynamic Effects of Microsoft v. Commission, 25 YALE J. ON REG. 247, 270 (2008) ("The possibility of free riding will lower incentives to innovate for all firms.").

[29]   *See infra* Part IV.A.4.d.

[30]   **PX-599** at -683 (prohibiting the "disclosure of External Customer CSI to UHG business units

by United's "careful" and "precise" lawyers.[31]

15.     In addition to allowing the use of rivals' claims data, United's firewall policy is replete with other failings, as discussed below,[32] and is subject to modification in the future at United's sole discretion.[33]  No third party has any say in United's decision of whether to revise or amend that policy; in fact, third parties may never know if that occurs.  And while Defendants claim that firewalls will be maintained because they are a commercial imperative, that contention is unsupported by evidence at trial.  Indeed, while United advances speculative theories of how commercial risks of data misuse would restrain its future behavior, such theories are wholly absent from its ordinary-course documents analyzing the transaction.

16.     Defendants' contention that firewalls should be approved here because they have been approved in other litigations or worked in other contexts ignores the fundamental fact that it is difficult, if not impossible, to disintermediate Change's EDI clearinghouse.  In those other matters, entities worried about their information falling into rivals' hands could protect themselves more easily through contractual negotiations or by switching vendors.[34]  Here, insurers cannot

---

*that are competitors of such External Customers*" and the "use of External Customer CSI to benefit UHG business units *that are competitors of such External Customers*" (emphasis added)).  Change also obtains these data rights from channel partners (*e.g.*, software vendors) or trading partners (*e.g.*, other clearinghouses) that have obtained data rights from providers. Similarly, UHC does not compete with channel partners or trading partners and is not restricted by the firewall from using data obtained from these entities.  **8/10P**, 56:15-18 (Witty).

[31]   **8/10P**, 32:20-25 (Witty).

[32]   *See infra* **Part** IV.A.4.b.

[33]   **8/10P**, 64:23-65:13 (Witty).

[34]   *See* Response of Plaintiff United States to Public Comments on the Proposed Final Judgment, ECF 52 at 16, *United States* v. *Evangelical Community Hosp.*, No. 4:20-cv-01383 (D.D.C. Aug. 31, 2021) ("To the extent that UPMC is concerned that Evangelical will share sensitive information about the UPMC-Evangelical contract with GHP, UPMC, a large, sophisticated

engage in effective self-help of this type.  As Change itself boasts, "[t]he healthcare system, and how payers and providers transact, would not work without Change."[35]  As set forth below, even rivals who decline to give United contractual rights to use their data are vulnerable, because United may have the right to use the same information from other sources.  Moreover, even switching away from Change entirely would not prevent Change from having the legal right to use that rival's competitively sensitive information.

17.     Firewalls are also particularly inadequate here, as the sheer magnitude of rival information United would be able to exploit and the potential harm to competition that would result is unprecedented.  Firewalls are a risky, regulatory solution that do not fit this case—not a panacea that can be trusted to eliminate the effects of the largest health insurer in the country acquiring troves of competitively sensitive data about its most significant competitors.[36]

18.     <u>Legal Restrictions</u>.  Through this transaction, United would inherit Change's "unfettered" data rights, which provide the ability to use or disclose deidentified data "unless prohibited by applicable law."  But neither "applicable law" nor any other restriction would strip United of the ability to derive competitive insights from the data here.

19.     For example, Defendants contend that Change's data rights are subject to confidentiality provisions in its agreements.   But this is a tailored-for-litigation argument

---

hospital system, can protect itself through its contract with Evangelical.");  Response of Plaintiff United States to Public Comments on the Proposed Final Judgment, ECF 56 at 32, *United States* v. *CVS Health Corp.*, No. 1:18-cv-02340 (D.D.C. Feb. 13, 2019) (noting that "customers could switch to an alternative PBM if their information were not kept confidential").

[35]   **PX-713** at -076.

[36]   *See infra* Part IV.A.4.b; COL ¶¶ 243-247.

inconsistent with the plain language of Change's contracts.   The confidentiality provisions Defendants highlight do not mention data at all, and are in any event subordinate to Change's broader "business associate agreements ('BAAs')," which "govern in the event of conflict or inconsistency" with other confidentiality provisions.   The broader BAAs are clear: Change may "[u]se or [d]isclose such de-identified data unless prohibited by applicable law."[37]   And when Change in the ordinary course monitors its rights to the data—its "batting average"—it does not discuss these confidentiality provisions.[38]

20.   Defendants, in turn, have identified no "applicable law" that would prevent the use and disclosure of the data at issue here.   The Health Insurance Portability and Accountability Act ("HIPAA") is no impediment.   The process of deidentifying data under HIPAA does not require United to excise from Change's claims data the fields necessary to derive insights from rivals' proprietary, competitively sensitive information (like payer ID, information on treatments and diagnoses, all the financial information associated with the claim, and information as to which claims were originally denied and later accepted), and HIPAA does not restrict the use and disclosure of deidentified data in any way relevant here.[39]   United understands the difference between deidentified data required by HIPAA and sanitized data that removes competitively sensitive information.   The former is required by law; the latter is not.   Defendants' expert

---

[37]   **PX-632** at -840, -843 (stating that Change may "[u]se or [d]isclose such de-identified data unless prohibited by applicable law" and that "[t]his agreement will govern in the event of conflict or inconsistency with any provision of the Underlying Agreement"); **8/3A**, 36:21-40:15 (Suther); **PX-460** at -610, -613 (same). This interpretation of Change's contracts is also inconsistent with the fact that Change makes its data available to certain third parties at the claim and service line level.   **8/2P**, 124:4-6 (Suther).

[38]   **8/2P**, 116:12-117:10 (Suther); **PX-167** at -070.

[39]   **8/8A**, 117:19-118:5 (Handel); **PX-821** ¶ 51.

witnesses did not say otherwise.

21.     <u>Reputational Concerns</u>.  Although United's executives speculated that reputational concerns would prevent United from deriving competitive insights from Change's data, those concerns are belied by the record at trial.

22.     United is unlikely to face a real-world cost from using rival insurers' data to generate insights, reports, or strategies that co-opt its rivals' competitively sensitive information. Rivals will likely assume that United is exercising its legal rights to use their data and will be powerless to change that—although they would have no way of knowing, as they have no effective means of monitoring how United would use Change's data.  This is because even if those rivals deny Change secondary use rights in their direct dealings—and even if the rivals refuse to offer United such rights directly post-merger—providers or intermediaries can still grant Change rights to use their data.  In addition, Change has already amassed rights for millions of their claims over time: 39% of ███████ claims, 45% of ███████ claims, and 54% of ███████ claims that have passed through Change's clearinghouse.[40]  These datasets are far larger than necessary for United to glean competitively sensitive insights using machine learning or other analytic techniques.[41]  Going forward, even switching away from Change entirely would not protect their data: for example, one insurer stopped using Change's clearinghouse, but Change continues to transmit millions of its claims (over two-thirds of the volume it transmitted before the termination), demonstrating how difficult Change is to disintermediate.[42]

---

[40]  **PX-1015** at 49.

[41]  **8/8A**, 124:25-125:11 (Handel).

[42]  **PX-1015** at 49.

23.     Nor are providers or their intermediaries likely to rescind Change's data rights. Providers, of which there are over a million in the United States,[43] and their intermediaries (*e.g.,* channel partners and trading partners) secure benefits from Change in exchange for granting data rights, and they would be less directly affected by UnitedHealthcare's using their data.[44] Moreover, many providers that rely on intermediaries may be unaware that Change is receiving their claims data and data rights.[45]

24.     United's claim of reputational concern is also inconsistent with the ordinary-course documents presented at trial.  At trial, United's executives claimed that United's regard for its reputation with rival payers and its corporate culture mean that using rivals' data for anticompetitive purposes would be unthinkable.  But United's true reputation is characterized by the "U-factor"—the wariness other health insurers have in dealing with United's Optum subsidiary because of its affiliation with their rival UnitedHealthcare.[46]  And United's deal documents reflect a different picture than it now offers of being indifferent to Change's "treasure trove" of health care claims with data rights.[47]  In evaluating the purchase of Change, United's executives analyzed potential use cases for these multi-payer data rights to "improve[]" UnitedHealthcare's "medical policy and benefits design," regardless of "competitive concerns."[48]  It is no accident that these use cases—which United actually analyzed—show, as the Government's healthcare data expert

---

[43]  **8/15P** 50:21-51:7 (Gowrisankaran).

[44]  **PX-453** at -146; **PX-450** at -783-84, -787, -795.

[45]  **PX-947** ¶ 12.

[46]  **8/4P**, 39:8-11 (Hasslinger).

[47]  **8/8A**, 35:10-19 (Spady).

[48]  **PX-54**; **8/4P**, 49:21-50:3, 57:24-58:3, 59:5-8 (Hasslinger); **PX-944** at -296.

demonstrated, that United can glean competitively useful insights from Change's trove of claims data.[49]   That concrete evidence of how United likely will use Change's data rights is far more probative than the efforts of United's witnesses to explain away the evidence away at trial.  *See Aetna*, 240 F. Supp. 3d at 70 ("in-court attempts to explain or disavow . . . documented exchanges" are not "more persuas[ive]" than "contemporaneous email exchanges."); *see also Cardinal Health*, 12 F. Supp. at 63-64 (finding that "defendants' own internal documents and public statements" were "compelling" evidence of likely competitive harm).

25.     Indeed, United's current CEO, Mr. Witty, admitted that United would be able to use "anonymized" data to develop products or insights.[50]   After the merger, the new data rights that United is paying for in this $13 billion deal would give United a strong incentive to use Change's data rights to the fullest extent permitted under the law.  And any gray areas of corporate compliance will be resolved by United itself.[51]   United's reputation would be no deterrent.  To the contrary, United's rivals would reasonably expect United to act in its enterprise self-interest— "[t]he old U-factor as we call it."[52]

26.     <u>Customer "Commitments.</u>"  Defendants' purported customer "commitments" to "Change's EDI customers" are also wholly insufficient to eliminate the anticompetitive effects of this transaction.  The "commitments" are unilateral promises lacking in consideration, nonbinding, and unenforceable.  In any event, they would do nothing to protect United's health insurance rivals.  As set forth above, United can glean insights about its health insurer rivals from *provider*-granted

---

[49]   **PX-821** ¶¶ 104-123.

[50]   **8/10P**, 64:16-22 (Witty).

[51]   **8/10P**, 76:20-78:15 (Witty).

[52]   **PX-523** at -586.

data rights, and United's commitments to customers would not affect United's ability to use these data for its own benefit in health insurance markets.  United's commitments fail to provide for any audit rights, do not apply to new Change customers, and expire at the end of the term of any existing contract that is amended.  They are also vague, which would make it difficult, if not impossible, for any party to prove that they were breached.  As a result, the commitments do not offer any real protection.

27.    Moreover, even a well-intentioned promise from United would fail to remedy the structural problems with this merger.  *See H&R Block*, 833 F. Supp. 2d at 82; *Cardinal Health*, 12 F. Supp. 2d at 65.  That is particularly the case here, as United's promises are fully one-sided (within the control of United), corporate executives and strategies change, and employees move frequently across business units, carrying insights from competitively sensitive information with them.[53]

28.    <u>Culture of Compliance</u>.  United's supposed culture of compliance is also a red herring.  The evidence shows that United's data governance is characterized by repeated failures, contradicting the rosy picture painted by United's trial witnesses.[54]  But the Court need not reach that issue, because no "firewall," "policy," "commitment," or "culture" will prevent United from using the data rights that it would acquire from Change to benefit itself, to the detriment of competition.  Contrary to Defendants' assertions, none of the Government's theories depends upon United's breaching any contractual or legal obligation.  The question for the Court is thus not

---

[53]  United has expressed significant concerns about the competitively sensitive information that employees who leave the company gained through their experience at United, **8/4A**, 37:13-39:10; **PX-1**031 at 15-16, which suggests that competitively sensitive information would also travel with employees who move from Optum to UnitedHealthcare.

[54]  *See infra* Part IV.A.4.d.

whether United will comply with those obligations, but whether United would have the ability and incentive to use Change's data rights to co-opt its rivals' innovations and decrease competition to benefit United's enterprise.[55]  The resounding answer to that question is yes.

29.     United's requests that this Court rely on its firewalls and commitments fundamentally amount to a request that the Court trust United with its rivals' competitively sensitive information, notwithstanding its powerful incentive to use it as evidenced by their own ordinary course documents.   But allowing these types of unilateral assurances to overcome United's economic incentives would turn the Clayton Act on its head, permitting United to circumvent the structural problems that this merger creates through promises crafted in litigation. *United States* v. *H&R Block*, *Inc.*, 833 F. Supp. 2d 36, 82 (D.D.C. 2011) (rejecting offer to freeze prices because, while there was "no reason to doubt that defendants would honor their promise, this type of guarantee cannot rebut a likelihood of anticompetitive effects in this case"); *Cardinal Health, Inc.*, 12 F. Supp. 2d at 65 ("Defendants' guarantees alone cannot cure the likely anti-competitive effects of the mergers."); *see also Heinz*, 246 F.3d at 721 (where merger reduces competition structurally, courts view "promises about post-merger behavior" with skepticism). This is the type of risky bet the antitrust laws abhor, and a reason structural remedies are favored over even the most ironclad behavioral remedies, much less the unenforceable assurances offered by United here.  *See United States* v. *E.I. du Pont de Nemours & Co.*, 366 U.S. at 334 (1961) (*du Pont II*) (denying behavioral relief because "an injunction can hardly be detailed enough to cover in advance all the many fashions in which improper influence might manifest itself").  United has

---

[55]  *See infra* Part COL ¶¶ 56, 233-234.

worked assiduously to prevent UnitedHealthcare's data from falling into its rivals' hands.[56]  Those rivals—and, ultimately, consumers—should not have to trust United with the rights to use its rivals' competitively sensitive claims data.

### B.     The Merger Substantially Lessens Competition by Giving United the Ability and Incentive to Raise its Rivals' Costs.

30.     The merger is also an illegal vertical merger because it would give United, through its control of Change's EDI clearinghouse, the ability and incentive to raise its rivals' costs, harming competition in the relevant insurance markets.  No remedies proposed by Defendants can avoid this illegality.[57]  Vertical mergers can unlawfully reduce competition by acting "as a clog on competition"—for instance, by placing rivals at a disadvantage in their ability to secure necessary inputs.[58]  Showing that, after the merger, United would have the ability and incentive to disadvantage its rivals is sufficient to show that the transaction is likely to be anticompetitive.  The Supreme Court has found liability based on this kind of risk of foreclosure in previous vertical mergers.  *See, e.g.*, *Ford*, 405 U.S. at 574-75, 578 (finding that the vertical merger "foreclose[d]" the remaining independent manufacturer in the relevant market, resulting in anticompetitive effects); *Brown Shoe*, 370 U.S. at 334 (holding that the merger, as well as "the trend toward vertical integration in the shoe industry," would "foreclose competition" in violation of Section 7).

31.     Today, as an independent company, Change is incentivized to pursue clearinghouse

---

[56]  *See, e.g.*, **PX-653** at -945; **PX-79** at -907; **PX-1013** (395:1-13) (Golden); **8/9P** 79:8-13 (McMahon) (United's executives were willing to relinquish health insurance customers to uphold data use restrictions).

[57]  *See, e.g.*, *Ford*, 405 U.S. at 574-75.

[58]  *Brown Shoe*, 370 U.S. at 323-24 (quotation omitted); *Steves and Sons, Inc.* v. *Jeld-Wen, Inc.*, 988 F.3d 690, 713 (4th Cir. 2021).

innovations that will benefit all insurers using its products.[59]  If United acquires Change, United would have the ability to secure those innovations for itself but delay or withhold them from rivals, ultimately raising their costs to compete.  Evidence already exists of such a lessening of competition: pre-merger, Change was pursuing EDI-related innovations (like "Real-Time Settlement"), but after the transaction was signed, it reduced investment in Real-Time Settlement and delayed the timeline for its development.[60]

32.     As the Government's economic expert demonstrated, the "vertical math" shows that United's incentives to increase profits are strong: the profits it stands to gain from new insurance accounts would likely far exceed the profits lost from delaying or withholding clearinghouse innovations from rivals or losing customers that decline to purchase services from the merged firm.[61]  This is not speculation; his opinion is well-supported by the evidence.  The record also shows that United has and continues to make decisions based on the benefits to the enterprise, considering the "enterprise math," as benefits to one part of the organization are weighed against costs to other parts, with decisions made to maximize the benefits for the organization as a whole.[62]  Indeed, Defendants' expert does not dispute that United seeks to maximize the value of the enterprise as a whole,[63] and  inappropriately ignores UnitedHealthcare's

---

[59]  **PX-820 ¶¶** 239-240; **8/9A**, 58:12-21 (Gowrisankaran).

[60]  **8/2A**, 86:13-25 (de Crescenzo); **PX-548** at -997; **8/3P**, 53:8-22 (Joshi).

[61]  **8/9A**, 68:18-69:2 (Gowrisankaran); **PX-820 ¶¶** 250-252.

[62]  **8/10A**, 23:24-24:20, 26:22-27:21 (Schumacher); **PX-353** at -042; *see also* **8/4A**, 18:16-19:6 (kept in mind whether proposed strategy of subsidiary was working to benefit the enterprise), 20:1-3 (as CEO, Mr. Wichmann took an enterprise view of virtually everything) (Wichmann).

[63]  **8/15A,** 95:22-96:9 (Murphy).

potential to gain new insurance accounts—which represents the bulk of United's business—in his unsuccessful attempt to produce 'vertical math' that favored the merger.[64]

33.     None of the non-binding commitments United proposes would remedy this illegality, for reasons analogous to those set forth above, and because none materially alters United's incentives or ability here.  For example, the customer commitments would do nothing to protect innovation.  The one-sentence "commercial availability" provision, which purports to protect Change's EDI customers from United denying them innovations, is vague and by its terms applies only to products developed "using Change's medical EDI clearinghouse network data," and would thus not apply to new innovations such as the Transparent Network.[65]

### C.     The Merger Would Create an Unlawful Near-Monopoly, and Defendants Have Failed to Show that the Divestiture Cures the Illegality.

34.     There really is no dispute that the underlying merger to which the Defendants agreed would violate Section 7 of the Clayton Act.  Defendants erroneously try to argue that this is irrelevant because of their proposed (albeit flawed) divestiture.  But the law is clear that the Court needs to go through a two-step process in this situation, *i.e.*, evaluating the extent of the underlying competitive problem and then evaluating the proposed remedy.  *See, e.g.*, *Aetna*, 240 F. Supp. 3d at 18-19, 59-60; *FTC* v. *Sysco Corp.*, 113 F. Supp. 3d 1, 72 (D.D.C. 2015).  This process is for good reason because: (i) *Defendants have the burden* to show their proposed remedy

---

[64]   **8/15P,** 22:12-23:11, 25:3-19  (Gowrisankaran**); PX-1036** at 14.

[65]   **DX-686** at -891.  The "Transparent Network" is a product that Optum is working to develop, which is similar to a Change product known as "Real-Time Settlement."  **PX-334** at -774 to -775; **PX-288** at 3-33.  As discussed in more detail below, these products aim to reduce administrative waste and increase the speed at which claims are processed by integrating what are now distinct parts of the claims adjudication process into a single offering.  *See infra* Part V.A.2.

replicates the competitive intensity of the lost competition,[66] and (ii) *Defendants' burden is higher* when plaintiffs do not rest on high market shares and presumption of illegality, but instead offer additional evidence demonstrating significant lost competition.[67]  Defendants have failed to carry this heavy burden.

35.     There is no appreciable dispute that the transaction would leave United with over 90% of the first pass claims editing market and result in a significant increase in concentration.  *See, e.g.*, *Phila. Nat'l Bank*, 374 U.S. at 364 (presumption established where merging entities controlled 30% of market); *FTC* v. *Swedish Match*, 131 F. Supp. 2d 151, 166 (D.D.C. 2000) (presumption established where merging entities controlled 60% of market).  Where, as here, the Government has not rested on this presumption, but has instead offered evidence showing that the merger would result in the elimination of head-to-head competition, the presumption of illegality is especially strong.  *Aetna*, 240 F. Supp. 3d at 19 (quoting *Baker Hughes*, 908 F.2d at 991); *see Baker Hughes*, 908 F.2d at 991 ("The more compelling the *prima facie* case, the more evidence the defendant must present to rebut it successfully.").  In addition, it is "well settled that once the Government has successfully borne the considerable burden of establishing a violation of the law, all doubts as to remedy are to be resolved in its favor."  *Ford*, 405 U.S. at 575 (quoting *Du Pont II*, 366 U.S. at 334).  United and Change are the only significant competitors for first-pass claims editing, and a divestiture that did anything less than fully "replace the competitive intensity" that would exist between them absent the merger would substantially lessen competition and harm consumers.  *Aetna*, 240 F. Supp. 3d at 60 (citations omitted).

36.     Defendants have failed to rebut the Government's *prima facie* case.  The entity

---

[66]   *See infra* Part COL¶ 411.

[67]   *See Baker Hughes*, 908 F.2d at 991.

Defendants propose as a buyer, TPG, is incapable of "replac[ing] the competitive intensity" that exists today between United and Change.  *Aetna*, 240 F. Supp. 3d at 60 (quoting *Sysco*, 113 F. Supp. 3d at 72).[68]   United and Change have both chosen, for strategic reasons, to offer comprehensive product suites that cannot be fully replaced by a product not offered as part of a broader suite.  United would not be divesting a standalone business or entity, but only a single product that, as TPG concedes, would be "carved out" from Change's product suite and offered alone.[69]   United would also not divest Change's Real Time Settlement—which was poised to compete directly with United's Transparent Network—again placing TPG in the disadvantageous position of having to spend significant sums to just catch up to where Change is today.  TPG's (i) lack of experience in claims editing and payment accuracy and (ii) short investment timelines similarly make it ill-suited to restore the competitive pressure that Change would have placed on Optum in the near- and long-term.[70]

37.     Although TPG may have an incentive to maximize its return on its investment in ClaimsXten, that does not equate to TPG having the incentive or ability to compete with ClaimsXten as intensely as Change does, particularly given these disadvantages.  No court has ever found that a divestiture would save an otherwise anticompetitive merger where the divestiture buyer cannot pursue the same sales, marketing, and innovation strategies as the seller—let alone a merger to a near monopoly where the evidence of illegality was overwhelming.[71]   Where

---

[68]   *See* **8/11A**, 145:9-11, 145:18-23 (Raj) (describing TPG and TPG Capital).

[69]   **PX-410** at 18; **PX-414** at 23; **PX-415** at -531; **PX-588** at -114, -119; **DX-402** at -055.

[70]   **PX-649** at -082; **8/11P**, 44:7-16 (Raj); **8/11P**, 59:15-60:18, 60:20-63:5; **PX-588** at -109, -110; **DX-402** at -082.

[71]   If United had found a clandestine way to disadvantage its main first-pass competitor by yanking it out of its existing product suite, leaving it an orphan product while augmenting its

Defendants fail to rebut or defeat the Government's showing, including by failing to establish that a proposed remedy would redress the illegality of the transaction, the merger should be enjoined.  *Aetna*, 240 F. Supp. 3d at 60; *see also du Pont II*, 366 U.S. at 331-32 (noting that the "burden is not on the Government to show" that the defendants' proposed remedy would be ineffective).

###### D.   Defendants' Efficiency Claims Cannot Save this Merger.

38.     Finally, Defendants' vague claims that the merger would result in efficiencies do not rebut the government's *prima facie* case on either the vertical or horizontal theory.  Defendants made no attempt at trial to establish that the transaction would result in efficiencies that are both "reasonably verifiable by an independent party" and "merger-specific," meaning that they could not be achieved by either company alone absent the merger.[72]  Defendants' economic expert, Dr. Murphy, made vague predictions when testifying about how the transaction would improve the delivery of healthcare, but made *no* attempt to quantify these efficiencies, let alone show that United could not achieve them absent the merger.  There is no independent corroboration of any efficiencies advanced by Defendants.[73]  "The Supreme Court has never approved an efficiencies defense to a § 7 claim," *St. Alphonsus Med. Ctr.-Nampa Inc.* v. *St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788-92 (9th Cir. 2015), and courts in this circuit and elsewhere have rejected similar

---

main rival's suite, stripping away certain leadership and other contributing staff, and putting it on a road for quick resale, it would readily be recognized as competitive vandalism.  But that is what would result from United's divestiture plan.

[72]   *H&R Block*, 833 F. Supp. 2d at 89; *cf. U.S. Dep't of Justice & Fed. Trade Comm'n*, Horizontal Merger Guidelines, § 10 (2010).

[73]   *See H&R Block*, 833 F. Supp. 2d at 89 (a cognizable efficiency is "a type of cost saving that could not be achieved without the merger and the estimate of the predicted saving must be reasonably verifiable by an independent party").

defenses outright or found them insufficient.  *See*, *e.g.*, *United States* v. *Anthem, Inc.*, 855 F.3d 345, 353-56 (D.C. Cir. 2017); *United States* v. *Bertelsmann*, 21-cv-02886 (D.D.C. Aug. 17, 2022) (8/17/22 a.m. transcript at 2751:22-2752:1, 2755:11-18 (ruling on motion *in limine*) (Pan, J.) (submitted as PX-1045).[74] . Even if such a defense were cognizable, the record provides no reason for the Court to recognize it here.

39.     Plaintiffs, United States, State of Minnesota, and State of New York (the "Government"), have carried their burden to demonstrate that the proposed merger is unlawful, and Defendants have failed to carry their burden of rebutting the Government's case.  The proposed merger should be enjoined.

40.     Set forth below are background facts common to the claims and defenses in this action, followed by proposed findings of fact and conclusions of law as to each of the significant issues presented.   In deference to the Court's request, the Government presents standalone proposed findings and conclusions.  In light of the length of the document, the Government does so in three substantive Parts, correlating to each of the three major claims in the case (the vertical claims and then the horizontal claim), any one of which is sufficient to enjoin the proposed merger.

---

[74]  *See also FTC* v. *Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 73 (D.D.C. 2018); *Aetna*, 240 F. Supp. 3d at 98; *Sysco*, 113 F. Supp. 3d at 85-86; *H&R Block*, 833 F. Supp. 2d at 90-92; *FTC* v. *Staples, Inc.*, 970 F. Supp. 1066, 1089-90 (D.D.C. 1997), which were cited by Judge Pan (**PX-1045** at 2755:13-18).

II.    BACKGROUND[75]

A.    **The Parties**

41.    United is a vertically-integrated healthcare company headquartered in Minnesota. **PX-830** at -444, -446.  United has approximately 365,000 employees worldwide. **8/10P**, 55:12-14 (Witty).

42.    As relevant here, United operates the nation's largest commercial health insurer, through its UnitedHealthcare business segment ("UHC"). **PX-830** at -478.  In 2021, UHC covered 31.6 million people under commercial insurance plans, including 9 million Americans under large group plans and 9.2 million Americans under national accounts plans, and earned approximately $222 billion in annual revenue across all of its insurance products. **PX-830** at -478; **PX-820** ¶ 60 (citing AIS-DHP-5-21.xlsx, Tab "1.1-Health Plans-National" (31.6 million lives)); **PX-40** at 4. United, through its OptumInsight business segment, also operates one of the nation's two dominant players in the market for first-pass claims editing. **PX-830** at -448; **PX-103** at 1.  OptumInsight is part of Optum, United's health services business. **PX-830** at -446, -448.

43.    Change is a leading healthcare technology company headquartered in Tennessee. **PX-824** at -867, -870.  Change describes itself as standing at the "center of the health ecosystem"

---

[75] The following abbreviations have the following meanings:

- "**PX-**" and "**DX-**" refer to the Government's and United and Change's exhibits, respectively;

- References to transcripts are abbreviated such that, for example, "**8/4A**" means "August 4, 2022 a.m. transcript" and "**8/4P**" means the corresponding afternoon transcript;

- "**HMG**" and "**VMG**" refer to the 2010 Horizontal and 2020 Vertical Merger Guidelines, respectively (*U.S. Dep't of Justice & Fed. Trade Comm'n*, **HMG** (2010); *U.S. Dep't of Justice*, **VMG** (2020));

- **FOF** and **COL** are internal cross-references to the findings of fact and conclusions of law sections of this document.

in the United States.  **PX-250** at 7; **PX-320** at 6.  Change also emphasizes its independence—it is not owned by a payer or provider—as one of its advantages.  **PX-824**, **8/2A**, 15:22-16:12 (de Crescenzo); **8/2P**, 131:22-132:16 (Suther); *see also* **PX-525** at -371; **PX-527** at 9; **PX-528** at -422; **PX-531** at -945 (Change's "advantage of independently working with payers and providers . . . . puts [it] in a unique position of not being owned by a competitor or dominant counter party."). Change's payer customers include many of UHC's key commercial health insurance rivals.  *See*, *e.g.*, **8/11A**, 31:25-32:1, 32:24-25, 33:7-8 (Wukitch); **8/3A**, 125:17-21 (Peresie); **PX-220** at -348; **PX-029** at -826, 3; **PX-820** ¶ 81, 367 Exh. 8.

44.     Change describes its services as an "information highway connecting key healthcare stakeholders." **PX-539** at -492.  In particular, Change offers the dominant first-pass claim editing solution in the United States (ClaimsXten), which is used by every national insurer except UHC.  **PX-820** at ¶ 81; **PX-1015** at 9; **PX-275** at -133; **PX-029** at -826; **PX-304** at -433. First-pass claim editors assist payers in determining whether to reject or pay a claim according to the payer's coverage policies and industry-standard clinical guidelines and include proprietary rules or edits of those payers.  **8/1P**, 31:21-33:23 (Lautzenhiser).  In first-pass claim editing, Change competes primarily against United's Claim Editing Solution ("CES"), which United offers through its OptumInsight business segment (but does not sell to major insurance rivals).  **PX-1015** at 9; **PX-830** at -448; **8/2P**, 79:7-14 (Turner); **PX-242** at -517; **PX-208** at 2; *infra* **FOF** ¶¶ 345-347.

45.     Change also operates the United States' largest EDI clearinghouse.[76]   The

---

[76]   **PX-88** at -710 (Change "brings a set of market capabilities in key areas including the largest EDI network"); **PX-257** at 84; **PX-275** at -133 (Change's "strong, unique, market position comes from having the of the most # of network nodes…, through the largest channel ecosystem…, with widest range of transaction types…" and "Change has dominant market

information exchanged between providers and payers about patient coverage, treatments, and reimbursement, *see* **8/9A**, 45:16-48:23 (Gowrisankaran); **PX-1015** at 21, 43; **8/3A,** 52:16-53:19 (Peresie), is referred to as claims data.  **8/5A**,108:25-109:3 (Musslewhite).

46.     By virtue of its business model, Change is at the "center of the healthcare ecosystem" and maintains connections across the American healthcare landscape: connections with over two thousand payers, one million physicians, and six thousand hospitals and health systems.  **8/8A**, 108:11-22 (Handel); **PX-1012** at 7; **PX-822** at -375; **PX-250** at 5; **PX-320** at 6. Change processes more than 15 billion healthcare transactions per year, together worth more than $1.5 trillion in adjudicated value.  **8/8A**, 108:11-23 (Handel); **PX-1012** at 7; **PX-250** at 5; **PX-320** at 6.  Through these transactions, Change gains access to vast amounts of data, relating to about half of all commercial medical claims in the United States.  **PX-1015** at 45; **PX-820** at 367 (Exhibit 8).  It also, as set forth below, secures legal rights to use these data through contracts with customers and intermediaries.  **FOF ¶¶** 103-110.  The data to which Change has access and rights includes claims data for each of United's major rivals going back to 2012, and its access and rights are significantly more expansive than what United has today.  **FOF ¶¶** 109, 121-134; **PX-167** at -070; **PX-290** at 9.

   **B.     The Proposed Merger**

47.     United considered acquiring Change for the better part of a decade.  **8/4P**, 38:4-7, 38:12-14 (Hasslinger); **PX-198**; **PX-769**.[77]

---

share."); see also FOF ¶ 93).

[77]  In July 2018, evaluating the potential acquisition, a United executive wrote key reactions including "Platform Idea," "Payer Hesitancy," and "Hard Sell."  **PX-130** at -879; **8/4P**, 139:9-140:5 (Yurjevich).  That same executive was given a role within United as a payment integrity expert and business sponsor from a payer standpoint.  **8/4P**, 137:2-4, 138:19-23 (Yurjevich).

48.     On January 5, 2021, United entered into an agreement to acquire Change for approximately $13 billion.  **ECF** 1 ¶ 26; **ECF** 37 ¶ 26.

49.     On February 24, 2022, the United States of America sued to block the merger, joined by the Attorneys General of United's home state of Minnesota and the state of New York. **ECF** 1.

50.     Following the filing of this lawsuit, Defendants undertook three unilateral actions designed to address the Government's allegations.  *First*, on April 22, 2022, United and Change entered into an agreement to sell ClaimsXten to TPG if the proposed merger is consummated.  **DX-579**; **8/11A**, 163:14-17 (Raj).  *Second*, on May 12, 2022—nearly three months after the filing of the complaint in this lawsuit—United issued its "UnitedHealth Group Firewall Policy for OptumInsight and Change Healthcare."  **PX-599** at -682.  *Third*, between May 27 and June 1, 2022, Defendants sent so-called "customer commitments" to Change's EDI customers.  **8/2A**, 132:25-133:3 (de Crescenzo); **FOF** ¶ 208.

III.    LEGAL STANDARD

51.    Section 7 of the Clayton Antitrust Act of 1914 prohibits mergers "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.  The goal of the statute, as the Supreme Court has underscored, is to "arrest anticompetitive tendencies in their incipiency." *Phila. Nat'l Bank*, 374 U.S. at 362 .  It is black-letter law that "[a]ll mergers are within the reach of [section] 7," including horizontal and vertical mergers.[78] Congress reinforced this proposition by amendment more than seventy years ago.  *See Brown Shoe*, 370 U.S. at 311, 317 (noting that Congress passed the Anti-Merger Act (the Celler-Kefauver Act) in 1950 "to make plain that [Section] 7 applied not only to mergers between actual competitors, but also to vertical and conglomerate mergers whose effect may tend to lessen competition in any line of commerce in any section of the country.").

52.    As a preliminary matter, "two aspects of the statutory text are worth highlighting" here.  *Aetna*, 240 F. Supp. 3d at 18.  *First*, "by using the word 'may,' Congress indicated that its 'concern was with probabilities, not certainties.'"  *Id.* (quoting *Brown Shoe*, 370 U.S. at 323).[79] Plaintiffs need not prove alleged anticompetitive effects "with 'certainty.'"  *Heinz*, 246 F.3d at 719; *see Brown Shoe*, 370 U.S. at 323 ("Congress used the words '*may be* substantially to lessen

---

[78]   As a general matter, "horizontal mergers" are those between competing firms, and "vertical mergers" are those between companies performing different supply chain functions for a common good or service.  *FTC* v. *Procter & Gamble*, 386 U.S. 568, 577 (1967).  This merger involves both horizontal and vertical elements.  *See* **VMG** at 1 ("Mergers often present both horizontal and vertical elements . . . .").

[79]   *Accord United States* v. *Penn-Olin Chem. Co.*, 378 U.S. 158, 175 (1964) (statute should be construed to require "reasonable probability," not "certainty"); *Procter & Gamble*, 386 U.S. at 577; *Phila. Nat'l Bank*, 374 U.S. at 362); *United States* v. *Falstaff Brewing Corp.*, 410 U.S. 526, 555-58 (Marshall, J. Concurring) (1973)).

competition' (emphasis supplied) to indicate that its concern was with probabilities, not certainties."); *United States* v. *Baker Hughes Inc.*, 908 F.2d 981, 984 (D.C. Cir. 1990) ("Section 7 involves *probabilities*, not certainties or possibilities.").

53.     *Second,* "[t]o assess a merger's probable effect on competition, the Court must undertake a 'comprehensive inquiry' into the 'future competitive conditions in a given market.'" *Aetna*, 240 F. Supp. 3d at 18 (quoting *Baker Hughes*, 908 F.2d at 988).  Courts must look to the "incentive" the merged firm would have post-merger to engage in strategies that would benefit the firm while harming competition.  *Ford*, 405 U.S. at 571; *see also, e.g.*, *FTC* v. *Tronox Ltd.*, 332 F. Supp. 3d 187, 208-11 (D.D.C. 2018); *H&R Block*, 833 F. Supp. 2d at 81; *see also In re Union Carbide Corp.*, 1961 WL 65409, at *19 (F.T.C. 1961) ("As long as the power is there, it may be exercised—that such exercise may be benevolent or sportsmanlike this year is no guarantee that it may not be anti-competitive next.").  Where a merger would give defendants the ability, along with an incentive, to harm competition, whatever the corresponding costs of specific tactics, there arises a reasonable probability that defendants will find a way to use it.

54.     Although the Government bear the burden of proving a violation by a "'preponderance of the evidence,'" *Aetna*, 240 F. Supp. 3d at 19 (citation omitted), "[a]ll that is necessary is that the merger create an appreciable danger of [anticompetitive] consequences in the future," which requires "[a] predictive judgment, necessarily probabilistic and judgmental rather than demonstrable."  *Heinz*, 246 F.3d at 719 (quoting *Hosp. Corp. of America* v. *FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986) (Posner, J.)).  "If the enforcement of § 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated."  *FTC* v. *Procter & Gamble*, 386 U.S. 568, 577 (1967).  As the Seventh Circuit has noted, Supreme Court precedent is clear that all "doubts are to be resolved

against the transaction." *Elders Grain*, 868 F.2d at 906 (Posner, J.) (citing *Phila. Nat'l Bank*, 374 U.S. at 362-63; *Falstaff*, 410 U.S. at 555-58); *accord FTC* v. *Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016).

55.     In making this probabilistic assessment, courts generally begin by "determin[ing] . . . the relevant market.'" *Brown Shoe*, 370 U.S. at 324-25 (quoting *United States v. E. I. du Pont de Nemours & Co*., 353 U.S. 586, 593 (1957) (*du Pont I*)); *see also Aetna*, 240 F. Supp. 3d at 18 (collecting precedent). Here, Defendants do not dispute[80] as relevant antitrust markets the Government's markets for the sale of (i) first-pass claims editing solutions in the United States and (ii) the sale of commercial health insurance to national accounts in the United States and to large group employers in local markets.[81]

56.     Under this Circuit's burden-shifting framework, the Government "must first establish a *prima facie* case that the merger is likely substantially to lessen competition in the relevant market." *U.S.* v. *AT&T, Inc.*, 310 F. Supp. 3d 161, 191 (D.D.C. 2018) (citing *United States v. Anthem*, 855 F.3d 345, 349 (D.C. Cir. 2017)); *see also United States v. Baker Hughes,* 908 F.2d 981, 982-83 (D.C. Cir. 1990). This is true as to both horizontal and vertical mergers. *AT&T*, 916 F.3d at 1032. In the horizontal context, if the Government demonstrates "'that the merger would produce a firm controlling an undue percentage share of the relevant market, and

---

[80]   Indeed, Defendants' expert, Dr. Murphy, makes no challenge to the assertion that these are all well-defined antitrust markets. Likewise, for example, Defendants framed their arguments as applicable to "any relevant market," but devoted no time in their pretrial brief to establishing the lack of such a market. *E.g.*, ECF 90-1 (Def. Br.) at 4. Defendants' trial presentation reflected tacit acceptance of the relevant markets. *E.g.*, ECF 90-1 at 23, 30 (as to first-pass claims editing solutions); 44, 46 (as to sale of commercial health insurance to national accounts and large group employers).

[81]   The D.C. Circuit recognized in *Anthem* that the sale of commercial health insurance to national accounts and to large groups were relevant antitrust markets. 855 F.3d at 353 (national accounts), 367 (large group).

would result in a significant increase in the concentration of firms in that market,'" then that showing creates a presumption of unlawfulness (*i.e.*, "'a presumption that the merger will substantially lessen competition'") that establishes the *prima facie* case. *Aetna*, 240 F. Supp. 3d at 18-19 (quoting *Heinz*, 246 F.3d at 719). In the context of a vertical merger, there is no presumption of unlawfulness that arises from an increase in concentration (as vertical mergers do not alter concentration), so the Government must establish its *prima facie* case by showing that "the proposed merger is likely to be anticompetitive." *AT&T*, 916 F.3d at 1032 (quotations omitted); *accord Ford*, 405 U.S. at 570-71 (finding vertical merger unlawful). The Government can show this, in the vertical context, in a variety of ways, including by demonstrating that the merger acts as a "clog on competition," *Brown Shoe*, 370 U.S. at 323-24, or that it provides an "incentive" to act anticompetitively or creates or strengthens "barriers to entry." *Ford*, 405 U.S. at 571.

57.     It then falls to defendants to rebut the Government's case. *Baker Hughes*, 908 F.2d at 990-91 n.12; *Aetna*, 240 F. Supp. 3d at 18-19. To carry this burden in the context of horizontal mergers, "'defendants must produce evidence that shows that the market-share statistics give an inaccurate account of the merger's probable effects on competition in the relevant market." *Aetna*, 240 F. Supp. 3d at 19 (quoting *Heinz*, 246 F.3d at 715). In the context of vertical mergers, defendants must either show that "the *prima facie* case 'inaccurately predicts the relevant transaction's probable effect on future competition,' or 'sufficiently discredit' the evidence underlying the *prima facie* case." *AT&T, Inc.*, 916 F.3d at 1032 (citations omitted). As the D.C. Circuit has noted, the "more compelling" the affirmative case, "the more evidence the defendant must present to rebut it successfully." *Aetna*, 240 F. Supp. 3d at 19 (quoting *Baker Hughes*, 908

F.2d at 991); *accord Heinz*, 246 F.3d at 720.[82]

58.     Defendants must carry their burden with "evidence," not argument.  In this context, "in-court attempts to explain or disavow . . . documented exchanges" will rarely be "more persuas[ive]" than "contemporaneous email exchanges."  *Aetna*, 240 F. Supp. 3d at 70; *see also Cardinal Health*, 12 F. Supp. at 63-64 (finding that "defendants' own internal documents and public statements" were "compelling" evidence of likely competitive harm).  Moreover, "[a] company's post-merger behavior—specifically, decisions not to engage in anticompetitive activities while under government scrutiny—is a weak predictor of whether it will engage in anticompetitive actions in the future.  This is for the 'obvious' reason that companies could 'stave off [enforcement] actions merely by refraining from aggressive or anticompetitive behavior when such a suit was threatened or pending.'"  *Aetna*, 240 F. Supp. 3d at 74 (*quoting United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 504-05 (1974)).

59.     To the extent defendants claim that a proposed remedy would rebut the Government's *prima facie* case, defendants bear the burden of proof.  *du Pont II*, 366 U.S. at 331-32 (noting that the "burden is not on the Government to show" that the defendants' proposed remedy would be ineffective).  Proof, in turn, must be whole, not partial: defendants must demonstrate that the remedy "would <u>negate</u> the effects of the merger," not merely relate to them.  *FTC* v. *Staples, Inc.*, 190 F. Supp. 3d 100, 137 n.15 (D.D.C. 2016).  In other words, defendants must show that the remedy would "be effective to redress the violations and to restore competition," by fully "replacing the *competitive intensity* lost as a result of the merger." *Sysco*,

---

[82]  As set forth above, the Supreme Court has noted that in "certain cases," in the "absence of evidence *clearly showing* that the merger is not likely to have such anticompetitive effects," the merger should be enjoined.  *Phila. Nat'l Bank*, 374 U.S. at 362-63.

113 F. Supp. 3d at 72-73, 76 (citations omitted) (emphasis in original); *Aetna*, 240 F. Supp. 3d at 60.  As with other rebuttals, the defendants' burden increases commensurately with the strength of the Government's prima facie case.  *Sysco*, 113 F. Supp. at 72.  And it is "well settled that once the Government has successfully borne the considerable burden of establishing a violation of the law, all doubts as to remedy are to be resolved in its favor."  *Ford*, 405 U.S. at 575 (quoting *Du Pont II*, 366 U.S. at 334).

60.     Where defendants fail to rebut the Government's showing, including by failing to establish that a proposed remedy would fully restore competition, the merger should be enjoined. *Aetna*, 240 F. Supp. 3d at 60; *Du Pont II*, 366 U.S. at 331-32.

**IV.   THE MERGER IS AN ILLEGAL VERTICAL MERGER BECAUSE
UNITED WOULD GAIN THE ABILITY, AND HAVE AN INCENTIVE, TO
USE RIVALS' COMPETITIVELY SENSITIVE INFORMATION**

61.     The proposed transaction is an unlawful vertical merger because through it, United would gain, for the first time, legal rights to substantial amounts of its rivals' competitively sensitive claims data that pass today through Change's EDI clearinghouse.   United does not possess rights to such data today, and comparable data are not publicly (or commercially) available.   From those data, United could gain key insights into rivals' proprietary strategies, reverse engineer proprietary rules or edits of rival payers, use rivals' information to inform its underwriting (allowing UHC to target "good risk," *i.e.*, healthy groups, and avoid profit-harming "bad risk," *i.e.*, unhealthy groups), identify and target rivals' customers, and appropriate rivals' competitive strategies.   **FOF ¶¶** 144-166.   Despite its made-for-litigation arguments to the contrary, under these facts, United could do all of this fully within the bounds of law, contract, or promise.   **FOF ¶¶** 191-216.   And it would have strong incentives to do so.   These behaviors by United are likely to lead to a number of negative outcomes, including reduced procompetitive behaviors (including innovation) by United's insurer rivals and reduced competition for some types of insurance customers, all of which would harm consumers.

62.     Defendants' contentions that unilateral, transient, and revocable promises (like purported commitments to customers and data firewalls) would eliminate such anticompetitive harm are misaligned with real-world incentives of profit-maximizing corporations duty bound to act in the interests of their shareholders.   Such promises ignore the reality of what uses are permitted.   And they cannot absolve the illegality of the transaction here.

63.     Any remaining doubts should be resolved against this transaction.   Avoiding harm to competition in its incipiency is precisely the aim of Section 7 of the Clayton Act, which is concerned with "probabilities, not certainties." *Brown Shoe*, 370 U.S. at 323; *see Ford*, 405 U.S.

at 567 n.4.  As Congress affirmed in 1950 by enacting the Anti-Merger Act, Section 7 applies just as strongly to vertical mergers, like this one, "whose effect may tend to lessen competition in any line of commerce in any section of the country," as it does to horizontal mergers (which this proposed merger also represents).  *Brown Shoe*, 370 U.S. at 317.

64.    The merger should be enjoined.

**A.    Proposed Findings of Fact**

**1.    The Relevant Markets
Are Proven and Undisputed**

65.    As a preliminary matter, under the "burden-shifting framework" in this Circuit, courts "generally begin[] with defining a relevant antitrust market."  *Aetna*, 240 F. Supp. 3d at 18 (collecting precedent); *see Brown Shoe*, 370 U.S. at 343-45; **VMG** at 3.

66.    The parties do not dispute the existence of the relevant antitrust markets for purposes of this aspect of the case.  In particular, the sale of commercial health insurance to (i) national accounts in the United States and (ii) large group employers in local markets are relevant antitrust markets.  **FOF** ¶¶ 77-84.  The Government offered factual and economic evidence so establishing, as set forth below.  Defendants did not contest this evidence, and their economic expert conceded these were well-defined antitrust markets.  **8/15A**, 97:2-24 (Murphy).  Moreover, the proposed markets are generally consistent with those recognized in prior merger litigation in this District.  *See Anthem*, 236 F. Supp. 3d 171, 196-97 (D.D.C. 2017) (sale of health insurance to "national accounts," *i.e.*, "customers with more than 5000 employees, usually spread over at least two states," was a relevant market); *id.* at 255-56 (sale of commercial health insurance to large group employers in 35 core-based statistical areas were relevant markets).

67.    This Section sets forth (i) certain background facts relevant to commercial health insurance, (ii) important dimensions of commercial health insurance competition, and (iii)

evidence establishing each relevant market.

### *(a)* *Competition to Sell Commercial Health Insurance*

68.     Most Americans receive their health insurance from their employers. **8/10A**, 105:12-19 (Schumacher).  For employers purchasing a health insurance plan for their employees, health insurance tends to be the employer's "number 1 or number 2 expenditure." **PX-1005** (71:2-5, 8-11) (Dill).  Health insurance companies (also called insurers or payers) provide medical benefits to employers through commercial health insurance plans, which are typically divided into two types by size (small- and large group). **PX-1013** (113:24-114:5) (Golden); **8/1P,** 33:10-23 (Lautzenhiser); **PX-820** ¶ 89.  "Small group" in the "vast majority of state[s] in the country" refers to employers with two to fifty employees. **PX-1013** (62:23-63:17) (Golden).  In four states, "small group" refers to employers with two to 99 employees. **PX-1013** (62:23-63:17) (Golden).  Within the large group category, the industry further distinguishes the largest accounts, called "national accounts." **PX-820** ¶¶ 89-90.

69.     When an employer purchases a fully-insured health insurance plan, it pays a premium to the health insurance company and the insurance company bears the risk of paying for the medical costs that the employer's plan members incur. **PX-1013** (55:25-56:7) (Golden). Fully-insured premiums reflect projected medical costs, administrative costs, and margin. **PX-1013** (41:11-42:02) (Golden).

70.     By contrast, when an employer is self-funded (or self-insured), the employer purchases an administrative services only ("ASO") plan. **PX-1013** (55:25-56:24) (Golden).  With an ASO plan, the employer bears the risk of paying medical costs members incur. **PX-1013** (55:25-56:24) (Golden).  It pays a health insurance company an "ASO fee" to administer the plan and access the insurer's provider networks. **PX-1013** (55:25-56:24, 179:25-181:6) (Golden).  The cost of administering an ASO plan includes claims processing and claims adjudication. **PX-1013**

(181:7-11) (Golden).

71.    ***Axes of Competition.***    Health insurers compete for national accounts and large group customers on a number of dimensions, including:

- ***Price***, meaning, for fully-insured employers, the premiums the health insurance company charges the employer,[83] and, for self-funded employers, the ASO fees the health insurance company charges the employer.[84]

- ***Network Access***, meaning the providers that are in-network in a given geography.[85]   Particularly important to employers is ensuring that their members will not experience disruption in terms of their provider network.[86]

- ***Network Construct***, meaning the design of provider networks.  For example, it has become popular with national accounts and large group customers for payers to offer a narrow network of higher-performing physician groups and hospitals.  **PX-1014** (155:22-156:22) (Golden).

- ***Network pricing***, meaning the rates payers negotiate with providers in their networks.  Rates are particularly important to ASO customers as rates impact medical costs.[87]   A payer may, for example, have preferred rates with certain providers, and can create a tiered network that will "steer people or incent people to go to higher performing providers."[88]  The more members that utilize "higher performing, higher quality providers," the lower the medical costs.[89]

- ***Affordability Strategies***, meaning strategies that payers use to control costs, and may include clinical, network, pharmacy, and payment integrity.[90]   Payers

---

[83]   **PX-1013** (151:20-152:4) (Golden); **PX-1005** (105:02-108:08, 108:09-108:15) (Dill); **8/4A,** 44:7-17 (Wichmann).

[84]   **PX-1013** (179:12-24) (Golden).

[85]   **PX-1013** (152:5-153:23) (Golden); *see also* **PX-1005** (43:03-46:08, 105:02-108:08) (Dill).

[86]   **PX-1005** (105:2-106:21) (Dill).

[87]   **PX-1013** (175:8-177:18, 188:7-17, 189:14-22) (Golden); see also **8/9P,** 68:11-19 (McMahon) (UHC negotiates with providers to drive down unit costs).

[88]   **PX-1014** (177:22-179:11) (Golden).

[89]   **PX-1014** (179:5-11) (Golden).

[90]   **PX-1014** (215:4-5, 15-24, 216:1-7, 216:23-217:11, 236:25-237:5, 237:7-238:13) (Golden); **PX-292** at -572; *see also* **PX-1005** (112:22-113:07) (Dill) (payers compete on cost containment efforts).

(including United) use them to compete in the market for commercial health insurance[91] For example, United identifies high drivers of cost and builds affordability strategies (including payment integrity strategies) to mitigate those costs.  **PX-1014** (237:7-238:13) (Golden).  If United does not execute on these strategies, its medical cost trend will go up, resulting in higher premiums relative to competitors.  **PX-1014** (239:15-23) (Golden).[92]  Affordability strategies are just "as impactful to [the] fully insured" business as to UHC's ASO business.  **PX-1013** (52:24-53:21) (Golden**)**; *see also* **8/9P**, 71:18-72:11 (McMahon).  Payment integrity programs—including claims adjudication—are an important part of United's efforts to contain medical costs.  **8/9P**, 72:12-19 (McMahon).[93]

- *Utilization Management*, meaning tools to ensure members receive medically appropriate care at an appropriate location.  Utilization management helps reduce medical costs,[94] and matters especially to ASO customers, because they are looking to manage plans effectively.[95]  **PX-1013** (181:12-182:19) (Golden) (likening fully-insured customers to renters, and ASO customers to

---

91   **8/4A,** 29:11-30:18 (Wichmann); *see also* **8/9P,** 68:7-10, 71:18-72:4 (McMahon); **8/1P,** 37:25-38:7 (Lautzenhiser).

92   Specifically, United builds affordability targets for its fully-insured business; if it misses them, its projected cost trend will be higher, "which would probably cause us not to be able to compete in the market nearly as well. . . . And if we don't execute here and our competitors do, it would be very challenging for our pricing."  **PX-1014** (238:14-18, 238:20-239:14) (Golden).

93   *See also* **PX-1037** (174:19-177:15) (Choate) (describing payment integrity strategies and claims adjudication as "table stakes" for commercial health insurance).  The parties jointly proposed that some limited deposition testimony that was not offered at trial could be offered in post-trial briefing.  Joint Submission Regarding Exhibit Admissibility, Deposition Designations, and Confidentiality Issues (ECF 80) at 5.  The Court agreed that some testimony that was cited solely in post-trial findings could be admitted, while advising that such citations should be used sparingly, which the Government has endeavored to do. **7/27P**, 21:2-8, 21:19-22:25; **8/10P**, 3:14-4:6. To ensure the Court has any necessary context for these citations, for any transcript cited herein that was not previously admitted during trial, the Government will be providing copies of all of the testimony designated by any party ,as part of the courtesy copy the Government will deliver to Chambers on September 1.  For ease of reference, these transcripts have been given PX- numbers, and an index will be provided with the courtesy copies.

94   **PX-1013** (159:21-160:4, 182:20-23, 192:20-193:3) (Golden); *see also* **8/4A,** 29:11-30:18 (Wichmann).

95   **PX-1013** (158:18-159:20) (Golden); *see also* **PX-1005** (43:03-46:08) (Dill).

homeowners).[96]

- *Product Design*, meaning the benefits employers provide employees; this can be both a retention vehicle and a means to reduce costs. **PX-1013** (160:5-9, 160:11-161:13) (Golden). ████████████████████████████████ ████████████████████████████████ [97]

- *Claims Processing*, both employer customers and employee members expect accurate, appropriate, and timely claims processing (these are "table stakes"[98]). Members want to have their claims processed without delay and without a headache. **PX-1013** (166:22-167:6) (Golden). Failing to deliver on these table stakes can impact a payer's ability to compete. **PX-1013** (165:25-167:6) (Golden) (some payers have "gone out of business" for failing to pay claims appropriately or due to "bad customer service").[99]

- *Customer Service*, for both the employer customer and employee member, their experience with an insurer is "super" important. **PX-1013** (198:2-199:14, 173:12-174:18) (Golden). Because poor service can create abrasion, which can make it difficult to retain or win employer customers, it would be (all things equal) a benefit to UHC if competitors offered poorer service. **8/4A**, 50:18-51:4 (Wichmann).[100]

- *Provider Experience*, which UHC measures according to the net promoter score ("NPS") system, reflecting whether a provider would recommend that payer. **PX-1013** (253:18-254:5) (Golden). UHC's goal is to achieve high NPS

---

96  Effective utilization management drives "a lot of the medical costs," and ASO customers in particular "understand the connection between plan design and utilization and plan design and rewarding people for making good choices." **PX-1013** (182:24-183:17) (Golden). ASO customers "make decisions on what they see as the drivers of their costs and ways they can mitigate those costs." **PX-1013** (182:24-183:17) (Golden).

97  In the national accounts space, product design innovations come from payers and also, to some degree, from employers and their consultants. **PX-1005** (246:21-247:5) (Dill) ("More from within Cigna than from customers, but they [plan design innovations] come from both."); **PX-1013** (193:3-194:15) (Golden) (national accounts "are interested in some of the things that we are doing that are unique and different").

98  **PX-1013** (196:24-197:5, 165:2-4, 6-17, 166:22-167:6, 184:9-17) (Golden); **8/4A**, 44:7-17 (Wichmann); **PX-1005** (112:22-113:07) (Dill) (payers compete on service).

99  **PX-1037** (Choate), 127:9-16 (the more accurate a payer's claim processing, "the more advantageous that is to a customer's cost, and frankly, the quality to their employees") (discussing national accounts ASO plans).

100  Whether customer service is more important than price depends on the customer. **PX-1013** (198:2-199:14, 173:12-174:18) (Golden).

scores, and it compares its scores to those of its chief competitors (*e.g.*, Aetna, Cigna, Anthem, and the Blues).  **PX-1013** (254:6-11) (Golden); **8/4A**, 46:7-47:25 (Wichmann); **PX-117**, at -812 (Net Promoter System Annual Report). UHC aims to increase the scores it receives from providers, because of the influence they have over members; one way to do this is by ensuring that claims are paid correctly the first time (which should lead to higher scores).  **PX-1013** (254:12-255:1) (Golden); *see also* **8/1P**, 38:08-39:17 (Lautzenhiser) ("We want to do everything we can to ensure appropriate payment is happening because we want to have a positive experience when working with our providers and our members.");  **PX-1013** (253:9-11, 14-17) (Golden); **PX-293** at -151.

72.      Innovating along these dimensions is important in competition for commercial health insurance customers, and UHC thus monitors what its competitors are doing to make sure its offerings are competitive.  **8/4A**, 52:16-20 (Wichmann); **8/10A**, 54:9-55:20 (Schumacher); **PX-364** at -367.

73.      ***Keeping Costs Down.***  Payers also compete to keep medical and administrative costs down.

- **Medical costs** are "essentially the cost of delivering care to a patient," **8/1P**, 36:24-37:1 (Lautzenhiser); *see* **8/9P**, 67:17-68:6 (McMahon).

- **Administrative costs** are part of either the ASO fee (for self-funded customers) or premium (for fully-insured customers).  **PX-1005** (78:17-21) (Dill); **PX-1013** (172:8-12) (Golden).  Reducing such costs can reduce the ASO fee or premium.  **PX-1013** (172:8-173:22, 185:25-186:25) (Golden).  For example, paying a claim correctly the first time would result in reduced administrative costs.[101]

- **Employers are concerned about both.**  **8/9P**, 68:7-10, 73:16-18 (McMahon); **PX-1005** (108:9-15) (Dill) (national accounts) (medical); **PX-1005** (75:18-22) (Dill) (national accounts) (administrative).

- **By reducing costs, payers can better compete against each other.**  Payers' ability to keep medical costs down impacts their ability to attract and retain employer customers.  **PX-1005** (111:14-17, 118:7-119:6) (Dill) ("So if I can't

---

[101]  **PX-1013** (241:3-4, 10-21, 242:3-17, 242:24-243:2, 249:19-250:25, 251:14-252:12, 252:16-24, 253:3-8, 289:13-16) (Golden); **PX-293** at -151; *see also* **8/4A**, 49:15-50:17 (Wichmann) (higher administrative costs could be disadvantageous to a competitor in head-to-head competition with UHC) (discussing national accounts).

contain their annual spend, curve it downward to be positive or keep it flat, keep it from trending up, then I will lose."); **8/9P**, 67:8-68:10, 72:5-11 (McMahon); **PX-180** at -040.  Likewise, payers may lose employer customers due to "uncompetitive ASO fees." **PX-1005** (75:18-22) (Dill) (national accounts).  As little as a 50-cent difference in an ASO fee can "make the difference between whether or not a client stays with [the incumbent] or moves to a competitor." **PX-1005** (76:12-77:12) (Dill).

74. *__Underwriting.__*  Additionally, UHC competes with other health insurers by working

to maximize "good" risk, and minimize "bad" risk, using underwriting strategies.

- Underwriting is core to ensuring UHC's profitability.  **PX-436** at 10; **8/10P**, 137:22-138:3 (Gehlbach); *see also* **8/8A**, 105:19-25 (Handel) (underwriting is an important driver of profitability for payers).

- Underwriters work to price and retain UHC's fully-insured large group business.  **8/10P**, 125:11-20 (Gehlbach).  They help determine what business to bid on, and what premiums to quote in bidding.  **8/10P**, 125:21-126:3 (Gehlbach).

- In underwriting large groups, UHC sets **premiums** to (i) cover its forecasted medical claims trend and (ii) make a profit.  **8/10P**, 127:4-11 (Gehlbach).

- The **claims trend** is a forecast of the medical costs UHC expects to pay out in claims for each group.  **8/10P**, 127:19-22 (Gehlbach).  To ensure profitability, UHC must attain its forecasted margin, which requires driving the claims trend down and appropriately pricing for that trend.  **8/10P**, 127:23-128:25, 129:11-130:4 (Gehlbach); **PX-1022** (38:5-10) (Gehlbach) (admitted for impeachment and for the truth of the matter, *see* **8/10P**, 129:22-130:4); *see also* **8/10P**, 140:22-141:20 (Gehlbach); **PX-433** at -396.  If UHC sets premiums below the forecasted medical cost trend, its profit margin will deteriorate.  **8/7P**, 70:16-19 (McMahon); **PX-180** at -040.

- The **business mix**—the mix of healthy and unhealthy group members—is a component of the claims trend forecast, and influences UHC's healthcare costs.  **8/10P**, 130:25-131:2; 131:8-16 (Gehlbach).

- In underwriting for large groups, UHC aims to avoid winning more "bad risk" (sicker members, higher costs) than its competitors.  **8/10P**, 132:5-8; 131:17-21 (Gehlbach).  If UHC takes on too much bad risk, its profitability can deteriorate.  **8/10P**, 132:12-133:8; **PX-1023** (101:12-14) (Gelbach) (admitted for impeachment and for the truth of the matter, *see* **8/10P**, 133:3-8).  If UHC's profitability deteriorates relative to its competitors, that impacts UHC's ability to compete against them.  **8/10P**, 133:22-25 (Gehlbach).  Conversely, winning more "good risk" than its competitors could put UHC at a competitive advantage.  **8/10P**, 134:9-12 (Gehlbach).

75.     The ability to understand rivals' claims trends would mean that UHC would know who its competitors' high- and low risk groups are; this would enable UHC to set premiums to avoid winning a greater share of "bad risk" groups.  *See* **8/10P**, 130:15-18 (Gehlbach).

76.     UHC seeks to retain its existing national accounts and large group business and grow its membership too.  **8/9P**, 100:4-13 (McMahon).  UHC sets "growth strategy across all of our commercial business to enhance our business, to grow membership, to hit our IOI [profitability] targets.  A lot of that is around product development, network development, [and] modernization of our business."  **PX-1013** (58:21-59:17) (Golden).  UHC looks "five and ten years out" to make sure it is "making the correct investments today . . . to compete in this business into the future."  **PX-1013** (58:21-59:17) (Golden); *see also* **PX-292** at -558 (E&I 2022 Business Plan setting growth targets of "+█████ FI lives" and "+█████ ASO lives").

### (b)     *Sale of Commercial Health Insurance to National Accounts is a Relevant Market*

77.     The sale of commercial health insurance to national accounts in the United States is a relevant antitrust product market.  As set forth above, the parties do not dispute this (**FOF ¶ 66**), and the market satisfies the factors set forth in *Brown Shoe* for identifying such a market. 370 U.S. at 325.  For example, the market has:

- *Distinct Customers*:  The national accounts market is a "completely different business" from other large group commercial health insurance.  **PX-1005** (39:18-40:04) (Dill); **PX-1013** (131:17-132:21) (Golden).  Its customers are distinct: employer groups with large numbers of employees (for UHC, 5,000 or more eligible employees;[102] for other payers, 3,000 or more employees) in multiple states.  **PX-1013** (136:25-137:5) (Golden); *see also* **8/4A**, 42:24-43:1 (Wichmann); **PX-1005** (21:09-21:15) (Dill). The Government's economic expert defines national accounts as employers with 5,000 or more employees. **8/9A,** 28:25-29:3 (Gowrisankaran).  National accounts customers are also

---

[102] **PX-1013** (131:17-132:21, 137:6-14) (Golden) (eligible employees refers to employees that purchase health insurance through their employer; their employer determines eligibility).

distinct in that they:

- Are "almost exclusively" self-funded and purchase ASO plans. **PX-1005** (40:05-41:04, 70:18-71:01) (Dill); *see also* **PX-1013** (131:17-132:21, 144:12-15) (Golden).

- "[A]re way more customized in the types of products and services that they're looking for" than smaller employer groups. **PX-1013** (131:17-132:21) (Golden).

- Usually contract for 3 to 5 years, as opposed to the shorter time period typical for fully-insured customers. **PX-1005** (69:08-70:17) (Dill); *see* **FOF** ¶ 81.

- Typically use consultants, such as Aon or Mercer, to oversee a request for proposal process, which can last up to 12 to 18 months for the largest employer groups. **PX-1013** (147:14-149:9) (Golden); *see also* **PX-1005** (104:12-105:01) (Dill).

- *Industry Recognition*: The industry recognizes that national accounts are distinct. For example, UHC and other large payers (Aetna, Cigna, Anthem) manage national accounts separately from other business lines. **PX-1013** (144:16-19, 147:14-18) (Golden) (United has a dedicated profit and loss statement, sales team, and product team for national accounts); **PX-1005** (21:09-22:03) (Dill) (Cigna, Anthem, and Aetna have separate national accounts divisions). UHC also compares itself to its chief competitors (Aetna, Cigna, Anthem, and the Blues) as to national accounts. **8/4A**, 46:21-47:3; **PX-117** at -812.

- *Specialized Vendors*: National accounts insurers are few and specialized; UHC's primary competitors include Aetna, Cigna, Anthem, HCSC, and other Blue Cross Blue Shield licensees. **PX-1013** (214:5-20) (Golden); **8/4A**, 46:21-47:3 (Wichmann).

78.     The United States is the relevant geographic market for the sale of commercial health insurance to national accounts. **8/9A**, 30:2-10 (Gowrisankaran); **PX-820** ¶ 99; *see also* **PX-1005** (23:2-8) (Dill).

79.     Economic analysis confirms that this is a proper antitrust market. As the Government's economic expert found, if a hypothetical monopolist were the only insurer for national accounts employers in the United States and that monopolist tried to raise prices 10 percent above the competitive level, "then there's really no alternative that these large employers

44

would have." **8/9A**, 30:16-31:4 (Gowrisankaran); *see also* **PX-820** ¶¶ 101-110.

80.     The U.S. market for sale of commercial health insurance to national accounts is concentrated.[103]  UHC has significant share, as do only a small number of additional competitors (Anthem and the other Blues, Aetna, and Cigna).  **8/9A**, 32:18-33:1 (Gowrisankaran); **PX-820** ¶¶ 111-112 & Ex. 3.

> ### (c)     *Sale of Commercial Health Insurance to Large Group Employers in Local Markets Are Relevant Markets*

81.     The sale of commercial health insurance to large group employers in local markets are also relevant antitrust markets.  As above, the parties do not fundamentally dispute this, and the markets satisfy the *Brown Shoe* factors.  370 U.S. at 325.  For instance:

- *Distinct Customers:* Large group employers are distinct customers from those in national accounts and small groups.  For example, certain Affordable Care Act requirements do not apply to large group employers, such as underwriting prohibitions that apply to small group health insurance.  **8/9A**, 37:8-38:1 (Gowrisankaran); **PX-820** ¶¶ 116-117.  Large group employers have more than 50 or 100 employees, depending on the state.  **PX-1013** (62:23-63:17) (Golden); **PX-433** at -397; **8/9A**, 37:2-38:1 (Gowrisankaran).

- *Industry Recognition:*  The industry also recognizes the markets as distinct.  For example, as with national accounts, UHC dedicates employees (including a sales team) exclusively to its "key accounts" business, which largely accords with the

---

[103] According to UHC's ordinary-course documents, the market for national accounts is highly concentrated, with an HHI (defined at **FOF** ¶ 342) of 2,519.  **8/9A** 35:13-36:10 (Gowrisankaran); **PX-820** ¶ 115; **PX-1015** at 17.  By Dr. Gowrisankaran's conservative calculations, the market has an HHI of 1,537, meaning that it is at least moderately concentrated.  *See* **HMG** at § 5.3; **8/9A** 34:25-35:8 (Gowrisankaran); **PX-820** ¶ 115.  Defendants' expert (Dr. Murphy) offers no colorable rebuttal; his analysis of the commercial health insurance industry is inaccurate as to the national accounts market because (for example) of the top 20 commercial health insurers he lists, 13 are Blue Cross Blue Shield licensees that generally coordinate efforts for national accounts, meaning that Murphy underestimates market concentration.  **8/15P**, 69:2-69:17 (Gowrisankaran); **PX-1036** at 15.  Moreover, Dr. Murphy's choice to include Centene is inappropriate because it specializes in individual plans, which are not a close substitute for national accounts. **8/15P**, 70:10-22 (Gowrisankaran); **PX-1036** at 15.

proposed market definition, and maintains a separate profit and loss statement for this business.  **8/10P**, 144:16-19 (Gehlbach); **PX-1013** (115:20-116:19, 126:24-127:01) (Golden).

- *Particular Characteristics*:   Large group employers also have particular characteristics.  Among other things, "[d]ifferences in regulatory environment drive rating methods for Individual, Small Group and Large Group markets." **PX-433** at -397.  Large group employers:

  - May purchase fully-insured and ASO plans.  **PX-1013** (131:17-132:21) (Golden).

  - May issue requests for proposal for their insurance contracts every year. **8/10P**, 103:13-15 (Gehlbach).

  - Typically use brokers to oversee an RFP or quote process, which typically runs from three weeks to a couple of months.  **PX-1013** (135:9-136:1) (Golden).

- *Specialized Vendors*:  UHC's primary competitors for key accounts include non-profit Blues (depending on the state), Aetna, Cigna, and Anthem. **PX-1013** (211:8-212:21) (Golden).

82.     As to the relevant geographic market here, large group employers want provider networks where their employees live and work. **PX-1013** (175:08-177:18) (Golden).   Core-based statistical areas ("CBSAs") that are also metropolitan statistical areas ("MSAs") in the United States—"in layman's terms, . . . a city and its suburbs"—are thus the relevant geographic markets for the sale of large group commercial health insurance.  **8/9A**, 28:14-24 (Gowrisankaran); **PX-820** ¶ 122.

83.     Economic analysis again confirms that the sale of commercial health insurance to large group employers in these local areas are proper antitrust markets.   In particular, if a hypothetical monopolist were the only insurer in a metropolitan statistical area and tried to raise prices 10 percent above the competitive level, "very few of these large-group employers would substitute away from getting health insurance," meaning very few of these employers would stop

providing health insurance to their employees or try to self-supply.  **8/9A**, 31:5-31:14, 38:18-39:15 (Gowrisankaran); **PX-820** ¶¶ 126-128, 130-131.

84.     Many of these markets are, as with the national accounts market defined above, already concentrated.[104]  UHC is one of the two largest health insurers in 270 (approximately 70.5%) of all MSAs in the United States.  **PX-947** ¶ 44.

### 2.     The Related Product Is EDI Clearinghouse Services

85.     Plaintiffs in vertical merger cases generally "specify one or more related products," meaning a product or service "supplied or controlled by the merged firm" and that "is positioned vertically or is complementary to the products and services in the relevant market."  **VMG** at 3.  A related product could be an input, a means of distribution, access to a set of customers, or a complement.  *Id.*

86.     As relevant here, the related product is EDI clearinghouse services.  **8/9A**, 45:1-15 (Gowrisankaran); **PX-820** ¶ 159.   EDI clearinghouses are a critical input in the relevant commercial health insurance markets.  **PX-820** ¶¶ 161-164.  It is important to customers that EDI clearinghouses function effectively.   **PX-1005** (249:9-13) (Dill).   Providers lack any viable alternative to using them.  **8/8A**, 37:8-20 (Spady).

---

[104] The Government's economic expert calculated conservative HHIs for each of the MSAs that he defined because he did not have data from all market participants.  **8/9A** 41:10-22, 42:19-43:7 (Gowrisankaran); **PX-820** ¶¶ 133-136.  He identified at least 42 MSAs as highly concentrated and 45 MSAs as moderately concentrated, as defined by the HMG.  **HMG** at § 5.3; **8/9A** 41:23-42:18, 43:8-17 (Gowrisankaran); **PX-820** ¶ 137.  That is, one in five MSAs are at least moderately concentrated.  **PX-820** ¶ 84.  Dr. Murphy's analysis of the broad commercial health insurance industry in the United States is inaccurate for the same two reasons identified above.  **FOF** ¶ 80 n.103; **8/15P**, 69:18-70:22 (Gowrisankaran); **PX-1036** at 15.

87.     An EDI clearinghouse is a pipe that transmits claims and other information between medical providers and payers. 108:21-24 (Musslewhite).  EDI clearinghouses process transactions between providers and payers electronically rather than via paper. **8/3A**, 52:16-21 (Peresie).  All EDI clearinghouses conform to an industry standard, known as the X12 standard. **8/3A**, 52:22-53:1 (Peresie).[105]  Change's EDI medical clearinghouse, housed within its Networks Solutions business, is referred to as the Medical Network.  **8/3A**, 52:10-15, 111:17-24 (Peresie).  Clearinghouses, such as Change's Medical Network, establish direct and indirect connections with payers and submitters.  **8/3A**, 54:1-55:24, 56:25-57:14 (Peresie).

88.     For payers, Change may serve as a managed gateway, meaning that Change serves as the entry point for all EDI transactions for that payer.  *See* **8/3A**, 55:25-56:15 (Peresie).  Alternatively, payers may connect directly with Change, among other clearinghouse vendors. *See* **8/3A**, 56:16-24 (Peresie).

89.     Submitters are the actual entity that submits transactions into the clearinghouse. **8/3A**, 56:25-57:4, 57:9-14 (Peresie).  Submitters include providers, channel partners, and trading partners.  **8/3A**, 57:12-58:1 (Peresie).  Change does not sell EDI clearinghouse services to providers on a standalone basis; rather Change sells technology products to providers that incorporate Change's clearinghouse services.  **PX-322** at -376; **8/3A**, 51:17-25 (Peresie); **PX-1039** (40:2-3, 40:5) (Calhoun); *see also* **8/3A**, 88:2-10 (Peresie).  Where a provider purchases revenue

---

[105] Claims transactions submitted by providers are identified as 837 transactions, **8/3A**, 53:2-15 (Peresie), and when a payer responds to the claim with an electronic remittance advice it is called an 835 transaction, **8/3A**, 53:16-19 (Peresie).  The 835 transactions contain information about how the insurer adjudicated the claim, how the benefits were applied, and how the discounts were applied.  **8/3A**, 57:12-15 (Peresie).  Both claims and remittance transactions are transmitted through an EDI Clearinghouse.  **8/3A**, 52:23-53:9 (Peresie).

cycle software directly from Change,[106] that provider would be considered a "submitter."  Because providers do not typically purchase EDI clearinghouse services on a standalone basis, but rather as part of a software or product, providers typically connect to only a single EDI clearinghouse. **8/8A**, 26:3-12 (Spady); **PX-130** at -893 (providers typically select a single clearinghouse vendor); **PX093** at -096.[107]

90.     As part of its clearinghouse business, Change maintains relationships with approximately 800 "channel partners."  **8/3A**, 59:18-60:13, 152:21-23 (Peresie); **PX-1041**  (48:9-48:11) (Linares); *see* **PX-963** at -675(spreadsheet collecting channel and trading partners of Change and describing the financial terms of the arrangement).  These companies sell services and software, such as electronic medical record systems, practice management systems, billing services, outsourcing services, revenue cycle management software systems, to providers.  **8/3A**, 58:2-19 (Peresie).  Channel partners include Change's EDI services as part of their software and enter into agreements with Change to resell Change's EDI clearinghouse services.  **8/3A**, 58:21-59:17 (Peresie).   Change attracts channel partners by offering them "financial incentives" or "rebates" in return for their providers' clearinghouse business and helping them compete in their markets.  **PX-626** at 5-6; **PX-627** at 5; **PX-963** at -675; **PX-1041** at 146:13-147:9, 147:11-12 (Linares).

---

[106] For example, Change sells a back-office revenue cycle technology to providers called Assurance, which relies on Change's Medical Network for sending claims and remittances. **8/3A** 86:4-17; 87:2-88:7 (Peresie); **PX-9** at 21.  Similarly, Change sells a technology product called Clearance to providers, which relies on Change's Medical Network for eligibility transactions. **8/3A** 86:4-87:1 (Peresie); **PX-9** at 21.

[107] When providers use "multiple" EDI clearinghouse vendors, it is typically the result of an acquired facility routing claims through a single legacy vendor.  **8/8A**, 37:21-38:10 (Spady) (Erlanger acquired a hospital in North Carolina, which still uses a legacy vendor, TruBridge, as its only EDI clearinghouse vendor); **PX093** at -096.

91.     Trading partners are other clearinghouses that route EDI transactions to Change. **8/2P**, 106:13-16 (Suther); **8/3A**, 60:10-23 (Peresie).  Such routing is often called "hops" between trading partners. *E.g.*, **8/3A**, 112:20-113:11 (Peresie). Because no clearinghouse establishes direct connections with every payer or submitter, clearinghouses rely on trading partners to connect indirectly.  **8/3A**, 60:10-16 (Peresie).  In this way, trading partners can be submitters to each other's networks through bi-lateral contracts. **8/3A**, 60:24-61:7, 101:12-24 (Peresie).   Change offers financial incentives (or "rebates") so that trading partners will use Change's clearinghouse services.   **8/3A**, 82:19-83:7 (Peresie); **PX-9** at 17.   Given these financial incentives, other clearinghouses—*i.e.*, Availity, Experian, SSI Group, TriZetto, Ability and Waystar—are trading partners to Change.  **8/3A**, 63:24-64:13 (Peresie).  These trading partners rely on Change to route clearinghouse transactions.  **PX-320** at 21; **8/3A** 62:21-66:9. (Peresie).  Change receives ▮▮▮▮ more transactions each month from Availity, Experian, SSI Group, TriZetto, Ability and Waystar than Change sends to them. *See* **PX-320** at 21; **8/3A**, 66:5-9 (Peresie).

92.     Change's contracts with channel and trading partners are structured to foster reliance on Change's network.  **PX-947** ¶ 77.  Channel and trading partners often pay Change nothing to transmit "par" transactions,[108] or alternatively may pay tiered rates depending on the submitter's volume.[109]  **8/3A**, 79:3-6, 79:22-80:21, 82:19-83:7 (Peresie); **PX-9** at 19.  Besides free

---

[108] *See, e.g.*, **PX-963** at -675 (channel partner pricing terms); **PX-964** at -646 (▮▮▮▮); **PX-510** at -041, -046, -047 (▮▮▮▮▮▮▮▮); **PX-629** at -061 (▮▮▮▮▮▮▮▮); **PX-509** at -040, -043 (▮▮▮▮▮▮▮▮▮▮▮); **PX-967** at -760 (▮▮▮▮); **PX-969** at -330 (▮▮▮▮); **PX-628** at -081 (▮▮▮▮▮▮▮); **PX-971** at -751 (▮▮▮▮▮▮); **PX-972** at -815, -820 (▮▮▮).

[109] *See, e.g.*, **PX-963** at -675 (channel partner pricing terms); **PX-973** at -561 (▮▮▮▮); **PX-736** at -854 (▮▮); **PX-631** at -759-60 (▮▮▮▮); *see also* **PX-975** at -566 (▮▮▮▮▮, tiered flat-rate based on number of providers); **PX-976** at -835 (▮▮, tiered, flat-rate pricing based on number of providers).

or volume-tiered pricing, many channel or trading partners receive "financial incentives," which often amount to a substantial share of the fee paid by payers on the transactions submitted by the channel or trading partner. **8/3A**, 76:22-78:7, 79:3-6 (Peresie); **PX-947** ¶ 77.[110] To unlock more lucrative "financial incentives," or sometimes to receive any "financial incentives," channel and trading partners commonly must satisfy minimum volume thresholds,[111] while several other agreements also include separate minimum quantity or exclusivity requirements.[112] **PX-947** ¶ 77. Change can provide these terms to its channel and trading partners in part because its higher volume allows it to negotiate higher fees from payers, thereby reinforcing Change's clearinghouse. **PX-947** ¶ 77. The fact that Change's "payer rebate/subsidy is higher," Change has recognized, provides a "durable competitive advantage" with channel and trading partners. **PX-464** at 4.

93. Change operates the largest EDI clearinghouse in the United States, transmitting as many claims as the second- and third-largest EDI clearinghouses combined. **8/10P**, 69:23-70:1 (Witty); **8/4P**, 55:1-56:9 (Hasslinger); **PX-944**, at -293; **8/9A**, 76:5-25 (Gowrisankaran); **PX-820** ¶¶ 183-187; **PX-1015** at 43; *see also* **PX-276** at -608. Change's clearinghouse transmits about 51% of all U.S. commercial medical claims, and about 50% of claims by adjudicated value.[113]

---

[110] *See, e.g.*, **PX-963** at -675 (channel partner pricing terms); **PX-973** at -560 (███████); **PX-629** at -073 (███████████████); **PX-964** at -648 (███████); **PX-977** at -038 (███████); **PX-972** at -817 (███████); **PX-628** at -983 (███████████); **PX-967** at -762 (███████); **PX-736** at -854 (███████); **PX-971** at -753 (███████████████); *see also* **PX-510** at -058 (███████████, tiered financial incentives based on the number of vendor's providers enrolled in Change's clearinghouse).

[111] *See, e.g.*, **PX-964** at 648 (███████); **PX-971** at -753 (██████████████████); **PX-736** at -854 (███████); **PX-970** at -602 (███████████); **PX-977** at -038 (███████).

[112] *See, e.g.*, **PX-978** at -445 (███████████); **PX-975** at -566 (███████); **PX-628** at -978 (███████████████); **PX-967** at -756 (███████); **PX-970** at -610 (███████); **PX-629** at -070 (███████████); **PX-973** at -556-57 (███████).

[113] This includes 46% of ███ claims, 30% of ███ claims, 18% of ███ claims, 31% of

Change's EDI clearinghouse provides it with rapid access to claims data: 50% are available within a week of treatment, and 75% within three weeks. **8/8A**, 108:23-109:3 (Handel); **PX-821** ¶ 95. As the company told investors, "Our position in the Network business is unique. We are the largest network, with the greatest diversity of participants and data types - . . . connect[ing] payers, providers, pharmacies, labs…all the different stakeholders - while remaining neutral." **PX-361** at -880.

### 3. With the Merger, United Would Gain Access and Rights to Rivals' CSI, and Would Be Incentivized to Use It

94. Were the merger to proceed, United would gain (i) access to a "treasure trove"[114] of data that flows through Change's EDI clearinghouse, and (ii) accompanying rights to use those data. United would then have the ability to derive competitively useful insights as to its rivals. Analytics applied to the data can reveal sensitive insights about (among others) how rival payers contract with providers, adjudicate claims, and define the limits of what they will cover, together with other sensitive financial and adjudication details.

### (a) Change Has Access to Vast Quantities of CSI

95. There was no material dispute at trial that claims data contains a vast amount of competitively sensitive and valuable information. **8/8A**, 35:10-19 (Spady). United recognizes this, and tries to protect its own, as set forth below. United's former CEO testified that "a network with no data isn't worth very much." **8/4A**, 82:25-83:3 (Wichmann).

96. Change's clearinghouse possesses valuable data, including the entire claim life cycle (before and after claims have been adjudicated by payers).

---

█████ claims, 39% of █████ claims, 36% of █████ claims, and 76% of all other claims. **8/9A**, 78:3-80:10 (Gowrisankaran); **PX-820** ¶¶ 185-187, Ex. 8; **PX-1015** at 45, 46.

[114] **8/8A**, 35:10-19 (Spady).

- **Pre-adjudicated** claims data includes such details as the provider, patient, plan employer group, location, diagnosis, services and procedures rendered, and billed amounts.  **8/1A**, 132:13-133:7 (Garbee); *see also* **8/8A**, 110:14-113:6 (Handel).

- **Post-adjudicated** claims data reflects additional details, such as contract details between the provider and the payer, the payer's claims edits (meaning rules and procedures to determine the final paid amount), medical policy and benefit design (i.e., utilization management), contract language, the member's benefit, the final paid amount, and remarks detailing the payer's adjudication decisions. **8/1A**, 134:17-135:5 (Garbee); **PX-1005** (49:18--50:11) (Dill) (data includes discounts, coordination of benefits, claims edits, all of which are proprietary); *see also* **8/9A**, 74:13-75:4 (Gowrisankaran).

97.    Claims data is competitively sensitive along many dimensions.  Claims data could be used by a rival to "figure out the secret sauce" of how a payer competes.  **PX-1005** (154:8-155:10) (Dill).  In particular:

- **Pre-adjudicated claims data** is competitively sensitive because it can show which markets and providers generate claims, which employer groups contract with particular payers, and the health of the employer group.  **8/1A**, 133:11-23 (Garbee). These data can help a payer identify which employers a rival might want to "go after" as potential customers.  **8/1A**, 133:14-134:9 (Garbee).

- **Post-adjudicated claims data** "has way more . . . proprietary information," including prior authorization and utilization management information.  **PX-1013** (395:1-24) (Golden).[115]  It contains information as to discounts, which payers consider competitively sensitive,[116] and information as to payers' contract terms, coverage rules, and benefits, which taken together could help a payer understand a rival's "whole adjudication process."  **8/1A**, 135:12-23 (Garbee); *see also* **8/10P**, 158:23-25, 159:4-6 (Gehlbach).

- In other words, claims data reflects payers' "**adjudication logic**."  **8/10P**, 158:19-25 (Gehlbach).  Knowledge of how a rival adjusts a claim would allow a payer to reverse engineer, and understand, that rival's rates and coverage policies.  **8/1A**, 135:24-136:9 (Garbee); **PX-1005** (49:18-49:20, 49:22-50:11) (Dill).  Additionally, knowledge of the final amount paid on a claim—or gaining access to post-adjudication claims data with remark codes—can reveal adjudication logic, including how edits were applied to claims, and in turn allow

---

[115] *See* **8/1A**, 135:9-11 (Garbee); **PX-1005 (**49:18-49:20, 49:22-50:11) (Dill); **8/10P**, 158:19-22 (Gehlbach).

[116] **PX-1005** (49:11-49:13, 49:15-49:16) (Dill); *see also* **8/1A**, 133:11-13 (Garbee).

a payer to undercut rivals.  **8/1A**, 137:8-13, 138:3-7 (Garbee).

98.     United itself considers pre-adjudicated claims data to be competitively sensitive, and post-adjudicated claims data to be even more sensitive.  **PX-1013** (395:1-24) (Golden).  It protects its proprietary adjudication logic from competitors.  **8/10P**, 159:11-13 (Gehlbach).  In particular:

- **United prohibits disclosure of its own claims data** outside the United enterprise in a way that would **enable a rival to compete** against United.[117]

- **Such use by a rival would be a "red line" for UHC.**  **PX-1013** (374:21-22, 375:2-11, 375:15-376:4, 393:6-394:25) (Golden); **PX-298** at -939; *see also* **8/10P**, 159:14-18, 164:11-19 (Gehlbach).  For example, United will not permit its claims data to be used by an employer customer or its consultant to build a provider network.  **PX-1013** (374:21-22, 375:2-11, 375:15-376:4, 393:6-394:25) (Golden); **PX-298** at -939.  United's prohibition on the use of UHC claims data to compete against UHC applies to both pre- and post-adjudicated claims data, **PX-1013** (395:1-24) (Golden); **PX-298** at -939, and includes a prohibition on reverse engineering claims data.[118]

99.     United takes strict precautions when it licenses UHC claims data.  **8/10A**, 34:17-35:14 (Schumacher).  The "vast majority" of United's licensing business is with pharmaceutical manufacturers, which "[d]o not have a primary business model that would compete directly with Optum or UHG."  **PX-356** at -568; *see* **8/10A**, 37:9-18, 37:23-38:1 (Schumacher).  Further, before licensing data, United de-identifies the data to comply with HIPAA, and also sanitizes it to remove competitively sensitive information.  **8/10A**, 35:18-36:8 (Schumacher); *see* **PX-355** at -644

---

[117] **8/9P**, 98:11-19 (McMahon); **8/10A**, 33:2-4, 34:10-35:3, 39:24-41:10 (Schumacher); **PX-353** at -042; **PX-356** at -567; **PX-357** at -308-09; **8/10P**, 162:9-18, 162:23-163:18; **PX-445** at -889 ("We always apply the minimum necessary standard from a PHI/PBI [Proprietary Business Information] perspective, but we have taken the position that we always retain ownership, AND the data cannot be monetized for resale or used in a way that [UnitedHealthcare] deems competing (building networks/steering).").

[118] **8/10P**, 159:19-161:8 (Gehlbach) (UHC prohibits reverse engineering to prevent competitors from using its post-adjudicated claims data to back out information to build their own provider network to compete with UHC); **PX-441** at -029.

("Sensitive information . . . is removed prior to external release, to eliminate the business risk of information being used against the company.").  In fact, United has an Enterprise Data Governance Policy, which governs the release of United data to third parties outside the United enterprise.  **PX-446**; *see also* **PX-357**; **8/10P**, 165:4-16; 165:20-166:8 (Gehlbach).  Consistent with its licensing approach, the policy denotes as a "restricted transaction" a data transaction that is primarily for the benefit of a significant competitor of the enterprise.  **PX-446** at 907; *see also* **PX-357** at -309; **8/10A**, 40:12-41:10 (Schumacher).  Such a transaction requires prior approval by the Enterprise Data Governance Committee, which is comprised of executives from UHC, Optum, and United, and which oversees the policy.  **PX-446** at 907; *see also* **PX-357** at -309; **8/10A**, 40:16-25 (Schumacher).[119]

100.    United protects its own competitively sensitive information even at the risk of losing certain customers and, in fact, UHC lost customers when it refused requests to share data with third parties.  **8/9P**, 78:5-79:14 (McMahon); **PX-1020** at -700; **8/10P**, 164:1-10 (Gehlbach); **PX-445** at -889. For example, in 2019, some of UHC's employer customers wanted United to share claims data with third-party data aggregators.  **8/9P**, 75:10-76:25 (McMahon).  United pushed back, concerned that aggregators would use the data—which included information about adjudication rules and claims editing logic, plan benefit designs, and provider network contracts and rates—to create a rival health plan to United.  **8/9P**, 75:10-76:25, 77:1-14, 79:14-81:12 (McMahon).

101.    Likewise, United defines information of the type contained in claims data—prices,

---

[119]  If the Committee is unable to reach agreement on approving a restricted transaction, the decision is escalated for resolution to the CEO of United, who may affirm or overturn the Committee's decision without reference to any standard to guide that decision.  **8/10A**, 41:11-42:18 (Schumacher); *see also* **8/10P**, 166:22-25; 167:21-168:8 (Gehlbach).

reimbursement methodologies, claims data, utilization data, and plan or benefit design—as competitively sensitive under its made-for-litigation May 2022 firewall policy (*see* FOF ¶¶ 202); **PX-599** at -682-83; **8/10P**, 52:16-53:8 (Witty).

### *(b)* *United Would Gain Legal Rights to Rivals' CSI*

102.    Change has legal rights to use United's rivals' CSI—specifically, at least 50% of the data flowing through its clearinghouse—and with the merger, United would gain these rights for the first time.

### *i.     Change Has Rights to Use at Least 50% of Data Flowing through Its Clearinghouse*

103.    Change secured legal rights to use at least 50% of the data passing through its clearinghouse, as set forth below.

104.    Rights to use clearinghouse data other than to provide clearinghouse services are called "secondary-use rights" or "data rights." **8/2P**, 101:19-102:1 (Suther).  Change must secure such rights before using the data in its Data Solutions business, which licenses data generated from Change's clearinghouse to third parties.  **8/2P**, 101:5-18 (Suther).

105.    Change's customer contracts grant it either no secondary use rights, unfettered secondary use rights, or qualified secondary use rights.  **8/2P**, 112:23-113:20 (Suther); **PX-166** at -427.

- **Unfettered secondary use rights** are Change's default.  **8/2P**, 113:18-20 (Suther).  Change's standard contract provides that Change may "use or disclose such de-identified data unless prohibited by applicable law."  **8/2P**, 113:21-24, 114:17-115:2 (Suther); *see also* **PX-165** at -501, **PX-632** at -840.

- Secondary use rights may be **qualified** if, for example, a customer requires that their de-identified data be used only to provide the products or services the customer contracts for with Change.  **8/2P**, 113:10-17 (Suther).

106.    Change tracks the volume of claims data for which it has secondary use rights. **8/2P**, 116:1-4 (Suther).  This "data rights capture rate" was a key performance indicator for

Change's board of directors. **8/2P**, 112:6-14 (Suther); **PX-166** at -426. Change has secured substantial rights. In particular, Change believed that it had secondary use rights to 69% of all medical claims data passing through its clearinghouse as of March 31, 2020. **8/2P**, 117:4-8 (Suther); **PX-290** at 9 (68% as of December 31, 2019).

107.   This means that Change has secondary use rights to **approximately 54% of all claims data** flowing through Change's EDI clearinghouse.

- The Government's expert calculated using 2019 claims data that Change has secondary use rights for 54% of all claims data that flow through its EDI clearinghouse. **8/9A**, 87:22-88:7 (Gowrisankaran); **PX-947** ¶ 69.

- Defendants' expert admits that Change has secondary use rights to at least 50% of all data that flow through its EDI clearinghouse. **8/15A**, 98:9-16 (Murphy).

108.   Either figure yields the same conclusion: United would gain "very substantial" secondary use rights to rival health insurers' competitively sensitive information through the merger. **8/15P**, 100:5-101:13 (Gowrisankaran). In particular:

- United has "very few" rights to use its health insurer rivals' competitively sensitive information today. **8/15P**, 30:25-31:5 (Gowrisankaran); **PX-1036** at 9; **PX-947** ¶ 98.

- United would gain a "huge amount more data regarding its competitors and a huge amount more data rights regarding its competitors' data than it currently has" by acquiring Change. **8/15P**, 30:25-31:15 (Gowrisankaran); **PX-1015** at 54; **PX-1036** at 9. **As to its four main rivals, it is undisputed that United would gain 12 to 21% of their claims data, enough to derive competitively sensitive insights. 8/15P**, 31:25-33:6 (Gowrisankaran); **DX-0862** at 27; **8/15A**, 41:18-42:10 (Murphy). This evidence is not contradicted by Defendants or their expert witnesses. The additional data would improve the accuracy of United's potential uses of the data. *See* ███████████████ ███████████████████; **PX-1018** (224:14-225:7) (Chennuru) (AI and machine learning does better when it has more data to churn).[120]

---

[120] Because machine learning algorithms are only developed on a subset of data, the datasets are more than enough to develop insights. *See* **PX-1018** (33:14-34:20) (Chennuru).

- Post-merger, United would **gain incremental access and rights to competitively sensitive information to about a quarter of all commercial healthcare claims** passing through the Change and United clearinghouses. **8/15P**, 29:12-30:24 (Gowrisankaran); **PX-1036** at 9 (based on an estimate in United's due diligence that Change has secondary use rights for 60% of claims); *see also* **8/15P**, 100:18-101:13 (Gowrisankaran) (even using Defendants' expert's estimate, United would gain incremental access and rights to 21-22% of such claims).

109.    Change has secondary use rights for data of UHC's chief rivals in the relevant commercial health insurance markets, including as to about 45% of all medical claims Change transmitted to ▮, 54% to ▮, 39% to ▮, and 65% to ▮.  **PX-1015** at 49; **8/9A**, 82:1-83:6 (Gowrisankaran).

110.    Today, Change uses its de-identified data for which it has secondary use rights in its Data Solutions business.  **8/2P**, 101:5-102:18 (Suther).  That business licenses de-identified data to third parties today that allows for, among other things, benchmarking against market-wide trends.  **8/3A**, 46:13-47:11 (Suther).  Importantly, these data are far more limited than the full data sets that Change obtains through the ordinary course of running its EDI business; for example, Change does not license to payers "specific information about one of [their] competitors."  **8/3A**, 46:13-47:11 (Suther).  In addition, Change permits licensees to use its data only for approved use cases and explicitly prohibits certain uses of its data.  **8/2P**, 121:8-19 (Suther).

>    *ii.    United's Rivals Would Be Powerless to Prevent United from Receiving Access and Using Rights to Their Data*

111.    Were the merger to proceed, United's rivals would be effectively powerless to prevent United from receiving access and rights to their data.    **8/15P**, 42:14-43:23 (Gowrisankaran).

112.    The reason for this is straightforward.  Much of the payers' claims data and data rights that Change receives come not from those payers directly, but through Change's networks of providers, trading partners, and channel partners.  **8/2P**, 31:17-20 (de Crescenzo); **8/9A**, 91:13-

92:25, 93:25-95:23 (Gowrisankaran); **8/2P**, 110:25-111:3 (Suther); *see also* **PX-278** at -980 (explaining that if a customer goes through another clearinghouse that customer "will be adding hops"…and "come thru [Change] in the end anyway").  Channel partners may grant Change secondary use rights if the channel partner has received such rights from their covered entity end-customers.  **8/2P**, 104:18-25 (Suther).  If the channel partner's covered entity end customer (e.g., a provider) grants the channel partner secondary-use rights, and the channel partner in turn grants Change secondary use rights, then Change has secondary use rights to the data that it receives from the channel partner.  **8/2P**, 105:15-25 (Suther).  Similarly, as with channel partners, trading partners can grant Change secondary use rights if the trading partner has, in turn, received secondary-use rights from their end customer.  **8/2P**, 106:17-22 (Suther).

113.    In other words, Change may secure rights to payer data from payers or from providers; it does not need a direct contractual relationship with the payer to secure secondary use rights to payer data.  **8/2P**, 104:9-12, 18-25; 111:4-15 (Suther).

114.    Indeed, Change receives secondary use rights for millions of claims each year for payers that elect not to grant secondary use rights to Change.  **8/2P**, 111:11-15 (Suther); *see also* **PX-168**.  For example, Change received secondary use rights to more than 13 million transactions over a twelve-month period for one payer ID number for a large national health insurance company that had not granted data rights to Change.  **PX-168** at 3.

115.    Without direct contractual rights, rivals would have difficulty protecting their data from United's reach.  An illustration of this difficulty is Anthem's migration from Change:

- In December 2018, Anthem began to switch from having multiple direct connections with clearinghouses, including with Change, to a managed gateway with Availity.  **PX-947** ¶ 79.  Change reached an agreement prior to this date that slowly migrated claims over a 12-month period, completing the switch by December 31, 2019.  **PX-947** ¶ 79.

- When Change had a direct connection to Anthem, it transmitted ██% of Anthem's claims. **PX-947** ¶ 80. But even in 2020, when Change no longer had a direct connection to Anthem, Change still transmitted ██% of Anthem's claims. **PX-947** ¶ 80; **PX-1015** at 57-58; **8/15P**, 43:6-23 (Gowrisankaran), **PX-1036** at 11.

116.     The Government's economic expert, Dr. Gowrisankaran, confirmed the difficulty or outright impossibility of ensuring that a given payer's or provider's claims data do not pass through a large EDI clearinghouse such as Change's because a payer or provider does not independently control the clearinghouses through which those claims data flow. **8/9A**, 53:13-54:3 (Gowrisankaran); **PX-820** ¶¶ 215-217.   Indeed, the many providers who rely on Change's clearinghouse indirectly through a channel or trading partner would have little way of knowing that their claims pass through Change's clearinghouse, let alone that Change obtains data rights to those transactions.  *See* **PX-1041** (116:11-117:12) (Linares) (██% of Change's channel partner relationships use the "reseller model," where Change will presumptively "not interact with the direct customer" and "[t]he partner will be first line support including implementation, enrollment"); **PX-624**, at 3 (same).[121]

117.     United can also count on the fact that it is difficult for rivals and providers to switch away from Change's EDI clearinghouse.

- **As to rival payers,** United concluded that "[s]ignificant cost and investment to switch from one primary clearinghouse to another" mitigated the U-Factor risk that rival payers would switch away from Change. **8/4P** 39:12-16 (Hasslinger); **PX-198** at 14; *see also* **PX-769** at -022 ("Switching costs are too high . . . Causes too much disruption with providers"); **8/4P**, 39:22-40:12 (Hasslinger); **PX-198** at 20 (United identified Change's "connection into a large number of non-UHC payers and providers" and that Change "Is 'sticky' = High switching

---

[121]   For example, Erlanger executive Chris Spady did not realize that the vendor used by its North Carolina hospital, CPSI/TruBridge, is a channel partner of Change's clearinghouse business and grants Change data rights.  *Compare* **8/8A**, 37:21-38:1, 38:11-14 (Spady), *with* **PX-736** at -854, -869.

costs to changing EDI vendors" as strengths).

- **For providers,** it is also difficult and costly to switch EDI vendors.

  - For one, switching EDI vendors would require a corresponding change in a software vendor. For example, if Erlanger Health switched its main facility's EDI clearinghouse vendor, it would also need to switch its back-end revenue cycle management ("RCM") and claims scrubbing vendors because Erlanger purchases those three products as a bundle from Change. **8/8A**, 26:3-19 (Spady). The switch would create business risks, take approximately ten to twelve months, cost over $1 million, involve at least one hundred employees, and risk disrupting Erlanger's cash flow. **8/8A**, 23:25-24:11, 27:16-30:8 (Spady). This is a significant expense in context: an expected switching cost of $1 million is more than Erlanger's annual EDI clearinghouse spend ($660,000) and significant when compared to Erlanger's projected profits during a good year ($30 million). **8/8A**, 29:16-25 (Spady).

  - Switching back-end RCM vendors, in turn, is disruptive to providers' ordinary operations, and places their revenue collection at risk. **PX-1008** (155:16-155:25, 196:17-196:20) (Mincher). It requires significant investment of a provider's employees' time and budget. **PX-1008** (163:25:168:25, 164:12-168:25) (Mincher). A Texas Health Resources witness estimated that switching back-end RCM vendors would take about 12 to 18 months. **PX-1008** (170:4-170:5, 170:7-170:18, 196:21-196:25) (Mincher). "[A] project of this size" would also impose opportunity costs on providers by "tak[ing] away from another project" that would improve patients' financial experience, reduce costs, or enhance the provider's competitiveness. **PX-1008** (173:2-7) (Mincher).

118.    The Government's expert corroborated this testimony, with analysis demonstrating that providers do not frequently switch EDI vendors. **8/9A**, 52:8-53:12 (Gowrisankaran). For instance:

- Only 2.8% of provider customers stopped using Change's EDI clearinghouses entirely from 2018 to 2019, and only 4.6% of provider customers stopped using Change's EDI clearinghouses entirely from 2019 to 2020. **8/15P**, 40:14-41:14 (Gowrisankaran), **PX-1036** at 10.

- The share of claims volume from provider customers who stopped using Change's EDI clearinghouse entirely was 0.4% in both 2018-2019 and 2019-2020. **8/15P**, 40:14-41:14 (Gowrisankaran Rebuttal), **PX-1036** at 10. This very small figure does not necessarily reflect switching between clearinghouses; it is similar to physician practice turnover numbers, meaning that much of it may reflect providers retiring or going out of business. **8/15P**, 40:14-41:14

(Gowrisankaran).

119.     United's use of its rivals' competitively sensitive information is unlikely to increase providers' incentives to withdraw data rights from United after the merger.  This is due in part to providers' limited visibility into the fact that Change is receiving their data rights, as discussed above.  And it is also due to the direct or indirect benefits that providers receive for giving data rights.  **PX-947** ¶ 12.  Change offers value-added product and services "that are dependent on de-identified data and therefore can only be provided with rights."  **PX-947** ¶ 12; **PX-453** at -146. These products and services can be given to providers that purchase Change's RCM products as well as those providers that use Change's channel partners.  **PX-453** at -146.

120.     Because, as this evidence shows, disintermediation is so difficult, a showing of market power in EDI clearinghouses is not necessary to establish that United would have the ability and incentive to use its rival health insurers' competitively sensitive information.  **8/15P**, 39:10-24 (Gowrisankaran).[122]

> ### iii.     United Lacks Access and Rights to _Comparable Claims Data Today_

121.     Defendants suggest that the data and rights United will secure via the transaction are no different than what it already possesses.  But those arguments do not reflect the business

---

[122] At trial, Defendants suggested that there are many clearinghouse competitors.  Defendants are mistaken.  For example, several of the firms they identified are niche and/or rely on Change as a trading partner.  *See, e.g.*, **PX-130** ("ZirMed, TriZetto, and Office Ally" are "provider-focused vendors"); **PX-966** (Change/Experian Trading Partner agreement).  Other firms are owned by larger clearinghouses and not independent.  *See, e.g.*, **8/3A**, 155:9-156:6 (Peresie) (Dorado, eSolutions, and Recondo are owned by Waystar); **8/3A**, 156:7-9 (Peresie) (nThrive [sic] purchased Transunion); **8/3A**, 156:10-12 (Peresie) (Inovalon purchased Ability).  Still other firms are actually channel partners and rely on Change for EDI connectivity.  *See, e.g.*, **8/3A**, 157:11-17 (Peresie) (AdvancedMD is a channel partner of Change); **PX-963** at -675 (spreadsheet collecting channel and trading partners of Change and describing the financial terms of the arrangement).

realities of the market, ignore the fact that United's most senior executive was only interested in the deal if United would get rights to Change's data, and are belied by the $13 billion price tag for this deal. Change's claims data and rights are incremental, unique, and valuable relative to United's existing data assets, for the following eight reasons.

122. ***First*, the testimony of United's executives and its business documents show that United today does not have access to its rivals' proprietary claims data.** United's Optum business currently operates an EDI clearinghouse. **8/5A**, 108:18-24 (Musslewhite). In contrast to Change's EDI clearinghouse, however, Optum's EDI clearinghouse is focused primarily on serving UHC and no other significant commercial payers. **8/5P**, 99:7-20 (Schmuker) (discussing **PX-337** at -464); **PX-944** at -293. United's witnesses and documents confirm that the "multipayer claims data" United would get from Change "would be additive to the datasets of Optum" and United does not have those data today. **8/4P,** 55:1-56:18 (Hasslinger); **PX-944** at -293; **8/4A,** 76:25-77:8 (Hasslinger); *see* **PX-211** at -701 (due diligence document explaining that the "takeaway" is that "Cambridge greatly increases UHG's access to healthcare data"). United's Chief Growth Strategy Officer similarly acknowledged that Optum's medical claims data is primarily comprised of UHC claims. **8/10A**, 8:18-23 (Schumacher); **8/10A**, 103:8-12 (Schumacher).[123] During diligence for this proposed transaction, United recognized that the "diverse payer representation" of Change's data assets—*i.e.*, that "Change's data assets come from payers that are beyond UnitedHealthcare"—"differentiates" them from United's own data assets. **PX-58**, -714; **8/5P**, 9:11-14 (Dumont).

---

[123] OptumHealth has certain other data from OptumRx and OptumHealth, but that data is significantly smaller in volume than the data with secondary use rights that United would obtain as a result of the proposed acquisition of Change. **8/15P**, 55:3-56:10, 57:4-58:8 (Gowrisankaran).

123.    **Second**, **United and its subsidiaries have limited legal rights to use the commercial medical claims data of rival insurers.**  This is important because Defendants have sought to confuse and conflate the distinct issues of data access and data rights to use Change's claims data.  They fail to address that whatever current access United asserts it has to its rivals' data, the data are useless to United without the rights to use them.  United's own deal documents clearly distinguish data access from data rights and, in particular, demonstrate United's interest in data rights.  *See* **PX-89** at -770 ("While we still need to better understand the richness of their data rights, they do have the ability to abstract valuable information and patterns from their claims flow"); **PX-82** at 1 ("[United's then-CEO Mr. Wichmann] says if we have data rights, he's excited. If it's just a commodity exchange, not as interested."); **PX-303** at -140 (identifying "data rights" as Mr. Wichmann's "main question"); **PX-944** at -283 (explaining that "Change has access to large amounts of claims data . . . . [o]btaining rights to create and use de-identified data requires only consent of the applicable payer or provider").  Contrary to Defendants' mischaracterization of the Government's argument, the Government's claim does not rely on data misuse, but rather on United's use of the data in accordance with secondary use rights provided by Change's customer contracts.

124.    As of 2021, only four non-UHC payers gave Optum data rights, contributing to its three secondary use databases, and none of them is a national health insurer like UHC.  **PX-665** at 2; **8/5A**, 141:12-16 (Dumont).  Indeed, OptumInsight has tried to get secondary use-rights since at least 2016, and in each case the language has been stricken from customer contracts.  **PX-306**; **8/4P**, 120:23-121:17 (Yurjevich).  Confirming as much, United's ordinary course documents reflect the lack of any meaningful data rights for commercial payers, and defendants offered no evidence to the contrary at trial.  **8/4P**, 121:10-20 (Yurjevich); **8/15P**, 30:25-31:5 (Gowrisankaran);

**PX-947** ¶ 64; **PX-213**, at -723; **PX-944**, at -293.  And unlike this deal, prior mergers in this space (e.g., Equian) did not include data rights.  **PX-129** at -132; **8/4P**, 136:20-22 (Yurjevich).  If United acquires Change, United would not only obtain access to Change's EDI clearinghouse claims data, which is additive to the data United has today, but United would also acquire the rights to use more than 50% of that claims data in its business.  **8/9A,** 86:14-88:12 (Gowrisankaran); **PX-947** ¶ 98.

125.      ***Third*, United does not receive a complete picture of its rivals' proprietary post-adjudicated claims data when it is bidding for new large group business.**  UHC's Chief Underwriting Officer from 2012 through June 2022, Thomas Gehlbach, conceded that claims experience of groups with fewer than 300 eligible employees is not typically available to UHC when bidding on new business.  **8/10P**, 106:6-22 (Gehlbach).  Contrary to Defendants' arguments, United does not get all the data it wants or could use when it is bidding for new large group business.  Mr. Gehlbach testified that for this reason, United uses Optum's Group Risk Analytics (GRA) tool to better predict the claims trend of its rival payers for customers with 51-300 eligible employees where claims experience is not available.  **8/10P**, 115:22-24, 140:10-14 (Gehlbach).  To the extent that United gets any claims experience for new groups over 300 employees, it only gets the monthly aggregated total amount of paid claims for the group for whatever period of time the broker decides to provide it.  **8/10P**, 107:3-10 (Gehlbach).  In contrast to these aggregated monthly-paid amounts, when United has previously insured a group, it has *all* of its own pre-adjudicated and post-adjudicated individual claims data for each member of the groups it insures, highlighting the disparity between available claims data and aggregated information available from others.  **8/10P**, 154:15-155:2 (Gehlbach).  These claims data also reflect United's adjudication logic based on its own rules of coverage to decide what claims should be paid or denied based on United's contracts with providers in its network.  **8/10P**, 155:3-10 (Gehlbach).  There is no

evidence that United gets the proprietary adjudication logic of its rivals from any source because those data are closely guarded by payers and treated as proprietary.[124]  *See infra* **FOF ¶¶** 97-98.

126.     ***Fourth*, third-party data sources do not provide the same detail as is available from Change's data.**  The Government's healthcare data expert, Dr. Benjamin Handel, testified that Change's claims data are "unique in scope and scale, truly very rich data at the center of the health ecosystem."  **8/8A**, 102:7-103:1 (Handel).  For instance:

- Change is unique in scope and size relative to other EDI clearinghouses. It has connections with over 2,000 payers and a meaningful portion of patients nationwide. **8/8A**, 108:11-22 (Handel). Through Change's EDI Clearinghouse flow about 15 billion transactions, over a trillion dollars in claims, and highly granular information. **8/8A**, 108:11-22 (Handel). Change's claims data contains millions or tens of millions of claims from United's major rivals, including millions or tens of millions of claims with data rights. **8/8A**, 124:12-24 (Handel). There is no evidence that United has those data today.

- Datasets from public and commercial sources are not delivered as rapidly as Change's data would be. **8/8A**, 106:1-19 (Handel). As set forth above, about 50% of claims are available in Change's clearinghouse within a week of treatment and 75% within three weeks; by contrast, commercially-available datasets take months or years to deliver. **8/8A**, 108:23-109:3 (Handel).

- Datasets from public and commercial sources do not contain rich information on the full lifecycle of claims. EDI clearinghouses transmit granular information related to claims. **8/8A**, 107:2-16 (Handel). EDI clearinghouses also include information on claims denials, which is vital to understanding a payer's utilization management. **8/8A**, 107:17-108:2 (Handel). Even Defendants' expert, Dr. Tucker, declined to present to the Court any significant disagreements with the limitations and restrictions Dr. Handel identified in commercially-available data. **8/12**, 58:12-60:23 (Tucker).

---

[124] Additional testimony confirms that during the RFP process, payers typically do not receive information about incumbent benefit plans that provides anything near the level of detail that could be derived from claims data.  *See* **PX-1005** (131:4-132:11) (Dill) (describing "all we receive" "[d]uring the RFP process for national account customers" as "a very high-level benefits summary"); **PX-1037** (143:2-12) (Choate) ("[I]t is not guaranteed that we would get the existing benefit plan, fee structures, guarantees, anything.  It's not likely that we get that information.  It is usually more around this is what we want for the future.");  *see also* **8/12**, 74:7-75:11 (Tucker) (discussing Mr. Choate's deposition testimony).

- Third-party data sources generally include licensing and use restrictions. They may not license claims data to insurers, license claims data only for specific uses, or license claims data with individual payer identities only if detailed financial information is not also provided. **8/8A**, 137:21-139:1 (Handel); **PX-821** ¶ 99.

127.    Change understands these distinctions, and it touts its data as superior to other datasets.  Change claims "advantage due to the breadth and depth of data," a "multitude of customers," and "the largest data network in healthcare."  **PX-177** at -997-98; *see also* **PX-178** at -234 (informing a potential customer that Change has the "largest independent dataset" which can be "licensed at service line detail, with substantial history")*.*[125]

128.    Change also distinguishes itself from data aggregators like Lexis and IQVIA.  **PX-175** at -777; *see also* **8/2P**, 123:4-14 (Suther).  Change explains that as the "largest independent first party source" of data, it offers "unique advantages" to data customers, **PX-175** at -777, whereas aggregators are "one step removed" from the data source and provide only high-level aggregated data.  **PX-176** at -779; ███████████████████████ ; *see also* **PX-454** (contract showing that IQVIA licenses its clearinghouse data from Change); **PX-455** (contract showing that Lexis licenses its clearinghouse data from Change).  Change asserts that these advantages allow customers more flexible use of data and faster data availability.  **PX-175** at -777; *see also* **8/2P**, 123:4-14 (Suther).

129.    Additionally, although Change licenses data to aggregators and life sciences companies, Change does not license data to payers like UHC as a matter of practice.  **8/2P**, 119:19-120:1 (Suther).  National payers like Cigna and Aetna do not permit Change to share their custom edits with other Change customers.  **8/1A**, 128:17-129:1 (Garbee); **8/1P**, 42:10-15 (Lautzenhiser).

---

[125] **8/2P**, 124:4-125:3 (Suther); **PX-175** at -777 ("Our data is available at claim & service line, offering superiority [sic] depth and granularity").

Payers consider the custom edits to be proprietary because they reflect how payers apply their policies to claims. **8/1A**, 129:9-17 (Garbee); **8/1P**, 42:16-43:8 (Lautzenhiser). For example, proprietary custom edits may reflect a payer's exceptions or liberalizations of policies for self-funded plans or for particular providers. **8/1P**, 42:16-43:8 (Lautzenhiser). Payers would be concerned if their proprietary custom edits were disclosed. **8/1P**, 43:24-44:6 (Lautzenhiser); **8/1A**, 128:17-129:1, 129:9-17 (Garbee).

130. ***Fifth*, public disclosures of negotiated rates and other pricing data required by new federal price transparency regulations (*i.e.*, the Transparency in Coverage Rule and Hospital Transparency Rule) are not a substitute for Change's claims data.** Post-adjudication claims data have far more information than is made public under those regulations. **8/1A**, 135:12-23 (Garbee). In particular, the required disclosures under those rules lack information on utilization, treatment, diagnoses, claims adjudication, and the life cycle of claims. **8/8P**, 56:22-59:14 (Handel); **PX-946** ¶ 49; **PX-1012** at 49. Those data points, as set forth above, are among those that would permit a payer to reverse engineer how a rival adjudicated a claim or what its coverage policies were. **8/1A**, 137:14-19, 138:3-7 (Garbee). Defendants' expert, Dr. Tucker, agreed that it would not be possible to reverse engineer claims edits using the disclosures required under the price transparency rules. **8/12**, 63:11-16 (Tucker). She conceded that the information the price transparency rules require be disclosed is not "a perfect substitute for claims data for all use cases," and that it is only a substitute for the specific types of claims data provided for by those rules (negotiated rates and lists of providers by plans). **8/12**, 62:13-63:10 (Tucker).

131. United itself is well aware of the limitations of the required disclosures, and it is careful not to disclose additional information beyond what it must. A "draft document outlining some of the tactical and strategic implications" of the Transparency in Coverage Rule for UHC

reflected that UHC would not disclose more information than its competitors because it would otherwise be at a competitive disadvantage. **PX-296** at -598, -613; *see* **PX-1013** (355:5-16, 356:24-357:10, 357:23-358:8, 358:24-359:14, 363:18-23, 365:13-366:22) (Golden); *see also* **8/10P**, 162:2-6 (Gehlbach) (United has no plans to disclose more than the rule requires). For example, UHC would not disclose its "complex value-based contracts," which are competitive advantages in the market in the way in which UHC reimburses some of its providers. **PX-1013** (366:23-367:18) (Golden); **PX-296** at -613.

132.    *Sixth*, **data available in state-level All-Payer Claims Databases would not provide United with any substitute for Change's data and data rights.** They are time-delayed, less comprehensive, exclude ASO data, do not contain the full life cycle of claims (and typically exclude denied claims entirely), and many restrict access to industry participants (like payers), as opposed to researchers. **8/8A**, 144:1-145:10 (Handel); **PX-1012** at 48. Defendants' expert, Dr. Tucker, did not dispute the limitations Dr. Handel identified in these data. **8/12,** 56:13-58:1, 60:1-23 (Tucker).

133.    *Seventh*, **data potentially available through Optum's Pharmacy Benefit Manager ("PBM") also would not provide United with a substitute for Change's data and data rights.** The vertical integration of United's main health insurer rivals with their own PBMs means that United is not likely to see a substantial number of the pharmacy or health claims for its main rival health insurers through United's PBM. **8/15P**, 49:19-50:17 (Gowrisankaran). There is no evidence in the record that United has secondary use rights with respect to its commercial large group and national accounts rivals (*e.g.*, Cigna, Aetna, Anthem) through OptumRx and, in any event, much of the data going through OptumRx relates to pharmacy data rather than medical

claims. **8/15P**, 55:3-56:3 (Gowrisankaran); **PX-820** ¶ 62.[126]

134.    ***Finally,* Defendants (correctly) do not appear to contend that electronic health record data is a substitute for Change's claims data.**   It would not be a substitute, because it is purely focused on the clinical aspects of a patient's care.  **PX-1018** (48:18-49:19) (Chennuru).

### (c)    Change's Data Rights are the <u>Foundation of the Proposed Merger</u>

135.    United actively seeks data about its competitors to understand their products and how to compete more effectively, but it is largely limited to public sources.  **8/10A**, 54:9-55:21 (Schumacher); **PX-364** at -367.  This changes with the merger.  As United's former CEO, Mr. Wichmann, candidly testified at his deposition, Change's data rights were the "foundation by which the business case was made to pursue" United's acquisition of Change.  **8/4A**, 63:2-64:23 (Wichmann); **PX-1009** at 6 (274:21-275:14).  Although Mr. Wichmann tried to "contextualize[]" this admission at trial, **8/4A**, 64:18-64:23 (Wichmann), contemporaneous evidence shows that he was laser-focused on Change's data and data rights in real time.  For example:

- In his notes from a September 2019 meeting of OptumInsight's senior executive leadership about acquiring Change, Mr. Hasslinger noted that "DSW"—referring to David Wichmann—"**wants the data**."  **PX-202** at -300; **8/4P** 43:13-18 (Hasslinger).

- In November 2019, when United's then-head of Corporate Development "took Dave's temperature" on acquiring Change, Mr. Wichmann's "**primary question . . . was about data rights**."  **PX-1** at -068.

- In January 2020, Mr. Wichmann told OptumInsight's then-CEO Robert Musslewhite that he would be "excited" about the prospect of a Change acquisition if United could acquire data rights, but "if it's just a commodity exchange, not as interested."  **8/5A**, 112:18-113:21 (Musslewhite); **PX-82** at 1.

---

[126]  *See also* **PX-297** at -356 (explaining that Anthem launched its own PBM, IngenioRx, and began "migrating members to IngenioRx [on] May 1, 2019" and that "Cigna completed the acquisition of Express Scripts in December 2018 [and] PBM services currently provided by OptumRx are expected to be transitioned by December 2020.").

Mr. Musslewhite's takeaway?  "We will need to come back to him with a good answer on data and why we get a **proprietary advantage** from doing this deal…which I think we can do."  **8/5A**, 115:6-12 (Musslewhite); **PX-82** at 1.  At trial, Mr. Musslewhite confirmed that Mr. Wichmann "remained very interested in **Change's data rights and the depth of data as a key factor** for him if he was going to support this acquisition."  **8/5A**, 128:15-24 (Musslewhite).

136.    In response to "Wichmann's obsession" with Change's data rights, **PX-98** at -902, United—with Mr. Musslewhite's approval—tasked the consulting firm McKinsey & Company with assessing Change's data rights as part of its evaluation of the Change acquisition.  **8/5A**, 126:16-127:5 (Musslewhite); **8/4P**, 44:16-18 (Hasslinger); *see also* **PX-2** at -664 (reporting that Mr. Wichmann "[r]emain[ed] very interested in **data rights** and depth of data" and that the deal team would "likely want to explicitly task McKinsey team to get a clear view of" the data Change had and "what rights they have to that data").  McKinsey prepared a January 2020 presentation analyzing the benefits to United—including specifically to UHC—from acquiring Change.  **PX-204** at -069 ("What's in it for UHC?"); **PX-84** at -356 (same); *see also* **PX-771** at -268.  Regarding Change's EDI data, McKinsey concluded that Change:

- "enjoys [the] broadest and deepest datasets in several categories," with "unrestricted access under HIPAA guidelines," **PX-204** at -077; **8/4P**, 45:16-22 (Hasslinger); **PX-084** at 29;

- had a high depth and breadth of data assets for commercial claims, **8/4P**, 45:23-46:1 (Hasslinger); **PX-204** at -077;

- "manages the highest volume of claims compared to any other EDI competitor as well as a large percentage of longitudinal data sets that are more valued." **PX-204** at -077; **8/4P**, 46:2-9 (Hasslinger); and

- "connects to >70% of all payers, providers, pharmacy and physician orgs"… **PX-084** at -364; **PX-087** at -664; **8/5A**, 126:16-128:6; 129:5-133:10 (Musslewhite).

137.    The deal team presented the Change acquisition to Mr. Wichmann and United CFO John Rex on April 22, 2020, highlighting Change's large EDI network and de-identified claims

71

data as "[k]ey Cambridge [a]ssets" and including McKinsey's findings on Change's data rights. **8/4P**, 46:2-7, 46:11-14 (Hasslinger); **PX-4** at -662; **8/5A**, 127:15-128:6, 129:5-133:10 (Musslewhite); **8/4A**, 69:7-25, 71:7-72:1 (Wichmann); **PX-123** at -470, -479.[127]  In preparing for the meeting, Mr. Musslewhite asked that a member of the deal team be prepared to "speak directly to the data rights issue" because "I'm sure Dave will ask about it."  **PX-795** at -090.  As Mr. Musslewhite predicted, Mr. Wichmann had additional questions about Change's data rights.  **8/4P**, 49:2-8 (Hasslinger); **PX-1038** (147:25-148:10, 148:13-149:3 (Rudolph).  Mr. Wichmann asked Mr. Hasslinger to analyze Change's data rights and develop potential use cases for Change's data. **8/4P**, 49:5-8 (Hasslinger).

138.    At Mr. Wichmann's request, the deal team investigated Change's data rights and wrote a memo analyzing potential uses for Change's data.  **PX-944**, at -295-96; **8/4A**, 74:7-75:2 (Wichmann); *see* **PX-161** at -368, -370 (email from Mr. Hasslinger setting up a meeting two days after the presentation to Mr. Wichmann explaining that "[e]xec leadership is interested in understanding what [Change's] data is" and "what it could be worth" and attaching the Change data rights summary); **8/4P**, 54:22-25 (Hasslinger).  The memo included use cases from a spreadsheet that Mr. Hasslinger prepared.  **PX-54**; **8/4P**, 49:21-50:3, 54:18-21 (Hasslinger); *see also* **PX-1010** at 2.[128]  One of the use cases identified in the memo to Mr. Wichmann was

_____

[127]  In June 2020, Mr. Wichmann forwarded the team's presentation to the Chairman of United's board of directors, Steve Hemsley, in advance of a meeting between Mr. Wichmann, Mr. Hemsley, and Mr. de Crescenzo.  **PX-123**; **8/4A**, 67:17-68:3 (Wichmann).

[128]  Although Mr. Higday suggested that he contributed to the assessment of Change before December 2020, **8/8A**, 74:7-13 (Higday), Mr. Hasslinger's testimony and documentary evidence confirm that he "wasn't involved in this transaction" "before December 2020."  **8/4P**, at 92:16-21 (Hasslinger); **PX-210**; *see also* **PX-803**; **8/4P**, 137:5-21 (Yurjevich).  Mr. Higday's subjective interpretation of the May 2020 memo (**PX-944**) and spreadsheet of use cases (**PX-54**) should therefore not be credited as it is irrelevant.

"improved medical policy and benefit design," an adaptation of McKinsey's proposal to use Change's data as "transactions intelligence" for UHC. **PX-944** at -296; **8/4P**, 52:12-21, 57:24-58:3, 59:5-9 (Hasslinger). United believed Change had rights to use the de-identified claims data and could implement this use case. **PX-944** at -296, **8/4P**, 58:4-59:4 (Hasslinger). This use case would utilize multi-payer data, and could result in UHC changing its benefits design. **8/8A**, 80:24-81:13 (Higday). "[T]rack[ing] procedure pricing [and] contracting" and expanding insurance underwriting were also included as use cases. **PX-944** at -296; **8/4P**, 59:9-14 (Hasslinger); *see also* **PX-211** at -003.[129]

139.   In evaluating these use cases, Mr. Hasslinger candidly identified potential concerns, including "provider sensitivity," "competitive concerns raised by Cambridge customers," and "antitrust concerns." **PX-54** at 2; **8/4P**, 53:6-54:2 (Hasslinger); *see also* **8/8A**, 76:16-18, 77:11-78:2 (Higday).[130] Despite recognizing these competitive concerns, the team included these use cases in the May 2020 memo to the CEO of United. **8/4P**, 93:23-94:19 (Hasslinger); **PX-944** at -296. After Mr. Wichmann received the memo, he agreed to commence negotiations with Change. **8/4P**, at 59:16-19 (Hasslinger); *see* **8/4A**, 67:17-68:3 (Wichmann).

140.   The extent of Change's data rights remained a key factor in due diligence and was

---

[129] Although Change's data rights remained a key issue through the end of diligence, where United confirmed that the transaction presented "[s]ignificant opportunities [] to expand" United's data assets, **PX-945** at -214, United did not quantify the value of the data. This is unsurprising since United had early on identified antitrust concerns with a number of their contemplated use cases. *See* **PX-54** at 1, 2.

[130] At trial, United sought to shift focus to a few other use cases instead—including "Next Best Action/CDS," "Enrich IHR with Multipayer Data," and "Certified Claims." But these use cases require *identified* rather than de-identified data, and Change has "little to no rights to use identified data currently." **PX-803** at -701_002; **8/8A**, 78:22-79:11, 79:24-80:4 (Higday); **PX-944** at -295; **PX-945** at -213. The use cases that rely on de-identified data for which Change already has secondary use rights are therefore more relevant to assessing the likely effects of the proposed merger.

resolved only days before Mr. Wichmann recommended the Change transaction to United's board. During due diligence, United closely scrutinized Change's data rights, viewing Change's data rights as "important information as part of the due diligence work." *See* **8/5P** 12:19-21 (Dumont). To verify Change's data rights, United reviewed Change's template Business Associate Agreement, which, as United concluded, "allows de-identification and then permits use or disclosure 'unless prohibited by applicable law.'" **PX-58** at -714; **8/5P**, 9:15-10:8 (Dumont). This data-rights language, United's due diligence team concluded, "is included in their customer contracts." **PX-58** at -714; *see* **8/5P**, 12:4-7 (Dumont) (admitting that the team separately confirmed that the data-rights language was in "one or two other contacts"). Change also shared an internal board presentation stating that it had rights to "~60%" of its clearinghouse data. **PX-56** at 4. Along with these key documents, United hosted three meetings with Change relating to its data rights during the diligence process. **PX-945** at -213. Based on all of its due diligence, United's due diligence team reported to Mr. Wichmann and Mr. Rex that it "believe[d] about 60% of all [of Change's] data has de-identification rights." **PX-945** at -213; **PX-124** at 3; **8/4A**, 86:15-25 (Wichmann); **8/5P**, 12:10-15 (Dumont). After Mr. Wichmann received this due diligence, he met with the United board the next day and recommended to the board that they move forward with the acquisition, which the Board approved on December 29, 2020. **8/4A**, 87:1-12 (Wichmann).

141.    Change's scale and data rights were key factors in United's decision to acquire Change. United considered and rejected investments in a number of other healthcare IT companies at the time it was considering acquiring Change, including nThrive, Availity, and Waystar. **8/4P**, 59:20-66:1 (Hasslinger). United decided not to pursue nThrive because it did not consider it to be an EDI clearinghouse player. **8/4P**, 59:25-60:5 (Hasslinger). United preferred an acquisition of

Change to a minority investment in Availity given Change's larger network (including with providers), the right to control, certainty of data rights, and concern about licensing intellectual property to its competitors. **8/4P**, 62:12-65:6 (Hasslinger); **PX-199**. United rejected an acquisition of Waystar, in part, because of its limited clearinghouse size compared to Change. **8/4P**, 65:15-21 (Hasslinger).

142.    In their recommendation to United's board of directors, Mr. Wichmann and Mr. Rex identified Change's "most strategic assets" as "its extensive digital connections and related transaction volumes and data (sometimes referred to as a 'network')." **PX-120**, at -326; **8/4A**, 87:1-12 (Wichmann).

143.    At trial, Mr. Wichmann reaffirmed that "a network with no data isn't worth very much." **8/4A**, 82:25-83:3 (Wichmann).  And Mr. Wichmann's successor, Mr. Witty, confirmed that by acquiring Change, United will gain access to "a vast amount of data and data rights." **8/10P**, 70:2-4 (Witty).

### (d)    United Could Glean Useful Insights from Rivals' CSI that United Could Exploit to Harm Competition

144.    The evidence at trial also established that United could use Change's vast data rights to surveil its rivals and take actions that would harm competition in the relevant health insurance markets.  As set forth above, United's deal documents identified several use cases for Change's data, including for "medical policy and benefit design," "track[ing] procedure pricing, contracting," and underwriting. **PX-944** at -296; *see* FOF ¶¶ 138.  These use cases depend on the right to use "multi-payer data," meaning the data and accompanying rights that Change has acquired concerning non-UHC claims. **PX-944** at -296.

145.    Corroborating United's ordinary-course documents, the Government's healthcare data expert, Dr. Handel, examined five potential "use cases" for Change's claims data.  Each of

these use cases involves the application of analytics within United's current capabilities (including, but not limited to, machine learning) to claims data. They illustrate how United could use Change's claims data and data rights after the merger to discern and co-opt rivals' competitive strategies and practices, including their (i) utilization management practices (ii) pricing and reimbursement strategies, (iii) provider network designs, (iv) claims adjudication process, and also how United could (v) use the data to inform United's underwriting. **8/8A**, 102:7-103:1, 123:22-124:11 (Handel); **PX-946** ¶¶ 38-69. As set forth below, each of these five use cases was either contemplated by United in connection with the proposed acquisition of Change or is otherwise supported by United's ordinary-course documents and other evidence—demonstrating that they are feasible and achievable after the proposed merger.

146.    Change's data and data rights would be "more than sufficient to implement" each of these use cases. **8/8A**, 124:25-125:11 (Handel); *see also* **PX-946** ¶ 70-73. Change's data are "unique in scope and scale" and "significantly richer . . . in scale and scope than public or commercial data sources that United could have access to" without the proposed merger. **8/8A**, 102:7-103:1 (Handel). Such alternative data sources would not allow United to glean equivalent insights to Change's claims data, as set forth in greater detail below for each use case. **8/8A**, 106:1-19 (Handel).

147.    These use cases exploit the granularity of the claims data passing through Change's clearinghouse about UHC's competitors—including, among other things, information about the patient's insurer (including the specific health plan) and provider, among other rich information about the patient's treatment and the full "lifecycle" of the claim (including the back-and-forth between payers and providers when adjudicating claims). **8/8A**, 110:23-113:18 (Handel).

148.    These rich, granular data would enable United to develop actionable intelligence

about particular rival payers that far exceed any publicly or commercially available information. After the transaction, United would have every incentive to benefit its overall enterprise by maximizing its use of the data and the insights that could be gleaned from them.  *See* **FOF ¶¶** 176- 186.  With the granular, payer-specific data—and data rights—it would acquire from Change, United would gain the ability to "free-ride off of its rivals' innovations and lower[] their incentive to innovate," **8/15P**, 28:8-29:11 (Gowrisankaran), harming competition in the relevant markets, *see* **FOF ¶¶** 188 .

149.    These use cases are described below in greater detail, along with the evidence showing that Defendants' expert did not seriously contest any of them.

i.    *Use Case #1:  Utilization Management*

150.    With Change's claims data, United could learn about its insurance rivals' utilization management tools, such as competing insurer's cost-sharing rules, service limitations, and prior authorization policies.  **8/8A**, 125:12-126:5 (Handel).  Dr. Handel also determined that United could infer which of its rivals' utilization management policies are effective.  **8/8A**, 126:6-126:23 (Handel). These insights could be inferred from information in claims data that includes the patients' share of the payment, which claims were accepted or rejected, which treatments and diagnoses were associated with the claims, and data fields or transactions indicating prior authorization.  **8/8A**, 126:6-23 (Handel).

151.    Dr. Handel's conclusions about this use case are corroborated by United's ordinary- course documents.  In assessing the acquisition of Change, United identified an "opportunity" to use Change's "[m]ultipayer claims data" to "improve policy and benefit design."  **PX-944** at -296; **PX-27** at -719; **PX-95** at -461; **8/8A**, 126:24-128:3 (Handel).  This potential use was presented to United's then-CEO, David Wichmann, in a memorandum analyzing the transaction.  **PX-944** at - 282, -296.  Dr. Handel also relied on the testimony of William Golden, the CEO of UHC's

Employer & Individual business line, who testified that United's post-adjudicated claims data has "our prior authorization, utilization management, and it has our unit cost information attached to it, and that's information that we deem proprietary." **PX-1013** (395:1-24) (Golden); *see also* **FOF** ¶¶ 95-97 (collecting evidence at trial regarding the information contained in claims data). This confirms Dr. Handel's opinion that Change's claims data could be used to learn utilization management practices and that insurers view those practices as competitively sensitive. **8/8A**, 147:24-148:16 (Handel).[131]

152.    Defendants' expert, Dr. Catherine Tucker, did not dispute Dr. Handel's explanation of how claims data can be used to determine rivals' utilization policies. **8/12**, 76:8-15 (Tucker). Although Dr. Tucker purported to identify public sources found on the Internet as an alternative data source for the utilization management use case (relying on an example concerning an "individual and family"—rather than commercial—plan), Dr. Tucker conceded that those sources do not include information on customized plans (as often sold to national accounts customers) or on total cost of care (which is needed to determine the effectiveness of utilization management policies). **8/12**, 70:5-8, 70:14-23, 71:2-13, 72:8-14, 73:2-6 (Tucker). Dr. Tucker also conceded that such information is less accessible for plans sold to national accounts and large group customers. **8/12**, 70:14-23, 71:8-13, 72:8-14 (Tucker). And although Dr. Tucker purported to identify information provided by employers to payers during the bidding process as an alternative data source for the utilization management use case, Dr. Tucker conceded that such information is "more aggregate" than "individual-level claims data." **8/12,** 73:17-74:6. Dr. Tucker also conceded that the information provided during a commercial health insurance RFP bidding process does not

---

[131] Dr. Handel's conclusions regarding the utilization management use case are set forth more fully in his expert reports. **PX-821**, ¶¶ 108-112; **PX-946** ¶¶ 38-48.

include a "particularized kind of data set" about "the effectiveness of specific benefit policies." **8/12**, 75:22-76:7.  For example, the information available in the RFP process typically excludes denied claims, is "███████████████," and ████████████████

████.  ███████████████; **8/10A**, 105:8-106:5, 107:3-10 (RFP for fully-insured accounts and ASO accounts with greater than 300 employees, but not smaller ASO accounts, typically include "monthly aggregate pay claims"), 109:4-11 (RFP for renewal also includes "[m]onthly paid claims") (Gehlbach).   These key differences would substantially limit the usefulness of alternative data sources when compared to Change's claims data itself.

ii.      *Use Case #2:  Provider Pricing and Reimbursement*

153.     Provider pricing and reimbursement refers to contracting practices between insurers and providers.  **8/8A**, 103:16-24 (Handel).   When providers are included in insurers' networks, they typically offer insurers discounted rates that are inextricably linked to the volume of patients that the provider receives from the insurer.  **8/8A**, 103:16-24; 128:23-129:4 (Handel). The discounts that insurers negotiate with providers are crucial for lowering insurers' costs.  **8/8A**, 103:25-104:3 (Handel).   United could use Change's claims data to learn its rivals' competitive provider reimbursement strategies because Change's claims data identify the specific insurer, service, negotiated rate, and actual reimbursement paid to the provider.  **8/8A**, 128:13-22 (Handel). Change's claims data are an extremely valuable source of information on the volume of claims between providers and insurers because they frequently contain all the claims sent by a particular provider to a particular insurer.  **8/8A**, 129:5-15 (Handel).[132]

154.     Dr. Handel's testimony about the provider pricing and reimbursement use case was

---

[132] Dr. Handel's conclusions regarding the provider pricing and reimbursement use case are set forth more fully in his expert reports.  **PX-821** ¶¶ 113-114; **PX-946** ¶¶ 49-50.

supported by United's ordinary course documents.  In evaluating the acquisition of Change, United identified the "[u]se of multipayer claims data to track procedure pricing, contracting" as an "opportunity" for Change's claims data.  **PX-207** at 2; **8/8A**, 129:16-24 (Handel).  This use case was also presented to United's then-CEO, David Wichmann, in a memorandum analyzing the transaction.  **PX-944** at -296; *see* **8/8A**, 129:9-24 (Handel).

155.    Although Defendants' expert, Dr. Tucker, purported to identify disclosures under the price transparency rules as an alternative data source for the provider pricing and reimbursement use case, Dr. Tucker conceded that volume is an input into negotiations between payers and providers that is not required to be disclosed under the price transparency rules.  **8/12**, 76:23-77:11 (Tucker).  Dr. Tucker also did not contest any of Dr. Handel's opinions on the limitations of the price transparency disclosures.  **FOF ¶¶** 130.

### iii.    *Use Case #3:  Rivals' Provider Network Designs*

156.    This use case is focused on how insurers construct provider networks.  **8/8A**, 104:4-15 (Handel).  Provider network design includes which providers are in or out of the network, as well as mechanisms such as tiering arrangements to steer patients to particular providers in the network.  **8/8A**, 104:4-15 (Handel).  In commercial insurance markets, provider network design is a key way that insurers differentiate themselves and drive value for customers.  **8/8A**, 104:16-21; 130:15-23 (Handel).  United could use Change's claims data to identify whether providers are in or out of its competitors' networks, as well as to assess whether the network is effective at reducing the cost of care by analyzing information about referral patterns and steering relationships.  **8/8A**, 131:15-132:6 (Handel).[133]

---

[133] Dr. Handel's conclusions regarding the provider network design use case are set forth more fully in his expert reports.  **PX-821 ¶¶** 115-118; **PX-946 ¶¶** 51-57.

157.    Defendants' ordinary course documents confirm that Change's claims data would be valuable for this purpose.  Change analyzed potential uses for its claims data and determined that it could be used by insurers for "network optimization" by "target[ing] physician partnerships to keep costs low and quality high."  **PX-170** at -787; **8/8A**, 132:7-16 (Handel).  Similarly, an analysis by United using its own claims data estimated that United could save more than $▮ million per year by identifying high-performing clusters of providers among cardiologists, which suggests that United could also derive substantial value from analyzing its competitors' network design choices.  **PX-218** at -322; **8/8A**, 132:17-133:11 (Handel).  Third-party testimony also demonstrates that this use case is achievable.  *See* **PX-1018** (90:23-92:2) (Chennuru) (explaining how using supervised machine learning models can be used to classify doctors using any number of criteria and how that information is used as part of the provider contracting process); **PX-1018** (146:10-16, 146:18-18, 150:24-151:11, 151:16-23, 151:25-25) (Chennuru) (explaining how in using de-identified claims data according to the safe-harbor method, one can predict from which providers in a particular geography Anthem members get care).

158.    Although Defendants' expert Dr. Catherine Tucker purported to identify insurers' web sites as an alternative data source for the provider network design use case, Dr. Tucker conceded that those web sites do not provide information on the effectiveness of provider networks.  **8/12**, 77:23-78:14 (Tucker).  Dr. Tucker also conceded that they do not provide information on networks that are customized for national accounts customers, as is typical.  **8/12**, 78:15-79:19 (Tucker).

*iv.    Use Case #4:  Rivals' Claims Adjudication Policies*

159.    Claims adjudication policies are insurers' policies that are applied by insurers to claims to determine whether and how claims will be paid.  **8/8A**, 104:22-105:4 (Handel). These policies are central for implementing insurers' utilization management policies, reducing

administrative waste, and driving value for insurers. **8/8A**, 105:5-12 (Handel). Adjudication policies are reflected in claims edits, and insurers consider custom edits to be competitively sensitive. **8/1A**, 124:10-125:22 (Garbee); **8/8A**, 133:12-134:24 (Handel). United could use Change's claims data to infer its rivals' adjudication policies by looking at the circumstances surrounding the claim, such as the diagnosis and treatment, and analyzing the way that the rival insurer adjudicated the claim. **8/8A**, 134:2-13 (Handel).[134]

160.    Dr. Handel's testimony was consistent with the testimony of knowledgeable executives Dirk McMahon of United and Lynn Garbee, formerly with Cigna, who testified that claims data reflect a health insurer's differentiated, proprietary custom claim edits. **8/9P**, 79:14-24 (McMahon); **8/1A**, 137:24-138:7 (Garbee).

161.    This use case is an example of how machine learning could be used to analyze and derive valuable insights from rivals' claims data, such as by determining, for particular rival insurers, what variables are most important for predicting why the rival accepted or denied a claim. **8/8A**, 121:4-19 (Handel). Machine learning is used to evaluate complex interactions between a large number of factors to find relationships—like those that underlie why claims are accepted or rejected—that would be too difficult by more traditional means. **PX-1018** (63:5-7, 63:10-16) (Chennuru) (explaining how machine learning models can be used to predict whether a claim should be paid and that Anthem does this today), **PX-946** ¶ 33. United has sophisticated artificial intelligence/machine learning capabilities, many of which United already applies to various aspects of its insurance business, as discussed below. **FOF** ¶¶ 167-173. Even Defendants' expert Dr. Tucker agrees that machine learning can be used to predict claims acceptance or rejection.

---

[134] Dr. Handel's conclusions regarding the claims adjudication policy use case are set forth more fully in his expert reports. **PX-821** ¶¶ 119-123; **PX-946** ¶¶ 58-65.

**8/12**, 80:3-10 (Tucker).

162.    Although Dr. Tucker purported to identify publicly available information—such as a Humana "Claims Payment Policy" that she found on the Internet—as an alternative data source for the claims adjudication policies use case, Dr. Tucker conceded that this source of information does not reflect all of the detailed proprietary information found in claims edits.  **8/12**, 80:11-81:12 (Tucker); *see also* **8/1A**, 128:8-129:17 (Garbee) (describing the competitively sensitive information, proprietary nature of Cigna's custom claims edits); **8/1P**, 40:18-44:6 (Lautzenhiser) (same for Aetna).

163.    Indeed, even the Humana policy that Dr. Tucker relied on as an illustration of the purported alternative data source contains a disclaimer—omitted from the excerpt in the demonstrative exhibit that Defendants offered to the Court to accompany Dr. Tucker's testimony—revealing that it is severely limited: it is a "guideline only and does not constitute medical advice, guarantee of payment, plan pre-authorization, an explanation of benefits, or a contract" and that it "does not govern whether a procedure is covered under a specific member plan or policy, nor is it intended to address every claim situation."  **PX-1024** at 1; **8/12**, 82:24-83:17, 84:14-24 (Tucker).  The Humana policy also provides that "claims payments are subject to other plan requirements for the processing and payment of claims, including, but not limited to, requirements of medical necessity and reasonableness and applicable referral or authorization requirements."  **PX-1024** at 2; **8/12**, 85:5-11 (Tucker).  As Dr. Tucker conceded, the Humana policy on which she relied does not contain "the rules for whether a procedure is covered under a specific plan or policy in a specific situation" and "does not contain all the information necessary to determine how a claim would be adjudicated."  **8/12**, 83:25:84:8, 85:12-19 (Tucker).

### *v.    Use Case #5:  Informing UHC's Underwriting*

164.    Underwriting is a process through which insurers assess the medical risk associated

with insuring a potential customer.  **8/8A**, 105:13-18 (Handel).  That risk assessment is then used in pricing insurance products to the customer.  **8/8A**, 105:13-18 (Handel).  As to fully insured customers, for which the insurers bear the risk for medical costs, underwriting is an important driver of profitability for insurers. **8/8A**, 105:19-25 (Handel).  Change's claims data contain rich information that would be useful to United in underwriting new business, including demographic information, geographic information, and detailed information on diagnoses and treatments.  **8/8A**, 135:20-136:11 (Handel).  For many employer groups, United would be able to retain information identifying the employer in de-identified claims data, which would allow it to match the data to a potential customer.  **8/8A**, 135:20-136:11 (Handel).[135]  Moreover, even if the employer's identity were not available in de-identified data, claims data could still be leveraged for underwriting by, for example, providing risk information about the geographic area that is relevant to the potential customer's employees.  **8/8A**, 136:21-137:6 (Handel).  United could use this granular information from rivals' claims data to "meaning[ful]ly improve[] the predictive nature of risk scores," including potential clients that are covered by UHC's "specific rival[s]."  **8/8A**, 135:20-136:11 (Handel).[136]

165.    The underwriting use case is consistent with UHC's business practices, the testimony of its former Chief Underwriting Officer (Mr. Gehlbach), and the documentary evidence.  Claims data is important in underwriting large group commercial insurance for fully-

---

[135] Under HIPAA, de-identification is a process of removing information that identifies specific individual patients from health data.  **8/8A**, 115:5-11 (Handel).  De-identification performed using the expert determination method does not necessarily require removing the identification of an employer.  **8/8A**, 116:24-117:15 (Handel).  The use cases identified by Dr. Handel for Change's claims data and data rights would not require HIPAA violations.  *See* **FOF** ¶¶ 193-194.

[136] Dr. Handel's conclusions regarding the underwriting use case are set forth more fully in his rebuttal expert report.  **PX-946** ¶¶ 66-69.

insured customers because it informs a payer's forecasted medical costs to enable a payer to better assess the risk of groups, set its premiums to account for the risk, and decide which groups to bid on. **8/10P**, 130:15-18, 144:6-21; 155:11-156:6 (Gehlbach).    As Mr. Gehlbach testified, "experience is always king." **8/10P**, 153:20-154:3 (Gehlbach); **PX-434** at -977.  That is, "an incumbent payer that has claims experience with a group has better visibility into the risk profile of that group," **8/10P**, 153:16-25 (Gehlbach), "so the incumbent can more accurately price to the claims trend" than UHC, **8/10P**, 154:4-9 (Gehlbach).  Indeed, UHC's "own claims experience with a group is far more accurate than any risk adjustment tool." **8/10P**, 152:19-153:15 (Gehlbach).[137]  In underwriting large groups, UHC sets its premiums to cover its forecasted medical claims trend and to make a profit.  **8/10P**, 127:4-11 (Gehlbach).  Understanding the claims trend forecast of a group also helps UHC avoid winning a greater share of bad risk.  *See* **8/10P**, 132:5-11 (Gehlbach).  UHC has a history of declining to bid for certain groups that present higher risk and are considered by United to be "undesirable."  For example, in 2021, UHC announced internally a national change (excluding California), that it would no longer underwrite large group business up to 350 employees with risk scores above a certain level calculated by Optum's Group Risk Analytics tool.  **PX-437** at -169-72 ("This change will help with lowering the turnaround time for Underwriting to get undesirable groups off their desk."); **8/10P**, 143:22-145:2 (Gehlbach).

166.    Today, UHC already uses its own claims data for underwriting using sophisticated analytics tools.  **PX-955** at -425; **PX-1030** at -765-66; **8/8A**, 136:15-20 (Handel).  United's evaluation of Change also identified underwriting as a use for Change's claims data, including in

---

[137] *See also* **8/10P**, 115:25-116:4 (Gehlbach) ("Claims experience is still a better predictor of future costs than GRA [underwriting tool], and we've done a retrospective analysis to prove that point."), 152:19-153:1 (UHC does not use the GRA tool to underwrite renewal business).

a memorandum presented to United's CEO, Wichmann.  **PX-944** at -296;[138] *see also* **PX-27** at -719; **PX-54**.  Even Defendants' expert Dr. Tucker conceded that United's existing Group Risk Analytics product, which is "based on machine- learning," "uses de-identified claims data to support underwriting."  **8/12**, 87:17-22 (Tucker).  After the merger, with Change's data and data rights, United will be able to use its advanced capabilities to exploit competitively sensitive information pertaining to its rivals to harm competition by giving UHC an edge in selecting "good risk" and avoiding "bad risk."

> vi.    *United Can Use Its Advanced Analytic Capabilities,*
> *Including Artificial Intelligence/Machine Learning,*
> *to Support Its Efforts to Analyze and Gain*
> <u>*Insights from Rivals' Claims Data*</u>

167.    The evidence at trial showed how United—like other large insurance companies (*see* **FOF** ¶ 174)—can use artificial intelligence ("AI") and machine learning ("ML") to inform underwriting, benefit design, and utilization management. **8/10A,** 64:9-65:11 (Schumacher); **PX-363** at -938.[139]  The evidence also showed that United's Optum business provides data analytics to its UHC business.  **8/4A**, 80:12-81:9; **8/10P**, 71:24-72:5 (Witty).

168.    United already has significant advanced analytic capabilities.  United employs over 500 data scientists, 3,000 analytics professionals, and uses over 2,000 analytic models.  **8/8A**, 122:12-21 (Handel); **PX-821** ¶ 85; *see also* **PX-267** at -943.  United currently applies machine learning to many parts of its insurance business, including, for example, underwriting, claims adjudication, and the identification of claims that are likely to contain fraud, waste, or abuse. **8/8A**, 123:3-21 (Handel); **PX-821** ¶ 86; **PX-267** at -943.

---

[138] Optum's GRA tool was previously known as PURE.  *See* **PX-946** ¶ 66 n. 175**.**

[139]  *See also* **PX-545** at -411 (noting other firm "reverse engineering historical claims to predict payments on new claims").

169.    Contrary to United's position that EDI claims data are not needed or used in underwriting for UHC, United has already created a number of tools that apply advanced analytic techniques to UHC's claims data to help UHC better underwrite claims.

170.    *First*, in 2020, United launched an Underwriting Transformation Project that was designed in part "to help UnitedHealthcare win a greater share of good risk in competing for large group business." **8/10P**, 134:24-135:9 (Gehlbach).   UHC and OptumInsight partnered on this project. **8/10P**, 135:6-15 (Gehlbach).   The Underwriting Transformation Project uses Optum's machine learning and artificial intelligence capabilities to help UHC improve its underwriting for its large group commercial insurance business.   UHC's Chief Underwriting Officer Thomas Gehlbach, while seeking funding for the project, emphasized the role of machine learning and artificial intelligence, stating: "Improved standardization and machine-learning/AI-aided [artificial intelligence-aided] logic will enable UHC to better align price to risk and thereby improve selection and market performance." **PX-436** at 10; **8/10P**, 137:22-138:15.   Mr. Gehlbach also emphasized the importance of moving quickly with underwriting innovation lest UHC "fall behind competition at the point of sale and 'win' a greater share of 'bad' risk." **PX-436** at 10; 8/10P, 138:16-139-3 (Gehlbach).   Mr. Gelbach's request for funding for the Underwriting Transformation Project was approved shortly after this presentation to the Capital Committee. **8/10P**, 139:4-7 (Gehlbach).

171.    *Second*, Optum's Cost Predictor tool, known as "UCP," uses UHC's claims data to help UHC identify specific members who might potentially have a large claim in the future. **8/10P**, 156:2-6 (Gehlbach); **PX-439** at -957.   Optum used UHC's individual claims data to develop UCP. **8/10P**, 157:3-20 (Gehlbach).   Optum and UHC agreed to run UHC's Employer & Individual groups through the UCP tool, stating that "UCP will be a significant improvement to the accuracy

of cost predictions, which will translate to improved profitability and increased retention of profitable groups." **PX-439** at -957; **8/10P**, 156:16-23 (Gehlbach).[140]

172.     *Third*, UHC began using Optum's Group Risk Analytics ("GRA") tool in 2020. **8/10P**, 139:18-22, 140:15-21 (Gehlbach); *see also* **PX-437** at -171.  The GRA tool uses machine learning techniques to produce a risk score to adjust its premium rates to appropriately reflect the expected morbidity of the group.  **8/10P**, 140:15-18 (Gehlbach); **8/12**, 87:17-22 (Tucker).  GRA outperforms other tools to help UHC's underwriting.  **8/10P**, 141:8-12, 141:23-142:4, 142:9-20 (Gehlbach); **PX-433** at -404; **PX-434** at -976.  The GRA Tool is now deployed in all of UHC's markets nationwide; as of June 2022, UHC was using the GRA tool in underwriting new large group business of up to 300 employees when claims experience is not available.  **8/10P**, 140:7-14 (Gehlbach).

173.     *Fourth*, Optum's Portfolio Optimization Tool uses artificial intelligence to analyze claims data for underwriting large group business for UHC.  **8/10P**, 157:25-158:4, 148:4-7 (Gehlbach).  Optum partnered with UHC to develop the Portfolio Optimization tool.  **8/10P**, 147:22-24 (Gehlbach).  Former UHC Chief Underwriter Thomas Gehlbach viewed the Portfolio Optimization tool as the most exciting project he had worked on in quite some time, and testified that it provides a competitive advantage for UHC in its underwriting.  **8/10P**, 148:16-18 (Gehlbach); **PX-434** at -976; **8/10P**, 148:19-149:9 (Gehlbach).  As of May 2021, Portfolio Optimization tool was provided "ahead of the market – exclusive" to UHC.  **8/10P**, 149:10-23

---

[140]   UCP was first deployed by UHC in the third quarter of 2020, and has now been deployed in all of UHC's commercial markets for its fully-insured business.  **8/10P**, 146:23-147:5 (Gehlbach).  Although UHC has deployed UCP nationwide, UHC's former Chief Underwriting Officer was not aware of any other payer that used the tool as of June 2022. **8/10P**, 147:6-15 (Gehlbach).

(Gehlbach); **PX-434** at -976.  In December 2021, Gehlbach reported that Portfolio Optimization had yielded "AMAZING" increased gross margins.  **PX-438** at -850; **8/10P**, 151:15-152:9 (Gehlbach).  As of June 2022, UHC had already deployed the Portfolio Optimization tool in 48 states, but no other payers use the tool.  **8/10P**, 150:6-13 (Gehlbach).

174.    Third-party testimony confirms the value of artificial intelligence/machine learning.  Anthem executive Ashok Chennuru confirmed the value of data combined with artificial intelligence and machine learning to health care payers and providers.  Payers can use supervised machine learning models to classify a plan member into relevant categories, to improve their payment integrity products, and to design provider networks. **PX-1018** (18:10-19:6, 23:1-23:8, 25:3-26:4, 71:11-72:7, 77:21-77:23, 81:13-81:24, 82:16-82:25, 85:11-86:8) (Chennuru). ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████ Machine learning can also be applied to deidentified claims data to learn about a payer's provider utilization in specific geographies.    **PX-1018**  (146:10-146:16,  146:18,  150:24-151:11,  151:16-151:23,  151:25) (Chennuru).  AI-enabled analytics enable payers to predict future events with a greater degree of certainty than traditional analytics. **PX-1018** (18:10-19:02) (Chennuru).  Machine learning models can be used to predict how a payer might adjudicate claims. **PX-1018** (25:17-26:4, 145:2-145:5, 145:7-145:8, 145:10-145:12) (Chennuru).

175.    Although Defendants' expert Dr. Tucker asserted that Dr. Handel overstated the value of artificial intelligence and machine learning to Dr. Handel's use cases, her criticism deserves no weight.  Dr. Handel has professional experience applying machine learning to claims data, unlike Dr. Tucker, who admitted she is not an expert on any particular machine-learning

model and who has never worked with claims data.  **8/8A**, 100:6-15 (Handel); **8/12**, 89:1-16 (Tucker).  Dr. Tucker also conceded that machine learning can be applied to structured data sets, including claims data, and even that machine learning can be used to predict the outcome of claims adjudication.  **8/12**, 79:19-80:2, 90:8-14 (Tucker).  Moreover, Dr. Handel's uses cases do not assume that AI/ML would be the exclusive analytical technique used; for example, United could also use statistical techniques of varying degrees of sophistication, such as regressions.  **8/8A**, 118:14-119:7 (Handel); *see also* **8/12**, 89:21-90:3 (Tucker).

### (e)   *United Would Have an Incentive to Use Rivals' CSI*

176.    The evidence at trial established that after the merger, United would have an incentive to leverage Change's data rights to health insurance rivals' CSI to benefit UHC.

177.    United's incentives would be distinct from Change's incentives today.  Change does not provide "specific information" to payers "about one of [their] competitors."  **8/3A**, 46:13-47:11 (Suther).  That follows naturally from Change's existing incentives: as an independent healthcare IT company, **FOF** ¶ 43, Change cannot afford to share payers' CSI because it would risk losing business with no way to recoup the loss.  **8/9A**, 83:15-84:19 (Gowrisankaran); **PX-947** ¶¶ 88-90.

178.    By contrast, United is a vertically integrated firm with an incentive to maximize its overall profits, not those of any individual subsidiary like Optum.  Mr. Witty, who answers to United's board and its shareholders, has told investors of his goal to drive 13-16% earnings growth over the medium- and long-term.  **8/10P**, 78:24-79:2, 80:11-18 (Witty).  To reach its goals, United balances the impacts of its decisions on its subsidiaries and pursues the path that will benefit the enterprise overall.  **8/10A**, 23:24-24:20; 26:22-27:21 (Schumacher); **PX-353** at -042.  This entails explicit tradeoffs: "in getting to the overall benefit for UnitedHealth Group," a decision "could advantage UnitedHealthcare, the insurance business, while at the same time potentially

disadvantaging Optum." **8/10A**, 27:16-21 (Schumacher).  That is especially so with OptumInsight because only ▇% of OptumInsight's revenue is attributable to external payers.  **8/15P**, 24:13-25:2 (Gowrisankaran); **PX-1036** at 6; **DX-813** at Table 5; *see also* **8/10P**, 84:10-15 (Witty) (approximately 2/3 of OptumInsight's business comes from UHC).  As one Optum Executive Leadership Team member candidly told Mr. Witty, "Honestly, external [is] not a priority for our business, UHC is the number 1 customer."  **PX-615** at -326; **8/10P**, 83:24-84:3 (Witty).

179.    United refers to its "enterprise culture" as its "one United" strategy.  **8/10A**, 14:22-15:5, 18:15-23 (Schumacher).  In practice, "one United" means ensuring "greater alignment between UnitedHealthcare and the Optum business."  **8/10A**, 14:22-15:5, 15:18-25 (Schumacher); **PX-351** at -050; *see* **8/4A**, 31:22-32:3 (Wichmann).[141]  "One United" also means increasing transparency between Optum and UHC, including mandating the sharing of information between the companies.  **8/10A**, 21:21-22:17; 24:15-20 (Schumacher); **PX-352**.  United executives have expressed concern, for example, about the "lack of clarity" on "rights to share internally and externally," *i.e.*, how data can be shared between Optum and UHC.  **8/10A**, 47:22-48:25 (Schumacher); **PX-351** at -050; **PX-360** at -081.

180.    United views data as an "enterprise asset"—not a subsidiary-level asset—and recognizes that "data underpins all enterprise growth priorities and opportunities."  **8/10A**, 52:9-53:1 (Schumacher); **PX-360** at -081, -088.  For instance, Mr. Witty testified that "there have been many examples" where "anonymized data" has been "extremely helpful to create new products,

---

[141] *See also* **PX-551** at -822 (notes from a call between Mr. de Crescenzo and Eric Murphy, former OptumInsight CEO, in which Mr. Murphy described the dynamic between UHC and OptumInsight as "UHC has always said don't sell to us, make sure you give us world-class service and make us your alpha clients for innovation, we know where to find you and we sit in meetings and we are confident you will share new stuff with us…"—which does not reflect a typical vendor-customer relationship).

insights, or service[s]." **8/10P**, 64:16-22 (Witty).  But United executives have long complained about data siloes within the enterprise and have tried to improve access to such data to increase United's competitiveness.  *See*, *e.g.*, **PX-615** at -271, -273, -433; **8/10P**, 86:23-24 (Witty); *see also* **8/10A**, 24:15-20, 47:13-17, 50:18-25, 53:10-54:1 (Schumacher); **PX-353** at -042; **PX-360** at -081-82.  Fragmented data "can't be used as [a] competitive advantage to grow existing business models and identify and capture new business models." **8/10A**, 49:19-50:25 (Schumacher); **PX-360** at -081, -086.

181.    Post-merger, United would have an incentive to use Change's de-identified claims data for which it has secondary use rights to appropriate its health insurance rivals' CSI to benefit United as an enterprise.  **8/9A**, 84:20-85:5, 89:20-90:18 (Gowrisankaran).[142]  As explained above, these data would provide United with valuable insights about its health insurance rivals that would enable UHC to better compete in the relevant commercial health insurance markets.   **FOF ¶¶** 144-166.  Even Defendants' expert Dr. Tucker expects United to balance the incentives of UHC and Optum in the interest of the overall enterprise, **8/12**, 48:7-18 (Tucker), and she agrees that UHC "has at least some incentive, potentially, to obtain and use" the data that United would obtain from Change, **8/12**, 94:25-95:22 (Tucker).

182.    To be clear, to the extent Defendants characterize the Government's CSI theory as alleging that United would "misuse" Change's claims data, which they claim would cause severe reputational harm, they have set up a strawman.  *See* **8/1A**, 77:20-78:9 (Opening Statement); **8/15A**

---

[142] Dr. Murphy appears to argue in his report that United's prior acquisition of Equian suggests United would not use its rivals' CSI here.  **DX-813** ¶ 131.  But the Equian transaction is not an appropriate natural experiment because there is no evidence United obtained secondary use rights to its health insurance rivals' data through that transaction.  **8/15P**, 7:8-8:3 (Gowrisankaran); **PX-947** ¶ 64; **8/4P**, 136:20-22 (Yurjevich); **PX-129** at -132.

(Murphy) (referring to "misuse" or "plaintiffs' CSI misuse theory" 22 times).  The Government does not allege misuse, but rather that United would use Change's data in accordance with HIPAA and its contractual rights.  *See* Compl. ¶¶ 5, 9, 40-44.  The Government's economic expert formed his opinion on United's incentives to use Change's data and data rights on the foundational assumption that United would do so in ways consistent with the law, the acquired secondary use rights, and United's May 2022 firewall policy.  **8/9A**, 98:13-100:6 (Gowrisankaran); **8/9P**, 54:21-55:19 (Gowrisankaran); **8/15P**, 48:3-25 (Gowrisankaran).[143]

183.    While United would gain substantial valuable insights about rival insurers, it is unlikely to lose any incremental payer business from using Change's de-identified claims data for which it has secondary use rights.  **8/9P**, 53:21-54:4 (Gowrisankaran); *see also* **8/9A**, 90:22-92:25 (Gowrisankaran).  To be sure, some of United's health insurance rivals may, as a result of the merger, try to switch away from certain Change solutions in favor of other vendors, **8/9A**, 90:22-25 (Gowrisankaran); **8/15P**, 59:9-12 (Gowrisankaran), although a payer who attempts to switch away from Change's EDI clearinghouse is unlikely to disintermediate Change, **FOF** ¶¶ 111-114. United's competitors "don't always want to partner with Optum because of UHC," **PX-615** at -326; **8/5P**, 90:22-91:4 (Schmuker), a phenomenon that United refers to euphemistically as the "U-factor," **8/10P**, 84:25-85:6 (Witty); **8/4P**, 39:8-11 (Hasslinger); **8/5P**, 88:12-21 (Schmuker).  For example, following United's acquisition of Equian in 2019, Anthem terminated two of three products it purchased from Equian and demoted Equian in the third solution.  **8/15P**, 59:19-60:14

---

[143] As for United's reputation, the company has been sued before, including by state attorneys general, and despite these lawsuits, United has been able to "move[] on" with its business. **8/10P**, 76:9-19 (Witty).  United has not explained why its use of data *consistent* with the law and its contractual rights would devastate its business when lawsuits alleging *actual* legal violations have not.

(Gowrisankaran); **PX-1036** at 12; **PX-109** at -281.  The U-factor is particularly acute among large national payers—"mega payers." **PX-108** at 6-7.  An internal presentation prepared for OptumInsight's then-CEO recounted how 10 out of 23 mega payers were "aggressively anti-UHG" and have "been resistant to a deeper Optum relationship for years." **PX-108** at 6-7.  Mr. Wichmann even mused about renaming United as Optum to "[r]educe[] U-Factor growth limitations." **PX-125** at -562; **8/4A** 89:24-91:24 (Wichmann).  The U-factor persists: after the merger announcement in 2021, in response to a text message from Mr. de Crescenzo about a *New York Times* article entitled "Doctors Accuse UnitedHealthcare of Stifling Competition," a senior Optum executive replied, "The old U-factor as we call it." **PX-521**; **PX-522**; **PX-523**.

184.    Beyond any potential losses attributable to the mere fact of the merger, Optum is unlikely to lose any additional payer business from using Change's data for which it has secondary use rights because, in the absence of knowing exactly how United will use Change's data, "payers will assume the risk that Optum will provide [Change's] data to UHC . . . even if . . . Optum doesn't actually share the data." **8/9P**, 54:21-56:2 (Gowrisankaran).  As demonstrated by the U-factor, other payers, especially UHC's national competitors, already appreciate United's strong incentives to act in its own best interest. **8/9A**, 91:22-92:13 (Gowrisankaran).

185.    Using Change's de-identified claims data for which it has secondary use rights to benefit UHC would not jeopardize United's OptumRx or OptumHealth businesses. **8/15P**, 49:9-18, 50:18-51:7, 51:8-55:2 (Gowrisankaran).  United's main health insurance rivals already have their own vertically integrated pharmacy benefit managers and are not likely to be significant clients of OptumRx. **8/15P**, 52:8-14 (Gowrisankaran).  And health insurers are not likely to switch away from OptumRx to a different pharmacy benefit manager that might hurt their clients on the basis that United is using CSI in compliance with the law. **8/15P**, 51:8-52:7 (Gowrisankaran).  As

for OptumHealth, United's health insurer rivals are unlikely to risk member abrasion—that is, making members unhappy with their insurance product—by switching provider networks due to United's use of CSI consistent with its legal and contractual rights. **8/15P**, 52:15-54:6 (Gowrisankaran); *see also* **PX-1005** (105:2-107:4) (Dill) (minimizing provider network disruption is "really important" to national accounts customers); **PX-117** at -812 ("limited" provider networks hamper UHC's NPS scores); *see* **FOF** ¶ 71.  A rival health insurer who switched away from OptumRx or OptumHealth in response to United's use of CSI in compliance with the law and its contracts would risk lower profits "out of spite," not out of any effort to maximize profits for its shareholders.  **8/15P**, 54:7-55:2 (Gowrisankaran).

186.    In addition, United's OptumRx and OptumHealth businesses are unlikely to lose substantial business because United's main health insurance rivals (Aetna, Anthem, Cigna, and HCSC) do not generate significant revenue for United's overall business.  **8/15P**, 61:12-18 (Gowrisankaran); **PX-820** ¶ 256.  None—indeed, not a single commercial payer—is among United's top 50 customers by earnings.  **PX-1034**; **8/10A**, 126:17-129:25 (Schumacher); **8/15P**, 61:19-62:20 (Gowrisankaran).[144]

### (f)    United's Use of Rivals' CSI
### Would Increase Prices and Decrease Innovation

187.    United's use of Change's data to benefit UHC would harm competition, resulting in higher quality-adjusted prices for health insurance.  **8/9A**, 95:24-96:8 (Gowrisankaran); **PX-820**, ¶¶ 179, 206-214.  The lower quality adjustments, and subsequent higher quality-adjusted

---

[144] OptumInsight and Change's combined revenue for selected products from United's four main health insurer rivals totaled $▮▮▮ million in 2020; this total is dwarfed by United's $60 billion in commercial health insurance revenue and its $285 billion in total revenue. **8/15P**, 62:21-65:5 (Gowrisankaran); **PX-1036** at 13-14; **PX-1035**, Exh. C.

prices, that would likely occur if the merger takes place are relative to innovative improvements that would occur if United does not acquire Change's data and data rights. **PX-820** ¶ 206.

188.     In particular, the Government's economic expert Dr. Gowrisankaran testified that the claims data that pass through Change's EDI clearinghouse reveal insurers' "sources of competitive advantage" concerning their "provider networks" and "processes that help optimize care." **8/9A**, 73:9-74:1 (Gowrisankaran); *see also* **FOF** ¶¶ 95-98. These sources of competitive advantage reflect insurers' innovations toward "how to develop health insurance that offers high-quality services at low cost"—as "everybody wants" in the marketplace. **8/9A**, 74:2-12 (Gowrisankaran); *see* **FOF** ¶¶ 71-76 (summarizing fact witness testimony about how commercial health insurers compete). As Dr. Gowrisankaran explained, United's competitors, knowing that United will be able to "appropriate or free-ride off of those innovations," will "invest less in innovation" because they will have "less of an incentive to innovate." **8/9A**, 75:5-17 (Gowrisankaran); *see also* **8/9A**, 88:15-89:3 (Gowrisankaran). Dr. Gowrisankaran's concerns about free-riding are borne out by Ms. Garbee, formerly with Cigna, who testified about the concern of rival insurers "piggybacking" off of Cigna's innovations. **8/1A**, 128:17-129:1 (Garbee).

189.     Competition in the relevant markets will be harmed because "regardless of what United's going to do, United's rivals are going to think that United will act in its own interests." **8/9A**, 91:13-92:25 (Gowrisankaran). Just as United would have an incentive after the merger to use its rivals' CSI (*see* **FOF** ¶¶ 176-186), United's rivals would have, and would be expected to act on, their reduced incentives to innovate.

190.     In response to evidence that this merger would harm competition in the relevant health insurance markets by reducing UHC's rivals' incentive to compete, Defendants take aim at

a straw man—mischaracterizing the Government's position as that the merger would stop innovation altogether in the relevant markets, despite testimony that rival payers would continue to compete.  That straw man has never been the Government's position.  Instead, the Government has undertaken to and did prove that the merger is "likely to substantially reduce competition in the relevant health insurance markets relative to the but-for world of no merger."  **8/9A**, 12:19-13:15 (Gowrisankaran).

### 4.    Defendants' Proposals
###       <u>Would Not Resolve this Illegality</u>

191.    Defendants claim that United is unlikely to make use of the data rights it will secure through this transaction, and that it will adhere to a variety of promises—including purported customer "commitments" and a firewall policy enacted in the shadow of litigation—that would prevent such use or harm from use.  None of these supposed impediments—in reality, a variety of unilateral, unenforceable promises—poses a real obstacle to United's use of Change's claims data and accompanying data rights, and United has not carried its burden to show they eliminate the competitive risk.  As shown below:

- HIPAA would not forbid United from using information gleaned from Change's de-identified claims data.  **FOF ¶¶ 193-194.**

- No contractual obligations would forbid post-merger United from using information gleaned from Change's claims data to benefit UHC.  **FOF ¶¶ 195-201.**

- Both United's made-for-litigation Firewall Policy and other security policies, and Defendants' "customer commitments" made shortly before trial, fail to mitigate the harm from competition.  **FOF ¶¶ 202-216.**

- United's track record of data governance failures underscores the likely harm to competition and undermines Defendants' claim that United's use of rivals' competitively sensitive information to benefit UHC is unlikely.  **FOF ¶¶ 217-223.**

> **(a)**     ***Neither Law nor Contract Would***
> ***Restrict United from Gaining Insights from Rivals' Claims Data***

192.     Through this transaction, United would inherit Change's "unfettered" data rights, which provide the ability to use or disclose deidentified data "unless prohibited by applicable law." But neither "applicable law" nor any other restriction would strip United of the ability to derive competitive insights from the data here.  At trial, Defendants identified only two purported legal constraints—contractual language and HIPAA, **8/3A**, 127:23-128:7 (Suther)—and the evidence established conclusively that neither would have the effect Defendants claim.

193.     *First,* Defendants have identified no "applicable law" that would prevent the use and disclosure at issue here.  The only specific law or regulation to which they pointed was the HIPAA Privacy Rule.  *See, e.g.*, **8/3A**, 127:23-128:7 (Suther).  But HIPAA is no impediment. HIPAA expressly permits the use of de-identified data.  **8/2P**, 102:14-23 (Suther); **8/3A**, 45:16-23 (Suther).[145]  And the process of deidentifying data under HIPAA does not require United to excise from Change's claims data the fields necessary to derive rivals' competitively sensitive information (like payer ID, information on treatments and diagnoses, all the financial information associated with the claim, and information as to which claims were originally denied and later accepted).[146]  In addition, under the flexible "expert" method of de-identification authorized by HIPAA, which Optum uses to de-identify its secondary-use databases, deidentified claims data may retain other information, such as employer ID.  **8/8A**, 116:24-117:15 (Handel); **8/5A**, 137:23-

---

[145] De-identification refers to a process of removing data that would have more than a minimal risk of being used to identify a specific individual.  **8/8A**, 115:5-11 (Handel).  This is a small subset of information from claims data and does not include the competitively sensitive information that otherwise is present in the claims data that can be analyzed and used.

[146] **8/8A**, 117:19-118:5 (Handel); **PX-821** at 51; **8/2P**, 103:4-23 (Suther); **8/3A**, 35:9-12 (Suther); **PX-1012** at 23.

25 (Dumont); **PX959** at -348.

194.     The evidence at trial established that United could derive all of the insights necessary for the use cases based on claims data de-identified in accordance with HIPAA.  **8/8A**, 124:12-14 (Handel).[147]

195.     *Second*, Change's counsel has suggested that Change's data rights are subject to confidentiality provisions in its "Master Relationship Agreements" and similar agreements.  **DX-843** at -366; *see* **8/3A**, 21:3-13 (Suther).  But this argument conflicts with the plain language of Change's contracts and Change's data licensing practices.

196.     The boilerplate confidentiality provisions in the Master Relationship Agreements do not mention data at all, and are in any event subordinate to Change's broader "business associate agreements ('BAAs')," which specify that they "modif[y]" the underlying agreements and "govern in the event of conflict or inconsistency" with other provisions.  **PX-460** at -613 (§ 9.6 of Change Enterprise BAA).  Those BAAs, in turn, are clear: Change may de-identify data under the HIPAA Privacy Rule and "Use or Disclose such de-identified data unless prohibited by applicable law." **PX-460** at -610 (§ 2.4 of Change Enterprise BAA).

197.     Other provisions confirm the conclusion that the BAAs control:

- The boilerplate confidentiality clause not only does not mention data or data rights, but makes clear that it does not govern "the use and disclosure of Protected Health Information," which "will be governed by a business associate agreement between the parties."   **DX-843** at -366, -373 (definition of "Confidential Information" expressly excludes PHI); *see also id.* at -366

---

[147] Dr. Handel is highly experienced with the use of claims data and in particular with the de-identification process, having served as an "expert determiner" for the de-identification of claims data.  **8/8A**, 99:8-16 (Handel).  Dr. Handel's opinion about de-identification is consistent with the relevant HIPAA regulations and more credible than the skepticism of Defendants' rebuttal expert, Dr. Tucker, who is not a HIPAA professional, has never served as an "expert determiner," and has never even worked with claims data.  **8/12**, 63:21-24, 64:4-8, 89:11-16 (Tucker).

(recognizing the MRA creates exceptions to the confidentiality clauses); Change's BAAs likewise reiterate that they govern the use or disclosure of protected health information. **PX-460** at -609-10. Because the de-identification of protected health information is considered "use" of those data under HIPAA, 45 C.F.R. § 164.502(a)(iii), the BAA controls;

- Unlike the MRA's confidentiality clauses, Change's rights to deidentify and use data "unless prohibited by applicable law" in the BAAs do not reference any confidentiality clause or any other potential qualification. **PX-460** at -610 (§ 2.4); and

- At trial, defendants failed to adduce any clearinghouse contract with a different structure, instead relying on a template Master Services Agreement that *does* follow this pattern while crucially omitting the accompanying BAA. **DX-843** at -366; *see* **8/3A**, 21:3-13 (Suther).[148]

198.     Change's current business practices refute any claim that the confidentiality clauses would prevent United from making use of CSI pertaining to its rivals.

199.     For one, when Change monitors its data rights in the ordinary course—its "batting average"—it does not discuss this confidentiality provision as a barrier, but instead describes its rights as "unfettered." **PX-166** at -427, -431 (explaining data rights batting average); **PX-167** at -070; **8/2P**, at 113:18-24, 116:5-117:10 (Suther).  Change does not use customers' data for secondary purposes "unless it has unfettered secondary use rights." **8/2P**, at 115:20-22 (Suther).

200.     For another, even today, Change licenses certain de-identified claims data to

_____

[148] Other Change clearinghouse contracts granting data rights are remarkably consistent despite spanning several decades. *See, e.g.*, **PX-510** at -083-85; **PX-628** at -015-17; **PX-629** at -080-82; **PX-632** at -839-40, -843; **PX-633** at 076-77, -080; **PX-634** at -447-48, -451; **PX-736** at -869-71; **PX-967** at -833-35; **PX-969** at -320-22; **PX-970** at -626-28; **PX-971** at -777-79; **PX-972** at -824-25; **PX-977** at -040-42.  Indeed, Change does not classify its contracts as granting data rights or include them in its data rights shares if there is "any material abrogation in rights, regardless of severity."  **PX-1040** (38:24-39:8) (Trotti Change 30(b)(6) testimony); *see also id.* at 38:19-23 (clarifying that an "abrogation" refers to any "restriction on our ability to deidentify and use Protected Health Information once deidentified").

aggregators like LexisNexis.  **PX-455** at -025.[149]  If, as Change's counsel intimates, the confidentiality clauses restrict such uses, Change is currently breaching them by "disclos[ing]" such data to aggregators.  **DX-843** at -366.  Unsurprisingly, throughout its extensive assessment of Change's data rights, United never suggested that Change's boilerplate confidentiality clauses limited the unfettered data rights granted by its BAAs.  *See generally, e.g.*, **PX-945**; **PX-58**; **PX-944**.  Defendants' effort to find protection in boilerplate confidentiality provisions is unsupported by facts, refuted by logic, and clearly derived for litigation purposes.

201.    Finally, Defendants' expert (Dr. Murphy) suggested that United's agreements with national payers would prohibit United from using their data, because the master service agreements with those payers contain also contain confidentiality clauses.  **DX-862** at 21.  This is wrong; Change's data rights derive largely from providers and their channel or trading partners, not payers.  **PX-947** ¶ 12; *see* **FOF** ¶¶ 112-113.  United's agreements with payers would not prevent United from using data rights acquired from other sources.  *See generally* **FOF** ¶ 111-116 (describing this dynamic); **DX-385** at -080 ¶ 10.3(iii) ; **DX-370** at -207 ¶ 7.4(c) ; **DX-468** at -207 ¶ 1.4 (iii); **DX-314** at -352 ¶ 7.4(c).

### (b)    *The Proposed Firewalls*
### *Would Not Rectify the Harm Here*

202.    United did not develop a firewall policy addressing the Change transaction until May 12, 2022—mere months before trial.  **PX-599** at -682 (version "1.0" of policy dated "05/12/2022" ("Firewall Policy")); **8/5P**, 56:5-10 (Dumont); **8/10P**, 51:4-17, 53:25-54:2 (Witty).

---

[149]  To be clear, Change carefully vets licensees' use of its data.  *See* **8/2P**, at 121:8-22 (Suther); **PX-1040** (41:10-25, 124:19-126:25) (Trotti Change 30(b)(6) testimony).  But if the boilerplate confidentiality restricted Change's unfettered data rights, nothing in the confidentiality clauses would distinguish between disclosures to data aggregators and payers. **DX-843** at -366.

The May 2022 Firewall Policy was created, as an Optum executive admitted, "to focus on the concerns that were being raised at the time"—in other words, this lawsuit. **8/5P**, 40:11-19 (Dumont). Defendants introduced no evidence showing that United would have instituted such a policy but for the lawsuit. And no evidence shows that United's nonbinding, tailored-for-litigation policy would remain in place, or the same, if the proposed merger were consummated. For example:

- Nothing in the policy prevents United from withdrawing or modifying it. **8/10P**, 64:23-65:4 (Witty). As Mr. Dumont admitted, United's May 12, 2022 policy "contemplates . . . that there will be modifications" in the future. **8/5P**, 58:12-22 (Dumont).

- United has also given no assurance that it would not change its policies after the merger. **8/10P**, 34:9-18 (Witty). To the contrary, United witnesses acknowledged that United's policies and strategy can change. **8/10A**, 12:18-13:9 (Schumacher); **8/10P**, 67:15-69:4 (Witty).[150]

- After the merger, United would have an incentive to write policies in such a way that maintains United's ability to use rivals' competitively sensitive information for United's business purposes to maximize the value to its shareholders. **8/9A**, 99:12-24 (Gowrisankaran).

- Defendants propose neither court order nor independent oversight to ensure that any firewall remained in place. *See* **PX-599**.

203.   Even assuming (without evidence) that the Firewall Policy would remain in place without modification, it would not prevent United from using claims data to compete with UHC's rivals for at least eight reasons:

- *First*, by their terms, the "guidelines" set forth in the Firewall Policy prohibit at most the "use" or "disclosure" of "External Customer CSI" to "UHG business units that are competitors of such External Customers." **PX-599** at -683. But Change's claims data and data rights generally come from providers, channel partners, and trading partners. **FOF** ¶¶ 112-114. In other words, they do not generally come from competitors of the relevant "United business unit," UHC.

---

[150]   *See also* **8/10P**, 66:1-11 (Witty) (as CEO of United, Mr. Witty is entrusted to "pivot" away from a path not proving to be profitable).

**8/10P**, 55:15-56:18 (Witty).  Thus, neither use of the claims data by UHC nor disclosure to UHC would violate the Firewall Policy even by its terms.

- *Second*, as its CEO acknowledged, United believes that there can be legitimate business reasons to use External Customer CSI, **8/10P**, 63:18-64:7 (Witty), which the Firewall Policy contemplates by expressly permitting United to make "exception[s]" that would negate any applicable prohibition.  **8/10P**, 64:8-15; **PX-599** at -683.  In creating this loophole, the Firewall Policy does not articulate any standard to guide such exceptions.  **8/10P**, 63:22-25; **PX-599** at -683.

- *Third*, United's policy lets United lawyers control how to interpret gray areas, and there are many.  For example, the policy leaves to the discretion of Optum and its internal legal counsel how to identify the legitimate business reasons above, **8/10P**, 64:8-64:15 (Witty); **PX-599** at -683, and does not even purport to preclude United from making an exception for the purpose of sharing rival payers' CSI with UHC.  **8/10P**, 64:16-64:22 (Witty).

- *Fourth*, the Firewall Policy does not cover all relevant United employees.  By its terms, "Covered Individuals" under the Firewall Policy are only "all employees of either Optum Insight or Change, post acquisition"—not UHC or other United employees.  **PX-599** at -683; **8/10P**, 54:7-13, 55:6-11 (Witty).  Nor are United's top executives covered by the Firewall Policy.  *See* **8/10P**, 54:18-24 (Witty) (United's CEO acknowledged that he was not a covered employee).

- *Fifth*, although United's Firewall Policy provides for a semi-annual review of United's access management system to monitor whether there has been unauthorized access, **PX-599** at -684; 8/10P, 57:15-19 (Witty), this review would not resolve the concerns with United's use of CSI from EDI clearinghouses, channel partners and providers because it is not prohibited by the firewall policy.  Moreover, the entitlement review is limited to checking systems access against role-based permissions; it does nothing to detect whether employees have shared confidential information orally, whether by phone, email, instant message, or in person.  **8/10P,** 57:20-58:10 (Witty).

- *Sixth*, United's firewall policy also does nothing to prevent executives' frequent movement between, and collaboration across, subsidiaries. United's practice of rotating employees throughout the organization was prioritized by Mr. Wichmann and persists today.  **8/4A**, 17:4-15 (Wichmann); **8/9P**, 64:20-65:1, 65:2-15 (McMahon).  The movement of employees throughout the enterprise creates a potential for the use or misuse of information.  **8/4A**, 38:21-39:10 (Wichmann).  As United has itself explained in unrelated litigation, employees "cannot unlearn [a subsidiary's] pricing strategies, formulas and pricing factors" or perform their jobs "without capitalizing on that information."  **PX-1031** ¶ 43.  Mr. McMahon, for example, agreed that he hadn't "forgotten the knowledge and insights that [he'd] learned at one of United's businesses when [he'd] gone to work for another one."  **8/9P**, 65:8-15 (McMahon).

- *Seventh*, employees of Optum and UHC regularly collaborate by, for example, attending monthly business review meetings. **8/4A**, 27:15-25, 31:22-32:3 (Wichmann); **8/10P**, 59:16-60:19 (Witty); *see, e.g.*, **PX-114**; **PX-118.** The Firewall Policy does not prohibit this collaboration. **8/4A,** 32:9-19 (Wichmann); **8/10P**, 63:10-17 (Witty).

- *Finally*, although the Government's contentions do not require a policy to be breached or data to be misused, nothing about the Firewall Policy would prevent breaches or misuse. *See* **8/4A**, 33:5-16 (Wichmann). As an initial matter, United's employees would need to be informed of the Firewall Policy to follow it, but the evidence at trial demonstrated that not even all of United's senior management—even senior "Covered Individuals"— are aware of it. For example, OptumInsight's CEO had not seen the policy created in May at the time of trial. **8/4P**, 29:23-30:14 (Schumacher). Further, firewalls and data governance policies can be breached. As set forth below, United has a history of data governance failures. **FOF** ¶¶ 217-223. Any violations would be impossible to detect, and even if detected, the internal policy does not create any remedy to compensate the affected parties, let alone redress the harm to competition. *See* **PX-599**.

204.    These deficiencies in the new Firewall Policy were far from accidental. They exist even though United issued the Firewall Policy in the heat of this litigation, knowing that it would be scrutinized by this Court. After this litigation ends, however, United's lawyers and executives will determine how to address and resolve "gray areas." **8/10P**, 78:3-15 (Witty).[151] The Court should not assume that they will interpret "gray areas" in a way that does not maximize United's interests as a for-profit enterprise. *See, e.g.*, **8/10P**, 78:3-79:2 (Witty).

205.    While Defendants at trial alluded to a preexisting "framework" of policies, **8/5P**, 56:19-23 (Dumont); **8/10P**, 51:15-52:4 (Witty), the only policy discussed by Defendants at trial was an antitrust compliance policy. *See* **DX-529**. That policy simply instructs employees to "[a]void disclosing customer or supplier information to other Business Units without prior approval from an attorney or compliance officer assigned to your Business Unit." **DX-529** at -

---

[151]    *See also* **8/10P**, 76:20-77:4 (Witty) (admitting that one considers the risk and the reward of going down a certain path).

327.  Apart from its vagueness, the policy plainly requires nothing more than consultation—again, with lawyers and compliance personnel who are ultimately beholden to United as an enterprise.

206.    Defendants further assert that United implements technological access controls and similar restrictions that effectively act as firewalls.  As discussed below, these contentions hold little water in light of United's track record of data governance failures, including unauthorized database access.  **FOF ¶¶ 217-223¶¶**.  Moreover, like the Firewall Policy itself, these restrictions are subject to change at any time.  Perhaps most importantly, the Government's case does not depend on potential misuse by rogue actors, but instead on United's incentive to maximize its enterprise value using its resources, including the data and data rights it would acquire with Change.

### *(c)    Purported "Commitments"*
### *Would Not Rectify the Harm Here*

207.    Nor would Defendants' purported "commitments" to Change's EDI customers address the competitive harms of this transaction, because they would not bar United from gleaning usable insights about rivals from Change's claims data.  *See* **DX-686**; **DX-786**.

208.    The "commitments"—instituted, like the Firewall Policy, in the shadow of trial (Defendants did not send them to customers until between May 27 and June 1, 2022, **8/2A**, 132:25-133:3 (de Crescenzo))—were written by United's lawyers and for United's benefit, not third parties.  *E.g.*, **8/10P**, 32:14-33:6 (Witty).  They are woefully incomplete, vague, and malleable, offering United the ability to pursue its interests around the commitments.  For these and other reasons, they fail to address the competitive harms associated with United's gaining control over Change's EDI clearinghouse, claims data, and data rights.

209.    *First*, the customer commitments merely amend Change's "Master Services Agreements" or similar agreements and explicitly incorporate the definition of "Confidential

Information" found in those agreements.  **DX-686** at -893.  But, as explained already, those contracts do not govern the use and disclosure of claims data, which instead are governed by Change's business associate agreements that grant unfettered rights to deidentify and use claims data "unless prohibited by applicable law."  **FOF ¶¶** 196-197.  Not only does United's commitment maintain Change's unfettered rights in those business associate agreements, but the commitment makes clear that those contracts "shall remain unchanged and shall remain in full force."  **DX-686** at -893.  United's decision to structure its commitment in this manner is particularly telling considering the parties knew well before this litigation that the United States rejected Change's suggested interpretation of the confidentiality clauses in the "Master Services Agreements."

210.   *Second*, United's commitments exclude payers whose data flow through Change's network but that do not contract directly with Change.  By its plain terms, United's commitments extend only to Change's direct customers, and even then, only to the "Customer's Confidential Information."  **DX-686** at -893, *see also* **DX-686** at -891 (letter addressed to "Change medical electronic data interchange clearinghouse customer[s]");  **8/10P**, 50:12-22 (Witty).   The commitments therefore do not cover the confidential information of payers that lack a direct contractual relationship with Change for EDI clearinghouse services, such as Anthem and HCSC, even though a significant share of these large payers' claims data passes through Change's network.  *See* **8/2P**, 31:17-20 (de Crescenzo) (confirming that "data flows over [Change's] network from companies that don't have contracts with Change"); FOF ¶¶ 93 n113.

211.   *Third*, even if a payer has a direct relationship with Change, United's supposed commitment to these payers would not restrict United's data rights acquired from providers, channel partners, or trading partners.  Recall that many payers already do not grant data rights to Change; Change's large swath of data rights for these payers comes instead from Change's

clearinghouse relationships with channel partners, trading partners, and providers.  **FOF ¶¶** 112-114.  The commitment carves out these third-party sources of claims data by adopting the underlying agreements' definition of "Confidential Information," which excludes "information lawfully obtained . . . by the receiving party" from other sources without breach of confidence.  **DX-843** at -373.  As a result, even if payers contract directly with Change, like Cigna and Aetna, the commitment provides them no assurances that United would abstain from using Change's claims data about these payers to benefit UHC.[152]

212.  *Fourth*, as unilateral promises unsupported by consideration, the customer commitments are unenforceable.  *See* **8/2A**, 136:13-16 (de Crescenzo) (customers have to pay "[a]bsolutely nothing" to receive the commitment); **8/3A**, 127:6-19 (Peresie) (contracts typically last for approximately three years, with auto-renewal provisions); **COL ¶** 248.  With its bevy of lawyers, United would understand this basic contractual point.  Nor has United made any commitment, in a consent decree or otherwise, to maintain these commitments in the future.  If the transaction closes, nothing would prevent United from retracting these commitments in new or renegotiated contracts.  **DX-686** at -893 ("Once the Amendment is effective, it shall remain in effect for the remainder of the term of the Agreement."); **8/10P**, 34:19-35:4 (Witty).

---

[152] To the extent that United argues that providers will enforce the commitment for the benefit of payers, that argument defies both the customer commitments and common sense.  As discussed, Change owes much of its strength to its relationships with channel and trading partners, rather than direct relationships with providers.  Even if a provider (or a channel or trading partner) has a direct contractual relationship with Change, that party could only protect its "Confidential Information," which is hardly coextensive with the insights that United could glean from Change's claims data about payers.  And providers, channel partners, and trading partners have little incentive—and would face tremendous costs—in trying to enforce United's commitments in order to protect payers' competitively sensitive information.

213.   *Fifth*, the commitments leave undefined the term "commercially reasonable firewall and information security policies," which United's lawyers would be able to interpret to United's advantage.  **DX-686** at -893, § I; **8/10P**, 39:1-11 (Witty); **8/2P**, 32:9-19 (de Crescenzo).  Optum executives and its counsel would interpret these vague terms in the first instance.  **8/10P**, 39:19-24 (Witty).  Tellingly, United refused to represent that it would not change its made-for-litigation firewall policy, or any other firewall and data security policies, in the future.  **8/10P**, 34:4-18 (Witty).[153]

214.   *Sixth*, the commitments give Change's EDI customers no right to audit United's use of claims data.  Although they refer to "existing contractual rights to audit," not all of Change's EDI customers currently have audit rights, and the "commitments" do not extend any new audit rights to customers who lack them.  **DX-686** at -893, § I; **8/10P**, 40:9-12 (Witty); **8/2P**, 33:12-24 (de Crescenzo); *see* **8/2P**, 28:15-18, 34:5-8 (de Crescenzo).  Even if a customer has audit rights, those rights would not cover information about those payers acquired from Change's other clearinghouse customers.[154]  Instead of granting full audit rights to all affected payers, the "commitments" merely assert that United will, if requested, "conduct a review of Customer's Confidential Information" and provide a report to Change's customer.  **DX-686** at -893.  But what this internal "review" would entail is not defined in the "commitments," and would thus be decided by Optum's executives and lawyers.  **8/10P**, 40:17-41:5 (Witty).  Without audit rights, Change's

---

[153]   Setting aside the cover letter's assertion that United had "these same firewall and data security policies" "[f]or years," the amendment embodying the commitments says nothing about "these same" policies and refers only to "commercially reasonable" policies, a term that is vague and malleable by United as shown above.  **DX-686** at -893, § I.

[154]   *See, e.g.*, **DX-314**, at -358 (granting audit rights only "to confirm Optum's compliance with Optum's obligations *under the Agreement . . . relating to Customer's data*" (emphasis added)).

customers would have no meaningful ability to evaluate whether and how their CSI would be used by United.[155]

215.     These deficiencies reflect United's strong incentives to use Change's data. United's lawyers drafted these commitments in full view of the Government's complaint and concerns about data use.  The obvious explanation is that United sought to preserve its flexibility to use Change's data as it sees fit.  *See, e.g.*, **8/10P**, 32:9-33:6, 35:20-22 (Witty) (admitting that United's "careful" and "precise" lawyers work to protect United's interests).

216.     Indeed, United's "careful" and "precise" lawyers know how to exploit contractual terms to United's benefit.  For example, when one of Optum's external payer customers raised concerns about Optum potentially sharing its data with UHC, United would only agree to monetary compensation upon disclosure of the data if the payer could first show that Optum "intentionally discloses (A) in writing; or (B) via electronic data transfer" its data to UHC.  Nor could the payer even disclose the existence of the contractual term lest it become invalid.  Optum's executives expressly sought to place a "high burden of proof" on their customer, and United's lawyers delivered.  **8/4P**, 121:21-132:17 (Yurjevich); **PX-993** at -823-24; **PX-132** at -649-58.

### (d)     *United's Past Data Governance Practices* <u>*Undermine Its Promises of Future Protection*</u>

217.     United's assertion that its corporate culture and reputational concerns would prevent it from using insights from rivals' data is undermined by its data governance practices.

218.     *First*, United has repeatedly granted UHC employees or Optum employees assigned to UHC projects access to sensitive data of external competitors.  Despite claiming at

---

[155] Based on the return responses from Change's customers as to the commitments, customers themselves harbor concerns about the commitment—87% of Change's customers have not signed the amendment.  *See* **DX-0214S**.

trial that its antitrust compliance policy prohibited sharing external payers' data with UHC, United classified many fields of the external payer data, including the "covered amount" (meaning essentially the allowed amount), as "standard" fields available in many different "views" of its secondary-use databases.   **PX-1042** (171:6-172:18) (Dumont United 30(b)(6) testimony). United's permission logs reveal that the employees granted access to external customer data have included:

- A Director of Healthcare Economics for United's commercial health insurance business (**PX-668**, rows 15851-56 and 17385-88; **PX-670**, rows 7386-436; *see also* **PX-962** at -587-89);

- A Healthcare Economics Consultant for UHC Networks (**PX-668**, rows 16330-34; **PX-670**, rows 18728-48; *see also* **PX-962** at -589);

- A Director of Data Science for UHC's Government Benefit Operations Segment. (**PX-668**, rows 5043-48 and 13806-15; **PX-670**, rows 6059-109);

- A Director of Data Analytics for UHC's Clinical Services Segment. (**PX-668**, rows 4122-27 and 14170-80; **PX-670**, rows 25282-332; *see also* **PX-962** at -589);

- A Business Analyst Consultant for UHC's Medicare and Retirement segment (**PX-668**, rows 5956-61 and 15293-15298; **PX-670**, rows 9419-60);

- A Senior Manager of Data Science for UHC's Clinical Services Segment. (EE 668423) (**PX-668**, rows 4952-54 and 17396-98; **PX-670**, rows 29650-29664; *see also* **PX-962** at -589);

- An Associate Director of Business Analysis for UHC's Payment Integrity Strategic Performance Division (**PX-668**, rows 3819-20 and 13087-88; **PX-670**, rows 3707-57);

- A Senior Director of Actuarial Services for UHC's Medicare and Retirement Underwriting and Healthcare Economics Division. (**PX-668**, rows 2769-73 and 17425-29, **PX-670**, rows 20798-831; *see also* **PX-962** at -589);

- An OptumInsight employee who received access for "a contract with United Healthcare Employer & Individual to provide de-identify [sic] benchmarking data" (**PX-668**, 6348-51; **PX-1032**, rows 6348-51; *see* **8/5A**, at 154:23-157:16 (Dumont));

- An OptumInsight employee who received access for "a funded agreement with

110

UHC to do cost predictions for various groups from E&I," which is UHC's commercial health insurance business (**PX-668,** rows 8891-96 and 14051-56; **PX-1032**, rows 8891-96 and 14051-56); and

- An OptumInsight employee who indicated that "currently access is required to fulfill my role to pull and analyse [sic] data for a UHC group pricing project." (**PX-668**, rows 3812-18; **PX-1032**, rows 3812-18; **PX-670**, rows 7692-742).[156]

219.    United's recordkeeping failures make it practically impossible to assess the extent and frequency of improper access.  United has no access logs for its dNHI database—an Optum database containing de-identified claims data—before May 2021,[157] approximately three months after the Government's investigation began.  **8/5A**, 162:7-9 (Dumont).  To compensate, United merely asked employees orally whether they accessed the non-UHC data, without confirming anything in writing.  **PX-1042** (220:3-221:5) (Dumont United 30(b)(6) testimony); **8/5A**, 162:13-18 (Dumont).  United did not notify any of the external customers whose data resided in these servers, such as Anthem, that it granted UHC-affiliated employees access to their data.  **PX-1042** (228:18-229:3, 229:22-230:13) (Dumont United 30(b)(6) testimony); **PX-665** at 2.

220.    At times, United has authorized access even when squarely prohibited by contract.

---

[156]  Despite claiming at trial that it removed payers' identities in these databases, *see* **8/5P**, 30:16-19 (Dumont), United actually assigned each payer a "data supplier code" whose referent is apparent.  **PX-1042** (157:14-16) (Dumont United 30(b)(6) testimony); **PX-655** at 2.  For example, all the BlueCross plans follow the nomenclature "X" followed by the name of the state or region the payer covers—*e.g.*, XMA01 for BlueCross BlueShield of Massachusetts, XNC01 for BlueCross BlueShield of North Carolina, XKC01 for BlueCross BlueShield of Kansas City, and XLA01 for BlueCross BlueShield of Louisiana.  **PX-665** at 2.  Likewise, United referred to Anthem as "ANT04."  *Id.*

[157]  For the period from May through October 2021, United provided only a partial access log that omitted employee numbers and Req IDs, making the data impossible to match for a large share of employees.  Thus, the only access log that the Government could effectively use begins in November 2021.  Even the data on employees' access rights lack information on a substantial share of employees' email domains and roles within United from PeopleSoft.  *See generally* **PX-668**; **PX-670**; **PX-1032**.

Under OptumRx's contracts with its external customers, "UHC employees are not allowed to see or use the non-UHC book of business." **PX-60** at -638. Contrary to these agreements, United granted "a handful" of UHC-affiliated employees access to the OptumRx external customer data in dNHI. **PX-60** at -636. A manager responsible for maintaining dNHI, Timothy Josephson, informed Mr. Dumont about improper access in January 2021, adding he "was not aware of the restrictions on access to the non-UHC OptumRx claims." **PX-60** at -636. In response, Mr. Dumont responded, "I'm [sic] don't have serious concerns" because the "data is de-identified in compliance with HIPAA, not PHI." **PX-60** at -636. There is no evidence that United ever notified its external customers that it breached its commitments by granting UHC-affiliated employees access to this OptumRx external customer data.[158]

221. Further, UHC employees have accessed external customer data as recently as March 2022. In a "very, very concerning" incident, UHC employees both were "able to access their competitors['] data," **PX-673**; **8/5P**, 64:7-65:9, 65:25-66:10 (Dumont), and "actually copied [such data] over into UHC's own case tracking system," **PX-674**; **8/5P**, 68:22-69:18 (Dumont). These "scary" breaches reflect the lack of safeguards implemented by Optum: an administrative employee merely asked "requesters [to] sign a confidentiality agreement that they won't look at things they shouldn't," which another employee acknowledged was "worthless without technical control in place to block access" because employees "can play dumb." **PX-676**; **8/5P**, 67:18-68:21

---

[158] When confronted at trial with evidence of this January 2021 incident, Mr. Dumont contended that the only affected employee was Ms. Love, who had left UHC for Optum. **8/5A**, 145:13-146:9 (Dumont); **8/5P**, 3:17-23, 30:18-25 (Dumont). But the email exchange reflects that Ms. Love's request for approval of a project had simply prompted the discussion of the "handful" of UHC-employees with access to the external OptumRx data. **PX-60** at -636, -638, -643; **PX-61**. Unlike at trial, Mr. Dumont recalled nothing about this incident during his deposition in December 2021. **8/5P**, 6:9-12 (Dumont); *see* **PX-60, PX-61** (relating clearly to the same incident).

(Dumont). Despite learning of the lapse no later than December 2021, **PX-675**; **8/5P**, 66:11-19 (Dumont), United's data governance employees failed to address it until at least March 2022, **PX-676**, with Optum data security employees chatting initially in January 2022 that, while one sought "a more aggressive timeline," he "d[idn't] want to look for problems" and they were not only failing to "mak[e] much headway," but in fact "going backwards from our last discussion." **PX-678**; **8/5P**, 67:1-10 (Dumont).

222. In yet another incident identified in December 2020, Optum's Cancer Guidance Program, which serves 24 million people, breached its obligation not to offshore data for ten state Medicaid programs. **PX-59**; **8/5A**, 165:2-11 (Dumont). When this issue surfaced, there had been no assessment of Optum's compliance with its offshoring obligations "since the program's CGP launch in the fall of 2018," two years prior. **PX-59** at -661.

223. United has been given clear notice of its data governance failures, but failed to remediate them. In December 2021, United's Internal Audit and Advisory Services conducted an audit of United's data management practices. **PX-600**; **8/10P**, 72:22-25 (Witty). "Given the potential pervasiveness and severity of the observations noted during the assessment," the auditors "assigned a rating of Needs Improvement to the Data Governance Internal audit." **PX-600** at -327. In particular, United's internal auditors concluded that there was:

- a "heightened risk of data being mismanaged" at Optum, **PX-600** at -329; **8/10P**, 73:23-74:2 (Witty);

- a "large opportunity for classification error and inconsistency and subsequent treatment of PHI and PII data," **PX-600** at -329; **8/10P**, 74:22-75:5 (Witty); and

- "no effective means of enforcement if or when data misuse is discovered or reported" leading to a "risk that the [Enterprise Data Management Office] will be unable to effectively intervene and reinforce data management practices," **PX-600** at -330; **8/10P**, 75:6-15 (Witty).

Mr. Witty forwarded the report to Mr. McMahon, writing: "A lot to do here." **PX-600** at -322;

**8/10P**, 75:16-23 (Witty).  Yet in June 2022—six months later—he still did not know whether any changes had been made to strengthen United's data governance. **8/10P**, 75:24-76:7 (Witty).

     **B.**     **Proposed Conclusions of Law**

224.    The proposed merger is an illegal vertical merger, because following it, United would have the ability and incentive to use its rivals' competitively sensitive information to its advantage and their detriment, thereby harming competition.

     **1.**     <u>**Relevant Markets**</u>

225.    As a preliminary matter, the sale of commercial health insurance to (i) national accounts in the United States and (ii) large group employers in local markets are relevant antitrust markets.  *Anthem*, 236 F. Supp. 3d at 192-93; *see also Brown Shoe*, 370 U.S. at 325-26, 343-45. This was effectively undisputed at trial.  **FOF** ¶ 66.

     **2.**     <u>**Related Products**</u>

226.    With respect to related products, the Government need not go through a formal market definition exercise, and any contention to the contrary is without support.

227.    In a vertical merger, competitive concern in a relevant market may flow from a "related product" that is "positioned vertically or is complementary to the products and services in the relevant market," such as an input, a means of distribution, or a complement.  **VMG** at 3.  Here, the Government has shown that EDI clearinghouses—and in particular, Change's EDI clearinghouse—are the related product.  Because the related product is not in the market in which harm to competition is predicted, there is no need for plaintiffs in Section 7 cases to use market-definition tools to identify the product and geographic markets for the related product.  *See* **VMG** at 3-4; *see also Brown Shoe*, 370 U.S. at 320-21 (relevant market is the "locus of competition [] within which the anti-competitive effects of a merger [are] to be judged").

228.    Defendants have suggested that Change lacks market power in EDI clearinghouses

and that this, if true, undermines the Government's showing that United will use its control over Change's clearinghouse to harm competition in the relevant health insurance markets. Any such suggestion that market power in the related product is a necessary element of the Government's case is meritless as a matter of law. According to the plain language of Section 7, the Government need only show potential competitive harm in one or more relevant markets—here, the undisputed national accounts and large group commercial health insurance markets. *See* 15 U.S.C. § 18 (prohibiting any proposed merger "the effect of [which] may be substantially to lessen competition" in "any line of commerce or in any activity affecting commerce in any section of the country"); *Anthem*, 855 F.3d at 349. Further, Defendants' suggested market power requirement reflects an incorrect understanding of United's ability to harm competition post-merger—particularly where, as here, United's rivals lack the ability to disintermediate Change. *See* **FOF ¶** 112-120. Given this fact, even if Change did not have market power, United could use this acquisition to harm competition through a variety of means, including by exploiting rivals' competitively sensitive information (and by raising its payer rivals' costs, *infra* **Part V**). *See Baker Hughes*, 908 F.2d at 988 (explaining that Section 7 analysis should involve "an overall analysis of competitiveness" not simply "a determination of whether a defendant has shown particular facts"); *United States* v. *Dentsply Int'l, Inc.*, 399 F.3d 181, 189 (3d Cir. 2005) (noting that the Supreme Court has emphasized that "economic realities rather than a formalistic approach must govern review of antitrust activity.").

### 3.   The Merger Is Unlawful

229.   Section 7 of the Clayton Act prohibits, as discussed above (*see* **Part III**), acquisitions "the effect of [which] **may be** substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18 (emphasis added). The statute was intended to "arrest[] anticompetitive tendencies in their 'incipiency.'" *Phila. Nat'l Bank*, 374 U.S. at 362-63. To

establish a Section 7 violation, a plaintiff must show that a proposed acquisition has a "reasonable probability" of causing anticompetitive effects. *Staples*, 970 F. Supp. at 1072.

230.    This standard applies with equal force to all mergers, including vertical mergers— *i.e.*, those that occur between firms at different levels of a supply chain. *Procter & Gamble*, 386 U.S. at 577 (all mergers "must be tested by the same standard, whether they are classified as horizontal, vertical [or] conglomerate"). Congress reaffirmed this in 1950 with the passage of the Anti-Merger Act. *Brown Shoe*, 370 U.S. at 317 n.31 ("That § 7 was intended to apply to all mergers—horizontal, vertical or conglomerate—was specifically reiterated by the House Report on the final bill.") (citing H. R. Rep. No. 1191, 81st Cong., 1st Sess. 11).

231.    To determine if a merger would have a reasonable probability of causing anticompetitive effects, courts predict the merger's "impact upon competitive conditions in the future." *Phila. Nat'l Bank*, 374 U.S. at 362. The inquiry into future market conditions goes beyond "merely an appraisal of the immediate impact," *id.*, and necessarily "deal[s] only with probabilities, not with certainties," *Procter & Gamble*, 386 U.S. at 577. In *Heinz*, for example, the D.C. Circuit reversed a district court decision that held there was no Clayton Act violation because of uncertainty about whether the transaction would increase retail prices. *Heinz*, 246 F.3d at 719. The Circuit reversed, holding it was not the FTC's burden to prove the specific anticompetitive impact with "certainty." *Id*.

232.    Courts have long recognized that vertical mergers have the potential to harm competition by, among other things, foreclosing from the independent segment of the market inputs or distribution relied on by rivals, thereby risking a "clog on competition." *Brown Shoe*, 370 U.S. at 323-24. The potential anticompetitive effects of a merger are not limited to price increases. *See, e.g., Anthem*, 855 F.3d at 366. The risks of such harm increase where, as here, a market is

already concentrated.  *See Brown Shoe*, 370 U.S. at 333 ("It is against this background of continuing concentration that the present merger must be viewed."); **FOF ¶¶** 80, 84.

233.    Predicting future competitive conditions of the market means, in part, looking to the **abilities** and **incentives** of the merged firm.  *See, e.g.*, *Ford*, 405 U.S. at 571 (holding vertical acquisition violated Clayton Act in part because defendant "would have every <u>incentive</u>" to act in an anticompetitive manner by maintaining barriers to entry) (emphasis added); *Cardinal Health*, 12 F. Supp. 2d at 52 (holding merger likely would violate Clayton Act where the transaction "<u>enabl[es</u> the merged entities] to raise prices above competitive levels."); *accord* **VMG** at 2 (agencies focus on "competitive outcomes caused by conduct that would be compatible with firms' abilities and incentives following a vertical merger"); *id.* at 4-5.[159]  In other words, courts are to evaluate a firm's actual abilities and incentives, rather than its self-serving promises.  *See Ford*, 405 U.S. at 571.

234.    Here, the evidence at trial established that United would have the **<u>ability</u>**, post-merger, to derive useful insights about its rivals from the competitively sensitive information to which it would gain access and data rights as a result of the merger.  **FOF** 144-175.  Paired with this, the Government established that United would have an **<u>incentive</u>**, post-merger, to use those insights to United's advantage and its rivals' detriment.  **FOF** 176-186.  The Government has therefore carried its *prima facie* burden to establish that the merger is unlawful, and Defendants have offered nothing to unseat this proof.

---

[159] *Tronox*, 332 F. Supp. 3d at 212 (merger reduced competition in part because it "create[d] incentives for the remaining industry participants to engage in strategic withholding"); *H&R Block*, 833 F. Supp. 2d at 81 (merger violates Clayton Act where "acquiring firm will have the incentive to raise prices or reduce quality after the acquisition, independent of competitive responses from other firms").

### (a)   The Government Has Established Its
### Prima Facie Case that the Merger Harms Competition.

235.    As set forth above: (i) pre-merger, Change has access and legal rights to vast quantities of United's rivals' CSI; (ii) through the merger, United would gain both access to the CSI and legal rights to it; (iii) United would have an incentive to use the information to its benefit, *Ford*, 405 U.S. at 571; and (iv) neither reputational concerns nor operation of law or contract would prohibit United from acting upon these incentives (to derive competitively useful analytics or insights about its rivals from Change's claims data that United could then use to its advantage and their detriment and to the detriment of competition).  **FOF** ¶¶ 94-190.  Based on the structure of this market, Change's central role, and the non-payer-specific mechanisms by which Change secures payers' data, United's rivals would have no effective means to prevent their CSI from being used by United to undermine them.  **FOF** ¶¶ 112-120.  United's securing access to Change's data and the accompanying data rights presents a reasonable likelihood of a "clog" on competition. *Brown Shoe*, 370 U.S. at 323-24.

236.    Indeed, relevant authorities underscore this precise pathway to anticompetitive harm.  Post-merger, "the merged firm can use access to a rival's competitively sensitive information to moderate its competitive response to its rival's competitive actions," including by preempt[ing] or react[ing] quickly to a rival's procompetitive business actions," potentially causing rivals to "see less competitive value in taking procompetitive actions." **VMG** at 10 (§ 4.b); *see also, e.g.*, *FTC* v. *PPG Indus., Inc.*, 798 F.2d 1500, 1508 (D.C. Cir. 1986) (Bork, J.) (holding that a divesture may not "fully restore competition" if preceded by the transfer of competitively sensitive information); *FTC* v. *Weyerhaeuser Co.*, 665 F.2d 1072, 1086 (D.C. Cir. 1981) (same).

237.    If this merger were to proceed, this type of access and rights—by the industry's largest payer, to rivals' competitively sensitive information—would create precisely one of the

harms the Clayton Act seeks to prevent.  In particular, anticompetitive conduct by United post-merger stemming from its use of rivals' competitively sensitive data might find cover and not be reached by Section 1 of the Sherman Act: any agreement on the use of data between United's OptumInsight and the rest of United, including UHC, would be protected from scrutiny under Section 1 due to *Copperweld Corp.* v. *Indep. Tube Corp.*, 467 U.S. 752, 770-71 (1984).  In such circumstances, United might feel emboldened to share information by using *Copperweld* to shield its conduct from scrutiny.

238.    Section 7 is ultimately prophylactic, and preventing this harm in its incipiency is precisely its purpose.  *See Du Pont I*, 353 U.S. at 589 ("Section 7 is designed to . . .  arrest in their incipiency restraints or monopolies in a relevant market which, as a reasonable probability, appear at the time of suit likely to result from the acquisition by one corporation of all or any part of the stock of any other corporation."); *Brown Shoe*, 370 U.S. at 318 n.32 (noting that Congress intended section 7 of the Clayton Act "to reach incipient monopolies and trade restraints outside the scope of the Sherman Act").

### (b)      *Defendants Have Failed to Rebut the Government's Prima Facie Case*

239.    Defendants' vague promises about post-merger behavior "cannot rebut a likelihood of anticompetitive effects" on this record.  *H&R Block*, 833 F. Supp. 2d at 82; *see also Heinz*, 246 F.3d at 721 (where merger reduces competition structurally, courts must rigorously analyze "promises about post-merger behavior"); *see also Heinz*, 246 F.3d at 721 (where merger reduces competition structurally, courts view "promises about post-merger behavior" with skepticism);  *du Pont I,* 353 U.S. at 607 ("[T]he fact that all concerned in high executive posts in both companies acted honorably and fairly, each in the honest conviction that his actions were in the best interests of his own company and without any design to overreach anyone, including [defendant's]

competitors, does not defeat the Government's right to relief.").

240.    As a preliminary matter, it is well settled that "evidence indicating the <u>purpose</u> of the merging parties, where available, is an aid in predicting the probable future conduct of the parties and thus the probable effects of the merger." *Brown Shoe*, 370 U.S. at 329, n.48 (emphasis added).  Here, the evidence reflects that the transaction is motivated, in significant part, by United's desire for Change's data and data rights, **FOF ¶¶** 135-143, and United offers no reason to believe the merged company would not use them.

241.    Likewise, the suggestion that the United business unit that would incorporate Change (Optum) could be trusted to act separately from the incentives of its parent company—for instance, not to make use of the CSI available to it—is directly at odds with the Supreme Court's holding in *Copperweld*.  "Separate units" of a business will not "act against the merged entity's common interest," and where, as here, it is in the "merged entity's common interest" to derive useful analytics from data, the entity should be presumed likely to do that, as is consistent with its obligations to shareholders.  *AT&T*, 916 F.3d at 1042, -43 (citing *Copperweld*, 467 U.S. at 770-71) (noting that it has been "adopted as a principle of antitrust law" that "a business with multiple divisions will seek to maximize its total profits").

242.    As discussed below, against this backdrop, a company's promises not to act according to its profit-maximizing incentives deserve no weight, and neither of Defendants' promises here do anything to dispel the likely anticompetitive effects of this proposed transaction. *Cf. Du Pont I*, 353 U.S. at 607 ("It is not requisite to the proof of a violation of § 7 to show that restraint or monopoly was intended."); *H&R Block*, 833 F. Supp. 2d at 82; *FTC* v. *Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 65 (D.D.C. 1998).

243.    *First*, Defendants' proposal to create a **<u>firewall</u>** that would purportedly limit the use

of CSI acquired through Change's clearinghouse does not address or rebut the *prima facie* anticompetitiveness of this merger, either in fact (**FOF ¶¶** 202-204) or as a matter of law.

244.    Courts routinely find behavioral promises, like promises to construct and maintain a firewall, inadequate to rebut the predicted anticompetitive effects of a merger.  For example:

- In *H&R Block*, the court considered defendants' unilateral promise to freeze prices of a particular product for three years and their argument that this would negate the possibility of anticompetitive effects, but held that while it had "no reason to doubt that defendants would honor their promise, **this type of guarantee cannot rebut a likelihood of anticompetitive effects in this case**," 833 F. Supp. 2d at 82 (emphasis added);

- In *Cardinal Health*, the court held that even in a case where defendants had presented credible evidence to rebut the presumption of anticompetitiveness, the "Government's case [wa]s more persuasive," including because, notwithstanding defendants' promise not to raise prices after the merger, "**Defendants' guarantees alone cannot cure the likely anti-competitive effects of the mergers.**" 12 F. Supp. 2d at 64-65 (emphasis added); *id.* ("The Defendants' promise not to raise prices fails to ensure that prices will continue to fall after these mergers--or fall by the amount they would have absent the mergers. This Court is not convinced that the Defendants would still vigorously compete with one another after the mergers to continue lowering their prices.").

245.    Likewise, because the evidence shows that the Defendants first created a firewall policy and offered their purported "commitments" to Change's customers in May 2022—long after the acquisition was announced, and in the shadow of this lawsuit—judicial skepticism is warranted as to whether the company would have ordinary-course business incentives to preserve them post-merger.  **FOF ¶¶** 202, 204, 208, 215.[160]  *See Aetna*, 240 F. Supp. 3d at 79 (finding that if a "decision

---

[160] As set forth above, courts view "post-acquisition evidence"—such as that offered by Defendants—that is "subject to manipulation by the party seeking to use it" as "entitled to little or no weight."  *See Hosp. Corp. of Am.*, 807 F.2d at 1384 (7th Cir. 1986); *see also Heinz*, 246 F.3d at 721 (stating that courts should "undertake a rigorous analysis" of the efficiencies offered by the merging entities to ensure that they were "more than mere speculation and promises about post-merger behavior").  Courts are appropriately skeptical of such late-arriving evidence, particularly when it does not reach the anticompetitive harms posed by the transaction.  *See H&R Block*, 833 F. Supp. 2d at 82 (stating that a three-year

was made to improve Aetna's litigation position" it would be "weak evidence of Aetna's likely future conduct" and noting the "common-sense proposition that a firm's behavior undertaken with the aim of persuading a court or the government regarding the legality of a merger may not be predictive of how that firm will behave once the court or the government are no longer engaged").

246.    In addition to being vague, Defendants have failed to carry their burden to show that the firewall they propose would even be responsive to the anticompetitive effects of the merger—in other words, that it would even work.  It would not; as shown above, the firewall would not prevent United from deriving useful analytics from Change's data.  **FOF** 203.

247.    The firewall proposed here should also be rejected because "a merger indefinitely changes the incentives of the merged firm and the structure of the market," while a behavioral proposal, such as a firewall, simply attempts to regulate the *effects* of the merging firms' incentives.  *U.S. Dep't of Justice*, Merger Remedies Manual, at 4 (2020).[161]  "Firewalls are infrequently used  because, "[n]o matter how well crafted, the risk of collaboration in spite of the firewall is great."  *Id.* at 15.

248.    *Second*, the "**commitments**" Defendants claim to have made, or intend to make, to customers cannot rebut the Government's *prima facie* case here.  This is true for the reasons set forth above, and for the further reason that the "commitments" are not legally binding; no

---

price guarantee by defendants "[could] not rebut a likelihood of anticompetitive effects" in the case).

[161]  The Antitrust Division rescinded the 2020 Merger Remedies Manual ("the Manual") as official policy of the Division in April 2022.  U.S. Dep't of Justice Antitrust Div., https://www.justice.gov/atr/merger-enforcement (listing the Manual "for historical purposes").  Defendants nevertheless have repeatedly quoted selectively from the Manual in this case.  In light of Defendants' selective citation to the Manual, the Government considers it appropriate to cite to the Manual as well to show that it does not support Defendants' proposed firewalls or divestiture.

consideration has been offered in exchange for them, and it is black-letter law that promises without consideration are not binding or enforceable.  **FOF** ¶ 212**;** *e.g.*, Restatement (Second) of Contracts § 17 (1981).  They also would not protect all payers (United's insurer rivals), as the "commitments" relate only to "Change's EDI customers," which excludes some payers. **FOF** ¶ 210.)

249.    Defendants' remaining counterarguments fare no better.

250.    For one, the suggestion that for United to make use of the data, it would have to engage in theft or breach is a red herring.  The utility of the data is not in its raw form, but from the ability—fully within bounds of United's legal and other constraints—to derive useful analytics from it.  **FOF ¶¶** 191-216.

251.    Defendants also contend that because the United States Department of Justice has approved firewalls in some cases as part of a consent decree, it should do so here even without those protections.  But this case presents different abilities, rendering a firewall inappropriate.  For example, in the *Geisinger Health/Evangelical Community Hospital* partial acquisition, the Division, as part of a consent decree that reduced Geisinger's ownership to a 7.5% percent passive ownership, approved of a firewall as a small piece of the decree where "a large, sophisticated hospital **system can protect itself through its contract**" with Evangelical, and the firewall would "provide[] an additional level of protection to prevent . . . improper disclosure."  Response of Plaintiff United States to Public Comments on the Proposed Final Judgment at 16, *United States* v. *Evangelical Comm. Hosp.*, No. 4:20-cv-01383-MWB (M.D. Penn. Aug. 31, 2021), ECF No. 52 (emphasis added). But here, payers cannot protect themselves through contract because United can obtain data rights from providers, channel partners, and trading partners, and it is difficult, if not impossible, to disintermediate Change. Furthermore, in a 100% acquisition of Change, the

(unenforceable) firewall proposed would be the only level of protection, and the government would not even have the same ability to "seek relief from the court under [a] Final Judgment" as it would under a consent decree.  *Id.*[162]

252.    This case also presents different incentives, likewise rendering a firewall inappropriate.  In the *CVS/Aetna* merger, the United States Department of Justice declined to amend its proposed final judgment after investigating the possibility of ineffective firewalls leading to coordination among health insurers.  But there, unlike here, the government determined that CVS was "commercially incentivized to maintain firewalls because [its] customers **could switch to an alternative** [pharmacy benefit manager] if their information were not kept confidential."  Response of Plaintiff United States to Public Comments on the Proposed Final Judgment at 32, *United States* v. *CVS Health Corp.*, No. 1:18-cv-02340-RJL (D.D.C. Feb. 13, 2019), ECF No. 56  (emphasis added).  Here, payers cannot prevent United from sharing their CSI with UHC by switching away because, as explained above, it is difficult, if not impossible, to disintermediate Change.  **FOF ¶¶** 111-120.

253.    Defendants' reliance on *AT&T* is also misplaced.  In that case, the court concluded that the Government's *prima facie* case—that Time Warner would be incentivized to withhold programming from distributors—was undermined because arbitration offers to which the merging entities agreed would take away Time Warner's ability to actually withhold the programming (a "real-world effect").  916 F.3d at 1041; *AT&T*, 310 F. Supp. 3d at 169 n.3, 241 n. 51.  Here, by

---

[162] *See also* Plaintiff United States' Petition for an Order to Show Cause Why Defendant AT&T Should Not Be Found in Civil Contempt at 5-6, *United States* v. *AT&T, Inc.*, No. 07-cv-01952-ESH (D.D.C. Mar. 20, 2008, ECF No. 14 ) (a contempt action alleging that defendants had violated a consent decree that required them to prevent AT&T employees from accessing confidential information for assets that had been divested).

contrast, firewalls and customer "commitments" represent only a promise not to *exercise* the ability United would gain through the merger—not, as in *AT&T*, interventions that will prevent the merging entities from *acquiring* the ability to harm competition.

254.   Because defendants failed to "present evidence that the *prima facie* case inaccurately predicts the relevant transaction's probable effect on future competition" or to "sufficiently discredit" the evidence underlying the *prima facie* case, judgment should enter for the Government.  *AT&T*, 916 F.3d at 1032 (citing *Anthem*, 855 F.3d at 349 in a vertical case) (internal quotation marks removed).  The "effect" of a merger that provides United with the ability to glean insights from its' rivals competitively sensitive information "may be substantially to lessen competition," 15 U.S.C. § 18, and thus the merger is illegal and should be enjoined.

### (c)   Defendants' Promises Are Not Legally Cognizable Remedies

255.   ***Remedies.***  For avoidance of doubt, not only do Defendants' forward-looking promises not rebut liability, they also are not cognizable as remedies following a liability finding.

256.   To be cognizable, post-liability remedies—divestitures, for example—"must 'effectively preserve competition in the relevant market'" and "'maintain the premerger level of competition.'"  *Sysco*, 113 F. Supp. 3d at 72 (considering divestiture) (quoting *U.S. Dep't of Justice*, Antitrust Division Policy Guide to Merger Remedies 1 (June 2011)); *accord Du Pont II*, 366 U.S. at 326.  But Defendants' promises as to firewalls cannot meet this standard, because they are one-sided and non-binding, and their effects are unverifiable, as set forth above.

257.   Moreover, behavioral promises are generally disfavored as post-merger remedies, and should be disfavored here, because they "risk[] excessive Government entanglement in the market."  *St. Alphonsus*, 778 F.3d at 793 (rejecting proposal of conduct remedy) (citation

omitted).[163]  This is in part because even court-ordered behavioral remedies are rarely "detailed enough to cover in advance all the many fashions in which improper influence might manifest itself," risking the need for future Government intervention.  *Du Pont II*, 366 U.S. at 334 (ordering divestiture and rejecting as suitable alternative imposition of behavioral relief with possibility of instituting contempt proceedings); *see also Ford*, 405 U.S. at 582 (Stewart, J., concurring) ("[W]hile divestiture remedies in [Section 7] cases have not enjoyed spectacular success in the past, *remedies short of divestiture have been <u>uniformly unsuccessful</u> in meeting the goals of the [Clayton] Act*.") (emphasis added).  As relevant here, a behavioral promise that would allow an otherwise anticompetitive transaction to proceed would conflict with Congress's "mandate . . . that tendencies toward concentration in industry are to be curbed in their incipiency," *Brown Shoe*, 370 U.S. at 346, and "involve the courts and the Government in regulation of private affairs." *Du Pont II*, 366 U.S. at 334.

258.    For these reasons, finding that, notwithstanding a liability judgment, post-merger behavioral remedies could adequately address the competitive harms caused by the merger would be inconsistent with the Clayton Act.  Nothing justifies such a departure here.

259.    The merger is unlawful and should be enjoined.  *See* 15 U.S.C. § 18.

---

[163]  *See also ProMedica Health Sys., Inc.* v. *FTC*, 749 F.3d 559, 573 (6th Cir. 2014) (upholding Commission's finding that conduct remedy was "disfavored because 'there are usually greater long term costs associated with monitoring the efficacy of a conduct remedy than with imposing a structural solution'" from the outset).

## V. THE MERGER IS ILLEGAL BECAUSE UNITED WOULD GAIN THE ABILITY AND INCENTIVE TO RAISE ITS RIVALS' COSTS

260. The proposed transaction is an illegal vertical merger for the independent reason that through it, United would gain the ability and incentive to raise its health insurer rivals' costs by (1) withholding or delaying the sale of EDI-related innovations, and (2) raising the price of, or withholding or delaying improvements to, ClaimsXten, absent any divestiture. This would illegally "clog" competition in the markets for the sale of commercial health insurance to (i) national accounts in the United States and (ii) large group employers in local markets throughout the United States.

261. Defendants' claim that their proposed "commitment" to Change's existing EDI customers—an unenforceable contract amendment—eliminates the risk that United would raise its health insurer rivals' costs is misaligned with the real-world incentives of corporations, which are bound to act in the interests of their shareholders. As set forth below, this "commitment" is an unenforceable promise and, in any event, it does not resolve the anticompetitive effects of the proposed transaction. The merger should be enjoined.

### A. Proposed Findings of Fact

262. With the proposed merger, United would gain the ability and incentive to raise its health insurer rivals' costs, leading to higher quality-adjusted prices in the relevant commercial health insurance markets. Paragraphs 263-264 describe the relevant markets for the Government's raising rivals' costs claim as it relates to both EDI-related innovations and ClaimsXten. Paragraphs 265-299 describe the Government's raising rivals' costs claim as it relates to EDI-related innovations. Paragraphs 300-302 describe the Government's raising rivals' costs claim as it relates to ClaimsXten.

### 1.    **The Relevant Markets Are Proven and Undisputed**

263.    As detailed above, the markets for the sale of commercial health insurance to national accounts in the United States and to large group employers in various local markets are relevant antitrust markets, which Defendants do not dispute.  **FOF ¶¶ 77-84**.

264.    As also detailed above, commercial health insurers compete on many dimensions, including customer service, provider experience, member experience, and affordability strategies to reduce medical and administrative costs.  **FOF ¶¶ 68-76**.

### 2.    **United Would Gain the Ability to Raise Rivals' Costs**

265.    Here, the "related product" to the Government's raising rivals' costs theory is EDI-related innovations such as integrated platforms.  Integrated platforms (including Change's pre-lawsuit Real-Time Settlement and United's Transparent Network) will offer numerous benefits to payers, including lower administrative and medical expenses, fewer software products required to adjudicate claims, improved patient and provider satisfaction, and faster payments.[164]

266.    Absent the transaction, United and Change have competed to develop their own innovative integrated platforms: the Transparent Network and Real-Time Settlement, respectively.  **FOF ¶¶ 267-275**.  If United were to acquire Change, United would control the development of the only scaled integrated platform, and United's main health insurance rivals would likely have no alternative because no other firm has all of the capabilities necessary to build a competing platform.  **PX-820 ¶¶ 253; 8/5P**, 100:24-101:2, 124:11-17 (Schmuker); **FOF ¶¶ 276-284**.  As a result, United would likely gain the ability to raise its health insurer rivals' costs, relative to the but-for world,

---

[164] *See, e.g.*, **PX-1007** (61:10-62:6, 81:5-20, 84:8-21, 164:11-165:24, 175:13-23, 177:18-20, 177:22) (Gopalkrishnan); **PX-394** at 7, 26, 43, 47-48; **PX-396** at 19; **PX-87** at -652; **8/5P**, 109:22-110:23 (Schmuker).

by delaying the sale of integrated platform innovations to them. **8/9A**, 13:25-14:20 (Gowrisankaran).

### (a)     *Pre-Merger, United and Change Compete*
### *to Deliver Integrated Platforms to Health Insurers*

267.    Absent the proposed transaction, United would not have the ability to withhold or delay the sale of an integrated platform to UHC's main rivals because United would likely continue to face competition from Change. **8/9P**, 50:3-9, 51:15-52:10 (Gowrisankaran); **PX-820** ¶¶ 252.

268.    Until the filing of this lawsuit in February 2022, United and Change were actively competing to develop their own "integrated platform[s]." *See, e.g.*, **PX-288** at 6 (Change); **PX-334** at -774 (United).  These integrated platforms—United's "Transparent Network" and Change's "Real-Time Settlement"—aimed to reduce administrative waste by shifting edits "to the left," *i.e.*, closer to the provider side of the claims process.  **PX-1007** (59:9-60:5, 65:10-15, 164:11-165:24) (Gopalkrishnan); **8/5P**, 92:17-25, 93:4-10 (Schmuker).  Making payer edits available earlier would in turn speed up payments to providers.   **PX-1007** (126:13-18, 126:20-127:3, 127:5-16) (Gopalkrishnan); **PX-394** at 26; **8/5P**, 95:6-11 (Schmuker); **PX-334** at -776; **DX-503** at -133.

269.    As the term "integrated platform" suggests, Defendants each aimed to incorporate many of their own separate products into their respective offerings.  *See, e.g.*, **PX-288** at 6; **PX-396** at 30; **PX-289** at -476 (Change); **PX-334** at -774 (United).  These products included, for example, each company's respective first-pass claims editing solution: CES for United and ClaimsXten for Change.  **PX-334** at -774 (United); **PX-289** at -476, -479 (Change).

270.    Change and United both viewed their integrated platforms as transformative.  In March 2021, Change's CEO, Neil de Crescenzo, characterized Real-Time Settlement as "core to the company's future."  **PX-543** at -923.  And in February 2022—just weeks before this lawsuit was filed—he told a potential development partner that Real-Time Settlement continued to be a

129

"truly disruptive area[]" in which Change was working. **PX-544** at -107. Similarly, United's CEO, Andrew Witty, testified that the Transparent Network would "fundamentally change the experience of the users." **8/10P**, 70:16-23 (Witty); *see also* **PX-87** at -650 (Transparent Network would "cut waste and transform the patient and provider experience").

271.    Defendants' attempts at trial to distinguish Real-Time Settlement and the Transparent Network directly contradicts their own ordinary-course business records and conduct.

272.    *First*, Defendants suggested at trial that Real-Time Settlement and the Transparent Network are not similar. *E.g.*, **8/5P**, 117:1-9 (Schmuker). Not so. Until the filing of this lawsuit, Mr. de Crescenzo himself described United's Transparent Network as having a "similar plan and even architecture" to Real-Time Settlement. **PX-546** at -651. United similarly identified Change's Real-Time Settlement as the "closest thing" to the Transparent Network. **PX-344**; **8/5P**, 103:19-21 (Schmuker). Change and United even used the same language to describe their efforts. For example, United referred to the Transparent Network's goal of minimizing the errors between claim submission and payment as "straight-through processing," **8/5P**, 104:1-9 (Schmuker)—which Change considered synonymous with Real-Time Settlement, **8/3P**, 33:7-12 (Joshi)—and United recognized that Change also had "a vision of moving to straight-through processing" and had "made progress in realizing it." **PX-345** at -573. Similarly, United and Change both described their platforms as creating a "frictionless" experience for customers. **8/5P**, 92:23-25 (Schmuker); **PX-1007** (164:11-165:24) (Gopalkrishnan); **PX-394** at -336.

273.    *Second*, Change incorrectly suggested at trial that Real-Time Settlement and the Transparent Network would not compete because, following some blinded interviews conducted in September 2020, Change decided "to focus *exclusively* on the provider side" of the market, not the payer side. **8/3P**, 59:18-60:1 (Joshi) (emphasis added). In fact, from September 2020 through

the filing of this lawsuit in February 2022, Change consistently described Real-Time Settlement, including to its board of directors, as aimed at *both* payers and providers. Examples include:

- The September 2020 survey feedback itself, in which "**100% of the interviewees agree[d] that the market needs an integrated solution.**" **PX-395** at -368. Unlike Mr. Joshi, Mr. Gopalkrishnan, who attended the interviews, testified consistent with this ordinary-course evidence that payers "were interested in the solution." **PX-1007** (90:13-23, 98:5-13) (Gopalkrishnan).

- An October 2020 presentation to Change's board of directors outlined a plan to release Real-Time Settlement to "▇▇▇▇▇▇▇▇" first, followed by "▇▇▇▇▇▇▇" and then "▇▇▇▇." **PX-539** at 137.

- A March 2021 mock press release and FAQ submitted to Change's board of directors explained that "**the customers for [Real-Time Settlement] are payers and providers.**" **PX-394** at -314, -340. An accompanying board presentation described Real-Time Settlement for *payers* as a "**North Star**" project, listed various payer benefits, and suggested monetizing the solution through a 2% fee from *both* payers and providers. **PX-394** at 24, 26. And Change still planned to "[b]egin development with providers" before "deliver[ing] a multi-payer solution." **PX-394** at 27.

- In November 2021, Mr. Joshi informed Mr. de Crescenzo that Change already had "a few small payers engaged," ▇▇▇▇▇ was "**very engaged,**" and ▇▇▇▇ had "**strong interest,**" even as Change focused its initial minimally viable product on providers. **PX-735** at -674.

- A February 2022 quarterly business review reported that "▇▇▇▇▇▇▇▇▇ ▇▇"—a "payor"—was interested in a partnership. **PX-289** at -475.

- An early March 2022 capital request for FY23 continued to report that Real-Time Settlement included a payer (▇▇▇▇▇) in the beta pipeline and would be monetized through a fee of "▇% from payer[s] on all real-time payments," in addition to the fees charged to providers. **PX-324** at 10.

274.   The ordinary-course evidence strongly indicates that any such "pivot" was likely due to the proposed merger. Mr. de Crescenzo characterized Real-Time Settlement as "truly disruptive" mere weeks before this lawsuit, **PX-544** at -107; hailed the effort to executive leadership, **PX-545** at -403; raised it with Change's board of directors twice, **PX-539** at 136; earmarked funds for its development if the proposed merger does not occur, **PX-548** at -997; and wanted to share it as quickly as possible with United, **PX-546** at -651. In addition, although some

payers were initially interested in participating in the development of Real-Time Settlement, they distanced themselves from these efforts due to the announcement of the proposed transaction.  **PX-402** at -365; **PX-403** at -178-79; **PX-1006** (244:9-12) (Gopalkrishnan) (⬛); **PX-404** at -802; **PX-405** at -536; **PX-1006** (255:15-25, 256:2-5) (Gopalkrishnan) (⬛); **PX-406** at -008; **PX-1007** (264:22-25, 265:2-3) (Gopalkrishnan) (Blue Shield of California); *cf.* **PX-520** at -019 (Mr. de Crescenzo: "Our people are being asked by customers re: the UHC health plan's perceived influence on Optum . . . .").  In any event, payers remain a key strategic stakeholder because Real-Time Settlement is "more attractive to a provider if more of that provider's payers participate[]" in it.  **PX-1007** (94:14-17, 94:21) (Gopalkrishnan).

275.    Most importantly, neither a lack of similarity between Change's current Real-Time Settlement and United's Transparent Network nor Change's "pivot" to focus exclusively on providers affects the key point—that Change already has all of the "[c]ore building blocks" necessary to develop an integrated platform that could compete with United.  **PX-89** at 49; **PX-1015** at 28; **8/9A**, 60:5-12 (Gowrisankaran); **8/15A**, 115:7-9 (Murphy).

### (b)    *Post-Merger, United Would Gain the Ability to Withhold or Delay EDI-Related Innovations to Health Insurer Rivals by <u>Controlling the Only Scaled Integrated Platform</u>*

276.    Post-merger, United would control the only scaled integrated platform.  As a result, United could raise its health insurer rivals' costs by withholding or delaying the sale of its integrated platform to them.

277.    ***First***, acquiring Change would give United unparalleled scale.  Although United has worked on the Transparent Network without Change, independently forming EDI connections with payers and providers is difficult and "would take Optum years."  **PX-345** at -571; **8/5P**, 100:2-4, 100:11-15 (Schmuker); **PX-944** at -289.  In evaluating its acquisition of Change, United went so far as to characterize its difficulty distributing analytics into the provider market as a "barrier

to entry." **PX-345** at -571. "Access to [Change's] extensive payer relationships, industry connectivity and payments volume cannot be easily replicated at scale on a timely basis without an acquisition." **PX-944** at -289. As a result, United believes the "best way" to *scale* the Transparent Network is by acquiring Change's EDI clearinghouse, **8/5P**, 100:16-23, 101:3-15, 124:6-10 (Schmuker); **PX-345** at -571, -573, which is the largest in the United States and is unique in scope, **FOF** 93.

278.     Acquiring or partnering with another EDI clearinghouse would not "achieve the same result[] as Change." **8/5P**, 100:24-101:2, 119:2-13, 124:11-17 (Schmuker); **PX-338** at 6 ("There are no alternatives of same scale and perceived quality."). Around the time that United was considering an acquisition of Change, it also evaluated other EDI clearinghouse targets, including Availity and Waystar. **8/4P**, 59:20-24, 60:6-8, 65:7-14 (Hasslinger). But these alternatives suffered from limitations compared to Change. Availity had a more limited "payer focus" and lacked Change's "greater overall scale and significant provider connectivity." **PX-199** at -643; **8/4P**, 62:23-63:23 (Hasslinger). And Waystar lacked Change's "material scale" and "payer-side connections." **8/4P**, 65:15-66:1 (Hasslinger).

279.     **Second**, the combination of Change's EDI network with United's existing suite of products would leave United's main health insurance rivals no alternative to United's integrated platform, giving United the <u>ability</u>—because competitive pressure from Change would be absent—to raise their costs by withholding or delaying integrated platform innovations. **PX-820** ¶ 253; **8/9A**, 58:22-61:1 (Gowrisankaran).

280.     **Third**, if the merger were to proceed, it is unlikely that any market participant could replicate this lost competition. Mr. Witty considered it a "very reasonable question" to ask whether the Transparent Network would be copiable by others in light of United's $13 billion investment

133

in Change.  **8/10P**, 89:18-90:4, 92:14-22 (Witty); **PX-609** at -247.

281.    The answer is likely *no* (**PX-609** at -247 ("If we do at the right scale, you become the utility and no one is going to build more power.")), and Defendants have offered no evidence to the contrary.  Change considers itself "uniquely positioned" to create an integrated platform because it already has a "broad portfolio of products" that serve as "the building blocks for a platform strategy."  **PX-288** at 12; *see* **PX-396** at 30.  United agrees: Change already has the "[c]ore building blocks" to create an integrated platform on its own, including a clinical claims editor and an EDI clearinghouse.  **PX-89** at 49; *see also* **PX-1015** at 28; **8/9A**, 60:5-12 (Gowrisankaran); **8/15A**, 115:7-9 (Murphy).

282.    Indeed, contrary to Change's suggestion at trial that its development efforts are speculative, *e.g.*, **8/3P**, 63:20-64:6 (Joshi), it has made steady progress.  As of the filing of this lawsuit in February 2022, Change already had ▮ beta clients, **DX-212** at -584, with ▮ ▮ in the pipeline, **PX-289** at -475; **PX-324** at 10.  In fact, until this lawsuit was filed, Change was projecting the launch of ▮ by ▮ 2022—just ▮ months later.  **PX-289** at -478; **8/3P**, 53:8-10 (Joshi).  To the extent Change has since faced delays, *see* **8/3P**, 53:11-22 (Joshi), the cause may be due to Change's underinvesting in Real-Time Settlement in anticipation of closing the proposed transaction.  In February 2022, Mr. de Crescenzo stated that, if Change remained "independent" of United, it would "have to re-allocate ~$10m+" into Real-Time Settlement.  **8/2A**, 86:13-25 (de Crescenzo); **PX-548** at -997.

283.    Although Defendants suggest otherwise, no other company has all of the capabilities necessary to build a scaled integrated platform to compete with post-merger United. **8/9A**, 60:5-12 (Gowrisankaran); **8/15P**, 14:17-15:4 (Gowrisankaran); **PX-1036** at 3; **8/5P**, 100:24-101:2, 124:11-17 (Schmuker).  Without access to the "electronic connections to the providers that

exist within the Change technology stack today," for example, other companies will face the same "barrier to entry" that United has faced without Change.  **PX-345** at -571; **8/9A**, 60:5-61:1 (Gowrisankaran).  In particular:

- **Google lacks subject matter expertise and necessary solutions.**  Change's own documents identify only one other "[l]ethal" integrated platform competitor: Blue Shield of California in partnership with Google.  **DX-212** at -582.  But Google first approached Change "to see if [Change] would be interested in partnering with them" to build an integrated platform because Google lacked "the subject matter expertise" and solutions like ClaimsXten to build a platform.  **PX-1007** (225:13-226:3, 228:15-229:19) (Gopalkrishnan).

- **Ooda lacks a claims editor and has scalability challenges.** Ooda instead "relies on reverse engineering historical claims to predict payments on new claims."  **PX-394** at -320, -341.  Ooda's scalability challenges make Change "more likely to be successful."  **PX-394** at -341; *see also* **PX-545** at -411 (noting scalability challenges).

- **Olive AI faces "[s]calability" challenges and lacks "RCM subject matter expertise."**  **PX-374** at -343.  One of Olive's provider customers complained that "[r]esults are not meeting expectations."  **PX-374** at -343-44.

- **Avaneer Health lacks many of the capabilities necessary for real-time settlement,** including the ability to "[p]erform real-time integrity checks," "[r]eal-time calculation of payer allowed amount," "[r]eal-time estimation of patient responsibility amount," and "[r]eal-time settlement of payer amount to provider."  **DX-212** at -582-83.

- **Other companies are even worse off**, with minimal go-to-market and disruptive capabilities relative to Change that make them unlikely to offer competing integrated platforms against post-merger United.  **DX-212** at -582.

284.    Thus, post-merger, it is unlikely that there would be alternatives to United's Transparent Network, **8/9P**, 52:18-53:7 (Gowrisankaran); **PX-820** ¶ 253, consistent with United's aspiration for the Transparent Network to "become the utility" and "become defacto [sic] so good, no one will invest."  **PX-609** at -247.

### 3.    United Would Have an
### Incentive to Raise Rivals' Costs

285.    Post-merger, United would have an <u>incentive</u> to raise its health insurer rivals' costs.

286.    United's incentive is to maximize its overall profits.    **FOF ¶ 178_**.  Because downstream commercial health insurance markets are much more lucrative than upstream healthcare IT markets, United would be incentivized to delay its integrated platform innovations to its main health insurer rivals.  **8/9A**, 61:2-62:7 (Gowrisankaran); **PX-820 ¶¶** 240-251; **PX-1015** at 30-37.  United's commercial health insurance business is important to its bottom line, and it continues to try to grow that business and to compete for accounts in both national and large group markets.  *See* **8/9P**, 100:2-13 (McMahon); **8/10P**, 99:21-100:25, 101:18-102:4 (Gehlbach); *see also* **FOF ¶** 76.  The Government's economic expert calculated that, on the one hand, United stands to lose $████████ in expected EBITDA in 2026 if it were to forgo *all* sales of the Transparent Network to rival health insurers.  **8/9A**, 65:11-66:24 (Gowrisankaran); **PX-820 ¶¶** 243-246, Ex. 12; **PX-1015** at 33-36.  On the other hand, even assuming conservatively that United would win customers from only its main health insurance rivals, **8/9A**, 65:20-66:6 (Gowrisankaran), United would need to increase its market share in national accounts and large group by just 0.2% to offset any losses, **8/9A**, 66:25-69:2 (Gowrisankaran); **PX-820 ¶¶** 247-251, Exh. 12 and 13; **PX-1015** at 37.

287.    As a profit-maximizing firm, United already employs this cost-benefit analysis in practice.  In making enterprise decisions, United considers how decisions by one subsidiary can affect others to ensure that individual subsidiaries pursue the course that is most profitable for United as a whole.  **8/10A**, 23:24-24:20, 26:22-27:21 (Schumacher); **PX-353**.  "[I]n getting to the overall benefit for UnitedHealth Group," United recognizes that a decision "could advantage UnitedHealthcare, the insurance business, while at the same time potentially disadvantaging Optum."  **8/10A**, 27:16-21 (Schumacher).  United's executives understand this tradeoff.  United's main health insurance rivals are not even among United's top 50 customers by earnings.  **PX-**

**1034¶** at 4-5; **8/10A**, 126:17-130:8 (Schumacher).  Approximately two-thirds of OptumInsight's business comes from UHC.  **8/10P**, 84:10-15 (Witty).  As one Optum Executive Leadership Team member put it in a candid survey response to Mr. Witty: "Honestly, external [is] not a priority for our business, UHC is the number 1 customer."  **PX-615** at -326; **8/10P**, 83:7-13, 83:24-84:3 (Witty).[165]

288.    To be clear, United's repeated claim that the Transparent Network must be multi-payer to achieve its financial targets, *see, e.g.*, **8/5P**, 114:2-10 (Schmuker), is consistent with the analysis and conclusions of the Government's economic expert.  The Government's economic expert merely conservatively *assumed*, for the purpose of his vertical math calculations, that "United would simply lose all of its sales of [the] transparent network to all rivals" and that it would win downstream customers only from its main rivals, and *still* concluded that United could offset any losses by gaining a mere 0.2% market share in national accounts and large group.  **8/15P**, 17:24-18:15 (Gowrisankaran).  If United instead were to withhold the Transparent Network from only its main health insurance rivals, it would forgo less upstream profit, requiring an even smaller gain in market share to offset the loss.  **PX-820 ¶¶** 246, 251.  Thus, United could, consistent with a multi-payer strategy, provide UHC and smaller payers access to the latest and best versions of the Transparent Network while delaying such timely innovations to its main health insurance rivals.  **PX-947 ¶** 110-13; **8/9A**, 69:3-70:4 (Gowrisankaran); **8/15P**, 17:5-23 (Gowrisankaran).

289.    Defendants' economic expert concluded that United would have no incentive to

---

[165] *See also* **PX-551** at -822 (notes from a call between Mr. de Crescenzo and Eric Murphy, former OptumInsight CEO, in which Mr. Murphy described the dynamic between UHC and OptumInsight as "we know where to find you and we sit in meetings and we are confident you will share new stuff with us"—which does not reflect a typical vendor-customer relationship).

raise its rivals' costs, **8/15A**, 68:1-69:18 (Murphy), but his analysis is flawed because it focuses on the sales United would forego by withholding the Transparent Network from other payers without accounting for the substantial revenues United could gain downstream in the relevant commercial health insurance markets. **8/15P**, 22:12-23:11 (Gowrisankaran). Defendants' economic expert also argued that United would not have an incentive to withhold EDI-related innovations because the upstream market for such innovations is "not very effective at moving customers in the downstream market." **8/15A**, 69:19-71:23 (Murphy). But this analysis ignores the ways EDI-related innovations will provide a competitive advantage to insurers, including by reducing costs and improving customer service for employer customers. **8/15P**, 20:22-21:21 (Gowrisankaran); **PX-820** ¶ 240.

290. Defendants' economic expert also cites United's acquisition of Equian to suggest that United would not have an incentive to withhold or delay the Transparent Network to its health insurance rivals. **8/15A**, 76:5-79:10 (Murphy). Dr. Gowrisankaran did not find the Equian acquisition to be a "good natural experiment" because "the markets that Equian competes in have a lot of rivals for them. There's a lot of competitors. So it makes it unlikely that United could use Equian products to substantially raise rivals' costs." **8/15P**, 7:8-8:3, 9:4-9 (Gowrisankaran); **PX-947** ¶¶ 57-60. Even so, post-acquisition pricing data showed price increases for United's primary rivals. Specifically, Dr. Gowrisankaran examined Dr. Murphy's empirical analysis of United's pricing of Equian products following that acquisition. After correcting for Dr. Murphy's errors, Dr. Gowrisankaran concluded that the data revealed that United charged higher prices to its primary rivals than to other payers, "showing that, in fact, United may have engaged in strategy here of raising rivals' costs." **8/15P**, 9:12-13:8; **PX-1036** at 2; **PX-947** ¶¶ 61-63. If United was able to raise rivals' costs after acquiring Equian's products, which faced some competition, a

similar result would be even more likely following the current acquisition because United would control the only scaled integrated platform.  **FOF ¶¶** 276-284.

291.    Going forward, United would likely delay the sale of the Transparent Network to its main health insurance rivals.  A Change strategy document provided by Optum Insight's then-CEO to then-Optum CEO Andrew Witty in preparation for a board meeting expressly provided that Optum's Transparent Network would be made available "to eliminate/minimize claims and adjudicate payments near real-time between UHC and OptumCare" providers three to five years after the deal closed and would be made available "to [the] broader market" only beginning in year six.  **PX-604** at -311; **8/10P**, 44:11-48:6 (Witty).  Although Mr. Witty, at trial, disputed the particular timeframe outlined in the document, he agreed that UHC would have access to the Transparent Network before any external payers.  **8/10P**, 47:4-48:2 (Witty).

292.    United's Provider Communication Gateway ("PCG") pilot as part of the Transparent Network is consistent with this strategy.  **8/5P**, 94:10-95:5 (Schmuker).  Optum first piloted PCG with UHC in January 2021.  **8/5P**, 94:16-23 (Schmuker).  Over a year later, Optum expanded the pilot to include Wellmark, a regional Blue Cross Blue Shield plan in Iowa.  **8/5P**, 94:24-95:1 (Schmuker).  By the time this lawsuit was filed in February 2022, Optum was not engaged in "active conversations" with any of United's main health insurer rivals as prospective PCG clients.  **DX-594** at -118.  And, as of May, UHC and Wellmark remained the only two payers involved in the pilot.  **8/5P**, 95:2-5 (Schmuker).

293.    Following the merger, United is unlikely to offer the latest and best versions of its integrated platform to its main health insurance rivals.  Rather, it could continually "test" or "pilot" new features for arbitrary periods of time, leaving its rivals with inferior versions and raising their costs relative to the but-for world.  **8/9A**, 69:3-70:4 (Gowrisankaran).

294.     At trial, Defendants argued that withholding or delaying the sale of the Transparent Network is inconsistent with Optum's multi-payer business model.  But Optum has made products available exclusively to UHC ahead of the market in the past.  For example, Optum initially offered Portfolio Optimization exclusively to UHC.   **PX-434** at -976; **8/10P**, 150:1-5 (Gehlbach). Portfolio Optimization uses artificial intelligence to help UHC's underwriters understand how much of a price increase a customer can sustain.  **8/10P**, 148:4-12 (Gehlbach).  The tool gives UHC a competitive advantage.  **8/10P**, 149:6-9, 150:14-152:12 (Gehlbach); **PX-438** (lauding performance of Portfolio Optimization).  UHC has deployed it in 48 states.  **8/10P**, 150:6-9 (Gehlbach).  Yet as of June 2022, UHC's former Chief Underwriting Officer was not aware of any other payer that used the tool.  **8/10P**, 150:10-13 (Gehlbach).

### 4.     Raising Rivals' Costs Would Harm Competition

295.     As an independent company not owned by any payer, **8/2P**, 132:17-19 (Suther), Change would likely sell its EDI-related innovations to all health insurers absent the merger, **PX-820** ¶ 255; **8/9A**, 13:25-14:20 (Gowrisankaran).  Unlike Optum, Change is "independent," i.e., "not owned by a health insurer, so no economic incentives that might skew a relationship."  **PX-176** at -779.  Change has touted its independence for years, describing how it has the "advantage of independently working with payers and providers" that "puts [it] in a unique position of not being owned by a competitor or dominant counter party."  **PX-531** at -945; *see also* **PX-530** at 3 (describing Change's "independen[ce]" as a factor of "competitive differentiation versus other participants"); **PX-174** at -805 ("[T]rust is grounded in our mission & independence . . . ."); **PX-175** at -777.  In short, Change has "zero economic incentive . . . to step on the scale one way or the other."  **PX-177** at -998; **8/2P**, 131:22-132:16 (Suther).

296.     In planning for a potential deal break in February 2022, Change's CFO even

prepared a draft investor presentation for Mr. de Crescenzo stating that Change "firmly believe[d] that the opportunities to maximize shareholder value are greater as a standalone company" than with United. **PX-527** at 9; *see also* **PX-525** at -371 ("It will be imperative that we immediately control the microphone and play offense with a goal to position us as a strong independent company solving mission-critical problems for our customers."). Mr. de Crescenzo responded that the slide should focus on "[o]ur new customer wins, the clarity our continued independence brings to our customers and partners and the accelerated innovation we have shown over the past year [that] ha[ve] created a strong foundation for our continued growth." **PX-528** at -422.

297.    By contrast, as described above, post-merger United would have the ability and incentive to raise its health insurer rivals' costs by withholding or delaying the sale of the latest and best versions of EDI-related innovations, such as its integrated platform. **FOF ¶¶ 265-294.** UHC would be the only health insurer among its rivals with access to the latest integrated platform. **8/9A**, 69:3-70:4 (Gowrisankaran).

298.    As a result, UHC's rivals and the competition that they bring would be weakened relative to the but-for world. As described above, **FOF ¶ 265**, integrated platforms will benefit payers through, for example, administrative and medical cost reductions and improved customer service, which are important dimensions of competition in the relevant commercial health insurance markets, **FOF ¶¶ 71, 73.** In doing so, these EDI-related innovations would likely help payers better attract and retain employer customers when competing against UHC. *See, e.g.*, **PX-1005** (111:14-111:17, 112:22-113-7, 118:7-119:6) (Dill); **PX-1013**, (172:8-173:11) (Golden); **8/9P**, 67:17-69:8, 71:3-72:11 (McMahon); **8/4A**, 29:16-30:18 (Wichmann); **8/9A**, 55:4-21 (Gowrisankaran).

299.    Therefore, United's withholding or delaying EDI-related innovations to its main

health insurer rivals would likely result in higher quality-adjusted prices in the relevant commercial health insurance markets, relative to the but-for world. **8/9A**, 71:18-72:4 (Gowrisankaran); **PX-820** ¶¶ 252-257; **PX-1015** at 39. Although Defendants' economic expert disagreed that United would have the ability and incentive to raise its health insurance rivals' costs post-merger, **8/15A**, 64:2-65:10 (Murphy), he agreed that, if a vertical merger gave a company the ability and incentive to raise its rivals' costs, it could harm competition, **8/15A**, 96:19-97:1 (Murphy).

### 5.   Post-Merger United Would Have the Ability and Incentive to Raise Rivals' Costs for ClaimsXten, Harming Competition

300.   Absent a divestiture of ClaimsXten, United would also have the ability to raise its health insurer rivals' costs by raising the price of, or withholding or delaying innovations to, ClaimsXten, relative to the but-for world.   **PX-820** ¶¶ 149-150, 274-276; **8/9A**, 101:5-19 (Gowrisankaran).

301.   Under this theory, the "related product" is ClaimsXten.   Rival insurers rely on ClaimsXten as a critical input to save billions of dollars per year in medical costs and there are few (if any) viable alternatives, **PX-820** ¶¶ 149-150; **FOF** ¶¶ 335, 340-341, 347-349.   In addition, switching costs for first-pass claims editing vendors are high. ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ ; *see also* **8/1P**, 4:21-5:24 (Garbee) (discussing switching costs).   The effort to switch would be significant,

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ Thus, if United were to raise the price of, or withhold or delay innovations to, ClaimsXten, its payer customers would be left to bear the price increase

or reduction in service.  **PX-820** ¶¶ 274-276; **8/9A**, 101:5-19 (Gowrisankaran).

302.     Post-merger, United would also have an incentive to raise its rivals' costs because profits in the relevant commercial health insurance markets are significantly larger than in the market for first-pass claims editing solutions.  **PX-820** ¶ 273. As a result, quality-adjusted prices in the relevant commercial health insurance markets would likely increase relative to the but-for world.  **PX-820** ¶¶ 274-276; **8/9A**, 101:5-19 (Gowrisankaran); **PX-1015** at 62.

### 6.     Defendants' Proposed "Commitment" <u>Cannot Remedy this Illegality</u>

303.     Defendants contend these harms can be addressed through the "commitment" offered in an amendment to Change's existing EDI customers' contracts.  But because the proposed amendment does nothing to alter United's ability or incentive to delay or withhold EDI-related innovations to its insurance rivals, it does not address the harms detailed above. **FOF** ¶¶ 263-299.

304.     Defendants propose <u>only one</u> "commitment" with respect to withholding or delaying innovations as a result of the proposed transaction, **8/10P**, 33:23-34:3 (Witty), which is set out in the following proposed amendment to Change's existing EDI customers' contracts:

> • **New or Improved Products and Services.**  If the UHG subsidiary into which Change's medical EDI clearinghouse business is integrated or operated develops new products and services, or improves upon existing products and services, by <u>using Change's medical EDI clearinghouse transaction data</u> (which will only be done in accordance with all applicable laws, regulations, and contracts), and if that subsidiary makes such products and services available to a UHG entity outside of a limited pilot or development trial, <u>it also will make such products and services available to Customer as soon as reasonably practicable and at commercially reasonable rates</u>.

**DX-686** at -893, § III.

305.     **The proposed amendment does not alter United's *ability* to raise its health insurer rivals' costs** by delaying the sale of integrated platform innovations to them.

306.    *First*, the proposed amendment governs only new or improved products and services developed "using Change's medical EDI clearinghouse transaction data."  **DX-686** at -893.  But United's own Senior Vice President for the Transparent Network testified that "the claims data . . . acquired from Change" does not "advance the Transparent Network in any way."  **8/5P**, 120:25-121:5 (Schmuker).   Thus, the amendment is simply inapplicable to United's Transparent Network innovations and fails to remedy the harm detailed above.  **FOF ¶¶** 263-299.

307.    *Second*, the proposed amendment is vague.  It applies only to products and services made available to a United entity "outside of a limited pilot or development trial," and even then, it provides only that United make those products or services available "as soon as reasonably practicable" and at "commercially reasonable rates."  **DX-686** at -893, § III; **8/10P**, 41:18-23 (Witty).  None of these terms is defined, leaving the meaning to be determined in the future by United.  **8/10P**, 41:24-43:7, 43:18-21, 44:3-10 (Witty); **8/2P**, 33:1-7 (de Crescenzo).   Given United's track record of providing innovative products and services exclusively to UHC for extended periods of time, **FOF ¶** 294, it is unlikely that United expects the amendment to limit its ability to give early or preferential access to integrated platform innovations to UHC.  Indeed, the deal document provided to Mr. Witty in preparation for a board meeting set out a three-year period in which the Transparent Network would be offered exclusively to UHC before being offered to rival payers.  **FOF ¶**291.  United's current practice in piloting the Transparent Network—first with UHC and then with a regional payer over a year later, with no plan to include United's main insurer rivals—is indicative that this plan will continue.  **FOF ¶** 292.

308.    Moreover, Mr. Witty testified that the commitment established a mere "framework for future negotiations between the company and its customers."  **8/10P**, 43:22-44:2 (Witty).  Although Mr. Witty testified that a "commercially reasonable rate[]" could be set even for a new,

innovative product like the Transparent Network based on such "a price negotiation or setting mechanism," **8/10P**, 43:8-17 (Witty), any such negotiation will be on United's terms because it will control the only scaled integrated platform post-merger, **PX-820** ¶ 253; **FOF** ¶¶276-284.

309.    *Third*, the amendment is limited to the term of a Change EDI customer's contract, and no longer.  **DX-686** at -893 ("Once the Amendment is effective, it shall remain in effect for the remainder of the term of the Agreement."); **8/10P**, 34:19-35:4 (Witty).

310.    *Fourth*, the amendment is a mere gratuitous promise.  Change's EDI customers paid "[a]bsolutely nothing" for them and agreed to "[n]othing whatsoever" in exchange for them.  **8/2A**, 136:13-20 (de Crescenzo).

311.    **Nor does the proposed amendment alter United's *incentive* to favor UHC over its main health insurance rivals.**  It does not alter United's incentive to maximize the profits of the overall enterprise.  **FOF** ¶¶ 285-287.  And it does not change market reality—the potential profits to be won in the national accounts and large group markets still dwarf any profits forgone by withholding or delaying the sale of the Transparent Network to rival health insurers.  **FOF** ¶ 285.

### B.    Proposed Conclusions of Law

#### 1.    Relevant Markets and Related Products

312.    The relevant markets are the same as those established above in Part IV.  *See* **COL** ¶ 225.

313.    The "related products" to the Government's raising rivals' costs theories are (1) EDI-related innovations such as integrated platforms, and (2) ClaimsXten.

#### 2.    The Merger Is Unlawful

314.    The proposed merger is an illegal vertical merger because it would give United the ability and incentive to raise its health insurance rivals' costs by (1) withholding or delaying access

to EDI-related innovations, and (2) raising the price of, or withholding or delaying improvements to, ClaimsXten, thereby harming competition in the relevant commercial health insurance markets. *See* **COL** ¶¶ 316-322.

315.    Post-merger changes to a firm's incentive and ability to compete are precisely the factors courts evaluate to determine whether a merger may be likely to substantially lessen competition, based upon an assessment of the merger's "impact upon competitive conditions in the future." *Phila. Nat'l Bank*, 374 U.S. at 362 (stating that the purpose of Section 7 was to "arrest anticompetitive tendencies in their 'incipiency'"); **COL** ¶¶ 231-233.   The Supreme Court has found liability based on precisely this kind of risk of foreclosure in previous vertical mergers. *See, e.g.*, *Ford*, 405 U.S. at 574-75, 578 (finding that the vertical merger "foreclose[d]" the remaining independent manufacturer in the relevant market, resulting in anticompetitive effects); *Brown Shoe*, 370 U.S. at 334 (holding that the merger, against the backdrop of "the trend toward vertical integration in the shoe industry," may "foreclose competition" in violation of Section 7).

### (a)    *The Government Has Established Its Prima Facie Case that the Merger Harms Competition*

316.    The evidence at trial established that post-merger United could gain the ***ability*** to raise its health insurance rivals' costs in at least three ways and thereby harm competition.

317.    *First*, the evidence at trial established that United would have the ability to withhold or delay EDI-related or ClaimsXten innovations to its main health insurance rivals, which would likely lead to higher quality-adjusted prices in the relevant commercial health insurance markets, relative to the but-for world.   **FOF** ¶¶ 265-284, 297-302.   Those higher quality-adjusted prices constitute harm to competition. *Anthem*, 855 F.3d at 366-67.

318.    *Second*, the evidence at trial established that post-merger United would have the ability to withhold or delay the latest and best versions of its EDI-related and ClaimsXten products

to its health insurer rivals.  **FOF ¶¶** 265-284, 297-302.  As a result, United would likely "reserve[e] special features or innovations" for itself.  *See H&R Block*, 833 F. Supp. 2d at 82.  "That threat to innovation is anticompetitive in its own right," even in the absence of a price increase.  *Anthem*, 855 F.3d at 361; *see also AT&T*, 916 F.3d at 1045 ("Vertical mergers can create harms beyond higher prices for consumers, including decreased product quality and reduced innovation.").

319.   *Third*, the evidence at trial established that, post-merger, United would have the ability to raise the cost of ClaimsXten to its health insurance rivals.  **FOF ¶¶** 300-301.  United would likely raise its rivals' costs by forcing them to "pay[] more to procure necessary inputs" like ClaimsXten, *see Sprint Nextel Corp.* v. *AT&T, Inc.*, 821 F. Supp. 2d 308, 330 (D.D.C. 2011), or "foreclosing [them] . . . from access on competitive terms" to ClaimsXten, *see Yankee Entm't & Sports Network, LLC* v. *Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 673 (S.D.N.Y. 2002).[166]  The evidence at trial established that if United were to raise its rivals' costs in this manner, prices in the relevant commercial health insurance markets would likely increase.  **FOF ¶** 302.  That price increase would constitute harm to competition.  *See AT&T*, 916 F.3d at 1045 (stating that price increases are one potential anticompetitive harm of a merger).

320.   Defendants' attempts at trial to minimize United's ability to raise rivals' costs by distinguishing Real-Time Settlement and the Transparent Network and by characterizing Change's development efforts as speculative are not entitled to any weight.  **FOF ¶¶** 272, 282.  Courts discount evidence of post-acquisition conduct "that may have been made to improve [defendant's]

---

[166]   *See Brown Shoe*, 370 U.S. at 324 n.40 ("[A] vertical merger may disrupt and injure competition when those independent customers of the supplier who are in competition with the merging customer, are forced either to stop handling the supplier's lines, thereby jeopardizing the goodwill they have developed, or to retain the supplier's lines, thereby forcing them into competition with their own supplier.").

litigating position," *Hosp. Corp. of Am.*, 807 F.2d at 1384, because such evidence "*could arguably be subject to manipulation.*" *Chicago Bridge & Iron* v. *FTC*, 534 F.3d 410, 435 (5th Cir. 2008). It is "common[]sense" that "a firm's behavior undertaken with the aim of persuading a court or the government regarding the legality of a merger may not be predictive of how that firm will behave once the court or the government are no longer engaged." *Aetna*, 240 F. Supp. 3d at 80. That principle applies even where, as here, a firm's conduct occurred "after [a] merger was announced" but before it was consummated. *Id.* Otherwise, "violators could stave off" lawsuits "merely by refraining from aggressive or anticompetitive behavior when such a suit was threatened or pending." *Gen. Dynamics*, 415 U.S. at 504-05 (1974). As a result, Defendants' ordinary-course business records and conduct—which demonstrate the similarity of Real-Time Settlement and the Transparent Network and the likelihood that Change could build an integrated platform on its own—are far more probative of the effect of the proposed merger than post-signing actions taken in the shadow of litigation.

321. Similarly unfounded are defendants' efforts to alter the state of competition between United and Change by asserting that Change's Real-Time Settlement is exclusively for payers—a pivot away from ordinary-course evidence demonstrating it was intended for both payers and providers. **FOF** ¶¶ 273-274. "While there can be no substantial lessening of competition if there is no pre-existing competition to begin with, the case law does not support defendants' approach of viewing competition as an on-off switch where a merging party can simply switch it off entirely by withdrawing from a market (potentially temporarily)." *Aetna*, 240 F. Supp. 3d at 76 (citation omitted); *see also FTC* v. *Warner Commc'ns Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984) ("[A] company's stated intention to leave the market . . . does not in itself justify a merger."). Courts "routinely view competitors that may have one foot in and one foot out of the

market as actual competitors, and evaluate the anticompetitive effects of a merger using the standard tools of antitrust analysis." *Aetna*, 240 F. Supp. 3d at 76. The same holds true here.

322. The Government also established that United would have an ***incentive***, post-merger, to raise its health insurer rivals' costs because it stands to gain far more in the relevant commercial insurance markets than it would lose by withholding or delaying the Transparent Network or ClaimsXten to other insurers. **FOF ¶¶** 285-294, 302. It is black-letter law that a "parent and its wholly owned subsidiary have a complete unity of interest." *Copperweld*, 467 U.S. at 771. "[T]heir general corporate actions are guided and determined not by two separate corporate consciousnesses, but one." *Id*. It follows that business divisions "pursue[] the common interests of the whole rather than interests separate from those of the corporation itself," and that the enterprise will use those divisions "to further its own interests in the most efficient manner." *Copperweld*, 467 U.S. at 770; *see also AT&T*, 916 F.3d at 1043 (explaining that *Copperweld* "adopted as a principle of antitrust law" that "a business with multiple divisions will seek to maximize its total profits"). Nothing warrants deviation from this black-letter principle of law—or economics—here.

### (b) *Defendants Have Failed to Rebut the Government's Prima Facie Case*

323. Defendants' proposed "commitment" in the form of an amendment to Change's existing EDI customers' contracts does nothing to prevent United from gaining the ability and incentive to raise its health insurance rivals' costs or to alter the conclusion that the effect of the proposed transaction is likely to substantially lessen competition.

324. To begin with, the evidence at trial established that Change's EDI customers neither paid for nor agreed to anything in exchange for the proposed amendment. **FOF ¶** 310. Because the amendment was not bargained for, it lacks consideration and is a mere unenforceable promise

from which United could deviate at any time without consequence.  *See Osborn ex rel. Osborn* v.

*Kemp*, 991 A.2d 1153, 1158 (Del. 2010); Restatement (Second) of Contracts § 71.

325.    Even assuming the amendment is binding on United, it does not alter United's

ability or incentive to raise its health insurance rivals' costs and thereby harm competition.

326.    *First*, the evidence at trial established that the amendment was offered only to

Change's existing EDI customers and endures only for the remainder of those contracts' terms.

**FOF ¶¶** 309.  It lacks both permanence and breadth.

327.    *Second*, the evidence at trial established that United's Transparent Network would

*not* be developed "using Change's medical EDI clearinghouse transaction data."  **FOF ¶** 306.  As

a result, United's obligation to offer innovations developed using such data to other payers "as

soon as reasonably practicable and at commercially reasonable rates" is beside the point.  Delaware

courts "interpret clear and unambiguous terms" in contracts "according to their ordinary meaning,"

*GMG Cap. Invs., LLC* v. *Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012), and on

this score at least, the contract's meaning is unambiguous.

328.    *Third*, the proposed amendment does nothing to change the market reality described

above, **FOF ¶¶** 307-308, 311, or prevent United from "further[ing] its own interests in the most

efficient manner."  *Copperweld*, 467 U.S. at 770.  United will exploit any gray areas to maximize

its own profits, as it is in its corporate interest to do so.

329.    The merger is unlawful and should be enjoined.  *See* 15 U.S.C. § 18.

## VI.   THE MERGER IS AN ILLEGAL HORIZONTAL MERGER BECAUSE IT WOULD CREATE A NEAR-MONOPOLY

330.   There is no material dispute that United's acquisition of Change violates Section 7 of the Clayton Act because it would give United a near-monopoly in first-pass claims editing solutions.  Defendants assert, instead, that this illegality is remedied by their narrow proposed divestiture.  But it is the defendants' burden—not the Government's—to establish that the proposed remedy replicates the competitive intensity between Change and United today.  **COL** ¶411.  That burden is higher where—as here—the Government has established a strong *prima facie* case showing that the merger would lead to a near-monopoly.  **COL** ¶412.  Defendants have failed to carry their burden.  The merger should be enjoined.

### A.   Proposed Findings of Fact as to the Proposed Merger

331.   The proposed merger is a presumptively illegal horizontal merger because it would (i) produce a firm controlling about 94% of the relevant market**, 8/9A** 24:18-21 (Gowrisankaran), **PX-820** ¶ 158, and (ii) result in a significant increase in concentration.  This is enough, as set forth below, to find that the Government has carried its burden to demonstrate illegality.  But the Government here, as in past cases involving unlawful mergers, "has not rested on that presumption," and has instead introduced evidence showing that the merger would "'eliminate head-to-head competition'" in the relevant market.  *Aetna*, 240 F. Supp. 3d at 43 (quoting *Staples*, 190 F. Supp. 3d at 131).

### 1.   <u>The Relevant Market Is Proven and Undisputed</u>

332.   As a preliminary matter, Defendants do not dispute the existence of a relevant antitrust market—here, the market for first-pass claims editing solutions in the United States—for this aspect of the case.  Defendants effectively conceded this market by virtue of their trial presentation, which did not materially challenge the Government's proof.

333.    In any event, the market for first-pass claims editing solutions bears the practical indicia of a distinct product market.  **COL** ¶351.

334.    As brief background, employers entrust payers to administer their health plans, and payers work to keep costs down, including by ensuring they pay the appropriate medical costs on their customers' claims.  *See generally* **FOF** ¶68-73; **8/1P**, 37:9-24 (Lautzenhiser).

335.    A payer's health insurance plan is made up of multiple types of medical benefits. Each of these benefits is tied to a payer's policies, which are applied to medical claims via claims editing.  **8/1P**, 33:10-23 (Lautzenhiser).  Claims editing is part of the payer's adjudication process, and helps payers execute their clients' unique coverage policies.  **8/1A**, 118:4-11, 121:23-122:4 (Garbee).  Claims editing software accomplishes this by using algorithms to implement logical "rules" so that claims are rejected or paid, as appropriate.  *See* **8/1A**, 119:21-122:14 (Garbee).  The software executes both "standard" rules—based on recognized clinical guidelines—and "custom" rules particular to each payer and plan.  **PX-1005** (63:2-15, 63:16-65:4) (Dill).  Custom edits in particular are proprietary to each payer, and differentiate payers.  **8/9P**, 73:19-74:20 (McMahon); *see also* **PX-1005** (86:10-87:01) (Dill) (explaining that with claims editing, payers show clients that the savings they can deliver are unique and proprietary).  Claims editing is a key input for health insurers, and reduces payers' costs.  **8/9P**, 72:23-73:15 (McMahon).  Cigna's commercial health insurance customers, for example, save approximately $█████ per year, or ███████ of their total costs, from Cigna's use of ClaimsXten.  **8/1P**, 3:19-4:2 (Garbee).  Aetna estimated that it saved ████████████████ in medical cost savings from ClaimsXten in 2021.  **8/1P**, 63:12-18 (Lautzenhiser); *see also* **PX-220** at -348 (███████████████████████████████████ ███████████████████████████).  A payer that overpays claims would have higher medical costs and be less competitive with rivals.  **8/1A**, 124:18-25 (Garbee); **8/1P**, 37:25-38:7

152

(Lautzenhiser) (Reducing medical costs is important because payers "need to be able to price our plans appropriately so that we can compete in the marketplace.").

336.  As relevant here, claims editing may take place in different "pass" positions, and the markets for first- and second-pass claims editing solutions are distinct.  For instance, first-pass claims editing solutions have distinct product features, pricing, and market participants relative to second-pass claims editing solutions.  *E.g.*, **8/1P** 31:21-22, 34:1-25 (Lautzenhiser) (describing differences).  For example:

- **The products function differently and can produce different results.**  First-pass claims editing occurs during the adjudication process, in real time: the software generates a response within milliseconds of receipt.  *See* **8/2P**, 43:10-13, 43:18-22, 44:2-4 (Turner).  Second-pass claims editing typically occurs post-adjudication and performs further checks on claims to supplement first-pass claims editing.  **8/2P**, 45:12-23 (Turner); **8/5P**, 84:2-7 (Schmuker); **PX-820** ¶¶ 41-42.  The products may yield different edits.  **8/1P**, 45:14-46:2 (Lautzenhiser).

- **The products are priced differently,** with first-pass typically on a per-member-per-year license fee basis and second-pass typically on a shared-savings basis.  **PX-820** at ¶ 42; **8/2P**, 83:21-84:20 (Turner); ███████████

- **The products have different market participants.**  Change and United (Optum) view each other as their only major competition in the market for first-pass claims editing solutions, as befits entities controlling 94% of the market.  *E.g.*, **PX-242** at -517 (Change describing itself as the "market leader" in first-pass editing, Optum as the only "major competitor"); **8/2P** 79:7-14 (Turner).  By contrast, Cotiviti is the "primary competition" for "second-pass," with "██% of the market."  **PX-102** at -654; **8/2P**, 80:22-81:3 (Turner); **PX-242** at -517.

337.  Likewise, industry participants (including Defendants) recognize first pass claims editing as a distinct product.  *E.g.*, **8/1P**, 31:21-22, 34:1-25 (Lautzenhiser).  In particular:

- **At trial, Change and Optum executives did not dispute that first- and second-pass claims editing solutions are distinct.**  *E.g.*, **8/2P** 76:18-21, 85:14-18 (Turner) (agreeing that "ClaimsXten is indeed the market leader for first-pass claims editing"); **8/5P**, 84:2-7 (Schmuker) (agreeing that second-pass editing refers to editing that happens after first-pass).

- **Contemporaneous documents show that Change and Optum evaluate**

**market competition for first- and second-pass separately.** *E.g.*, **PX-102** at -654 (separately assessing "First pass (mid adjudication)" and "Second pass (post adjudication) market" share); **PX-411** at -460 (separately evaluating "Market Position" of competitors in "Primary Editing" and "Secondary Editing"); **PX-242** at -517 (separately evaluating competitive positioning for "CCM (CXT)" and "CCM - Secondary Editing").

338.     First- and second-pass claims editing solutions are commonly used as complements, not substitutes.  The Government's economic expert provided this opinion, and Defendants' economic expert offered no contravening testimony.  **PX-820** ¶ 147; **8/15A**, 97:24-98:2 (Murphy).  The products (i) typically process claims at different stages of the processing lifecycle (mid- and post-adjudication, respectively), **PX-102** at -654, and (ii) many payers use both first- and second-pass solutions, in that order.  **8/2P**, 43:7-13, 43:18-22 (Turner); **PX-104** (spreadsheet at "Summary" tab).

339.     The United States is a relevant geographic market for the sale of first-pass claims editing solutions.  The Government's economic expert so testified, **8/9A**, 22:8-18; **PX-820** ¶ 148 n.320 (collecting sources), and Defendants' economic expert offered no contravening testimony.  **8/15A**, 97:25-98:2 (Murphy).  For example, ClaimsXten is marketed nationally, with customers located in all fifty states and Puerto Rico.  **PX-411** at -450.  Because of the uniqueness of the U.S. healthcare system, U.S. health insurers would not look to first-pass claims editing solutions used outside the U.S. if faced with a price increase.  **PX-820** ¶ 155 (Gowrisankaran).

### 2.     The Merger Would Produce a Firm Controlling 94% of the Relevant Market

340.     The proposed merger would result in United controlling 93.9% of the market for first-pass claims editing solutions.  **8/9A**, 24:18-21 (Gowrisankaran); **PX-820** at 156 (Ex. 5).  Based on 2019 revenue data, Change has a 67.3% share of the market and United a 26.6% share, for a combined 93.9%.  **8/9A**, 24:18-21 (Gowrisankaran); **PX-820** at 156 (Ex. 5); **PX-1015** at 9.

341.     Defendants do not dispute these figures.  In particular:

- Defendants' expert, Dr. Murphy, was not "asked to evaluate" this claim. **DX-813** ¶ 4.

- A Change executive testified that Change has roughly 60-70% market share and United roughly 20%. **8/2P**, 76:8-15, 85:14-18 (Turner).

- A United document estimated that Change had 65% share and United 25% in 2020. **PX-104** at -835; **8/5P**, 83:5-11 (Schmuker); *see also* **PX-479** at 6 (estimating United's share as 30%).

### 3. The Merger Would Result in a Significant Increase in Concentration

342.     Market concentration is "often measured using the Herfindahl-Hirschmann Index, or HHI," which is "'calculated by summing the squares of the individual firms' market shares.'" *Aetna*, 240 F. Supp. 3d at 42 (citations omitted).

343.     The merger here would produce a market with an HHI of 8,831, an increase in HHI of 3,577 over the pre-merger HHI of 5,254. **8/9A**, 25:11-16, 26:9-18 (Gowrisankaran); **PX-820** at 165 (Ex. 14); **PX-1015** at 12.  These numbers represent, as set forth below, both an already-concentrated market—that is, a market with an HHI above 2,500—and a substantial increase in concentration as a matter of law—that is, an increase of over 200 points. **COL** ¶354.  The Government's economic expert corroborated both points, **8/9A**, 13:16-24, 25:17-23, 26:9-18 (Gowrisankaran),[167] and the Defendants' economic expert did not dispute them. **8/15A**, 100:10-20 (Murphy).  Under these market concentrations figures, the Government is entitled to a presumption that the proposed merger is anticompetitive under the Horizontal Merger Guidelines. **COL** ¶¶354-355.

---

[167] The Government's economic expert also concluded, in the alternative, that both points would be true as to an antitrust market defined to include both first- and second-pass claims editing, notwithstanding the absence of debate as to the contours of the relevant market here. **8/2A** 26:9-18 (Gowrisankaran); **PX-820** ¶¶ 264-268, & p. 165 (Ex. 14); **PX-1015** at 12.

### 4.   The Merger also Would Result in a
### Loss of Head-to-Head Competition

344.    In addition to these factors, which render the merger unlawful, the merger would also result in a loss of head-to-head competition for both (i) price and quality and (ii) innovation.

345.    *First*, Change and United (Optum) engage in intense head-to-head competition over price and quality, resulting in lower prices and higher quality for customers.  For example:

- **United** offered a customer a "**sweetheart deal**" amounting to a ██% discount off list price "to win them away from [Change]," **PX-107** at -66 (emphasis added); **8/5P**, 85:3-25 (Schmuker);

- Optum described **"steal[ing]" a customer** from Change because it offered them "the incentive needed" to "select Optum over [Change]," **PX-485** at -080 (emphasis added);

- United described **"approving 20%-25% discounts consistently"** to compete with Change, **PX-327** at 22 (emphasis added); **8/5P**, 86:6-88:7 (Schmuker);

- Change **cut its license fee** by 36% and hosting fee by 30% to "keep us competitive with Optum," **PX-35** at -267-68; **8/2P**, 55:6-57:9 (Turner);

- Change approved a ██% license fee discount and ██% implementation fee discount "**due to [the] competitive situation** with Optum," **PX-223** at -401, -405 (emphasis added); **8/2P**, 62:1-64:18 (Turner);

- Change's sales team requested discounts because it was "in a very **competitive situation** with OPTUM" and noted that it had been "very aggressive" with two customers because of discounts offered by Optum, **PX-226** at -828-29 (emphasis added); **8/2P**, 57:10-61:25 (Turner); and

- Change introduced a new state Medicaid edits offering because of the **"competitive threat"** from Optum, **PX-236** at 6 (emphasis added); **8/2P**, 66:14-69:1 (Turner).[168]

346.    Underscoring Change and United's collective dominance of the first-pass claims

---

[168]   *See also* **PX-33** at -447 ("We are facing an extremely competitive situation from OPTUM); **PX-224** at -052 ("We are competing with Optum in all of these deals.  We have had several losses so I'm trying to make adjustments to our approach."); **PX-238** ("[W]e have competitive cost pressure due to Optum[.]").

editing solutions market, these ordinary-course documents about the fierce competition between them do not even mention other competitors.

347.    Consistent with these episodes of head-to-head competition, Change and Optum view one another as their primary competitors in first-pass claims editing.  Optum views itself and Change as the "primary editors in the payer market."   **PX-327** at -112; **8/5P**, 86:12-87:7 (Schmuker); *see also* **PX-104** at -835.  Change similarly views Optum as the only "[m]ajor [c]ompetitor" to ClaimsXten.  **PX-242** at -517; **8/2P**, 79:7-24 (Turner).

348.    By definition, head-to-head competition between Change and Optum over price and quality would be lost were the merger to proceed.  Price and quality benefits that customers enjoy as a result of that competition would also therefore be lost; Change and Optum control 94% of the market today, and no remaining competitor could restore that loss in the event of a merger. **8/9A**, 26:19-27:9 (Gowrisankaran); *accord* **PX-820** ¶ 259.

349.    The head-to-head competition between Change and Optum lost through this merger would not be replaced by other competitors or self-supply by payers.  For example:

- **Smaller first-pass vendors and second-pass vendors are not viable options in the first-pass claims editing space.**  For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Similarly, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- **Large payers are unable to self-supply due to the cost, time investment, and risks required to develop a solution comparable to ClaimsXten.**  For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

similarly

350.     ***Second***, as set forth above, **FOF ¶ 267-275,** Change and Optum also compete head-to-head to develop innovative products incorporating claims editing capabilities that payers can use to improve performance and customer satisfaction.   **PX-820 ¶ 259.**   This head-to-head innovation competition also would by definition be lost were the merger to proceed.

### B.     Proposed Conclusions of Law as to the Proposed Merger

#### 1.     The Merger Is Presumptively Illegal

351.     The market for first-pass claims editing solutions in the United States constitutes a relevant antitrust market.  **FOF ¶¶ 333-339**; *Brown Shoe*, 370 U.S. at 324-28.

352.     The proposed merger is presumptively illegal because it would "produce a firm controlling an undue percentage share of the relevant market, and would result in a significant increase in the concentration of firms in that market."  *Heinz*, 246 F.3d at 715 (quoting *Phila. Nat'l Bank*, 374 U.S. at 363) (brackets and quotation marks omitted).

353.     *First*, because the merger here would result in 93.9% control of the relevant market by United, **FOF ¶¶ 340-341,** it would "produce a firm controlling an undue percentage share of the relevant market." *Heinz*, 246 F.3d at 715 (quoting *Phila. Nat'l Bank*, 374 U.S. at 363) (brackets and quotation marks omitted).  Courts routinely find this standard met with far lesser control.  *See, e.g.*, *Phila. Nat'l Bank*, 374 U.S. at 364 (presumption established where merging entities controlled 30% of market); *FTC* v. *Swedish Match*, 131 F. Supp. 2d 151, 166-67 (D.D.C. 2000) (presumption established where merging entities controlled 60% of market).

354.     *Second*, the merger is presumptively unlawful because it would "result in a significant increase in the concentration of firms in that market." *Heinz*, 246 F.3d at 715 (quoting

*Phila. Nat'l Bank*, 374 U.S. at 363) (brackets and quotation marks omitted)).  As set forth above, **FOF ¶342**, market concentration is often measured using HHI.  *E.g.*, *Heinz*, 246 F.3d at 716; *Aetna*, 240 F. Supp. 3d at 42.  "'Sufficiently large HHI figures establish the [Government's] *prima facie* case that a merger is anti-competitive" as a matter of law.  *Aetna*, 240 F. Supp. 3d at 42 (quoting *Heinz*, 246 F.3d at 716).  "If a merger would produce a highly concentrated market [a market with 'an HHI over 2,500'] and 'involve an increase in the HHI of more than 200 points,' then it 'will be presumed to be likely to enhance market power.'"  *Id.* (quoting *Heinz*, 246 F.3d at 716); **HMG**, § 5.3.  Because the merger here would produce a market with an HHI of 8,831, and involve an increase in the HHI of 3,577, it is presumptively unlawful.  **FOF** ¶343; *Heinz*, 246 F.3d at 716; *Aetna*, 240 F. Supp. 3d at 42; *H&R Block*, 833 F. Supp. 2d at 72 (presumption established with a post-merger HHI of 4,691 and an HHI increase of approximately 400).  Defendants offered no contradictory evidence or argument.

355.    For these reasons alone, "the government is entitled to a presumption that the merger would substantially lessen competition."  *Aetna*, 240 F.Supp.3d at 43.

356.    But here, as in *Aetna*, the Government "has not rested on that presumption," and has instead "introduced evidence tending to show that the merger would substantially lessen competition," *id.*, in the form of evidence showing that the merger would "'eliminate head-to-head competition'" in the market for first-pass claims editing solutions.  *Aetna*, 240 F. Supp. 3d at 91 (quoting *Staples*, 190 F. Supp. 3d 100, 131 (D.D.C. 2016)); *see also Sysco*, 113 F. Supp. 3d at 61 (collecting cases); **FOF ¶¶** 344-350.

357.    Evidence of lost head-to-head competition renders a *prima facie* case "very strong."  And where, as here, the "government has made a very strong *prima facie* case that the proposed merger may substantially lessen competition, . . . relying on both the presumption based on market

concentration and on direct evidence of head-to-head competition," defendants' burden on rebuttal is higher. *Aetna*, 240 F. Supp. 3d at 91. The "'more compelling the *prima facie* case, the more evidence the Defendant[s] must present to rebut it successfully.'" *Id.* at 91 (quoting *Baker Hughes*, 908 F.2d at 991)). This burden is, in the words of the D.C. Circuit, "extraordinary": in a case with an even smaller increase in concentration than the one described here, the D.C. Circuit found that "high market concentration levels present in [a] case require[], in rebuttal, proof of extraordinary efficiencies, which the appellees failed to supply." *Heinz*, 246 F.3d at 720; *see also Aetna*, 240 F.Supp.3d at 94.

358.    Where, as here, Defendants' rebuttal rests on a proposed remedy, the Defendants must show that the remedy would "restore the competition lost by the merger," by "replacing the *competitive intensity* lost as a result of the merger." *Sysco*, 113 F. Supp. 3d at 72-73 (emphasis in original); *see also Aetna*, 240 F.Supp.3d at 60, *FTC* v. *RAG-Stiftung*, 436 F. Supp. 3d 278, 304 (D.D.C. 2020).

359.    Defendants, as set forth below, have not carried their burden to demonstrate that their proposed remedy would replace the competitive intensity lost as a result of the merger.

### C.    Proposed Findings of Fact as to the Proposed Divestiture

360.    Defendants propose a narrow divestiture of Change's "Clinical Claims Management Franchise"—which includes Change's ClaimsXten—to TPG. **PX-411** at -447, -464; **DX-579**; **8/11A**, 13:8-14:6 (Wukitch).

361.    The proposed divestiture would not replace the "competitive intensity" that would be lost were the merger to proceed. **8/15P**, 65:13-23 (Gowrisankaran); **8/11A**, 116:24-117:1, 118:20-119:1 (Wukitch); **8/11A**, 122:1-19 (Wukitch); **8/11P**, 44:17-24 (Raj). TPG's generalized incentive to operate the divested assets profitably does not ensure that TPG would be capable of asserting the same competitive pressure on Optum as Change does today.

### 1. TPG Was Not Selected for Ability to Replace Today's Competitive Intensity

362.    As a preliminary matter, United—the company that will compete against the buyer of ClaimsXten if the Court approves this transaction—chose TPG as the buyer.  That TPG is not poised to replicate the competitive force Change offers is not news to United.  Indeed, the evidence shows that in selecting a prospective buyer, United focused not on TPG's ability to compete with Optum, but on whether TPG could close quickly on the purchase of the divested assets.  *See, e.g.*, **8/11P**, 57:1-20 (Raj); **PX-588** at -109-10; **DX-619** at -675.

363.    TPG was not United's first choice to purchase ClaimsXten.  United initially selected a different firm, New Mountain Capital, as the divestiture buyer.  **8/11P**, 74:24-76:12 (Raj).  United only pivoted to TPG after negotiations with New Mountain Capital broke down. **PX-755** at -928.

364.    United selected TPG despite the fact that it had no experience running first-pass claims editing or any other payment accuracy businesses.  **8/11P**, 44:7-16 (Raj); *see also* **8/11P**, 76:22-77:18 (Raj).  United's preferred buyer—New Mountain Capital—had experience operating payment accuracy businesses, as did at least one strategic buyer that submitted a bid for ClaimsXten.  **PX-585** at -779; **PX-755** at -925 ("Our battleship is sunk on ClaimsXten. . . .  Not even really a terms / price issue.  NMC [New Mountain Capital] has owned assets in rev cycle and claims editing.  Lawyers became obsessed with that.").  Recognizing its lack of relevant industry experience, TPG knew that it "could [not] compete" with New Mountain Capital's previous experience.  **PX-755** at -926.

365.    Nonetheless, United ultimately selected TPG as the buyer for ClaimsXten, although

TPG never learned why.  **8/11P** 71:13-18 (Raj).[169]  The record reveals the reason.  Defendants did not begin marketing ClaimsXten to potential buyers until late January 2022, **8/11P** 45:4-10 (Raj), despite the fact that Change had started working on a potential divestiture of ClaimsXten in March 2021, at the latest.  **8/11A**, 112:16-23 (Wukitch); **PX-412** at -833.  Because of the short timeframe for a sale of ClaimsXten, TPG understood that the primary factors driving United's selection of a buyer were the speed and certainty of closing a transaction.  **PX-588** at -109-110 (TPG relayed internally that "UnitedHealth is strongly motivated to run a process focused on speed and certainty so that [ClaimsXten] (~6% of Change's revenue) is not an impediment."); **8/11P**, 57:1-20 (Raj).  United, in fact, informed TPG that "[i]n addition to value, we are focused on certainty as it relates to signing a binding contract in early March."  **DX-619** at -675.

366.  TPG thus understood that United's sale of ClaimsXten was a "[l]imited regulatory-driven process focused on speed and certainty."  **PX-649** at -056.  Although strategic buyers may bring greater experience in relevant industries, such buyers were disfavored in United's divestiture process.  **PX-585** at -779 (stating that "strategics have been disadvantaged in this current process due to the sellers' focus on speed and certainty of closing").  United's advisor, Barclay's, also informed TPG that strategic buyers were "complicated" and that "a strategic won't win."  **PX-646** at -898.

---

[169] United declined to disclose the reasons that it ultimately selected TPG as the divestiture buyer on the bases that the company's 30(b)(6) deposition designee on the topic of the divestiture did not know the answer, and that in any event the reasons for the decision were privileged.  **PX-1043** (108:9-11, 108:13, 108:16-17, 108:19-109:6) (Yurjevich United 30(b)(6) testimony) ("Q: And do you - can you state the basis for the decision of why [United] decided to go with TPG in the end?  . . .  A: A, it was privileged; and B, I don't know the answer to that.").

### 2. The Divestiture Will Not Replace Today's Competitive Intensity Because TPG Will Be Unable to Replicate Change's Longstanding Competitive Strategy

367.    Change and Optum are unique in the breadth of payment accuracy solutions they offer to customers. **PX-530** at 3. Today, when competing with Optum, Change leverages an end-to-end payment accuracy strategy, which puts it at a competitive advantage. *See* **8/11A** 94:7-12 (Wukitch). It was uncontroverted at trial that TPG, if it were to acquire ClaimsXten, would not be able to replicate this strategy. *E.g.*, **8/11A** 116:24-117:1, 118:21-119:1 (Wukitch); **8/11P** 44:17-24 (Raj); **8/15P**, 65:13-23 (Gowrisankaran).

368.    Today, Change markets ClaimsXten as part of an end-to-end payment accuracy suite that includes six other payment accuracy products. **8/11A** 90:17-23 (Wukitch). In addition to claims editing, the suite consists of Coding Advisor, Insight Record Review, Integrated Repricing Network, coordination of benefits, audit & recovery, and data mining. **8/11A**, 90:17-23 (Wukitch). This seven-part suite covers, as "end-to-end" suggests, products that address payment accuracy at various stages, from pre-submission to audit and recovery. **8/11A**, 90:17-23 (Wukitch).

369.    But the divestiture United proposes here covers only one of these seven products, claims editing. **8/11A**, 90:21-23 (Wukitch). United did not offer to sell the remainder of the suite, which would remain with United post-merger. **8/11P**, 45:4-10 (Raj); **8/11A**, 90:7-9 (Wukitch).

370.    The scope of the divestiture is inconsistent with Change's sales, marketing, and overall competitive approach with ClaimsXten today and for the last several years. In other words, TPG cannot replicate Change's competitive strategy.

371.    From almost the moment it was possible to do so, Change marketed ClaimsXten as one part of an end-to-end "payment accuracy suite." *E.g.*, **PX-415** at -575. In 2017, Change merged with McKesson Technology Solutions, bringing McKesson's ClaimsXten product

together with Change's suite of payment accuracy products.   **PX-415**.   Soon after, Change formulated its new strategy for its payment accuracy offerings, including "[i]ntegration of pre-submission, pre-and post pay data/workflows into [end-to-end] [s]trategy" and an "[end-to-end] comprehensive platform" that is "powered by CXT."  **PX-421** at 10, 12; *accord* **8/11A**, 118:21-119:12 (Wukitch).   From 2017 until now, Change has consistently leveraged an end-to-end payment accuracy story and strategy, extolling the benefits of end-to-end offerings internally, to investors, and to customers.  **8/11A**, 118:21-23 (Wukitch).

372.    Contemporaneous documents show this strategic pivot away from point solutions and towards an end-to-end strategy, and trial testimony confirmed it: a Change executive, Carolyn Wukitch, who is slated to be the CEO of TPG's ClaimsXten business and receive approximately $█ million in equity in addition to her salary if the divestiture happens, **8/11A**, 10:18-21, 129:10-20 (Wukitch), admitted that Change moved from selling individual-point solutions to marketing and selling ClaimsXten as part of an end-to-end suite, and that the pivot represented a strategy. **8/11A**, 116:12-23, 118:21-119:12, 119:2-4 (Wukitch).  Thus, for example:

- In a 2019 presentation, Change's CEO told investors that Change was "moving from selling point solutions to selling **comprehensive, integrated solutions** to address more complex customer needs."  **PX-530** at -964 (emphasis added).

- In 2021, business plans described Change as "uniquely positioned to be the first and only vendor to deliver on a **fully-integrated suite of end-to-end Payment Accuracy** solutions, securing a differentiated and defensible position in a growing $4B market."  **PX-413** at 72 (emphasis added).

373.    Change made clear, in contemporaneous documents, that it viewed integration into an end-to-end suite as delivering specific competitive advantages, like "[c]ollaboration across the solution set."  **PX-410** at 18.  For example:

- In 2019 talking points aimed at investors, Change's CEO wrote that Change's competitors, with the exception of Optum, "**primarily offer point solutions, where we offer a breadth of solutions** and services which can be provided in a modular and **integrated model creating greater value** for our customers."

164

PX-530 at 3 (emphasis added).

- A 2019 strategy presentation described Change's "[e]nterprise portfolio span (end-to-end and beyond)" as part of Change's "**durable competitive advantage**." **PX-417** at 4. Change described how its "[e]nd-to-end [v]alue [p]roposition" enabled it to "[l]everage results and content from post-payment to sell-in earlier-stage solutions" and "[t]ell the story of a comprehensive savings opportunity and a more comprehensive total savings strategy". **PX-417** at 12.

- In 2019, Change told a large national customer that its "ClaimsXten Roadmap" included "Solutions Working Together Supporting End to End Payment Accuracy." **PX-410** at 18. Change described the end-to-end suite as enabling "**[c]ollaboration across the solution set** to identify the optimal position for editing" and allowing Change to "[l]everage **insight gathered at each step to develop concepts that drive efficiencies further up the continuum**." **PX-410** at 18 (graphic showing (i) insights from "Post Payment Audit & Recovery" driving efficiencies in "Pre-Payment Code Edits" and (ii) insights from "Pre-Payment Code Edits" driving efficiencies in "Pre-Submission Messaging") (emphasis added).

- In 2020, Change told a regional payer customer that Change's "[e]nd-to-end payment accuracy solution" could "Creat[e] Highly Differentiated Strategies." **PX-414** at -351. Change specifically described the end-to-end suite as differentiating it from its competitors, stating that it "provides the opportunity for a **more cohesive strategy** that optimizes for maximum savings" and that "**[i]ndividual solutions and other vendors do not provide** this additional level of optimization." **PX-414** at -361. Change explained to customers that its end-to-end payment accuracy solutions were effective, "helping [Change] **gain share**." **PX-414** at -351 (emphasis added).

- In 2021, Change described itself to a large national payer as "unique in the breadth and depth of our industry expertise and solution offerings," and described the benefits of its end-to-end approach. **PX-415** at -530-31. Change again pointedly distinguished its end-to-end approach from that of point solution vendors, explaining that "[t]raditional **payment integrity services alone are not enough** to address the growing complexity of our industry." **PX-415** at -531. Change described itself as having "pivoted our strategy to **better address the emerging needs** of our payer clients" since the McKesson merger, away from "individual point solutions" and towards an integrated approach. **PX-415** at -531 (emphasis added).

374.    Change recognized that lacking products in payment accuracy would put it at a competitive disadvantage. In a 2019 presentation for Change's Executive Leadership Team, Change explained that although Change "dominate[s] primary editing" today, "gaps in the offering

and install base create opportunity for competitors." **PX-417** at 5.

375.    Change continues to tout its end-to-end payment accuracy strategy to customers today.  *E.g.*, **PX-415** at -526-67; **8/11A**, 118:21-119:12 (Wukitch).[170]  No market force has caused Change to abandon it, and the executive in charge of the program, Ms. Wukitch, continues to "believe[] in [the] strategy" today.  **8/11A**, 119:2-4 (Wukitch).

376.    Indeed, even in 2021, with a potential divestiture of ClaimsXten looming, Ms. Wukitch recommended increasing Change's investment in the end-to-end payment accuracy strategy as a means to "[f]uel long-term growth and market differentiation by **transforming the fragmented portfolio into a suite** of Payment Accuracy solutions on the Payer Business Platform."  **PX-413** at 70 (emphasis added).  Change—in particular, Ms. Wukitch—viewed offering a "[s]uite of [s]ervices" as the "[f]uture [s]tate" of payment accuracy.  **PX-413** at 73; **8/11A**, 110:7-12 (Wukitch).

377.    The evidence at trial thus made clear that Change viewed the fact that ClaimsXten is embedded within a broader end-to-end suite as offering competitive advantages.

378.    The evidence also made clear that TPG would not be able to pursue anything akin to Change's end-to-end strategy.  *E.g.*, **8/11P**, 44:17-24 (Raj).  Even Ms. Wukitch agreed.  At trial, she admitted that if ClaimsXten is divested to TPG:

- ClaimsXten would have to "pivot back to individual point solutions,"

---

[170] Change also, of course, continues to describe the fact that its products are integrated: Change's website still contains an e-book titled "Cultivate End-to-End Payment Accuracy" and lists Coding Advisor, Audit & Recovery, Pre-Payment Insight & Review, and Coordination of Benefits as "related solutions" to ClaimsXten.  *See, e.g.*, **8/11A**, 119:13-120:6 (Wukitch) (referring to website at "Cultivate End-to-End Payment Accuracy," changehealthcare.com (last accessed Aug. 31, 2022), *available at* https://www.changehealthcare.com/insights/e2e-payment-accuracy-ebook and ClaimsXten, changehealthcare.com (last accessed Aug. 31, 2022), *available at* https://www.changehealthcare.com/payment-accuracy/claimsxten).

abandoning the "end-to-end strategy," **8/11A**, 116:24-117:1, 118:21-119:1 (Wukitch);

- "TPG will not be able to say it has end-to-end payment accuracy" or "follow the same sales and marketing strategy that Change uses today," **8/11A**, 93:22-94:12 (Wukitch);

- Optum will "be able to truthfully say" that it has "a more comprehensive set of solutions than TPG," which Optum cannot say of Change today, **8/11A**, 122:14-19 (Wukitch); and

- First-pass claims editing "competition" will be "different" between TPG and Optum than between Change and Optum today.  **8/11A**, 122:1-19 (Wukitch).

379.  TPG's inability to leverage an end-to-end payment accuracy story when competing with Optum will deprive TPG of a competitive strategy that Change has relied upon for years.  **8/11A**, 94:7-12 (Wukitch).  This means, by definition, that TPG cannot replicate Change's competitive intensity.

380.  In contrast, Optum can—and does—pursue an end-to-end strategy when selling its first-pass claims editing product.  Optum competes against Change today with a "bundled suite" of products, **PX-588** at -115, and emphasizes the cost-saving benefits of "comprehensive payment integrity" solutions for consumers (2-4% added savings).  **8/11A**, 121:13-17 (Wukitch) (referring to website at "Comprehensive Payment Integrity," optum.com (last accessed Aug. 31, 2022), available at https://www.optum.com/business/health-plans/claims-payment-accuracy/payment-integrity.html); *see also* **PX-588** at -119 (Optum's CES is "[t]ypically bundled with other products when sold").  Today, Change can—and does—respond to Optum's strategy by emphasizing its similar suite of offerings.  **PX-530** at 3 (Change CEO stating that "Optum is the only other company that can match the breadth of solutions" Change provides).  Indeed, Change determined that its strategy to win against Optum should be to "[l]everage" the "end-to-end payment accuracy story."  **PX-421** at 70.  If the divestiture proceeds, TPG will have no such response.

381.  TPG recognizes that offering bundled products "resonates" well with small to

medium sized payers.  **PX-588** at -115 (evaluating competition between Change and Optum).  But it cannot offer them.  **8/11P**, 44:17-24 (Raj).  In this way, TPG would be unable to replace the competitive intensity that would be lost were the merger to proceed.

382.    Defendants attempted at trial to explain this evidence away.    But the contemporaneous record speaks for itself.

383.    For example, Defendants attempted to suggest that Change's years-long touting of its end-to-end suite was merely an observation that Change offered multiple payment accuracy products, rather than a concession that the end-to-end strategy offers strategic advantages to Change and its customers.  *E.g.,* **8/11A**, 29:24-30:13 (Wukitch).  But, consistently over a long period of time, Change's ordinary-course documents (including customer-facing sales and marketing documents) tell, as set forth above, a different story:  Change viewed, and views, its end-to-end capabilities as a point of competitive differentiation compared to companies that only offer point solutions.  **FOF** ¶¶ 367-377 (collecting materials).  The fact that Change's executives elected to pursue this competitive strategy and have not abandoned it after years of doing so— notwithstanding suggestions at trial that it is ineffective—establishes its continued competitive significance.

384.    Defendants also asserted that Change's customers purchase ClaimsXten as a point solution, not as part of an end-to-end suite.  *E.g.*, **8/11A**, 30:25-31:5 (Wukitch).  These assertions are again contradicted by ordinary-course documents, which show that customers increasingly demand end-to-end payment accuracy capabilities.  For example:

- In 2018, Change determined that payment accuracy **customers were "[s]eeking true end-to-end solutions." PX-421** at 101 (emphasis added); *see also* **PX-421** at 104 ("Market shows **clear signs of increasing focus on comprehensive capabilities** and prospective/pre-submission solutions . . . ."). Change determined that in order to meet its payment accuracy customers' "Jobs-To-Be-Done," Change needed to "[l]everage [its] entire product portfolio

to disrupt and become the market leader in the end-to-end space and decrease overall administrative costs." **PX-421** at 66.

- A 2019 strategy presentation describing market dynamics for Change's Network and Financial Management business described a **"[c]ritical mass shift towards pre-payment/pre-submission savings,"** "[b]reak[ing] down silos to deliver on **true end-to-end**," and an **"[i]ndustry shift** towards 'enterprise' view of savings." **PX-417** at 4.

- A 2021 internal presentation describes a "[s]uite of [s]ervices" as the "[f]uture [s]tate" of payment accuracy. **PX-413** at 73; **8/11A**, 110:7-12 (Wukitch).

- Change's presentations to customers echo its internal assessment. Change explained to one customer that its payment accuracy strategy "provides the opportunity for a **more cohesive strategy** that optimizes for maximum savings" and that "[i]ndividual solutions and other vendors do not provide this additional level of optimization." **PX-414** at -361. Likewise, in 2021, Change stated that that "**payers are asking for more** medical cost savings, achieve these savings sooner, and do all this with less provider abrasion," which Change has addressed with "a different approach that integrates traditional point solutions." **PX-415** at -531-32. Change specifically designed its "End-to-End Payment Accuracy" strategy to service these previously unmet or poorly met needs and to respond to competition. **PX-421** at 68, 70; *see also* **PX-421** at 107 ("Create Competitive Hurdles . . . *i.e.*, link end-to-end solutions together").

385.    In addition, Defendants emphasized at trial that no customer had purchased a "complete" end-to-end solution from Change. *E.g.* **8/11A**, 31:13-16 (Wukitch). But this is a red herring. Consumers can choose the components that work for them: a Change executive admitted that customers can and do buy multiple parts of Change's payment accuracy suite, even if they do not buy every part. **8/11A**, 92:3-10 (Wukitch).[171] They do not need to buy all parts to mean that the *ability* to buy multiple parts is what drives them to choose Change.

---

[171] Change has told customers that its "end-to-end payment accuracy set of solutions" can be "adopted in modules by customers or all together." **PX-414** at -351; *see also* **PX-530** at 3 (describing solutions as "modular"); **PX-822** at -379 (Change 10-k describing "solutions" as "comprehensive" but also "modular to meet their specific needs."); *see also* **8/9P**, 25:24-26:4 (Gowrisankaran) (testifying that "complementary products don't necessarily need to be sold in a bundle").

386.    Moreover, Defendants' contention that the bundled offering is not what drives customers to Change is at odds with what Change understands "wins" customers for Optum. Change observed that Optum "market[s] more complete offerings" to be "one source for all needs," **PX-421** at 70, and that the "[b]readth" of its offerings is one of Optum's "value props" in payment accuracy.  **PX-417** at 4.  TPG similarly observed that Optum's first-pass claims editing solutions are "[t]ypically bundled with other products when sold."  **PX-588** at -119.

387.    TPG recognizes the value of offering an end-to-end payment accuracy suite to customers.  TPG has acknowledged that it cannot pursue Change's strategies with the assets it would acquire through the divestiture, and might have to buy additional payment integrity solutions in order to re-create what was lost in the divestiture. **8/11P**, 71:4-9 (Raj).  One of TPG's preliminary M&A theses therefore involved expanding to create an end-to-end payment integrity solution—in other words, attempting to make up for the limitations of the divestiture.  **8/11P**, 82:9-20, 83:11-84:1 (Raj); **PX-594** at -840; **PX-588** at -123 ("Strengthen capabilities in secondary editing and expand into payments and post-payment activities to create an end-to-end payment integrity solution").  Echoing Change's pre-merger marketing materials, TPG's M&A thesis draws on language about "leveraging insights from payments and post-payment activities to improve pre-payment editing."  **8/11P**, 83:2-24 (Raj); **PX-594** at -840.  Yet, TPG does not have any specific plan to pursue such M&A.  **8/11P**, 81:11-24 (Raj).  To the extent it did pursue such a strategy, it would be starting at a deficit against the established products and strategies that United would possess.  **PX-421** at 70, **PX-417** at 4, **PX-588** at -119.

388.    Defendants did not attempt to replicate Change's end-to-end suite in the divestiture. Instead, Change focused on making the divestiture as narrow as possible from a technical perspective.  A Change executive involved in deciding which products should be included in the

divestiture—Amy Larsson, Change's Vice President of Solution Design and Consulting Services for Payment Accuracy and Value-Based Payments—recommended that the divestiture include "pre-payment services" such as Insight Record Review because doing so would "create a more comprehensive offering." **PX-412** at -835; **8/11A**. 111:16-117:12 (Wukitch).  Change ultimately elected not to include products aside from the claims editing products.  **8/11A**, 112:13-15 (Wukitch).  Ms. Larsson explained that the decision was made instead to "make [the divestiture perimeter] *as narrow as possible*" from "a technical perspective," meaning to include solutions only if ClaimsXten "would not run without it."  **PX-1044** (94:4-95:13) (Larsson) (emphasis added).

389.    Defendants suggested that TPG's generalized motive to compete with the ClaimsXten business is evidence that it can replace competition lost through the proposed merger. *E.g.*, 8/11P 41:17-20 (Raj).  But that incentive exists in every transaction.  TPG may compete and run the business profitably without fully replacing the competition that exists between Change and Optum today.  Even if ClaimsXten is a good investment for TPG, the divestiture does not preserve the competitive intensity in first-pass claims editing because TPG—by its own admission and by the admission of the Change executive responsible for ClaimsXten today—cannot pursue Change's longstanding competitive strategy.  **FOF ¶¶** 378-381.

390.    The proposed divestiture would benefit TPG and the new company's management, **8/11P**, 87:19-24 (Raj), **8/11A**, 129:10-20 (Wukitch), but harm competition.  TPG stands to profit upon turning around and selling the business to a strategic competitor.  **PX-649** at -058 (stating that "against the backdrop of a current sale process focused more on speed and certainty than value, believe there is potential to realize upside above what we've modeled in our TPG cases through a strategic exit"), -078 (modeling enterprise value at exit for ClaimsXten business); **8/11P**, 61:3-

62:6, 63:23-64:24 (Raj).  TPG's models suggest it could exit in 2023 for $2.88 billion—a profit of nearly $700 million in approximately one year.  **PX-649** at -078; **8/11P**, 64:23-24 (Raj).  United, too, would get a competitive windfall.  Before TPG sells ClaimsXten to a strategic competitor, *see* **PX-649** at -082, United would enjoy one or more years competing against a standalone company that cannot replicate the competitive strategies employed, or innovations planned, by its fierce competitor today.  **8/11P**, 63:23-64:24 (Raj); **FOF ¶¶** 378-381, 397.

### 3.    TPG also Will Be Unable to Replace Innovation Competition Between Change and Optum

391.    The proposed divestiture to TPG would fail to preserve competitive intensity for the independent reason that TPG would be unable to replace innovation competition between Change and Optum.

392.    As set forth above, Change (with its "Real-Time Settlement" product) and United (with its "Transparent Network" product) are engaged today in active head-to-head competition to create a straight-through processing solution that incorporates each company's first-pass claims editing solutions and to bring that product to market.  **FOF ¶¶** 267-275¶.  Competition between United and Optum to develop these innovative solutions would be lost were the entities to merge. TPG would be unable to replace Change as a competitor of United on this front.  **FOF ¶** 397.

393.    Defendants' arguments to the contrary are unsupported and in conflict with the contemporaneous evidence.  **FOF ¶¶** 271-275.

394.    Defendants' claims at trial that Change's ClaimsXten will not be integrated into Real-Time Settlement is not borne out by the record.[172]  Change's ordinary course documents

---

[172] For example, Change executives attempted to distance Real-Time Settlement from ClaimsXten at trial.  *E.g.*, **8/3P** 38:16-24 (Joshi) ("We're only focused on administrative edits.  The clinical edits we have never taken from ClaimsXten and we have never run any

consistently demonstrate that from Real-Time Settlement's inception until the filing of this lawsuit, ClaimsXten was intended to be integrated with Real-Time Settlement.  For example:

- A September 2020 presentation sent to Change's CEO listed ClaimsXten as part of the "Certification" module in Change's proposed Real-Time Settlement workflow.  **PX-288** at 8.

- A December 2020 due diligence document shared with Optum described ClaimsXten as part of the proposed workflow for Real-Time Settlement, and stated that ClaimsXten was part of the "orchestration platform" that "integrates 8 different services" within Real-Time Settlement.  **PX-343** at -924, -925.

- A March 2021 mock press release and frequently asked questions sent to Change's CEO and board of directors explained that the rules incorporated into Real-Time Settlement include rules from ClaimsXten.  **PX-394** at -339.

- An August 2021 presentation to a potential development customer explained that "Pre-adjudication payer rules" from "ClaimsXten" were an element of the "Check Integrity" module of Real-Time Settlement.  **PX-396** at -145.

- A September 2021 monthly business review listed an API to ClaimsXten as a "Complete" milestone for Real-Time Settlement.  **PX-399** at -485.

- A February 2022 Quarterly Business Review for Real-Time Settlement described ClaimsXten as part of Real-Time Settlement's "[c]laims integrity check," and stated that the "[i]ntegrity" module of Real-Time Settlement includes "run[ning] claims against . . . ClaimsXten."  **PX-289** at -476, -479.

395.    Contradicting his testimony at trial that Change has "not looked at anything on the clinical side" in Real-Time Settlement, **8/3P**, 38:16-24 (Joshi), Mr. Joshi testified in his May 2022 deposition that "the claims integrity check aspect of Real-Time Settlement involves an API call to ClaimsXten." **PX-1003** at 2.

396.    Defendants' claim that the proposed divestiture would not affect competitive intensity because Real-Time Settlement can be paired with any claims editor, and need not be paired with an in-house claims editor, *e.g.*, **8/3P** 36:3-10 (Joshi), is likewise unsupported by the

---

clinical edits on Real-Time Settlement. … We have not looked at anything on the clinical side.").

evidence.  To the contrary, Change's contemporaneous business plans make clear that Change's "[d]esign [a]pproach" was to "[u]tilize Change Healthcare solutions & network" to build Real-Time Settlement.  **PX-541** at -606; *see also* **PX-394** at -322, **PX-396** at -136, **PX-343** at -924.

397.    Defendants further suggested that TPG may be able to replicate Change's Real-Time Settlement through an idea called "Provider Claim Editing."  *E.g.*, **8/11A** 69:22-70:21 (Wukitch).    Unlike Real-Time Settlement, however, Provider Claim Editing is not even in development at Change.  **8/11A**, 128:19-20 (Wukitch).  Provider Claim Editing has not had a business case approved verifying its commercial viability, it has received no funding at Change, and TPG has no plans to fund it at the new company.  **8/11A**, 128:16-18, 128:21-129:2 (Wukitch). Even if TPG did pursue Provider Claim Editing, it would not be a substitute for Real-Time Settlement; it lacks several capabilities that are integrated into Real-Time Settlement, including claims pricing, EDI transmission, and payments processing.  *Compare* **PX-411** at -497 (Provider Claim Editing) *with* **PX-289** at -476, -479 (Real-Time Settlement); FOF ¶¶ 268-269.

398.    Defendants adduced no evidence supporting the conclusion that severing Real-Time Settlement from an in-house claims editor would be sufficient to preserve the competitive intensity projected today for the near future.  For example, they produced no contemporaneous evidence that Change ever considered connecting any third-party claims editor with Real-Time Settlement.

399.    Indeed, Defendants' own contemporaneous documents show that they recognized the competitive advantage that pairing Real-Time Settlement with an in-house claims editor is poised to offer.  For example, Change recognized that it was "uniquely positioned to create this solution" because of its "broad portfolio of products which are the building blocks for a platform strategy," **PX-288** at 12, and that it would have an advantage in "[s]peed to value" by

"leverage[ing] broad Change Healthcare solutions and network." **PX-396** at -136.

400.    The suggestion that Change intended to incorporate claims editing solutions aside from ClaimsXten into Real-Time Settlement is not borne out by the record; if there were a true competitive incentive to do so, one would expect to see that incentive reflected in the company's forward-looking strategic plans.  Instead, the documents make clear that ClaimsXten was a key building block of Real-Time Settlement until this lawsuit was filed.  *See* **FOF ¶¶ 394-396¶¶**.

401.    In short, because TPG cannot replicate Real-Time Settlement, it would not be able to restore the head-to-head competition to create an integrated platform that would be lost with this merger.

402.    Finally, Defendants suggest that Change's current level of investment in its Real-Time Settlement product means that the product is speculative, such that TPG's inability to replace the competition to pursue the product would be immaterial.  But this is a tailored-for-litigation argument.  Until the filing of this lawsuit, Change projected launching Real-Time Settlement in 2022.  **FOF ¶ 282.**  Any delays following the filing of this lawsuit are due no legal weight, **COL ¶ 320**, particularly because the evidence here strongly suggests that Change would have invested more heavily in Real-Time Settlement if the merger agreement with United had been terminated, **FOF ¶ 282**.

### 4.    Divestiture to TPG Poses a Material Risk of Degrading Future Competitive Positioning of ClaimsXten

403.    More generally, the proposed divestiture places on the public a material, and unacceptable, risk that because TPG has reduced ability or incentive, compared to Change, to improve ClaimsXten through innovation, the future competitive positioning of the ClaimsXten product will be degraded.

404.    Not only does TPG lack complementary assets that may be used to create new

innovations like Real-Time Settlement, but TPG is also already planning its eventual exit by selling to a strategic buyer. **8/11P**, (Raj) 59:15-60:18, 60:20-63:5; **PX-588** at -109, 110; **PX-649** at -058, -082; **DX-402** at -058, -082. Given TPG's short investment horizon—it modeled a sale after holding ClaimsXten for just four years, **PX-588** at -131, **PX-649** at -083— TPG has not communicated any specific plans for growth strategies, R&D, or innovation with ClaimsXten to the incoming management for the new company. **8/11A**, 128:6-9 (Wukitch); **8/11P**, 84:5-13 (Raj). Although TPG has "focus areas" for R&D spending, it has not communicated a plan for how its R&D money should be spent. **8/11P**, 84:5-20 (Raj); **8/11A**, 128:6-9 (Wukitch). Further, TPG admitted that its R&D budget may be decreased if TPG cannot meet its "target case" projections for the business, **8/11P**, 85:3-10 (Raj) (*e.g.* meet its debt load), and that there are "some scenarios where there's just so much interest that there's not room to spend on anything else," **8/11P**, 66:1-9 (Raj); *see also* **PX-649** at -069 (contemplating ceasing R&D "surge spend" if it "fail[s] to drive additional growth").

405. Defendants have failed to produce evidence that TPG can replicate the competitive intensity that would be lost as a result of the proposed merger. Defendants have failed to satisfy the extremely high burden to rebut the presumption of harm as set forth by this Circuit for a merger to near monopoly that would combine nearly 94% of the market.

### 5. Divestiture to TPG Poses a Material Risk of Degrading the Asset Because TPG Lacks the Support System ClaimsXten Has at Change

406. Finally, TPG risks degrading the ClaimsXten asset because it does not have the internal support systems that encircle and support ClaimsXten at Change today. If ClaimsXten degrades under TPG's ownership, it would be less competitive and would deliver fewer benefits to customers—leading to higher quality-adjusted prices for customers, many of whom are United's main insurer rivals—than it does under Change's ownership today. **PX-820** ¶ 278; **8/9A**, 27:19-

176

28:7 (Gowrisankaran).

407.    At present, ClaimsXten is part of a large, leading independent healthcare IT company.  **PX-824** at -867, -870.  Defendants have not proposed divesting a complete business unit, but instead a small portion of Change's Network and Financial Management portfolio within the Software & Analytics business unit.  **PX-823** at -652 (Change 10-K including chart detailing solution areas within Change's business units); **8/11A**, 6:21-23, 10:14-17 (Wukitch).  Defendants have not proposed divesting all of the assets or personnel supporting ClaimsXten today, nor have they shown that TPG has any plans or the ability to replicate analogous assets or personnel functions.  All of this adds appreciably to the riskiness of the proposed divestiture.

408.    For example, multiple senior employees who support or supported ClaimsXten would not transfer, including any employee senior to Ms. Wukitch (such as her superiors with decision-making authority for the Software & Analytics business unit at Change) and several of her direct reports (such as the current head of Change's Payment Accuracy business and the head of business development for Network & Financial Management).  **8/11A**, 127:4-23 (Wukitch).  They will go to United, with knowledge of and insights about ClaimsXten's strategies and plans.  **8/11A**, 126:6-127:1 (Wukitch).  Similarly, many employees who support ClaimsXten today part time—including personnel in operations, research & development, sales, implementation, marketing, information technology, and account management—would not transfer to TPG as part of the divestiture package.  **PX-418** at Summary tab.

409.    Accordingly, TPG cannot replace lost competition here.

### D.    Proposed Conclusions of Law as to the Proposed Divestiture

#### 1.    Defendants' Proposed Divestiture Fails to Rebut the Presumption of Illegality; the Merger Is Illegal and Should Be Enjoined

410.    The merger proposed here is presumptively unlawful.  Defendants effectively

concede that the underlying merger would violate the antitrust laws in the market for first-pass claims editing solutions.  The only genuine question is whether Defendants have met their burden to show that the proposed divestiture rebuts the *prima facie* case that the proposed merger would reduce competition.  That burden is even heavier where, as here, it is virtually uncontested that the underlying merger would lead to a near-monopoly in the relevant market.  Remedies like divestitures intrinsically carry risk.  *See, e.g.*, *Tronox*, 332 F. Supp. 3d at 217 ("Divestitures may not succeed at restoring competition to the post-merger market.").  That risk is greater where the underlying transaction would combine two firms that are, by far, the most significant competitors in the relevant market.  *Sysco*, 113 F. Supp. 3d at 72 ("The more 'compelling the [Government's] prima facie case, the more evidence the defendant must present to rebut [the presumption] successfully.'") (quoting *Baker Hughes*, 908 F.2d at 991).

411.    Where, as here, the Government has carried its burden of demonstrating presumptive illegality, it falls to Defendants to prove that the remedy proposed—here, the proposed divestiture to TPG—would "replac[e] the *competitive intensity* lost as a result of the merger."  *Aetna*, 240 F. Supp. 3d at 60 (quoting *Sysco*, 113 F. Supp. 3d at 72 (defendants have burden); *see also RAG-Stiftung*, 436 F. Supp. 3d at 278, 304 ("[d]efendants have the burden to show that a proposed divestiture will replace the merging firm's competitive intensity"); *Staples*, 190 F. Supp. 3d at 137 n.15.  In evaluating whether a potential divestiture rebuts the *prima facie* case, courts scrutinize, among other things, the "scope of the divestiture" and the "experience" and "independence of the divestiture buyer from the merging seller."  *RAG-Stiftung*, 436 F. Supp. 3d at 304; *see also Aetna*, 240 F. Supp. 3d at 60.

412.    Where the *prima facie* case is especially "strong," the rebuttal evidence must be correspondingly strong.  *Baker Hughes*, 908 F.2d at 991 ("The more compelling the *prima facie*

case, the more evidence the defendant must present to rebut it successfully."). Thus, where, for example, the Government presents essentially uncontested evidence that a merger would create a monopolist in a market with high barriers to entry, Defendants bear a particularly heavy burden in establishing that their proposed divestiture would restore the existing or expected "competitive intensity" absent the merger. *See Sysco*, 113 F. Supp. 3d at 72 (concluding that the defendants' proposed divestiture, even when considered together with their other defenses, could not "overcome the FTC's strong presumption of anticompetitive harm"). Finally, the "relief in an antitrust case" cannot be aspirational or unverifiable," but instead "must be 'effective to redress the violations' and 'to restore competition.'" *Sysco*, 113 F. Supp. 3d at 72 (quoting *Ford*, 405 U.S. at 573).

413.    Defendants have failed to carry their burden to demonstrate that the proposed divestiture would restore competition here.

414.    Courts, including courts in this Circuit, reject divestitures that fail to replicate the "*competitive intensity* lost as a result of the merger." *Aetna*, 240 F. Supp. 3d at 60 (quoting *Sysco*, 113 F. Supp. 3d at 72) (emphasis in original). For instance, courts reject divestitures where the evidence shows that the buyer will lack:

- **Sufficient resources to compete effectively (because, for example, less than an entire ongoing business was divested).** *See OKC Corp.* v. *FTC*, 455 F.2d 1159, 1163 (10th Cir. 1972) (rejecting divestiture because offered assets "*could not stand alone*") (emphasis added); *Aetna*, 240 F. Supp. 3d at 65, 68, 73 (rejecting insurance divestiture where contracts establishing provider network would not transfer with divestiture, and in a business where "scale does matter," proposed buyer would "struggle to put together a competitive provider network in the available time frame"); *see generally Fed. Trade Comm'n, The FTC's Merger Remedies 2006-2012: A Report of the Bureaus of Competition and Economics*, at 23-24, 32 (Jan. 2017) (finding "[d]ivestitures of selected assets . . . even with upfront buyers, succeeded less often and raised more concerns than divestitures of ongoing businesses"); *see also United States* v. *Microsoft Corp.*, 253 F.3d 34, 106 (D.C. Cir. 2001) (en banc) (per curiam) (a "corporation, designed to operate effectively as a single entity, cannot readily be

dismembered of parts of its various operations without a marked loss of efficiency"); *see also U.S. Dep't of Justice*, Merger Remedies Manual, at 9 (2020) ("Where divestiture of an existing standalone business is insufficient to resolve the competitive issues raised by the proposed merger and preserve competition, additional assets from the merging firms will need to be included in the divestiture package.  For example, in some industries, it is difficult to compete without offering a 'full line' of products. In such cases, the Division may seek to include a full line of products in the divestiture package, even when the antitrust concern relates to only a subset of those products.").

- **Sufficient experience to manage the divested business**, *see Aetna*, 240 F. Supp. 3d at 73 (rejecting proposed divestiture when proposed buyer's "experience [in Medicaid] will not transfer so as to enable it to be a successful competitor in the individual Medicare Advantage market").

415.   For example, courts in this Circuit have applied these principles in finding remedies inadequate to restore competition in the following circumstances:

- In *Sysco*, the Court rejected a divestiture, expressing skepticism that the divestiture buyer would be able to compete effectively, including against the merged entity, in part because the buyer lacked the ability to compete at the scale of the merged entity or develop strategic capabilities to put itself on "equal competitive footing with the merged firm."  113 F. Supp. 3d at 72, 74-75 (concluding that the defendants' proposed divestiture, even when considered together with their other defenses, could not "overcome the FTC's strong presumption of anticompetitive harm").  The Court noted that the defendants' "own growth belies" the fact that the complete set of assets were "a competitive advantage," and referenced customer-facing materials to establish how "Defendants presently compete" that the proposed buyer could not replicate. *Id.* at 74-75.  The Court further noted that the proposed buyer would be at a "competitive disadvantage in its ability to offer value-added services." *Id.* at 77.  The Court rejected the remedy even though it was—in contrast to the divestiture proposed here—to an established competitor in the industry. *Id.* at 17 (describing the proposed buyer as the "largest regional broadliner").

- In *Tronox*, the court not only rejected the proposed divestiture, but highlighted the risks of attempting to restore competition through a divestiture, citing an FTC study showing that only 25% of ordered remedies are "successful," 332 F. Supp. 3d at 217, meaning that in 75% of cases, ordered remedies had failed adequately to replace lost competition.

- *See also Aetna*, 240 F. Supp. 3d at 60 (discussed above).

416.   A high degree of skepticism towards the proposed divestiture of a market-leading product is especially warranted because the public would bear the risk of a failed divestiture. *E.g.*,

*Tronox*, 332 F. Supp. 3d at 219 (granting preliminary injunction on the basis that there are "strong public interests in ensuring the effective enforcement of antitrust laws and in equipping the [government] with the ability to order appropriate remedies" and that these public interests "cannot be overcome by the private equities proffered by the Defendants").  This is not a hypothetical risk, as recent examples illustrate.  In a recent case, Dean Foods was required to divest a milk processing plant to OpenGate Capital to restore harm to competition in a particular market.  Sixteen months after the acquisition, OpenGate closed the plant and filed for bankruptcy.[173]  Likewise, in 2015, the FTC required Dollar Tree and Family Dollar to divest 330 stores to a buyer in order to address competitive overlaps between the merging companies.  Less than two years later, the buyer sold the stores because it could no longer operate them as a viable standalone business.[174]  Defendants, not the public, should bear this risk.  *U.S. Dep't of Justice*, Merger Remedies Manual, at 5 (2020) ("To the extent any risk of failure remains, that risk should be borne by the parties, who seek to consummate a merger that would otherwise violate Section 7.  Consumers should not bear the risk of a failed remedy."); *see also Tronox*, 332 F. Supp. 3d at 219.

417.    Faced with such risks, courts block mergers rather than relying on idealistic

---

[173] C*ompare* Final Judgment, *United States* v. *Dean Foods Co.*, No. 2:10-cv-59 (E.D. Wis. July 29, 2011), ECF No. 80 (requiring Dean Foods to divest a milk processing plant to restore the harm to competition in the relevant markets) *with* Chapter 7 Voluntary Petition, *In re Golden Guernsey Dairy, LLC*, No. 13-10044 (Bankr. D. Del. Jan. 8, 2013), ECF No. 1 (following Dean Foods' sale of the plant to OpenGate Capital, OpenGate closed the plant and filed for bankruptcy 16 months after the acquisition).  *Cf. Tronox*, 332 F. Supp. 3d at 217 (finding a public interest in granting a preliminary injunction on a merger based on the principle that "[d]ivestitures may not succeed at restoring competition to the post-merger market").

[174] *Compare* Decision and Order, *In the Matter of Dollar Tree, Inc. and Family Dollar Stores, Inc.*, FTC Docket No. C-4530 (Sept. 16, 2015) (ordering divestiture of 330 stores to Sycamore Partners), *with* Application for Approval of Proposed Sale of Dollar Express Assets and Request for Expedited Treatment, *In the Matter of Dollar Tree, Inc. and Family Dollar Stores, Inc.*, Docket No. C-4530 at 3 (Mar. 30, 2017) (explaining that "Dollar Express can no longer operate as a viable standalone business").

hypotheticals and litigation-motivated promises. *Aetna*, 240 F. Supp. 3d at 99 (blocking merger); *Sysco*, 113 F. Supp. 3d at 87-88 (blocking merger); *Tronox*, 332. F. Supp. 3d at 219-20 (blocking merger by granting preliminary injunction); *FTC* v. *CCC Holdings*, 605 F. Supp. 2d 26, 77 (D.D.C. 2009).

418.    The same result is appropriate here.  The proposed merger is unlawful, and should be blocked in its entirety, because it would give United a merger to virtual monopoly in the market for first-pass claims editing solutions, in violation of the Clayton Act.  15 U.S.C § 18 (prohibiting mergers "where in any line of commerce . . . the effect of such acquisition may be . . .  to tend to create a monopoly").  Defendants have failed to present sufficient evidence, as is their burden, that the remedy they propose would fully restore the "competitive intensity" lost as a result of the merger.  *Aetna*, 240 F. Supp. 3d at 60 (quoting *Sysco*, 113 F. Supp. 3d at 72).

419.    Defendants contend that divestiture is sufficient because TPG would retain "every motivation and desire" for ClaimsXten to perform well.  **8/11P**, 90:23-91:3 (Raj).  All divestiture buyers, of course, seek to maximize the returns on their investment.  But it is not enough for the buyer of assets to have an incentive for the assets to perform well.  In *Sysco*, for example, the court stated that it did "not doubt" the buyer's "financial commitment" or the CEO-to-be's "leadership capabilities," but rejected the proposed divestiture nonetheless because it was "not persuaded that post-merger [the buyer] will be able to step into [the seller's] shoes to maintain . . . the pre-merger level of competition that characterizes the present marketplace."  *Sysco*, 113 F.Supp.3d at 73.  The standard, therefore, is not whether TPG will profit from its acquisition of ClaimsXten.  *See U.S. Dep't of Justice*, Merger Remedies Manual, at 10 (2020)  (stating that a "purchaser's interests are not necessarily identical to those of the consumer" and therefore divestiture buyers may benefit "regardless of whether [the divested assets] remedy the competitive concerns").  Rather, the

standard is whether TPG can step into Change's shoes and maintain pre-merger competitive conditions.  *Sysco*, 113 F.Supp.3d at 73; *Aetna*, 240 F. Supp. 3d at 60.  Defendants have admitted that TPG would not be able to pursue Change's pre-merger competitive strategies with ClaimsXten.  **FOF ¶¶** 378-388.  TPG would be at a competitive disadvantage against Optum as a result.  **FOF ¶¶** 367-377.  The divestiture must be rejected.

420.    Defendants also argue that the divestiture does not harm innovation competition on the grounds that (i) Change's Real-Time Settlement does not compete with Optum's Transparent Network because Real-Time Settlement is aimed at providers rather than payers, and (ii) ClaimsXten would not be integrated into Real-Time Settlement and Real-Time Settlement would connect with any first-pass claims editing solution.  But, contrary to defendants' arguments, Change's ordinary-course documents show that—at least until the filing of this lawsuit—Real-Time Settlement: (i) targeted payers as customers and (ii) integrated ClaimsXten, and that Change did not contemplate connecting Real-Time Settlement with any other first-pass claims editing solution.  **FOF ¶¶** 394-395.

421.    Defendants cannot salvage their proposed divestiture by repositioning Real-Time Settlement in an attempt to switch off this innovation competition between them.  Courts discount post-lawsuit competitive repositioning that purportedly eliminates competition between the merging parties.  *Aetna*, 240 F. Supp. 3d at 76 ("the case law does not support defendants' approach of viewing competition as an on-off switch where a merging party can simply switch it off entirely by withdrawing from a market (potentially temporarily)").  Instead, courts "routinely view competitors that may have one foot in and one foot out of the market as actual competitors."  *Id*.

422.    Defendants post-lawsuit testimony contradicts their pre-lawsuit ordinary course

documents.  Such tailored-for-litigation evidence carries no weight.  *Aetna*, 240 F. Supp. 3d at 80

("a firm's behavior undertaken with the aim of persuading a court or the government regarding the

legality of a merger may not be predictive of how that firm will behave once the court or the

government are no longer engaged").  Courts properly discount evidence of a "post-acquisition

transaction that may have been made to improve [defendant's] litigating position," *Hosp. Corp. of

Am.*, 807 F.2d at 1384 (upholding district court's discounting), and evidence that, like this, "*could

arguably* be subject to manipulation."  *Chicago Bridge & Iron* , 534 F.3d at 435.  Defendants'

assertions that Real-Time Settlement would target only providers and that ClaimsXten would not

be integrated into Real-Time Settlement are due no weight.

423.    The divestiture proposed here would, like those cited above, fail to replicate

Change's competitive positioning today or the innovative landscape Change's efforts produce.  It

is high risk and requires the public to bear the unacceptable risk of failure.  *Sysco*, 113 F. Supp. 3d

at 73-76.  For all of these reasons, the divestiture should be rejected.

424.    The merger is unlawful and should be enjoined.  *See* 15 U.S.C. § 18.

**VII.   NONE OF DEFENDANTS' REMAINING ARGUMENTS, INCLUDING AS TO PURPORTED "EFFICIENCIES," SAVE THE TRANSACTION**

425.   Finally, Defendants contend that the transaction should be permitted because it will "benefit consumers, foster competition, and reduce cost and friction in the healthcare system." **ECF 90** at 1.  Defendants' argument as to the purported "efficiencies" of their illegal transaction is irrelevant, and cannot save the transaction on either the horizontal or vertical theories.

**A.   Proposed Findings of Fact**

426.   The evidence does not support a conclusion that the merger would provide efficiencies Change and Optum could not achieve on their own.

427.   Defendants failed to present any expert evidence substantiating their proffered efficiencies.  As Dr. Murphy admitted, alleged efficiencies must be verified, substantiated, and merger-specific.  **8/15A**, 126:8-10 (Murphy).  But although Defendants presented a business model for the proposed transaction, **8/5A**, 92:18-25, 94:12-14, 96:1-17 (Yurjevich); **DX-840** at -938, Dr. Murphy made no attempt to quantify any purported efficiencies.  **8/15A**, 127:4-6, 10-12, 20-23, 128:7-10 (Murphy).  Dr. Murphy also failed to show that any purported efficiencies would be merger-specific: Change already sells products in all of the relevant "complementary health IT spheres," including operating the nation's largest EDI clearinghouse and offering a full suite of payment integrity and revenue cycle management products.  **8/15P**, 66:11-67:23 (Gowrisankaran); **PX-947** ¶¶ 49, 162; **FOF** ¶¶ 44-45, 93, 367-368, 372-377, 429.  Nor did Dr. Tucker opine on whether Defendants' proposed merger would yield efficiencies.  **8/12A**, 43:22-44:3, 44:9-15, 125:20-126:2.

428.   Based on Defendants' want of proof, the government's expert, Dr. Gowrisankaran, found no evidence of cognizable efficiencies from United's proposed acquisition of Change.  **8/9A**, 102:7-103:2, 103:3-6 (Gowrisankaran); **8/15P**, 66:7-67-17 (Gowrisankaran); **PX-820** ¶¶ 280-282.

429.   Even if Defendants could proffer an efficiencies defense without independent verification—which they cannot as a matter of law, as set forth below—Defendants did not present evidence of verified, substantiated, and merger-specific efficiencies.  Change's and Optum's product portfolios overlap extensively.  **PX-947** ¶¶ 49, 162; **PX-89** at -793; **PX-425** at -974; **PX-530** at -963; **PX-533** at -249, -251; *supra* **FOF** ¶¶427, 268-269.  Given this extensive overlap, Defendants have not identified specific efficiency-achieving complementarities they could achieve from the merger but could not achieve on their own.  For example:

- Some of Defendants' witnesses identified clinical decision support as a potential benefit of the transaction.  *See, e.g.*, **8/9P** 95:2-4 (McMahon); **8/5A** 120:12-20 (Musslewhite).  But United's clinical decision support projects predate the deal with Change, **8/9P** 95:5-7 (McMahon), **8/8A** 51:7-52:14 (Higday), and United will continue to develop clinical decision support even if the proposed transaction were enjoined, **8/9P** 95:18-23 (McMahon).

- To the extent Defendants' theory relies on United acquiring Change's set of clinical guidelines, InterQual and CareSelect, *see* **8/2A**, 88:13-16, 119:22-120:12 (de Crescenzo); **8/2P**, 9:7-14 (de Crescenzo); **8/4P** 14:24-15:9 (Wichmann); **8/5A**, 87:19-88:16 (Yurjevich), Defendants did not produce any verified and substantiated evidence of efficiency-achieving complementarities that Change could not achieve on its own.  Indeed, Change is already integrating its clinical guidelines into EHR workflows.  **8/5A** 87:3-18 (Yurjevich); **PX-534** at -221; **PX-531** at -746; **PX-111** at 462.

- Similarly, some of Defendants' witnesses testified that one of United's rationales for acquiring Change was to reduce friction between payers and providers.  *See, e.g.*, **8/9P**, 88:7-9, 92:13-93:25, 96:2-4 (McMahon); **8/4P**, 14:24-15:9 (Wichmann); **8/4P**, 73:18-75:3 (Hasslinger); **8/5A**, 35:4-15 (Yurjevich).  But Change, too, has focused on reducing friction, and would likely continue to pursue those efforts if the deal were blocked.  **8/9P**, 95:25-96:9 (McMahon); **PX-345** at-573; **FOF** ¶¶268-275.

430.   Defendants have not claimed, as is commonly asserted in vertical transactions, that their merger would achieve efficiencies through the elimination of double marginalization.  Any such defense is therefore forfeited.  Further, as United is already vertically integrated, any such argument would need careful verification.

## B.     Proposed Conclusions of Law

431.     Defendants' purported "efficiencies" do not affect, let alone offset, the anticompetitive effects of this merger.  The efficiencies claims presented here are irrelevant at the *prima facie* stage and not cognizable at the liability stage.  In particular, as the Supreme Court has recognized, "a merger the effect of which 'may be substantially to lessen competition' is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial."  *Phila. Nat'l Bank*, 374 U.S. at 371.  Indeed, the "Supreme Court has never expressly approved an efficiencies defense to a § 7 claim."  *St. Alphonsus*, 778 F.3d at 788-89.  This Circuit has also questioned whether efficiencies "offer a viable legal defense to illegality under Section 7" at all.  *Anthem*, 855 F.3d at 353 (citing *Procter*, 386 U.S. at 580, 587).

432.     Considering its skepticism of efficiencies as a defense to liability, the only context where this Circuit has accepted such evidence is in assessing whether a defendant has "rebut[ted] a *prima facie* showing."  *Anthem*, 855 F.3d at 355.  In other words, where a plaintiff has shown that the evidence predicts anticompetitive effects resulting from a merger, a defendant may attempt to illustrate, using efficiencies evidence, that the "prediction of anticompetitive effects from the *prima facie* case is inaccurate."  *St. Alphonsus*, 778 F.3d at 791.  But the "claimed efficiencies . . . must [so] show."  *Id.*  This means that Defendants bear the burden of proving that any claimed efficiencies are both "merger-specific," meaning that they "cannot be achieved by either company alone," *Heinz*, 246 F.3d at 721-22,[175] absent the merger and that they are "reasonably verifiable by an independent party."  *Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 72 (D.D.C. 2018).

---

[175]  *See also, e.g.*, *Anthem*, 855 F.3d at 356 (reaffirming verifiability and merger-specificity requirements); **2020 VMG** at 11 (efficiencies must be cognizable, verifiable, and merger-specific); **2010 HMG** at § 10 (efficiencies must be cognizable).

Furthermore, the efficiencies must be specific to the particular relevant market at issue in the case. In other words, defendants may not argue that a "merger would allow the defendant to compete more efficiently *outside* the relevant market." *St. Alphonsus*, 778 F.3d at 789; *Phila. Nat'l Bank*, 374 U.S. at 370; *see also United States* v. *Topco Assocs.*, 405 U.S. 596, 610 (1972) (competition "cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy").

433.    Courts apply "close judicial scrutiny" to efficiencies claims, lest the analysis devolve into "mere speculation and promises about post-merger behavior." *Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d at 72 (quoting *Heinz*, 246 F.3d at 721). Without such constraints and substantiation, "the efficiencies defense might well swallow the whole of Section 7 of the Clayton Act," because the merging entities could claim efficiencies based on their own self-interested assessments, "and the Court would be hard pressed to find otherwise." *H&R Block*, 833 F. Supp. 2d at 91.

434.    Courts in this Circuit have thus routinely rejected efficiencies claims where the merging entities failed to demonstrate "that their efficiencies [we]re verifiable," *CCC Holdings*, 605 F. Supp. 2d at 72-73, or to substantiate them with evidence or testimony. *Staples*, 190 F. Supp. 3d at 137 n.15 (defendants "called no witnesses" on this point). For example, applying these principles, the court in a trial contemporaneous with this one, *United States* v. *Bertelsmann Se & Co. Kgaa*, recently excluded defendants' proffered efficiencies model on the grounds that it had "not, in fact, been independently verified by anyone," rendering the efficiencies "not cognizable." *United States* v. *Bertelsmann Se & Co. Kgaa*, 21-cv-02886 (D.D.C. Aug. 17, 2022) (8/17/22 a.m. transcript at 2751:22-2752:1 (ruling on motion in limine) (Pan, J.) (submitted as **PX-1045**). In

particular, the defendants failed to adduce any expert testimony verifying the claimed efficiencies. *Id.* at 2751:17-2752:1. As the court noted, "[w]here efficiencies are not independently verifiable and verified, **no court in this jurisdiction has ever given any weight to such efficiencies evidence**." *Id.* at 2755:11-13 (emphasis added). The court "strongly disagree[d]" with defendants' suggestion that the court independently verify the assumptions and projections underlying the efficiencies claim, recognizing that "it is not in a position to fact-check" the deal model's assumptions "to determine whether [the] assumptions were reasonable," and "none of the cases that have considered this issue support the notion that the Court should provide the independent verification necessary to support efficiencies evidence proffered by [d]efendants." *Id.* at 2763:18-2764:4.

435.    For similar reasons, Defendants' efficiencies claims do not suffice in this case.

436.    For one, Defendants have failed to carry their burden to show that efficiencies evidence undercuts the Government's *prima facie* showing that the merger may have anticompetitive effects. In particular:

- Defendants have offered no independently verifiable efficiencies model. No expert witness substantiated Defendants' efficiencies claims. **FOF** ¶ 427, *supra*. This alone is fatal. *See, e.g.*, *Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d at 73; *CCC Holdings*, 605 F. Supp. 2d at 72-73.

- Defendants have offered no evidence that any claimed efficiencies are merger-specific, as is their burden. This again is independently fatal. *See, e.g.*, *Heinz*, 246 F.3d at 721-22.

- Defendants also have not proven that any purported efficiencies would enhance competition in the specific relevant market. *Phila. Nat'l Bank*, 374 U.S. at 370; *see* **FOF** ¶ 429.

- Defendants' "efficiencies" claims do not show that United somehow lacks "ability" or "incentive" to use Change's claims data to rivals' detriment, risking harm in the relevant commercial health insurance markets. Defendants' efficiencies claims are thus by definition immaterial to the Government's CSI case, and cannot "rebut" it. *St. Alphonsus*, 778 F.3d at 791 (efficiencies are only relevant to the extent they cast doubt upon the "prediction of

anticompetitive effects from the *prima facie* case").

437.    For all of these reasons, Defendants' efficiencies claims are not sufficient to rebut the Government's *prima facie* case.

438.    As set forth above, Defendants' efficiencies claims also are not cognizable at any other stage of the analysis.  Once a finding has been made that a merger is unlawful, "[p]ossible economies cannot be used as a defense to illegality."  *See Procter & Gamble*, 386 U.S. at 580.  As noted, the "Supreme Court has never expressly approved an efficiencies defense to a § 7 claim."  *St. Alphonsus*, 778 F.3d at 788-89.  There is no justification, in law or fact, from departing from this principle in this case.

439.    For all of these reasons, Defendants' proffered "efficiencies" do not affect, let alone offset, the anticompetitive effects of the transaction.

## VIII.   Conclusion

440.    Because the effect of the transaction "may be substantially to lessen competition" and would "tend to create a monopoly," the Government respectfully requests that this Court enjoin the proposed transaction pursuant to 15 U.S.C. § 18.

Dated: August 31, 2022

Respectfully submitted,

/s/ Eric D. Welsh
Eric D. Welsh (D.C. Bar No. 998618)
Jill C. Maguire (D.C. Bar No. 979595)
Travis R. Chapman
Joseph Adamson
Jared T. Bond
Markus A. Brazill
John M. Briggs
Marissa C.M. Doran
A. Maya Khan
Grace Lee (D.C. Bar No. 198304)
Mark Rohan (D.C. Bar No. 177193)
David M. Stoltzfus

U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4100
Washington, DC 20530
Tel.: (202) 598-8681
Email: eric.welsh@usdoj.gov

*Attorneys for United States of America*

/s/ Elizabeth Odette
Elizabeth Odette
James W. Canaday
Jason Pleggenkuhle
Katherine Moerke

Office of the Minnesota Attorney General
Consumer, Wage and Antitrust Division
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
Telephone: (651) 757-1028
Email: elizabeth.odette@ag.state.mn.us

*Attorneys for State of Minnesota*

/s/ Olga Kogan
Christopher D'Angelo (D.C. Bar No. 502220)
Olga Kogan
Benjamin J. Cole
Elinor R. Hoffmann
Amy E. McFarlane

New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8262
Email: olga.kogan@ag.ny.gov

*Attorneys for State of New York*