**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA, *et al.*,

        *Plaintiffs*,

v.

UNITEDHEALTH GROUP
INCORPORATED, *et al.*,

        *Defendants*.

Civil Action No. 1:22-cv-0481 (CJN)

**[REDACTED VERSION]**

## POST-TRIAL BRIEF OF DEFENDANTS UNITEDHEALTH GROUP INCORPORATED AND CHANGE HEALTHCARE INC.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION................................................................................................................... 1

LEGAL STANDARD ............................................................................................................ 5

ARGUMENT......................................................................................................................... 6

I.  **PLAINTIFFS FAILED TO PROVE A LIKELY AND SUBSTANTIAL
    LESSENING OF COMPETITION UNDER THEIR HORIZONTAL
    THEORY.** ................................................................................................................. 6

II. **PLAINTIFFS FAILED TO PROVE A LIKELY AND SUBSTANTIAL
    LESSENING OF COMPETITION UNDER ANY OF THEIR VERTICAL
    THEORIES.**............................................................................................................ 14

    A.    Plaintiffs failed to prove a likely and substantial lessening of competition
    under their data-misuse theory................................................................ 14

        1.    The record does not support the "copying innovations" version of
        Plaintiffs' data-misuse theory. ................................................. 15

        2.    The record does not support the "improving GRA" version of
        Plaintiffs' data-misuse theory. ................................................. 26

    B.    Plaintiffs failed to prove a likely and substantial lessening of competition
    under their other vertical theories. ......................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Cases**

**Page(s)**

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)..............................................................................................5, 24

*FTC v. Arch Coal, Inc.*,
  329 F. Supp. 2d 109 (D.D.C. 2004) .........................................................................6

*FTC v. Arch Coal, Inc.*,
  No. 1:04-cv-00534-JDB (D.D.C. July 7, 2004), ECF No. 67....................................8

*FTC v. RAG-Stiftung*,
  436 F. Supp. 3d 278 (D.D.C. 2020)...........................................................................9

*United States v. AT&T Inc.*,
  310 F. Supp. 3d 161 (D.D.C. 2018)...............................................................1, 6, 16

*United States v. AT&T, Inc.*,
  916 F.3d 1029 (D.C. Cir. 2019) ......................................................*passim*

*United States v. AT&T Inc.*,
  Case No. 1:17-cv-02511-RJL (D.D.C. May 8, 2018), ECF No. 127.......................2

*United States v. Baker Hughes Inc.*,
  908 F.2d 981 (D.C. Cir. 1990)............................................................................5, 6, 8

*United States v. CVS Health Corp.*,
  2019 WL 4793060 (D.D.C. Sept. 4, 2019) ............................................................17

*United States v. Gray Television, Inc.*,
  1:21-cv-02041-CJN (D.D.C. Oct. 25, 2021), ECF No. 11 .....................................13

*United States v. SunGard Data Sys., Inc.*,
  172 F. Supp. 2d 172 (D.D.C. 2001) .......................................................................23

**Statutes**

15 U.S.C. § 18...............................................................................................*passim*

**Rules**

Fed. R. Evid. 702 ..................................................................................................21

**Other Authorities**

16 C.F.R. § 802.70 ...................................................................................................................13

Antitrust Div., U.S. Dep't of Justice, *Merger Remedies Manual* (Sept. 2020) .............................12

## <u>INTRODUCTION</u>

After fourteen months of pre-suit investigation, four months of intense discovery, tens of millions of pages of document productions, dozens of depositions, and a two-week trial, the record lays bare what UnitedHealth Group Incorporated ("UHG") and Change Healthcare Inc. ("Change") have contended all along: there is no legal basis for blocking this merger. Rather than grapple with economic realities, Plaintiffs' case instead caricatures the proposed transaction, challenging a horizontal merger that will never happen and conjuring up complex, multi-step vertical theories of harm that, on this record, would require repudiation of settled law. Antitrust enforcers cannot obtain a Clayton Act injunction simply by theorizing a possible state of the post-merger world in which competition is supposedly lessened. "[A]ntitrust theory and speculation cannot trump facts," and it was Plaintiffs' burden to make a "'fact-specific' showing that the effect of the proposed merger 'is likely to be anticompetitive,'" based on a "'comprehensive inquiry'" into the market's "'structure, history[,] and probable future.'" *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 190–92 (D.D.C. 2018) (citations omitted), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). Plaintiffs have failed to do so.

In fact, Plaintiffs have not come close to carrying their burden. In place of the "comprehensive inquiry" mandated by the Clayton Act, Plaintiffs improperly cordon off a laundry list of inconvenient market facts as "irrelevant" to the case, among them: the strength of UHG's firewalls; the extensive vertical integration across the healthcare industry (supported by firewalls similar to UHG's); the Department of Justice's approval of similar mergers based on firewalls; and the lack of any evidence that Optum has ever shared competitive intelligence with UnitedHealthcare ("UHC") about UHC's rivals, despite having the theoretical ability to do so today. *See* 8/1/22 AM Trial Tr. 13:22–14:14 (Pls.' Opening). Although the inquiry under Section 7 of the Clayton Act is necessarily forward looking, this historical evidence reveals that

competition can thrive under the exact conditions that Plaintiffs claim will exist post-merger and speaks directly to the incentives and constraints that inform UHG's conduct in the marketplace. Plaintiffs therefore have no choice but to dismiss these historical factors—not because they say too little about the likely future state of competition, but because they say too much.  It is hard to believe that Plaintiffs would deem all of this key evidence irrelevant in a case where history favored (rather than refuted) their theories, *see* United States' Proposed Conclusions of Law ¶ 69, *United States v. AT&T Inc.*, Case No. 1:17-cv-02511-RJL (D.D.C. May 8, 2018), ECF No. 127 ("Courts can also evaluate historical events in the market to assess whether a merger is reasonably likely to lead to coordinated effects."), and Plaintiffs' decision to ignore that evidence here only underscores how incompatible their theories are with market realities.

Plaintiffs' case seeks to stitch together out-of-context snippets of documents and testimony to paint a picture of the post-merger world that was disclaimed by every single fact witness in the case and refuted by the record as a whole.  For all Plaintiffs' and their experts' predictions of competitive catastrophe, none of the supposed "victims" here—no rival payer, national-account or large-group customer, or insurance broker or consultant—sent a representative to trial to support Plaintiffs' theories of harm.  That silence from the market speaks volumes, and is the lens through which the Court should view the record evidence in this case.

Plaintiffs' lone horizontal theory, premised on the combination of Optum's and Change's first-pass claims editing solutions, attacks a strawman.  Because UHG has agreed to divest Change's claims editing business, ClaimsXten, to TPG Capital, L.P. ("TPG"), there is no horizontal overlap in the actual post-merger world for Plaintiffs to challenge.  Even assuming that UHG and Change have the burden of proving that the divestiture will maintain competition in the post-merger world, however, that burden has been more than satisfied.  ClaimsXten operated as

an independent product for over a decade, becoming the market leader in first-pass claims editing long before it was sold alongside Change's other offerings.  Post-divestiture, ClaimsXten will be run by a management team with decades of experience with the product and the industry, and Plaintiffs presented no testimony from any ClaimsXten customers expressing concerns about the divestiture itself or about TPG as a buyer.  That is hardly surprising.  TPG is a preeminent private-equity firm with extensive experience in carve-out transactions and healthcare technology.  TPG's investment history, its financial incentives, and its specific plans to grow and innovate ClaimsXten through research-and-development ("R&D") investments qualify TPG as precisely the kind of buyer that will ensure ClaimsXten remains a market-leading solution, thereby preserving and enhancing competition.

Plaintiffs' case thus centers on the kinds of vertical-merger theories that have not been successfully pressed in a federal district court in half a century.  ***First***, Plaintiffs allege that UHG will misuse the claims data passing through Change's Electronic Data Interchange ("EDI") clearinghouse to give UHC a leg up on other payers, resulting in harm to competition in the markets for commercial health insurance sold to national accounts and large-group employers.  One version of this data-misuse theory predicts that, after the merger: (i) one of UHG's subsidiaries, OptumInsight, will have access to claims data passing through Change's EDI clearinghouse; (ii) OptumInsight will conduct competitive surveillance on Change's EDI data and provide that data, or insights derived from it, to UHG's health-insurance arm, UHC; (iii) UHC will use the data or insights to reverse engineer and copy innovations that rival payers use to distinguish themselves in the relevant insurance markets; (iv) UHC's copying will chill further innovation by those rival payers; and (v) this reduced innovation will cause antitrust harm in the form of lower quality or higher cost health plans in the relevant insurance markets.  The second version of Plaintiffs' data-

misuse theory contends that OptumInsight will use Change's EDI data to improve an underwriting tool known as Group Risk Analytics ("GRA"), which will be offered only to UHC, resulting in UHC competing less vigorously for certain employer customers (those with high risk pools). **Second**, Plaintiffs claim that Optum will use Change's EDI clearinghouse to develop products that will be deployed for UHC's sole benefit, either because they will be withheld from the market altogether or because Optum will offer degraded versions to UHC's rivals. **Third**, Plaintiffs allege that Optum will use Change's EDI clearinghouse itself to raise rival payers' quality-adjusted costs either by throttling rival payers' EDI transactions in real time or by "dropping them to paper."

All of Plaintiffs' vertical theories fail for a simple reason: they have been created out of whole cloth and completely lack supporting evidence. Plaintiffs' theories assume that, post-merger, UHG's entire business strategy and corporate culture would change; it would intentionally violate or repeal its existing firewall policies; it would violate Change's existing contracts and the additional contractual commitments that UHG has offered in connection with the merger; and it would sacrifice billions of dollars in revenue from Optum's growing external payer business in order to preference UHC in the marketplace. These assumptions reflect a profound misunderstanding of how businesses operate in the real world and, in particular, how UHG has achieved its success in the market—by earning and maintaining the trust of its customers. Indeed, UHG today does not engage in any of the conduct that Plaintiffs claim it will post-merger, whether misusing data, withholding products, or otherwise raising rivals' costs.

Plaintiffs therefore needed to show that the merger will change UHG's incentives, such that UHG would change its conduct going forward. Plaintiffs wholly failed to do so and, worse, they put on virtually no evidence that any of the post-merger conduct they hypothesize would substantially lessen competition in the markets for commercial health insurance sold to national

accounts and large-group employers.  Although Plaintiffs theorized that UHG might have new incentives to engage in certain conduct post-merger, they have not set forth any coherent theory for how that conduct would translate into a substantial lessening of competition in their alleged markets.  It was Plaintiffs' burden to make this showing without the benefit of any presumption, yet their theories ask the Court to take it on faith that the relevant markets will be substantially less competitive after the merger, without any meaningful explanation of why that would be so.

UHG and Change respectfully submit that the Court should deny Plaintiffs' request for a permanent injunction, enter judgment in favor of UHG and Change, and order that ClaimsXten be divested to TPG.

## LEGAL STANDARD

Section 7 of the Clayton Act prohibits a merger if, "in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition."  15 U.S.C. § 18; UHG and Change's Conclusions of Law ("COL") ¶ 1.[1]  Although Plaintiffs try to downplay their evidentiary burden, the language of Section 7 has long been interpreted to prohibit transactions only where harm is probable or likely: the "mere possibility" of harm to competition is not enough to establish a claim.  *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 n.39 (1962)); *see also Brown Shoe*, 370 U.S. at 323 ("[N]o statute was sought for dealing with ephemeral possibilities.  Mergers with a probable anticompetitive effect were to be proscribed by this Act."); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 984 (D.C. Cir.

---

[1]   UHG and Change's Proposed Findings of Fact and Conclusions of Law are being filed concurrently with this memorandum.

1990) (Thomas, J.) ("Section 7 involves *probabilities*, not certainties or possibilities."); COL ¶¶ 2–6.

In a horizontal merger case, plaintiffs can establish a presumption of competitive harm by showing "that a transaction will lead to undue concentration in the market for a particular product in a particular geographic area." *See Baker Hughes*, 908 F.2d at 982 (footnote omitted); COL ¶ 19. Plaintiffs do not get that "short cut," or any resulting presumption of competitive harm, in a vertical-merger case. *AT&T*, 916 F.3d at 1032; COL ¶ 42. Plaintiffs instead "must make a 'fact-specific' showing that the proposed merger is 'likely to be anticompetitive,'" *AT&T*, 916 F.3d at 1032 (citation omitted); COL ¶ 43, "on the basis of record evidence relating to the market and its probable future," *AT&T*, 310 F. Supp. 3d at 190 (quoting *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116–17 (D.D.C. 2004)); COL ¶ 10. Plaintiffs cannot rely on "antitrust theory and speculation" to "trump facts," *AT&T*, 310 F. Supp. 3d at 190 (quoting *Arch Coal*, 329 F. Supp. 2d at 116–17); COL ¶¶ 10, 45, and evidence that "it could be *possible* to act in accordance with [plaintiffs'] theories of harm is a far cry from evidence that the merged company is *likely to do so* (much less succeed in generating anticompetitive harms as a result)," *AT&T*, 310 F. Supp. 3d at 210 (emphases added); COL ¶ 60. Any testimony and documentary evidence, or snippets thereof, must be viewed in context against all "other evidence related to the motivation for the challenged merger . . . that came out at trial." *AT&T*, 310 F. Supp. 3d at 210; COL ¶ 60.

## ARGUMENT

## I.    PLAINTIFFS FAILED TO PROVE A LIKELY AND SUBSTANTIAL LESSENING OF COMPETITION UNDER THEIR HORIZONTAL THEORY.

Plaintiffs' horizontal theory—that the transaction would result in a merger to monopoly in the market for first-pass claims editing solutions—finds no support in the evidence. In the pre-merger world, the two leading products in the market, Change's ClaimsXten and Optum's Claims

Edit System ("CES"), are sold by competitor firms.  The same will be true in the post-merger world: as a consequence of the divestiture, TPG will own the ClaimsXten business and Change's current management team will continue to operate it as the market-leading competitor to CES.

Plaintiffs virtually ignored the divestiture during their case in chief, declining to ask a single one of the few payer or provider witnesses who testified whether they were concerned about ClaimsXten's future (or claims-editing competition more generally) in light of the divestiture. When Plaintiffs did address the divestiture, they largely focused on "process" points, insinuating wrongly that the divestiture process was rushed and its outcome certain, reflecting a "cozy" relationship between UHG and TPG.  Contrary to Plaintiffs' allegations, the undisputed evidence shows that UHG and Change used a well-known investment banker (Barclays) to run a robust and competitive M&A process, all by the book.  TPG fully diligenced ClaimsXten, and TPG and UHG acted, as they always have, as arm's length market participants.  Critically, the record shows that TPG will only increase competition for first-pass claims editing because TPG has the ability and financial incentives to grow ClaimsXten and intends to make substantial investments to achieve that growth.  *See, e.g.*, 8/11/22 PM Trial Tr. 90:19–22 (Raj) ("[THE COURT:] Is there any world in which you, personally, TPG, as an entity, and the investors do better if ClaimsXten performs poorly?  A. Absolutely not.); *id.* at 91:15–23 ("[THE COURT:] [N]et-net, the better ClaimsXten does between now and whatever might happen in 2026, whether it's a sale, a continued ownership, et cetera, the -- if, at that time, when you assess the value of the business in 2026, the better that ClaimsXten has performed in the interim, the more valuable it will be to you as an asset.  Correct? A. That's 100 percent right."); UHG and Change's Findings of Fact ("FOF") ¶ 483.  For those reasons, Plaintiffs' horizontal claim should be rejected.

Rather than affirmatively grapple with the competitive implications of the divestiture, Plaintiffs contend that UHG and Change bear the "burden" "to prove the divestiture w[ill] be sufficient" and will "replace the competition that's lost by the merger." 8/1/22 AM Trial Tr. 29:7–21 (Pls.' Opening). Plaintiffs' framing reflects cascading legal error, both in its allocation of the burden and in its articulation of the relevant statutory standard. To obtain a presumption of harm to competition, Plaintiffs needed to introduce evidence showing that the "transaction will lead to undue concentration in the [relevant] market." *Baker Hughes*, 908 F.2d at 982; COL ¶ 19. But the relevant "transaction" for purposes of their Section 7 claim "is in reality . . . the merger agreement including the . . . divestiture." *See, e.g.*, Mem. Op. at 5, *FTC v. Arch Coal, Inc.*, No. 1:04-cv-00534-JDB (D.D.C. July 7, 2004), ECF No. 67; COL ¶ 24. The "transaction" thus will not cause any increased concentration in the market for first-pass claims editing because, in the post-transaction world, ClaimsXten and CES will not be owned by the same entity due to the divestiture of ClaimsXten to TPG. Plaintiffs therefore do not get the benefit of a presumption of harm to competition on their horizontal theory that would shift the burden to UHG and Change. COL ¶¶ 33–34.

Regardless, Plaintiffs are wrong to suggest that UHG and Change would need "*to prove* the divestiture w[ill] be sufficient." 8/1/22 AM Trial Tr. 29:7–21 (Pls.' Opening) (emphasis added). "[T]he ultimate burden of persuasion" in a Section 7 case "remains with [plaintiffs] at all times." *Baker Hughes*, 908 F.2d at 983; COL ¶¶ 16–18, 35. A presumption of harm to competition only shifts the "burden of *production*" to UHG and Change, and that burden can be satisfied through evidence "that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition." *Baker Hughes*, 908 F.2d at 991 (emphasis added); COL ¶¶ 13, 35. The record conclusively shows that Plaintiffs' prima facie case—which alleges a merger

involving the two leading players in the market for first-pass claims editing—inaccurately predicts the state of the post-merger market, where TPG will own ClaimsXten.

Burden shifting aside, Plaintiffs are wrong that Section 7 requires a showing that a proposed divestiture perfectly maintains the existing level of competition in a relevant market. The plain text of Section 7 makes clear that the only relevant question is whether, in light of the divestiture, the transaction considered as a whole would be likely to "*substantially* . . . lessen competition." 15 U.S.C. § 18 (emphasis added); COL ¶¶ 1, 30–32. Plaintiffs' approach to divestiture-related issues therefore stands antitrust law on its head, imposing a heightened burden of proof on UHG and Change (who do not bear the ultimate burden of persuasion) to show maintenance of competition at precisely the same level as the pre-merger world (a standard lacking support in the text of the Clayton Act).

Even so, the Court need not decide these threshold legal questions because whoever bears the burden of production or persuasion, and whatever the statutory standard, a TPG-owned ClaimsXten will not only maintain, but will likely increase, the level of competition for first-pass claims editing. A federal court tasked with evaluating the effect of a divestiture on competition considers a variety of factors, including "the likelihood of the divestiture; the experience of the divestiture buyer; the scope of the divestiture[;] the independence of the divestiture buyer from the merging seller[;] and the purchase price." *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 304 (D.D.C. 2020); COL ¶ 36. On each of these metrics, the trial evidence conclusively established that the divestiture will maintain and enhance future competition for first-pass claims editing.

*Likelihood.* Plaintiffs have not contested the likelihood of the divestiture, and for good reason: it is a virtual certainty. UHG and TPG have entered into a definitive purchase agreement, all conditions of which have been satisfied, except for those that will be satisfied either at closing

or by resolution of this case.  8/11/22 AM Trial Tr. 163:24–164:2 (Raj) ("Q. Mr. Raj, is this agreement from April 22 binding on TPG and UHG, as you understand it?  A. It is.  The only real contingency that I'm aware of is the outcome of this proceeding, but, otherwise, it's binding on us."); FOF ¶ 428.

*Scope.*  The scope of the divestiture, which includes all assets necessary to operate ClaimsXten as a standalone business, also supports the divestiture.  A "core aspect" of TPG's due-diligence process was determining whether the asset package it would acquire was "sufficient to operate ClaimsXten on a standalone basis."  8/11/22 AM Trial Tr. 160:11–14 (Raj); FOF ¶ 459.  TPG concluded that there was not "any asset -- physical, human capital, intellectual property -- that TPG . . . need[ed] to stand up ClaimsXten[] [that was] not included in the asset package."  8/11/22 AM Trial Tr. 161:10–13 (Raj); FOF ¶ 460.  The trial evidence supports TPG's conclusion.  Carolyn Wukitch, Change's senior leader who currently manages ClaimsXten for Change, will be the CEO of ClaimsXten post-divestiture.  8/2/22 AM Trial Tr. 105:14–25 (de Crescenzo); FOF ¶ 436.  Ms. Wukitch is bringing approximately 375 Change employees with her, including the entire ClaimsXten leadership team, 8/11/22 AM Trial Tr. 47:12–18 (Wukitch); 8/2/22 AM Trial Tr. 106:15–24 (de Crescenzo); FOF ¶¶ 434, 437, and all the technology "architecture around ClaimsXten" is included in the divestiture package, 8/11/22 AM Trial Tr. 40:11–41:1 (Wukitch); FOF ¶ 429.

Plaintiffs' main response is that ClaimsXten may be less successful if it is not sold alongside Change's other payment-accuracy offerings.  But Plaintiffs do not contend that end-to-end payment accuracy comprises a relevant market, nor did they present any evidence on this illusory market segment, such as the products offered or the competitive landscape.  More to the point, before ClaimsXten became part of Change in 2017, it was sold as a standalone product by

McKesson Corporation ("McKesson") for a decade, during which time it became the market leader in first-pass claims editing. *See* 8/11/22 AM Trial Tr. 17:1–12 (Wukitch); FOF ¶ 491. "Probably 90 percent" of ClaimsXten's current customers—including Aetna, Anthem, and Cigna—began buying ClaimsXten from McKesson as a standalone product, *see* 8/11/22 AM Trial Tr. 130:21– 132:10, 141:20–25 (Wukitch); FOF ¶ 491, and multiple witnesses testified that they are unaware of a single customer who has since decided to buy ClaimsXten because it was included in a suite of products. 8/2/22 PM Trial Tr. 95:22–25 (Turner); 8/11/22 AM Trial Tr. 38:15–18 (Wukitch); FOF ¶ 490. In fact, Plaintiffs elicited no testimony showing that customers have any desire to buy other payment-accuracy solutions alongside ClaimsXten. ClaimsXten has been, is now, and will continue to be bought and sold as a standalone product, and it is inconceivable that a sophisticated buyer like TPG would agree to pay $2.2 billion if it thought anything different.

*Experience.* Plaintiffs also lack any meaningful response to TPG's relevant experience in healthcare and IT. TPG has significant experience with both carve-out transactions and healthcare assets, and historically has helped grow its healthcare businesses by increasing their R&D budgets by 156% as described in a retrospective assessment. *See, e.g.*, 8/11/22 PM Trial Tr. 8:16–9:14 (Raj); DX-0617A at .0009; FOF ¶¶ 445–50. TPG plans to follow this same playbook with ClaimsXten. Under Change, ClaimsXten's R&D budget was $14 million in FY2022. 8/11/22 PM Trial Tr. 34:20–35:4 (Raj); FOF ¶ 478. Under TPG, ClaimsXten's target R&D budget will increase to $17 million in FY2023, $26 million in FY2024, $28 million in FY2025, and $30 million in FY2026—that is, as compared to Change's R&D spending, TPG will more than double R&D spending within 4 years. 8/11/22 PM Trial Tr. 36:20–37:22 (Raj); FOF ¶ 478.

Plaintiffs' answer to TPG's concrete plans for growing ClaimsXten and its history of success in the healthcare space is to point out the obvious: TPG is a private-equity firm. According

to Plaintiffs, this fact somehow counts against TPG as a divestiture buyer because private-equity firms "have incentives that run different" to those of strategic buyers. *See, e.g.*, 8/1/22 AM Trial Tr. 30:7–17 (Pls.' Opening). Not so. The Clayton Act does not put a thumb on the scale against private-equity firms as divestiture buyers, and nothing in the law presumes, as Plaintiffs do, that such firms are somehow incapable of replicating competition in the markets in which they participate. Plaintiffs' position is belied by the Department of Justice's own Merger Remedies Manual, which recognizes that "in some cases a private equity purchaser may be preferred" to a strategic buyer because the private-equity firm has more "flexibility in investment strategy, [i]s committed to the divestiture, and [i]s willing to invest more when necessary." Antitrust Div., U.S. Dep't of Justice, *Merger Remedies Manual* 24–25 (Sept. 2020) (DX-0777 at .0027–28); FOF ¶ 468. The record evidence also conclusively refuted Plaintiffs' position. When the Court asked the co-managing partner of TPG whether "TPG, you personally, and your investors, benefit through this acquisition more the better ClaimsXten performs," he responded, "[a]bsolutely" and went on to explain that "the better [a] company does between the time we buy it and the time we're ready to sell it, the more money someone will pay us for that asset." 8/11/22 PM Trial Tr. 90:15–18, 91:8–14 (Raj); FOF ¶ 483. This alignment of incentives is precisely why TPG plans to make substantial R&D investments to help ClaimsXten grow and why ClaimsXten will compete just as fiercely post-merger as it does today, if not more.

***Independence.*** TPG is an entirely independent buyer. Despite Plaintiffs alleging a "cozy" relationship between UHG and TPG, 8/1/22 AM Trial Tr. 30:3–6 (Pls.' Opening), the evidence showed that the two have done only a handful of deals together, each of which was conducted "at arm's length" and was "heavily and hotly negotiated." 8/11/22 PM Trial Tr. 5:3–9 (Raj); FOF ¶ 469. The existence of a standard transition services agreement ("TSA") between TPG and UHG

does not remotely suggest otherwise.  The Department of Justice routinely signs off on divestitures that employ TSAs.  FOF ¶ 470.  And this particular TSA is both limited in scope and in fact necessary for the success of the divestiture, providing a routine 9–12 months of support for the "back-office parts of the business"—things like "finance systems, IT systems, [and] HR systems"—with no support offered for parts of the business that are "customer facing or product oriented."  8/11/22 AM Trial Tr. 164:25–166:25 (Raj); FOF ¶¶ 471–72.  The duration and scope of the services provided under the TSA are "very typical" for carve-out transactions, and in no way render TPG—one of the leading private-equity firms in the country—beholden to UHG. 8/11/22 AM Trial Tr. 165:7–9, 166:9–25 (Raj); FOF ¶ 472.

*Purchase Price.*  There can be no serious dispute over whether the $2.2 billion price tag for ClaimsXten is adequate and reflects ClaimsXten's standalone value.  *See* 8/11/22 PM Trial Tr. 55:12–14 (Raj); FOF ¶ 428.  Indeed, ███████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████.  *See* DX-0616A at .0006; PX195 at 1; FOF ¶ 428.

In short, if ClaimsXten is divested to TPG, first-pass claims editing will remain just as competitive as it is today, if not more so, and that is dispositive under Section 7 of the Clayton Act.  Plaintiffs have not presented any third-party testimony attacking the adequacy of the divestiture, and in fact the only payer witness ███████████ to address the issue confirmed that █ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████; FOF ¶ 488.  Plaintiffs' horizontal claim fails, and the Court should order the divesture.  *See* Final Judgment at 9–15, *United States v. Gray Television, Inc.*, 1:21-cv-02041-CJN (D.D.C. Oct. 25, 2021), ECF No. 11 (ordering a divestiture); 16 C.F.R. § 802.70.

II.     **PLAINTIFFS FAILED TO PROVE A LIKELY AND SUBSTANTIAL LESSENING OF COMPETITION UNDER ANY OF THEIR VERTICAL THEORIES.**

Unable to make a horizontal case, Plaintiffs resorted to vertical theories of competitive harm, all of which are speculative and unsupported by the record.

A.     **Plaintiffs failed to prove a likely and substantial lessening of competition under their data-misuse theory.**

Plaintiffs' first vertical theory is that UHG would use the claims data that passes through Change's EDI clearinghouse to benefit UHC.  One version of that theory claims that UHG would use Change's EDI data to reverse engineer rival payers' innovations, which would enable UHC to copy those innovations and chill rival payers from innovating further, thereby harming competition in the relevant markets for the sale of commercial health insurance.  A second version of Plaintiffs' theory claims that UHG would use Change's EDI data to improve the GRA underwriting tool, which would enable UHC (and UHC alone) to bid less competitively (or not bid at all) on certain high-risk employer customers.

Both versions of Plaintiffs' data-misuse theory suffer from the same fundamental defects. *First*, Plaintiffs assert that UHG would act in ways that contradict more than a decade of experience as a vertically integrated company, despite having no meaningful evidence that the merger will materially change UHG's incentives.  Although Plaintiffs predict a tectonic shift in UHG's corporate culture and strategy, there are no internal UHG documents or testimony that show UHG even considering such a shift, much less making one, and Plaintiffs' economic expert offered neither an accepted methodology for assessing UHG's post-merger incentives, nor any quantification of those incentives.  *Second*, rival payers—large, sophisticated firms with powerful incentives to keep UHC from gaining a leg up—offered no testimony in support of Plaintiffs' theory.  Indeed, rival payers squarely contradicted the "copying innovations" version of the theory, stating that the merger will not cause them to innovate any less with respect to health plans offered

to national accounts and large-group employers.   ***Third***, no evidence whatsoever establishes that any of the actions Plaintiffs predict UHG would take after the merger would result in higher prices, lower quality, or any other harm to competition in the relevant commercial insurance markets.

        1.    <u>The record does not support the "copying innovations" version of Plaintiffs' data-misuse theory.</u>

The "copying innovations" version of Plaintiffs' data-misuse theory predicts that UHG will make radical changes to the way it has always done business despite a total absence of proof that the merger will change UHG's incentives.   UHG's Optum subsidiary is—and always has been— "fiercely multi-payer in [its] orientation."   8/4/22 PM Trial Tr. 23:5–25 (Wichmann); 8/10/22 PM Trial Tr. 21:7–22:9 (Witty) ("I strongly, strongly believe that being multi-payer is a key feature of Optum, a key feature really, therefore, of UnitedHealth Group."); FOF ¶ 45.   That means that Optum tries to sell each of its products to external payers.   DX-0850; 8/5/22 AM Trial Tr. 62:23– 63:3 (Yurjevich); FOF ¶¶ 46, 48, 73–74.   Optum has been successful at doing so: of the approximately 230 payers in the United States, Optum has contracts with about 220 of them. 8/5/22 AM Trial Tr. 19:6–12 (Yurjevich); FOF ¶ 78.   The list includes Aetna, Anthem, Cigna, many of the largest BlueCross BlueShield plans, and nearly all of UHC's other most significant rivals.   *See* 8/5/22 AM Trial Tr. 12:8–18, 19:13–18 (Yurjevich); FOF ¶¶ 78, 87.   Because Optum does business with so many external payers, it already has access to huge volumes of external payers' data.   DX-0862 at .0014–15; FOF ¶¶ 83–87.   Indeed, Optum currently has access to huge volumes of external payers' *claims data*—the exact form of data that passes through Change's EDI clearinghouse—in addition to other competitively sensitive pieces of information, such as payer-

provider reimbursement terms, payer-provider contracts, and payer-specific adjudication rules. DX-0862 at .0014–15; FOF ¶¶ 83–99.

UHG has every incentive to take the protection of such data "very seriously."  8/10/22 PM Trial Tr. 119:22–120:11 (Gehlbach); FOF ¶ 104.  For as long as Optum has existed, UHG has maintained an enterprise-wide firewall policy that prohibits employees of one business unit from "participat[ing] in or facilitat[ing] communications that may reduce or eliminate competition between another Business Unit and its competitor(s)." DX-0529A at .0002; FOF ¶¶ 121–23.  UHG has also operationalized its firewall policy through "robust" technological systems that prevent employees of one UHG business unit from accessing data housed within another UHG business unit.  8/5/22 PM Trial Tr. 31:12–32:4 (Dumont); FOF ¶¶ 124–26.  UHG's firewall policy—and the technology behind it—have worked.  Plaintiffs spent 18 months probing the effectiveness of UHG's firewalls through depositions, document productions, and written discovery.  Yet Plaintiffs have not identified *a single instance* of Optum sharing external payers' data with UHC or UHC accessing external payers' data housed within Optum.  FOF ¶¶ 127–29.  That is no surprise: Optum's customers audit UHG's firewalls frequently, and none of those audits have turned up a breach.  DX-0755; FOF ¶¶ 116–19.  It is telling that after 18 months of scrutiny, and in-depth discovery into UHG's firewalls, Plaintiffs now deem UHG's track record regarding its firewall policies "irrelevant."  *See* 8/1/22 AM Trial Tr. 13:22–14:4 (Pls.' Opening).  But the Clayton Act does not permit Plaintiffs to ignore historical evidence simply because it hurts their case; it demands a "'fact-specific' showing that the effect of the proposed merger 'is likely to be anticompetitive,'" based on the "'structure, *history*[,] and probable future'" of the markets at issue. *See AT&T*, 310 F. Supp. 3d at 192, 221 (emphasis added) (citations omitted); COL ¶¶ 44, 46–47.

As belt and suspenders, UHG also attempted to assuage Plaintiffs' unfounded concerns about its firewalls by adopting an additional, merger-specific firewall policy that reaffirms the company's existing policies and practices.  UHG's merger-specific policy expressly prohibits the "disclosure of External Customer CSI to UHG business units that are competitors of such External Customers" as well as the "use of External Customer CSI to benefit UHG business units that are competitors of such External Customers."  DX-0654 at .0002; FOF ¶¶ 130–33.  After the merger, then, external payers would have the benefit of not one but two layers of firewall protection.

Plaintiffs seem to believe that neither layer of protection would prevent rogue employees from using data to reverse engineer other payers' innovations and then passing those innovations to UHC "remotely and over the phone."  *See* 8/1/22 AM Trial Tr. 15:1–7 (Pls.' Opening).  This "telephone" theory reflects an astonishingly naive view of how vertically integrated businesses operate, but more importantly it misunderstands the complicated nature of the data and insights at the heart of Plaintiffs' theory.  As Plaintiffs' own claims-data expert, Dr. Handel, testified, reverse engineering rival payers' innovations "would take a team of analytics professionals some months or some meaningful amount of time."  8/8/22 PM Trial Tr. 38:16–39:3 (Handel); FOF ¶ 375.  This is the stuff of machine learning models, regressions, and complex statistics—not whisper down the lane—and it severely undermines Plaintiffs' suggestion that any data misuse would be undetectable.  In any event, if Plaintiffs' theory of data misuse were correct, Section 7 would prohibit the extensive vertical integration that exists in the healthcare space today because of the inherent risk of data misuse in every telephone conversation between employees of different business units.  To state the obvious, that is not the law.  *See United States v. CVS Health Corp.*, 2019 WL 4793060 (D.D.C. Sept. 4, 2019) (final judgment authorizing the merger of CVS and Aetna).

UHG's maintenance and enforcement of strong firewall policies is entirely consistent with its economic incentives and business model.  Last year alone, non-UHG customers accounted for approximately $63 billion in Optum revenue, with OptumInsight accounting for $4.1 billion of that share.  PX830 at USDOJ-008-000001519; 8/10/22 AM Trial Tr. 71:9–22 (Schumacher); FOF ¶ 384.  If external payers stopped trusting Optum to keep their data away from UHC, then that "entire book of external business" would be "immediately at risk."  8/5/22 AM Trial Tr. 31:13–32:11, 71:6–14 (Yurjevich); FOF ¶ 385.  If an external payer cannot trust one Optum business unit with its data, then it cannot trust any Optum business unit with its data, meaning that Optum risks losing the payer's business entirely, not just the $4.1 billion share from OptumInsight.  8/5/22 AM Trial Tr. 31:24–32:11 (Yurjevich); PX830 at USDOJ-008-000001519; 8/10/22 AM Trial Tr. 71:9–22 (Schumacher); FOF ¶¶ 384–85.

Although Plaintiffs cannot seem to grasp that UHG's firewalls align with its financial incentives in the pre- and post-merger world, the market gets it.  One ▮▮▮▮▮ plan, for example, was "highly confident and convinced" that Optum would not "share their Plan's information with United Healthcare" because doing so would "risk [Optum's] credibility or brand reputation."  DX-0472 at .0004; FOF ¶¶ 95, 139, 383.  That is exactly right—and credibility and reputation are all that stand between Optum and a $63 billion loss from misuse of data in the post-transaction world.

Plaintiffs discount all of the above—UHG's firewalls, their track record, and what they reveal about UHG's incentives—as "not relevant."  8/1/22 AM Trial Tr. 13:22–14:4 (Pls.' Opening).  The transaction will change UHG's incentives, Plaintiffs say, and UHG's firewalls will change accordingly.  *Id.* at 50:6–13.  But Plaintiffs cannot meet their burden simply by intoning "changed incentives" like a mantra, and "things might change" is not a viable theory of vertical antitrust harm.  To carry their burden, Plaintiffs needed to make a "'fact-specific' showing" that

the merger would change UHG's incentives, *AT&T*, 916 F.3d at 1032 (citation omitted); COL ¶ 43, and they have fallen well short of doing so.

The record reveals that, post-merger, Optum would have an equal or greater incentive to prohibit UHC from using rival payers' data to copy their innovations.  Post-merger, Optum would still stand to lose at least $63 billion by sharing external payers' data (or innovations derived from that data) with UHC, including the $4.1 billion in external payer revenue generated by OptumInsight.  *See* 8/5/22 AM Trial Tr. 31:24–32:11 (Yurjevich) ("Q. Why do you say that? Because Change is just going to be part of OptumInsight, but why are OptumRx and OptumHealth also affected?  A. OptumRx and OptumHealth serve the same customers that we serve within OptumInisght.  So our customers don't think of us as OptumInsight, OptumHealth or OptumRx.  Our customers think of us as Optum."); FOF ¶¶ 384–85.  Change likewise has billions in revenue from non-UHC payers that would be put at risk, even excluding the revenue (███████████ ██████) that comes from ClaimsXten.  8/10/22 AM Trial Tr. 134:19–24 (Schumacher); 8/15/22 AM Trial Tr. 39:24–41:17 (Murphy) ("But the other side of the equation is the cost of misusing data goes up, too, because you're not now just putting the existing Optum business at risk by misusing data, you're putting the Change business at risk by misusing data."); FOF ¶ 386.  Setting the Change revenue aside, UHG expects that Optum's external-payer business will "continue to grow," 8/9/22 PM Trial Tr. 87:20–25 (McMahon); FOF ¶ 387, so Optum likely will have more than $63 billion to lose in future years, as compared to the approximately ████████ in revenue that UHC generates from national-account and large-group customers, ██████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████; FOF ¶ 35.

The consequences of data misuse do not end with the risk of lost business. When questioned by the Court, Change's Senior Vice President and General Manager of Data Solutions unequivocally testified that Change's standard EDI contract prohibits the use of one payer's data for another payer's benefit. 8/3/22 AM Trial Tr. 47:12–24 (Suther) ("And if we felt that a [sic] interested health insurer were trying to, you know, reverse engineer the business practices of one of their competitors, that, in our mind, would be a violation of our confidentiality obligations under our agreement and wouldn't permit it."); FOF ¶¶ 232, 388. This testimony is corroborated by Change's longstanding business practice: Change has never sold one payer's data to a rival payer. 8/2/22 PM Trial Tr. 119:25–120:1 (Suther); FOF ¶ 233. Plaintiffs' theory of harm thus requires an inference that UHG would adopt a different interpretation of Change's contracts post-merger, thereby exposing itself to significant legal liability. Further, UHG offered amendments to Change's customer contracts to guarantee that "UHG will maintain commercially reasonable firewall and information security policies to protect Customer's Confidential Information from being disclosed" to UHC. DX-0766 at .0004; FOF ¶¶ 403–08, 410–11. Nearly 2,900 of Change's customers took UHG up on that offer. DX-0214S; FOF ¶ 409. UHG has therefore voluntarily assumed additional contract liability that constrains its ability to act in the manner Plaintiffs hypothesize. That is not the conduct of a company that intends to turn around and misuse rival payers' data to copy their innovations, and Plaintiffs have no evidence suggesting otherwise.

Rather than address the substantial costs that data misuse would impose on UHG, Plaintiffs and their economist take the position that any such costs would be "negligible" because "rivals aren't going to know whether United uses this information." 8/9/22 PM Trial Tr. 54:5–55:19 (Gowrisankaran); FOF ¶ 392. This is pure speculation: Dr. Gowrisankaran conducted no investigation whatsoever into whether external payers would be able to detect UHG's misuse of

their data.  FOF ¶ 393.  Nor did he provide any methodology to the Court that comes close to satisfying Rule 702 of the Federal Rules of Evidence.  FOF ¶ 393.  Equally problematic, Dr. Gowrisankaran simply zeroed out the potential costs to UHG by assuming away the "legal ramifications" that would flow from data "sharing," even though the sharing he hypothesizes is contrary to UHG's policies, contractual commitments, and—under Plaintiffs' theory—qualifies as a violation of antitrust law.  *See* 8/15/22 PM Trial Tr. 28:8–29:11 (Gowrisankaran) ("I made no contention that, as a result of this merger, UnitedHealth Group was going to misuse its rivals' data that it's going to use it in a way that violates legal standards or its contracts."); FOF ¶ 394.  The risk of legal liability is real and significant—and it cannot be ignored simply because it is inconsistent with Plaintiffs' theory.

On the other side of the scale, Plaintiffs have vanishingly little proof that UHG stands to gain anything by misusing external payers' data.  Today, UHG does not use external payers' data to reverse engineer those payers' innovations.  *See, e.g.*, 8/4/22 PM Trial Tr. 31:4–7 (Wichmann); 8/5/22 AM Trial Tr. 13:23–14:16 (Yurjevich); 8/8/22 AM Trial Tr. 89:25–90:10 (Higday); 8/10/22 AM Trial Tr. 73:14–74:16 (Schumacher); 8/10/22 PM Trial Tr. 119:22–120:11 (Gehlbach); FOF ¶ 104.  By Plaintiffs' own logic, that means UHG does not currently have sufficient incentive to engage in reverse engineering.  Plaintiffs therefore needed to prove that Change's EDI data would give UHG *additional* incentive to engage in reverse engineering, and such incentive would exist only if Change's EDI data made reverse engineering more valuable than it is today.

Plaintiffs have not come close to showing that reverse engineering would be more valuable post-merger.  Optum currently has huge volumes of external payers' claims data.  DX-0862 at .0014–15; FOF ¶¶ 83–87, 90–96.  Plaintiffs have not shown how much of that data Optum has; what innovations could be reverse engineered from that data; or how valuable those innovations

would be—*i.e.*, how much new national-account or large-group business UHC could win as a result of the innovations. Optum also has significant volumes of other types of external payers' data (*e.g.*, provider guides, contracts, and payer-specific adjudication rules that Optum receives in connection with its payment-integrity products). DX-0862 at .0015; FOF ¶¶ 83–84, 88–93, 95–99. Plaintiffs have not shown how much of that other data Optum has; what innovations could be reverse engineered from that data; or how valuable those innovations would be. In short, Plaintiffs have not established a baseline of how valuable reverse engineering would be today, and without that baseline, Plaintiffs cannot prove that reverse engineering would be ***more*** valuable post-merger.

Plaintiffs' inability to estimate and compare the value of innovations that Optum could reverse engineer before and after the merger is not just a failure of proof, it highlights the implausibility of their theory more broadly. What is difficult for Plaintiffs to estimate is equally difficult for UHG, and no evidence establishes that UHG would be able to confirm that the innovations it could reverse engineer from Change's EDI data would give a greater benefit to UHC than the $63 billion in lost sales that they would cost Optum, to say nothing of the additional legal liabilities. In fact, Optum was never able to quantify the incremental data that it would receive through the merger, nor was Optum ever able to determine the incremental percentage of claims for which it would obtain secondary-use rights. *See* 8/5/22 AM Trial Tr. 123:4–11 (Musslewhite); 8/10/22 AM Trial Tr. 96:21–97:1 (Schumacher); PX027 at UHG-2R-0006509717 ("Due to potential data overlaps between Optum primary data sets (NHI/dNHI and Optum Labs Data Warehouse (OLDW), which leverages NHI data plus external sources) and Cambridge data, estimating how much additional data will be added to Optum's pool is very difficult."); FOF ¶¶ 335–36.

In any event, a reverse-engineering strategy would be self-defeating in the long run. The few major payers that use Change's EDI clearinghouse could stop doing so and could apply pressure to providers to do the same. Empirical evidence shows that switching is not prohibitively expensive for many providers. As Plaintiffs' own economist opined, between 2018 and 2020, 30.2% of all Change's provider customers reduced the volume of claims that they transmitted through Change's EDI clearinghouse by 50% or more. 8/9/22 PM Trial Tr. 4:6–16 (Gowrisankaran); FOF ¶ 205. Against these statistics, Plaintiffs offered only anecdotal evidence from two provider witnesses who testified that switching clearinghouses would be costly or disruptive for them. But combined, those providers add up to "less than one-tenth of 1 percent" of Change's total volume of claims transmitted, 8/3/22 AM Trial Tr. 147:8–12 (Peresie); FOF ¶ 213, and they both purchase Change's EDI services as a component of Change's revenue-cycle-management ("RCM") software, not on a standalone basis, PX1008 at 143:15–20 (Mincher); 8/8/22 AM Trial Tr. 26:3–15 (Spady); FOF ¶ 215. Nothing in the record establishes that the experience of those two provider witnesses is "representative of the entire universe of [providers]," *see United States v. SunGard Data Sys., Inc.*, 172 F. Supp. 2d 172, 192 (D.D.C. 2001), and the empirical evidence suggests that their experience is not representative. As such, the testimony of the two provider witnesses should carry little weight.

Lacking evidence of changed incentives, Plaintiffs instead try to dress up portions of internal UHG documents as evidence that UHG intends to change its behavior post-merger. *See* PX027; PX054; PX944. But those documents—which discuss potential use cases for Change's data—do not state that the data could be valuable because it could benefit ***UHC exclusively***. Unbroken and unrebutted testimony from UHG's witnesses confirms that any potential uses of Change's EDI data would benefit ***all payers equally***, consistent with Optum's multi-payer business

model.  8/5/22 PM Trial Tr. 47:4–50:14 (Dumont); 8/8/22 AM Trial Tr. 49:13–69:7 (Higday); 8/4/22 PM Trial Tr. 81:1–86:9 (Hasslinger); FOF ¶ 337–41.  None of those use cases require Optum to share competitively sensitive information with UHC.  If anything, then, UHG's internal documents reveal that UHG wanted Change's data for procompetitive purposes.

To see just how fundamentally Plaintiffs misunderstand UHG's enterprise incentives, the Court need only review the testimony of Plaintiffs' economist.  In his report and testimony, Dr. Gowrisankaran cites UHG's CEO, Andrew Witty, as saying "that UnitedHealth Group needs to think about United at an enterprise level," 8/9/22 AM Trial Tr. 90:4–18 (Gowrisankaran); PX947 ¶ 25 & n.43; FOF ¶ 395, to create the impression that UHG invariably favors its most profitable business unit, UHC in whole, without regard for the incentives of its other business units or any external constraints.  The trial presentation, however, exposed this reading as at best incomplete, and at worst misleading.  The full picture of Mr. Witty's testimony makes clear that maximizing enterprise value "sometimes . . . would involve [separate business units'] assets being worked together," and "sometimes individually," all subject to "the important caveat of all of the rule sets" that limit UHG's conduct.  *See* DX-0852 at 296:1–297:17 (Witty); FOF ¶ 395.  All of UHG's efforts, then—whether "meeting the needs of the marketplace" or "meeting the needs of physicians and patients"—seek to "mak[e] the best of" the organization's assets, subject to meaningful "constraints," including market incentives, contractual limitations, firewall policies, and business ethics.  *See* DX-0852 at 296:1–297:17 (Witty); FOF ¶ 395.

Plaintiffs' case also fails for the basic reason that they have not marshalled any evidence of harm to competition in the relevant markets.  Under Plaintiffs' theory, what harms competition is not the copying of innovations itself, but the chilling of innovation by other payers and the resulting effect on health plans sold to national accounts and large-group employers.  *See Brown*

*Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (stating that Section 7 is "concern[ed] with the protection of competition, not competitors"); COL ¶ 44. Plaintiffs offered next to no evidence about the dynamics of the markets for commercial health insurance sold to national accounts or large-group employers, leaving a host of questions unanswered: Where would UHC deploy innovations it copied from rivals? Would these innovations enable UHC to win bids for national-account and large-group customers? At what threshold would UHC's copying chill rival payers from innovating? Would the absence of rival payers' would-be innovations have any effect on national-account and large-group customers? If so, would the effect be a substantial lessening of competition? And what particular innovations, separately or together, would accomplish this substantial lessening? Each of these questions is an essential link in Plaintiffs' case, and they have answered none of them, providing yet more reasons to reject Plaintiffs' theory.

Plaintiffs' "copying innovation" theory does not just suffer from a failure of proof, it is squarely contradicted by the scant payer testimony that did make it into the record. An Aetna employee testified that he was "not forecasting" Aetna innovating any less as a result of the merger. 8/1/22 PM Trial Tr. 94:23–95:2 (Lautzenhiser); FOF ¶ 399. █████████████████████████████

████████████████████████████████████████████████████████████

████████████████████; FOF ¶ 399. A Cigna employee testified that Cigna would not "ever compete less for any reason." PX1005 at 169:14–16, 169:19–170:6 (Dill); FOF ¶ 399. Finally, a former Cigna employee with no authority to testify on Cigna's behalf, Lynn Garbee, stated that Cigna "would still innovate" post-merger, but that "they would be more careful where they put their edits." 8/1/22 PM Trial Tr. 14:17–22 (Garbee); FOF ¶ 399. But Ms. Garbee then explained that she was referring to moving those edits out of ClaimsXten—a concern solved by the divestiture. 8/1/22 PM Trial Tr. 15:22–16:12 (Garbee); FOF ¶ 399. Ms. Garbee's statement is the

closest Plaintiffs came to marshalling third-party support for their theory, and it is still light years away from testimony that any payer will innovate less.  In sum, Plaintiffs presented no testimony from any national account or large-group employer about the likely effects of the transaction on competition, and the payer testimony in the record affirmatively refutes Plaintiffs' central, data-misuse theory.

2.   <u>The record does not support the "improving GRA" version of Plaintiffs' data-misuse theory.</u>

The "improving GRA" version of Plaintiffs' data-misuse theory fares no better.  This version of Plaintiffs' theory hinges on the notion that Optum would refuse to sell an improved version of its GRA tool to external payers.  8/9/22 PM Trial Tr. 13:1–6 (Gowrisankaran) ("Q. Doctor, I need you to answer the question yes or no.  If Optum did market GRA to all payers, then you don't know what would happen, true?  A. I didn't look at what would happen to competition if it were offered on an equal footing to all payers for that particular [product], yes.");  FOF ¶ 55.  But Optum has never offered a product only to UHC.  DX-0850; 8/5/22 AM Trial Tr. 62:23–63:3 (Yurjevich); FOF ¶¶ 53, 73–74.  Here too, Plaintiffs have failed to prove that UHG would be incentivized to change its behavior post-merger.  Dr. Gowrisankaran did not even attempt to calculate what UHC would purportedly gain by being the only payer with access to an improved version of GRA.  Nor did he attempt to calculate what Optum would lose by foregoing sales of an improved version of GRA to external payers.  Thus, Dr. Gowrisankaran's prediction that Optum would withhold an improved version of GRA is little more than a guess.

Worse, that guess is predicated on a blatant factual error.  At his deposition, Dr. Gowrisankaran testified that Optum sells the current version of GRA only to UHC.  8/9/22 PM Trial Tr. 6:5–8 (Gowrisankaran); FOF ¶ 54.  But at trial, he admitted he was wrong about that; GRA is sold to both UHC and external payers.  8/9/22 PM Trial Tr. 6:9–7:6 (Gowrisankaran);

8/5/22 AM Trial Tr. 55:9–57:13 (Yurjevich); DX-0850; FOF ¶ 54.  Dr. Gowrisankaran made the same mistake with respect to a second Optum product, first testifying that a tool known as Portfolio Optimization was offered exclusively to UHC, but later conceding that the product was in fact marketed to all payers.  8/9/22 PM Trial Tr. 13:17–14:10 (Gowrisankaran); 8/5/22 AM Trial Tr. 60:22–61:10 (Yurjevich); DX-0850; FOF ¶¶ 60–61.  Given those errors, Dr. Gowrisankaran's analysis should get zero weight.

Plaintiffs' fallback theory—that Optum would offer an improved version of GRA to UHC while offering only a degraded version to the market—also finds no support in the trial record. Optum has never sold one version of a product to UHC and a lesser version to external payers because that would be antithetical to its business model.  8/5/22 AM Trial Tr. 61:11–22 (Yurjevich) ("[I]t would be ridiculous for us to offer a different product in the commercial market than we do for United."); FOF ¶ 62.  Plaintiffs made no serious effort to prove that Optum would have new incentive to do so post-merger: Dr. Gowrisankaran did not calculate the benefit UHC would get from using an improved version of GRA or what sales Optum would lose if it marketed a degraded version of GRA to non-UHC payers.

Beyond an absence of evidence of UHG's supposedly changed incentives, direct evidence contradicts Plaintiffs' theory.  OptumInsight's Chief Operating Officer testified that Optum has no plans to use Change's EDI data to improve GRA; that Optum does not even know whether Change's data could be used to improve GRA; and that, post-merger, Optum intends to continue selling identical versions of GRA to both UHC and rival payers.  8/5/22 AM Trial Tr. 55:9–60:14 (Yurjevich); FOF ¶ 56.  This credible, unrebutted testimony makes it impossible for Plaintiffs to meet their burden on the "improving GRA" version of their theory.

27

But again, Plaintiffs failed to show that the post-merger conduct they predict would result in any harm to competition, much less substantial harm. Plaintiffs claim that an improved version of GRA would allow UHC (and only UHC) to more accurately gauge the medical risk associated with particular employer customers and bid (or not bid) accordingly. To begin with, UHC does not conduct risk analysis when bidding on administrative-services-only ("ASO") customers because the customers are the ones taking on the risk. 8/10/22 PM Trial Tr. 106:11–22 (Gehlbach); FOF ¶ 57. Almost all national accounts are ASO customers, and UHC has also "seen an increased interest in ASO across the large group segment." 8/10/22 PM Trial Tr. 101:1–9, 102:5–14 (Gehlbach); FOF ¶ 57. Any improved version of GRA thus would have little effect in the market for national accounts, and a diminishing effect in the market for large-group employers.

Even within the market for fully insured large-group accounts, UHC currently uses GRA only in the underwriting process for employers with between 51 and 300 eligible employees. 8/10/22 PM Trial Tr. 115:22–24 (Gehlbach); FOF ¶ 58. Plaintiffs have no evidence that any improved version of GRA could or would be used for any additional employers. So the record does not support the suggestion that any improved version of GRA could substantially affect competition for (the very few) fully insured national accounts or (the shrinking number) of fully insured large-group employers with more than 300 employees.

There is also reason to doubt whether Change's EDI data would enable UHC to more accurately gauge medical risk for *any* employer customers. Under the Health Insurance Portability and Accountability Act ("HIPAA"), only de-identified data can be used to improve a product like GRA. At both Optum and Change, information about a patient's employer is removed during the de-identification process, 8/3/22 AM Trial Tr. 13:16–15:4 (Suther); 8/5/22 PM Trial Tr. 30:3–10 (Dumont); FOF ¶ 342, which according to UHG and Change's data expert, Professor Catherine

Tucker, would prevent UHG from learning anything "about a particular employer's risk profile"—a "glaring" problem for Plaintiffs' theory, 8/12/22 AM Trial Tr. 28:17–29:10 (Tucker); FOF ¶ 343.

Finally, to the extent Plaintiffs contend that UHC would harm competition by improving its assessment of customer risk pools through some unspecified means other than GRA, that theory also fails. No evidence establishes how exactly UHC would improve its risk analysis; Change's de-identified data cannot be used for such purposes because it is missing employer information; and UHC does not perform risk analysis for ASO customers, which include nearly all national accounts and many large-group employers.

In sum, with respect to both versions of Plaintiffs' data-misuse theory, Plaintiffs have failed to make the "'fact-specific' showing" of likely and substantial harm to competition that the law demands of them. *AT&T*, 916 F.3d at 1032 (citation omitted); COL ¶ 43.

### B.   Plaintiffs failed to prove a likely and substantial lessening of competition under their other vertical theories.

Plaintiffs advance two additional vertical theories, neither of which is supported by the record. Plaintiffs contend that UHG will use Change's assets to develop and withhold from the market (in whole or in part) innovations like Change's Real-Time Settlement project or Optum's Transparent Network offering. Plaintiffs also contend that UHG will use Change's EDI clearinghouse to raise external payers' quality-adjusted costs. For reasons discussed below, these theories also fail.

As an initial matter, an actual product must exist in order for Optum to have the ability or incentive to raise rivals' costs by withholding or degrading that product, and neither Real-Time Settlement nor the Transparent Network are marketable products today. "Real-Time Settlement is a concept[,] . . . not a product," and it "is not close to being a product." 8/3/22 PM Trial Tr. 57:1–10 (Joshi); FOF ¶ 251. Optum's Transparent Network is further along in the development

process, and Optum is "really hopeful" that it will be a success.  8/5/22 PM Trial Tr. 120:25–122:11 (Schmuker); FOF ¶ 295.  But Optum cannot yet "say definitively" whether it will ever be a marketable product.  8/5/22 PM Trial Tr. 120:25–122:11 (Schmuker); FOF ¶ 295.  That uncertainty is a serious strike against Plaintiffs, who bear the burden to prove that Optum will *likely* withhold these innovations from rivals, resulting in a substantial lessening of competition in the downstream markets for the sale of commercial insurance to national accounts and large-group employers.

Moreover, Optum has never withheld a product from external payers, nor sold different versions of a product internally and externally.  8/5/22 AM Trial Tr. 61:11–22, 62:23–63:3 (Yurjevich); FOF ¶¶ 62, 73–74.  Plaintiffs' supposed proof of Optum's changed incentives—in the form of Dr. Gowrisankaran's "vertical math"—is deeply flawed.  To put it mildly, Dr. Gowrisankaran was equivocal about the specific product that Optum supposedly will withhold post-transaction—Optum's nascent Transparent Network offering or Change's Real-Time Settlement project.  *Compare* PX820 ¶ 250 (opining on the number of members that rival payers would need to lose "in order for foreclosure of the Transparent Network to be profitable" for UHG), *with* PX947 ¶ 30 ("The concern of foreclosure is whether United would have an incentive to raise rivals' costs using Change's Real-Time Settlement").

Dr. Gowrisankaran's "vertical math" also assumes that the Transparent Network would provide value to UHC even if UHC were the only payer using it.  That assumption is faulty, as the record amply shows.  The Transparent Network "wouldn't work if it were one payer and one provider."  8/5/22 AM Trial Tr. 83:18–84:6 (Yurjevich); 8/5/22 PM Trial Tr. 114:5–16 (Schmuker) (explaining that "with one payer you wouldn't drive enough provider participation" and thus "wouldn't have a viable business opportunity"); FOF ¶ 297.  Indeed, every document discussing

30

the Transparent Network refutes Plaintiffs' theory, making clear that Optum intends for the Transparent Network to be multi-payer because that is the only way the product will work. *See* DX-0748 at .0014 ("Platform will be multi-payer, multi-provider[.]"); 8/5/22 AM Trial Tr. 82:6–25 (Yurjevich); DX-0557 at .0009, .0014, .0016 (including in UHG's synergy model significant revenues from sales of the Transparent Network to non-UHC payers); FOF ¶¶ 296–303.

Perhaps most importantly, Dr. Gowrisankaran's "vertical math" hinges upon a foundational—but unsubstantiated—assumption that Optum would have market power in the market for EDI-related innovations. 8/9/22 PM Trial Tr. 52:11–53:7 (Gowrisankaran) (acknowledging that Plaintiffs' innovation theory "depend[s] on there being market power in these innovations that result from EDI clearinghouse in these integrated platforms"); FOF ¶ 325. The Court asked Dr. Gowrisankaran whether he had defined the market for such innovations, and he conceded: "I have not defined that market." 8/9/22 PM Trial Tr. 52:11–53:7 (Gowrisankaran); FOF ¶ 325. Dr. Gowrisankaran went on to opine that "there's likely not going to be substitutes" to the Transparent Network. 8/9/22 PM Trial Tr. 52:11–53:7 (Gowrisankaran). But the record refutes his prediction. A Change witness testified that at least six other firms are currently developing integrated platforms, including a partnership between Google and Blue Shield of California. 8/3/22 PM Trial Tr. 67:9–17 (Joshi); DX-0212 at .0002; FOF ¶¶ 261–62. A UHG witness identified additional competitors, including Waystar, one of the largest EDI clearinghouses. 8/5/22 PM Trial Tr. 121:6–24 (Schmuker); PX947 ¶ 81 & n.177; FOF ¶ 322. And UHG and Change's economic expert Dr. Murphy testified that Availity, one of the largest EDI clearinghouses, may also be innovating in the space. DX-0862 at .0059; 8/15/22 AM Trial Tr. 85:22–86:7 (Murphy); PX947 ¶ 81 & n.177; FOF ¶ 323.

Plaintiffs' final vertical claim—that UHG will use Change's EDI clearinghouse to raise rivals' costs—was all but abandoned at trial.  Dr. Gowrisankaran expressly disclaimed offering an opinion on the theory.  8/9/22 PM Trial Tr. 24:23–25 (Gowrisankaran) ("Q. You don't offer an opinion about whether Optum would raise pricing on Change's current EDI clearinghouse network, correct?  A. That's correct."); FOF ¶ 220.  In any event, for the theory to work, Change would need to have market power in the payer market for EDI clearinghouse services, which it does not.  DX-0813 ¶ 30 ("Change does not have substantial market power over payers[.]"); FOF ¶¶ 191, 196–97.  Thus, Plaintiffs' final theory fails on the merits even if Plaintiffs have not abandoned it.

*     *     *

For the foregoing reasons, Plaintiffs have failed to prove that the transaction would likely cause substantial harm to competition in the relevant markets.  UHG and Change respectfully submit that the Court should deny Plaintiffs' request for a permanent injunction, enter judgment in favor of UHG and Change, and order that ClaimsXten be divested to TPG.

Dated:  August 31, 2022

Respectfully submitted,

By:  */s/ Craig S. Primis*
    Craig S. Primis

Matthew J. Reilly, P.C. (D.C. Bar No. 457884)
Craig S. Primis, P.C. (D.C. Bar No. 454796)
K. Winn Allen, P.C. (D.C. Bar No. 1000590)
Richard Cunningham (D.C. Bar. No. 1644119)
T.J. McCarrick (D.C. Bar. No. 219283)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone:  (202) 389-5000
Facsimile:  (202) 389-5200
matt.reilly@kirkland.com
craig.primis@kirkland.com
winn.allen@kirkland.com
tj.mccarrick@kirkland.com

Alexia R. Brancato (NY0467)
**KIRKLAND & ELLIS LLP**
600 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
alexia.brancato@kirkland.com

Charles Loughlin (D.C. Bar. No. 448219)
Justin W. Bernick (D.C. Bar. No. 988245)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone:  (202) 637-5600
Facsimile:  (202) 637-5910
chuck.loughlin@hoganlovells.com
justin.bernick@hoganlovells.com

*Counsel for Defendant UnitedHealth Group Incorporated*

Sara Y. Razi (D.C. Bar No. 473647)
Abram J. Ellis (D.C. Bar No. 497634)
Nathaniel Preston Miller (D.C. Bar No. 1021557)
**SIMPSON, THACHER & BARTLETT LLP**
900 G Street, NW
Washington, DC 20001
Telephone:  (202) 636-5500
Facsimile:  (202) 636-5502
sara.razi@stblaw.com
aellis@stblaw.com
preston.miller@stblaw.com

David I. Gelfand (D.C. Bar No. 416596)
Daniel P. Culley (D.C. Bar No. 988557)
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
2112 Pennsylvania Ave, N.W.
Washington, DC 20037
Telephone:  (202) 974-1500
Facsimile:  (202) 974-1999
dgelfand@cgsh.com

*Counsel for Defendant Change Healthcare Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 31st day of August 2022, a copy of the foregoing Post-Trial Brief of Defendants UnitedHealth Group Incorporated and Change Healthcare Inc. was electronically transmitted to the Clerk of Court using the CM/ECF system, which will transmit notification of such filing to all registered participants.

/s/ *Craig S. Primis*

Craig S. Primis, P.C. (D.C. Bar No. 454796)