# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:22-cv-0481 (CJN) |
| UNITEDHEALTH GROUP INCORPORATED, *et al.*, | **[REDACTED VERSION]** |
| *Defendants*. | |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF DEFENDANTS UNITEDHEALTH GROUP INCORPORATED AND CHANGE HEALTHCARE INC.

## TABLE OF CONTENTS

FINDINGS OF FACT ................................................................................................ 1

A.  UHG ................................................................................................................. 3

    1.  Corporate Background ............................................................................ 3

    2.  UHC ........................................................................................................ 4

    3.  Optum ................................................................................................... 11

        a.  Optum relentlessly pursues a multi-payer business strategy. .................. 12

        b.  OptumInsight relentlessly pursues a multi-payer business strategy. ........ 18

        c.  Optum already has extensive access to non-UHC payer data and
competitively sensitive information ........................................................... 21

        d.  Optum has not misused external payer data for UHC's benefit. .............. 27

        e.  Other vertically integrated healthcare businesses maintain industry
standard firewalls. ...................................................................................... 41

B.  Change ............................................................................................................ 45

    1.  ClaimsXten & First-Pass Claims Editing ............................................ 47

        a.  ClaimsXten historically has thrived as a functionally independent,
standalone product. .................................................................................... 47

        b.  ClaimsXten is purchased as an independent standalone product,
unbundled from Change's other suite of offerings. .................................. 48

        c.  ClaimsXten is a market leader that generates substantial revenue
through its independent and loyal customer base. .................................... 50

    2.  EDI Clearinghouse Network ................................................................. 52

        a.  EDI clearinghouse services are highly competitive and
commoditized ............................................................................................. 55

        b.  Change is restricted in how it can use data transmitted through its
EDI clearinghouse network ....................................................................... 61

        c.  Change lacks secondary use rights in the vast majority of payer
commercial claims data .............................................................................. 66

    3.  Real-Time Settlement ........................................................................... 68

i

C.    The Transaction ............................................................................ 72

1.    Transaction rationale ........................................................... 72

a.    The transaction will advance clinical alignment ............................ 73

b.    The transaction will enhance claims accuracy ........................... 75

c.    The transaction will simplify the claims payment process. ...................... 76

d.    The transaction will help facilitate Optum's nascent Transparent Network project. .......................... 77

e.    The transaction was not motivated by Change's EDI data. .................... 85

f.    Commercial and public data sources contain significant amounts of UHC claims data and other information. ................ 89

2.    Plaintiffs failed to show incremental value from Change's EDI data that would alter UHG's incentives post-merger. ......................... 95

3.    UHG's has strong post-merger legal, reputational, and financial incentives not to engage in anticompetitive conduct. ........................... 99

4.    Contractual commitments to Change's customers legally constrain UHG's ability to engage in anticompetitive conduct. .................... 106

5.    Plaintiffs failed to prove harm to competition in their alleged markets. ............ 109

6.    The divestiture solves any alleged horizontal overlap in the market for first-pass claims editing. ........................ 110

a.    Divestiture Timeline ................................ 111

b.    Divestiture Package ................................ 112

c.    TPG ........................................ 115

d.    TPG's Due Diligence ................................ 117

e.    Capital Structure of the Divestiture ........................ 119

f.    Relationship between UHG and TPG .................... 120

g.    ClaimsXten's Competitive Prospects .................... 121

CONCLUSIONS OF LAW ........................................... 127

## <u>TABLE OF AUTHORITIES</u>

**Cases**

**Page(s)**

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ................................................................... *passim*

*Comcast Cable Commc'ns, LLC v. FCC*,
    717 F.3d 982 (D.C. Cir. 2013 ........................................................136

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984) ...................................................................141

*Fruehauf Corp. v. FTC*,
    603 F.2d 345 (2d Cir. 1979) ........................................................138

*FTC v. Arch Coal, Inc.*,
    329 F. Supp. 2d 109 (D.D.C. 2004) ...............................................*passim*

*FTC v. Arch Coal, Inc.*,
    No. 1:04-cv-00534-JDB (D.D.C. July 7, 2004), ECF No. 67 .....................132, 133

*FTC v. Foster*,
    2007 WL 1793441 (D.N.M. May 29, 2007) ......................................139, 140

*FTC v. Libbey, Inc.*,
    211 F. Supp. 2d 34 (D.D.C. 2002) .................................................133

*FTC v. Owens-Illinois, Inc.*,
    681 F. Supp. 27 (D.D.C. 1988) ....................................................145

*FTC v. RAG-Stiftung*,
    436 F. Supp. 3d 278 (D.D.C. 2020) ...........................................133, 136

*FTC v. Sysco Corp.*,
    113 F. Supp. 3d 1 (D.D.C. 2015) .........................................132, 133, 134

*Kloth v. Microsoft Corp.*,
    444 F.3d 312 (4th Cir. 2006) ......................................................142

*Nat'l Fuel Gas Supply Corp. v. FERC*,
    468 F.3d 831 (D.C. Cir. 2006) .....................................................136

*United States v. AT&T Inc.*,
    310 F. Supp. 3d 161 (D.D.C. 2018) ...............................................*passim*

*United States v. AT&T, Inc.*,
  916 F.3d 1029 (D.C. Cir. 2019) ........................................................................ *passim*

*United States v. AT&T, Inc.*,
  No. 1:17-cv-02511-RJL (D.D.C. Mar. 13, 2018), ECF No. 85 .............................132

*United States v. AT&T Inc.*,
  No. 1:17-cv-02511-RJL (D.D.C. May 8, 2018), ECF No. 127 ...........................137, 138, 140

*United States v. Baker Hughes Inc.*,
  908 F.2d 981 (D.C. Cir. 1990) ........................................................................ *passim*

*United States v. CVS Health Corp.*,
  2019 WL 4793060 (D.D.C. Sept. 4, 2019) ....................................................2, 120, 121, 136

*United States v. CVS Health Corp.*,
  407 F. Supp. 3d 45 (D.D.C. 2019) ..................................................................2, 121

*United States v. Danfoss A/S*,
  2021 WL 5707762 (D.D.C. Oct. 26, 2021) ...............................................................120, 136

*United States v. Engelhard Corp.*,
  126 F.3d 1302 (11th Cir. 1997) .............................................................................144

*United States v. Gen. Dynamics Corp.*,
  415 U.S. 486 (1974) ......................................................................................129, 139

*United States v. Gray Television, Inc.*,
  No. 1:21-cv-02041-CJN (D.D.C. Oct. 25, 2021), ECF No. 11.....................................120, 136

*United States v. SunGard Data Sys., Inc.*,
  172 F. Supp. 2d 172 (D.D.C. 2001) .........................................................................127, 144

**Statutes**

15 U.S.C. § 18................................................................................................ *passim*

Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d
  *et seq.* .......................................................................................................... *passim*

**Other Authorities**

16 C.F.R. § 802.70..................................................................................................136

45 C.F.R. § 164.514 ...........................................................................................44, 45, 63

Antitrust Div., U.S. Dep't of Justice, *Antitrust Division Policy Guide to Merger Remedies* (Oct. 2004)...................................................................................................134

Antitrust Div., U.S. Dep't of Justice, *Merger Remedies Manual* (Sept. 2020) ..........................120

Dennis A. Yao & Susan S. DeSanti, *Innovation Issues Under the 1992 Merger Guidelines*, 61 Antitrust L.J. 505 (1993) ......................................................................142, 143

Douglas H. Ginsburg, *Vertical Restraints: De Facto Legality Under the Rule of Reason*, 60 Antitrust L.J. 67 (1991)........................................................................137

Ken Heyer, *Predicting the Competitive Effects of Mergers by Listening to Customers*, 74 Antitrust L.J. 87 (2007) .............................................................145

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2022) ............................................................142

Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* (4th ed.)................137

Richard T. Rapp, *The Misapplication of the Innovation Market Approach to Merger Analysis*, 64 Antitrust L.J. 19 (1995) .............................................................142, 143

Robert H. Bork, *The Antitrust Paradox* (1978) ..........................................................137

U.S. Dep't of Just. & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010)...................140

U.S. Dep't of Just. & Fed. Trade Comm'n, *Vertical Merger Guidelines* (2020) ...............137, 138

U.S. Dep't of Just., *Non-Horizontal Merger Guidelines* (1984) ................................................137

## FINDINGS OF FACT

1.      The healthcare ecosystem is complex and filled with many different players. Prominent among these players are health insurers, known as "payers," which pay and process medical claims submitted by hospitals, clinicians, and other caregivers, known as "providers." 8/1/22 AM Trial Tr. 116:15–24 (Garbee); 8/3/22 AM Trial Tr. 116:17–24 (Peresie).

2.      A commercial health insurance medical "claim" is an invoice submitted by a provider to a payer comprised of "the information that a provider submits to a payer to get reimbursed for the service that they provide."  8/5/22 AM Trial Tr. 34:5–8 (Yurjevich); *see also* 8/1/22 AM Trial Tr. 117:6–7 (Garbee) ("A claim is an invoice for [a provider's] services.").

3.      On a surface level, the lifecycle of a claim is straightforward: a provider treats a patient; the provider submits a claim for reimbursement to a payer; the payer evaluates whether it should pay the claim and, if so, how much it should pay; the payer provides an explanation of the result, known as a "remittance"; and the payer reimburses the provider, if appropriate.  *See, e.g.*, 8/1/22 AM Trial Tr. 117:3–5, 118:21–25 (Garbee); 8/3/22 AM Trial Tr. 56:25–57:8 (Suther); 8/3/22 AM Trial Tr. 110:22–111:13 (Peresie); 8/5/22 AM Trial Tr. 18:11–25 (Yurjevich).

4.      In practice, however, claims processing often involves multiple steps and far more than a simple bilateral exchange of information between payers and providers.  There are network companies that provide the "pipes"—or Electronic Data Interchanges ("EDI")—that allow payers and providers to exchange claims and remittance information, 8/2/22 AM Trial Tr. 15:7–21, 26:4–12 (de Crescenzo); technology companies that provide "payment integrity" or "payment accuracy" solutions to help payers properly reimburse providers, 8/5/22 AM Trial Tr. 18:6–25 (Yurjevich); care services companies that provide clinical and medical management services, 8/9/22 PM Trial Tr. 90:19–91:8 (McMahon); 8/4/22 AM Trial Tr. 95:17–97:2 (Wichmann); 8/5/22 AM Trial Tr. 30:1–9 (Yurjevich); and pharmaceutical services companies, including pharmacy benefits

1

managers ("PBMs"), which act as intermediaries to negotiate reimbursement rates for drugs, 8/1/22 PM Trial Tr. 95:15–22 (Garbee).

5.      The healthcare sector is also marked by pervasive vertical integration.  Most major healthcare enterprises have formed "services" companies, distinct from their commercial insurance businesses, to provide some combination of the products and services described above.  8/4/22 PM Trial Tr. 7:15–8:1 (Wichmann); *see also* 8/12/22 Trial Tr. 13:10–14:14 (Tucker; ██████████ ██████████.

6.      For instance, CVS Health owns both Aetna, a payer, and CVS Caremark, a PBM, 8/1/22 PM Trial Tr. 95:3–6 (Garbee), and HDMS, a data analytics group, 8/10/22 PM Trial Tr. 123:21–124:5 (Gehlbach).   In fact, CVS acquired Aetna in 2019 in a transaction that was investigated and approved by the Department of Justice in a formal consent decree.  *United States v. CVS Health Corp.*, 407 F. Supp. 3d 45 (D.D.C. 2019) (granting the Department of Justice's motion to enter a proposed final judgment), *judgment entered*, 2019 WL 4793060 (D.D.C. Sept. 4, 2019).   Cigna owns a commercial health insurance business; eviCore, a care management company focused on radiology and cardiology services; and Express Scripts, the largest PBM in the country.  8/9/22 PM Trial Tr. 90:19–91:8 (McMahon); 8/15/22 PM Trial Tr. 49:19–50:2 (Gowrisankaran).   Anthem owns a commercial insurance business and other non-insurance analytics and care companies.  ████████████████████.  And a collection of payers, including Anthem, Healthcare Services Corporation ("HCSC"), Humana, and Blue Cross Blue Shield of Florida have ownership positions in Availity's EDI clearinghouse business.  8/3/22 AM Trial Tr. 129:10–25 (Peresie).  ██████████████████ ████████████████████ ██████████████.

7.      UnitedHealth Group ("UHG") also is a vertically integrated healthcare enterprise with two principal, independent subsidiaries: Optum—which includes OptumInsight, its "full-scale" data and technology services business, OptumHealth, which includes its provider business, and OptumRx, its PBM business—and UnitedHealthcare ("UHC"), its benefits business.  8/4/22 AM Trial Tr. 95:14–97:5 (Wichmann); 8/10/22 PM Trial Tr. 21:7–23:2 (Witty).



*See* Defs.' Opening Demonstrative at 9.

**A.      UHG**

1.      *Corporate Background*

8.      UHG is a vertically integrated healthcare company with a mission "to help people live healthier lives, help make the health system work better for everyone."  8/4/22 AM Trial Tr. 93:6–94:8 (Wichmann).  Through UHC and Optum, UHG seeks to improve access to healthcare to "ensure that everybody has an opportunity to be covered in the United States," "[a]ffordability" of care, patients' experiences, and "differential outcomes" and "care delivery operations" to improve the health of underserved populations.  *Id.*

9.      UHC and Optum are structurally distinct, independent businesses that serve different needs within the healthcare ecosystem. *Id.*  ("Q. Does OptumInsight or any part of Optum

report to UHC?  A. No.").  Both businesses are "critically important" to the overall strategic and growth priorities for UHG, and UHG does not seek to prioritize the growth of one of these business units over the other.  8/10/22 AM Trial Tr. 69:12–22 (Schumacher); *see also id.* at 70:10–14 ("Q. As you think about growth strategies for UnitedHealth Group, are you looking to prioritize the growth of one business over the other, whether it be Optum or UnitedHealthcare?  A. No."); 8/10/22 PM Trial Tr. 26:1–9 (Witty) ("Q. As the chief executive officer of UnitedHealth Group, do you feel you have a fiduciary duty of some kind to make sure OptumInsight favors UHC to help them gain share or profits because -- against their rivals because they're a part of the same corporate umbrella?  A. No, I don't.  Q. Why not?  A. Because I think the downside of that would be a destruction of my whole fiduciary responsibility."); *see also id.* at 26:10–28:24.

10.     Optum and UHC contribute approximately equally to UHG's overall earnings. UHC's earnings from operations in 2021 were $12 billion, 8/10/22 AM Trial Tr. 68:23–69:4 (Schumacher); *see also* PX830 at 33, which reflects a modest decrease in UHC's earnings from 2020, 8/10/22 AM Trial Tr. 69:8–11 (Schumacher).  Optum's earnings were also $12 billion in 2021, which reflects year-over-year growth of approximately 19%.  8/10/22 AM Trial Tr. 69:5–21 (Schumacher).

2.     *UHC*

11.     UHC is a health insurance business that serves 45 million patients in the United States.  8/4/22 AM Trial Tr. 95:14–97:2 (Wichmann); 8/8/22 AM Trial Tr. 71:9–20 (Higday).

12.     On the insured side, UHC offers health insurance plans for individuals, employers, and small businesses through its commercial insurance business.  8/4/22 AM Trial Tr. 95:14–97:2 (Wichmann) ("Under that commercial, which is the employer and individual business, roughly 170 million member market funded by employers.").  On the uninsured side, UHC provides Medicare and Medicaid services.  *Id.* ("Inside there, on UnitedHealthcare, you've got Medicare,

so serving people over the age of 65 which the company does very well. . . .  And then Medicaid, which is community and state.").

13.     UHC competes for commercial health insurance business with other major insurers, including Anthem, Aetna, Cigna, and local Blue Cross Blue Shield affiliates across the country. 8/4/22 AM Trial Tr. 43:10–18 (Wichmann).

14.     Most Americans receive health insurance through employer-sponsored health plans.  8/10/22 AM Trial Tr. 105:16–19 (Schumacher); 8/1/22 AM Trial Tr. 119:10–14 (Garbee).

15.     To develop these plans, payers generally categorize employer-customers based on the number of employees and their geographic distribution.  PX1013 at 131:17–132:21 (Golden). These categories include national accounts and large group accounts, 8/4/22 AM Trial Tr. 46:11–15 (Wichmann), the latter of which are called "key accounts" or "small business" within UHC, depending upon the size of the employer customer, 8/10/22 AM Trial Tr. 113:16–19, 120:18–122:4 (Schumacher).

16.     National accounts are large employers with a multi-state geographic footprint and headcount, which UHC (and other payers) generally define as multi-state employers covering over 5,000 lives.  *See, e.g.*, 8/4/22 AM Trial Tr. 42:24–43:1 (Wichmann); PX1013 at 71:25–73:03 (Golden).  UHC's primary competitors in the national accounts space are Anthem, Aetna, and Cigna.  8/10/22 PM Trial Tr. 99:21–100:10 (Gehlbach).

17.     Large group or key accounts refer to smaller groups of employers—those with more than 50 employees in multiple states (or, in some jurisdictions, over 100 employees).  *See, e.g.*, 8/4/22 AM Trial Tr. 46:16–20 (Wichmann).  UHC also has a "small business" group that serves employers with 2 to 100 employees, thus partially overlapping with Plaintiffs' definition of "large group employers."  *See* 8/10/22 AM Trial Tr. 120:18–122:4 (Schumacher).  UHC's primary

competitors in this space are local Blue plans, Aetna, Cigna, and Anthem.  8/10/22 PM Trial Tr. 101:18–102:4 (Gehlbach).

18.     Employer groups have the option to choose either a self-funded administrative-service-only ("ASO") plan or an insurer-funded, fully-insured plan.  8/4/22 AM Trial Tr. 42:13–23 (Wichmann).

19.     Under an ASO plan, an employer covers its members' medical costs, but pays a fee for administration of the plan and to access, among other things, a payer's provider network.  PX1013 at 55:25–56:24 (Golden).

20.     Under a fully insured plan, an employer pays a premium to a payer in exchange for the payer covering member medical costs, providing benefits to plan members, and administering the plan.  *See id.*

21.     National account customers very rarely choose fully insured plans.  *Id.* at 131:17–132:21 ("[N]ational accounts works almost exclusively in self-funding."); 8/10/22 PM Trial Tr. 101:4–9 (Gehlbach) ("For national accounts, we only have one fully insured client.  That's the Aon exchange, which represents about 5 percent of the membership.  So 95 percent ASO, 5 percent fully insured.").  ASO plans thus constitute the "vast majority" of plans for national account customers.  *See* PX1013 at 144:12–15 (Golden); *see also* 8/4/22 AM Trial Tr. 42:19–23 (Wichmann); 8/10/22 PM Trial Tr. 101:10–17 (Gehlbach) ("The majority of national account clients are of the size and have the reserves to be able to take the risk themselves, so with their interest in having flexibility in benefits, flexibility in network design, potentially bringing point solutions to the table, all of which really lend themselves to an ASO fee structure.").

22.     ASO plans also are increasing in prevalence for large group customers with even relatively smaller employers—*i.e.*, those with 50 eligible employees.  8/10/22 PM Trial Tr. 102:8–

6

14 (Gehlbach) ("Q. Over time, have you observed any changes in the proportion of your large group clients that are ASO versus fully insured?  A. We've seen an increased interest in ASO across the large group segment, and we've also seen the size of customer that's willing to self-insure go down-market.  We have even [seen] what I would call small customers, 50 eligible employees, for example, that are interested in self-funded solutions.").

23.    The commercial health insurance market for national accounts and key accounts is highly competitive.  *See* 8/9/22 PM Trial Tr. 85:21–86:3 (McMahon) ("I would say both key accounts and national accounts are very competitive[,] . . . just strong competitors all around."); 8/10/22 PM Trial Tr. 101:18–20 (Gehlbach) ("Q. Let's talk about the large group market.  How competitive would you describe that market as?  A. I would say it's also very competitive.").

24.    Exact shares depend on the market segment, but UHC accounts for between 15.9% and 21.4% of the commercial health insurance market; Anthem accounts for between 10.8% and 13.8%; Aetna accounts for between 10.3% and 16.8%; Cigna accounts for between 8.4% and 10.2%; and Health Care Service Corp ("HCSC") accounts for between 7.7% and 10.5%.  *See* DX-0813 ¶¶ 78–79 & Ex. 5; PX820 ¶ 112 & Ex. 3.

25.    Shares of large group accounts in local markets vary and are more difficult to calculate, but generally speaking, a local Blue Cross Blue Shield affiliate frequently has the leading share in a given state or metropolitan area, often by a considerable margin.  *See* DX-0813 ¶ 80.

26.    One factor driving competition in national and large accounts is the bidding process.  National account customers frequently hire consultants to run bid processes for their insurance business.  8/10/22 PM Trial Tr. 102:15–22 (Gehlbach); *see also* 8/9/22 AM Trial Tr. 122:15–20 (Gowrisankaran).  Large group customers, in contrast, typically hire brokers.  8/10/22 PM Trial Tr. 102:15–24 (Gehlbach).

27.     These intermediaries help employers determine which payer's plan suits their needs.  8/10/22 PM Trial Tr. 102:25–103:8 (Gehlbach).  Brokers and consultants partner with employers to write requests for proposals ("RFPs"), which include the specifications, benefit design, service level, and network composition that employers are seeking in a bid.  *Id.* at 102:18– 103:8.  RFPs are then sent to multiple payers to help the employer determine which carrier is the best fit for their benefits strategy.  *Id.*

28.     The typical bid cycle for a national account is once every three years, and UHC participates in approximately 300-350 bids annually.  *Id.* at 103:9–21.  The turnaround time for national account bids is around 20 business days, but may be longer if the request is for a "highly customized arrangement."  *Id.* at 104:3–15.

29.     For large-group accounts, the bid cycle is typically every year, and UHC participates in approximately 48,000-49,000 bids annually.  *Id.* at 103:13–15, 103:25–104:2.  The turnaround time is quick: for a fully insured large group bid, typically five working days, and for an ASO client, typically ten days.  *Id.* at 104:3–12.

30.     RFPs often ask bidders to match an incumbent payer's plan design.  *See id.* at 104:24–105:4 ("In many instances, the customer will ask us to match their incumbent plan design, if not match it exactly, match it as closely as we possibly can.").

31.     In addition to benefit design, bidders also receive extensive additional information in the RFP process, including census information about the population to be covered, large claims information, and "claims experience" information, which is total paid monthly claims for a specified period.  *Id.* at 106:6–10, 107:3–10.

32.     The result of this competition—and visibility into competitor plan offerings—has created a lack of differentiation on key aspects of commercial market design in both the national and large account markets. *See, e.g.*, *id.* at 99:21–100:25, 101:18–102:4.

33.     As to national accounts, "the spread on discounts has narrowed over time," as has network value. *Id.* at 99:21–100:10 ("[I]t's hard to compete on discount.").  Differences also have compressed in the "clinical model space," such that utilization management, care management, payment integrity, and disease management programs, have become "table stakes" across the industry. *Id.* at 100:11–25 (Gehlbach).  Altogether, it has become "very difficult" for payers "to differentiate in the national account space." *Id.*

34.     Similar "compression is occurring in the large group market." *Id.* at 101:18–102:4. "Discount differential" is decreasing; "[c]linical models are very similar"; and "[b]enefit designs are very similar." *Id.*  The upshot is "a very competitive marketplace" across carriers. *Id.*

35.     This competitiveness is reflected in UHC's financial results.  ██████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████; *see also* 8/15/22 PM Trial Tr. 79:7–80:3 (Gowrisankaran).

36.     ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████.

37. ████████████████████████████████████████

██████████████████████████████████████████████████████

████. On a revenue basis, national accounts revenues were about 2% of total UHG revenue going back to 2017, and key accounts were about 10% for that period.  8/9/22 PM Trial Tr. 86:4–14 (McMahon).  In 2022, national accounts will be about 1% of total UHG revenue, and key accounts will be 7%.  *Id.*

38. Plaintiffs presented no evidence identifying the specific accounts, plans, or networks from rival payers that UHC would target using the incremental claims data available through Change's EDI network, if any, or the innovations contemplated by UHG and Change.  Nor did Plaintiffs present any evidence of prior bids, bid competitors, or requests for proposal.

39. Plaintiffs likewise presented no evidence even identifying the specific national account customers or large group employers UHC would win using the incremental claims data available through Change's EDI network, if any, or innovations contemplated by UHG and Change. ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████; 8/1/22 PM Trial Tr. 93:2–5 (Lautzenhiser) ("Q. Sitting here today, you can't tell us of a single national account customer that Aetna conceivably could lose if this . . . transaction goes through, right?  A. I would not be able

to."); *id.* at 93:6–9 ("Q. You can't tell us of a single large group employer that Aetna conceivably could lose if this transaction moves forward, right?  A. No.").

40.     Plaintiffs failed to present any evidence that payers compete for large-group and national-account customers on the basis of EDI-related functionality, Real-Time Settlement capabilities, or Transparent Network abilities.

> 3.     *Optum*

41.     Optum is a family of three companies—OptumHealth, OptumRx, and OptumInsight—that provide a broad range of healthcare-related services to payers, providers, state governments, and life-science companies.  8/4/22 AM Trial Tr. 95:14–97:5 (Wichmann); 8/5/22 AM Trial Tr. 37:22–38:1 (Yurjevich).

42.     OptumHealth offers care delivery, care management, wellness and consumer engagement, and health financial services.   8/4/22 AM Trial Tr. 95:14–97:5 (Wichmann) ("OptumHealth . . . provides care but also organizes the provision of certain types of care, very high-end care, like transplantation.").

43.     OptumRx provides a diversified array of pharmacy care services.  *Id.* ("OptumRx . . . is a classic pharmacy benefit management business, [and] it does provide some at-home services and some in facility-based services.").

44.     OptumInsight, the entity that will acquire Change, provides software solutions and services for healthcare business needs, including revenue cycle management, solutions-based care programs, and payment integrity services to payers, providers, and many others.   *Id.* ("OptumInsight . . . [is] a data and technology company and a technology-enabled services business. . . .  So it provides services on a multi-payer basis.  It also provides services to care providers and intermediaries in healthcare and data sciences companies.").

a.   Optum relentlessly pursues a multi-payer business strategy.

45.    Optum's business strategy is "fiercely multi-payer in [its] orientation."  8/4/22 PM Trial Tr. 23:5–25 (Wichmann) ("So we just need to remember that this company has a two-part mission, and the second part of that mission is to serve all."); *see also id.* at 3:11–21 ("[F]iercely multipayer . . .  mean[s] that [Optum's] business is organized to serve all payers.").  This is a "key feature of Optum," and "therefore, of UnitedHealth Group" as an enterprise, with the "multi-payer dimension keep[ing]" UHG "focused on . . . the leading edge of thinking in the marketplace." 8/10/22 PM Trial Tr. 21:7–22:9 (Witty).

46.    Optum sells to non-UHC payers in all three lines of its business.  8/9/22 PM Trial Tr. 86:23–87:25 (McMahon) ("OptumInsight sells payment integrity services.  OptumRx sells . . . PBM services to other payers . . . .  And Optum[Health] -- within Optum[Health], local care delivery, physician offices, and the like.  They have network contracts with all payers.").

47.    Although UHC is Optum's biggest customer, "these two organizations are [at] strictly [an] arm's length relationship[]."  8/10/22 PM Trial Tr. 22:10–23:2 (Witty); 8/4/22 PM Trial Tr. 3:22–4:6 (Wichmann).  Optum works with UHC as a customer "very similar to the way" Optum works with its other commercial customers.  8/5/22 AM Trial Tr. 22:9–16 (Yurjevich).

48.    Optum "relentlessly" markets its products to all potential customers in the marketplace.  8/10/22 PM Trial Tr. 24:11–25:8 (Witty); *see also* 8/5/22 AM Trial Tr. 22:17–23:1 (Yurjevich).

49.    Sometimes Optum will work with UHC to test or pilot new products to ensure they work properly before introducing them into the market.  8/5/22 AM Trial Tr. 22:17–23:1 (Yurjevich) ("So oftentimes, with UnitedHealthcare we will launch new products with them almost as an alpha customer to make sure we get it right.").  UHC itself has even brought products to

Optum for development, including, for example, the Group Risk Analytics ("GRA") underwriting tool that Optum sells externally.  8/10/22 PM Trial Tr. 116:9–23 (Gehlbach).

50.     Other times, Optum will launch products in the marketplace ***before*** bringing them to UHC.  8/5/22 AM Trial Tr. 22:17–23:1 (Yurjevich) ("[T]here ha[ve] been examples where we actually launched in the commercial marketplace and then bring things to UnitedHealthcare."); 8/10/22 PM Trial Tr. 94:20–95:5 (Witty) ("[Q.] [I]t is presently a normal business practice of Optum and UHG for Optum sometimes at least to test products with UHC before offering the product to other payers, even if that is the intended market for that product?  [A.] Correct.  And it can work the other way as well.  So there can be situations where Optum will work with a non-UHC partner or through an acquisition, perhaps, and then develop a product for UHC, even though another external party has been using it.").

51.     Plaintiffs failed to present any evidence that the pilot phase for certain Optum products unfairly benefitted UHC as a market participant or lessened competition in any line of business, including commercial health insurance sold to large group employers or national accounts.

52.     To the contrary, Optum's innovation process benefits the market because it allows Optum to "validat[e] that the thing we've developed is market tested, that we are pricing it fairly, competitively, and we can stand behind it."  8/10/22 PM Trial Tr. 24:11–25:8 (Witty); *see also* 8/15/22 AM Trial Tr. 13:17–14:9 (Murphy) ("You got to iron out the bugs and, you know, get rid of the problems, and . . . it's easier to do that often within the firm.").

53.     Plaintiffs also failed to present any evidence of an instance in which Optum has withheld a product that it sells to UHC from other payers, and Plaintiffs' shifting accounts of

Optum's products that are supposedly withheld from the market have been conclusively disproven. *See* DX-0850.

54.     At trial, Plaintiffs' economist, Dr. Gowrisankaran, conceded that his prior deposition testimony that Optum's "Group Risk Analytics" or "GRA" product was not commercially sold in the marketplace was incorrect, and that he learned during opening statements that GRA is, in fact, sold to the market.  8/9/22 PM Trial Tr. 6:5–7:2 (Gowrisankaran) ("I saw later evidence that they did sell it to some payers.  That was in the opening statements for the defense, that I saw later."); *see also* 8/5/22 AM Trial Tr. 55:9–56:6 (Yurjevich) ("Q. Do you know if any customers outside of UnitedHealthcare who have bought Group Risk Analytics?  A. Yes. . . .  I'm aware of three."); *id.* at 59:17–23; *see also* ███████████████████.

55.     As Dr. Gowrisankaran acknowledged at trial, he formed no opinion as to whether or how GRA would affect post-merger competition if Optum continued to make it available to all payers.  8/9/22 PM Trial Tr. 13:1–6 (Gowrisankaran) ("Q. Doctor, I need you to answer the question yes or no.  If Optum did market GRA to all payers, then you don't know what would happen, true?  A. I didn't look at what would happen to competition if it were offered on an equal footing to all payers for that particular [product], yes.").

56.     OptumInsight's Chief Operating Officer testified that Optum has no plans to use Change's EDI data to improve GRA; that Optum does not even know whether Change's data could be used to improve GRA; and that, post-merger, Optum intends to continue selling identical versions of GRA to both UHC and rival payers.  8/5/22 AM Trial Tr. 55:9–60:14 (Yurjevich).

57.     UHC generally does not conduct risk analysis when bidding on ASO customers because the customers are the ones taking on the risk.  8/10/22 PM Trial Tr. 106:11–22 (Gehlbach). Almost all national accounts are ASO customers, and UHC has also "seen an increased interest in

14

ASO across the large group segment." *Id.* at 101:1–9, 102:5–14.  An improved version of GRA would therefore have little effect in the market for national accounts, and a diminishing effect in the market for large-group employers.

58.     GRA is currently used only in the underwriting process for large-group employers with between 51 and 300 eligible employees.  8/10/22 PM Trial Tr. 115:22–24 (Gehlbach).  There is no evidence that any improved version of GRA could or would be used in any additional markets, and thus there is no evidence that any improved version of GRA could plausibly affect competition in the markets for fully insured national accounts or fully insured large-group employers with more than 300 employees.

59.     If UHC were to use an improved version of GRA post-merger, such use would have clear pro-competitive effects.  An improved version of GRA would allow UHC to identify customers that were less risky than UHC previously thought, resulting in lower prices being offered to those customers.  8/15/22 AM Trial Tr. 60:22–63:4 (Murphy).  And because GRA is used only in the underwriting process for customers that UHC is attempting to win from an incumbent insurer, who has better information on the customer's risk profile than UHC does, the likely effect of GRA thus would be to drive that incumbent insurer's pricing down to more closely match actual risk.  *Id.*

60.     Dr. Gowrisankaran also incorrectly testified that Optum's Portfolio Optimization product is sold exclusively to UHC.  *See* 8/9/22 PM Trial Tr. 13:7–22 (Gowrisankaran) ("Q. And you've claimed that 'recent testimony identified Portfolio Optimization as an example of . . . Optum offering a tool exclusively to UHC to give UHC a competitive advantage.'  You've made that claim, correct?  A. That's right.").

61.     Again, Dr. Gowrisankaran acknowledged at trial that his prior deposition testimony about Portfolio Optimization was incorrect because Portfolio Optimization is, in fact, marketed to external payers. *Id.* at 14:5–7 ("Q. And you understand that Portfolio Optimization is marketed to external payers?  A. I understand it now is, yes."), 14:8–10 ("Q. Did you learn that in my opening statement, too, or in Mr. Yurjevich's testimony?   A. No, I heard that from your opening statement."); *see also* 8/5/22 AM Trial Tr. 60:22–61:4 (Yurjevich) ("Q. Does OptumInsight currently market this service [Portfolio Optimization] to external non-UHC payers?  A. Yes, we do.").

62.     Nor did Plaintiffs present any evidence that Optum has ever sold to an external payer a degraded or lesser version of a product it sold to UHC.  The evidence at trial uniformly confirms that Optum has offered neither degraded products nor different products to UHC than those sold to external payers.  8/4/22 PM Trial Tr. 3:22–24 (Wichmann) ("Q. Does OptumInsight ever favor UHC by not selling products and services to rival payers or selling them a degraded product?  A. No."); 8/5/22 AM Trial Tr. 61:2–14 (Yurjevich) ("Q. Do you have a degraded or lesser version for people other than UnitedHealthcare of [P]ortfolio [O]ptimization?  A. No, we don't."), 61:15–22 ("[I]t would be ridiculous for us to offer a different product in the commercial market than we do for United.  We have no incentive as OptumInsight to offer a different product."), 59:24–60:3 ("Q. And if [the government's expert] said that, if you did sell [GRA] externally, you would sell external payers a worse product than you sell to United Healthcare.  Would that be true or false?  A. That would be false.").

63.     Because UHC is "just one payer in a group of many, many payers across the industry," "[t]he total addressable market to be able to sell Optum's health services is just much bigger if you sell to all payers."  8/9/22 PM Trial Tr. 86:23–87:25 (McMahon).  Choosing to serve

UHC exclusively would "leave[] the opportunity to serve the other 80, 85 percent of the market." 8/10/22 AM Trial Tr. 71:19–72:25 (Schumacher); 8/4/22 AM Trial Tr. 97:9–25 (Wichmann) ("[I]t is a significant stretch to assume that United would take all of these assets and all of the business it has and diminish it so that it could simply serve, what, 15, maybe 17 percent of the market.  You would be foregoing the remaining 83 percent.").

64.   Of Optum's total $155.6 billion in revenue, $63.2 billion—or 40%—comes from "unaffiliated customers," *i.e.*, third parties, including providers, service organizations, and payers—some of which are payers that compete with UHC.  8/10/22 AM Trial Tr. 71:19–25 (Schumacher); *see also* 8/5/22 AM Trial Tr. 31:6–16 (Yurjevich).



*See* DX-0848.

65.   Optum's external patient population also dwarfs that of UHC.  8/8/22 AM Trial Tr. 71:9–20 (Higday) ("OptumRx serves 65 million consumers in a multi-payer context today. OptumHealth serves over 100 million consumers in a multi-payer context.  And to put that in perspective, UHC only serves 45 million patients in the United States.").

66.     UHG's future "revolves around [its] ability to continue to develop great services and products, largely in the Optum side of the organization."  8/10/22 PM Trial Tr. 26:1–20 (Witty).  This opportunity "really comes from [Optum's] . . . work with non-UHC partners," and "anything which unbalances that would literally . . . bring to an end the strategic direction of the company."  *Id.*

67.     Optum's economic incentives thus lie in pursuing a multi-payer business strategy as a "growth opportunity."  *See* 8/10/22 AM Trial Tr. 71:19–72:25 (Schumacher); 8/10/22 PM Trial Tr. 26:1–20 (Witty) ("[Favoring UHC] would undermine the entire construct of the company.").  This approach creates value not only for Optum as an individual business unit, but also for UHG as an enterprise.  8/4/22 PM Trial Tr. 5:18–6:2 (Wichmann).

b.     <u>OptumInsight relentlessly pursues a multi-payer business strategy.</u>

68.     OptumInsight is the division of Optum that will acquire Change following the merger.  8/2/22 AM Trial Tr. 11:12–18 (de Crescenzo).

69.     OptumInsight is a "technology company and a technology-enabled services business" that provides support for clinical, administrative, and financial processes in the healthcare system.  8/4/22 AM Trial Tr. 95:17–97:2 (Wichmann); DX-0782 at .0013.  It serves four key industry groups: payers, providers, state governments, and life sciences companies.  DX-0782 at .0013.

70.     OptumInsight's products include advisory services, which supply strategy and planning through a subscription-based research business; technology solutions for improving administrative processes, such as revenue cycle management, payment integrity, and risk and quality services; and data exchange services to connect payers, providers, and consumers.  *Id.*; *see also* DX-0850.

71.     OptumInsight also has a legacy EDI network that processes up to 16 million claims on a monthly basis, 10 million of which it receives from non-UHC payers.  8/15/22 AM Trial Tr. 25:17–26:5 (Murphy); DX-0813 Table 10; DX-0862 at .0014.  OptumInsight's EDI network, however, is not marketed externally or offered on a standalone basis.  DX-0813 ¶ 73.

72.     OptumInsight is "perceived as one of the top payment integrity partners" and "thought leader[s]" in the payment integrity space, with a suite of technology products aimed at helping all payers "determine if the claim's been paid correctly and/or billed correctly, typically resulting in medical cost savings back to the payer."  8/5/22 AM Trial Tr. 18:11–25 (Yurjevich).

73.     OptumInsight's payment integrity products include: claims editing; clinical review and resolution services; contracts and duplicates services (*i.e.*, post-payment review of a paid claim to ensure it was paid according to the payer-provider contract); coordination of benefits, detection of fraud, waste, abuse, and error; provider audits; and retrospective chart services.  DX-0849; 8/5/22 AM Trial Tr. 41:12–19, 47:13–17 (Yurjevich).

74.     With the exception of a fraud and abuse detection service, all of these products are sold to UHC's biggest rivals, which are some of the largest and most well-respected health insurers in the country.  8/5/22 AM Trial Tr. 42:3–43:20 (Yurjevich).  The fraud and abuse detection service is sold only to UHC only because there is no external payer demand for that service.  *Id.* at 54:9–24, 62:23–63:3.

75.     OptumInsight's core "focus areas" as a company are "administrative efficiency," "clinical alignment," and "payment simplification."   8/5/22 AM Trial Tr. 34:25–35:12 (Yurjevich); *see* DX-0782 at .0013.

76.     Administrative efficiency refers to ensuring that all the information that is needed to pay a claim is contained when that claim is sent.  8/5/22 AM Trial Tr. 36:6–15 (Yurjevich).

Clinical alignment refers to improving the communication between payers and providers to help them align on service, or type of care, that needs to be provided to a patient. *Id.* at 36:18–37:10. Payment simplification refers to improving the current manual nature of claims payments and automating it through electronic transactions. *Id.* at 37:11–21.

77.     Together, "[t]he net goal is to reduce the waste and error or the inefficiencies that occur in healthcare causing increased expense and dissatisfaction across the board." *See id.* at 37:17–21.

78.     Of the approximately 230 payers in the country, OptumInsight provides at least one type of product or service to approximately 220 of them. *Id.* at 19:6–12. This includes virtually all of the largest payers in the United States, namely, Anthem, Cigna, Aetna, Humana, Horizon, Florida Blue, Molina, and HCSC. *Id.* at 19:13-18.

79.     Three of OptumInsight's top five external clients by revenue and year-over-year growth are ███████████████—some of UHC's largest competitors. *See* DX-0656A at .0004. OptumInsight also has ██████████████████████████████ ████████████████ *id.*, through which OptumInsight is integrated into payers' planning cycles to talk about savings, go-forward changes, and ways in which OptumInsight "can help meet them where they're going." 8/5/22 AM Trial Tr. 29:4–18 (Yurjevich).

80.     Like the rest of Optum, OptumInsight is a multi-payer business. *Id.* at 23:2–8; *see also id.* at 24:19–25:11. This multi-payer approach is necessary for OptumInsight to hit its growth targets. *Id.* at 26:6–14; DX-0656A at .0003. Also, like the rest of Optum, OptumInsight is completely independent of UHC. 8/5/22 AM Trial Tr. 21:18–22:1 (Yurjevich).

81.     Non-UHC payer revenue made up approximately ███ of OptumInsight's total payer revenue.  DX-0813 Ex. 2. ████████████████████████████████████ ████████████████.  DX-0656A at .0004.

c.     Optum already has extensive access to non-UHC payer data and competitively sensitive information.

82.     Many of OptumInsight's products are driven by data and analytics that "help derive" "best outcome[s]" from both an administrative and clinical perspective.  8/5/22 AM Trial Tr. 38:2–7 (Yurjevich).

83.     OptumInsight today has access to extensive de-identified clinical and claims data covering 270 million lives.  DX-0782 at .0013; 8/5/22 AM Trial Tr. 34:9–11 (Yurjevich).  Under its contracts, Optum separately receives non-claims-related proprietary information, including payer-specific adjudication rules, payment policies, and contract information, in connection with the services it renders to customers, including non-UHC payers.  DX-0849; DX-0862 at .0015.

84.     "On the clinical data side, [OptumInsight] would receive much of this from providers that [OptumInsight] work[s] with where they give [OptumInsight] de-identified data rights."  8/5/22 AM Trial Tr. 34:12–19 (Yurjevich).  OptumInsight also receives: (i) data from commercially or publicly available sources and (ii) individualized claims data from external payer customers.  *Id.* at 34:12–19, 42:21–25.

85.     In terms of commercially available data, OptumInsight licenses de-identified, aggregated claims data from data aggregators or vendors.  *Id.* at 34:12–19; 8/12/22 Trial Tr. 19:11–22 (Tucker).  There are multiple different aggregators or vendors that cover hundreds of millions of lives.  8/12/22 Trial Tr. 19:11–22 (Tucker); *see also* DX-0814 Fig. 1.  Plaintiffs' claims data expert, Dr. Handel, did not specifically quantify or value the delta between the information, or insights from that information, that are commercially or publicly available to Optum today and the

information on Change's EDI network, nor did any other witness—leaving no evidence in the record on the incremental amount of data or the value of that incremental data to UHG. *See* 8/8/22 PM Trial Tr. 6:25–7:18 (Handel) ("Q. And as you prepared your opinion in this case, you did not have a detailed understanding of which non-UHC payers provide claims data or other competitively sensitive information to Optum today in the course of a contractual relationship between that payer and Optum; isn't that correct?  A. Yes.  Q. As a part of your work in this case, you also did not specifically quantify, by which I mean number of claims received over a period of time, the claims data that Optum currently has provided to it by non-UHC payers; isn't that correct?  A. Yes, that's correct.  Q. And so as a part of your expert work in this case, for example, you did not quantify the volume of claims data that Optum Rx today receives from non-UHC payers; correct?  A. Correct.  Q. You also did not specifically quantify the volume of claims data that OptumHealth today receives from non-UHC payers; isn't that correct?  A. Yes, correct.").

86.     Perhaps most importantly, Optum already receives extensive claims data from external payer customers.  8/15/22 AM Trial Tr. 24:20–25:17 (Murphy); DX-0859 at .0011.  This includes prospective claims data (*i.e.*, data from before a claim is paid) and retrospective claims data (*i.e.*, data reflecting the final disposition of a claim).  8/5/22 AM Trial Tr. 43:1–11 (Yurjevich).

87.     The claims data Optum receives today contains the very same information that would be included in an EDI "remittance," which is a payer's response to a claim detailing how the claim was billed and paid.  *Id.* at 45:16–46:13, 48:5–9.  "From a national account standpoint, [Optum] ha[s] claims data for ███████████████████████████████ ███████████████."  8/5/22 AM Trial Tr. 12:13–18 (Yurjevich).

88.     OptumInsight also has access to additional competitor information over and above the claims data it receives, including: medical records data; payer-specific adjudication rules (*i.e.*,

a payer's rules about what sorts of services are reimbursable); payer-specific payment policies (*i.e.*, specific rules about how a claim must be billed); contract information; employer group and member eligibility information for national account customers; employee and member-specific coverage and benefit information; and provider guides.  *Id.* at 43:12–44:24.  The data received by OptumInsight today thus is "much more complete" and "much more data and information that's [sic] contained within an EDI file or a remittance."  *Id.* at 50:22–51:15.

### OptumInsight External Payer Business

| Payers | Optum Products/Services | | | | | | | | Data provided to Optum |
|---|---|---|---|---|---|---|---|---|---|
| | CES Software | Clinical Review and Resolution | Contract and Duplicates | Coordination of Benefits | Pre-Pay Fraud, Waste, Abuse and Error | Post-Pay Fraud, Waste, Abuse and Error | Provider Audit | Retrospective Chart Services | |
| | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | • Claims data |
| | | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | • Medical records* |
| | ✓ | ✓ | | ✓ | ✓ | | | | • Payer-specific adjudication rules |
| | ✓ | | ✓ | ✓ | | | | | • Payer-specific payment policy* |
| | | ✓ | ✓ | ✓ | | | | ✓ | • Contract information |
| | | ✓ | ✓ | ✓ | | | | | • Employer group and member eligibility information |
| | | ✓ | | ✓ | ✓ | | | | • Employee and member specific coverage and benefit information |
| | ✓ | | ✓ | ✓ | | | | | • Provider guide |

Source: Steve Yurjevich testimony; DX-0779 at 7-12

YURJEVICH DEMO 2

DX-0849.

89.    The amount and type of payer data OptumInsight receives depends upon the products and services a payer is buying.  8/5/22 AM Trial Tr. 12:19–13:4 (Yurjevich).

90.    For example, payers that buy OptumInsight's "contracts and duplicates" product entrust OptumInsight with "claims data, payer-specific adjudication rules, payer-specific payment policy, contract information between the payer and provider, employer group and member eligibility information, and specific coverage and benefit information, and the provider guide."  *Id.* at 47:1–48:4; *see id.* at 48:5–8 ("Q. Do you receive, for contracts and duplicates, the data that would be included in an EDI remittance?  A. Yes, we do.").  Payers that purchase the "contract[s]

and duplicates" product include 

███.

91.     OptumInsight's contractual agreements also detail the types of data that payers are *obligated* to provide.  8/8/22 PM Trial Tr. 9:16–19 (Handel) ("Q. And then in E, you see that this payer has to provide Optum with a number of pieces of information.  Do you see that?  A. Yes."); DX-0016 at .0002.

92.     For example, the contract between Ingenix, the predecessor to Optum, and

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

████████████████████████; *see also* 8/8/22 PM Trial Tr. 9:11–15 (Handel).

93.     To take another example, OptumInsight provides payment integrity services for ███.  DX-0308 at .0001.  ███ is required to provide: "the most current and available thirty-six (36) months' worth" of "[c]ustomer data files," including "[c]ustomers' paid claims, member, provider, and reference data files," updated on a monthly basis; data for "In-Scope Lines of Business post-adjudicated, pre-payment claims on a daily basis"; and, to the extent required by Optum to provide its services, "payment policies, reimbursement policies, benefit grids for employer groups (if applicable), claims information, correct coding initiative (CCI) edits, percent of fee schedules, [and] provider records," among other items.  *Id.* at .0005–6.

94.     Optum also receives substantial amounts of claims data from ███ plans.  *See* DX-0472.  Overall, Optum provides claims editing services for ██████, pre-payment services

for ███████████, and post-payment services for ███████████. *Id.* at .0003–4. Combined, this client base comprises "96.5M or 48% of their 200M members." *Id.*

95.     More specifically, ███████████████ provides "claims, member, and provider data to Optum," and has done so since 2015 for pre- and post-payment services. *Id.* When consulted during an RFP process for another payer, ███████████████ confirmed that "the Business Associate Agreement and Master Service Agreement adequately protects them from Optum sharing their data with any third party," and that its audit of offshore sites "didn't identify any concerns related to data security." *Id.* at .0004. ███████████████ also was "***highly confident and convinced that Optum will not risk their credibility or brand reputation to share their Plan's information with United Healthcare***," and "rate[d] Optum as 'one of their best vendors' to work with." *Id.* (emphasis added).

96.     Similarly, ███████████████ "has provided claims, member, and provider data to Optum" in connection with the pre-payment, post-payment, second-pass claims editing, data mining, coordination of benefits, and other editing they receive. *Id.* ███████████████ "didn't limit . . . the data elements requested by Optum" and "initially shared two years of historic data during the implementation process." *Id.* Although ███████████████ did not share its provider agreements, it did disclose to Optum "payment policies and various methodologies." *Id.* at .0005. In total, ███████████████ "send[s] approximately 250,000 claims daily to Optum." *Id.*

97.     Optum's other business units—OptumRx and OptumHealth—also have access to payer data. 8/8/22 AM Trial Tr. 90:11–24 (Higday) ("Q. Do you have a ballpark sense of, within the data that OptumRx has, what percentage of those data are UHC claims versus everyone else? A. That's a really tough question . . . but I can point you back to the numbers I gave before . . .

165 million patients between OptumHealth and OptumRx, only 45 million UHC.  That likely is a pretty equivalent evaluation of the systems of data we have access to.").

98.     OptumRx, for example, has access to data about how external payers treat pharmacy claims.  *Id.* at 88:21–89:3 ("Q. So does that mean, generally speaking, that Optum could, presently, try to maybe -- well, Optum has the data available to it to, for example, figure out how Payer X treats pharmacy claims of a particular type?  A. Certainly, we have the data on what the adjudication rules are, et cetera.  That data is held very closely and not shared across the UHG enterprise because it's individual payer data covered by contract.").

99.     The data OptumInsight and other Optum entities receive from external payer customers is considered competitively sensitive information by these customers.  8/5/22 AM Trial Tr. 44:20–24 (Yurjevich).  The data is also "much more complete" than the information contained within an EDI remittance.  *Id.* at 50:22–51:15.  Indeed, when claims data is sent to OptumInsight, it is not de-identified or masked in any way.  *Id.* at 44:25–45:2.

100.    Neither Dr. Handel nor any other witness provided "the total quantum of claims data that Optum has presently."  8/5/22 AM Trial Tr. 13:13–22 (Yurjevich); 8/8/22 PM Trial Tr. 7:6–10 (Handel) ("Q. As a part of your work in this case, you also did not specifically quantify, by which I mean number of claims received over a period of time, the claims data that Optum currently has provided to it by non-UHC payers; isn't that correct?  A. Yes, that's correct."); *id.* at 7:15–18 ("Q. You also did not specifically quantify the volume of claims data that OptumHealth today receives from non-UHC payers, isn't that correct?  A. Yes, correct.").

101.    Plaintiffs similarly presented no evidence about whether the amount or kind of information Optum already receives from payers would be sufficient to derive competitive insights that could benefit UHC.  *See, e.g.*, 8/8/22 PM Trial Tr. 9:20–25 (Handel) ("Q. Dr. Handel, you

don't know whether the information that this payer provides to Optum today under this contract is sufficient for Optum to analyze that information and derive the types of competitive insights that you identified in your report; isn't that correct?  A. I believe so, yeah.  I don't know."); *id.* at 17:24–18:4 (similar); *id.* at 18:12–23 (similar).

102.     Although Dr. Handel discussed the differences between Change's EDI data and other commercially available data at the highest level of generality, what he "never really grappled with is why these differences matter" or what incremental value would be provided.  *See* 8/12/22 Trial Tr. 23:7–21 (Tucker) ("Sure, the data is different, but if we can still use it to get the same kind of insights, that doesn't really matter as a data scientist."); *see also id.* at 22:5–10; *See* DX-0472 at .0005 ("Based on evaluation, all requested data elements, including our Allowed Amount, are available to Optum th[r]ough COB claims, ███████ claims, ████████ claims, FOIFA, BHI or some other third party if they want to pursue obtaining them.  With █████ market share and standard payment rates even de-identified data[] would give a third party significant information if they wanted to compete with us.").

### d.     Optum has not misused external payer data for UHC's benefit.

103.     Plaintiffs did not introduce evidence of a single instance in which OptumInsight—or OptumRx or OptumHealth—has misused external payer data for the benefit of UHC.

104.     UHG's witnesses universally testified that they are not aware of any instance in which competitor claims data has been used for the benefit of UHC, and would never do so:

- Andrew Witty, CEO, UnitedHealth Group: "Q. [Plaintiffs'] expert also testified that because of your enterprise approach, that that would cause people at OptumInsight to give data concerning UHC's rivals over to UHC so they could beat them in the marketplace.  And what's your response to that?  A. So again, first of all, that would be against the tone, the culture, the rules, everything we stand for in the organization. . . . And so I would absolutely not expect that to happen.  And again, I would say if it ever did, it would be hugely destructive, not just to our reputation but to our economic interest, because customers are not going to come back to an organization that abuses their data in that way."  8/10/22 PM Trial Tr. 28:2–24 (Witty).

- David Wichmann, Former CEO, UnitedHealth Group: "[Q.] Was it ever a strategy of the group to use that [payer] data to help United compete against payer competitors? [A.] Never." 8/4/22 PM Trial Tr. 31:4–7 (Wichmann).

- Steve Yurjevich, COO, Optum Insight: "Q. Okay.  So has Optum ever, to your knowledge, ever used . . . the claims data of competitor payers to UnitedHealth with respect to national accounts . . . [t]o help UnitedHealth figure out how to compete with payers in the national account market?  A. Yeah.  It's a fair question, and the [answer] is unequivocally no.  That would be -- it would be against our culture and the way we treat and handle data.  It would be against our policy within OptumInsight and Optum and UnitedHealth Group and it would be -- go against the contract that we have with our payers that have very, very strict data use rights." 8/5/22 AM Trial Tr. 13:23–14:16 (Yurjevich).

- Peter Dumont, Chief Privacy Officer, Optum Labs, Former Vice President of Data Governance, Optum: "Q. In this case, in the pretrial brief, the plaintiffs have said that United will, 'use the exact data and data rights that United seeks to acquire from Change to gain a competitive edge for United's own health insurance business.'  Do you agree with that statement, Mr. Dumont?  A. I don't.  That's just -- culturally, it's antithetical to the way we work.  We just wouldn't be in business if we operated that way. Customers would not send us their data.  We wouldn't have products outward facing." 8/5/22 PM Trial Tr. 46:6–14 (Dumont).

- Paul Higday, Senior Vice President of Strategy and Innovation, UnitedHealth Group: "Q. And so -- and your testimony today is that . . . OptumRx does not make available to UHC such kinds of claims information we're talking about, whether it's the raw information or analysis to enable UHC to compete against other payers with respect to pharmacy benefits?  A. No, not that I'm aware of.  I can tell you in places where I have access to that data, at least in summary form.  Neither I nor anyone on my team is allowed or will share that data across the firewall." 8/8/22 AM Trial Tr. 89:25–90:10 (Higday).

- Dirk McMahon, President and COO, UnitedHealthcare: "[Q.] So, what would be your reaction if someone at UHG proposed to use data at Change about other payers for the purpose of allowing UHC to compete against other payers on whatever -- in whatever way?  [A.] No.  My reaction would be no.  I mean, my reaction would be very visceral and very -- no, very quickly." 8/9/22 PM Trial Tr. 101:11–17 (McMahon).

- Daniel Schumacher, Chief Strategy and Growth Officer, UnitedHealth Group: "Q. Has it ever been part of UnitedHealth Group's corporate strategy to take the non-UHC payer data to which Optum has access and use that data to provide competitive intelligence to UnitedHealthcare?  A. No.  Q. In your view, would such a strategy be consistent with Optum's business model?  A. Absolutely not.  Q. Why not?  A. It would be completely counter to it.  It would kill us in the market . . . .  Q. Mr. Schumacher, are you personally aware of any instance in which a rival payer -- in which rival payer claims data or other rivals' CSI was passed from Optum to UnitedHealthcare?  A. I am not.  Q. Are you personally aware of any instance in which Optum analyzed rival payer

claims data and provided UnitedHealthcare with competitive insights about its rivals? A. I am not." 8/10/22 AM Trial Tr. 73:14–74:16 (Schumacher).

- Thomas Gehlbach, Former Chief Underwriting Officer, UnitedHealthcare: "Q. In that time [at UHC], are you aware of any instance in which you or anyone else associated with UnitedHealthcare received from Optum competitively sensitive information about a rival payer? A. No. Q. What's your understanding as to why that's never happened? A. We take the firewalls that exist between Optum and UnitedHealthcare very seriously. And we also understand -- we have our own expectations about the handling of sensitive information when we disclose to third parties claim information, and we have very stringent NDAs in place on the UHC side of the house. And we respect the fact that Optum has that with any other carrier that's entrusted them with sensitive information. And for UnitedHealthcare to have a breach across that wall, the detriment to our organization would be substantial. So we do not dance anywhere close to that line." 8/10/22 PM Trial Tr. 119:22–120:11 (Gehlbach).

105.    UHG's testimony is confirmed by consistent and unequivocal trial and deposition testimony from non-UHC payers and their employees, none of whom are aware of any instance in which Optum misused their claims data. To take take a few examples:

- Larry Lautzenhiser, Executive Director of Medical Policy and Program Solutions, Aetna: "Q. You're personally not aware of a single instance in which Optum has misused the claims data Aetna provides, are you? A. I'm not aware." 8/1/22 PM Trial Tr. 77:14–16 (Lautzenhiser); *see also id.* at 77:2–5 ("Q. You're not aware of a single instance in which Optum has analyzed Aetna's claims data and passed off competitive insights to UHC, are you? A. I don't know of any instance."); *id.* at 77:6–9 ("Q. You're not aware of a single instance in which Optum has conducted corporate surveillance on Aetna's claims data for UHC's benefit, are you? A. I don't know of any.").

- 

106.    OptumInsight has not lost a customer because of actual or perceived misuse or theft of data. 8/5/22 AM Trial Tr. 38:23–25 (Yurjevich).

107.    Instead, the record conclusively showed that OptumInsight uses data consistent with its contractual obligations, lawful purposes, and its multi-payer culture. *Id.* at 50:18–21; *id.*

at 71:6–10 ("Q. Mr. Yurjevich, in all of your time working at OptumInsight, have you ever seen or heard of any instance where data received from one of your payer customers has been intentionally shared with UnitedHealthcare?  A. No, I haven't."); *id.* at 74:3–13 ("We've never been accused of providing data or information to UnitedHealthcare."); *see also* 8/2/22 AM Trial Tr. 127:8–21 (de Crescenzo).

108. OptumInsight's commitment to protecting payer data is shown through the several levels of protection it has around that data.

109. ***UHG's Organizational Culture.***  Multiple witnesses testified that Optum—and UHG as a whole—has a culture of trust and integrity around protecting customers' sensitive information.  Dave Wichmann, former Chief Executive Officer of UHG, testified that the "first cultural element of the company is integrity, which is, you know, ensuring that people build trust within the marketplace." 8/4/22 AM Trial Tr. 98:4–15 (Wichmann).  Mr. Wichmann testified that, "when you're going to have your own payer and at the same time serve many others, this is a good example of why, you know, it's important to never violate that trust." *Id.*  In reference to data security specifically, Mr. Wichmann testified that UHG "took very seriously" the idea of setting a "tone at the top," which laid "the foundation [upon] which then we protected data, you know, through our technology teams and prioritized investments." *Id.* at 99:1–19.

110. Steve Yurjevich, the Chief Operating Officer of OptumInsight, testified similarly, explaining that OptumInsight's "culture" is to "treat customers' data as they would treat their data themselves." 8/5/22 AM Trial Tr. 64:11–14 (Yurjevich).  Likewise, when asked by the Court, "[w]hat if somebody said, [']We're a single enterprise.  We care about the single enterprise bottom line and we'll make more money on our ability to compete against other payers.  And it will cost you in reputation or loss of revenue or whatever on the Optum side.  So, net, net, it's a benefit['],"

UHG's Chief Privacy Officer, Peter Dumont, responded: "I honestly think you would see a lot of people quitting."  8/5/22 PM Trial Tr. 75:7–16 (Dumont).

111.    UHG witnesses testified that using other payers' data to benefit UHC would be flatly inconsistent with UHG's culture.  Andrew Witty, the current Chief Executive Officer of UHG, stated that such data misuse "would be against the tone, the culture, the rules, everything we stand for in the organization."  8/10/22 PM Trial Tr. 28:2–24 (Witty).  Similarly, when the Court asked Mr. Yurjevich whether Optum had ever misused other payers' data to benefit UHC, Mr. Yurjevich answered: "It's a fair question, and the [answer] is unequivocally no.  That would be -- it would be against our culture and the way we treat and handle data."  8/5/22 AM Trial Tr. 13:23–14:16 (Yurjevich).

112.    ***Contractual Restrictions.***  OptumInsight's contracts also require the protection of customer data.  *Id.* at 65:4–7.  OptumInsight's contracts with its payer customers generally require that OptumInsight use all "reasonable commercial means" to protect data and forbid the sharing of data with UHC or any of its affiliates, with some even expressly referencing UHC.  *Id.* at 65:13–23; *see, e.g.*, DX-0314 § 2.3 ("Optum and its Affiliates in the health services line of business shall prevent and maintain commercially reasonable safeguards to prevent the disclosure of [c]ustomer [d]ata to, and access or use of [c]ustomer's [d]ata by, United Healthcare and/or any of its [a]ffiliates."); DX-0468 § 5.1 ("During the [t]erm of this [a]greement, each [p]arty shall protect the other [p]arty's [c]onfidential [i]nformation using the same degree of care as it uses to protect its own [c]onfidential [i]nformation of like nature, but no less than a reasonable degree of care and no less than the standard of care required by [a]pplicable [l]aws for the respective categories of [c]onfidential [i]nformation which are delivered by one [p]arty to another for the performance of the [s]ervices."); *see also* DX-0370; DX-0385; 8/5/22 PM Trial Tr. 23:4–13 (Dumont) ("Q. Are

there contractual limitations on Optum's ability to use this payer claims data that originates outside of United?  A. Yes, there are.  Q. And what types of contractual restrictions?  A. Well, assuming the data is protected health information, there is, of course, a business associate agreement as part of that contract, and that limits how we can use their PHI.  There's also -- as part of that document, those agreements, there's a master of services agreement, typically, that limits how we can use all of their data, not just the PHI.").

113.    Using rival payers' data to benefit UHC thus would be inconsistent with OptumInsight's legal and contractual obligations to its payer customers.  8/4/22 PM Trial Tr. 31:23–32:7 (Wichmann).

114.    Even when Optum receives payer data from sources other than the payer itself, it treats that data as if it was provided directly by the payer, and Optum does not share it with UHC. 8/5/22 AM Trial Tr. 15:4–22 (Yurjevich) ("Q. [S]o if Optum receives . . . claims data of ███ relating to ███ national accounts, but it doesn't get that claims data from ███, it gets it from some other source, does Optum view its commitments to ███ in its contracts as covering that data or those data?  A. Yes, absolutely.  And an example of that might be in our credit balance business where we're working on behalf of the payer but we get the information from the provider. And let's use ███ as an example where we don't get national account data but, in our credit balance business, we might get that information performing that different service provided by the provider, but we would treat that data just like we would if it was given to us by the payer.  Q. You would treat that, in effect, as data provided to you by ███?  A. That's correct, yes.").

115.    Plaintiffs offered no evidence that OptumInsight has ever breached, or would ever breach, those contracts.  *See* 8/5/22 PM Trial Tr. 35:4–15 (Dumont) ("Q. . . . [B]ut if a customer prohibits Optum from using de-identified claims data in a contract, does Optum abide by the

contract?  A. Yes, we do.  Q. And is Optum's practice of adhering to those contracts going to change as a result of this transaction with Change Healthcare?  A. No, it is not.  Q. And this is important: If Change's current contracts prohibit sharing claims data with UnitedHealthcare, will Optum abide by those contractual restrictions following the merger?  A. Absolutely.").

116.    OptumInsight's contracts ordinarily permit payer customers to audit OptumInsight's data protection measures.  8/5/22 AM Trial Tr. 71:15–72:4 (Yurjevich).  The results of those audits, including audits by major UHC rivals, confirm that Optum has not misused competitor data, *see* UHG's Opening Deck at 49 (citing DX-0755):



117.    Optum takes these audits "[v]ery seriously" and "invest[s] a lot of capital and staff into making sure that [it] run[s] and manage[s] [its] internal controls correctly and to [its] customers' requirements."  8/5/22 PM Trial Tr. 21:13–18, 22:15–19 (Dumont); *see also* DX-0761 at .0007 (customer audit summary noting that "[n]ineteen controls were reviewed and tested to determine the information system safeguards of assets, maintaining data integrity and operating efficiency" and "[t]here were no risks identified").

118.    Optum also views audits as a "a window into what [their] customers want, [and] what they feel is important from [Optum's] internal controls."  8/5/22 PM Trial Tr. 21:13–18 (Dumont).  Optum's audits therefore are part of the fabric of its business relationships with customers: "These [audits] are incredibly valuable to maintain that relationship [with a customer] and deliver the services that [they] need to in a safe, secure manner."  *Id.*

119.    Plaintiffs have not identified a single instance of a customer audit revealing that OptumInsight was giving customer data to UHC or sharing insights from customer data with UHC in breach of its contractual obligations.  *Id.* at 18:5–19:8, 19:19–20, 22:11–19; *see also* DX-0755; DX-0761; DX-0472 at .0004 ("Overall, they rate Optum as 'one of their best vendors' to work with, that is data-driven, well-prepared, professional and delivers on the results projected.").

120.    ***Firewall Policies and Procedures.***  OptumInsight also has industry standard firewalls in place that prevent competitively sensitive information from being shared between Optum and UHC.  8/5/22 AM Trial Tr. 63:20–64:10 (Yurjevich).

121.    Contrary to Plaintiffs' repeated suggestion that UHG first created a firewall policy restricting information sharing in May 2022, UHG has maintained a corporate antitrust policy since 2007 that directly addresses the sharing of information between business units.  DX-0529A; 8/4/22 AM Trial Tr. 102:4–7 (Wichmann).

122.    This corporate antitrust policy has been in place since Optum's creation, 8/5/22 PM Trial Tr. 38:14–17 (Dumont), and it applies to all business units, including OptumInsight and UHC, 8/4/22 AM Trial Tr. 102:14–19 (Wichmann); 8/5/22 PM Trial Tr. 38:14–19 (Dumont).

123.    UHG's antitrust policy expressly prohibits the following:

- "You must not participate in or facilitate communications that may reduce or eliminate competition between another Business Unit and its competitor(s).  You may only discuss [rates, pricing, customers, providers, refusals to deal, and competitively sensitive information] with suppliers and customers who are competitors of another

UHG Business Unit when you have a legitimate business reason to do so . . . ."  DX-0529A at .0002.

- "Exercise caution when communicating with a customer or supplier who is a competitor of another UHG Business Unit (or with a different group within the same Business Unit).  Avoid serving as a conduit of information or an intermediary between that 'competitor' and the other Business Unit."  *Id.* at .0003.

- "Exercise caution when communicating with another Business Unit (or with a different group within the same Business Unit) where the Business Unit (or group) is a competitor of a customer or supplier of your Business Unit.  Avoid serving as a conduit of information or an intermediary between the 'competitor' and the other business unit."  *Id.*

This policy applies to all Optum customers, regardless of whether they have negotiated heightened contractual protections for their competitively sensitive information.  8/4/22 AM Trial Tr. 105:20–24 (Wichmann).

124.    UHG's policies are supported and implemented by technical restrictions on data access.  OptumInsight uses specific software that restricts employee access to confidential customer information based on their business unit.  8/5/22 AM Trial Tr. 64:20–65:3 (Yurjevich).

125.    This software, which is OptumInsight's "primary access management system," 8/5/22 PM Trial Tr. 31:19–21 (Dumont), is called the "Secure System."  8/5/22 AM Trial Tr. 64:20–65:3 (Yurjevich) ("Q. Now you mentioned some technical firewalls and approvals that are needed.  Are you familiar with something called the Secure System?  A. Yes, I am.  Q. What is Secure?  A. Secure is, I would call it, a software product that we use internally.  And that product is used to give our employees access to specific confidential customer information based on their business unit.").

126.    The Secure System and other data access management systems strictly circumscribe employees' enterprise access to OptumInight's data; "[u]sers have to submit an access request" and "those situations are evaluated carefully."  8/5/22 PM Trial Tr. 30:20–25

(Dumont).  OptumInsight's access management systems are "quite robust" and "tested all the time by customers and regulators."  *Id.* at 31:19–32:4.

127.   Plaintiffs have not identified a single instance in which UHG's firewalls were breached.  *Id.* at 42:24–43:2; *see also* 8/4/22 AM Trial Tr. 101:6–10 (Wichmann) ("Q. Were you aware of any employees of United across the business segments using competitively-sensitive information learned from one business segment and applying it to another?  A. No.").

128.   Although Plaintiffs point to a single request and subsequent email exchange to suggest that certain UHC employees had the technical ability to access non-UHC OptumRx pharmacy claims data, *see* PX060, Mr. Dumont explained, "[t]here was no incident with this issue" as it stemmed from a delay in updating an Optum employee's email domain, 8/5/22 AM Trial Tr. 145:13–146:9 (Dumont) ("That was an employee who had a legacy email domain.  So she was part of OptumLabs, but she hadn't updated her email to say '@optum.'  It still said '@UHC.'").  In addition, UHG has determined that no UHC employee in fact accessed non-UHC OptumRx pharmacy claims data in this way.

129.   In connection with this litigation, UHG also performed a forensic review of access to all systems that contained external customer claims, and based on that review, identified "barely a dozen" out of 350,000 UHC employees who even had technical privileges to access external customer data.  8/5/22 PM Trial Tr. 43:3–9 (Dumont).  None of those employees had ever used, viewed, or accessed that data, *id.* at 43:3–9, 43:15–19, and those employees' technical privileges have been revoked, *id.* at 43:3–9, 44:10–15; PX962.

130.   In May 2022, UHG issued additional guidance to address the specific context of the Change transaction and the data sharing principles that will apply post-merger.  *See* DX-0654; 8/5/22 PM Trial Tr. 40:1–4 (Dumont).  This policy did not alter UHG's longstanding approach to

information sharing between business units, but proactively "memorialize[d]" the enterprise's position on the transaction.  8/5/22 PM Trial Tr. 40:11–19 (Dumont) ("[W]e felt this was a good way to memorialize our position and help address the issue that we may have to deal with with regards to OptumInsight and Change."); *see also* DX-0654 at .0001 ("This Policy sets forth specific guidelines consistent with the UHG antitrust compliance policy with respect to the use and disclosure of competitively sensitive information obtained from customers of Optum Insight or Change.").

131.    UHG's transaction-specific policy defines competitively sensitive information as "any non-public information that could be used to obtain a commercial advantage over a competitor, customer or supplier," including, among other things, "[p]rovider reimbursement rates, fee schedules, discounts, billed amounts, allowed amounts, paid amounts, or reimbursement methodologies," "[s]ubscriber, member, or health plan premiums, prices, administrative fees, discounts, cost share amounts, or plan or benefit design," "[d]ata, including claims data, financial data . . . , utilization data, discharge data, or subscriber or member data," "[b]ids or proposals for new accounts or customers," and "[p]roprietary medical, clinical, or coverage guidelines or policies that impact benefit design, insurance coverage, or reimbursement eligibility or amount." *See* DX-0654 at .0001–2.

132.    UHG's May 2022 policy specifically provides:

- "Covered employees may not use or disclose External Customer data for any purpose that is not permitted in [agreements between OptumInsight and Change and their customers] or required by law."

- "The disclosure of External Customer CSI to UHG business units that are competitors of such External Customers is strictly prohibited."

- "The use of External CSI to benefit UHG business units that are competitors of such External Customers is strictly prohibited."

- "UHG employees may not access External CSI unless such access is necessary to perform their job responsibilities."

*Id.* at .0002.  These principles prevent the use or disclosure of external customer data by any means—telephone or otherwise, *compare* 8/1/22 AM Trial Tr. 15:4–7 (Pls.' Opening), *with* 8/5/22 PM Trial Tr. 41:11–42:11 (Dumont)—and imposes specific requirements for where such data can be maintained, *see* DX-0654 at .0002–3.  In fact, the text of the policy prevents the improper disclosure of competitively sensitive information by ***any*** medium: "UHG employees are <u>strictly prohibited</u> from saving, printing, sending, faxing, scanning, transmitting, forwarding, mailing, emailing, or otherwise extracting External Customer CSI from Electronic Data Sites for purposes of disclosing such information beyond those authorized to receive it, including but not limited to employees of other UHG business units that are competitors with such External Customer."  DX-0654 at .0002.

133.    Plaintiffs' assertions notwithstanding, UHG's May 2022 policy prohibits use or disclosure of a payer's data even if Optum received that data from a provider or intermediary.  The policy defines "External Customers" to include all "Optum Insight or Change customers who are not a UHG business unit."  *Id.* at .0002.  That covers virtually all payers in the United States. 8/5/22 AM Trial Tr. 19:6–12 (Yurjevich) (explaining that approximately 220 of the 230 payers in the country are OptumInsight customers, including Aetna, Anthem, Cigna, Florida Blue, HCSC, Horizon, Humana, and Molina).  As noted, the policy then provides that "External Customer CSI" shall not be disclosed to, or used to benefit, "UHG business units that are competitors of such External Customers," and makes no exception for situations in which Optum received the "External Customer CSI" from a provider or intermediary rather than directly from the "External Customer" itself.  DX-0654 at .0002.

134.    Multiple UHG witnesses testified that Optum's contracts and firewall policies prohibit use or disclosure of a payer's data regardless of whether Optum received that data from a provider or intermediary.  *E.g.*, 8/5/22 PM Trial Tr. 42:12–18 (Dumont) ("Q. So, just to walk that through with an example, if Optum receives data about a UnitedHealthcare competitor from a healthcare provider, could Optum share that data with UnitedHealthcare since it's not coming from a competitor directly?  A. It could not.  That would be against a number of our policies; this policy [the May 2022 policy] in particular."); *see also supra* UHG and Change's Findings of Fact ("FOF") ¶¶ 104, 114.

135.    UHG's firewall policies restrict its ability to use data in the way envisioned by Plaintiffs post-merger, and Plaintiffs presented no evidence that UHG intends to alter those firewall policies.

136.    Plaintiffs have discounted these policies, asserting that UHG can rescind or modify these firewall policies whenever it wishes.  8/1/22 AM Trial Tr. 50:6–8 (Pls.' Opening) ("And I think you have to ask yourself, though, when the spotlight is gone, what will United do with this [firewall] policy?  Would it revise it?  Would it eliminate it?"); PX820 ¶ 223 ("To the extent that any [firewall] protocols currently in place have proved effective, it does not mean that they are robust to this change in incentives.").  Plaintiffs insinuated the same during the questioning of UHG's CEO, 8/10/22 PM Trial Tr. 64:23–65:13 (Witty), implying that a hypothetical, future leadership team could facilitate this effort, *id.* at 68:8–69:4.

137.    But no matter the time or the leadership team, there was unequivocal testimony that rescinding firewall policies to gain competitively sensitive information regarding rivals is "just bad business" for UHG.  8/9/22 PM Trial Tr. 89:3–15 (McMahon).  As UHG's former CEO

explained, if UHG misused Change's data after the acquisition all of Optum's external revenue "would be immediately at risk." 8/5/22 AM Trial Tr. 31:13–32:11 (Yurjevich).

138.    As another UHG executive testified, misusing data to benefit UHC at the expense of its rivals "would be completely counter" to UHG's strategy and "would kill [UHG] in the market," 8/10/22 AM Trial Tr. 73:14–74:3 (Schumacher), and Plaintiffs offered no evidence about the legal and reputational implications for Optum more broadly.

139.    These market realities are recognized by Optum's customers, as any specter of misuse would severely damage Optum's reputation and reverberate across the market. *See* DX-0472 at .0004 ("███████ is highly confident and convinced that Optum will not risk their credibility or brand reputation to share their Plan's information with United Healthcare.").

140.    UHG thus has significant incentives to adhere to these firewalls and other contractual restrictions that protect competitively sensitive data. OptumInsight's "multi-payer business is predicated on payers and providers trusting that its firewalls will protect their data[.]" DX-0813 ¶ 147; *see also supra* FOF ¶¶ 68–81. As Professor Tucker explained, "healthcare is a world, especially healthcare analytics[,] is a world where we've got these long-run relationships. Customers are expensive to acquire. Each customer is worth a great deal of revenue. So you don't really want to risk that loss of revenue. And brand and reputation is incredibly important." 8/12/22 Trial Tr. 11:3–19 (Tucker). Dr. Kevin Murphy likewise explained, "[e]conomics implies that UHG must believe that the gains in OI profits from having effective firewalls are greater than the increase in UHC profits from using rival payers' data to benefit UHC." DX-0813 ¶ 147.

141.    Plaintiffs have offered no evidence—fact or expert—to explain how access to data or the value of that data will change Optum's incentives and cause it to abandon these consistent and comprehensive protections across the enterprise. *See, e.g.*, 8/12/22 Trial Tr. 96:21–97:7

(Tucker) ("THE COURT: . . . [Y]ou think that Professor Handel's report is lacking because it fails to recognize the importance of firewalls in the incentive structure; correct?  THE WITNESS: Yes. So, my point isn't legalistic, but as an economist, all we do is we think about incentives.  That's really sort of the major underpinning of a lot of the economics.  And so, for me, it's very strange to not as an economist think about the incentives of complying with firewalls and saying you can disregard them.").  Again, as Dr. Murphy has explained, "[t]he same economic incentives that induce UHG not to use the data from rival payers that it currently has in ways that would disadvantage them will induce UHG to protect rival payers' data from being used to harm them after the merger."  DX-0813 ¶ 19.

e. <u>Other vertically integrated healthcare businesses maintain industry standard firewalls.</u>

142.    Firewalls are an industry standard means of protecting competitively sensitive information in the vertically integrated healthcare space.  8/15/22 AM Trial Tr. 38:14–24 (Murphy) ("Firewalls in this industry for protecting CSI have been deemed to be effective."); █████████ ████████████████████████████████████████████████████████████████ .

143.    For example, CVS Health—which owns Aetna, a major payer, and CVS Caremark, a PBM—has a corporate firewall policy that prohibits sensitive information from one line of business from being shared with another line of business.  8/1/22 PM Trial Tr. 95:5–25, 96:3–18 (Lautzenhiser).

144.    Plaintiffs presented no evidence of any instance in which CVS Health's corporate firewall policies were violated to benefit the enterprise's commercial health insurance business. *See id.* at 97:16–19 ("Q. You're not aware of anyone at Aetna who has asked any CVS Health company for rivals' competitively sensitive information, right?  A. Correct."); *id.* at 97:24–98:2 ("Q. You're not aware of anyone at Aetna conducting corporate surveillance on rivals using data

those rivals may give to other [CVS] Health companies, right?  A. I'm not aware of any."); *id.* at 98:6–8 ("Sitting here today, you're not aware of anyone at Aetna who has ever broken corporate firewall policies, right?  A. Nobody that I know of.").

145.    Anthem, a major commercial insurer, also operates non-health plan businesses that sell products and services to other payers.  ███████████████████████████████████

████████████; DX-0860 at 10:8–10:10 (Anthem 30(b)(6)).   Those non-health plan businesses receive external payers' medical claims data, which Anthem protects using firewall policies nearly identical to UHG's.  ████████████████████████████████; DX-0860 at 11:21–24, 13:5–8 (Anthem 30(b)(6)); *compare* DX-0529A *and* DX-0654, *with* DX-0022 to DX-0025, DX-0026, *and* DX-0028 to DX-0030.

146.    The record contains no evidence of any instance in which Anthem's firewall policies were violated to benefit the enterprise's commercial health insurance business.  DX-0860 at 13:20–25 (Anthem 30(b)(6)) ("Q. For the nonhealth plan businesses that you have knowledge of, is Anthem aware of any instance in which an Anthem employee has accessed medical claims data of other payers that are held by those nonhealth plan businesses?  A. Yeah.  To the best of my knowledge, no."); *id.* at 14:8–12 ("[Q.] Has Anthem ever received, to your knowledge, any medical claims data of other payers held by Anthem's nonhealth plan businesses?  A. No."); *id.* at 14:17–21 ("Q. Are you aware of any instance in which Anthem has used medical claims data of other payers held by Anthem's nonhealth plan businesses to compete for commercial health insurance?  A. Not I'm -- no, not that I'm aware of.").

147.    Cigna, a payer, operates subsidiaries that provide services to other payers, ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

148.   ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████

149.    UHC also entrusts competitively sensitive information to enterprises that operate rival health insurers.  8/9/22 PM Trial Tr. 90:19–21 (McMahon) ("Q. Are you aware of any instances in which UHC discloses its confidential data to an entity owned by a rival payer?  A. Yes, we do.").

150.    For example, UHC shares clinical rules and medical management protocols with eviCore, a subsidiary of UHC's payer rival, Cigna.  *Id.* at 90:22–91:8.  UHC is comfortable sharing this data because it expects, and contractually requires, that eviCore and Cigna have effective firewalls, and no evidence exists that they have ever been breached.  *Id.* at 91:18–23; *see id.* at 97:16–98:6 ("Q. So, just to break that down, United makes a contract with eviCore, and that contract allows eviCore to use those data for certain things but not for other things; isn't that right?  A. Yes, that would be a logical assumption.  Q. And whenever United discloses data outside of the enterprise, United makes some sort of contract or license that defines what the -- how the data can be used; isn't that right?  A. Yeah, that goes back to what I was talking about before.  Regardless of -- when we have data go outside of our walls, there's restrictions on how that data can be used.

Generally, it's in the -- it's in the realm of having somebody administer their medical plan for a group of employees.  Generally, that's the case.  And in our case, what we're giving eviCore, we're -- for our book of business, we're enabling them to help us manage the medical expenses in radiology and cardiology.").

151.    ***Legal Restrictions.***    Optum must comply with the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d *et seq.*, which requires that certain health information be de-identified using either the safe harbor method or the expert determination method.  DX-0814 ¶ 29.

152.    Under the safe harbor method, the following patient-level ***and*** employer-, group-, and plan-level identifying information is removed: (i) names; (ii) "all geographic subdivisions smaller than a State including street address, city, county, precinct, zip code, and their equivalent geocodes" (with certain exceptions allowing for the initial three digits of a zip code to be disclosed); (iii) "all elements of dates (except year) for dates directly related to an individual, including birth date, admission date, discharge date, date of death" (with certain exceptions for those over 89 years of age); (iv) telephone numbers; (v) fax numbers; (vi) email addresses; (vii) social security numbers; (viii) medical record numbers; (ix) health plan beneficiary numbers; (x) account numbers; (xi) certificate/license numbers; (xii) vehicle identifiers and serial numbers (including license plate numbers); (xiii) device identifiers and serial numbers; (xiv) universal resource locators ("URLs"); (xv) IP addresses; (xvi) biometric identifiers, including finger and voice prints; (xvii) full face photographic images and any comparable images; and (xviii) "[a]ny other unique identifying number, characteristic, or code, except as permitted."   45 C.F.R. § 164.514(b)(2)(i); DX-0814 ¶ 29 & n.54.

153.    Under the expert determination method, an expert—defined as "[a] person with appropriate knowledge and experience with generally accepted statistical and scientific principles and methods for referring information not individually identifiable"—analyzes identified data and determines whether "the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information."  45 C.F.R. § 164.514(b)(1).  The expert may then conclude that certain fields need not be de-identified, so long as he or she "[d]ocuments the methods and results of the analysis that justify such determination[.]"  *Id.*; *see* DX-0814 ¶ 29 ("The 'Expert Determination' method is a nuanced and sophisticated method based on the statistical properties of the data and expert judgement.").  But the expert determination method must "make sure that re-identification can't happen through a combination of the different data fields," meaning that there may be "fewer data fields" after the de-identification process to remove any "risk of re-identification."  8/12/22 AM Trial Tr. 64:16–65:3, 65:17–66:5 (Tucker).

154.    To comply with HIPAA, Optum removes payer ID, provider ID, employer or customer ID, as well as "other sensitive financial information like the negotiated reimbursement rate."  8/5/22 PM Trial Tr. 30:3–25 (Dumont); *see also id.* at 35:19–36:7.

155.    Plaintiffs presented no evidence that there is any way to comply with HIPAA without removing employer information.

**B.    Change**

156.    Change Healthcare is a healthcare technology company that provides data solutions aimed at improving clinical decision-making and simplifying payment processes across the healthcare system.  PX195 at 31.

157.    Founded in 1996, Change merged with McKesson Corp.'s Technology Solutions division in 2017 to create the healthcare technology company that exists today.  *Id.*; 8/2/22 AM Trial Tr. 92:20–94:7 (de Crescenzo).

158.    Change historically has operated through three main business units: (i) Software and Analytics; (ii) Network Solutions; and (iii) Technology Enabled Services.  PX195 at 33–34; 8/2/22 AM Trial Tr. 14:23–15:9 (de Crescenzo).

159.    Change's Software and Analytics business provides solutions aimed at "improv[ing] financial performance, payment accuracy, clinical decisions, revenue cycle management ('RCM') and value-based payment, as well as provider / consumer engagement, imaging, and clinical workflows."  PX195 at 33.  Such solutions include coordination of benefits, audit and recovery, first-pass claims editing (ClaimsXten), technology solutions, risk adjustment and quality, clinical decision support (Interqual), RCM technology, imaging and clinical workflow solutions, and consumer engagement.  *Id.*

160.    Change's Network Solutions business centers on facilitating "financial, administrative, and clinical transactions, electronic business-to-business and consumer-to-business payments," as well as aggregation and analytical data services.  *Id.* at 34.  Change performs these services through its EDI clearinghouse, and its Electronic Payments, and Data Solutions businesses.  *Id.*; 8/2/22 AM Trial Tr. 15:10–21 (de Crescenzo).

161.    Change's Technology Enabled Services business delivers "RCM services, value-based care, consumer engagement, payment services, pharmacy benefits administration, third-party administration services and healthcare consulting."  PX195 at 34.

       1.    *ClaimsXten & First-Pass Claims Editing*

162.    One of Change's products, offered through its Software and Analytics business, is its first-pass claims-editing solution, ClaimsXten.  8/11/22 AM Trial Tr. 13:7–17 (Wukitch); DX-0616A at .0023.

163.    ClaimsXten "review[s] a health claim that comes into the payer, identifies which codes should be paid," and "help[s] payers pay claims more accurately and guard against fraud, waste and abuse."  8/11/22 AM Trial Tr. 15:1–12 (Wukitch); 8/2/22 AM Trial Tr. 97:4–22 (de Crescenzo).  ClaimsXten sits within a category of products often referred to as Payment Accuracy, which generally focus on ensuring claims have been paid correctly.  *See* PX195 at 33 ("ClaimsXten is a clinically-based claims payment software solution for payers that deploys automated rulesets to improve payment accuracy, reduce appeals and drive administrative savings.").

       a.    <u>ClaimsXten historically has thrived as a functionally independent, standalone product.</u>

164.    McKesson released ClaimsXten in 2006, 8/11/22 AM Trial Tr. 8:1–5 (Wukitch), after which ClaimsXten enjoyed "significant growth," and became "the market leader" in first-pass claims editing before the combination with Change in 2017, *id.* at 17:8–18.

165.    ClaimsXten's success as a standalone product at McKesson stemmed from investments in the solution's functionality, as well as the strength of the dedicated team that supported the business.  8/11/22 AM Trial Tr. 17:19–18:5 (Wukitch).

166.    ClaimsXten continued its success following the combination of Change and McKesson in 2017, owing in large part to its "stellar reputation among its customers in the industry," 8/2/22 AM Trial Tr. 97:4–22 (de Crescenzo), and status as the "gold standard" in clinical claims management, DX-0616A at .0018.

167.    Functionally, ClaimsXten is used by a payer's claims adjudication system.  Change does not offer claims adjudications systems.  Rather, ClaimsXten contributes to the overall claims adjudication process by providing "payment recommendation[s] to the payer" "in less than a quarter of a second."  8/2/22 AM Trial Tr. 97:4–22, 99:16–18 (de Crescenzo); 8/2/22 PM Trial Tr. 44:2–4 (Turner) ("Q. And the primary editor usually responds in a matter of seconds or even less?  A. 100 to 200 milliseconds.").

168.    To facilitate these recommendations, Change develops "edits" and "rules" governing when claim codes should be recommended for rejection, which payers then implement in their adjudication systems.  8/2/22 PM Trial Tr. 41:2–20 (Turner).  These edits and rules often are grouped together in "knowledge packs," which "[t]ailor[] clinical content to address policy management needs in rules."  DX-0616A at .0030; *see* 8/2/22 PM Trial Tr. 41:24–42:11 (Turner).

169.    ClaimsXten knowledge packs reflect "clinical rationale[s]" derived from "a clinical authority," such as the Centers for Medicare & Medicaid Services and the American Medical Association.  8/2/22 PM Trial Tr. 88:9–21 (Turner).  Change therefore "go[es] right to the source" in developing editing rules for ClaimsXten and does not draw clinical content from other products or utilize machine learning in doing so.  *Id.* at 89:2–90:4.

170.    Certain payer customers work with Change to offer customized edits and rules based on payer-specific coverage rules and policies.  8/1/22 AM Trial Tr. 123:21–124:9 (Garbee).

b.      ClaimsXten is purchased as an independent standalone product, unbundled from Change's other suite of offerings.

171.    ClaimsXten is a "standalone solution" offered by Change that is not technologically integrated with any other Change payment accuracy offerings and is sold separately from those offerings.  8/11/22 AM Trial Tr. 18:9–18:22 (Wukitch).  ClaimsXten is an entirely self-sufficient first-pass claims editing tool that is not dependent in any way on Change's other products.  *See,*

*e.g.*, 8/2/22 PM Trial Tr. 90:5–8 (Turner) ("Q. Does a payer need any other products from Change Healthcare to operate ClaimsXten?  A. No, just ClaimsXten, an instance of Oracle, and a claims processing system."); 8/2/22 AM Trial Tr. 102:17–19 (de Crescenzo) ("Q. Does ClaimsXten rely on any other products that Change sells in order to function?  A. No, not that I am aware of."); 8/11/22 AM Trial Tr. 38:12–14 (Wukitch) ("[Q.] Does ClaimsXten rely in any way on any other Change products or services to operate?  A. It does not.").

172.    Although Change has tried to sell ClaimsXten as part of an "end-to-end" "payment accuracy suite" since its combination with McKesson in 2017, customers have continued to purchase ClaimsXten "alone without necessarily any other products being purchased at the same time."  8/2/22 AM Trial Tr. 101:18–1027, 102:20–103:9 (de Crescenzo) ("[N]o matter how many times you put on a PowerPoint slide that you'd like people to buy a number of things all at once, you can't really control, you know, how or what or why people buy products, and what the facts show is that ClaimsXten has been purchased as a stand-alone point solution over the years."); 8/2/22 PM Trial Tr. 95:22–25 (Turner) ("Q. Are you aware of any instances where Change won primary claims editing business from a customer because ClaimsXten was a part of an end-to-end suite?  A. No."); 8/11/22 AM Trial Tr. 18:20–22 (Wukitch) ("Q. Customers are able to license and call the software without having any other Change products; do I have that right?  A. Correct.").

173.    For example, Change has offered ClaimsXten alongside another payment accuracy product called Coding Advisor—a "presubmission messageing [sic]" tool, PX414 at CHNG-004262351—as part of a payment accuracy "end-to-end solution," but customers have not bought the products together.  *See, e.g.*, 8/11/22 AM Trial Tr. 136:14–16 (Wukitch) ("Q. All right.  So, like the other examples that we talked about before, did they buy these products together?  A. They did not buy ClaimsXten and Coding Advisor together."); *see also* 8/2/22 AM Trial Tr. 102:8–16

(de Crescenzo) (testifying that a Blue Cross Blue Shield plan recently considered Change's full suite of payment accuracy products, "[b]ut in the end, they decided to just purchase ClaimsXten").

174.    To take another example, Change customers, including Aetna, agree that ClaimsXten operates separate and apart from other Change payment accuracy products like Insight Record Review, an automated solution designed to capture "outlier and complex scenarios" for claims payment.  8/1/22 PM Trial Tr. 51:23–52:9 (Lautzenhiser); 8/11/22 AM Trial Tr. 36:9–11 (Wukitch) (noting that ClaimsXten and Insight Record Review are "separate and distinct" products). █████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

175.    Change estimates that "[p]robably 90 percent" of its current customers were McKesson customers before 2017, including major payers such as Cigna, Anthem, and Aetna. 8/11/22 AM Trial Tr. 130:21–132:6, 141:22–142:25 (Wukitch).

176.    Plaintiffs failed to present any evidence that payers, including Cigna, Anthem, and Aetna consider the availability of other payment accuracy products when they first purchased ClaimsXten or that they do so now.  Plaintiffs likewise failed to present any evidence that it is important to payer customers for payment accuracy products to be sold together.

c.    <u>ClaimsXten is a market leader that generates substantial revenue through its independent and loyal customer base.</u>

177.    ClaimsXten's share of the market for first-pass claims editing solutions is in the range of 60% to 70%.  8/2/22 PM Trial Tr. 85:14–18 (Turner).

178.    ClaimsXten today has "a little over 100" customers, 8/11/22 AM Trial Tr. 18:23–24 (Wukitch), including Anthem, HCSC, Humana, Aetna and Cigna, among others, DX-0616A at

.0006.  These customers—and customers of Change's adjacent claims editing products—are part of Change's "blue chip customer base," which includes nearly all of the top commercial health insurance payers and 71% of Blue Cross Blue Shield plans.  DX-0616A at .0009.

179.    Customers also tend to stick with ClaimsXten as a first-pass claims editing solution: owing to the value it drives for customers and the "low appeal rates" associated with its edits, ClaimsXten's customer retention rate is "well in excess of 95 percent."  8/2/22 PM Trial Tr. 88:4–8 (Turner); DX-0616A at .0006 (noting "99% Customer Retention").

180.    As noted above, when asked by the Court for a sense of how many of Change's current customers were McKesson customers before 2017, Ms. Carolyn Wukitch, the Change executive in charge of ClaimsXten, answered "[p]robably 90 percent."  8/11/22 AM Trial Tr. 141:22–25 (Wukitch).  This includes Aetna, which served as a McKesson beta partner for ClaimsXten by evaluating, testing, and providing McKesson a financial investment to assist with ClaimsXten's development.  8/1/22 PM Trial Tr. 47:17–48:18 (Lautzenhiser).  Anthem and Cigna also began purchasing ClaimsXten before the product was acquired by Change.  8/11/22 AM Trial Tr. 32:8–13, 131:11–22 (Wukitch).

181.    Change's other claims editing products, each of which are part of the divestiture to TPG, include: (i) ClaimCheck, a legacy solution that Change will sunset in 2023, *id.* at 13:22–14:6; DX-0616A at .0025; (ii) ClaimsXten Select, a version of ClaimsXten targeted towards smaller payers and without "as much clinical content and less service offerings," 8/11/22 AM Trial Tr. 15:15–16, 15:20–16:1 (Wukitch); and (iii) ClaimsXten Cloud, Change's newest product, which was released in 2019, and which provides second-pass claims editing for payers that occurs post-claims adjudication, 8/11/22 AM Trial Tr. 16:2–8 (Wukitch); DX-0616A at .0023.

182.    Sales of Change's claims editing products account for over ███████ in annual revenue and generated billions of dollars in annual customer savings, relative to not using any payment accuracy product.  DX-0616A at .0006.  This revenue comes from annual license fees based on the number of plan members, as well as associated service revenues, with contracts usually lasting three to five years.  8/11/22 AM Trial Tr. 14:7–13 (Wukitch).

2.    *EDI Clearinghouse Network*

183.    Another of Change's products, offered through its Network Solutions business unit, is Change's "medical network" EDI clearinghouse.  PX195 at 34; 8/3/22 AM Trial Tr. 111:14–24 (Peresie).

184.    Change's EDI clearinghouse "facilitate[s] electronic communication between providers and payers in health insurance companies for the purposes of predominantly the revenue cycle, which generally involves the transmission of electronic claims and, ultimately, the remittance advice or the kind of explanation of the payer's payment back to the provider."  8/3/22 AM Trial Tr. 111:5–13 (Peresie).

185.    EDI transactions are submitted in uniform, standardized transaction formats, so that clearinghouses and payers and providers can all interoperate with one another, follow the same standards and make sure that electronic transactions are consistent and easy to adopt across the industry.  *Id.* at 113:17–25.

186.    These standards—specifically, the "fields and the codes and the specifications of exactly how you have to format that transaction," as well as other operating rules—are set by several third-party organizations, such as X12 and CAQH Core.  *Id.* at 114:1–23.

187.    Different transaction types are numerically denominated based upon whether they originate from a payer or a provider: a reimbursement request from a provider, or "claim," is

known as an 837 transaction; a remittance from a payer to a provider in response to a provider's request for reimbursement is known as an 835 transaction.  *Id.* at 53:2–19.

188.    A provider's 837 reimbursement request generally contains "information on, among other things, the healthcare providers that delivered the medical services, the patient that received the services, the insurance company that covers the patient, the service facility, the services provided, a payer estimated amount due, and a patient estimated amount due."  DX-0813 ¶ 57.

189.    A payer's 835 remittance generally contains "information on, among other things, the insurance company or payer, the patient or subscriber, the monetary amount charged, the monetary amount paid, and various codes related to adjustments made *(i.e.*, contractual obligations, payer-initiated reductions, and amounts for which the patient is responsible)."  *Id.*

190.    "From a clearinghouse perspective, there's nothing unique about Change Healthcare's clearinghouse," as it "do[es] the same thing everyone else does."  8/3/22 PM Tr. 6:18–24 (Joshi).

191.    Not all medical claims transmitted between payers and providers in the United States flow through Change's EDI network.  UHG's and Change's expert, Dr. Kevin Murphy estimated Change's EDI market share to be between 18.3% and 22.0% of medical claims for large payers with direct connections in 2020.  *See* DX-0813 Ex. 16.  Dr. Murphy likewise estimated that Change had between 17.8% and 33.8% of medical claims share for providers with direct connections.  DX-0813 Ex. 17.  Plaintiffs' expert, Dr. Gowrisankaran, does not calculate Change's market share of EDI clearinghouse services on either the payer or provider side of the market.  *See* PX820 Ex. 08.  Instead, Dr. Gowrisankaran asserts that Change transmitted approximately 51% of all commercial medical claims, a figure which extrapolates multiple assumptions from data related

to just 6 payers and which accounts for "hops" or instances in which a claim touches Change's network after traveling on another EDI network.  PX820 ¶¶ 185, 199.  This figure includes claims for which Change does not have secondary use rights.

192.    In order to send or receive EDI transactions, providers and payers must connect to an EDI clearinghouse, whether directly or indirectly.  *See* 8/3/22 AM Trial Tr. 54:7–55:20 (Peresie).  Direct connections involve a direct integration with an EDI clearinghouse.  *Id.*  Indirect connections establish EDI connectivity through a third-party vendor or intermediary.  *Id.*

193.    On the provider side, indirect connections can be obtained through an electronic health record ("EHR") or revenue cycle management ("RCM") vendor, sometimes referred to as a channel partner.  *Id.* at 58:2–59:25.  Examples include AthenaHealth, Allscripts, and eClinical Works.  PX273 at CHNG-007270760.

194.    Channel partners are sophisticated companies that frequently "multi-home" or connect to more than one EDI clearinghouse, which gives them the ability to easily choose and quickly alter how to allocate transactional volumes among the clearinghouses to which they connect.  8/3/22 AM Trial Tr. 118:3–9, 121:3–20 (Peresie).  In order to "switch" EDI vendors, a provider simply could swap one EDI clearinghouse for another within the EHR or RCM system or, in more extreme cases, could switch the entire back-end RCM system into which the EDI clearinghouse integrates.  *See, e.g.*, *id.* at 140:15–143:19 (discussing switching by switching EDI vendors); *id.* at 144:22–145:21 (discussing switching RCM).

195.    On the payer side, indirect connections frequently take the form of an "EDI gateway."  *Id.* at 118:21–119:11.  EDI gateway vendors consolidate inbound claims feeds from multiple clearinghouses into a single stream that feeds into the payer's claims adjudication system.  *Id.* at 56:7–11.

196.    Nearly all large payers either do not use Change as their EDI clearinghouse or do not do so exclusively.   UHC, Anthem, HCSC, Florida Blue, and Blue Cross Blue Shield of Michigan do not connect to Change's EDI network at all.   *Id.* at 125:22–25 ("Q. And which of these 10 large payers do not connect to Change's EDI network?  A. United, Anthem, Healthcare Services Company, Florida Blue and Blue Cross Blue Shield of Michigan.").   Other large payers, including Aetna, Cigna, Kaiser Permanente, and Blue Shield of California use multiple clearinghouses to process medical claims, only one of which is Change.  DX-0813 Table 11; 8/3/22 AM Trial Tr. 126:1–9 (Peresie).

197.    Plaintiffs have dismissed Change's low market share and lack of direct relationships with large payers because claims may "hop" from one clearinghouse to another, meaning that certain claims may touch Change's EDI clearinghouse even when a payer does not connect to it.  8/3/22 AM Trial Tr. 60:10–23, 113:1–2 (Peresie); DX-0813 at .0027, .0030–31.  But "hops" are not ubiquitous and only occur when a provider's clearinghouse does not also connect to the receiving payer.  8/3/22 AM Trial Tr. 60:10–23 (Peresie).   In the case of UHC's largest competitors, they either do not connect to Change at all or use Change as one of many connections, making the incidence of hops to Change's networks less frequent.  *Id.* at 119:12–15.

<ul><li>a.  <u>EDI clearinghouse services are highly competitive and commoditized.</u></li></ul>

198.    The EDI clearinghouse market is "extremely competitive."  *Id.* at 128:23–129:9; *see also* DX-0092 at .0003 (noting "[c]ompetitive payer market / pricing pressures persist in payer market").

199.    Ability, Availity, nThrive, Experian, TransUnion, Waystar, SSI Claims Net, and Quadax, among others, compete with Change in the EDI space, and Change has lost business to each of these companies.  8/3/22 AM Trial Tr. 129:10–19 (Peresie); *see also* DX-0813 Ex. 4;

PX857.  One of these competitors—Availity—is also owned by payers, including Anthem, HCSC, Humana, and GuideWell (a subsidiary of Blue Cross Blue Shield of Florida).  8/3/22 AM Trial Tr. 129:20–25 (Peresie).

200.    Driving the intense competition between EDI vendors is the continued commoditization of EDI services.  *Id.* at 128:23–129:9; 8/5/22 PM Trial Tr. 118:17–24 (Schmuker) ("So EDI, in and of itself, you know, is a commodity that allows for claims to be transferred back and forth."); *see also* 8/3/22 PM Trial Tr. 14:18–15:4 (Joshi) ("The connectivity [of Change's EDI network] is not differentiating.  Today, everybody can connect to everybody and there are multiple ways to get to any of these payers.  So, the differentiation isn't so much the connectivity as much as it is the relationships.").

201.    One key indicia of this commoditization is the "extreme[] price sensitiv[ity]" and declining prices for EDI services.  8/3/22 AM Trial Tr. 128:23–129:9 (Peresie).  Average revenue per EDI transaction is declining for Change, DX-0813 Ex. 15, and several payers have even stopped paying for EDI entirely, DX-0813 ¶¶ 163, 171.  Today, Change on average receives "just around 6 cents of revenue per EDI transaction" because "[i]n many cases, the degree of competition just necessities that."  8/3/22 AM Trial Tr. 130:1–16 (Peresie).

202.    Change "constantly" is "being asked to reduce [its] price" for EDI and must "be very aggressive in keeping our price low" so as "to maintain [its] position, maintain [its] business that [it] ha[s], and [to] try to win deals."  *Id.* at 130:9–10, 13–15.

203.    Change thus often experiences volume attrition (*i.e.*, "customers that have decided to move their volume to another clearinghouse or network service provider"), rate attrition (*i.e.*, customers that have received "price cuts or price reductions"), and client attrition (*i.e.*, "customers

that had terminated and switched service providers") for EDI services from both payers and providers. DX-0092 at .0008–9; 8/3/22 AM Trial Tr. 136:21–139:23 (Peresie).

204.     This attrition is facilitated by the ease with which customers can switch between and disintermediate EDI vendors.  8/3/22 PM Trial Tr. 22:11–19 (Joshi) ("It is quite easy to get around Change, and we have to bend over backwards with rebates to make sure we are providing adequate financial incentives to these channel partners and trading partners for them to send us more volume.  And they switch volume away from us all the time to get better economics from other clearinghouses.  It's a constant battle in a very, very competitive space.").

205.     On the provider side, even Plaintiffs' expert, Dr. Gautam Gowrisankaran, concedes that between 2018 and 2020, 30.2% of Change's provider customers dropped at least 50% of their claims volume.  PX947 Ex. 5.

206.     On the payer side, Dr. Gowrisankaran likewise testified that "[i]t's typically less hard" for payers to switch because payers usually "multi-home" their claims amongst different clearinghouses, with the lone exception being payers that use Change as a managed gateway. 8/9/22 AM Trial Tr. 53:2–12 (Gowrisankaran).  UHG's and Change's expert economist, Dr. Murphy, largely agreed with Dr. Gowrisankaran on this score, noting that "for most payers, they multi-home, which means they could switch [EDI clearinghouses] pretty easily[,]" and that the most difficult switching would come from managed gateway customers, of which there are "not many."  8/15/22 AM Trial Tr. 52:8–23 (Murphy) (explaining that managed gateway switching is "less applicable in this case because Change just doesn't have a lot of those customers").  Moreover, Change's managed gateway customers "tend to be small payers" and "[c]ombined, they represent about 3 percent of all claims submitted in the U.S. in 2020."  DX-0813 ¶ 69; *see also id.* at Table 9 (listing Change's managed gateway customers).

207.     Payers not only can easily establish new connections and switch their own EDI clearinghouse vendors, they also can effectuate a complete disintermediation even of EDI vendors to which they do not directly connect, such as by stopping acceptance of claims from a specific vendor, by influencing providers to avoid a vendor, or by forming direct connections between themselves with large providers or channel partners.   For example, one of Change's payer customers—███—recently established a direct connection with one of Change's channel partners, ███, bypassing Change entirely for ███ claims.  *See* DX-0813 ¶ 165; *see also* 8/3/22 AM Trial Tr. 117:12–20 (Peresie) (explaining that providers can also direct connect "out of their electronic medical record system or practice management system" to an EDI network and "others may actually bypass a clearinghouse altogether and go directly to a payer").

208.     Payers can even disintermediate EDI clearinghouse vendors like Change when they are only involved through claim "hops," which would occur only when the payer and provider are not connected to the same network.  8/3/22 AM Trial Tr. 60:17–20 (Peresie).

209.     Payers can effectuate a switch in EDI vendors in multiple ways, whether by stopping acceptance of claims from a specific vendor or influencing providers to avoid a vendor. For example, one of Change's payer customers—███—recently established a direct connection with one of Change's channel partners, ███, bypassing Change entirely for ███ claims.  *See* DX-0813 ¶ 165; *see also* 8/3/22 AM Trial Tr. 117:12–20 (Peresie) (explaining that providers can also direct connect "out of their electronic medical record system or practice management system" to an EDI network and "others may actually bypass a clearinghouse altogether and go directly to a payer").

210. There are many examples of payers and providers switching away from Change's EDI clearinghouse.  8/3/22 AM Trial Tr. 142:22–143:19 (Peresie) (for payers, listing Centene, Meridian, Medica, TMG, and Affinity, and for providers, listing the Mayo Clinic and LabCorp).

211. EDI switching can take as little as 60 to 90 days when a new connection is required, or shorter when the new connection is made by API—an "application programming interface" offered by major Change competitors like Availity and Waystar—or when an alternative connection already exists.  *Id.* at 140:15–142:21; 8/3/22 PM Trial Tr. 23:1–3 (Joshi) ("It is not about whether [customers] can switch away or not.  They can very easily switch away, and they do all the time.").  When the Mayo Clinic switched from Change to Availity, for instance, "they were able to execute that change in less than a week."  8/3/22 AM Trial Tr. 141:18–19 (Peresie).

212. Employees from two of Change's provider customers, Texas Health Resources ("THR") and Erlanger Health System ("Erlanger"), testified at trial—one live, one by video.  *See generally* PX1008 (Mincher); 8/8/22 AM Trial Tr. 20:8–44:13 (Spady).

213. The experience of these two companies, which described a more difficult switching process, is not representative: combined, the claims submitted by THR and Erlanger add up to "less than one-tenth of 1 percent" of Change's total volume of claims transmitted.  8/3/22 AM Trial Tr. 145:22–146:14, 146:15–147:7, 147:8–12 (Peresie) (explaining that Change transmits "about 90,000 [claims] a month" for THR and "roughly 125,000 [claims] a month" for Erlanger).

214. Plaintiffs' economist did not identify a representative sample of Change's payer and provider customers for purposes of estimating switching time or switching costs.

215. Unlike most Change customers, which use RCM vendors that are not exclusive to any one EDI network, THR and Erlanger receive EDI connectivity from Change by purchasing RCM software, which differentiates those customers' switching experience from those Change

customers solely switching EDI suppliers.  PX1008 at 143:15–20 (Mincher) ("Is it the case that Texas Health Resources does not purchase an EDI clearinghouse on a standalone basis but rather as a part of back-end RCM product?  A. I agree.  I think there's a number of factors that go into that decision-making process."); 8/8/22 AM Trial Tr. 41:23–42:11 (Spady) ("Q. And that your estimates do not involve a change solely away from the EDI clearinghouse.  Correct?  A. That's correct."); *see also* 8/3/22 AM Trial Tr. 166:17–167:17 (Peresie) ("[I]f it's purely an EDI connection, it's relatively straightforward, because think of it as a plug.  All you're doing is plugging into the clearinghouse. . . .  If you have the software and you're just using the software and you're not trying to do a lot of customized integration with your electronic medical records system, that's fairly straightforward as well.  Some of our larger hospital system clients that have big centralized billing offices, they may want to have customized workflow in the software that we have to set up so that they can manage their large workforce.  And so in those instances, that's where the implementation time can take longer because they have a lot more -- it's not so much the network itself.  It's actually the software configuration, if you will, where we've customized it for them, tailored it for their needs.  And then you have to train your staff, and the more staff you have, the longer it can take to train.  So those are the variables."); 8/8/22 AM Trial Tr. 26:3–15 (Spady).

216.    A relatively small fraction of the claims transmitted on Change's EDI network originate from Change's own back-end RCM product, where competition with other RCM vendors is vigorous, as opposed to traffic from other submitters, such as channel partners and trading partners.  *See* 8/3/22 AM Trial Tr. 144:6–145:15 (Peresie); DX-0813 at .0074.

217.    Moreover, notwithstanding the purported difficulties in switching, switching costs are not prohibitive even for uniquely situated providers like THR and Erlanger, both of whom

testified that they would switch or would consider switching if the transaction is consummated. *See* PX1008 at 182:4–7.

218.   Given the ease and frequency of switching and low price point for EDI services, Change's ability and incentive—and by extension the post-merger entity's ability and incentive—to engage in the anticompetitive conduct hypothesized by Plaintiffs is limited.  *See supra* FOF ¶¶ 203–11.

219.   For example, Change has never "dropped a payer to paper," 8/3/22 AM Trial Tr. 97:19–25, 98:1–4 (Peresie), a term used in the industry that refers to terminating access to an EDI network.  Plaintiffs presented no evidence that Change has ever done this, including when ▮▮▮▮ migrated from Change to ▮▮▮▮ for its managed gateway services.  8/3/22 AM Trial Tr. 109:23–110:8 (Peresie).  That is because "threatening a customer with something like that would . . . be damaging to [Change's] brand reputation" and "would hurt [its] ability to sell future products." *Id.* at 150:9–12.

220.   Plaintiffs likewise presented no evidence supporting the suggestion that, post-merger, OptumInsight would drop customers to paper or otherwise use Change's EDI clearinghouse to raise rivals' costs.  8/9/22 PM Trial Tr. 24:23–25 (Gowrisankaran) ("Q. You don't offer an opinion about whether Optum would raise pricing on Change's current EDI clearinghouse network, correct?  A. That's correct.").

   b.   Change is restricted in how it can use data transmitted through its EDI clearinghouse network.

221.   Change receives access to customer data through its EDI clearinghouse from both payers and providers.  8/2/22 PM Trial Tr. 101:5–15 (Suther).

222.   Change's rights to access customer data come in two forms: "primary use" rights, which permit the transmission of data through Change's EDI clearinghouse, and "secondary use"

rights, which permit the de-identification of data and use of that de-identified data for other purposes.  8/2/22 PM Trial Tr. 101:12–102:13 (Suther).

223.    Change's use of de-identified data is broadly "controlled by three things": (i) "applicable law"; (ii) "contract"; and (iii) "whether or not it comports with [Change's] data values."  8/3/22 AM Trial Tr. 17:23–18:5 (Suther); *see also* 8/2/22 AM Trial Tr. 123:19–124:17 (de Crescenzo); PX174 at CHNG-011002805-06 ("We have very high constraints for use" and "[w]e take our trusted role seriously, [w]e have high barriers/constraints to use of data . . . .  No PHI.  No harm.  Must benefit the healthcare ecosystem.  We never sell data.  It's licensed for a specific use.  Restrictions are substantial.  Contractual remedies are significant.  All agreements have audit rights.").

224.    ***First***, as for "applicable law," Change, like Optum, must comply with HIPAA. DX-0814 ¶ 29.  Change utilizes the expert determination method and removes certain fields from medical claims data during the de-identification process, including "anything that can identify the patient" under HIPAA, such as "name and address," as well as "plan ID and group ID, which are affiliated with health insurers and their customers."  8/3/22 AM Trial Tr. 14:2–3, 14:9–13 (Suther).

225.    A plan ID "signif[ies] the actual coverage of a member" from a health plan perspective and "is not included" after Change de-identifies its data.  *Id.* at 14:17–21.  "A group ID is an identifier associated with the employer."  *Id.* at 14:25–15:4.  Thus, "there's no ability to isolate information any individual health sponsor" in Change's de-identified data because employer identification is removed.  *Id.*

226.    Regardless of the scope of secondary use rights granted to Change, de-identified data in Change's possession does not identify the employer or plan associated with a particular medical claim.  *Id.* at 14:9–13.  Plaintiffs presented no evidence that Change intends to alter its de-

identification protocols post-transaction or that UHG does either.  *See id.* at 48:3–8 ("Q. Again, this is a hypothetical to some extent.  But do you anticipate that the same approach will apply after the closing, if there is one?  A. I assume so.  And if I am not mistaken, United has made a public proclamation that they were going to continue supporting [Change's] data solutions business.");  8/5/22 PM Trial Tr. 35:4–11 (Dumont).

227.    Plaintiffs likewise presented no evidence that there is any way to comply with HIPAA without removing employer information.

228.    ***Second***, the contractual permissions and limitations governing Change's secondary use rights flow from a series of interlocking provisions in Change's business associate agreements and master relationship agreements with customers.  8/2/22 PM Trial Tr. 104:13–17 (Suther);  8/3/22 AM Trial Tr. 20:6–18 (Suther); *see, e.g.*, DX-0843.

229.    Change's default business associate agreement ("BAA") provides: "In exchange for the rights and access granted hereunder to the Services and notwithstanding anything in any other agreement between Customer and [Change] to the contrary, the Protected Health Information (as defined under HIPAA) contained in any data received by [Change] directly from Customer or from any third-party customer under this or other agreements between Customer and [Change] may be de[-]identified in accordance with 45 C.F.R. § 164.514(b).  [Change] may use or disclose such de[-]identified data unless prohibited by applicable law."  PX165 at CHNG-011136501.

230.    Contrary to Plaintiffs' suggestion, the unequivocal and unrebutted testimony maks clear that this is not the only contractual limitation on Change's use of a customer's confidential, de-identified information, nor can Change do whatever it wishes with a customer's data so long as the data use at issue does not violate a specific provision of law.  Change's default master relationship agreement ("MRA") also imposes specific restrictions:

**Use and Disclosure of Confidential Information.**  Each party will protect and safeguard the other party's Confidential Information with at least the same care used for its own Confidential Information of a similar nature, but no less than reasonable care.  Except as expressly permitted by this MRA, neither party may:

(a) disclose the other party's Confidential Information except (i) to its employees or contractors who have a need to know and are bound by confidentiality terms at least as restrictive as those contained in this section, or (ii) to the extent required by law, after giving prompt notice of the required disclosure to the other party; nor

(b) use the other party's Confidential Information for any purpose other than (i) to perform its obligations or exercise its rights under this MRA, (ii) in the case of Customer as the receiving party, Customer's evaluation of CHC Solutions, or (iii) in the case of CHC as the receiving party, CHC's development of new and existing products and services.

DX-0843 at .0004.

231.    This provision imposes on Change a contractual obligation to "protect and safeguard the other party's Confidential Information with at least the same care used for its own Confidential Information of a similar nature, but no less than reasonable care." *Id.*  Using Change's EDI claims data in the way Plaintiffs envision would expose UHG to litigation risk under this provision.  8/3/22 AM Trial Tr. 22:22–23:4 (Suther).

232.    It also would be contrary to Change's current practices and procedures.  Change operates under its customer agreements to disallow potential corporate surveillance by one payer of another's medical claims data.  Tim Suther, Senior Vice President and General Manager of Change's Data Solutions business, unequivocally testified: if a "payer wanted specific information about one of its competitors" from Change, then the company "would view that as a violation of [its] confidentiality obligations and . . . would turn that down."  *Id.* at 46:13–24 (Suther).  In other words, if Change "felt that a[n] interested health insurer were trying to . . . reverse engineer the business practices of one of their competitors, that . . . would be a violation of [Change's] confidentiality obligations under [its] agreement and [Change] wouldn't permit it."  *Id.* at 47:14–24.

233.    Consistent with Change's understanding of its contracts, Change does not sell one payer's medical claims data to another payer.  8/2/22 PM Trial Tr. 119:25–120:1 (Suther); *see also* 8/3/22 AM Trial Tr. 10:15–11:5 (Suther).

234.    Change also ensures that its licensees maintain strict data protections.  When Change licenses de-identified data to third parties, its customer agreements often "enumerate[]" "substantial" restrictions, along with "significant contractual remedies," and even audit rights to ensure that third parties comply with Change's contractual restrictions.  *See, e.g.*, 8/3/22 AM Trial Tr. 33:21–34:4 (Suther); PX174 at CHNG-011002805-06 ("We have very high constraints for use" and "[w]e take our trusted role seriously[,] [w]e have high barriers/constraints to use of data.").

235.    Plaintiffs offered no persuasive evidence to the contrary.  Plaintiffs' expert witnesses assume that claims data could be used for any lawful purpose post-transaction.  But this assumption is contrary to the language of Change's contracts and unrebutted testimony about Change's ordinary course of conduct under those contracts—both of which prohibit licensing de-identified data to payers or providers for the purpose of conducting competitive intelligence.

236.    Plaintiffs' claims data expert, Dr. Handel, is not a lawyer, and did not offer (nor could he offer) any legal opinion on the meaning of Change's contracts.  *See* 8/8/22 PM Trial Tr. 29:5–14 (Handel).  Nor did Dr. Handel offer an opinion on how those contracts are implemented in practice.  In fact, Professor Handel did not review a single payer, provider, or template contract from Change in full, relying instead on two limited screenshots of incomplete language from Change's default BAA.  *See* 8/8/22 PM Trial Tr. 29:24–30:5, 30:24–32:18 (Handel).

237.    If Change misused customer data or otherwise breached its contractual obligations, Change could face legal action for breach of contract or suffer financial loss from a customer taking its business elsewhere.  8/3/22 AM Trial Tr. 22:22–23:4 (Suther).

238.   Ensuring confidentiality is "oxygen to [Change's] business," 8/3/22 AM Trial Tr. 44:2 (Suther), and "the consequences" of betraying the trust of its customers or breaching its legal agreements "would be catastrophic," *id.* at 22:16–23:4.

239.   **Third**, Change's "data values" require that any data use be "aligned on [its] mission, which is to improve healthcare at large in this country, [and] also to honor the trust that [its] customers have placed in [it]." *Id.* at 22:16–21.

240.   Change's "law," "contract," and "data values" framework for secondary use rights limits Change's ability, pre- and post-merger, to engage in anticompetitive conduct. Indeed, undisputed testimony confirms that Change will take the same approach to data rights after the transaction that it takes today. *Id.* at 48:3–8; *see also* 8/2/22 AM Trial Tr. 138:21–139:11 (de Crescenzo).

c.   <u>Change lacks secondary use rights in the vast majority of payer commercial claims data.</u>

241.   In any event, Plaintiffs exaggerate the breadth of data to which Change has secondary use rights in the medical claims data transmitted by its EDI clearinghouse.

242.   Notwithstanding the 60% figure sometimes cited by Plaintiffs and their experts, *see, e.g.*, PX1015 at 54, based on the testimony of both sides' experts, Change likely has secondary use rights for between 50% and 54% of the medical claims that pass through its EDI clearinghouse. *See* DX-0813 ¶ 193 (estimating use rights in 50% of medical claims); 8/15/22 AM Trial Tr. 98:9–16 (Murphy) (same); PX947 ¶ 69 (estimating use rights in 54% of medical claims); 8/9/22 AM Trial Tr. 87:22–88:7 (Gowrisankaran) ("What I found is that Change actually has secondary use rights for 54 percent of claims.").

243. But even these figures significantly overstate the **total** percentage of payer and provider medical claims for which Change has use rights, as only **some** claims ever touch Change's EDI clearinghouse at all.

244. Plaintiffs' expert, Dr. Gowrisankaran, asserts that 51% of commercial medical claims touch Change's EDI network—*i.e.*, just over half of all commercial medical claims. *See* PX820 ¶ 185.

245. Assuming that is true, by Dr. Gowrisankaran's own analysis, Change would only have use rights in between 25.5% and 27.4% of commercial medical claims transmitted between payers and providers (51% claims volume x 50% use rights = 25.5% of claims with use rights; 51% claims volume x 54% use rights = 27.4% of claims with use rights). This is because Change does **not** have use rights in all of the medical claims transmitted through its EDI network.

246. The percentage of commercial claims in which Change has use rights is even lower for UHC's major competitors (the entities Plaintiffs contend would be the targets of post-merger corporate surveillance). Again, using Dr. Gowrisankaran's own figures, Change only had secondary use rights in only:

- 12% of ███████ 2019 claims (31% claims volume, only 39% of which convey use rights);

- 12% of ███████ 2019 claims (18% claims volume, only 65% of which convey use rights);

- 13% of ███████ 2020 claims (24% claims volume, only 54% of which convey use rights); and

- 21% of ██████ 2019 medical claims (46% claims volume, only 45% of which convey use rights).

*See* DX-0862 at .0027; 8/15/22 PM Trial Tr. 89:9–17 (Gowrisankaran).

247.    In sum, Change can de-identify and use only a small percentage of the claims for the entities Plaintiffs contend would be the targeted for post-merger corporate surveillance.  *See* PX168 (listing payers that do not currently give Change data rights).

3.    *Real-Time Settlement*

248.    Change also has an R&D project known internally as Real-Time Settlement.  8/3/22 PM Trial Tr. 31:22–24 (Joshi).

249.    Real-Time Settlement is a "concept" designed "to speed up the payment to a provider."  *Id.* at 57:1–7 (Joshi).  It is an attempt "to build a solution that allows providers to get paid in real-time when the claims being settled in real-time versus having to take 30 to 60 days between providers and payers."  PX1007 at 33:25–34:10 (Gopalkrishnan); *see also* 8/2/22 AM Trial Tr. 107:1–10 (de Crescenzo).

250.    In its current form, Real-Time Settlement is a solution that is "really focused entirely on providers," as "there's no payer-facing component to the solution at this point."  8/3/22 PM Trial Tr. 43:23–24 (Joshi); *see also* 8/2/22 AM Trial Tr. 109:8–10 (de Crescenzo) ("Q. If this came to market, who would the customers be?  A. They would be providers.").

251.    The solution is still in development and Change does not offer it today.  8/11/22 AM Trial Tr. 34:2–5 (Wukitch) ("Q. First of all, does change Healthcare have an existing offering called Real-Time Settlement?  A. No.  It is a concept that's in development."); 8/3/22 PM Trial Tr. 57:1–10 (Joshi) ("So, Real-Time Settlement is a concept.  It is not a product today.  It is not close to being a product.").

252.    Change's Real-Time Settlement concept involves the development of three primary capabilities: (i) Change would "estimate the claim that would be paid by the payer with adequate accuracy," (ii) Change would contract with a financial institution that would front the payment to the provider, and (iii) Change would develop software to true up its payments to the provider

because they likely would not match payer's reimbursement with 100% accuracy.  *See* 8/2/22 AM Trial Tr. 107:11–108:4 (de Crescenzo).

253.    To achieve this goal, Real-Time Settlement "does not process the EDI transactions through a clearinghouse" and is "a completely separate process parallel to the EDI process."  8/3/22 PM Trial Tr. 43:11–13 (Joshi).  As Change envisions it, Real-Time Settlement does not affect the payer claims adjudication process.  8/2/22 AM Trial Tr. 109:17–110:6 (de Crescenzo).  A claim processed through Real-Time Settlement "doesn't hit the payer" and thus "gets settled completely separately."  8/3/22 PM Trial Tr. 43:14–16 (Joshi).

254.    Change's Real-Time Settlement concept also is "a completely separate process parallel to the EDI process" and "does not process the EDI transactions through a clearinghouse."  8/3/22 PM Trial Tr. 43:11–13 (Joshi).

255.    ClaimsXten also is not an integral part of any conceived Real-Time Settlement solution.  *Id.* at 38:19–24 ("The clinical edits we have never taken from ClaimsXten and we have never run any clinical edits on Real-Time Settlement . . . .  We have not looked at anything on the clinical side."); 8/2/22 PM Trial Tr. 93:18–19 (Turner) ("[Real-Time Settlement is] not a product as far as I know, and I can tell you, ClaimsXten is not being used."); 8/11/22 AM Trial Tr. 34:6–12 (Wukitch) ("Q. Is there any integration between ClaimsXten and the Real-Time Settlement development project that's going on at Change Healthcare?  A. No, there is not.  Q. Has ClaimsXten ever been integrated into something called Real-Time Settlement?  A. No, it has not been.").

256.    Real-Time Settlement "does not require clinical edits," like those applied by ClaimsXten, "to be settled."  8/3/22 PM Trial Tr. 38:3–15 (Joshi).

257.     Real-Time Settlement remains in an "embryonic" stage.  *Id.* at 38:22–24.  Change has allocated only $5.9 million of R&D funding to the project for FY 2022, which is around 1% of Change's total R&D budget.  *Id.* at 57:13–22, 58:17–19; *see also* 8/2/22 AM Trial Tr. 110:14–22 (de Crescenzo).

258.     Over the course of its development, Real-Time Settlement has undergone several conceptual iterations, and is not conceived today as a possible end-to-end solution for ***both*** payers and providers.  8/3/22 PM Trial Tr. 59:1–4 (Joshi) ("Q. And you've been mentioning provider benefit.  Is Real-Time Settlement envisioned also as a solution for payers as of today?  A. No, it is not a solution for payers as of today."); 8/2/22 AM Trial Tr. 109:8–10 (de Crescenzo) ("Q. If [Real-Time Settlement] came to market, who would the customers be?  A. They would be providers.").

259.     Change's provider-focused Real-Time Settlement project is therefore entirely different in kind from UHG's more holistic Transparent Network initiative.  8/15/22 AM Trial Tr. 83:18–84:8 (Murphy) ("My understanding of the Transparent Network is a little more grand [than Real-Time Settlement]."); 8/5/22 PM Trial Tr. 116:10–117:2 (Schmuker) ("Q. . . . Ms. Schmuker, are you aware of efforts in the industry aimed at settling or paying providers' claims earlier, in realtime?  A. Yes.  I'm familiar with the concept of that Real-Time Settlement.  Q. And you understand that that's something that Change is working towards?  A. Yes.  Q. And is that, sort of, instantaneous payment of claims the same thing as what the Transparent Network is aimed at doing?  A. No.  So, that is the idea that you would immediately, or instantaneously, pay a claim prior to the claim being adjudicated.  The Transparent Network is trying to take claims edits and infusing them into the provider workflow.  Q. So, those are two different things?  A. Those are two different things.").

260.    In addition, Plaintiffs presented no evidence that the proposed transaction has affected the progression of Real-Time Settlement within Change.  8/3/22 PM Trial Tr. 60:5–12 (Joshi) ("Q. Has the merger with Optum affected the level of investment in Real-Time Settlement? A. No, it has not.  We have proceeded down the same path we would ordinarily proceed with experimentation and investment, and try to do as much as we can.  Q. Has the merger with Optum affected the timing of investment in Real-Time Settlement?  A. No, it has not.").

261.    Change is not the only market player pursuing development projects that would accelerate payments to providers.  For example, Blue Cross of California and Google, Avaneer Health, Olive AI, Oracle Insurance, VBA and Repay, and Conexia are each developing solutions. DX-0212 at .0002; 8/3/22 PM Trial Tr. 67:13–67:23 (Joshi); *see also* 8/2/22 AM Trial Tr. 112:9–113:13 (de Crescenzo).  Avaneer Health's partners include Aetna, Anthem, HCSC, Cleveland Clinic, and PNC Bank.  *Id.*

262.    Blue Shield of California and Google's strategic partnership in particular has been described internally within Change as "lethal," DX-0212 at .0002, and a "formidable competitor" based on the coupling of Blue Shield of California's "market presence" and payer contracts with Google's natural language processing capabilities, 8/3/22 PM Trial Tr. 67:24–69:3 (Joshi).

263.    Change does not have advantages relative to other firms developing solutions to accelerate payments to providers and, actually, has some disadvantages relative to them.  *See* 8/3/22 PM Trial Tr. 70:14–71:5 (Joshi) ("Q. Does Change have any type of comparative advantage in developing Real-Time Settlement versus others working on similar solutions?  A. No, we don't. If you look at the architecture of Real-Time Settlement, it is a box that basically calls out to various services and tries to improve on and speed up the process.  The major capabilities that are needed to do that we don't possess in-house.  The natural language processing capabilities we don't

possess, we haven't figured out how to do the contract modeling which Apex has, but we don't have and we don't know how to scale that. And the payment capabilities we don't have in-house, we would need a banking or financial partner to do those. So it's really about orchestrating all these different capabilities, many of them we don't have in-house at all. And that's one of the reasons you find start-up companies getting into the space, because they have a run at this as much as we do.").

### C.  The Transaction

#### 1.  *Transaction rationale.*

264.    On January 6, 2021, UHG announced its agreement to acquire Change for $25.75 per share. DX-0838 at .0003.

265.    Following the merger, OptumInsight will combine with Change "to help make health care work better for everyone" by "provid[ing] software and data analytics, technology-enabled services and research, advisory and revenue cycle management offerings." DX-0838 at .0001; 8/4/22 PM Trial Tr. 10:21–11:9 (Wichmann).

266.    The primary purpose of the Change transaction is straightforward: "[t]o minimize the amount of friction between payers and providers." 8/9/22 PM Trial Tr. 92:11–93:25 (McMahon); DX-0452A at .0006.

267.    Driven by that rationale, UHG viewed "this transaction as a critical component of United contributing to the development of the next generation health system." 8/4/22 PM Trial Tr. 10:21–11:9 (Wichmann).

268.    "Pretty much all constituents"—payers, providers, and patients—of the American healthcare system would benefit from the reduction of friction and lower administrative waste resulting from the Change acquisition. *Id.* at 11:10–12:2. "Payers would benefit from lower costs, streamlined administration, and better outcomes for their patients"; providers "would benefit from

both better clinical insights, as well as streamlined administration"; and patients would have lower costs and improved experiences "through better administration, faster, more streamlined administration, and hopefully better outcomes as well." *Id.*

269.   More specifically, combining the capabilities of Optum and Change will create transformative synergies across the American healthcare system and generate significant benefits for payers, providers, and patients through: (i) clinical alignment; (ii) claims accuracy; and (iii) payment simplification.  PX195 at 1; DX-0748 at .0005.  Plaintiffs do not challenge any aspect of the transaction related to clinical alignment and payment simplification.

<u>a.      The transaction will advance clinical alignment.</u>

270.   Clinical alignment refers to improving the degree of communication and coordination between payers and providers in the "clinical" aspects of their business—*i.e.*, the decisions to administer medical care and the approval of those decisions from a utilization management perspective.  8/5/22 AM Trial Tr. 36:18–25 (Yurjevich) ("Q. All right.  'Clinical alignment' is next.  What does that bullet describe?  A. Clinical alignment describes the process by where payers and providers need to be aligned on the service, type of service, that needs to be provided to a patient.  And the example I'll use here is with a routine colonoscopy taking place at an outpatient surgery center, that's automatically approved.  Payer and provider are aligned on that claim.").

271.   The clinical alignment flowing from the transaction will "[i]mprove the quality of health care delivery by offering critical point of care insights aligned to best evidence-based medical standards within the workflow of physicians."  PX195 at 1.

272.   The depth and breadth of Change's clinical connections formed an integral part of the transaction's thesis.  To illustrate, Change brings to the table over 50 million lives in interoperability and 700 vendor partnerships, in total, touching one in three patient records in the

United States and helping to facilitate over 2.8 billion clinical transactions.  DX-0748 at .0006.

These are unrelated to Change's EDI network and result from other Change touch-points with

payers and providers, such as through its "CommonWell" clinical information network.  PX004 at

UHG-2R-0003249663.

273.    "[R]eal-time approval decisions," "[c]lear and shared policy," and "[i]ntegrated

record retrieval"—pivotal parts of any forward-looking clinical alignment—thus will each be

furthered by Change's "[k]ey role in clinical messaging, industry interoperability."  DX-0748 at

.0005–6.

274.    Change also brings with it "key clinical assets" such as InterQual, DX-0748 at

.0006, a clinical decision support product which is "the most widely adopted clinical guidelines

[used] by clinicians," PX195 at 1.  InterQual's "set of promulgated clinical guidelines that

physicians supported" are a key way to "reduce friction" within the healthcare system.  8/4/22 PM

Trial Tr. 14:24–15:19 (Wichmann).  For example, if a payer and provider are connected through

InterQual, approval for a procedure (*e.g.*, an inpatient colonoscopy) can "happen[] upfront" thus

"avoiding the denial, avoiding the rebill and the back-and-forth that creates the waste in the system

today."  8/5/22 AM Trial Tr. 88:2–12 (Yurjevich).

275.    In addition, Change's "direct integration into the EMR workflow . . . will extend

care provider reach and improve the quality of clinical care delivery."  PX195 at 1.  Separate and

apart from its EDI network, Change maintains a "[n]etwork of bi-directional EMR integrations to

support clinical data exchange," thus allowing payers and providers "to determine reimbursement

levels, identify real-time treatment options at the point of care and automate utilization

management workflows."  PX195 at 20, 33.

276.    Payers, providers, and patients thus will benefit from the clinical value proposition spurred on by the transaction.  *See* PX004 at UHG-2R-0003249660.

277.    For payers, combining Change's and Optum's capabilities into an integrated platform will decrease administrative costs through decreased number and duration of clinical reviews and clinical processes, total cost of care through the prevention of unnecessary procedures and "[e]xpand[ed] adherence" to clinical guidelines, and provider abrasion through a "[m]igrat[ion] to [a] trust-but-verify-model" for providers.  *Id.*

278.    For providers, administrative costs will likewise be reduced in the much the same way it will for payers, while "[a]ccess [to] trusted content sources" will ensure increased transparency for payer reimbursement.  *Id.*

279.    And for patients, they will enjoy the follow-on benefit of increased satisfaction from the streamlining of treatment and information between payers and providers.  *Id.*

b.    The transaction will enhance claims accuracy.

280.    The transaction is aimed at addressing the over $100 billion in administrative waste currently plaguing the U.S. healthcare system due to inaccuracies in the claims payment system. DX-0748 at .0004.

281.    Optum's vision for tackling administrative waste requires "[r]adically reduced claims flow," "[c]lear and shared decision rules," "[c]ontracts that allow for 'trusted' status," and a "[l]ink to 'long tail' of providers."  DX-0748 at .0005.

282.    Change and its capabilities will help achieve that vision.  Although Optum will not pursue in-stream EDI editing as part of its post-acquisition integration of Change, 8/5/22 AM Trial Tr. 86:7–16 (Yurjevich), Change's connectivity to and relationships with payers and providers complement Optum's payer integrity analytics and content, *see* PX195 at 1 ("[Change] brings a scaled transaction network built on extensive payer and provider connections, which complements

Optum's advanced payment integrity analytics and content, as well as Optum's revenue cycle management solutions.").

283.     More specifically, Change's "[c]omprehensive suite of pre- and post-pay payment integrity offerings," "[b]road portfolio of risk and quality solutions[,]" and "[e]nd-to-end collection of revenue cycle technology and services" complement Optum's current offerings and enable the transformation envisioned as a result of the transaction.  PX195 at 20.

284.     As with clinical alignment, benefits from payment accuracy will flow to payers, providers, and patients.

285.     Payers will enjoy lower administrative costs from fewer errant claims and increased payment accuracy and resulting costs savings "by pursuing edits not previously deployed"; reduced provider abrasion will follow.  PX004 at UHG-2R-0003249659.

286.     Providers will see fewer denials and "[i]ncreased revenue yield on commercial claims" and "accelerated cash flow from avoided denials," as well as "[r]educed administrative cost" as a result.  *Id.*  From "[i]ncreased transparency and confidence of revenue performance[,]" providers will realize more predetermined revenue projections.  *Id.*

287.     For patients, "improved claims accuracy will enhance the patient experience through clear communication of benefits, deductible status and payer network economics at point of referral."  PX195 at 1.

c.     The transaction will simplify the claims payment process.

288.     Payment simplification also will follow from the combination of Change's and Optum's capabilities.  PX195 at 1.  Acquiring Change will help Optum "[p]rovide patient payment obligations at the point of service and accelerate provider billing and payment, in part enabled by advances in upstream clinical and claims processes."  *Id.*

289.    Payments are an important aspect of any effort to reduce administrative waste, and Optum has conceived of "[a]ll-electronic provider payments," "[p]rice transparency for patients," and "[f]inancing to help bridge costs" accordingly.  DX-0748 at .0005.

290.    Change "will provide opportunities for simplified patient payment when leveraged with deposits at OptumBank" after acquisition by "[a]dminister[ing] significant payment volumes which can be transitioned to digital payments."  PX195 at 1.

291.    In particular, combining the payment portfolios of Change and Optum will allow for "the ability to enable the patient at the point of service to be able to know what their obligation is right at the doctor's office, and to do that relatively quickly."  8/9/22 PM Trial Tr. 92:11–93:25 (McMahon).

292.    Payment simplification will drive efficiencies for payers, providers, and patients, PX004 at UHG-2R-0003249661, by "simply taking a process that's very much manual and paper-based today and automating it through electronic transactions," 8/5/22 AM Trial Tr. 37:11–16 (Yurjevich).

293.    Payers will enjoy lowered administrative costs from scaled consolidation of payment channels and a reduction in provider abrasion "through reduced payment-related conflicts."  PX004 at UHG-2R-0003249661.  And patients will enjoy an enhanced payment experience "through consumer-convenient options (HSA, credit cards)" and "tailored financing options," to say nothing of the "[m]ore consolidated visibility into services and obligations via improved patient estimates, EOBs."  *Id.*

> d.    <u>The transaction will help facilitate Optum's nascent Transparent Network project.</u>

294.    UHG also hopes that integrating Change's and Optum's capabilities will help the development of the Transparent Network—a nascent "next generation platform" that seeks "to

take a number of individual point solutions" and "bring them together in a more unified way to align interests and accuracy amongst payers and doctors." 8/4/22 PM Trial Tr. 73:18–74:4 (Hasslinger). This is "consistent with [Optum's] vision to try to make the healthcare system work better, [to] try to bring payers and providers closer together." 8/5/22 PM Trial Tr. 109:22–110:7 (Schmuker).

295.    Although transformational in concept, the Transparent Network today is a pilot project in its infancy and is not commercially available for purchase. 8/5/22 AM Trial Tr. 92:2–6 (Yurjevich); DX-0813 ¶ 212 ("As a preliminary matter, it is important to note that both the Transparent Network and RTS are products in development." (footnote omitted)); 8/5/22 PM Trial Tr. 122:6–11 (Schmuker) ("Well, I mean, I can't sit here today and say definitively that we can [bring the Transparent Network to market], but I am really hopeful.").

296.    In order to be successful, however, the Transparent Network will require broad multi-payer and multi-provider adoption and support: "It's important that the Transparent Network be system agnostic" because the "industry transformation" at its core requires "enough market demand, and in order to do that you have to have enough providers interested and enough payers interested and enough content." 8/5/22 PM Trial Tr. 112:3–18 (Schmuker).

297.    The Transparent Network "wouldn't work if it were one payer and one provider." 8/5/22 AM Trial Tr. 83:18–25 (Yurjevich). This is because "[i]f you have one payer and one provider, you might address 5 percent of that payer's gross, provider's gross patient billings. So to really make this a standard process for the provider, you need to address 40 to 50 percent of their gross patient billings, which requires multiple payers interacting with the provider." *Id.* at 83:21–84:6; *see also* 8/5/22 PM Trial Tr. 114:5–16 (Schmuker) ("Well, again, you know, you wouldn't -- with one payer you wouldn't drive enough provider participation. The providers don't

want something that's just for one payer.  So, we wouldn't have a viable business opportunity, if we targeted to one payer.").

298.    The overarching purpose of the Transparent Network, therefore, is "to develop something that will work for everybody"; Optum does not "want a process that works only for payer A, something different for payer B[,]" and for payers, "[t]hey don't want something . . . varied per -- by provider."  8/5/22 PM Trial Tr. 113:15–23 (Schmuker); 8/5/22 AM Trial Tr. 82:16–22 (Yurjevich) ("At a high level, the way [the Transparent Network] works is it, *multi-payer* and *multiple-provider*, it connects payers and providers and ultimately consumers around the care that they're giving and the payer rules, payer requirements and clinical information needed to deliver the appropriate care at the right time for the patient." (emphases added)).

299.    By definition, the Transparent Network must be offered to the market for it to be financially viable because "with one payer you don't drive enough provider participation[,]" and "[s]o, [Optum] wouldn't have a viable business opportunity, if [Optum] targeted [it] to one payer." 8/5/22 PM Trial Tr. 114:5–16 (Schmuker).

300.    Transaction synergy models bear out this multi-payer, multi-provider focus. UHG's January 2021 synergy model, financial projections contemplated significant multi-payer and multi-provider buy-in for the Transparent Network.  PX195 at 5 ("Based on expected transparent network coverage, ~2.5% or $3.8 billion of addressable administrative waste is forecasted to be eliminated by 2030 for payers and providers.").

301.    UHG's latest synergy model from June 2022 largely anticipates the same.  DX-0840 at .0002 ("Based on expected transparent network coverage, ~2.4% or ~$3.1 billion of addressable administrative waste is forecasted to be eliminated by 2030 for payers and providers.").  Earnings from the Change acquisition "have a slower ramp in the first several years"

after closing, but increase over time because "it's going to take a little bit of time to get to the point where we've got participation from payers and providers driving the benefits to the consumers" from the Transparent Network.  8/5/22 AM Trial Tr. 96:18–97:5 (Yurjevich).

302.    Optum thus is "projecting that [it is] in building up this multi-payer, multi-provider network," *id.* at 97:5–10, which is necessary to hit the company's financial targets for the Transparent Network, 8/5/22 PM Trial Tr. 112:10–18 (Schmuker) ("And if you limit yourself to only one, you know, product or one editor application, you just won't get enough traction and we wouldn't be able to achieve our financial targets . . . do this industry transformation.").

303.    Other transaction documents confirm the Transparent Network's multi-payer, multi-provider emphasis.  For example, "Establish Broad Market Buy-in" is listed as one of "[s]everal steps [that] are required for success post-acquisition," along with the statement that the "[p]latform will be multi-payer, multi-provider."  DX-0748 at .0014; *see also* DX-0557 at .0009, .0014, .0016 (including in UHG's synergy model significant revenues from sales of the Transparent Network to non-UHC payers).

304.    This multi-payer, multi-provider strategy for the Transparent Network is entirely consistent with (and advances) Optum's broader business model. *E.g.*, 8/5/22 AM Trial Tr. 24:19–25 (Yurjevich) ("[M]ost of our products really benefit from being a multi-payer, multi-provider product.  And it benefits not us, as OptumInsight, it benefits the payer and it benefits the provider."); 8/8/22 AM Trial Tr. 69:21–70:3 (Higday) ("[W]e design, the [innovation] team at least, all of our products for a large multi-provider, multi-payer market.").

305.    UHG's pilot programs confirm that the Transparent Network is a multi-payer, multi-provider endeavor.

306.     UHG currently is piloting a component of the Transparent Network—the Provider Communication Gateway ("PCG")—with internal (UHC) and external (Wellmark Blue Cross Blue Shield of Iowa) payers, as well as an external provider (the University of Iowa Health System).  8/5/22 PM Trial Tr. 94:16–95:5 (Schmuker).

307.     UHC, Wellmark Blue Cross Blue Shield of Iowa and the University of Iowa Health System were well positioned as pilot candidates because they possessed "some real friction points"—namely, "some types of claims that were needing to be reworked over and over and over again." *Id.* at 111:2–13.

308.     The results of the pilot project to date indicate "that when you provide access to that information to the provider and their workflow, that they do take action on it, . . . it does eliminate that back and forth." *Id.* at 113:6–14.

309.     "[P]ayers of all sizes" have expressed interest in the PCG, and Optum plans to pilot it "in the next couple months with a provider that's not using" Optum's claims manager product; Optum also "ha[s] payers in [its] pipeline that are not using CES," its claims-editing solution. *Id.* at 112:3–9, 112:25–113:5.

310.     Optum's decision to pilot aspects of the Transparent Network with non-UHG entities today undercuts any suggestion that Optum intends to withhold the Transparent Network from the market. *Id.* at 115:1–4 ("Q. Does Optum have any plans today to withhold innovations that it might achieve through the Transparent Network from UnitedHealthcare's competitors?  A. No.").

311.     Plaintiffs presented no evidence that UHG intends to withhold the Transparent Network from the market, which was the sole basis for the "vertical math" calculations offered by Plaintiffs' expert, Dr. Gowrisankaran.  *See* PX820 ¶¶ 242–251 (claiming that Optum would forego

$75 million in profits in 2026 by withholding the Transparent Network).

312.    To the contrary, the unrebutted testimony shows by making the Transparent Network available "to the entirety of the marketplace," [i]f you sell your product to multiple buyers and customers, you will make more money than if you sell it to" UHC alone.  8/4/22 PM Trial Tr. 76:2–12 (Hasslinger).

313.    Perhaps recognizing the complete absence of evidence that Optum has any incentive or intention to withhold the Transparent Network from rival payers, Dr. Gowrisankaran pivoted to the claim that Optum will market a degraded version of the network to rivals, rather than withhold the product altogether.  *See* 8/11/22 AM Trial Tr. 17:5-23 (Gowrisankaran) ("United is not likely to completely withhold transparent network from rivals.  That's not my contention. Rather, United is likely to keep the latest and best version of transparent network away from its main rivals."); *see also* PX947 ¶ 111.

314.    No evidence supports the theory that Optum would market a cut-rate version of the Transparent Network to UHC's rivals, nor did Dr. Gowrisankaran quantify the supposed harm to competition flowing from this theory, identifying it only "[a]s one possibility."  PX947 ¶ 111.  Dr. Gowrisankaran also failed to provide any methodology on which to base his conclusion that offering of a degraded version of the Transparent Network will likely lessen competition in a substantial way in the markets for commercial insurance sold to national accounts or large group employers, the only relevant markets alleged by Plaintiffs in connection with this vertical theory.

315.    Contrary to Plaintiffs' speculation, the trial testimony conclusively showed that Optum has not favored UHC by offering a degraded product to UHC's rivals.  *See, e.g.*, 8/4/22 PM Trial Tr. 3:22–24 (Wichmann) ("Q. Does OptumInsight ever favor UHC by not selling products and services to rival payers or selling them a degraded product?  A. No."); 8/5/22 AM

Trial Tr. 57:4-7 (Yurjevich) ("Q. Mr. Yurjevich, when OptumInsight provides these customers with group risk analytics, is that product limited or degraded in any way?  A. No.  Absolutely not."); 8/5/22 AM Trial Tr. 61:11–14 (Yurjevich) ("Q. Do you have a degraded or lesser version for people other than UnitedHealthcare of portfolio optimization?  A. No, we don't.").

316.    Plaintiffs also provided no evidence that competition would be substantially lessened during any "pilot" period for the Transparent Network or other EDI-related innovations.

317.    UHG's CEO expects "it would be unlikely for [the Transparent Network] to be in a pilot mode within UHG for more than a year," 8/10/22 PM Trial Tr. 46:16–47:3 (Witty), and that "tak[ing] more than a year to test before going [to market] would be a missed opportunity," *id.* at 93:22–94:19.

318.    "[O]ther potential users of that network" still will "have the benefit of UHC de-risking the product or the service" through the pilot.  *Id.* at 47:21–48:2.

319.    This is consistent with standard market practice.  "[H]aving a period where you use it internally before you make it available externally . . . is very consistent with the economics of vertical integration" because "it provides you an opportunity to develop things in-house, get it working, make it work in the way you think is useful, and then making it more broadly available in the marketplace."  8/15/22 AM Trial Tr. 66:15–67:7 (Murphy).

320.    Moreover, other companies are currently innovating in the same friction-reducing space as the Transparent Network.

321.    Epic, for example, has "recently gotten into the payer space, like linking payer and provider together."  8/5/22 PM Trial Tr. 121:6–24 (Schmuker); DX-0813 ¶ 219 ("Epic, a medical technology company, already markets a product called the Payer Platform, which focuses on getting access to medical records directly as part of resolving preauthorization issues and reducing

claims denials." (footnote omitted)).

322.    EDI vendor, Waystar, also "ha[s] those connections into the provider workflow," and so does Cedar.  8/5/22 PM Trial Tr. 121:6–24 (Schmuker); *see also* 8/2/22 AM Trial Tr. 113:5–13 (de Crescenzo) (identifying Cognizant, Oracle, and Cerner as companies seeking "to improve the efficiency, and especially in payments in healthcare"); DX-0813 ¶ 219 ("Humana in partnership with Oracle Health Insurance is currently exploring opportunities for real time claims adjudication, which 'can enable providers to immediately calculate the total responsibility of the patient and collect payment at the time of service.'" (footnote omitted)).

323.    EDI vendor, Availity, may also be innovating in the same friction-reducing space as the Transparent Network.  DX-0862 at .0059; 8/15/22 AM Trial Tr. 85:22–86:7 (Murphy).

324.    Plaintiffs' expert, Dr. Gowrisankaran, made no efforts to define the innovation market at issue in this case, despite alleging harm to certain EDI-related innovations.  When directly asked by the Court, Dr. Gowrisankaran conceded: "I have not defined that market."  8/9/22 PM Trial Tr. 52:21–53:7 (Gowrisankaran); *see also* 8/11/22 AM Trial Tr. 64:2–65:10 (Murphy) ("[Dr. Gowrisankaran] doesn't define a market for EDI-related innovations and, therefore, fails to account for the fact that there are lots of -- potential competition for other products in this space.").

325.    This failure to define an innovation market is fatal to Plaintiffs' withholding theory. Dr. Gowrisankaran testified that UHG's ability and incentive to withhold innovations from UHC's rivals "depend[s] on there being market power in these innovations that result from EDI clearinghouses in these integrated platforms."  8/9/22 PM Trial Tr. 51:15–52:17 (Gowrisankaran). As a matter of basic logic, Plaintiffs cannot establish UHG's power in a market that has been wholly undefined.  *Id.* at 51:15–53:7 ("THE COURT: So is it your testimony that the combined entity will have market power in that [innovation] market? THE WITNESS: Yes.  THE COURT:

Have we defined that market?  THE WITNESS: I have not defined that market. . . .").

326.    Plaintiffs presented no evidence of the contours of any innovation market, and the record shows that Real-Time Settlement and the Transparent Network are complementary products, not substitutes, and thus should not be included in the same product market even if such a market was defined.  *See* 8/5/22 PM Trial Tr. 116:12–117:2 (Schmuker).  The proposed merger therefore would not increase market power in any innovation market or increase the likelihood of harm to competition from these procompetitive innovations.

327.    Ultimately, any Transparent Network that is developed will face extensive competition.  *See, e.g.*, *id.* at 114:17–25 ("Q. So, if the Transparent Network is successful in signing up multiple payers and multiple providers, does that mean that other competing solutions will be unable to sign up enough payers and providers to compete with the Transparent Network? A. No. I mean, you know, today, payers and providers use multiple partners for cost containment or, you know, for various programs, so it would be my expectation that that would continue.  We are not the only people, you know, in this space today.  So I think it will remain a competitive market.").

e.    The transaction was not motivated by Change's EDI data.

328.    As a data analytics company, part of Optum's due diligence focused on the data and data rights Change had in the medical claims flowing through its EDI network.

329.    This data was expected to provide "[o]pportunities . . . to further enrich bi-directional clinical information flow and expand[ed] data use to improve patient health and health system performance, as well as support[ing] new health care discovery."  PX195 at 18; 8/4/22 PM Trial Tr. 21:15–22:12 (Wichmann); 8/4/22 PM Trial Tr. 12:7–22 (Wichmann) ("So data is, in many respects, kind of the oil that will make healthcare work better.  But right now, it's clearly not optimized.").

330.    "[F]rom an OptumInsight perspective," the role of data within the transaction rationale "was always to take data [from Change] and use it to help make the process more efficient."  8/5/22 AM Trial Tr. 121:14–122:2 (Musslewhite).

331.    Data did not, however, drive the transaction.  Optum's final synergy model did not even include a valuation of Change's data or data rights.  8/5/22 AM Trial Tr. 98:23–25 (Yurjevich) ("Q. Is there any valuation of Change's data rights or assets in this model?  A. No. there's not."); DX-0840.  And the UHG board approval package from January 2021, PX195 at 1, makes no mention of Change's data rights, 8/4/22 PM Trial Tr. 17:18–20 (Wichmann).

332.    Certain UHG and Optum executives did express interest in learning about Change's data and data rights in due diligence, identifying data-related issues as a "gap in the analysis that the team at first offered."  *See, e.g.*, 8/4/22 PM Trial Tr. 13:19–14:2 (Wichmann); *see also* PX119. UHG and Optum therefore inquired into Change's data rights and potential use cases for Change's data.  *See* PX027; PX944 at UHG-2R-0003671293–96; PX945.

333.    Certain documents estimated that Change had use rights in approximately 60% of the medical claims flowing through Change's EDI network, PX027 at UHG-2R-0006509715, although UHG or Optum have never verified the actual extent of Change's secondary use rights.

334.    The 60% figure in some of the deal documents is inaccurate.  Based on the testimony of both sides' experts, Change's use rights in their medical claims data ranges from 50% to 54%, with an even much smaller percentage of use rights in the claims data of UHC's major competitors, which do not transmit all, or even a majority, of their medical claims through Change's network.  *See supra* FOF ¶¶ 241–47.

335.    Even at the end of the due diligence process, UHG and Optum "never knew conclusively what [Change's] secondary-use rights were," 8/10/22 AM Trial Tr. 96:21–97:1

(Schumacher), nor was there clarity on how much incremental data UHG and Optum would obtain. *See* 8/5/22 AM Trial Tr. 123:4–11 (Musslewhite) ("Q. And did you get an ultimate answer to Mr. Wichmann's questions about the data rights?  A. Not really because, at the end of the day, as I recall, data rights depended heavily on Change's client contracts.  Of course, we couldn't review those contracts at that time, so it was never really clear what data rights, if any, would accrue from -- what Change had and therefore would come to us.").

336.    In a January 2021 memorandum, Optum's due diligence team explained that "[d]ue to potential data overlaps between Optum primary data sets (NHI/dNHI and Optum Labs Data Warehouse (OLDW), which leverages NHI data plus external sources) and Cambridge data, estimating how much additional data will be added to Optum's pool is very difficult."  PX027 at UHG-2R-0006509717.  After estimating that Change "may have data rights for as many as 90M lives annually," the memorandum concluded that "[t]he incremental additional [sic] to Optum's data sets will likely be significantly lower" given the "likely significant overlap with existing Optum data."  *Id.* at UHG-2R-0006509718.

337.    During due diligence, OptumInsight also developed a series of potential use cases for Change's data following the merger.  PX054; DX-0851 (demonstrative depicting these use cases); 8/8/22 AM Trial Tr. 49:17–20 (Higday).

338.    These potential uses cases spanned across payer, provider, and life sciences businesses, including: "Next Best Action/CDS [Clinical Decision Support]"; "Enrich IHR [Individual Health Record] with multipayer data"; "Disease tracking (infectious and pop health)"; "Certified claims"; "Improved medical policy and benefit design"; "Clinical data for risk and quality"; "Price transparency"; "Insurance Underwriting: Life and Group Health"; "Patient finding for DRN (Digital Research Network)"; "Value Based Contracting United"; "Symmetry Groupers";

and "Optum Performance Analytics / Care Preformance [sic]Solutions."  PX054 at 2.

339.    None of these potential use cases were designed for UHC's exclusive benefit, and OptumInsight does not plan to provide UHC with an enhanced version of any of the products or offerings than what would be supplied externally.  8/5/22 PM Trial Tr. 47:4–50:14 (Dumont); 8/8/22 AM Trial Tr. 49:13–69:7 (Higday); 8/4/22 PM Trial Tr. 81:1–86:9 (Hasslinger).

340.    Each of the potential use cases derives from products or offerings that UHG already offers or intends to offer, that are currently (or will be) sold externally, and that do not involve sharing rival payers' competitively sensitive or confidential data with UHC.  8/8/22 AM Trial Tr. 52:2–14, 53:14–24, 54:19–55:5, 55:19–56:2, 58:5–16, 59:17–60:2, 60:19–61:5, 62:13–25, 64:25–65:11, 66:8–67:1, 67:16–65, 68:15–69:2 (Higday).

341.    None of OptumInsight's hypothetical use cases state that data will be used solely to benefit UHC, *see, e.g.*, PX054, and the trial testimony uniformly rejected the suggestion that the purpose of the transaction was to provide UHC with competitive intelligence about its rivals, *see, e.g.*, 8/5/22 AM Trial Tr. 124:1–10 (Musslewhite) ("Q. Mr. Musslewhite, I just have a few more questions.  We've heard a lot in this case about the deal rationale for the Change transaction is to gain access to Change's data and their data rights and use that to benefit UHC.  As the executive sponsor for this deal, what's your reaction to that?  A. We would never do that.  We never talked about it.  It would never be something that OptumInsight could do as a functioning business entity.  It just is not the way we function."); 8/4/22 PM Trial Tr. 79:9–16 (Hasslinger) ("Q. And when the executives asked you to look more into Change's data rights or data assets, did you understand that they were interested in acquiring Change's data or data rights so that they could share that with UHC?  A. No.  Q. And did you understand that those executives wanted to use Change's data for competitive intelligence for UHC?  A. No.").

342.    Moreover, with respect to HIPAA, both Change and Optum perform a thorough de-identification process.  Change uses the expert determination method under HIPAA, removing among other things the plan ID and group ID for insurers and their customers.  8/3/22 AM Trial Tr. 13:16–15:4 (Suther); 8/5/22 PM Trial Tr. 30:3–10 (Dumont).  Optum also removes payer ID, provider ID, employer or customer ID, as well as "other sensitive financial information like the negotiated reimbursement rate."  8/5/22 PM Trial Tr. 30:3–25 (Dumont); *see also id.* at 35:19–36:7.  Neither Optum nor Change thus have usable access to all fields in external claims data, which complicate any post-merger ability to execute on Plaintiffs' hypothesized use cases.

343.    Specifically, the removal of the data fields discussed above would significantly complicate, if not completely eliminate, Plaintiffs' underwriting use case, meaning that there is no substantial likelihood that the post-merger company could use Change's EDI data in the alleged markets for large employers and national accounts.  *See* 8/12/22 Trial Tr. 28:17–29:10 (Tucker) ("Q. So the next use case is underwriting.  Is Dr. Handel correct that one could glean unique insights from Change's EDI data related to underwriting?  A. No, he's not.  Q. Why not?  A. Well, two things to emphasize here.  First of all, I think the lack of employer ID and the problems it causes for his use cases is maybe the most glaring thing, because, of course, the speculation is that you can somehow find out about a particular employer's risk profile.  But without an employer ID, you're not going to be able to do that.  So that's sort of the practicality element of how this will work.").  Thus, the evidence suggests that Change's data could not be used to improve GRA.

    f.    <u>Commercial and public data sources contain significant amounts of UHC claims data and other information.</u>

344.    Much of the external claims data that Plaintiffs allege Optum would receive (and misuse) after the transaction is also already available through (i) third-party data aggregators or vendors; (ii) the newly issued Transparency Rules; and (iii) the RFP process for bidding on

business from large-group employers and national accounts.

345.    Third-party data aggregators or vendors form the core of "an industry which builds on the non-rivalry of EDI data"—meaning that the data "can be provided to multiple parties"— "to create data sets that it then resells."  DX-0814 ¶¶ 33, 38.

346.    As Professor Tucker explained, "many goods are rivalrous. . . .  [I]f I have an ice cream and I eat the ice cream, then there's no ice cream for anyone else."  8/12/22 Trial Tr. 17:11– 20 (Tucker).  But "the wonderful thing about digital data is that it is nonrivalrous.  I can use a data set.  Another party can use a data set, and we're not going to deplete either one's ability to use that data set.  And that's a really important property as an economist when you're thinking about digital data."  *Id.*

347.    For example, one such data aggregator is IBM MarketScan, which uses a database of deidentified claims data from ███████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████. IBM MarketScan then ███████████████████████████████ ███████████████████████████████████████████

348.    IBM  MarketScan  thus ██████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

349.    All told, IBM MarketScan contains data from roughly ████████████████████ ███████████████

350. Other data aggregators beyond IBM MarketScan have access to large quantities of claims data, including Avalere (338 million patients for claims data), HealthVerity (over 330 million patients for claims data), Komodo Health (over 330 million patients for claims data), Stratasan (over 2 billion claims per year), and Blue Health Intelligence (over 234 million patients for medical and pharmacy claims data).  DX-0814 Fig. 1.

351. The claims fields to which these kinds of aggregators have access ranges in scope, but involve some combination of provider ID, payer ID, procedure, total charge, total allowed, patient cost share, in-network/out-of-network, and claim denial:

**Figure 2**
**Selected Third-Party Vendors with Access to Medical and Pharmacy Claims Data**

| Provider | Selected Claims Fields Included | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Provider ID | Payer ID | Procedure | Total Charge | Total Allowed | Patient Cost Share | In vs Out of Network | Claim Denial |
| | X | - | X | - | X | X | X | X |
| | X | X | X | X | - | - | - | - |
| | X | X | X | X | - | X | - | - |
| | X | X | X | X | X | - | - | X |
| | X | - | X | X | X | X | X | X |

Sources:
[1] UHG-LIT-01911129.
[3] UHG-LIT-01911395.
[4] UHG-LIT-01911599.
[5] UGH-LIT-01911181;

DX-0814 Fig. 2.

352. In addition, other companies analyze "claims and other healthcare data" so as "to derive and sell insight relating to benefit design, provider network optimization, and utilization management[.]"  DX-0814 ¶ 41.  Avalare, for instance, "provides optimization of provider networks utilizing their MORE Registry claims database," and Lumiata "provides solutions to

payers, providers, and software as a service companies[sic]" by "using AI, drawn from healthcare data including over 100 million patient records."  DX-0814 ¶ 41b & e (footnotes omitted).

353.    Besides third-party data aggregators or vendors, the Federal Transparency Rules serve as another key source of publicly available claims data by requiring payers to post machine-readable files, free of charge, of in-network and out-of-network information.  8/8/22 PM Trial Tr. 22:18–23:13 (Handel); 8/8/22 AM Trial Tr. 60:6–18 (Higday); *see also* DX-0734.

354.    Payers' in-network files must disclose, among other things, health plan identifier information; billing codes; negotiated rates; underlying fee schedule rates; derived amounts; bundled rates; place of service codes; and national provider identifiers.  8/8/22 PM Trial Tr. 24:9–26:16 (Handel); DX-0734.  This information must be provided on a plan-by-plan, provider-by-provider, service-by-service basis.  *See* 8/8/22 PM Trial Tr. 24:9–26:16 (Handel); DX-0734 at .0151.

355.    Payers' out-of-network files must disclose similar information, including: health plan identifier information; billing codes; unique out-of-network allowed amounts and billed charges; place of service codes; and national provider identifiers.  8/8/22 PM Trial Tr. 26:17–27:13 (Handel); DX-0734 at .0151–52.  Again, this information must be provided on a plan-by-plan, provider-by-provider, service-by-service basis.  8/8/22 PM Trial Tr. 26:17–27:13 (Handel); DX-0734 at .0151–52.

356.    Nearly every national and regional payer has published this information, with approximately half a petabyte of pricing and network information being disclosed, an amount equal to "three and a half times a couple distances the moon."  *See* 8/8/22 AM Trial Tr. 61:11–22 (Higday).  UHC alone published between 50,000 and 60,000 files.  *Id.*

357.    This information reveals what payers' networks look like, what providers are in and out of network, and pricing information.  Dr. Handel specifically concedes that the Transparency Rules disclose "[n]egotiated rates for many services" and a "[l]ist of providers by plan."  *See* PX1012 at 49.

358.    Even assuming that UHC could even access rival payers' competitively sensitive plan information after the transaction (it will not), any data Change brings to the table would be unlikely to significantly improve UHC's success in the commercial health insurance bidding process.

359.    Payers like UHC engage in a competitive bidding process resulting from RFPs, in which employers—through their brokers or consultants—reveal an incumbent payer's plan design by asking the new bidder to match that design. *See supra* FOF ¶¶ 26–30.  More specifically, payers like UHC therefore receive access to a rival payer's (i) census information, (ii) large claims information, and (iii) claims experience.  *See supra* FOF ¶ 31.  Each of these three pieces of information provides critical insight necessary to form a competitive new bid.

360.    Census information refers to the "demographic information on the population [that an employer] want[s] covered," including "employee and dependent, age, gender, location, so that [UHC] can do a demographic adjustment to a base rate."  8/10/22 PM Trial Tr. 105:5–106:5 (Gehlbach).  "Each rating area, each city, if you will, has a base rate for every network that [UHC] offer[s] and for every plan design that [UHC] offer[s][,]" and UHC "use[s] the demographic information, the age and location, to determine area factors to adjust that manual rate to be specific for the population that [the employer] want[s] to cover."  *Id.* at 107:11–108:17.

361.    Large claims information means "the claimant, the dollars that were paid, usually the diagnosis associated with the large claim," and perhaps "whether it's an ongoing or a closed claim as well." *Id.* at 105:5–106:5.

362.    And claims experience is the "total amount of paid claims for the population covered month by month" for either 12-, 24-, or 36-month periods, "subdivided between medical claims, pharmacy claims, and sometimes behavioral health[.]" *Id.* at 107:3–10. From this claims experience, UHC "know[s] who the incumbent is[,]" and "know[s] how [its] network position is compared to the incumbent." *Id.* at 107:11–108:17.

363.    Based on all of this RFP information, payers, including UHC, conduct various analyses, including projecting the premium it can offer a customer as compared to the premium offered by the incumbent. *Id.*

364.    In creating these projections, payers also rely on the data from the Unified Data Submission ("UDS"). *Id.* at 111:5–112:18.

365.    The UDS is an annual process through which all major payers submit a standardized, anonymized data set of their entire claims history for a certain period of time. *Id.* at 111:5–25. This information allows brokers and consultants to calculate the respective discount positions of all payers who participate in the UDS, which can be communicated to employer customers or payers themselves. *Id.* ("What the consultants do with that is then analyze what our discount position is relative to all other carriers.").

366.    Payers also use the UDS to glean valuable competitive insights. *Id.* at 112:1–18 ("We then use that information, that relative position, to calculate what we call a network efficiency factor. . . . I use that factor, once I know who the incumbent is, to convert the claims to my economic model, how I think my discounts compare to the incumbent carrier."). Although the

data in the UDS is anonymized, payers can use data that they have from other sources to identify their competitors. *Id.* ("[W]e can then bounce that against our coordination of benefits data . . . . That helps us identify who the other carriers are.").

367.    Payers can then use that information to determine how their plans and discounts compare to their competitors, *i.e.*, their relative "network position." *Id.*; *see also id.* at 114:1–13 ("The Unified Data Submission process already really identifies at the macro level how our discounts align with all the other carriers at an individual market level. So we have a frame of reference there.").

2.    *Plaintiffs failed to show incremental value from Change's EDI data that would alter UHG's incentives post-merger.*

368.    In light of all the information and insight that UHC and all other payers already receives as part of the bidding process, access to incremental individual-level competitor claims data from Change's EDI would be unlikely to increase UHC's success over those competitors. *See* 8/10/22 PM Trial Tr. 109:12–111:4 (Gehlbach). "It's not really practical, and it's not really necessary[,]" as UHC's Former Chief Underwriting Officer Mr. Gehlbach explained, because "[i]f you think about a large employer with several thousand employees, you may be talking about a million individual claim lines, if you think about their entire data set of claims" and "there's a lot of variability at a member level on what the combination of a procedure code and a diagnosis code, how that might translate into future expense." *Id.* at 109:16–110:3.

369.    By contrast, aggregated claims data, which is readily available from a variety of sources, *see supra* FOF ¶ 85, avoids that problem: "When you're talking about large blocks of data where you might overshoot or undershoot, it tends to normalize itself out." 8/10/22 PM Trial Tr. 109:18–110:3 (Gehlbach). Thus, when asked directly whether he believed EDI claims data would help UHC in its bidding for large group and national accounts, Mr. Gehlbach was

95

unequivocal: "I don't."  *Id.* at 110:18–111:4 ("Q. Do you believe that EDI claims data would be beneficial to UnitedHealthcare in developing bids for large group and national account RFPs?  A. I don't.  Q. Why not?  A. Going back to the answer I just gave, to try to utilize the individual claim-level detail to do future projections gets really cumbersome and has some inaccuracies built into it because you're trying to estimate, for every combination of a diagnosis and procedure, what the next year's claims cost is going to be, and there's wide variability at the member level on how that might turn out.").

370.    Despite the fact (or perhaps because of the fact) that much of Change's claims data is either already obtained by Optum, otherwise publicly available, or largely unhelpful to the commercial bidding process, Plaintiffs' claims data expert, Dr. Handel, failed to quantify how much additional data, on a claims or covered lives basis, Optum would obtain as a result of the transaction, nor did he compare the information Optum currently has to what Optum would receive as a result of the merger.  *See, e.g.*, 8/8/22 PM Trial Tr. 6:25–7:5 (Handel) ("Q. And as you prepared your opinion in this case, you did not have a detailed understanding of which non-UHC payers provide claims data or other competitively sensitive information to Optum today in the course of a contractual relationship between that payer and Optum; isn't that correct?  A. Yes.");  *id.* at 7:6–10 ("Q. As a part of your work in this case, you also did not specifically quantify, by which I mean number of claims received over a period of time, the claims data that Optum currently has provided to it by non-UHC payers; isn't that correct?  A. Yes, that's correct.").

371.    Plaintiffs and their expert also failed to identify a single instance in which OptumInsight used the data in its possession to derive "a specific rival's negotiated rates," "a specific rival's product network design," or "a specific rival's claims edits" and provide that information to UHC based on the multi-payer claims data already in its possession.  *Id.* at 19:6–

18.

372.     Dr. Handel, nevertheless, asserts that Change's data potentially could be used by UHG to "conduct surveillance on its rival insurers by extracting significant insights about the insurance products they offer to large group customers," likewise identifying potential use cases for UHG based on that data: (i) utilization management tools and design; (ii) negotiations of reimbursement rates with providers; (iii) provider network design; (iv) claims edits; and (v) underwriting.  PX821 ¶¶ 104–05; PX946 ¶ 66.

373.     But Dr. Handel did not even conduct an analysis of the data that UHG would allegedly receive—and benefit from—as a result of the transaction: he did not look at Change's raw claims data; he did not take a sample of that data; and he did not use artificial intelligence or machine learning to derive any specific insight about any of UHC's rivals using that data.  *See, e.g.*, 8/8/22 PM Trial Tr. 35:13–39:9 (Handel); *see also* PX1012 at 24 ("Illustrative examples" of summary statistics and regression analyses "based on hypothetical data.").

374.     Dr. Handel's self-described "blueprint" for his use cases does not provide "the series of instructions, series of . . . iterations of variables, consideration of what machine algorithms you might use, none of the things you need for a blueprint."  8/12/22 Trial Tr. 34:11–35:2 (Tucker).  To use Dr. Handel's architecture analogy, "you don't have any instructions about how to build a building.  You're just told it's possible."  *Id.*

375.     In Dr. Handel's words, "[a]ctually conducting a data analysis with the raw claims data, that's something that would take a team of analytics professionals some months or some meaningful amount of time to implement."  8/8/22 PM Trial Tr. 38:16–39:3 (Handel).

376.     Dr. Handel did not measure, in concrete terms, the difference, if any, between the use cases OptumInsight could develop using commercially available information from data

aggregators, the claims data or other competitively sensitive information already in its possession, and the pricing and network information made public through the Transparency Rules, on the one hand, and the use cases OptumInsight could develop using Change's incremental data.

377.    Nor did Dr. Handel quantify or support through analysis his assertion that Change's data contains additional, and more useful, data than the information publicly available through the Transparency Rules.  *See* 8/8/22 PM Trial Tr. 56:25–59:14 (Handel).

378.    In other words, Dr. Handel offered no opinion about how UHG's ability and incentive to use data would change, if at all, based on the incremental data that UHG would obtain through the transaction.  *See* 8/12/22 Trial Tr. 94:17–24 (Tucker) ("[The Court:] Do I have it right that in thinking about the question of whether United, UHG post-merger or post-acquisition would be likely to permit Change data to be used by UHC, you first have to identify what incremental data not available from any other source would be coming to the acquired -- or to the merged entity as a result of the Change acquisition? . . .  [A.] Yes.").

379.    More specifically, Dr. Handel offered no opinion whatsoever on whether UHG could use data in this fashion consistent with its corporate firewall policies.  *See* 8/8/22 PM Trial Tr. 49:5–11 (Handel); *id.* at 49:24–50:4 ("Q. Just to be completely clear, you're not offering an opinion in this case about whether UnitedHealth Group's firewalls would or would not permit sensitive information contained in claims data to be transferred from Optum to UnitedHealthcare; isn't that correct?  A. That is correct.").

380.    Unrebutted testimony from UHG's Chief Privacy Officer confirms that using Change's data to provide UHC with competitive insights about rivals' utilization management tools, co-pays, benefit maximums, prior authorizations, medical necessity policies, provider reimbursement rates, provider networks, claims edits, or to improve UHC's underwriting would

violate UHG's firewall policies.  *See* 8/5/22 PM Trial Tr. 52:14–54:2 (Dumont).

> 3.    *UHG's has strong post-merger legal, reputational, and financial incentives not to engage in anticompetitive conduct.*

381.    The financial and reputational costs of breaching or altering firewall policies factor into UHG's incentive to use data in the ways Plaintiffs theorize.  *See* 8/12/22 Trial Tr. 95:13–22 (Tucker) ("[The Court:] But then, and I think this is an important part of your report, you also have to think about the other incentives that would be pushing in the other direction, to include the firewall policies, reputational risk, and the like.  Correct?  [A.] Yes, that's precisely correct.  And the way I might characterize it is to understand the dynamics of the incentives in this situation and the extent to which United and Optum can anticipate the very negative consequence of a breach of firewalls, for example."); *see id.* at 96:21–97:7.

382.    UHG's own due diligence documents recognize the "risk of customer abrasion and a potential for [Change] to lose some of its customer base if there is a perception that certain competitively sensitive data can be used by other businesses within UHG or that Optum will add existing de-identified data to [Change's] data products."  PX945 at UHG-2R-0018222214.

383.    Moreover, the market, which includes rivals of UHC, trusts OptumInsight with its data precisely because UHG understands, and takes seriously, reputational risks surrounding data use.  *See* DX-0472 at .0004 ("This Plan is highly confident and convinced that Optum will not risk their credibility or brand reputation to share their Plan's information with United Healthcare.").  Not a single rival payer testified otherwise at trial.

384.    Post-merger, UHG would continue to have strong reputational and financial incentives to protect other payers' data.  Last year, non-UHG customers accounted for approximately $4.1 billion in OptumInsight revenue and approximately $63 billion in total Optum revenue.  8/10/22 AM Trial Tr. 71:9–22 (Schumacher); PX830 at USDOJ-008-000001519.  Optum

would put all of that $63 billion "immediately at risk" if, after the merger, it removed or modified its firewalls and began providing other payers' data to UHC.  8/5/22 AM Trial Tr. 31:17–32:4 (Yurjevich).

385.     Plaintiffs have suggested that not all of that revenue would be at risk because OptumRx and OptumHealth account for some of the $63 billion.  As Mr. Yurjevich explained, however, "OptumRx and OptumHealth serve the same customers that we serve within OptumInsight.  So our customers don't think of us as OptumInsight, OptumHealth or OptumRx.  Our customers think of us as Optum."  *Id.* at 31:24–32:11.  And if those customers cannot trust one Optum business unit with their data, they will not trust any Optum business unit with their data.  *See id.*  Thus, if OptumInsight misused rival payers' data, that would "put our entire book of external business at risk, that $63 billion that we talked about earlier."  *Id.* at 71:6–14.

386.     Contrary to Plaintiffs' suggestion, Optum would actually have *greater* incentive to protect other payers' data post-merger.  For one thing, Change generated about $3 billion in revenue in fiscal year 2021.  PX823 at US-DOJ-008-000000712; ███████████████████████████ ██████████.  Less than ████ of that revenue comes from ClaimsXten, so as Dr. Murphy explained, Optum would put the remaining Change revenue at risk if it began misusing rival payers' data post-merger.  8/15/22 AM Trial Tr. 39:24–41:17 (Murphy) ("But the other side of the equation is the cost of misusing data goes up, too, because you're not now just putting the existing Optum business at risk by misusing data, you're putting the Change business at risk by misusing data.").

387.     Even setting Change's revenue aside, UHG expects that Optum will have more than $63 billion in external revenue in future years and anticipates that Optum's external-payer business will "continue to grow."  8/9/22 PM Trial Tr. 87:20–25 (McMahon).  Indeed, UHG considers the

growth of Optum's external-payer business to be "an essential element of the future growth of the company" as a whole.  8/10/22 AM Trial Tr. 72:20–25 (Schumacher).

388.    Optum's post-merger incentives not to misuse data go beyond the risk of losing business.  Change's standard contract with EDI customers prohibits using one payer's data for another payer's benefit.  8/3/22 AM Trial Tr. 47:12–24 (Suther) ("[The Court:] Part of your answer just now was about not licensing or selling to a particular payer information about its competitors.  In your view, based on your experience, are there contractual prohibitions that would kick in to prevent that or is that a business practice or would that be?  I understand this is a hypothetical situation.  A. I'd say they're mostly contractual.  So, again, we're very attentive to the trust that our customers have placed in us.  And if we felt that a[n] interested health insurer w[as] trying to, you know, reverse engineer the business practices of one of [its] competitors, that, in our mind, would be a violation of our confidentiality obligations under our agreement and wouldn't permit it.").

389.    To avoid all doubt, UHG has offered to amend Change's contracts with EDI customers to guarantee that "UHG will maintain commercially reasonable firewall and information security policies to protect Customer's Confidential Information from being disclosed" to UHC.  DX-0766 at .0004.  UHG has pledged to honor that guarantee even for EDI customers who do not formally amend their contracts.  *Id.* at .0002–3.

390.    Moreover, at trial, multiple UHG witnesses were asked point blank whether UHG would use rival payer data from Change's EDI to benefit UHC.  Every witness answered—in court, under oath, and without equivocation—that UHG would not do so.  *E.g.*, 8/10/22 PM Trial Tr. 28:2–24 (Witty); 8/4/22 PM Trial Tr. 31:4–7 (Wichmann); 8/5/22 AM Trial Tr. 13:23–14:16 (Yurjevich); 8/8/22 AM Trial Tr. 89:25–90:10 (Higday); 8/9/22 PM Trial Tr. 101:11–17

(McMahon); 8/10/22 AM Trial Tr. 73:14–74:16 (Schumacher); 8/10/22 PM Trial Tr. 119:22–120:11 (Gehlbach).

391.    Given the contracts and UHG witnesses' sworn representations, UHG would expose itself to potentially disastrous legal liability if it were to use Change's EDI data to benefit UHC.  That risk of legal liability is yet another incentive against misusing rival payers' data post-merger.  *See* 8/2/22 AM Trial Tr. 123:19–124:17 (de Crescenzo) ("Q. Now, let's say a customer has granted secondary-use data rights to Change let's say in accordance with your standard contract language.  Does that mean that Change can just do whatever it wants with that data?  A. Absolutely not.  First of all, as I mentioned, whether it's personal to our standard contract or not, there [are] a number of contractual restrictions that our customers have put upon us that, of course, we wouldn't violate, never mind the reputational and business risks but the financial liability of doing so against customer contracts. . . .");  *see also* 8/3/22 AM Trial Tr. 47:12–24 (Suther).

392.    Despite the fact that UHG would risk both lost business and legal liability by misusing rival payers' data, Plaintiffs' economic expert, Dr. Gowrisankaran, opined that the costs of such misuse would be "negligible" because "rivals aren't going to know whether United uses this information."  8/9/22 PM Trial Tr. 54:5–55:19 (Gowrisankaran).

393.    Dr. Gowrisankaran, who is not an expert in firewalls or data security, did not investigate whether external payers would be able to detect UHG's misuse of their data.  Nor did he provide any methodology that could be used in such an investigation.

394.    Moreover, Dr. Gowrisankaran's opinion about "negligible" costs is predicated on the counterfactual assumption that UHG would face no legal ramifications if it misused rival payers' data to benefit UHC.  *See* 8/15/22 PM Trial Tr. 28:8–29:11 (Gowrisankaran).

395.     Dr. Gowrisankaran's misunderstanding of UHG's enterprise incentives runs deeper.  In his expert report and testimony, Dr. Gowrisankaran cites UHG's CEO, Andrew Witty, as saying "that UnitedHealth Group needs to think about United at an enterprise level," 8/9/22 AM Trial Tr. 90:4–18 (Gowrisankaran); PX947 ¶ 25 & n.43.  But that rendering omits important context.  In full, Mr. Witty's deposition testimony makes clear that maximizing enterprise value "sometimes . . . would involve [separate business units'] assets being worked together," and "sometimes individually," all subject to "the important caveat of all of the rule sets" that limit UHG's conduct.  *See* DX-0852 at 296:1–297:17.  All of UHG's efforts, then—whether "meeting the needs of the marketplace" or "meeting the needs of physicians and patients"—seek to "mak[e] the best of" the organization's assets, subject to meaningful "constraints," including market incentives, contractual limitations, firewall policies, and business ethics.  *See id.*

396.     Given those massive risks, if UHG were considering a strategy built around misusing other payers' data, one would expect to see business documents weighing the pros and cons.  No such documents exist.

397.     On the other side of the scale, Plaintiffs have not presented any economic evidence quantifying the gains that UHC could purportedly make by using other payers' claims data to reverse engineer those payers' innovations.  More specifically, Plaintiffs' economic expert, Dr. Gowrisankaran, did not calculate any of the following: (i) the number of innovations that UHC could reverse engineer from data that UHG currently possesses; (ii) the incremental number of innovations that UHC could reverse engineer once UHG had access to Change's EDI data; or (iii) the value of those incremental innovations—that is, the dollar value of new national-account or large-group business that UHC could win as a result of the incremental innovations.

398.    With no quantifiable proof, Plaintiffs' theory therefore boils down to speculation that turns on the inconceivable premise that Optum will irreparably tarnish its reputation as a trusted business partner, plus risk billions of dollars in lost business and untold sums more in legal liabilities, all in exchange for a theoretical, unquantified, and likely unquantifiable amount of new business for UHC.  To describe that theory is to discredit it.

399.    No rival payer offered any corporate testimony that they would innovate less or compete less aggressively with respect to claims edits or plans offered to large-group or national-account customers.  No employee or former employee of a rival payer offered such testimony either.  In fact, witnesses testified to just the opposite.  *See, e.g.*, ██████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████; 8/1/22 PM

Trial Tr. 14:17–22 (Garbee) ("[Q.] After the United-Change transaction was announced, you don't recall Cigna competing less aggressively for employer business?  A. No.  In innovating, though, they would be more careful where they put their edits.  They would still innovate but be more careful about where they put it."); *id.* at 15:22–16:12 ("Q. And when you were speaking with Mr. Culley, you had stated you would be more careful about where you put your edits.  Can you explain what you meant by that?  A. Just like I said, we had actually, like, add-on routines that we would run post ClaimsXten that you could put our custom edits and not have it be seen by Change.  So

we might elect to put or [sic] innovative edits in that place instead of running it right in the software."); 8/1/22 PM Trial Tr. 94:23–95:2 (Lautzenhiser) ("Q. This transaction certainly won't cause your group at Aetna to innovate less, will it?  A. It should not.  Q. You don't foresee any less innovation; is that fair?  A. I'm not forecasting any."); PX1005 at 169:14–16, 169:19–170:6 (Dill) ("Q[:] You are not going to compete less aggressively after UnitedHealthcare acquires Change Healthcare? . . .  [A:] So in my personal opinion, I don't think we ever compete less for any reason.  Right.  We always go at it really hard.  That's our job.").

400.    UHG's data diligence also considered the importance of contractual restrictions on data use.  *See, e.g.*, PX944 at UHG-2R-0003671294 ("Careful consideration must be given to not only legal, compliance and privacy issues, but also to the public perception and business abrasion issues that could result from seeking consent from one market participant relative to another (e.g. public and patient concerns regarding Google / Ascension data activities or conversely, a potential payer or provider customer of Optum may have concerns if Optum were to approach their patient / customer)."); *see also* PX027 at UHG-2R-0006509715 ("Legal language as shared in Cambridge's contract template is highly aligned with Optum's approach to data rights in that both Optum and Cambridge only de-identify data where given the explicit right to do so by the customer.").

401.    Plaintiffs presented no evidence that UHG intends to alter its longstanding firewall protections, *see supra* FOF ¶¶ 103–41; depart from Change's understanding and application of its standard contractual language, *see supra* FOF ¶¶ 228–38; or abandon OptumInsight's multi-payer business model, *see supra* FOF ¶¶ 45–81.  In fact, the record showed precisely the opposite.  *See also, e.g.*, 8/10/22 PM Trial Tr. 32:1–35:4 (Witty) (explaining that UHG's renewed contractual commitments to Change's customers are "consistent with what [UHG] believe[s] is the right way

of managing the information and the relationship" and Mr. Witty "do[esn't] think we foresee any

change here"); DX-0686; 8/10/22 AM Trial Tr. 81:2–12 (Schumacher) (answering "[n]o" when

asked whether he was "aware of any efforts to change [UHG's] policies regarding the exchange

of information, competitively-sensitive information, between Optum and UnitedHealthcare" and

whether it is "likely . . . that any of those policies would be changed in the near future").

402.    In sum, "access to data wasn't a part of the core thesis and the real driver of

[UHG's] interest in Change Healthcare."  8/4/22 PM Trial Tr. 80:10–20 (Hasslinger); *see also*

DX-0450 at .0001 ("[W]e had roughly zero value to data in our thesis presented to Dave

[Wichmann] and [John] Rex.  I think the deal stands without it and data is not our message.").

4.    *Contractual commitments to Change's customers legally constrain UHG's
ability to engage in anticompetitive conduct.*

403.    To avoid any doubt regarding possible use of Change's data, UHG has made

contractual commitments and offered amendments to Change's EDI customers that maintain

Change's firewalls and allow for annual customer review to ensure compliance after the

transaction's close.   DX-0766 at .0002–3; *see also* DX-0765 at .0001 (similar commitment

informing Change's data solutions customers that UHG "is committed to continuing Change's

business of making aggregated or de-identified data, and insights and benchmarking derived from

it, available in the marketplace in the same manner as Change does today").

404.    UHG additionally has promised to make any innovation developed through claims

data from Change's EDI network available to all payers and providers, while continuing to provide

industry-standard EDI services.  DX-0766 at .0002–3.

405.    UHG agreed to make these commitments, and notified Plaintiffs of its intent to do

so, **before** Plaintiffs filed suit to block this transaction.  ECF No. 37) at General Resp. to Pls.'

Allegations ¶ 14; *see also* PX596 at UHG-LIT-01672120 (attorney for Plaintiffs writing "[w]e

would also appreciate hearing you describe any additional commitments, such as those Matt [Reilly, counsel for UHG,] mentioned yesterday, that the parties are willing to make to ensure that United would not use Change's EDI clearinghouse to advantage itself relative to rival insurers").

406.    The final commitments made to Change's EDI customers are comprehensive in scope and detailed in nature, as explained in UHG's notification letter which states:

- Protecting Potentially Sensitive Business Information — For years, UHG has maintained robust firewall and data security policies specifically designed to make sure customers' potentially sensitive information is protected and not misused in any way. UHG commits to apply these same firewall and data security policies to customer data held by Change on behalf of Change's EDI customers, and to uphold all contractual rights of Change's customers to audit the protection and security of their data.

- EDI Clearinghouse Network — We understand that the payer and provider customers of Change's EDI clearinghouse network expect timely and accurate transmission of claims, eligibility, and other data.  UHG commits to maintaining Change's exceptional service level following the merger.

- Innovative Products — We expect the combination of UHG and Change to facilitate new or improved products and services.  UHG commits to make available to our customers any new or improved products or services developed using Change's EDI clearinghouse network data.

DX-0766 at .0002.

407.    The contractual amendment offered to Change's EDI customers confirms UHG's commitments made in the letter:

- **Confidential Information Controls.**  UHG will maintain commercially reasonable firewall and information security policies to protect Customer's Confidential Information from being disclosed to UHG's health insurance, health plan administrative services, or health care provider businesses.  Upon request, which shall be made no more than once annually, UHG agrees to conduct a review of Customer's Confidential Information held by Change or the UHG subsidiary into which Change's medical EDI clearinghouse business is integrated and to provide a report to Customer identifying any violations of UHG's firewall and information security policies relating to the disclosure of Customer Confidential Information and the corrective actions undertaken to resolve such violations.  Nothing herein shall interfere with Customer's existing contractual rights to audit the protection and security of Customer's Confidential Information.

- **EDI Clearinghouse Network.**  UHG agrees to provide medical EDI clearinghouse services at levels consistent with Change's current medical EDI clearinghouse network service level and all applicable industry standards and regulations.

- **New or Improved Products and Services.**  If the UHG subsidiary into which Change's medical EDI clearinghouse business is integrated or operated develops new products and services, or improves upon existing products and services, by using Change's medical EDI clearinghouse transaction data (which will only be done in accordance with all applicable laws, regulations, and contracts), and if that subsidiary makes such products and services available to a UHG entity outside of a limited pilot or development trial, it also will make such products and services available to Customer as soon as reasonably practicable and at commercially reasonable rates.

*Id.* at .0004.

408.     Each of these binding commitments eliminates Plaintiffs' theories of competitive harm:  UHG's commitment to protect Change's data with firewalls protects against any misuse of competitively sensitive information received from customers; UHG's commitment to maintain industry-standard service levels safeguards customers from any throttling or degradation of quality from Change's EDI clearinghouse; and UHG's commitment to share any innovation stemming from Change's EDI clearinghouse data undercuts the notion that UHG will hoard post-transaction innovations.  *See* DX-0766 at .0002–4.

409.     As of August 12, 2022, Change had received 3,119 signed amendments reflecting these commitments, which—based on customers having multiple accounts—represents 2,880 of Change's customers.  DX-0214S ¶ 4 & Ex. A.

410.     But regardless of whether Change's customers sign these amendments, UHG has agreed to "uphold these commitments for all Change EDI customers after the merger is complete. As added assurance, UHG is offering to incorporate these provisions into Change's EDI customer contracts."  DX-0766 at .0002; *see also* 8/2/22 AM Trial Tr. 136:13–20 (de Crescenzo) ("Q. All right.  Do customers have to pay anything to get this amendment?  A. Absolutely nothing.  We even included a postpaid envelope for them to return the signed letter and amendment.  Q. Do they

have to agree to any other changes in their existing contracts in order to get the benefit of the amendment?  A. Nothing whatsoever.").

411.    No plans exist to alter these commitments in the future, with any change nevertheless requiring renegotiation between UHG and customers.  8/10/22 PM Trial Tr. 34:19–35:4 (Witty) ("Q. Okay.  We will get to the contract amendment in the future, but it would just be, then, for the length of that contract, the term of that contract?  A. So first of all, I don't think we foresee any change here, because obviously, what's laid out here is consistent with what we believe is the right way of managing the information and the relationship.  Secondly, while the contract's in place, those would be the terms.   Obviously, if anything changed, it would require a renegotiation, and therefore, the customer would have the chance to choose whether to re-sign or not.").

412.    In sum, UHG has memorialized its market incentives to not misuse competitively sensitive information into binding agreements with legal and financial consequences, further reinforcing the speculative nature of any supposed harm resulting from the hypothetical conduct alleged by Plaintiffs.

### 5.    *Plaintiffs failed to prove harm to competition in their alleged markets.*

413.    Even if UHC were to misuse data to copy rivals' innovations, withhold innovations, or otherwise degrade the quality of EDI services offered to non-UHC payers, Plaintiffs offered no evidence of harm to competition for the sale of commercial health insurance to large-group employers or national accounts.

414.    ***First***, Plaintiffs offered no evidence establishing: (i) the specific innovations from particular rivals UHC would be able to copy in the post-merger world; (ii) in what networks, and against which rivals, UHC would deploy these copied innovations; (iii) whether the innovations would enable UHC to win bids for any specific national-account or large-group employer

customers; (iv) the threshold at which rival payers would stop innovating their commercial health plans as a result of UHC's copying; (v) the specific innovations UHC's rivals would forgo; (vi) the effect of these would-be innovations on the market for the sale of commercial health insurance to large-group employers and national accounts; (vii) whether that effect would amount to a substantial lessening of competition.  Each of these

415.    **Second**, Plaintiffs failed to offer evidence establishing: (i) the definition of the innovation market; (ii) the level of competition in this unspecified innovation market; (iii) the substitutability of the Optum's Transparent Network and Change's Real-Time Settlement; (iv) the ability of the Transparent Network to function if offered exclusively to UHC; or (v) the Transparent Network's share as a percentage of insurance profits.

416.    **Third**, Plaintiffs failed to offer any evidence that Optum would raise prices for EDI services or otherwise degrade EDI transactions for rival payers.

417.    Plaintiffs thus presented no evidence showing that competition for large-group employers and national accounts would be reduced as a result of the transaction.  No evidence supports Plaintiffs' suggestion that rival payers would compete less aggressively for large-group employer or national account customers post-merger.

6.    *The divestiture solves any alleged horizontal overlap in the market for first-pass claims editing.*

418.    Plaintiffs' sole basis for claiming that the merger is "presumptively" unlawful is the allegation that the combination of Optum's and Change's claims editing products "tend to create a monopoly in first-pass claims editing solutions."  *See* Compl. (ECF No. 1) § V.C. (capitalization omitted).

419.    UHG, however, has agreed to divest Change's claims editing business, ClaimsXten, to TPG Capital, L.P. ("TPG")—a private equity firm with extensive experience investing in and owning and operating healthcare technology companies.  *See* DX-0579; DX-0617A at .0010.

420.    For ease of reference, "ClaimsXten" as used in this section is a collective name used to denote the four claims editing products included in the divestiture package, which comprise Change's entire primary and secondary claims editing businesses.  *See supra* FOF ¶ 181.

a.    Divestiture Timeline

421.    In January 2022, UHG announced its intent to divest ClaimsXten upon consummation of UHG's acquisition of Change.  8/11/22 AM Trial Tr. 61:1–62:10 (Wukitch); *see* DX-616A at .0001.

422.    Change retained investment banking firm Barclays to run the sale process.  8/11/22 PM Trial Tr. 10:19–21 (Raj).  Barclays approached twenty potential buyers—fourteen financial and six strategic—to gauge their interest in ClaimsXten.  DX-0622 at .0004.

423.    Eighteen potential buyers began conducting diligence, with fourteen receiving management presentations from the ChangeXten leadership team.  *Id.*; 8/11/22 AM Trial Tr. 62:11–63:8 (Wukitch).

424.    In early February 2022, nine potential buyers— ██████████████████████ ██████████████████████████ New Mountain Capital, ███████████████████, and TPG—submitted preliminary bids.  DX-0621 at .0004.

425.    Six potential buyers— ████████████████████████████ TPG, and Advent International/New Mountain Capital jointly—advanced to the second round of diligence. DX-0622 at .0004–5.

426. All six submitted second-round bids in early March 2022. *Id.* The bids ranged from $1.7 billion to $2.2 billion. *Id.* at .0006. TPG's bid of $2.2 billion tied for the highest amount offered for the ClaimsXten business. *Id.*

427. TPG submitted a third and final bid of $2.2 billion in late March 2022. 8/11/22 AM Trial Tr. 161:14–162:9 (Raj); DX-0663 at .0002.

428. In April 2022, UHG and TPG entered a definitive purchase agreement, all conditions of which have been satisfied, except for those that will be satisfied at closing or by resolution of this case. *See* DX-0579 at .0064–66; 8/11/22 AM Trial Tr. 163:24–164:2 (Raj) ("Q. Mr. Raj, is this agreement from April 22 binding on TPG and UHG, as you understand it? A. It is. The only real contingency that I'm aware of is the outcome of this proceeding, but, otherwise, it's binding on us."). The final purchase price is $2.2 billion. 8/11/22 PM Trial Tr. 55:12–14 (Raj). ████████████████████████████████████████████████████████

████████████████████████████████████████████ *See* DX-0616A at .0006; PX195 at 1.

b. <u>Divestiture Package</u>

429. Change currently sells four claims editing solutions: ClaimCheck, ClaimsXten, ClaimsXten Select, and ClaimsXten Cloud. 8/11/22 AM Trial Tr. 13:8–17 (Wukitch). The first three products are all first-pass solutions, which are within the first-pass claims editing solution market alleged by Plaintiffs. *Id.* at 13:21–16:1. ClaimsXten Cloud is a second-pass solution. *Id.* at 16:2–8. All four products are included in the divestiture package, as is the technology "architecture around ClaimsXten[,] . . . ClaimsXten Select[,] and ClaimsXten Cloud." *Id.* at 13:8–20, 40:11–16, 40:23–41:1.

430.    The divestiture package does not include other payment-accuracy solutions offered by Change.  *Id.* at 42:8–44:12; DX-0124 at .0002.  These solutions fall outside the first-pass claims editing market alleged by Plaintiffs.

431.    The decision about which of Change's products to include in the divestiture package was made by a team of Change employees.  8/11/22 AM Trial Tr. 38:24–40:3 (Wukitch). One core member of the divestiture team was Carolyn Wukitch, Senior Vice President and General Manager, Network and Finance Management, who has decades of experience with claims editing products at Change and its predecessors and will serve as the CEO of ClaimsXten post-divestiture. *Id.* at 6:21–23, 10:18–21, 38:24–40:10.  Other departments represented on Change's internal divestiture team include corporate development, finance, legal, management, and technology.  *Id.* at 38:24–40:3.

432.    The Change divestiture team determined that Change's claims editing solutions comprised "the full suite . . . needed to have a successful claims editing business."  *Id.* at 40:17–22.

433.    Over the course of about a year, Ms. Wukitch and the Change divestiture team also engaged in a "very thoughtful," "multistep process" for determining which personnel and assets would become part of the divestiture package now slated for sale to TPG.  *Id.* at 44:19–45:11, 52:12–53:8.

434.    About 375 individuals will go with ClaimsXten.  *Id.* at 47:12–18; DX-0223.  That includes the entire 70-person clinical-content team—the "clinicians or medical coders who have responsibility for defining the clinical content."  8/11/22 AM Trial Tr. 53:13–54:2 (Wukitch).  It also includes the entire 60-person software-and-engineering team and the entire 200-person customer-success team.  *Id.* at 54:3–22.

435.    Some departments within Change support both ClaimsXten and other products.  For those departments, Ms. Wukitch and the Change divestiture team evaluated employees on a person-by-person basis, accounting for "their experience [and] their success record with claims editing." *Id.* at 45:12–46:1.  For example, out of the fifteen sales employees that support Change's payment-accuracy products, seven are going with ClaimsXten. *Id.*  Those seven sales employees "have a proven track record selling ClaimsXten." *Id.*

436.    As noted above, one of the approximately 375 individuals who will go with ClaimsXten to TPG is Ms. Wukitch herself. *Id.* at 10:18–21.  Ms. Wukitch has been working in the claims editing space since 1990. *Id.* at 10:8–10.  Today, she runs the ClaimsXten business. 8/2/22 AM Trial Tr. 105:14–25 (de Crescenzo).  She will continue to run ClaimsXten as the business's CEO post-divestiture, and more than 50% of Ms. Wukitch's compensation will be based on ClaimsXten's performance. *Id.*; 8/11/22 AM Trial Tr. 10:18–21, 11:10–12:5 (Wukitch).

437.    At Change, Ms. Wukitch has assembled a leadership team that has "largely . . . been working with this business for . . . literally decades in many cases." 8/2/22 AM Trial Tr. 106:15–24 (de Crescenzo).  That team is going with Ms. Wukitch to run the ClaimsXten business as well. *Id.*

438.    Currently, Ms. Wukitch and a team of thirty to forty people, including her leadership team, meet regularly with TPG and their consultants to plan for the post-divestiture business, set progress benchmarks, and continue to develop a marketing strategy and sales system. 8/11/22 AM Trial Tr. 79:12–80:12, 81:6–10, 84:6–85:5 (Wukitch).

439.    For all of its investments, TPG is "very clear" that, on a day-to-day basis, "management is running the business." 8/11/22 AM Trial Tr. 150:6–19 (Raj).  TPG views its role

as "put[ting] the right people in those seats and hav[ing] the management team run the companies."

*Id.*

440.    Plaintiffs' position that TPG "lacks the experience necessary to compete as effectively as Change" thus lacks support. *See* Pls.' Pretrial Br. (ECF No. 87-1) at 67. Post-divestiture, the team managing ClaimsXten will be the exact one that has been running the market-leading business for years. To reiterate, Ms. Wukitch, who has been managing ClaimsXten since 2000, will continue to run the business, 8/2/22 AM Trial Tr. 105:14–106:14 (de Crescenzo), and the rest of ClaimsXten's leadership team is joining her, *id.* at 106:15–24. That team has been together for "many, many years and are trusted by the customers and well known in the market."

*Id.*

c.    <u>TPG</u>

441.    TPG is one of the world's leading private-equity firms with approximately $109 billion in assets under management. DX-0617A at .0009.

442.    TPG is a "fundamentally growth-oriented" private-equity fund. 8/11/22 AM Trial Tr. 148:9–149:5 (Raj) ("[W]e make money from growing the businesses that we invest in, so we have a growth-oriented philosophy.").

443.    TPG accelerates growth in the businesses it acquires through organic investment, *i.e.*, research and development ("R&D") spending, and through add-on acquisitions where appropriate. *Id.* at 149:6–23 ("[U]sually it's the combination of those two, both organic investments and acquired investments, that end up forming our investment [thesis].").

444.    TPG profits from its investments primarily through "return . . . at exit," such that if TPG is successful in growing the business, then it can sell the business for more than it paid. *Id.* at 150:20–151:7. This aligns TPG's incentives with the performance of the businesses in which it is investing. *See id.*

445.     TPG has significant experience with "carve-out investments," in which TPG buys a division of a larger company and then operates it as a standalone business.  *Id.* at 151:8–22 ("Historically, [carve-out investments are] one of the deal types that we enjoy doing the most because it aligns very well with this growth transformation thesis that we have, or investment philosophy that we have.  So, we've done a number of carve-outs over the years.").

446.     In the past 18 months, TPG and its portfolio companies have completed three carve-outs of divisions worth $1 billion or more—Boomi, which was carved out of Dell; DirecTV, which was carved out of AT&T; and CarePort, which was carved out of AllScripts.  *See* DX-0619 at .0004–5.

447.     TPG's other successful carve-outs include Allogene, a biotech company carved out of Pfizer; McAfee, a cybersecurity company carved out of Intel; and Wind River, a software company also carved out of Intel.  8/11/22 PM Trial Tr. 13:1–15:3 (Raj); DX-0619 at .0005.

448.     TPG also has significant experience in the healthcare space.  TPG has been one of the most active healthcare investors in private equity, with more than $24 billion of total equity deployed since 2003.  DX-0617A at .0010.  TPG has invested in healthcare providers (through companies like Kindred Healthcare); medical products (through companies like Confluent Medical); and services and healthcare IT (through companies like WellSky).  *Id.*  TPG has also invested in the payer services category, of which ClaimsXten is a part.  *Id.*; 8/11/22 PM Trial Tr. 9:25–10:5 (Raj).

449.     On average, TPG has held its healthcare investments for approximately eight years before exiting.  8/11/22 PM Trial Tr. 8:16–9:14 (Raj); DX-0617A at .0009.

450.     On average, TPG has increased R&D spend in its healthcare companies by ███.
DX-0617A at .0009.   TPG has also contributed approximately  ██████  to mergers-and-
acquisitions activity on behalf of those companies.  *Id.*

         d.     TPG's Due Diligence

451.     TPG was first approached about acquiring ClaimsXten in January 2022.  8/11/22
AM Trial Tr. 153:1–5 (Raj).

452.     TPG spent the next "three or so months" conducting "extensive due diligence."  *Id.*
at 153:11–154:1.  TPG usually has only "four to six weeks to complete [its] diligence and make a
decision."  *Id.* at 158:23–159:13.

453.     The record therefore does not support Plaintiffs' contention that the sale process
was "rushed."  *See* Pls.' Pretrial Br. (ECF No. 87-1) at 67.

454.     There were fifteen TPG employees and three outside consulting firms involved in
the diligence process—"a big team" by TPG's standards.  8/11/22 AM Trial Tr. 154:2–14,
158:23—159:23 (Raj).

455.     TPG spent more than $10 million on the outside consultants, which is "on the high
side" for an investment opportunity the size of ClaimsXten: Bain & Company conducted market
research, Deloitte assisted on the carve-out portion, and West Monroe Partners aided in the
technology and product diligence.  *Id.* at 159:14–160:6. That price tag reflected "the importance
that [TPG] placed on" the deal.  *Id.*

456.     TPG's diligence efforts focused on four key questions.  First, "is this a good market
to invest in"?  *Id.* at 156:11–157:2.  Second, "is the company well positioned to continue its
leadership in this market?"  *Id.*  Third, is this "a company that can be separated from its parent
without issues?"  *Id.*  And fourth "can we accelerate [the company's] growth?"  *Id.*

457.    On the first question—whether the market made sense to invest in—TPG concluded that the market served by ClaimsXten is "attractive," "large," and still "growing." *Id.* at 157:3–13.  "Payers in the U.S. continue to look [for] ways to improve their operations," and "there's a need for technology" that will help payers do so. *Id.*

458.    On the second question—whether ClaimsXten would continue to lead the market—TPG concluded that "customers really valued" ClaimsXten and relied on it "day-to-day to conduct their core business." *Id.* at 157:14–25.

459.    The third question—whether the asset package TPG would acquire in the divestiture "is sufficient to operate ClaimsXten on a standalone basis"—was a "core aspect of [TPG's] due diligence." *Id.* at 160:11–14.  TPG had "every incentive to analyze that and run that to ground." *Id.* at 160:15–25.

460.    After doing so, TPG concluded that ClaimsXten is "a highly separable asset." *Id.* at 158:1–8.  That conclusion was based in part on conversations with ClaimsXten customers, who told TPG that ClaimsXten "was sold very independently to the market." *Id.* at 160:15–25.  In TPG's view, there are no assets that TPG needs to stand up ClaimsXten that is not included in the divestiture package. *Id.* at 161:10–13 ("Q. Okay.  Is there any asset -- physical, human capital, intellectual property -- that TPG believes it needs to stand up ClaimsXten, but is not included in the asset package?  A. There's not.").

461.    On the fourth question—whether TPG could accelerate ClaimsXten's growth—TPG concluded that "the company would . . . be able to grow more quickly under [TPG's] ownership than it had been." *Id.* at 158:9–22.  TPG determined that "customers were willing to pay more for better products in this space," and that TPG could help ClaimsXten deliver those

better products by investing more in "innovative seeds that the [ClaimsXten] team had planted, but maybe hadn't invested as thoroughly behind as they could have." *Id.*

462.    The ClaimsXten leadership team perceived the due-diligence efforts of potential buyers—including TPG—as "very intense" and "thorough." *Id.* at 77:12–78:13 (Wukitch). The ClaimsXten leadership team gave management presentations and hosted numerous follow-up meetings. *Id.* In answering potential buyers' questions, the ClaimsXten leadership team had help from Change personnel with business, financial, legal, and technical expertise. *Id.*

463.    Whatever Plaintiffs' criticisms of the divestiture process, those criticisms do not speak to ClaimsXten's ability to compete post-divestiture.

e.    Capital Structure of the Divestiture

464.    There are no financing conditions on the divestiture. 8/11/22 PM Trial Tr. 16:18–22 (Raj). Equity is fully committed by TPG and debt is fully committed by a group of lenders. *Id.*

465.    TPG will put $1.2 billion of equity into the acquisition, and the remaining $1 billion will be debt financed. *Id.* at 16:23–17:4. That capital structure is "typical" for a TPG investment, "particularly in the software area." *Id.* at 17:23–18:4.

466.    The capital structure for the ClaimsXten deal was based on a "careful analysis" of the business's profitability and cash flows, and does not call into question TPG's ability to provide capital for R&D and other purposes. *Id.* at 17:9–22, 18:16–19:11. Given ClaimsXten's "recurring revenue" and "high [customer] retention rates," it is "very difficult to imagine" that ClaimsXten would struggle with debt payments. *Id.* at 18:5–15. TPG therefore is "not concerned" about ClaimsXten covering its debt. *Id.* at 19:12–16.

467.    If ClaimsXten did have trouble covering its debt, however, TPG would "be prepared to . . . invest more equity and retire some of that debt to reduce the debt burden." *Id.* at 18:5–15.

468.    The Department of Justice has recognized that "funding from private equity and other investment firms [can be] important to the success of" a divestiture precisely because such firms may have "flexibility in investment strateg[ies], [be] committed to the divestiture, and [be] willing to invest more when necessary."  Antitrust Div., U.S. Dep't of Justice, *Merger Remedies Manual* 24–25 (Sept. 2020) (DX-0777 at .0027–28).

f.    Relationship between UHG and TPG

469.    TPG has done three prior deals with UHG.  8/11/22 PM Trial Tr. 4:12–20 (Raj).  All three deals were done at "arm's length," and were "heavily and hotly negotiated," *see id.* at 5:3–9, and no evidence supports Plaintiffs' suggestion that TPG's past deals with UHG will cause post-divestiture ClaimsXten to compete any less vigorously in the market for first-pass claims editing solutions, *id.* at 5:16–22 ("Q. Will the fact that TPG has done deals in the past with UnitedHealth Group in any way impact the vigor with which ClaimsXten will compete in the marketplace assuming the transaction goes forward?  A. No, absolutely not.  We're going to do the very best we can with this investment irrespective of any history."); *id.* at 5:10–15 ("All of our portfolio company investments need to stand on their own and be as successful as they can be on their own.").

470.    As part of the divestiture, UHG and TPG have entered a transition services agreement ("TSA").  DX-0579 at .0108–236; DX-0783.  The Department of Justice regularly agrees to divestitures with TSAs.  *See United States v. Danfoss A/S*, 2021 WL 5707762, at *8 (D.D.C. Oct. 26, 2021) (Nichols, J.); Final Judgment at 14–15, *United States v. Gray Television, Inc.*, No. 1:21-cv-02041-CJN (D.D.C. Oct. 25, 2021), ECF No. 11; *United States v. CVS Health Corp.*, 2019 WL 4793060, at *3–4 (D.D.C. Sept. 4, 2019).

471.    The TSA runs for nine months, with the option of three one-month extensions. 8/11/22 AM Trial Tr. 164:22–165:6 (Raj); DX-0783 at .0003, and the services UHG will provide

are related to "back-office parts of the business"—*e.g.*, "finance systems, IT systems, HR systems"—that are "not customer facing or product oriented."  8/11/22 AM Trial Tr. 166:9–25 (Raj).

472.    The existence, duration, and scope of the TSA are all "very typical" for carve-out transactions.  *Id.* at 165:7–9 (duration), 165:18–166:8 (existence), 166:9–25 (scope).

473.    Every transition service that ClaimsXten needs to run successfully post-divestiture is included in the TSA.  *Id.* at 165:10–17 ("Q. Okay.  And, again, I'm not going to ask you about the details of this agreement, but are there any transition services that TPG believes it needs to carve-out ClaimsXten successfully that it is not slated to receive, assuming the transaction goes forward?  A. No.  Everything we need is in here.  It's, as you can see, 80 pages of very, very detailed line-item services that will be provided, and we feel this is sufficient.").

474.    The Department of Justice repeatedly has approved divestitures involving transition service agreements, including divestitures in the healthcare sector.  *E.g.*, *CVS Health*, 407 F. Supp. 3d at 49 (granting motion for entry of final judgment, which required that "CVS must, at WellCare's option, enter into an administrative services agreement to provide WellCare with all of the services required to manage the divestiture assets through the 2019 plan year, which ends on December 31, 2019, including contracting with pharmacy networks, administering the plans' formularies, and providing back-office support and claims administration functions"), *judgment entered*, 2019 WL 4793060 (D.D.C. Sept. 4, 2019).

g.    ClaimsXten's Competitive Prospects

475.    ClaimsXten is the "market leader" in first-pass claims editing solutions and has held this position since it was sold as a standalone product by McKesson prior to the formation of the joint venture between Change and McKesson Technologies.  8/2/22 PM Trial Tr. 95:11–21 (Turner); 8/11/22 AM Trial Tr. 17:8–12, 31:13–23 (Wukitch).

476.    Plaintiffs' economic expert estimates that ClaimsXten has a market share of 67.3%, PX820 at Ex. 5, and concedes that (other than UHC) nearly all of the top commercial health insurers use ClaimsXten for first-pass claims editing, *id.* at Ex. 7.

477.    ClaimsXten has a customer-retention rate of "approximately 99 percent."  8/11/22 AM Trial Tr. 21:22–23 (Wukitch); 8/2/22 PM Trial Tr. 88:4–5 (Turner) (describing the customer-retention rate as "[w]ell in excess of 95 percent").  And neither the ClaimsXten leadership team nor TPG have any concerns about ClaimsXten's ability to "compete vigorously and effectively" post-divestiture.  *See* 8/11/22 PM Trial Tr. 41:17–20 (Raj); 8/11/22 AM Trial Tr. 86:9–25 (Wukitch) ("I think we're going to be very successful . . . ."); 8/2/22 PM Trial Tr. 97:8–11 (Turner) ("Q. Do you have any doubt about whether ClaimsXten will be as competitive and as successful under TPG's ownership as it is today?  A. None, no doubts.").

478.    TPG has concrete plans to fuel further growth at ClaimsXten.  Under Change's ownership in FY2022, ClaimsXten's R&D budget was $14 million.  8/11/22 PM Trial Tr. 34:20–35:4 (Raj); DX-0402 at .0020.  TPG plans to increase that budget to $17 million in FY2023, $26 million in FY2024, $28 million in FY2025, and $30 million in FY2026.  8/11/22 PM Trial Tr. 35:20–37:18 (Raj); DX-0402 at .0020, .0031.  Thus, within four years, TPG plans to more than double ClaimsXten's most recent annual R&D budget.  8/11/22 PM Trial Tr. 37:19–22 (Raj).

479.    TPG expects that, with an increased R&D budget, ClaimsXten will be able to improve its product "and accelerate revenues as a result."  *Id.* at 40:22–41:16.

480.    In light of TPG's plans to increase ClaimsXten's R&D budget substantially, the record does not support Plaintiffs' contention that ClaimsXten's debt obligations "would limit the available capital for research and development."  *See* Pls.' Pretrial Br. (ECF No. 87-1) at 66–67.

481.    Moreover, Plaintiffs' comparison between ClaimsXten's anticipated annual debt payments and annual R&D spending is "an apples-versus-oranges sort of comparison."  8/11/22 PM Trial Tr. 18:16–19:11 (Raj).  The fact that ClaimsXten's annual debt payments will outstrip its annual R&D budgets is not "relevant or surprising."  *Id.*

482.    TPG's plans to increase ClaimsXten's R&D budget also belie Plaintiffs' contention that, because TPG is a private-equity firm, it "would not be motivated to make significant investments in developing new or innovative products that may become commercialized outside of TPG's narrow investment horizon."  *See* Pls.' Pretrial Br. (ECF No. 87-1) at 65.

483.    TPG has clear financial incentives to grow ClaimsXten before exiting the investment.  In response to the Court's question, "[a]m I right that TPG, you personally, and your investors, benefit through this acquisition more the better that ClaimsXten performs?," TPG's co-managing partner responded, "[a]bsolutely," going on to say "the better [a] company does between the time we buy it and the time we're ready to sell it, the more money someone will pay us for that asset." 8/11/22 PM Trial Tr. 90:15–18, 91:8–14 (Raj); *see also id.* at 91:15–23 (Raj) ("[The Court:] . . . [N]et-net, the better ClaimsXten does between now and whatever might happen in 2026, whether it's a sale, a continued ownership, et cetera, the -- if, at that time, when you assess the value of the business in 2026, the better that ClaimsXten has performed in the interim, the more valuable it will be to you as an asset.  Correct?  A[:] That's 100 percent right.").  The reverse is equally true.  When asked by the Court, "[i]s there any world in which you, personally, TPG, as an entity, and the investors do better if ClaimsXten performs poorly," Mr. Raj responded, "[a]bsolutely not."  *Id.* at 90:19–22.

484.    Moreover, TPG's average investment window on its healthcare businesses has been eight years.  *Id.* at 8:16–9:14; 8/11/22 AM Trial Tr. 149:24–150:5 (Raj); DX-0617A at .0009; *see*

*also* 8/15/22 AM Trial Tr. 89:19–90:16 (Murphy) ("Sometimes [private equity firms] hold them for long periods of time, sometimes they hold them for shorter, but the key is, they're going to hold it as long as they can where they think they're the best owner, where they can do the best to grow it, and then pass it off to somebody else who can use it even better after they get rid of it.").

485.    Plaintiffs have presented no evidence that TPG would fail to support an innovation that would be commercialized outside of TPG's investment window.  Likewise, Plaintiffs have presented no evidence that the market would inaccurately appraise the value of any yet-to-be-commercialized innovation if TPG elected to sell ClaimsXten before the innovation were ready for market.

486.    Plaintiffs contend that a TPG-owned ClaimsXten would not be as competitive because the divestiture would force ClaimsXten "to operate as a standalone business" rather than as "part of a broad end-to-end suite of payment accuracy products."  *See* Pls.' Pretrial Br. (ECF No. 87-1) at 65.

487.    No payer in the case testified that they would prefer to buy ClaimsXten as part of a broader suite of payment-accuracy products.  In fact, Plaintiffs never even asked the only live payer witness about this subject.

488.    Indeed, no payer witness in the case testified that they had any concerns about the divestiture at all.  Two payer witnesses testified live at trial.  One, a former employee of Cigna, said nothing about the divestiture. ███████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████ Another two payer witnesses testified by deposition.  One, an employee of Anthem, said nothing about the divestiture.  The other, an

employee of Cigna, testified that she was not even aware of the divestiture.  PX1005 at 167:01–04 (Dill).

489.     In addition, the ClaimsXten leadership is unaware of any payer that currently uses ClaimsXten having told Change that they are unlikely to continue using the product post-divestiture.  8/11/22 AM Trial Tr. 142:1–6 (Wukitch).

490.     Multiple Change witnesses testified that they were not aware of any payer that has ever bought ClaimsXten because it is part of a broader suite of products.  8/2/22 PM Trial Tr. 95:22–25 (Turner) ("Q. Are you aware of any instances where Change won primary claims editing business from a customer because ClaimsXten was a part of an end-to-end suite?  A. No."); 8/11/22 AM Trial Tr. 38:15–18 (Wukitch) ("Q. And are you aware of any instance where a customer purchased ClaimsXten because ClaimsXten was sold alongside another payment accuracy solution?  A. No.").

491.     Further, "[p]robably 90 percent" of ClaimsXten's current customers began purchasing the product when it was owned by McKesson and sold as a standalone product.  8/11/22 AM Trial Tr. 17:1–7, 141:20–25 (Wukitch).  That includes Aetna, Anthem, and Cigna.  *Id.* at 130:21–132:10, 141:21–25.  It was while McKesson was selling ClaimsXten as a standalone product that it first became the market leader.  *Id.* at 17:8–12.

492.     Plaintiffs also argue that a TPG-owned ClaimsXten would not be as competitive because it could not sell "integrated payment accuracy solutions," including Change's potential Real-Time Settlement product.  *See* Pls.' Pretrial Br. (ECF No. 87-1) at 66.

493.     No evidence exists showing that ClaimsXten is, or ever has been, a component of Change's Real-Time Settlement project.

494.    Multiple Change witnesses testified that ClaimsXten is not, and never has been, a component of Real-Time Settlement.  8/11/22 AM Trial Tr. 34:6–12 (Wukitch) ("Q. Is there any integration between ClaimsXten and the Real-Time Settlement development project that's going on at Change Healthcare?  A. No, there is not.  Q. Has ClaimsXten ever been integrated into something called Real-Time Settlement?  A. No, it has not been."); *see also* 8/2/22 PM Trial Tr. 93:13–24 (Turner).

495.    More broadly, no evidence shows that Change's first-pass claims editing solutions are technologically integrated with any other Change product.

496.    Multiple Change witnesses testified that Change's first-pass claims editing solutions are not technologically integrated with any other Change product.  8/11/22 AM Trial Tr. 18:16–19 (Wukitch) ("Q. Is [ClaimsXten] technically integrated with any other products?  A.: No, it is not.  Q: It operates on its own code?  A: Yes, it has its own standalone technology code."); *see also* 8/2/22 AM Trial Tr. 101:13–17 (de Crescenzo); 8/2/22 PM Trial Tr. 91:1–7 (Turner).

497.    Change's standard second-pass claims editing solution also is not technologically integrated with any other Change product other than its primary editing products.  8/2/22 PM Trial Tr. 91:8–11 (Turner).

498.    Change did a "custom project" for one payer that integrated Change's second-pass claims editing solution and its Insight Record Review product.  *Id.*

499.    Post-divestiture, "the functionality [of the custom work done for that payer] will remain the same." 8/11/22 AM Trial Tr. 37:20–38:6 (Wukitch).  "The only thing different is the contract will be with two different companies for those respective products"—the second-pass claims editing solution, on the one hand, and Insight Record Review, on the other.  *Id.*

500. ██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

501. ██████████████████████████████████████

████████████████████████████████████████

502.     In any event, the sole payer for whom Change has done custom work combining ClaimsXten and Insight Record Review is "not happy with the results."  8/11/22 AM Trial Tr. 36:18–22 (Wukitch).

503.     ClaimsXten has no plans to do similar custom work for any other payers, and no plans to market the custom work related to Insight Record Review.  *Id.* at 37:10–19.

## CONCLUSIONS OF LAW

1.     ***Elements and Burden.***  Section 7 of the Clayton Act prohibits a merger if, "in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition."  15 U.S.C. § 18.

2.     This language has long been interpreted to prohibit transactions only where harm to competition is reasonably "likely" or "probable."  *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 & n.39 (1962)); *see also United States v. Baker Hughes Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990) (Thomas, J.) ("[T]he ultimate issue" in a Section 7 case is "whether a transaction is likely to lessen competition substantially."); *United States v. SunGard Data Sys., Inc.*, 172 F. Supp. 2d 172, 180 (D.D.C. 2001) ("To establish a Section 7 violation, plaintiff must show that a pending acquisition is reasonably likely to cause anticompetitive effects.").

3.      To be "likely" or "probable," there must be a "reasonable probability" of harm to competition, *Brown Shoe*, 370 U.S. at 325; *AT&T*, 916 F.3d at 1032, meaning that such harm is "sufficiently probable and imminent' to warrant relief," *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 115 (D.D.C. 2004) (quotations omitted).

4.      Plaintiffs consistently have tried to water down the Section 7 standard, highlighting over and over again that they need only show "that the effect of the proposed transaction 'may be'" to harm competition. *See, e.g.*, Pls.' Pretrial Br. (ECF No. 87-1) at 11 (citation omitted); *see also id.* at 23, 43, 54, 78; 8/1/22 AM Tr. Tr. 16:22–17:1 (Pls.' Opening) ("Section 7 prohibits mergers and acquisitions where the effect may be substantially to lessen competition or tend to create a monopoly.  That is the standard, Judge, that Congress set, and Congress was deliberate in its wording when it chose the word 'may'.").

5.      But the Supreme Court has made clear that "[t]he use of these words ('may be') means that" the Clayton Act applies, not "to the mere possibility" of harm to competition, "but only to the reasonable probability of" harm.  *Brown Shoe*, 370 U.S. at 323 n.39 (citation omitted). Congress's deliberate choice in Section 7 was to prevent "[m]ergers with a probable anticompetitive effect"; "no statute was sought for dealing with ephemeral possibilities." *Id.* at 323.

6.      The "mere possibility" of harm to competition therefore is insufficient to establish a violation of Section 7.  *AT&T*, 916 F.3d at 1032 (citation omitted); *see also Brown Shoe*, 370 U.S. at 323 ("[N]o statute was sought for dealing with ephemeral possibilities.  Mergers with a probable anticompetitive effect were to be proscribed by this Act."); *Baker Hughes*, 908 F.2d at 984 ("Section 7 involves *probabilities*, *not* certainties or *possibilities*." (second and third emphases added)).

7.      To violate Section 7 of the Clayton Act, the "likely" or "probable" harm to competition also must be "substantial." *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 511 (1974); *AT&T*, 916 F.3d at 1032 ("[T]he government must show that the proposed merger is likely to *substantially* lessen competition, which encompasses a concept of 'reasonable probability.'" (citation omitted)).

8.      A federal court evaluating a merger under Section 7 must consider how a proposed merger likely will affect competition "in the market for a particular product in a particular geographic area." *Baker Hughes*, 908 F.2d at 982; *see also United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 191 (D.D.C. 2018) (holding that identification of "the relevant product and geographic market" are elements of a Section 7 claim), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019); *Arch Coal*, 329 F. Supp. 2d at 117 (D.D.C. 2004) ("Analysis of the likely competitive effects of a merger requires determination[] of . . . the transaction's probable effect on competition in the relevant product and geographic markets.").

9.      Relevant factors include market concentration, the presence or absence of significant barriers to entry, the sophistication of customers in the relevant market, access to alternative suppliers for a given product, history of foreclosure in a given market, and the nature and the terms of sale for the products at issue, among others.  *See, e.g.*, *Baker Hughes*, 908 F.2d at 984–86 (collecting authorities).  No single factor is "dispositive," as "[t]he Supreme Court has adopted a totality-of-the-circumstances approach" to Section 7.  *Id.* at 984–85.

10.      "[A]ntitrust theory and speculation cannot trump facts," and plaintiffs must prove their case "on the basis of the record evidence relating to the market and its probable future." *AT&T*, 310 F. Supp. 3d at 190 (quoting *Arch Coal*, 329 F. Supp. 2d at 116–17).

11.    ***Burden-Shifting Framework.***   The "likely" and "probable" effects of a proposed merger are evaluated using a well-established burden-shifting framework.  *See Baker Hughes*, 908 F.2d at 982–83.

12.    Under this framework, plaintiffs must first establish a *prima facie* case that the merger is likely to harm competition substantially.  *See id.* (applying the framework to a horizontal merger claim under Section 7); *AT&T*, 916 F.3d at 1032 (applying the framework to a vertical merger claim under Section 7).

13.    If plaintiffs establish a *prima facie* case, the burden of production shifts to the defendants to discredit the evidence supporting the *prima facie* case or to "present evidence that the *prima facie* case 'inaccurately predicts the relevant transaction's probable effect on future competition.'"  *AT&T*, 916 F.3d at 1032 (citations omitted); *Baker Hughes*, 908 F.2d at 991; *Arch Coal*, 329 F. Supp. 2d at 116 ("Defendants can then rebut the presumption by producing evidence that market-share statistics produce an inaccurate account of the merger's probable effects on competition in the relevant market.").

14.    This rebuttal evidence either can "affirmatively show[] why a given transaction is unlikely to substantially lessen competition" or "discredit[] the data underlying the initial presumption in the [plaintiffs'] favor."  *Baker Hughes*, 908 F.2d at 991.

15.    "[A] fairly weak prima facie case" "requires less of a rebuttal showing," *Arch Coal*, 329 F. Supp. 2d at 158, but no matter the strength of the plaintiffs' case, defendants never bear the burden of "'clearly' disprov[ing] anticompetitive effect[s]" from a transaction.  *Baker Hughes*, 908 F.2d at 991 (rejecting the proposition that a defendant must "produce evidence 'clearly' disproving future anticompetitive effects" as a "depart[ure] from settled principles" and too "heavy" a burden).

130

16.    If sufficient evidence exists that the proposed merger is not likely to harm competition in a substantial way, "the burden of producing additional evidence of anticompetitive effects shifts" back to the plaintiffs and "merges with the ultimate burden of persuasion, which remains with the [plaintiffs] at all times." *AT&T*, 916 F.3d at 1032 (quoting *Baker Hughes*, 908 F.2d at 983).

17.    In other words, at all stages of the burden-shifting process, the question remains essentially the same: considering all of the evidence in the record (whether in the plaintiffs' *prima facie* case, defendants' rebuttal case, or plaintiffs' last shot), is the proposed merger likely to lessen competition substantially in the alleged relevant markets?  *See AT&T*, 916 F.3d at 1032; *Baker Hughes*, 908 F.2d at 983.

18.    Regardless of the stage of the burden-shifting process, plaintiffs have "the ultimate burden of proving a Section 7 violation by a preponderance of the evidence," with a "failure of proof in ***any*** respect" meaning "the transaction should not be enjoined."  *AT&T*, 310 F. Supp. 3d at 189 (emphasis added) (citations omitted); *see also Baker Hughes*, 908 F.2d at 983 (stating that "the ultimate burden of persuasion . . . remains with the [plaintiffs] at all times"); *Arch Coal*, 329 F. Supp. 2d at 116 ("[P]laintiffs have the burden on every element of their Section 7 challenge, and a failure of proof in any respect will mean the transaction should not be enjoined.").

19.    ***Principles Governing Horizontal Claims.***  "The basic outline of a [S]ection 7 horizontal acquisition case is familiar.  By showing that a transaction will lead to undue concentration in the market for a particular product in a particular geographic area," plaintiffs "establish[] a presumption that the transaction will substantially lessen competition."  *Baker Hughes*, 908 F.2d at 982 (footnote omitted).

20.     To evaluate market concentration in the post-transaction world, a federal court compares a market's concentration before and after the proposed merger, *id.* at 982–83; *Arch Coal*, 329 F. Supp. 2d at 116, 123–24, to determine whether "the proposed 'merger would produce a firm controlling an undue percentage share of the relevant market, and would result in a significant increase in the concentration of firms in that market,'" *AT&T*, 310 F. Supp. 3d at 192 (citations omitted).

21.     An evaluation of market concentration necessarily entails consideration of the transaction being challenged and the post-transaction participants in the relevant market. *See, e.g.*, Mem. Op. at 3, *FTC v. Arch Coal, Inc.*, No. 1:04-cv-00534-JDB (D.D.C. July 7, 2004), ECF No. 67 ("*Arch Coal* Mem. Op."); *Arch Coal*, 329 F. Supp. 2d at 116, 124–25.

22.     Although "there is a lack of clear precedent providing an analytical framework for addressing the effectiveness of a divestiture that has been proposed to remedy an otherwise anticompetitive merger," *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 72 (D.D.C. 2015), it is well established that a "transaction" being challenged under the Clayton Act can include multiple agreements related to the disposition of the relevant business, *see Arch Coal* Mem. Op. at 5.  *See also* Pl.'s Mot. *in Limine* to Exclude or Limit Evid. of Defs.' Arbitration Offer at 6, *United States v. AT&T, Inc.*, No. 1:17-cv-02511-RJL (D.D.C. Mar. 13, 2018), ECF No. 85 (explaining that divestiture agreements and amended merger agreements change the "structure" of the relevant transaction being considered under Section 7).

23.     Even when a transaction is technically structured "as two separate transactions rather than one three-way agreement," that "structural choice" is not "dispositive."  *Arch Coal* Mem. Op. at 4.  That is because, no matter how the transaction is structured, the real-world result for purposes of evaluating future market conditions is the same: post-merger and post-divestiture,

the acquiring entity and the divestiture buyer will be market participants whereas the acquired business will not.  *See id.*

24.     In a case involving a divestiture, therefore, the "transaction" being challenged "in reality" is "the merger agreement including [any] divestiture."  *See id.* at 5 ("The Court therefore concludes that the transaction that is the subject of the FTC's challenge is properly viewed as the set of two transactions involving the acquisition of Triton by Arch and the immediate divestiture of the Buckskin mine to Kiewit."); *FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 51 (D.D.C. 2002) (analyzing the amended merger agreement, not the original merger agreement, in evaluating the government's *prima facie* case).

25.     The only disputed questions are who bears the burden of addressing the competitive implications of a divestiture and what are the proper standards for evaluating those implications.

26.     Under one line of cases, plaintiffs bear the burden of showing that the combined effect of a transaction and divestiture will be likely to lessen competition substantially.  *See Arch Coal* Mem. Op. at 6 ("[T]he burden is on the FTC to convince this Court that its judgment is correct that the Arch-Triton merger including the Kiewit transaction raises questions so serious, substantial, difficult[,] and doubtful as to make the challenged transactions fair ground for permanent injunction proceedings . . . ."); *Libbey*, 211 F. Supp. 2d at 51 (considering amended merger agreement at the *prima facie* stage of the burden-shifting analysis).

27.     Under a different line of cases, defendants bear the "burden to show that a proposed divestiture will replace the merging firm's competitive intensity."  *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 304 (D.D.C. 2020); *Sysco*, 113 F. Supp. 3d at 73 (holding that defendants bear the burden of showing that the premerger level of competition will be maintained).

28.     The Court need not resolve this legal question on the record presented here because Plaintiffs' case fails regardless of who bears the burden of proof or what the standard for competition in the post-merger world is.  As set forth in UHG's and Change's Proposed Findings of Fact and Conclusions of Law, and UHG's and Change's Post-Trial Brief, Plaintiffs almost entirely ignored the divestiture during their case in chief and failed to counter the substantial evidence presented that the divestiture will maintain or enhance competition in the market for first-pass claims editing, not diminish it.  *See supra* FOF ¶¶ 418–503; Defs.' Post-Trial Br. at 6–13.

29.     As an analytical matter, however, requiring plaintiffs to bear the burden of establishing a substantial lessening of competition in a world with a divestiture best comports with: (i) the text of Section 7; (ii) the burden-shifting framework used to evaluate mergers; and (iii) and the parties' respective burdens of proof and production.

30.     ***First***, requiring defendants to show that a divestiture will "[r]estor[e] competition" by "replacing the competitive intensity lost as a result of the merger," *see Sysco*, 113 F. Supp. 3d at 72 (emphasis omitted) (quoting Antitrust Div., U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies 5 (Oct. 2004)), imposes a heightened standard wholly divorced from the text of the Clayton Act.

31.     The plain text of Section 7 makes clear that the Clayton Act does not prohibit every merger with a marginal adverse effect on competition.  Section 7 prohibits only those mergers that are likely "*substantially* to lessen competition."  15 U.S.C. § 18 (emphasis added).

32.     Thus, in demanding that divestitures preserve the exact level of intensity or competition that existed pre-transaction improperly elevates the substantive standard under Section 7 beyond what the text will bear.

33.   **Second**, requiring defendants to bear the burden of production on divestiture-related issues improperly shifts the burden of production to defendants absent any showing of market concentration.

34.   To be entitled to a presumption of anticompetitive effects in a horizontal merger, plaintiffs must show a likely concentration in the relevant market in the **actual** post-merger world, *Baker Hughes*, 908 F.2d at 982–83; *AT&T*, 310 F. Supp. 3d at 192; *Arch Coal*, 329 F. Supp. 2d at 116, 123–24, not a counterfactual world that arbitrarily excludes a divestiture buyer as a market participant.  *See Arch Coal*, 329 F. Supp. 2d at 125 (summarizing "market concentration measurements . . . based on Arch's acquisition of the North Rochelle mine and Kiewit's [the divestiture buyer's] acquisition" of the acquired entity's second mine).  In other words, plaintiffs should not be entitled to a presumption against a merger, and thus improperly shift the burden of production to defendants, where no post-merger market concentration is likely to exist as the consequence of a divestiture.  *See id.*

35.   **Third**, requiring plaintiffs to bear the burden on divestiture-related issues is most consistent with the fact that "the ultimate burden of persuasion" in a Section 7 case "remains with [plaintiffs] at all times.  *Baker Hughes*, 908 F.2d at 983.  It is black-letter law in this circuit that defendants at no point bear the burden of making a "clear showing" that a proposed merger is not likely to harm competition in a substantial way, as such a standard would "move far toward forcing a defendant to rebut a probability with a certainty."  *See id.* at 983, 989, 992.

36.   In any event, and regardless of where the burden is allocated, courts evaluating a divestiture's effect on competition consider, among other factors, "the likelihood of the divestiture; the experience of the divestiture buyer; the scope of the divestiture[;] the independence of the

divestiture buyer from the merging seller[;] and the purchase price." *RAG-Stiftung*, 436 F. Supp. 3d at 304.

37.     A federal court has authority to order a divestiture in an action brought pursuant to the Clayton Act. *United States v. CVS Health Corp.*, 2019 WL 4793060, at *2–4 (D.D.C. Sept. 4, 2019) (ordering a divestiture); *see also United States v. Danfoss A/S*, 2021 WL 5707762, at *5–9 (D.D.C. Oct. 26, 2021) (Nichols, J.) (same); Final Judgment at 9–15, *United States v. Gray Television, Inc.*, No. 1:21-cv-02041-CJN (D.D.C. Oct. 25, 2021), ECF No. 11 (same). Pursuant to 16 C.F.R. § 802.70, a divestiture ordered by a federal court "in an action brought by the Federal Trade Commission or the Department of Justice" is exempted from the filing requirements of the Hart-Scott-Rodino Antitrust Improvements Act.

38.     ***Principles Governing Vertical Claims.***   A vertical merger joins firms "standing in a supplier-customer relationship." *Brown Shoe*, 370 U.S. at 323.

39.     Courts have recognized that "[v]ertical mergers often generate efficiencies and other procompetitive effects." *AT&T*, 310 F. Supp. 3d at 197; *see also id.* at 193 (noting "the recognition among academics, courts, and antitrust enforcement authorities alike that 'many vertical mergers create vertical integration efficiencies between purchasers and sellers'" (citation omitted)); *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 840 (D.C. Cir. 2006) (Kavanaugh, J.) ("[V]ertical integration creates efficiencies for consumers."); *Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982, 990 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("Vertical integration and vertical contracts in a competitive market encourage product innovation, lower costs for businesses, and create efficiencies—and thus reduce prices and lead to better goods and services for consumers.").

40.    Indeed, the Department of Justice itself has recognized that "[v]ertical mergers 'are less likely than horizontal mergers to create competitive problems,'" Pl.'s Proposed Conclusions of Law ¶ 22, *United States v. AT&T Inc.*, No. 1:17-cv-02511-RJL (D.D.C. May 8, 2018), ECF No. 127 (quoting U.S. Dep't of Just., *Non-Horizontal Merger Guidelines* § 4 (1984)), largely because "[v]ertical mergers combine complementary economic functions and eliminate contracting frictions, and therefore have the capacity to create a range of potentially cognizable efficiencies that benefit competition and consumers," U.S. Dep't of Justice & Fed. Trade Comm'n, *Vertical Merger Guidelines* 11 (2020) (DX-0776 at .0013).

41.    Influential scholars and jurists have made the same point, noting the pervasiveness and pro-consumer bent of vertical integration.  *See, e.g.*, Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 7.06[A] (4th ed.) ("[V]ertical integration is ubiquitous and practically infinite in its variety.  In the great majority of cases, no anticompetitive consequences can be attached to it, and injury to competition should never be inferred from the mere fact of vertical integration."); Robert H. Bork, *The Antitrust Paradox* 245 (1978) ("[I]n the absence of a most unlikely proved predatory power and purpose, antitrust should never object to the verticality of any merger."); Douglas H. Ginsburg, *Vertical Restraints: De Facto Legality Under the Rule of Reason*, 60 Antitrust L.J. 67, 76 (1991) ("If there is any legitimate role for the regulation of vertical restraints . . . it is only in such near-monopoly markets.").

42.    "[B]ecause vertical mergers produce no immediate change in the relevant market share," the "short cut" available in a horizontal case—*i.e.*, a "presumption" of anticompetitive effects based on "statistics about the change in market concentration"—is unavailable to support vertical theories of competitive harm.  *AT&T*, 916 F.3d at 1032.  In other words, unlike in a horizontal merger case, there is no presumption of harm in a vertical merger case under Section 7

of the Clayton Act. *See id.*; *see also AT&T*, 310 F. Supp. 3d at 192 (stating there is "no presumption of harm in play").

43.     Plaintiffs instead "must make a 'fact-specific' showing that the effect of the proposed merger 'is likely to be anticompetitive.'" *AT&T*, 310 F. Supp. 3d at 192 (citation omitted); *see also* Pl.'s Proposed Conclusions of Law ¶ 22, *United States v. AT&T Inc.*, No. 1:17-cv-02511-RJL (D.D.C. May 8, 2018), ECF No. 127 ("[T]he very point of a trial is to engage in a fact-intensive inquiry in order to determine whether the particular merger at hand indeed has a reasonable likelihood of harming competition and consumers.").

44.     "Nothing less than a comprehensive inquiry" into the "structure, history[,] and probable future" of a market is expected, keeping in mind that "the Clayton Act protects 'competition,'" rather than competitors. *AT&T*, 310 F. Supp. 3d at 165, 190 (citations omitted); U.S. Dep't of Just. & Fed. Trade Comm'n, *Vertical Merger Guidelines* 2 (2020) (DX-0776 at .0004) ("The Agencies are concerned with harm to competition, not to competitors.").

45.     Plaintiffs in a vertical merger case cannot carry their burden by relying on "antitrust theory and speculation." *AT&T*, 310 F. Supp. 3d at 190 (quoting *Arch Coal*, 329 F. Supp. 3d at 116–17).   Rather, they must marshal specific evidence about "competitive outcomes" that are probable and likely based on the merged firms' "abilities and incentives following a vertical merger, but would not be in the absence of the merger." U.S. Dep't of Just. & Fed. Trade Comm'n, *Vertical Merger Guidelines* 2 (2020) (DX-0776 at .0004).

46.     Factors bearing on a merged firm's ability and incentive to engage in anticompetitive conduct include: "market share" statistics, which are "the primary index of market power," *Brown Shoe*, 370 U.S. at 322 n.38; *Fruehauf Corp. v. FTC*, 603 F.2d 345, 352 n.9, 353 (2d Cir. 1979); the "structure, history[,] and probable future" of the relevant upstream and

downstream markets, *Brown Shoe*, 370 U.S. at 322 n.38; the "entry of new competition or the erection of barriers to prospective entrants" in the relevant markets, *Brown Shoe*, 370 U.S. at 322; the manner in which the merged firm could maximize its enterprise-wide profits given market dynamics, *AT&T*, 916 F.3d at 1043–44; and efficiencies generated by the merger, including the elimination of double marginalization, *Arch Coal*, 329 F. Supp. 2d at 124.

47.      In assessing whether a post-merger entity has the ability or incentives to engage in anticompetitive conduct, and to handicap its likelihood of doing so, pre-merger conduct and market history and structure can be highly persuasive.  *See AT&T*, 916 F.3d at 1039 ("The district court had to determine whether the economic theory applied to the particular market by considering evidence about the 'structure, history, and probable future' of the . . . industry." (citations omitted)); *AT&T*, 310 F. Supp. 3d at 190 ("[O]nly . . . examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger." (alterations in original) (quoting *General Dynamics*, 415 U.S. at 498)); *AT&T*, 310 F. Supp. 3d at 219 (crediting "testimony regarding executives' prior experiences in the industry" while "working within a vertically integrated company"); *see Arch Coal*, 329 F. Supp. 2d at 158 (considering the absence of any "historical evidence of actual express or tacit anticompetitive" action in the relevant market); *FTC v. Foster*, 2007 WL 1793441, at *38 (D.N.M. May 29, 2007) ("[A]ntitrust agencies rely extensively on natural market experiments to provide relevant evidence to show whether or not a transaction is likely to lessen competition. '"Natural experiments," *i.e.*, evidence [whether] the posited harm has occurred under circumstances similar to the proposed transaction, are relevant to merger analysis.'" (citation omitted)).

48.     Contrary to this precedent, Plaintiffs advance a good-for-this-case-only, ahistorical approach to past conduct, cordoning off a host of factors that speak to UHG's ability and incentive to engage in anticompetitive conduct post merger as "irrelevant," among them: the strength of UHG's firewalls, the strength of other vertically-integrated healthcare companies' firewalls, the Department of Justice's decision to bless other mergers on the theory that firewalls are an effective means of preventing the improper transfer of competitively sensitive information, and whether Optum has ever shared competitive intelligence with UHC about UHC's rivals.  *See* 8/1/22 AM Trial Tr. 13:22–14:10 (Pls.' Opening).

49.     Plaintiffs' approach is inconsistent with black-letter antitrust law.  *See, e.g.*, *AT&T*, 916 F.3d at 1039; *AT&T*, 310 F. Supp. 3d at 190; *Arch Coal*, 329 F. Supp. 2d at 158; *Foster*, 2007 WL 1793441, at *38.

50.     But Plaintiffs' position also is inconsistent with prior positions taken by the Department of Justice.  In the last vertical merger case tried in this district, the Department of Justice urged the court to consider whether there had been "[h]istorical coordination" or "other forms of [prior] cooperation" in the relevant market.  Pl.'s Proposed Conclusions of Law ¶ 69, *United States v. AT&T Inc.*, No. 1:17-cv-02511-RJL (D.D.C. May 8, 2018), ECF No. 127.  Moreover, in the horizontal merger context, the Department of Justice explicitly "look[s] for historical events, or 'natural experiments,' that are informative regarding the competitive effects of the merger."  *See* U.S. Dep't of Just. & Fed. Trade Comm'n, *Horizontal Merger Guidelines* 3 (2010).

51.     If ***anti***competitive conduct that occurred pre-merger is relevant, so too is the absence of such conduct when a pre-merger firm has the ability and incentive to engage in the same or similar conduct.

52.    Binding future commitments—even those made "shortly after the filing of [a] suit"—made to address hypothetical competitive concerns related to a transaction also have "real-world effects" and constrain a merged firm's ability and incentives to engage in certain conduct. *See AT&T*, 310 F. Supp. 3d at 241 n.51 ("I am hard-pressed to conclude that AT & T would (much less could) retreat from the commitment in light of the apparent reputational costs of doing so— costs that would imperil future negotiations in a marketplace with repeat players."); *see also AT&T*, 916 F.3d at 1044 ("AT&T's view that the government's claims of fundamental economic errors are ultimately irrelevant in light of Turner Broadcasting's irrevocable arbitration/no blackout commitment is not implausible.").

53.    Such commitments are not "akin to an admission . . . that the proposed merger would lead to the anticompetitive harms" alleged, but rather reflect the merging parties' willingness to "put [their] money where [their] mouth is." *AT&T*, 310 F. Supp. 3d at 241 n.51.

54.    It is a "principle of antitrust law" that "a business with multiple divisions will seek to maximize its total profits." *AT&T*, 916 F.3d at 1043 (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984)).  In some circumstances, the optimal strategy for maximizing corporate-wide profits will be to use one division of the business for the exclusive benefit of a sister division.  But in other circumstances, the optimal strategy will be to have the first division do business with many customers, including competitors of the sister division.  *AT&T*, 916 F.3d at 1043 (crediting the district court's conclusion that Turner Broadcasting's "spreading its content among distributors . . . would redound to the merged firm's financial benefit").  It is not "contrary to the principle of corporate-wide profit maximization" to evaluate which of those strategies will work best "in a particular industry." *See id.* at 1044.  One business unit's interest in "spreading" its products and innovations, rather than withholding them, can "redound to the merged firm's

financial benefit" and be "the best way to increase company wide profits." *Id.* at 1043–44 (citations omitted); *see also AT&T*, 310 F. Supp. 3d at 245 n.53 ("The combined entity would stand to gain much from wide distribution of Time Warner content to virtual MVPDs, and stand to lose much by refusing to do so.").

55.     Specifically with regard to the effects of a vertical merger on innovation, courts have recognized that inquiry to be notoriously difficult because the harms alleged "with respect to the loss of competitive technologies" are often "so diffuse that they could not possibly be adequately measured." *Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 975g (2022) (noting "truly formidable" proof problems in determining innovation economies).

56.     "Innovation is intangible, uncertain, unmeasurable, and often even unobservable, except in retrospect." *See* Richard T. Rapp, *The Misapplication of the Innovation Market Approach to Merger Analysis*, 64 Antitrust L.J. 19, 27 (1995). It therefore is difficult, as an economic matter, to make a fact-specific showing about "the nature of the injury claimed" under an innovation theory of harm. *See Kloth*, 444 F.3d at 324.

57.     Put differently, even though "[a]ll merger analysis must deal with the problem of attempting to predict future outcomes," innovation reduction theories pose special problems of proof because "the likely results of innovation are more speculative," making it "difficult to approach th[o]se issues with any confidence." Dennis A. Yao & Susan S. DeSanti, *Innovation Issues Under the 1992 Merger Guidelines*, 61 Antitrust L.J. 505, 508–09 (1993); *see also* Rapp, *supra*, at 45.

58.     Courts lack a "principled way" for evaluating innovation-reduction theories because there are no accepted "means for judging whether innovation is harmed or served by a merger." Rapp, *supra*, at 45; *see also* Yao & DeSanti, *supra*, at 508 ("[I]t is typically difficult to predict and appropriately value how innovation would proceed with or without the merger."). This problem is particularly acute in the context of innovations not yet in existence: applying the antitrust laws to such innovations represents an "avant-garde" and "potentially dangerous" "application of merger enforcement under Section 7 of the Clayton Act." *See* Rapp, *supra*, at 43–44.

59.     Perhaps for these reasons, it does not appear that any federal court has enjoined a proposed vertical merger on grounds that competitors would likely innovate less in a way that is likely to substantially lessen competition.

60.     ***Weighing the Evidence.*** Evidence that "it could be *possible* to act in accordance with [plainitffs'] theories of harm is a far cry from evidence that the merged company is *likely to do so* (much less succeed in generating anticompetitive harms as a result)." *AT&T*, 310 F. Supp. 3d at 210 (emphases added). Any testimony and documentary evidence, or excerpts thereof, must be viewed in light of all "other evidence related to the motivation for the challenged merger . . . that came out at trial." *Id.*

61.     Documents containing "'informal speculation' about 'rationales for the merger" are of limited relevance to the probabilistic inquiry under Section 7, as are materials "generated by individuals 'who had no decision-making role or authority in relation to the merger.'" *Id.* at 209 (citations omitted). Ordinary-course business documents must be considered in light of their "context, circumstances, and foundation," and the fact that certain statements "were contained in

a preliminary draft and were subsequently removed or changed" is reason to assign them less weight. *Id.* at 204, 208.

62.     In evaluating the testimonial evidence, the absence of third-party and competitor testimony is significant.  It counts as a "strike against" an alleged "theory of competitive harm" if "the record is barren of any contentions by . . . third-party competitors that they would" behave as plaintiffs predict they would in the post-merger world. *Id.* at 214.

63.     Where competitor or customer testimony is offered, however, it should be met with "[c]aution" because there is a risk that such testimony may reflect competitors' "self-interest rather than genuine concerns about harm to competition." *Id.* at 211.

64.     Third-party testimony that is "speculative" or that "simply accept[s] key assumptions . . . without any supporting analysis or data" should be discounted and given little to no weight. *Id.* at 212; *see also Arch Coal*, 329 F. Supp. 2d at 146 ("Customers do not, of course, have the expertise to state what *will* happen in the SPRB market, and none have attempted to do so.  The Court therefore concludes that the concern of some customers in the SPRB market that the transactions will lessen competition is not a persuasive indication that coordination among SPRB producers is more likely to occur.").

65.     Competitor and customer testimony that has not been proven to be representative of relevant competitor and customer views likewise should receive little to no weight. *SunGard Data Sys.*, 172 F. Supp. 2d at 192 & n.23 ("[T]he record does not indicate whether the customers cited by plaintiff [in 50 declarations] are representative of the entire universe of shared hotsite clients . . . .   On the contrary, since defendants have submitted an equal or greater number of conflicting statements, one can only conclude that the statements submitted by both parties prove very little, if anything at all."); *see also United States v. Engelhard Corp.*, 126 F.3d 1302, 1306

(11th Cir. 1997) ("No matter how many customers in each end-use industry the Government may have interviewed, those results cannot be predictive of the entire market if those customers are not representative of the market.").

66.     Opinions of customers and competitors "must be viewed in light of their actual behavior." *FTC v. Owens-Illinois, Inc.*, 681 F. Supp. 27, 38 n.32 (D.D.C.), *vacated as moot*, 850 F.2d 694 (D.C. Cir. 1988) (per curiam); *see* Ken Heyer, *Predicting the Competitive Effects of Mergers by Listening to Customers*, 74 Antitrust L.J. 87, 123 n.71 (2007) ("[E]vidence consisting of how consumers actually have behaved under particular conditions in the past can be more reliable and, hence, more valuable, than consumer statements about how they are likely to behave if and when faced with such conditions in the future.").

67.     Applying these well settled principles to this case, Plaintiffs' claims fall far short. Plaintiffs' horizontal claims fail because the proposed divesture defeats any suggestion of concentration in the market for first-pass claims editing.  Plaintiffs also have failed to offer any meaningful evidence that ClaimsXten will not continue to be the market-leading first-pass claims editing solution, as it was as a standalone product at McKesson for nearly a decade.

68.     Plaintiffs' vertical theories likewise fail because they depend upon a daisy chain of speculation that disregards UHG's unbroken track record of safeguarding rival health insurers' data and presumes, without support, that, post-merger, UHG will abandon its multi-payer business strategy; jettison its firewall policies; break its contractual commitments; and risk catastrophic legal, reputational, and financial harms to attract an uncertain number of new large group employers and national accounts for its commercial insurance business.

69.     "Things might change" is not a cognizable theory of antitrust harm.  Because Plaintiffs have failed to establish even a *prima facie* case, judgment should be entered in UHG's

and Change's favor, Plaintiffs' request for a permanent injunction should be denied, and the divestiture of ClaimsXten to TPG should be ordered.

Dated:  August 31, 2022

Respectfully submitted,

By:  */s/ Craig S. Primis*
       Craig S. Primis

Matthew J. Reilly, P.C. (D.C. Bar No. 457884)
Craig S. Primis, P.C. (D.C. Bar No. 454796)
K. Winn Allen, P.C. (D.C. Bar No. 1000590)
Richard Cunningham (D.C. Bar. No. 1644119)
T.J. McCarrick (D.C. Bar. No. 219283)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone:  (202) 389-5000
Facsimile:  (202) 389-5200
matt.reilly@kirkland.com
craig.primis@kirkland.com
winn.allen@kirkland.com
tj.mccarrick@kirkland.com

Alexia R. Brancato (NY0467)
**KIRKLAND & ELLIS LLP**
600 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
alexia.brancato@kirkland.com

Charles Loughlin (D.C. Bar. No. 448219)
Justin W. Bernick (D.C. Bar. No. 988245)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone:  (202) 637-5600
Facsimile:  (202) 637-5910
chuck.loughlin@hoganlovells.com
justin.bernick@hoganlovells.com

*Counsel for Defendant UnitedHealth Group Incorporated*

Sara Y. Razi (D.C. Bar No. 473647)
Abram J. Ellis (D.C. Bar No. 497634)
Nathaniel Preston Miller (D.C. Bar No. 1021557)
**SIMPSON, THACHER & BARTLETT LLP**
900 G Street, NW
Washington, DC 20001
Telephone:  (202) 636-5500
Facsimile:  (202) 636-5502
sara.razi@stblaw.com
aellis@stblaw.com
preston.miller@stblaw.com

David I. Gelfand (D.C. Bar No. 416596)
Daniel P. Culley (D.C. Bar No. 988557)
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
2112 Pennsylvania Ave, N.W.
Washington, DC 20037
Telephone:  (202) 974-1500
Facsimile:  (202) 974-1999
dgelfand@cgsh.com

*Counsel for Defendant Change Healthcare Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 31st day of August 2022, a copy of the foregoing Proposed Findings of Fact and Conclusions of Law of Defendants UnitedHealth Group Incorporated and Change Healthcare Inc. was electronically transmitted to the Clerk of Court using the CM/ECF system, which will transmit notification of such filing to all registered participants.

/s/ *Craig S. Primis*

Craig S. Primis, P.C. (D.C. Bar No. 454796)