UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>UNITEDHEALTH GROUP INCORPORATED, *et al.*,<br><br>    *Defendants*. | Civil Action No. 1:22-cv-0481 (CJN) |

**UNITEDHEALTH GROUP INCORPORATED AND CHANGE HEALTHCARE INC.'S RESPONSE TO PLAINTIFFS' NOTICE OF AUTHORITY**

  Though styled as a notice of authority in response to the Court's questions during closings, Plaintiffs' submission in truth recycles arguments and citations that appeared in Plaintiffs' *Daubert* motion (ECF No. 108-1) and/or their post-trial briefing (ECF No. 119). Even with the benefit of a second (or third) bite at the apple, however, Plaintiffs have failed to accurately recount the relevant legal principles regarding market power or the framework for evaluating a divestiture, and none of their supplemental citations should change the outcome of this case.

  ***First***, in suggesting that courts have enjoined vertical mergers "where the merged entity would not have market power in either the upstream or downstream market," Plaintiffs overstate the law. *See* Pls.' Notice of Authority (ECF No. 128-1) at 1. A merged entity's market power is clearly relevant to establishing a substantial lessening of competition on a vertical claim under Section 7 of the Clayton Act. Plaintiffs' cited cases prove the point. In *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), the Supreme Court acknowledged that "market power" as measured by "the shares of the market controlled by industry leaders and the parties to the merger" is always

1

a starting point for Section 7 analysis, but that, in most cases, "only a further examination of the particular market—its structure, history[,] and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger." *Id.* at 322 n.38; *see also id.* at 328–29.  Far from suggesting that market power was irrelevant to the evaluation of a vertical claim, *Brown Shoe* expressly considered market concentration in the upstream and downstream markets alleged in that case.  *See id.* at 331–32 (evaluating concentration in the markets for shoe manufacturing and shoe retailing).  Likewise, *Ford Motor Co. v. United States*, 405 U.S. 562 (1972), considered the impact of power and concentration in the market for cars on the related market for spark plugs, affirming the district court's conclusion that the acquisition would have the "result of transmitting the rigidity of the oligopolistic structure of the automobile industry to the spark plug industry, thus reducing the chances of future deconcentration of the spark plug market by forces at work within that market." *Id.* at 568.

The point, then, is not that market power in an upstream market is a required element of a vertical claim under Section 7, but that such power is relevant to a vertical claim because it speaks to a merged firm's ability to substantially lessen competition in a downstream market.  In an initial decision issued just last week, the Chief Administrative Law Judge of the Federal Trade Commission (FTC) rejected an FTC vertical-merger challenge, highlighting "the degree of market power that would be possessed by the merged enterprise and the number and strength of competing suppliers and purchasers" as among the "[m]ost important factors." *In re Illumina, Inc.*, No. 9401, at 133 (FTC Sept. 9, 2022) (quoting *Fruehauf v. FTC*, 603 F.2d 345, 353 (2d Cir. 1979)) (attached as Exhibit A).  This observation is consistent with well-established case law underscoring the importance of market power in evaluating the competitive effects of a vertical merger.  *See, e.g., Fruehauf*, 603 F.2d at 352–53 & n.9; *Alberta Gas Chems. Ltd. v. E.I. du Pont de Nemours & Co.*,

826 F.2d 1235, 1246 (3d Cir. 1987); *Crane Co. v. Harsco Corp.*, 509 F. Supp. 115, 124–25 (D. Del. 1981); *Crouse-Hinds Co. v. InterNorth, Inc.*, 518 F. Supp. 416, 431–32 (N.D.N.Y. 1980); *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018) (explaining in a case under § 1 of the Sherman Act that "[v]ertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market"). To the extent Plaintiffs suggest otherwise, their position should be rejected.

***Second***, Plaintiffs' articulation of the legal standard governing the evaluation of divestitures confirms that they seek a counter-factual and atextual test that loads the dice in their favor. As a threshold matter, Plaintiffs seek to benefit from a presumption of market concentration that is not "likely" to exist in the post-merger world. To "establish[] a presumption that [a] transaction will substantially lessen competition," Plaintiffs must establish "undue market concentration in the market for a particular product in a particular geographic area." *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982 (D.C. Cir. 1990). In assessing whether plaintiffs have made that showing, a federal court compares concentration in a given market before and after a proposed merger, taking into account the "likely" future state of the relevant market. *See id.* at 982–83; *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 123–24 (D.D.C. 2004). This includes, and of necessity must include, consideration of the transaction at issue and what that transaction would "likely" mean in terms of the post-merger players in the relevant market. *See* Mem. Op. at 3, *FTC v. Arch Coal, Inc.*, No. 1:04-cv-00534-JDB (D.D.C. July 7, 2004), ECF No. 67("*Arch Coal* Mem. Op."); *FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 51 (D.D.C. 2002).

Under any real-world analysis, Plaintiffs should not be entitled to any presumption of anticompetitive effects where, as here, a complete divestiture will result in ***no*** increase in market concentration. Plaintiffs offer no authority, and UHG and Change are aware of none, supporting

the proposition that antitrust plaintiffs are entitled to a presumption against a single transaction that involves the simultaneous acquisition and complete divestiture of assets that would otherwise create a horizontal merger problem. The result should be no different here simply because the transaction is structured "as two separate transactions rather than one three-way agreement." *Arch Coal* Mem. Op. at 4; *Libbey*, 211 F. Supp. 2d at 51 (analyzing amended merger agreement in evaluating government's prima facie case). Whether structured as one transaction or two, the real-world result for purposes of considering future market conditions is the same: pre-merger and post-divestiture, there will be no increased concentration in the relevant market, meaning that Plaintiffs must show a substantial lessening of competition by some other means. *Arch Coal* Mem. Op. at 4. Pretending otherwise is flatly inconsistent with Section 7's requirement that the Court consider "record evidence relating to the market and its **probable** future." *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 190 (D.D.C. 2018) (emphasis added; quoting *Arch Coal*, 329 F. Supp. 2d at 116–17).

Plaintiffs' supplemental submission skips over this analytical step almost entirely, relegating its discussion of how to treat a divestiture under the burden-shifting framework to a footnote. *See* Pls.' Notice of Authority at 2 n.1. Plaintiffs' efforts to distinguish *Arch Coal* as a decision rejecting an overbroad motion *in limine* fall flat. Although decided in the context of a motion *in limine*, the court in *Arch Coal* explicitly "conclude[d] that the transaction that is the subject of the FTC's challenge is properly viewed as the set of two transactions involving the acquisition . . . and the immediate divestiture" of the relevant assets. *Arch Coal* Mem. Op. at 5. In its merits decision, the court then evaluated the market concentration that would exist after the merger **and** the divestiture. *Arch Coal*, 329 F. Supp. 2d at 125 (summarizing "different market concentration measurements … based on Arch's acquisition of the North Rochelle mine and

Kiewit's [the divestiture buyer's] acquisition of Buckskin [a second mine]"). Crucially, the court conducted that evaluation at the first step of the burden-shifting framework—that is, at the step analyzing whether antitrust enforcers have established a prima facie case. *See id.* at 129. Plaintiffs thus put the cart before the horse in claiming that Section 7 "does not permit defendants to salvage an otherwise illegal merger by showing that the transaction *less* the divested assets would not exceed [any] presumption of illegality or otherwise violate" the law. *See* Pls.' Notice of Authority at 2. In a world where ClaimsXten is divested to TPG, there is no illegal merger to begin with, and thus no market concentration that gives rise to any sort of presumption against the transaction.

Even if antitrust plaintiffs could establish a prima facie case through a merged entity's momentary ownership of soon-to-be-divested assets, such a case would be extraordinarily weak and would "require[] less of a rebuttal showing by defendants." *Arch Coal*, 329 F. Supp. 2d at 158. Indeed, producing evidence that a complete divestiture would actually occur would be sufficient to show that such a prima facie case "inaccurately predicts the relevant transaction's probable effect on future competition," *see Baker Hughes*, 908 F.2d at 991, which is all that would be required to shift the burden of production back to the plaintiffs. *Id.* Here, there can be no doubt that UHG and Change produced sufficient evidence that a complete divestiture will actually occur. Plaintiffs do not even attempt to contest that point.

Plaintiffs also distort the substantive standard for evaluating competition under Section 7, imposing a for-divestitures-only requirement that competition must be perfectly "replicated" or "restored" in the post-divestiture world. This formulation has no basis in the text of Section 7, which prohibits a transaction only if its likely effect is "***substantially*** to lessen competition." 15 U.S.C. § 18 (emphasis added). Section 7, in other words, does not prohibit every transaction that might have some non-substantial effect on competition.

Plaintiffs seemed to recognize this fact during closing. Asked by the Court whether they must "prove that there will be a substantial lessening of competition including the divestiture," Plaintiffs responded, "We have to persuade Your Honor at the end of the day, after they've come in with their divestiture evidence, that Your Honor believes that *there's a substantial lessening of competition*." See 9/8/22 Trial Tr. 163:17–23 (emphasis added); *see also id.* at 160:4–14 ("THE COURT: How can it be that, if I conclude at the end of this case -- I'm not saying I have but at the end of this case -- that, as a result of the divestiture, there will be a modest but not substantial lessening of competition. Who wins then? A: We ultimately, under Section VII, Judge, have to show you that this transaction may … lead to substantial lessening of competition. That's ultimately our burden in front of Your Honor."). Plaintiffs have not retracted that representation.

Plaintiffs cite a number of cases in support of their claim that a divestiture must perfectly "restore" or "replace" pre-merger levels of competition to pass muster under Section 7. *See* Pls.' Notice of Authority at 2 (citing *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 304 (D.D.C. 2020); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 60 (D.D.C. 2017); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 137 n.15 (D.D.C. 2016); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 72 (D.D.C. 2015)). To the extent these cases imply any standard other than one that comports with Section 7's text and binding circuit precedent, they should not be followed here. *See Cochise Consultancy, Inc. v. United States ex rel Hunt*, 139 S. Ct. 1507, 1512 (2019) ("[T]he clear text of the statute controls."). The D.C. Circuit has held in no uncertain terms that, at every stage of the burden-shifting framework for a Section 7 case, "[t]he ultimate burden of persuasion . . . remains with [plaintiffs]" and requires plaintiffs to show that a challenged transaction is "likely to substantially lessen competition." *See Baker Hughes*, 908 F.2d at 983, 989, 992. At no point do defendants bear the heightened standard of "'clearly' disprov[ing]" even probable anticompetitive effects from a

6

merger. *Id.* at 991; *see also id.* at 992 (rejecting standard that would "would move far toward forcing a defendant to rebut a probability with a certainty"). These well-settled principles rule out the heightened standard of perfect restoration or replication of competition for which Plaintiffs advocate here.

In any event, the "restore" or "replace" language in Plaintiffs' cases can be reconciled with the text of Section 7 and governing circuit precedent to the extent that competition is being "restored" or "replaced" to a level that is **not substantially less** than the pre-merger level of competition, rather than to the *exact* level of pre-merger competition. The bulk of Plaintiffs' cases trace back to a single decision from this district (*Sysco*), two versions of the Department of Justice's non-binding Merger Remedies Manual, and ultimately the Supreme Court's decision in *Ford Motor Co. v. United States*, 405 U.S. 562 (1972). In *Ford*, the Supreme Court observed that "[t]he relief in an antitrust case must be effective to redress the violations" of Section 7 "and to restore competition" in the relevant market. *See id.* at 573 (quotations omitted). Plaintiffs interpret that language from *Ford* to require a perfect restoration or replication of pre-merger competition (without ever definitively explaining what such competition entails). But that is not what *Ford* actually says, and as this Court recognized, that language is "ambiguous" and can be read only to require that defendants "establish [a] divestiture would restore a context in which there is not a substantial lessening of competition." 9/8/22 Trial Tr. 159:21–160:1; *see also Ford*, 405 U.S. at 573 n.8 (explaining that relief in a Section 7 case "must be directed to that which is necessary and appropriate in the public interest to eliminate the effects of the acquisition offensive to the statute") (quotations omitted). This latter reading is the better one because it is the only reading that squares with the text of Section 7, which is confirmed by the most recent decision cited by Plaintiffs, *FTC v. RAG-Stiftung*. 436 F. Supp. 3d 278 (D.D.C. 2020). That decision explicitly framed the

7

"threshold question" with respect to the divestiture as whether the sale of certain assets to a divestiture buyer will "replace [the prior firm's] competitive intensity," such that "***competition will not be substantially lessened in th[e] geographic market***." *Id.* at 304 (emphasis added).

*United States v. E.I. du Pont de Nemours & Co*, 366 U.S. 316 (1961)—which did not involve a complete divestiture package like the one that exists in this case—is not to the contrary. It is true that *du Pont* observed that "[t]he burden is not on the Government to show de novo that" an alternative to a divestiture remedy "would violate [§] 7" for that remedy to be discounted. *Id.* at 331. But that statement was made in service of *du Pont*'s ultimate conclusion that, for a remedial decree to be inadequate, "[i]t need only appear that the decree entered leaves a substantial likelihood that the tendency towards monopoly of the acquisition condemned by [§] 7 has not been satisfactorily eliminated." *Id.* at 331–32. Contrary to Plaintiffs' suggestion, *du Pont* thus confirms UHG's and Change's articulation of the relevant legal standard and makes clear that the touchstone for evaluating divestitures is the same substantial-lessening standard used to evaluate Plaintiffs' prima facie case.[1]

Plaintiffs' suggestion of gamesmanship is equally baseless and should stand as no obstacle to this Court ordering the divestiture pursuant to 16 C.F.R. § 802.70. Plaintiffs conducted a 14-

---

[1] Plaintiffs cannot escape the import of Section 7 by recasting the divestiture as a "remedy." The divestiture is not a "remedy" in the usual sense (*i.e.*, a court-ordered fix for a violation of law), but is simply a future market condition in the post-merger world. Regardless of how the divestiture is labeled, however, Plaintiffs are not entitled to have the proposed merger evaluated under nonbinding antitrust merger guidelines concerning remedies, particularly where Plaintiffs—in keeping with what now appears to be standard policy at the Antitrust Division—refused to even consider a consent decree or negotiated solution regarding the complete divestiture of ClaimsXten. *See* Jonathan Kanter, Assistant Attorney General, Antitrust Div., U.S. Dep't of Just., Remarks to the New York State Bar Association Antitrust Section (Jan. 24, 2022) ("I am concerned that merger remedies short of blocking a transaction too often miss the mark. . . . [I]n my view, when the division concludes that a merger is likely to lessen competition, in most situations we should seek a simple injunction to block the transaction.").

month pre-suit investigation during which they received two Rule 30(b)(6) depositions on the subject of the proposed divestiture, in addition to obtaining access to the entire data room for the sale of ClaimsXten.  During litigation, Plaintiffs conducted two additional Rule 30(b)(6) depositions on the proposed divestiture, deposed two executives from the divestiture buyer (one of whom appeared at trial), and received written discovery and document productions from the parties and third parties about the divestiture process.  Plaintiffs had ample time and opportunity to vet the divestiture and to present evidence of any perceived inadequacies.

In any event, the review provisions of the Hart-Scott-Rodino Antitrust Improvements Act do not alter this Court's inquiry in analyzing a Section 7 claim: whether there will likely be a substantial lessening of competition in the post-merger world.  UHG and Change have been engaging with the Department of Justice on a proposed divestiture from the very beginning of this investigation.  In fact, this very divestiture was offered to the Department of Justice in December 2021, months before Plaintiffs' complaint was filed.  There has been nothing approaching gamesmanship here, as the record makes abundantly clear.

In closing, it bears emphasis that, although Plaintiffs are mistaken about the legal framework for evaluating a divestiture, UHG and Change prevail even under Plaintiffs' standard. The divestiture of ClaimsXten will result in no change in market share in first-pass claims editing; it includes an asset that historically has been marketed as a standalone product; that asset will be supported by over 300 employees and management with extensive experience in the product market; and an experienced private-equity buyer has committed to substantial research-and-development investments in the product.  The divestiture will therefore enhance, not substantially lessen, competition in the relevant market.

Dated:  September 16, 2022

Respectfully submitted,

By: */s/ Craig S. Primis*
    Craig S. Primis

| | |
|---|---|
| Matthew J. Reilly, P.C. (D.C. Bar No. 457884)<br>Craig S. Primis, P.C. (D.C. Bar No. 454796)<br>K. Winn Allen, P.C. (D.C. Bar No. 1000590)<br>Richard Cunningham (D.C. Bar. No. 1644119)<br>T.J. McCarrick (D.C. Bar. No. 219283)<br>**KIRKLAND & ELLIS LLP**<br>1301 Pennsylvania Avenue, N.W.<br>Washington, DC 20004<br>Telephone:  (202) 389-5000<br>Facsimile:  (202) 389-5200<br>matt.reilly@kirkland.com<br>craig.primis@kirkland.com<br>winn.allen@kirkland.com<br>tj.mccarrick@kirkland.com | Sara Y. Razi (D.C. Bar No. 473647)<br>Abram J. Ellis (D.C. Bar No. 497634)<br>Nathaniel Preston Miller (D.C. Bar No. 1021557)<br>**SIMPSON, THACHER & BARTLETT LLP**<br>900 G Street, NW<br>Washington, DC 20001<br>Telephone:  (202) 636-5500<br>Facsimile:  (202) 636-5502<br>sara.razi@stblaw.com<br>aellis@stblaw.com<br>preston.miller@stblaw.com |
| Alexia R. Brancato (NY0467)<br>**KIRKLAND & ELLIS LLP**<br>600 Lexington Avenue<br>New York, NY 10022<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900<br>alexia.brancato@kirkland.com | David I. Gelfand (D.C. Bar No. 416596)<br>Daniel P. Culley (D.C. Bar No. 988557)<br>**CLEARY GOTTLIEB STEEN & HAMILTON LLP**<br>2112 Pennsylvania Ave, N.W.<br>Washington, DC 20037<br>Telephone:  (202) 974-1500<br>Facsimile:  (202) 974-1999<br>dgelfand@cgsh.com |
| Charles Loughlin (D.C. Bar. No. 448219)<br>Justin W. Bernick (D.C. Bar. No. 988245)<br>**HOGAN LOVELLS US LLP**<br>555 Thirteenth Street, NW<br>Washington, D.C. 20004<br>Telephone:  (202) 637-5600<br>Facsimile:  (202) 637-5910<br>chuck.loughlin@hoganlovells.com<br>justin.bernick@hoganlovells.com | *Counsel for Defendant Change Healthcare Inc.* |
| *Counsel for Defendant UnitedHealth Group Incorporated* | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 16th day of September 2022, a copy of the foregoing UnitedHealth Group Incorporated and Change Healthcare Inc.'s Response to Plaintiffs' Notice of Authority was electronically transmitted to the Clerk of Court using the CM/ECF system, which will transmit notification of such filing to all registered participants.

                                                  /s/ *Craig S. Primis*
                                                Craig S. Primis, P.C. (D.C. Bar No. 454796)