# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:22−cv−00481−CJN

| | |
|---|---|
| UNITED STATES OF AMERICA et al v. UNITEDHEALTH GROUP INCORPORATED et al <br> Assigned to: Judge Carl J. Nichols <br> Cause: 15:1 Antitrust Litigation | Date Filed: 02/24/2022 <br> Date Terminated: 09/19/2022 <br> Jury Demand: None <br> Nature of Suit: 410 Anti−Trust <br> Jurisdiction: U.S. Government Plaintiff |

**Non−Party Petitioner**

**ABILITY NETWORKS INC.**          represented by  **Olivia Houston**
DLA PIPER LLP (US)
500 8th Street NW
Washington, DC 20004
202−799−4396
Email: olivia.houston@us.dlapiper.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Non−Party Petitioner**

**AVAILITY, L.L.C.**          represented by  **Amanda L. Wait**
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW
Washington, DC 20001
202−662−4550
Email: amanda.wait@nortonrosefulbright.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Esha Kamboj**
NORTON ROSE FULBRIGHT US LLP
799 9th Street, NW
Suite 1000
Washington, DC 20001
(202) 662−0307
Fax: (202) 662−4643
Email: esha.kamboj@nortonrosefulbright.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**UNITED STATES OF AMERICA**          represented by  **Aruna Maya Khan**
DOJ−ATR
Antitrust Division
450 Fifth Street NW
Suite 7000
Washington, DC 20530

202−549−2163
Email: maya.khan@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Ashley D. Kaplan**
U.S. DEPARTMENT OF JUSTICE
Antitrust Division
450 5th Street, N.W.
Washington, DC 20001
202−598−8784
Email: ashley.kaplan@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Benjamin Holland Able**
U.S. DEPARTMENT OF JUSTICE
Antitrust Division
450 Fifth Street NW
Suite 4100
Washington, DC 20530
202−290−6319
Email: benjamin.able@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Bindi R. Bhagat**
DOJ−ATR
Antitrust
450 5th Street, NW
Suite 7100
Washington, DC 20001
202−595−2962
Email: bindi.bhagat@usdoj.gov
*ATTORNEY TO BE NOTICED*

**David M. Stoltzfus**
DOJ−ATR
Antitrust Division
450 5th Street, NW
Suite 4100
Washington, DC 20530
202−598−2978
Fax: 202−307−5802
Email: david.stoltzfus@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Erin Leigh Craig**
DOJ−ATR
Antitrust Division
450 5th Street NW
Suite 7100
Washington, DC 20530
202−532−4791
Email: erin.craig@usdoj.gov

*ATTORNEY TO BE NOTICED*

**Garrett M. Liskey**
DOJ−ATR
Antitrust Division
450 Fifth Street, NW
Suite 4100
Washington, DC 20530
202−598−2849
Email: garrett.liskey@usdoj.gov
*ATTORNEY TO BE NOTICED*

**George Charles Nierlich**
DOJ−ATR
450 Fifth Street NW
Suite 7100
Washington, DC 20530
202−368−2217
Email: george.nierlich@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Grace Lee**
DOJ−ATR
Competition Policy & Advocacy Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
202−227−1711
Email: grace.lee@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Janet Jaqueline Brody**
DOJ−ATR
Antitrust Division
450 Fifth Street, NW.
Suite 7100
Washington DC, DC 20530
202−616−1947
Email: janet.brody@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jared Bond**
DOJ−ATR
Antitrust Division
950 Pennsylvania Avenue NW
Suite 3412
Washington, DC 20530
202−550−1092
Email: jared.bond@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jennifer A. Wamsley**
DOJ−ATR

Antitrust Division
450 Fifth Street NW
Suite 7100
Washington, DC 20530
202−705−6340
Fax: 202−616−8544
Email: jennifer.wamsley@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jeremy C. Keeney**
U.S. DEPARTMENT OF JUSTICE
450 Fifth Street, NW
Suite 4100
Washington, DC 20530
202−372−5922
Email: Jeremy.Keeney2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jill Christine Maguire**
U.S. DEPARTMENT OF JUSTICE
Antitrust Division
450 5th Streeet, NW
Suite 4100
Washington, DC 20530
202−598−8805
Email: jill.maguire@usdoj.gov
*ATTORNEY TO BE NOTICED*

**John M. Briggs**
DOJ−ATR
Antitrust Division
450 Fifth Street, NW
Suite 8700
Washington, DC 20530
202−676−6131
Email: john.briggs@usdoj.gov
*ATTORNEY TO BE NOTICED*

**John Lindermuth**
DOJ−ATR
Antitrust Division
450 Fifth Street NW
Suite 7646
Washington, DC 20001
978−877−7671
Email: john.lindermuth@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Joseph Adamson**
DOJ−ATR
Antitrust Division
450 5th Avenue NW

Ste 4100
Washington, DC 20530
202−718−7745
Email: joseph.adamson@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Marissa Doran**
DOJ−ATR
450 5th Street NW
Washington, DC 20530
202−230−6732
Email: marissa.doran@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Mark Rohan**
DOJ−ATR
Healthcare and Consumer Products Section
450 5th Street NW
Suite 4100
Washington, DC 20530
202−674−6258
Email: mark.rohan@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Markus Alexander Brazill**
DOJ−ATR
Department of Justice
450 Fifth Street, NW
Washington, DC 20530−0001
202−549−5489
Email: markus.brazill@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Karr**
DOJ−ATR
Technology and Digital Platforms Section
450 5th Street NW
Suite 7100
Washington, DC 20001
202−598−2240
Email: ryan.karr@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Ryan M. Sandrock**
SHOOK HARDY
Antitrust Division
555 Mission
San Francisco, CA 94102
415−852−2594
Email: rsandrock@shb.com
*TERMINATED: 09/19/2022*
*ATTORNEY TO BE NOTICED*

**Sonia M. Orfield**
DOJ−CIV
Antitrust Division
450 4th Street, N.W.
Room 4642
Washington, DC 20530
202−598−8713
Email: sonia.orfield@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Travis Richard Chapman**
DOJ−ATR
450 5th Street NW
Suite 7100
Washington, DC 20530
202−353−9006
Email: travis.chapman@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Vittorio Cottafavi**
DOJ−ATR
450 5th Street NW
Suite 7100
Washington, DC 20530
202−598−8229
Email: vittorio.cottafavi@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Eric Damian Welsh**
U.S. DEPARTMENT OF JUSTICE
Antitrust Division
450 Fifth Street, NW
Washington, DC 20530
(202) 598−8681
Fax: (202) 305−1190
Email: eric.welsh@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**STATE OF MINNESOTA**

represented by **Elizabeth R. Odette**
MINNESOTA ATTORNEY GENERAL's
OFFICE
445 Minnesota Street
Suite 1400
Saint Paul, MN 55101−2131
651−728−7208
Email: elizabeth.odette@ag.state.mn.us
*ATTORNEY TO BE NOTICED*

**Katherine Moerke**
OFFICE OF THE MINNESOTA

ATTORNEY GENERAL
445 Minnesota Street
Suite 1400
St. Paul, MN 55101
651−728−7174
Email: katherine.moerke@ag.state.mn.us
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**STATE OF NEW YORK**                represented by   **Olga Kogan**
NYS OFFICE OF THE ATTORNEY
GENERAL
28 Liberty Street
New York, NY 10005
212−816−8262
Email: olga.kogan@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Elizabeth McFarlane**
NYS OFFICE OF THE ATTORNEY
GENERAL
Antitrust Bureau
28 Liberty Street
New York, NY 10005
212−416−6195
Email: amy.mcfarlane@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Benjamin Julian Cole**
ATTORNEY GENERAL'S OFFICE FOR
THE STATE OF NEW YORK
28 Liberty Street
23rd Floor
New York, NY 10005
212−416−8482
Email: benjamin.cole@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Elinor R. Hoffmann**
ATTORNEY GENERAL'S OFFICE/NY
28 Liberty Street
New York, NY 10005
212−416−8269
Fax: 212−416−6015
Email: elinor.hoffmann@ag.ny.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| UNITEDHEALTH GROUP INCORPORATED | represented by | **Ashley Monet Howlett**<br>HOGAN LOVELLS US LLP<br>Columbia Square<br>555 Thirteenth Street, NW<br>Washington, DC 20004<br>202−637−3682<br>Email: ashley.howlett@hoganlovells.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
|---|---|---|

**Charles A. Loughlin**
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637−5661
Fax: (202) 637−5910
Email: chuck.loughlin@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Fitzpatrick**
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street NW
Washington, DC 20004
202−637−3668
Email: chris.fitzpatrick@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Hamilton**
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, DC 20004
202−637−5600
Email: john.hamilton@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Bernick**
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, DC 20004
(202) 637−5485
Fax: (202) 637−5910
Email: justin.bernick@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew James Reilly**
KIRKLAND & ELLIS LLP
655 15th Street, NW

Suite 1200
Washington, DC 20005
(202) 879−5140
Fax: (202) 879−5200
Email: matt.reilly@kirkland.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Molly Pallman**
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
202−637−5600
Email: molly.pallman@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexia Renee Brancato**
KIRKLAND & ELLIS LLP
Citigroup Center
601 Lexington Avenue
New York, NY 10022−4611
212−909−3344
Email: alexia.brancato@kirkland.com
*ATTORNEY TO BE NOTICED*

**Craig S. Primis**
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389−5921
Fax: (202) 389−5200
Email: craig.primis@kirkland.com
*ATTORNEY TO BE NOTICED*

**Jamie Lee**
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
202−637−6410
Email: jamie.lee@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Jeffrey David Ayer**
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
202−389−5097
Email: jeffrey.ayer@kirkland.com
*ATTORNEY TO BE NOTICED*

**Kenneth Winn Allen**

KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389−5000
Fax: (202) 389−5200
Email: winn.allen@kirkland.com
*ATTORNEY TO BE NOTICED*

**Richard Hale Cunningham**
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20005
202−389−3119
Fax: 202−389−5200
Email: rich.cunningham@kirkland.com
*ATTORNEY TO BE NOTICED*

**Sarahi Constantine Padilla**
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
202−389−5000
Fax: 202−389−5200
Email: sarahi.constantinepadilla@kirkland.com
*TERMINATED: 09/01/2022*
*ATTORNEY TO BE NOTICED*

**Terence J. McCarrick , Jr.**
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 879−5000
Email: tj.mccarrick@kirkland.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHANGE HEALTHCARE INC.**          represented by  **Abram J. Ellis**
SIMPSON, THACHER & BARTLETT
LLP
900 G Street, NW
Washington, DC 20001
(202) 636−5554
Fax: (202) 636−5502
Email: aellis@stblaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sara Young Razi**
SIMPSON THACHER & BARTLETT
LLP
900 G Street NW
Washington, DC 20001

202−636−5582
Email: sara.razi@stblaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel P. Culley**
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue NW
Washington, DC 20037
(202) 974−1500
Fax: (202) 974−1999
Email: dculley@cgsh.com
*ATTORNEY TO BE NOTICED*

**David Irving Gelfand**
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue NW
Suite 1000
Washington, DC 20037
(202) 974−1690
Fax: (202) 974−1999
Email: dgelfand@cgsh.com
*ATTORNEY TO BE NOTICED*

**Kathleen W. Bradish**
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue NW
Suite 1000
Washington, DC 20037
202−974−1500
Email: kbradish@cgsh.com
*ATTORNEY TO BE NOTICED*

**Nathaniel Preston Miller**
SIMPSON, THACHER & BARTLETT
LLP
CityPoint, 1 Ropemaker Street
London EC2Y 9HU
UK
(202) 636−5576
Email: preston.miller@stblaw.com
*ATTORNEY TO BE NOTICED*

**Stephen J. Houck**
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue, NW
District of Columbia, DC 20037
202−974−1500

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 02/24/2022 | 1 | | COMPLAINT against All Defendants (Fee Status:Filing Fee Waived) filed by UNITED STATES OF AMERICA. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons)(Welsh, Eric) (Entered: 02/24/2022) |
| 02/24/2022 | | | Case Assigned to Judge Carl J. Nichols. (znmg) (Entered: 02/24/2022) |
| 02/24/2022 | 2 | | NOTICE of Appearance by Travis Richard Chapman on behalf of UNITED STATES OF AMERICA (Chapman, Travis) (Entered: 02/24/2022) |
| 02/24/2022 | 3 | | WAIVER OF SERVICE. CHANGE HEALTHCARE INC. waiver sent on 2/24/2022, answer due 4/25/2022. (Chapman, Travis) (Entered: 02/24/2022) |
| 02/25/2022 | 4 | | NOTICE of Appearance by Jill Christine Maguire on behalf of UNITED STATES OF AMERICA (Maguire, Jill) (Entered: 02/25/2022) |
| 02/25/2022 | 5 | | SUMMONS (2) Issued Electronically as to CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED. (Attachment: # 1 Notice and Consent)(zeg) (Entered: 02/25/2022) |
| 02/28/2022 | 6 | | WAIVER OF SERVICE. UNITEDHEALTH GROUP INCORPORATED waiver sent on 2/24/2022, answer due 4/25/2022. (Chapman, Travis) (Entered: 02/28/2022) |
| 03/02/2022 | 7 | | NOTICE of Appearance by Matthew James Reilly on behalf of UNITEDHEALTH GROUP INCORPORATED (Reilly, Matthew) (Entered: 03/02/2022) |
| 03/02/2022 | 8 | | NOTICE of Appearance by Craig S. Primis on behalf of UNITEDHEALTH GROUP INCORPORATED (Primis, Craig) (Entered: 03/02/2022) |
| 03/02/2022 | 9 | | NOTICE of Appearance by Kenneth Winn Allen on behalf of UNITEDHEALTH GROUP INCORPORATED (Allen, Kenneth) (Entered: 03/02/2022) |
| 03/02/2022 | 10 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Anne McClain Sidrys, Filing fee $ 100, receipt number ADCDC−9077064. Fee Status: Fee Paid. by UNITEDHEALTH GROUP INCORPORATED. (Attachments: # 1 Declaration of A. Sidrys, # 2 Text of Proposed Order)(Allen, Kenneth) (Entered: 03/02/2022) |
| 03/02/2022 | 11 | | NOTICE of Appearance by Charles A. Loughlin on behalf of UNITEDHEALTH GROUP INCORPORATED (Loughlin, Charles) (Entered: 03/02/2022) |
| 03/02/2022 | 12 | | NOTICE of Appearance by Justin Bernick on behalf of UNITEDHEALTH GROUP INCORPORATED (Bernick, Justin) (Entered: 03/02/2022) |
| 03/02/2022 | 13 | | NOTICE of Appearance by Sara Young Razi on behalf of CHANGE HEALTHCARE INC. (Razi, Sara) (Entered: 03/02/2022) |
| 03/02/2022 | 14 | | |

| | | | NOTICE of Appearance by Abram J. Ellis on behalf of CHANGE HEALTHCARE INC. (Ellis, Abram) (Entered: 03/02/2022) |
|---|---|---|---|
| 03/02/2022 | 15 | | Joint MOTION for Protective Order *(Stipulated)* by UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order Stipulated Protective Order and Order Governing Production of Investigation Materials)(Chapman, Travis) (Entered: 03/02/2022) |
| 03/02/2022 | 16 | | NOTICE of Appearance by Nathaniel Preston Miller on behalf of CHANGE HEALTHCARE INC. (Miller, Nathaniel) (Entered: 03/02/2022) |
| 03/02/2022 | 17 | | NOTICE of Appearance by David Irving Gelfand on behalf of CHANGE HEALTHCARE INC. (Gelfand, David) (Entered: 03/02/2022) |
| 03/03/2022 | 18 | | NOTICE of Appearance by Jeremy C. Keeney on behalf of UNITED STATES OF AMERICA (Keeney, Jeremy) (Main Document 18 replaced on 3/3/2022) (zeg). (Entered: 03/03/2022) |
| 03/03/2022 | 19 | | NOTICE of Appearance by Bindi R. Bhagat on behalf of UNITED STATES OF AMERICA (Bhagat, Bindi) (Entered: 03/03/2022) |
| 03/03/2022 | 20 | | NOTICE of Appearance by Elinor R. Hoffmann on behalf of STATE OF NEW YORK (Hoffmann, Elinor) (Entered: 03/03/2022) |
| 03/03/2022 | 21 | | NOTICE of Appearance by Olga Kogan on behalf of STATE OF NEW YORK (Kogan, Olga) (Main Document 21 replaced on 3/3/2022) (zeg). (Entered: 03/03/2022) |
| 03/03/2022 | 22 | | NOTICE of Appearance by Elizabeth R. Odette on behalf of STATE OF MINNESOTA (Odette, Elizabeth) (Entered: 03/03/2022) |
| 03/03/2022 | 23 | | NOTICE of Appearance by Katherine Moerke on behalf of STATE OF MINNESOTA (Moerke, Katherine) (Entered: 03/03/2022) |
| 03/07/2022 | 24 | | STANDING ORDER. Signed by Judge Carl J. Nichols on March 7, 2022. (lccjn2) (Entered: 03/07/2022) |
| 03/07/2022 | | | MINUTE ORDER. The Court having considered Defendants' 10 Motion for Leave to Appear Pro Hac Vice of Anne McClain Sidrys, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under Local Civil Rule 83.2(d), it is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that Anne McClain Sidrys, is ADMITTED to practice before the Court pro hac vice. Signed by Judge Carl J. Nichols on March 7, 2022. (lccjn2) (Entered: 03/07/2022) |
| 03/07/2022 | 25 | | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by UNITEDHEALTH GROUP INCORPORATED (Allen, Kenneth) (Entered: 03/07/2022) |
| 03/07/2022 | 26 | | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by CHANGE HEALTHCARE INC. (Miller, Nathaniel) (Entered: 03/07/2022) |
| 03/08/2022 | 27 | | MOTION for Scheduling Order by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit − Index of Exhibits, # 4 Exhibit A − Proposed Case Schedule, # 5 Exhibit B − Feb. 24, |

| | | | |
|---|---|---|---|
| | | | 2022 Email, # 6 Exhibit C − Mar. 2, 2022 Email, # 7 Exhibit D − Mar. 7, 2022 Email, # 8 Exhibit E − Mar. 8, 2022 Email, # 9 Exhibit F − Mar. 8, 2022 Email)(Primis, Craig) (Entered: 03/08/2022) |
| 03/09/2022 | 28 | | PROTECTIVE ORDER. Signed by Judge Carl J. Nichols on March 9, 2022. (lccjn2) (Entered: 03/09/2022) |
| 03/09/2022 | | | MINUTE ORDER. Upon review of 27 Defendants' Motion for a Scheduling Order, it is ORDERED that Plaintiffs shall file a response by 5:00pm on March 10, 2022; that Defendants shall file a reply by 5:00pm on March 11, 2022; that the Parties shall address the anticipated length of trial in their respective filings; and that the Parties shall appear for an in−person hearing in Courtroom 19 at 10:00am on March 14, 2022. Signed by Judge Carl J. Nichols on March 9, 2022. (lccjn2) (Entered: 03/09/2022) |
| 03/09/2022 | 29 | | NOTICE of Appearance by Molly Pallman on behalf of UNITEDHEALTH GROUP INCORPORATED (Pallman, Molly) (Entered: 03/09/2022) |
| 03/09/2022 | 30 | | NOTICE of Appearance by Christopher Fitzpatrick on behalf of UNITEDHEALTH GROUP INCORPORATED (Fitzpatrick, Christopher) (Entered: 03/09/2022) |
| 03/09/2022 | | | Set/Reset Deadlines/Hearings: Response due by 3/10/2022. Reply due by 3/11/2022. Status Conference set for 3/14/2022 at 10:00 AM in Courtroom 19− In Person before Judge Carl J. Nichols. (zcal) (Entered: 03/09/2022) |
| 03/09/2022 | 31 | | ENTERED IN ERROR.....MOTION Permission to Appear Remotely for the Scheduled Hearing, Monday March 14, 2022, 10:00 a.m. by STATE OF NEW YORK. (Kogan, Olga) Modified on 3/10/2022 (zeg). (Entered: 03/09/2022) |
| 03/10/2022 | 32 | | NOTICE of Appearance by Benjamin Julian Cole on behalf of STATE OF NEW YORK (Cole, Benjamin) (Main Document 32 replaced on 3/10/2022) (zeg). (Entered: 03/10/2022) |
| 03/10/2022 | | | NOTICE OF CORRECTED DOCKET ENTRY: re 31 MOTION Permission to Appear Remotely for the Scheduled Hearing, Monday March 14, 2022, 10:00 a.m. was entered in error and counsel was instructed to refile said pleading in proper pleading format. (zeg) (Entered: 03/10/2022) |
| 03/10/2022 | | | NOTICE OF ERROR re 31 Motion for Miscellaneous Relief; emailed to olga.kogan@ag.ny.gov, cc'd 34 associated attorneys −− The PDF file you docketed contained errors: 1. Please refile document, 2. Incorrect format (Letter) (LCvR 5.1(a)) (zeg, ) (Entered: 03/10/2022) |
| 03/10/2022 | 33 | | NOTICE of Appearance by Amy Elizabeth McFarlane on behalf of STATE OF NEW YORK (McFarlane, Amy) (Main Document 33 replaced on 3/11/2022) (zeg). (Entered: 03/10/2022) |
| 03/10/2022 | 34 | | RESPONSE re 27 MOTION for Scheduling Order filed by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit Index of Exhibits, # 2 Exhibit A − Proposed Case Schedule, # 3 Exhibit B − FILED UNDER SEAL, # 4 Exhibit C − Feb. 24, 2022 Keeney Email, # 5 Exhibit D − Mar. 2, 2022 Sidrys Email, # 6 Exhibit E − Mar. 7, 2022 Keeney Email, # 7 Exhibit F − Mar. 8, 2022 Sidrys Email, # 8 Exhibit G − Mar. 8, 2022 Keeney Email, # 9 Exhibit H − Echostar Hearing Tr. Excerpt)(Keeney, Jeremy) (Entered: 03/10/2022) |

| 03/10/2022 | 35 | | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by UNITED STATES OF AMERICA (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit A − FILED UNDER SEAL, # 2 Text of Proposed Order)(Keeney, Jeremy) (Entered: 03/10/2022) |
|---|---|---|---|
| 03/11/2022 | 36 | | REPLY to opposition to motion re 27 MOTION for Scheduling Order filed by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E)(Primis, Craig) (Entered: 03/11/2022) |
| 03/11/2022 | 37 | | ANSWER to Complaint by UNITEDHEALTH GROUP INCORPORATED.(Primis, Craig) (Entered: 03/11/2022) |
| 03/11/2022 | 38 | | ANSWER to Complaint by CHANGE HEALTHCARE INC..(Razi, Sara) (Entered: 03/11/2022) |
| 03/14/2022 | | | Minute Order and Entry for Proceedings held before Judge Carl J. Nichols: Motion Hearing held on 3/14/2022 re 27 MOTION for Scheduling Order. 27 Motion for Scheduling Order; Taken Under Advisement. Order to be issued by the Court. Court Reporter Lorraine Herman. (zcal) (Entered: 03/14/2022) |
| 03/16/2022 | 39 | | NOTICE of Appearance by Ashley D. Kaplan on behalf of UNITED STATES OF AMERICA (Kaplan, Ashley) (Main Document 39 replaced on 3/17/2022) (zeg). (Entered: 03/16/2022) |
| 03/17/2022 | | | MINUTE ORDER. Upon review of 27 Defendants' Motion for a Scheduling Order and in light of the hearing held on March 14, 2022, it is ORDERED that trial in this matter will commence at 9:00am in Courtroom 19 on Monday, August 1, 2022. Trial will last 12 days and conclude on Tuesday, August 16, 2022. Plaintiffs will have 7 days to present their case (including rebuttal) and Defendants will have 5 days. The Court is willing to consider various proposed divisions of the allotted time. It is further ORDERED that, as discussed during the March 14 hearing, the Parties shall meet and confer and file a joint status report on or before March 23, 2022 outlining a proposed scheduling order to govern further proceedings. Signed by Judge Carl J. Nichols on March 17, 2022. (lccjn2) (Entered: 03/17/2022) |
| 03/17/2022 | | | Set/Reset Deadlines/Hearings: Joint Status Report due by 3/23/2022. Bench Trial set for 8/1/2022 at 09:00 AM in Courtroom 19− In Person before Judge Carl J. Nichols. (zcal) (Entered: 03/17/2022) |
| 03/21/2022 | 40 | | NOTICE of Appearance by Ryan Thomas Karr on behalf of UNITED STATES OF AMERICA (Karr, Ryan) (Entered: 03/21/2022) |
| 03/23/2022 | 41 | | Joint MOTION for Order by UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order − Joint Proposed Scheduling and Case Management Order)(Keeney, Jeremy) (Entered: 03/23/2022) |
| 03/28/2022 | 42 | | ORDER. Signed by Judge Carl J. Nichols on March 28, 2022. (lccjn2) (Entered: 03/28/2022) |
| 03/28/2022 | | | Set/Reset Deadlines/Hearings: Brief due by 7/20/2022. Discovery due by 7/25/2022. Dispositive Motions due by 6/3/2022. Discovery Plan due by 6/21/2022. Exhibit List due by 6/30/2022. Witness List due by 5/11/2022. |

| | | | |
|---|---|---|---|
| | | | Motion in Limine due by 7/13/2022. Rebuttal due by 7/13/2022. Plaintiff Rule 26(a)(2) due by 6/6/2022. Defendant Rule 26(a)(2) due by 6/27/2022. Pretrial Conference set for 7/27/2022 at 04:00 PM in Courtroom 19− In Person before Judge Carl J. Nichols. (zcal) (Entered: 03/28/2022) |
| 04/04/2022 | 43 | | NOTICE of Appearance by Jamie Lee on behalf of UNITEDHEALTH GROUP INCORPORATED (Lee, Jamie) (Entered: 04/04/2022) |
| 04/04/2022 | 44 | | NOTICE of Appearance by Ashley Monet Howlett on behalf of UNITEDHEALTH GROUP INCORPORATED (Howlett, Ashley) (Entered: 04/04/2022) |
| 04/04/2022 | 45 | | NOTICE of Appearance by John Hamilton on behalf of UNITEDHEALTH GROUP INCORPORATED (Hamilton, John) (Entered: 04/04/2022) |
| 04/04/2022 | 46 | | NOTICE of Appearance by Terence J. McCarrick, Jr on behalf of UNITEDHEALTH GROUP INCORPORATED (McCarrick, Terence) (Entered: 04/04/2022) |
| 04/04/2022 | 47 | | NOTICE of Appearance by Alexia Renee Brancato on behalf of UNITEDHEALTH GROUP INCORPORATED (Brancato, Alexia) (Entered: 04/04/2022) |
| 04/04/2022 | 48 | | NOTICE of Appearance by Sarahi Constantine Padilla on behalf of UNITEDHEALTH GROUP INCORPORATED (Constantine Padilla, Sarahi) (Entered: 04/04/2022) |
| 04/04/2022 | 49 | | NOTICE of Appearance by Richard Hale Cunningham on behalf of UNITEDHEALTH GROUP INCORPORATED (Cunningham, Richard) (Entered: 04/04/2022) |
| 04/04/2022 | 50 | | NOTICE of Appearance by Jeffrey David Ayer on behalf of UNITEDHEALTH GROUP INCORPORATED (Ayer, Jeffrey) (Entered: 04/04/2022) |
| 04/05/2022 | 51 | | NOTICE of Appearance by Kathleen W. Bradish on behalf of CHANGE HEALTHCARE INC. (Bradish, Kathleen) (Entered: 04/05/2022) |
| 04/05/2022 | 52 | | NOTICE of Appearance by Daniel P. Culley on behalf of CHANGE HEALTHCARE INC. (Culley, Daniel) (Entered: 04/05/2022) |
| 04/05/2022 | 53 | | NOTICE of Appearance by Stephen J. Houck on behalf of CHANGE HEALTHCARE INC. (Houck, Stephen) (Entered: 04/05/2022) |
| 04/06/2022 | 54 | | NOTICE of Appearance by Mark Rohan on behalf of UNITED STATES OF AMERICA (Rohan, Mark) (Entered: 04/06/2022) |
| 04/06/2022 | 55 | | NOTICE of Appearance by John Lindermuth on behalf of UNITED STATES OF AMERICA (Lindermuth, John) (Entered: 04/06/2022) |
| 04/06/2022 | 56 | | NOTICE of Appearance by Markus Alexander Brazill on behalf of UNITED STATES OF AMERICA (Brazill, Markus) (Entered: 04/06/2022) |
| 04/07/2022 | 57 | | NOTICE of Appearance by Jennifer A. Wamsley on behalf of UNITED STATES OF AMERICA (Wamsley, Jennifer) (Entered: 04/07/2022) |
| 04/07/2022 | 58 | | |

| | | | |
|---|---|---|---|
| | | | NOTICE of Appearance by David M. Stoltzfus on behalf of UNITED STATES OF AMERICA (Stoltzfus, David) (Entered: 04/07/2022) |
| 04/08/2022 | 59 | | NOTICE of Appearance by Janet Jaqueline Brody on behalf of UNITED STATES OF AMERICA (Brody, Janet) (Main Document 59 replaced on 4/8/2022) (zeg). (Entered: 04/08/2022) |
| 05/02/2022 | 60 | | NOTICE of Appearance by Jared Bond on behalf of UNITED STATES OF AMERICA (Bond, Jared) (Main Document 60 replaced on 5/2/2022) (zeg). (Entered: 05/02/2022) |
| 05/02/2022 | 61 | | NOTICE of Appearance by Joseph Adamson on behalf of UNITED STATES OF AMERICA (Adamson, Joseph) (Main Document 61 replaced on 5/2/2022) (zeg). (Entered: 05/02/2022) |
| 05/02/2022 | 62 | | NOTICE of Appearance by Benjamin Holland Able on behalf of UNITED STATES OF AMERICA (Able, Benjamin) (Entered: 05/02/2022) |
| 05/02/2022 | | | NOTICE OF ERROR re 60 Notice of Appearance; emailed to jared.bond@usdoj.gov, cc'd 61 associated attorneys ─ The PDF file you docketed contained errors: 1. **Notice of Corrected Docket Entry:** Your entry has been modified as a courtesy. Please note the appropriate reminders for future filings; do not refile document, 2. Form is fillable; document must be a non−fillable PDF (zeg, ) (Entered: 05/02/2022) |
| 05/02/2022 | | | NOTICE OF ERROR re 61 Notice of Appearance; emailed to joseph.adamson@usdoj.gov, cc'd 61 associated attorneys ─ The PDF file you docketed contained errors: 1. **Notice of Corrected Docket Entry:** Your entry has been modified as a courtesy. Please note the appropriate reminders for future filings; do not refile document, 2. Form is fillable; document must be a non−fillable PDF (zeg, ) (Entered: 05/02/2022) |
| 05/05/2022 | 63 | | REDACTED DOCUMENT− E. Welsh letter to L. Oliver (Feb. 23, 2022) − REDACTED to 34 Response to motion,, 35 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by UNITED STATES OF AMERICA (This document is SEALED and only available to authorized persons.) by UNITED STATES OF AMERICA. (Keeney, Jeremy) (Entered: 05/05/2022) |
| 06/01/2022 | 64 | | NOTICE of Appearance by Ryan M. Sandrock on behalf of UNITED STATES OF AMERICA (Sandrock, Ryan) (Entered: 06/01/2022) |
| 06/02/2022 | 65 | | NOTICE of Appearance by Grace Lee on behalf of UNITED STATES OF AMERICA (Lee, Grace) (Main Document 65 replaced on 6/6/2022) (zeg). (Entered: 06/02/2022) |
| 06/09/2022 | 66 | | NOTICE of Appearance by Marissa Doran on behalf of UNITED STATES OF AMERICA (Doran, Marissa) (Entered: 06/09/2022) |
| 06/15/2022 | 67 | | NOTICE of Appearance by Garrett M. Liskey on behalf of UNITED STATES OF AMERICA (Liskey, Garrett) (Entered: 06/15/2022) |
| 06/22/2022 | 68 | | NOTICE of Appearance by Sonia M. Orfield on behalf of UNITED STATES OF AMERICA (Orfield, Sonia) (Entered: 06/22/2022) |
| 07/12/2022 | | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER. It is ORDERED that the pretrial conference previously scheduled for July 27, 2022 at 4:00 P.M. is RESCHEDULED for July 27, 2022 at 3:00 P.M. and will be held in Courtroom 19. Signed by Judge Carl J. Nichols on July 12, 2022. (lccjn1) (Entered: 07/12/2022) |
| 07/12/2022 | | | Set/Reset Hearings: Pretrial Conference reset for 7/27/2022 at 03:00 PM in Courtroom 19− In Person before Judge Carl J. Nichols. Note time change. (zcal) (Entered: 07/12/2022) |
| 07/13/2022 | 69 | | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Motion in Limine − Proposed Redactions Highlighted, # 2 Exhibit Motion in Limine Proposed Order, # 3 Text of Proposed Order, # 4 Certificate of Service)(Chapman, Travis) (Entered: 07/13/2022) |
| 07/13/2022 | 70 | | PRETRIAL STATEMENT by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit 1 − Plaintiffs' Witness List, # 2 Exhibit 2− Plaintiffs' Exhibit List (FILED UNDER SEAL), # 3 Exhibit 3 − Plaintiffs' Deposition Designations)(Welsh, Eric) (Entered: 07/13/2022) |
| 07/13/2022 | 71 | | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by UNITED STATES OF AMERICA (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit 2 − Plaintiffs' Exhibit List, # 2 Certificate of Service, # 3 Text of Proposed Order)(Welsh, Eric) (Entered: 07/13/2022) |
| 07/13/2022 | 72 | | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Motion in Limine with Proposed Redactions, # 2 Exhibit Motion in Limine Exhibit Index, # 3 Exhibit Motion in Limine Exhibit 1, # 4 Exhibit Motion in Limine Exhibit 2, # 5 Exhibit Motion in Limine Exhibit 3, # 6 Exhibit Motion in Limine Exhibit 4, # 7 Exhibit Motion in Limine Exhibit 5, # 8 Exhibit Motion in Limine Exhibit with proposed redactions, # 9 Exhibit Motion in Limine Exhibit with proposed redactions, # 10 Exhibit Motion in Limine Exhibit 8 with proposed redactions, # 11 Exhibit Motion in Limine Proposed Order, # 12 Text of Proposed Order Motion to File Under Seal Proposed Order, # 13 Certificate of Service)(Chapman, Travis) (Entered: 07/13/2022) |
| 07/13/2022 | 73 | | MOTION in Limine *to Exclude DX−001 and DX−002 in their Unredacted Form* by Ability Networks Inc.. (Houston, Olivia) (Entered: 07/13/2022) |
| 07/13/2022 | 74 | | PRETRIAL STATEMENT by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED. (Attachments: # 1 Appendix A − Defs.' Exhibit List, # 2 Appendix B − Defs.' Deposition Designations)(Primis, Craig) (Entered: 07/13/2022) |
| 07/13/2022 | 75 | | MOTION in Limine *TO EXCLUDE DEFENDANTS EXHIBITS OF NON−TESTIFYING THIRD PARTY WITNESSES* by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Chapman, Travis) (Entered: 07/13/2022) |

| 07/14/2022 | | | MINUTE ORDER. Upon review of 69 Plaintiffs' Motion to File a Motion in Limine under Seal, it is ORDERED that the Motion is GRANTED in part. The Court awaits Defendants' Opposition to rule on the substance of the Motion. Signed by Judge Carl J. Nichols on July 14, 2022. (lccjn2) (Entered: 07/14/2022) |
|---|---|---|---|
| 07/14/2022 | | | MINUTE ORDER. Upon review of 71 Plaintiffs' Motion to File an Exhibit List under Seal, it is ORDERED that the Motion is GRANTED. Signed by Judge Carl J. Nichols on July 14, 2022. (lccjn2) (Entered: 07/14/2022) |
| 07/14/2022 | | | MINUTE ORDER. Upon review of 72 Plaintiffs' Motion to File a Motion in Limine under Seal, it is ORDERED that the Motion is GRANTED in part. The Court awaits Defendants' Opposition to rule on the substance of the Motion. Signed by Judge Carl J. Nichols on July 14, 2022. (lccjn2) (Entered: 07/14/2022) |
| 07/19/2022 | | | MINUTE ORDER. In light of the Parties' agreement, it is ORDERED that the Parties shall file Daubert motions on or before July 26, 2022. Signed by Judge Carl J. Nichols on July 19, 2022. (lccjn2) (Entered: 07/19/2022) |
| 07/19/2022 | 76 | | NOTICE *THAT DEFENDANTS HAVE MOOTED PART OF PLAINTIFFS MOTION IN LIMINE* by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA re 72 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA (This document is SEALED and only available to authorized persons.) (Chapman, Travis) (Entered: 07/19/2022) |
| 07/19/2022 | | | Set/Reset Deadlines: Daubert Motions due by 7/26/2022. (zcal) (Entered: 07/19/2022) |
| 07/19/2022 | 77 | | NOTICE of Appearance by John M. Briggs on behalf of UNITED STATES OF AMERICA (Briggs, John) (Entered: 07/19/2022) |
| 07/19/2022 | 78 | | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by CHANGE HEALTHCARE INC. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order Regarding Motion to Seal, # 2 Defendants' Response to Plaintiffs' Motion in Limine to Exclude Defendants' Third−Party Declarations and Testimony From Defendants' Experts Relying on Those Declarations, # 3 Defendants' List of Exhibits, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Text of Proposed Order Regarding Motion in Limine, # 9 Certificate of Service)(Culley, Daniel) (Entered: 07/19/2022) |
| 07/20/2022 | 79 | | NOTICE of Appearance by Aruna Maya Khan on behalf of UNITED STATES OF AMERICA (Khan, Aruna) (Entered: 07/20/2022) |
| 07/20/2022 | 80 | | Joint STATUS REPORT *REGARDING EXHIBIT ADMISSIBILITY, DEPOSITION DESIGNATIONS, AND CONFIDENTIALITY ISSUES* by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit A, # 2 Exhibit B1, # 3 Exhibit B2)(Welsh, Eric) (Entered: 07/20/2022) |
| 07/20/2022 | 81 | | RESPONSE re 73 MOTION in Limine *to Exclude DX−001 and DX−002 in their Unredacted Form* filed by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED. (Attachments: # 1 Text of |

| | | | |
|---|---|---|---|
| | | | Proposed Order)(Primis, Craig) (Entered: 07/20/2022) |
| 07/20/2022 | 82 | | Memorandum in opposition to re 75 MOTION in Limine *TO EXCLUDE DEFENDANTS EXHIBITS OF NON−TESTIFYING THIRD PARTY WITNESSES* filed by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED. (Attachments: # 1 Text of Proposed Order)(Primis, Craig) (Entered: 07/20/2022) |
| 07/20/2022 | 83 | | MOTION for Leave to File *a Position Statement on Plaintiffs' Motion in Limine* by Availity, L.L.C.. (Attachments: # 1 Position Statement of Non−Party Availity, L.L.C., # 2 Text of Proposed Order, # 3 Certificate of Service)(Kamboj, Esha) (Entered: 07/20/2022) |
| 07/20/2022 | 84 | | Memorandum in opposition to re 72 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA (This document is SEALED and only available to authorized persons.) filed by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED. (Attachments: # 1 Declaration of P. Miller, # 2 Text of Proposed Order)(Primis, Craig) (Entered: 07/20/2022) |
| 07/20/2022 | 85 | | Joint MOTION for Order *ON THE USE OF CONFIDENTIAL INFORMATION AT TRIAL* by UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order STIPULATED ORDER ON THE USE OF CONFIDENTIAL INFORMATION AT TRIAL)(Welsh, Eric) (Entered: 07/20/2022) |
| 07/20/2022 | 86 | | MOTION for Leave to File *a Motion Pursuant to the Court's Protective Order* by Availity, L.L.C.. (Attachments: # 1 Motion for and Memorandum in Support of Order to Prohibit Public Disclosure, # 2 Declaration of Scott Herbst in Support of Motion for Order to Prohibit Public Disclosure, # 3 Text of Proposed Order, # 4 Certificate of Service)(Kamboj, Esha) (Entered: 07/20/2022) |
| 07/20/2022 | 87 | | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit PLAINTIFFS' PRETRIAL BRIEF, # 2 Certificate of Service, # 3 Text of Proposed Order)(Welsh, Eric) (Entered: 07/20/2022) |
| 07/20/2022 | 88 | | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by CHANGE HEALTHCARE INC. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order, # 2 Corrected Defendants' Response to Plaintiffs' Motion in Limine to Exclude Defendants' Third−Party Declarations and Testimony From Defendants' Experts Relying on Those Declarations, # 3 Certificate of Service)(Culley, Daniel) (Entered: 07/20/2022) |
| 07/20/2022 | 89 | | NOTICE *of Correction* by CHANGE HEALTHCARE INC. re 78 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by CHANGE HEALTHCARE INC. (This document is SEALED and only available to authorized persons.) (Culley, Daniel) (Entered: 07/20/2022) |
| 07/20/2022 | 90 | | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP |

| | | | |
|---|---|---|---|
| | | | INCORPORATED (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Defendants' Pretrial Brief, # 2 Text of Proposed Order)(Primis, Craig) (Entered: 07/20/2022) |
| 07/21/2022 | 91 | | NOTICE of Appearance by George Charles Nierlich on behalf of UNITED STATES OF AMERICA (Nierlich, George) (Entered: 07/21/2022) |
| 07/21/2022 | 92 | | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Appendix A, # 2 Certificate of Service, # 3 Text of Proposed Order)(Ellis, Abram) (Entered: 07/21/2022) |
| 07/22/2022 | | | SEALED MINUTE ORDER: Upon review of 92 Defendants Unopposed Motion to Seal and Re−file, it is ORDERED that the Motion is GRANTED. It is further ORDERED that Appendix A of Defendants Pretrial Statement filed on July 13, 2022 (ECF 74−1) shall be sealed, and a redacted version of ECF 74−1 shall be substituted on the public docket. So Ordered by Judge Carl J. Nichols on 7/22/2022. (This document is SEALED and only available to authorized persons.)(zcal) (Entered: 07/22/2022) |
| 07/22/2022 | 93 | | NOTICE of Appearance by Vittorio Cottafavi on behalf of UNITED STATES OF AMERICA (Cottafavi, Vittorio) (Entered: 07/22/2022) |
| 07/22/2022 | | | MINUTE ORDER. Upon review of 88 Defendants' Motion to File a Motion in Limine under Seal, it is ORDERED that the Motion is GRANTED. Signed by Judge Carl J. Nichols on July 22, 2022. (lccjn2) (Entered: 07/22/2022) |
| 07/22/2022 | | | MINUTE ORDER. Upon review of 73 Non−Party Ability Networks' Motion to File a Motion in Limine and in light of 81 Defendants' Response, it is ORDERED that the Motion is DENIED as MOOT. Signed by Judge Carl J. Nichols on July 22, 2022. (lccjn2) (Entered: 07/22/2022) |
| 07/22/2022 | | | MINUTE ORDER. Upon review of 83 Non−Party Availity LLC's Motion for Leave to File a Position Statement, it is ORDERED that the Motion is GRANTED. Signed by Judge Carl J. Nichols on July 22, 2022. (lccjn2) (Entered: 07/22/2022) |
| 07/22/2022 | | | MINUTE ORDER. Upon review of 86 Non−Party Availity L.L.C.'s Motion for Leave to File a Motion Pursuant to the Court's Protective order and in light of Footnote 1, it is ORDERED that the Parties shall meet−and−confer in an effort to resolve any concerns related to the potential use of Availity's Confidential Information. It is further ORDERED that the Parties shall file an update on the status of the Motion on or before 12:00pm on Wednesday, July 27, 2022. Signed by Judge Carl J. Nichols on July 22, 2022. (lccjn2) (Entered: 07/22/2022) |
| 07/22/2022 | | | MINUTE ORDER. Upon review of 87 Plaintiffs' Motion to File Under Seal its Pretrial Brief, it is ORDERED that the Motion is GRANTED. Signed by Judge Carl J. Nichols on July 22, 2022. (lccjn2) (Entered: 07/22/2022) |
| 07/22/2022 | | | MINUTE ORDER. Upon review of 90 Defendants' Motion to File Under Seal its Pretrial Brief, it is ORDERED that the Motion is GRANTED. Signed by Judge Carl J. Nichols on July 22, 2022. (lccjn2) (Entered: 07/22/2022) |
| 07/22/2022 | 94 | | |

| | | | |
|---|---|---|---|
| | | | STIPULATED ORDER. Signed by Judge Carl J. Nichols on July 22, 2022. (lccjn2) (Entered: 07/22/2022) |
| 07/22/2022 | 95 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jennifer M. Selendy, Filing fee $ 100, receipt number ADCDC−9390358. Fee Status: Fee Paid. by Availity, L.L.C.. (Attachments: # 1 Declaration of Jennifer M. Selendy, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Kamboj, Esha) (Entered: 07/22/2022) |
| 07/22/2022 | 96 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− David S. Flugman, Filing fee $ 100, receipt number ADCDC−9390520. Fee Status: Fee Paid. by Availity, L.L.C.. (Attachments: # 1 Declaration of David S. Flugman, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Kamboj, Esha) (Entered: 07/22/2022) |
| 07/22/2022 | 97 | | SUPPLEMENTAL MEMORANDUM to re 74 Pretrial Statement filed by CHANGE HEALTHCARE INC.. (Attachments: # 1 Appendix A)(Ellis, Abram) (Entered: 07/22/2022) |
| 07/22/2022 | 98 | | ERRATA − *Correct Proposed Order for David S. Flugman Pro Hac Vice Application* by AVAILITY, L.L.C. re 96 MOTION for Leave to Appear Pro Hac Vice :Attorney Name− David S. Flugman, Filing fee $ 100, receipt number ADCDC−9390520. Fee Status: Fee Paid. filed by AVAILITY, L.L.C.. (Kamboj, Esha) (Entered: 07/22/2022) |
| 07/22/2022 | 99 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Bret Matera, Filing fee $ 100, receipt number ADCDC−9390630. Fee Status: Fee Paid. by AVAILITY, L.L.C.. (Attachments: # 1 Declaration of Bret Matera, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Kamboj, Esha) (Entered: 07/22/2022) |
| 07/22/2022 | 100 | | NOTICE *of Filing of Position Statement per 7/22/22 Minute Order* by AVAILITY, L.L.C. (Kamboj, Esha) (Entered: 07/22/2022) |
| 07/22/2022 | 101 | | TRIAL BRIEF *PLAINTIFFS' PRETRIAL BRIEF (REDACTED)* by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA. (Attachments: # 1 Certificate of Service)(Welsh, Eric) (Entered: 07/22/2022) |
| 07/22/2022 | 102 | | MOTION in Limine *TO EXCLUDE DEFENDANTS THIRD PARTY DECLARATIONS AND TESTIMONY FROM DEFENDANTS EXPERTS RELYING ON THOSE DECLARATIONS (REDACTED)* by UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(Chapman, Travis) (Entered: 07/22/2022) |
| 07/22/2022 | 103 | | TRIAL BRIEF *Defendants' Amended Pretrial Brief (REDACTED)* by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED. (Primis, Craig) (Entered: 07/22/2022) |
| 07/22/2022 | 104 | | MOTION in Limine *TO STRIKE EXHIBITS, AND PROHIBIT DEFENDANTS FROM INTRODUCING UNTIMELY PRODUCED DOCUMENTS, ANY RELATED EVIDENCE, AND ANY SUMMARIES THEREOF (REDACTED)* by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit Index, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6 (REDACTED), # 8 Exhibit 7 (REDACTED), # 9 Exhibit 8 (REDACTED), # 10 Text of Proposed Order, # 11 Certificate of Service)(Chapman, Travis) |

| | | | (Entered: 07/22/2022) |
|---|---|---|---|
| 07/25/2022 | | | MINUTE ORDER. The Court having considered Non−Party Availity's 95 Motion for Leave to Appear Pro Hac Vice of Jennifer M. Selendy, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under Local Civil Rule 83.2(d), it is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that Jennifer M. Selendy, is ADMITTED to practice before the Court pro hac vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions Signed by Judge Carl J. Nichols on July 25, 2022. (lccjn2) (Entered: 07/25/2022) |
| 07/25/2022 | | | MINUTE ORDER. The Court having considered Non−Party Availity's 96 Motion for Leave to Appear Pro Hac Vice of David S. Flugman, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under Local Civil Rule 83.2(d), it is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that David S. Flugman, is ADMITTED to practice before the Court pro hac vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions Signed by Judge Carl J. Nichols on July 25, 2022. (lccjn2) (Entered: 07/25/2022) |
| 07/25/2022 | | | MINUTE ORDER. The Court having considered Non−Party Availity's 99 Motion for Leave to Appear Pro Hac Vice of Bret Matera, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under Local Civil Rule 83.2(d), it is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that Bret Matera, is ADMITTED to practice before the Court pro hac vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions Signed by Judge Carl J. Nichols on July 25, 2022. (lccjn2) (Entered: 07/25/2022) |
| 07/25/2022 | 105 | | Memorandum in opposition to re 104 MOTION in Limine *TO STRIKE EXHIBITS, AND PROHIBIT DEFENDANTS FROM INTRODUCING UNTIMELY PRODUCED DOCUMENTS, ANY RELATED EVIDENCE, AND ANY SUMMARIES THEREOF (REDACTED) [Redacted]* filed by CHANGE HEALTHCARE INC.. (Attachments: # 1 [Redacted] Defendants' List of Exhibits, # 2 Exhibit 1 [Redacted], # 3 Exhibit 2 [Redacted], # 4 Exhibit 3 [Redacted], # 5 Exhibit 4 [Redacted], # 6 Text of Proposed Order)(Culley, Daniel) (Entered: 07/25/2022) |
| 07/26/2022 | 106 | | Joint STATUS REPORT *AND PROPOSED ORDER REGARDING POTENTIAL USE OF CONFIDENTIAL INFORMATION AT TRIAL* by AVAILITY, L.L.C., UNITEDHEALTH GROUP INCORPORATED. (Flugman, David) (Entered: 07/26/2022) |
| 07/26/2022 | 107 | | TRANSCRIPT OF MOTION HEARING before Judge Carl J. Nichols, held on March 14, 2022. Page Numbers: 1−41. Date of Issuance: July 26, 2022. Court Reporter: Lorraine T. Herman. Telephone number: 202−354−3196. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter re ferenced above. After 90 days, the transcript may be accessed via PACER. Other |

| | | | |
|---|---|---|---|
| | | | transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 8/16/2022. Redacted Transcript Deadline set for 8/26/2022. Release of Transcript Restriction set for 10/24/2022.(Herman, Lorraine) (Entered: 07/26/2022) |
| 07/26/2022 | 108 | | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit PLAINTIFFS' DAUBERT MOTION TO EXCLUDE CERTAIN TESTIMONY OF DEFENDANTS' EXPERT KEVIN MURPHY BASED ON INCORRECT LEGAL STANDARD, # 2 Exhibit Index, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit Daubert Motion Proposed Order, # 8 Text of Proposed Order, # 9 Certificate of Service)(Chapman, Travis) (Entered: 07/26/2022) |
| 07/26/2022 | 109 | | Joint STATUS REPORT *ON NON−PARTY AVAILITY L.L.C.'S MOTION FOR AN ORDER PROHIBITING THE PUBLIC DISCLOSURE OF CERTAIN CONFIDENTIAL INFORMATION (ECF 86−1)* by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA. (Keeney, Jeremy) (Entered: 07/26/2022) |
| 07/27/2022 | | | MINUTE ORDER. In light of 106 the Joint Status Report, it is ORDERED that Availity's 86 Motion is DENIED as MOOT. Signed by Judge Carl J. Nichols on July 27, 2022. (lccjn2) (Entered: 07/27/2022) |
| 07/27/2022 | | | Minute Order and Entry for Proceedings held before Judge Carl J. Nichols: Final Pretrial Conference held on 7/27/2022. Deferring ruling on 69 Sealed Motion for Leave to File Document Under Seal. Denying 72 Sealed Motion for Leave to File Document Under Seal. Deferring ruling on 75 Motion in Limine. Email Courtroom Deputy Expert Reports by evening of 7/27/2022. Court Reporter: Lorraine Herman. (zcal) (Entered: 07/27/2022) |
| 07/29/2022 | 110 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Amanda L. Wait, Filing fee $ 100, receipt number ADCDC−9406683. Fee Status: Fee Paid. by AVAILITY, L.L.C.. (Attachments: # 1 Declaration of Amanda L. Wait, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Kamboj, Esha) (Entered: 07/29/2022) |
| 08/01/2022 | 111 | | Unopposed MOTION to Admit Plaintiffs' Exhibits with No Objections by UNITED STATES OF AMERICA. (Welsh, Eric) (Entered: 08/01/2022) |
| 08/01/2022 | | | Minute Entry for proceedings held before Judge Carl J. Nichols: Bench Trial began and held on 8/1/2022. Bench Trial continued to 8/2/2022 at 09:00 AM in Courtroom 19− In Person before Judge Carl J. Nichols. Court Reporter AM: Lorraine Herman / PM: Jan Dickman; Witnesses: Lynn Garbee, Kelly Dill (by |

| | | | |
|---|---|---|---|
| | | | video), and Larry Lautzenhiser. (zcal) (Entered: 08/01/2022) |
| 08/01/2022 | | | MINUTE ORDER. The Court having considered Non−Party Availity's [110] Motion for Leave to Appear Pro Hac Vice of Amanda L. Wait, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under Local Civil Rule 83.2(d), it is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that Amanda L. Wait, is ADMITTED to practice before the Court pro hac vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions Signed by Judge Carl J. Nichols on August 1, 2022. (lccjn2) (Entered: 08/01/2022) |
| 08/02/2022 | | | Minute Entry for proceedings held before Judge Carl J. Nichols: In−Person Bench Trial resumed and held on 8/2/2022. Bench Trial continued to 8/3/2022 at 09:00 AM in Courtroom 19− In Person before Judge Carl J. Nichols. Court Reporter AM: Lorraine Herman / PM: Sara Wick. Witnesses: Jeffrey Mincher (by video), Neil de Crescenzo, Mark Turner, and Tim Suther. (zcal) (Entered: 08/02/2022) |
| 08/03/2022 | | | Minute Entry for proceedings held before Judge Carl J. Nichols: Bench Trial resumed and held on 8/3/2022. Bench Trial continued to 8/4/2022 at 09:00 AM in Courtroom 19− In Person before Judge Carl J. Nichols. Court Reporter AM: Lorraine Herman / PM: Jan Dickman; Witnesses: Tim Suther, Mike Peresie, Kris Joshi, and Shiv Gopalkrishnan (by video). (zcal) (Entered: 08/03/2022) |
| 08/04/2022 | [112] | | NOTICE of Appearance by Amanda L. Wait on behalf of AVAILITY, L.L.C. (Wait, Amanda) (Entered: 08/04/2022) |
| 08/04/2022 | | | Minute Entry for proceedings held before Judge Carl J. Nichols: Bench Trial resumed and held on 8/4/2022. Bench Trial continued to 8/5/2022 at 09:00 AM in Courtroom 19− In Person before Judge Carl J. Nichols. Court Reporter AM: Lorraine Herman / PM: Sara Wick; Witnesses: Shiv Gopalkrishnan, David Wichmann, Christopher Hasslinger, and Steven Yurjevich. (zcal) (Entered: 08/04/2022) |
| 08/05/2022 | | | Minute Entry for proceedings held before Judge Carl J. Nichols: Bench Trial resumed and held on 8/5/2022. Bench Trial continued to 8/8/2022 at 9:00 AM in Courtroom 19− In Person before Judge Carl J. Nichols. Witnesses: Steven Yurjevich, Robert Musslewhite, Peter Dumont and Erin Schmuker. (Court Reporter AM−Lorraine Herman/ PM−Jan Dickman.) (dot) (Entered: 08/05/2022) |
| 08/08/2022 | | | Minute Entry for proceedings held before Judge Carl J. Nichols: In−Person Bench Trial resumed and held on 8/8/2022. Post−Trial Submissions due by 8/31/2022. Bench Trial continued to 8/9/2022 at 09:15 AM in Courtroom 19− In Person before Judge Carl J. Nichols. Court Reporter AM: Lorraine Herman / PM: Sara Wick. Witnesses: Chris Spady, Paul Higday, Professor Ben Handel, and William Golden (by video). (zcal) (Entered: 08/08/2022) |
| 08/09/2022 | | | Minute Entry for proceedings held before Judge Carl J. Nichols: In−Person Bench Trial resumed and held on 8/9/2022. Bench Trial continued to 8/10/2022 at 09:00 AM in Courtroom 19− In Person before Judge Carl J. Nichols. Court Reporter AM: Lorraine Herman / PM: Jan Dickman. Witnesses: Professor Gautam Gowrisankaran, Dirk McMahon, and Ashok Chennuru (by video). (zcal) (Entered: 08/09/2022) |

| 08/10/2022 | 113 | | Memorandum in opposition to re 108 Sealed Motion for Leave to File Document Under Seal,, filed by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED. (Primis, Craig) (Entered: 08/10/2022) |
|---|---|---|---|
| 08/10/2022 | | | Minute Entry for proceedings held before Judge Carl J. Nichols: In−Person Bench Trial resumed and held on 8/10/2022. Plaintiff's rest their case. Bench Trial continued to 8/11/2022 at 09:00 AM in Courtroom 19− In Person before Judge Carl J. Nichols. Court Reporter AM: Lorraine Herman / PM: Sara Wick. Witnesses: Ashok Chennuru (by video), Daniel Schumacher, James Mason (by video), Andrew Witty, and Thomas Gelbach. (zcal) Modified on 8/10/2022 (zcal). (Entered: 08/10/2022) |
| 08/11/2022 | | | Minute Order and Entry for Proceedings held before Judge Carl J. Nichols: Bench Trial resumed and held on 8/11/2022. Sealed Motion 108 ; DENIED for reasons set forth on the record. Bench Trial continued to 8/12/2022 at 09:00 AM in Courtroom 19− In Person before Judge Carl J. Nichols. Court Reporter AM: Jan Dickman / PM: Lorraine Herman. Witnesses: Carolyn Wukitch and Nehal Raj. (zcal) (Entered: 08/11/2022) |
| 08/12/2022 | | | Minute Entry for proceedings held before Judge Carl J. Nichols: In−Person Bench Trial resumed and held on 8/12/2022. Bench Trial continued to 8/15/2022 at 09:00 AM in Courtroom 19− In Person before Judge Carl J. Nichols. Closing Argument set for 9/8/2022 at 01:00 PM in Courtroom 19− In Person before Judge Carl J. Nichols. Court Reporter: Sara Wick. Witness: Dr. Catherine Tucker (by Zoom). (zcal) (Entered: 08/12/2022) |
| 08/15/2022 | | | MINUTE ORDER. Upon review of 111 Plaintiffs' Unopposed Motion to Admit Plaintiffs' Exhibits, and for the reasons discussed on the record on August 1, 2022, it is ORDERED that the Motion is GRANTED. It is further ORDERED that the exhibits listed in the Motion are ADMITTED. Signed by Judge Carl J. Nichols on August 15, 2022. (lccjn2) (Entered: 08/15/2022) |
| 08/15/2022 | | | Minute Entry for proceedings held before Judge Carl J. Nichols: Bench Trial resumed and held on 8/15/2022. Defense rests its case. Further Order to be issued by the Court. Closing Argument set for 9/8/2022 at 01:00 PM in Courtroom 19− In Person before Judge Carl J. Nichols. Court Reporter AM: Jan Dickman / PM: Lorraine Herman. Witnesses: Dr. Kevin Murphy and Professor Gautam Gowrisankaran. (zcal) (Entered: 08/15/2022) |
| 08/18/2022 | 114 | | MOTION to Admit Defendants' Exhibits with No Objections by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Primis, Craig) (Entered: 08/18/2022) |
| 08/18/2022 | 115 | | Unopposed MOTION for Order *Redacting/Sealing One Line of the Public August 12, 2022 AM Trial Transcript* by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Keeney, Jeremy) (Entered: 08/18/2022) |
| 08/18/2022 | | | MINUTE ORDER. Upon Plaintiffs' 115 Unopposed Motion to Redact/Seal One Line of the Public Trial Transcript, it is hereby ORDERED that the court reporter shall redact and otherwise seal the company/product named on line 6 of page 94 of the August 12, 2022 AM public trial transcript. All other portions of that trial transcript shall remain unsealed. Signed by Judge Carl J. Nichols |

| | | | |
|---|---|---|---|
| | | | on August 18, 2022. (lccjn2) (Entered: 08/18/2022) |
| 08/22/2022 | | | MINUTE ORDER. Upon review of Defendants' 114 Motion to Admit Defendants' Exhibits with No Objections, the Court hereby GRANTS the Motion and admits Defendants' Exhibits listed in Exhibit A to the Motion into evidence. Signed by Judge Carl J. Nichols on August 22, 2022. (lccjn2) (Entered: 08/22/2022) |
| 08/31/2022 | 116 | | MOTION to Withdraw as Attorney by UNITEDHEALTH GROUP INCORPORATED. (Attachments: # 1 Text of Proposed Order)(Constantine Padilla, Sarahi) (Entered: 08/31/2022) |
| 08/31/2022 | 117 | | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW, # 2 Text of Proposed Order, # 3 Certificate of Service)(Welsh, Eric) (Entered: 08/31/2022) |
| 08/31/2022 | 118 | | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Defs.' Post−Trial Brief, # 2 Defs.' Proposed Findings of Fact and Conclusions of Law, # 3 Text of Proposed Order)(Primis, Craig) (Entered: 08/31/2022) |
| 09/01/2022 | | | MINUTE ORDER. Upon review of Sarahi Constantine Padilla's 116 Motion to Withdraw as Counsel for Defendant UnitedHealth Group Incorporated, it is ORDERED that the Motion is GRANTED. Signed by Judge Carl J. Nichols on September 1, 2022. (lccjn2) (Entered: 09/01/2022) |
| 09/06/2022 | 119 | | REDACTED DOCUMENT− Pls.' Proposed Findings of Fact and Conclusions of Law (REDACTED) to 117 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA (This document is SEALED and only available to authorized persons.) by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA. (Welsh, Eric) (Entered: 09/06/2022) |
| 09/07/2022 | 120 | | REDACTED DOCUMENT− Defendants' Post−Trial Brief (REDACTED) to 118 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED (This document is SEALED and only available to authorized persons.) by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED. (Primis, Craig) (Entered: 09/07/2022) |
| 09/07/2022 | 121 | | REDACTED DOCUMENT− Defendants' Proposed Findings of Fact and Conclusions of Law (REDACTED) to 118 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED (This document is SEALED and only available to authorized persons.) by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED. (Primis, Craig) (Entered: 09/07/2022) |
| 09/07/2022 | 122 | | |

| | | | |
|---|---|---|---|
| | | | NOTICE of Appearance by Erin Leigh Craig on behalf of UNITED STATES OF AMERICA (Craig, Erin) (Entered: 09/07/2022) |
| 09/07/2022 | 123 | | Joint MOTION for Order *Releasing Non−Confidential Portions of Sealed Trial Transcripts* by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit A − 8/1/22 PM Tr. (SEALED), # 2 Exhibit B − 8/3/22 AM Tr. (SEALED), # 3 Exhibit C − 8/3/22 PM Tr. (SEALED), # 4 Exhibit D − 8/5/22 AM Tr. (SEALED), # 5 Exhibit E − 8/8/22 PM Tr. (SEALED), # 6 Exhibit F − 8/10/22 AM Tr. (SEALED), # 7 Text of Proposed Order)(Keeney, Jeremy) (Entered: 09/07/2022) |
| 09/07/2022 | 124 | | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit A − 8/1/22 PM Tr., # 2 Exhibit B − 8/3/22 AM Tr., # 3 Exhibit C − 8/3/22 PM Tr., # 4 Exhibit D − 8/5/22 AM Tr., # 5 Exhibit E − 8/8/22 PM Tr., # 6 Exhibit F − 8/10/22 AM Tr., # 7 Text of Proposed Order)(Keeney, Jeremy) (Entered: 09/07/2022) |
| 09/08/2022 | | | Minute Entry for proceedings held before Judge Carl J. Nichols: Bench Trial resumed and concluded on 9/8/2022. Oral Motion by Plaintiff's to Strike Defense's Closing Arguments; DENIED for reasons set forth on the record. Matter Taken Under Advisement. Further Order and Opinion to be issued by the Court. Court Reporter: Lorraine Herman. (zcal) (Entered: 09/08/2022) |
| 09/08/2022 | 125 | | Exhibit List by Plaintiffs. (zcal) (Entered: 09/08/2022) |
| 09/08/2022 | 126 | | Exhibit List by Defendants. (zcal) (Main Document 126 replaced on 9/14/2022) (zcal). (Entered: 09/08/2022) |
| 09/09/2022 | 127 | | MOTION to Withdraw as Attorney *Ryan Sandrock* by UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Sandrock, Ryan) (Entered: 09/09/2022) |
| 09/12/2022 | 128 | | MOTION for Leave to File *NOTICE OF AUTHORITY IN RESPONSE TO THE COURT'S QUESTIONS* by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit THE GOVERNMENT'S NOTICE OF AUTHORITY IN RESPONSE TO THE COURT'S QUESTIONS, # 2 Text of Proposed Order)(Welsh, Eric) (Entered: 09/12/2022) |
| 09/14/2022 | 129 | | Unopposed MOTION for Order *Redacting/Sealing Two Lines of the Public August 11, 2022 AM Trial Transcript* by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED. (Attachments: # 1 Appendix A − 8/11/22 AM Tr. (SEALED), # 2 Text of Proposed Order)(Razi, Sara) (Entered: 09/14/2022) |
| 09/14/2022 | 130 | | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Appendix A − 8/11/22 AM Tr., # 2 Text of Proposed Order)(Razi, Sara) (Entered: 09/14/2022) |
| 09/14/2022 | 131 | | Unopposed MOTION TO ADMIT DEPOSITION TESTIMONY CITED IN THE GOVERNMENTS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by UNITED STATES OF AMERICA. |

| | | | |
|---|---|---|---|
| | | | (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Chapman, Travis) (Entered: 09/14/2022) |
| 09/16/2022 | 132 | | RESPONSE re 128 MOTION for Leave to File *NOTICE OF AUTHORITY IN RESPONSE TO THE COURT'S QUESTIONS* filed by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED. (Attachments: # 1 Exhibit A)(Primis, Craig) (Entered: 09/16/2022) |
| 09/16/2022 | 133 | | NOTICE OF SUPPLEMENTAL AUTHORITY by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED (Attachments: # 1 Exhibit A)(Primis, Craig) (Entered: 09/16/2022) |
| 09/19/2022 | 134 | | ORDER. Signed by Judge Carl J. Nichols on September 19, 2022. (lccjn2) (Entered: 09/19/2022) |
| 09/19/2022 | | | MINUTE ORDER. Upon review of Defendants' 129 Unopposed Motion to Seal Two Lines of the Public August 11, 2022 AM Trial Transcript, it is ORDERED that the Motion is GRANTED. It is further ORDERED that the court reporter shall redact and otherwise seal the number/amount named on lines 15 and 16 of page 129 of the August 11, 2022 AM public trial transcript. All other portions of that trial transcript shall remain unsealed. Signed by Judge Carl J. Nichols on September 19, 2022. (lccjn2) (Entered: 09/19/2022) |
| 09/19/2022 | | | MINUTE ORDER. Upon review of Plaintiffs' 131 Unopposed Motion to Admit Deposition Testimony Cited in the Government's Proposed Findings of Fact and Conclusions of Law, it is ORDERED that the Motion is GRANTED. It is further ORDERED that Defendants' counter−designations to that testimony and Plaintiffs' counter−counter−designations are admitted into evidence, as provided in Exhibit A of Plaintiffs' 131 Unopposed Motion. Signed by Judge Carl J. Nichols on September 19, 2022. (lccjn2) (Entered: 09/19/2022) |
| 09/19/2022 | | | MINUTE ORDER. Upon review of Ryan Sandrock's 127 Motion to Withdraw as Counsel, it is ORDERED that the Motion is GRANTED. Signed by Judge Carl J. Nichols on September 19, 2022. (lccjn2) (Entered: 09/19/2022) |
| 09/19/2022 | 135 | | ORDER. Signed by Judge Carl J. Nichols on September 19, 2022. (lccjn2) (Entered: 09/19/2022) |
| 09/19/2022 | 136 | | SEALED MEMORANDUM OPINION. Signed by Judge Carl J. Nichols on 9/19/2022. (This document is SEALED and only available to authorized persons.)(zcal) (Entered: 09/19/2022) |
| 09/19/2022 | | | MINUTE ORDER. The 136 Memorandum Opinion has been docketed under seal because it may contain competitively sensitive information. By September 21, 2022, the parties shall meet and confer and (1) file under seal proposed redactions to the Opinion and (2) submit an editable.pdf copy of the proposed redactions, via email to Nichols_Chambers@dcd.uscourts.gov or USB drive, which will allow the Court to accept or modify the proposed redactions. A redacted version of the Memorandum Opinion shall be placed on the public docket shortly thereafter. Signed by Judge Carl J. Nichols on September 19, 2022. (lccjn2) (Entered: 09/19/2022) |
| 09/21/2022 | 137 | | SEALED DOCUMENT filed by CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED re 136 Sealed Memorandum |

| | | | |
|---|---|---|---|
| | | | Opinion, Order,, (This document is SEALED and only available to authorized persons.)(Primis, Craig) (Entered: 09/21/2022) |
| 09/21/2022 | 138 | | REDACTED MEMORANDUM OPINION. Signed by Judge Carl J. Nichols on September 21, 2022. (lccjn2) (Entered: 09/21/2022) |
| 09/21/2022 | | | MINUTE ORDER. Upon review of the Parties' proposed redactions to the 136 Sealed Memorandum Opinion, and pursuant to the Court's September 19, 2022 Minute Order, a 138 Redacted Memorandum Opinion has been placed on the public docket. The material redacted from the 138 Redacted Memorandum Opinion shall remain under seal. It is so ORDERED. Signed by Judge Carl J. Nichols on September 21, 2022. (lccjn2) (Entered: 09/21/2022) |
| 11/18/2022 | 139 | | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 135 Order, 138 Memorandum & Opinion, Order,, by STATE OF MINNESOTA, STATE OF NEW YORK, UNITED STATES OF AMERICA. Filing fee $ 505, receipt number ADCDC−9684538. Fee Status: Fee Paid. Parties have been notified. (Welsh, Eric) (Entered: 11/18/2022) |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITEDHEALTH GROUP INCORPORATED and CHANGE HEALTHCARE, INC.,<br><br>*Defendants*. | Civil Action No. 1:22-cv-0481 (CJN) |

## NOTICE OF APPEAL

Notice is hereby given that the United States of America, joined by the States of New York and Minnesota, Plaintiffs in the above-named case, hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the final judgment entered in this action on September 19, 2022.

November 18, 2022                                    Respectfully submitted,

*/s/ Elizabeth Odette*
Elizabeth Odette
James W. Canaday
Jason Pleggenkuhle
Katherine Moerke
Office of the Minnesota Attorney General
Consumer, Wage and Antitrust Division
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
Telephone: (651) 728-7208
Email: elizabeth.odette@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*


*/s/ Christopher D'Angelo*
Christopher D'Angelo (D.C. Bar No. 502220)
Olga Kogan
Elinor R. Hoffmann
Amy E. McFarlane
Benjamin J. Cole
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8262
Email: olga.kogan@ag.ny.gov

*Counsel for Plaintiff State of New York*

*/s/ Eric D. Welsh*
Eric D. Welsh (D.C. Bar No. 998612)
Jill C. Maguire (D.C. Bar No. 979595)
Travis R. Chapman
United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4100
Washington, DC 20530
Telephone: (202) 598-8681
Email: eric.welsh@usdoj.gov

*Counsel for Plaintiff United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2022, a true and correct copy of the foregoing was served on all counsel of record via electronic notification.

/s/ Eric D. Welsh
Eric D. Welsh (D.C. Bar No. 998618)
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4100
Washington, DC 20530
Tel.: (202) 598-8681
Email: eric.welsh@usdoj.gov

*Counsel for Plaintiff United States of America*

UNITED STATES OF AMERICA, *et al.*,

      *Plaintiffs*,

      v.

UNITEDHEALTH GROUP INCORPORATED
and
CHANGE HEALTHCARE, INC.,

      *Defendants*.

Civil Action No. 1:22-cv-0481 (CJN)

## MEMORANDUM OPINION

The United States, joined by New York and Minnesota (collectively, "the Government"), seeks to enjoin UnitedHealth Group's proposed acquisition of Change Healthcare. In its Complaint and pretrial filings, the Government made several allegations that, if proven, would raise serious questions about whether the proposed merger violates Section 7 of the Clayton Act. But after a thorough trial on the merits—which lasted over two weeks, included testimony from over two dozen witnesses, and introduced more than 1,000 exhibits—the Court concludes that the Government has not met its burden of proving that the transaction is likely to substantially lessen competition in the relevant markets. The Court therefore enters judgment for Defendants. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a).

## I.    Background

### A.  Healthcare Claims Processing

At a high level, payments for services in the American healthcare system proceed through a simple process: Health insurers, also known as "payers," pay medical claims submitted by

caregivers, also known as "providers."[1]  The process begins with a provider treating a patient.  The provider then submits a claim to a payer so that she can be reimbursed for her services.  Before payment is made, the payer evaluates the claim and determines how much, if anything, it should pay.  If appropriate, the payer then reimburses the provider for that amount.  The patient, of course, may be responsible for some (or perhaps even all) of the provider's bill.

This payment process, although simple in theory, is complex in practice.  Historically, payers and providers used paper and phone to communicate between and among each other and to process claims.  But this approach was costly in terms of time and money—large health insurers, after all, receive millions of claims per day.  Plaintiffs' Exhibit ("PX") 821 ¶ 24.  The process was also prone to fraud and error—problems that payers would try to remedy after-the-fact through a practice known as "pay and chase."  PX-820 ¶ 33.  Naturally, this approach to processing claims yielded substantial administrative waste, the cost of which flowed from payers to providers, and ultimately, to patients.  *Id.* at ¶ 34.

Over the years, technological innovations have revolutionized claims processing, resulting in less waste and lower costs.  Two of those innovations are center stage in this case:  claims editing and Electronic Data Interchanges (EDI).  The Government claims that the proposed acquisition will harm competition by consolidating control over these critical inputs to commercial health insurance.

## 1.  Claims Editing

Most health insurers use a payment integrity product called claims editing to adjudicate medical claims.  8/1/22 AM Trial Tr. 117:21–118:11 (Garbee).  The software implements a payer's coverage policies by using a set of rules, or "edits," to determine whether a particular claim

---

[1] Providers include physicians, hospitals, clinics, and other caregivers.

received from a provider should be paid or rejected. *See* PX-820 ¶ 40. Some of these rules are "standard" edits common to the industry—such as edits to weed out fraudulent or duplicate claims—while others are "custom" edits tailored to a particular payer's health plans and reimbursement policies. PX-1005 at 62:1–64:6 (Dill). A payer's custom edits are considered proprietary, as these edits reflect payer-specific strategies to reduce healthcare costs. 8/9/22 PM Trial Tr. 73:19–75:8 (McMahon).

The industry generally distinguishes between two types of claims editing: "first-pass" and "second-pass." PX-820 ¶ 41. First-pass claims editing automatically processes every claim that a health insurer receives—which, for certain insurers, may be millions of claims per day. *Id.* First-pass claims editing occurs early in the lifecycle of a claim—during the adjudication—and the software generates a response within milliseconds. *Id.*; 8/2/22 PM Trial Tr. 43:23–44:4 (Turner). Second-pass claims editing, by contrast, typically occurs post-adjudication and may involve significant manual review. PX-820 ¶ 42.

By helping payers avoid reimbursement for improper claims, claims editing obviates the need for the costly post-payment review typified by the "pay and chase" model. *See id.* at ¶ 33. Without claims editing, an insurer would be more vulnerable to overpayment, making it less competitive with rivals. *See* 8/9/22 PM Trial Tr. 73:6–18 (McMahon). Claims editing is therefore considered a key input for health insurers. *See id.*

### 2. EDI Clearinghouses

EDI clearinghouses are another critical input in commercial health insurance markets. Often called "pipes," EDI clearinghouses enable the electronic transmission of claims, remittances, and other information between and among payers and providers. 8/2/22 AM Trial Tr. 15:7–21, 26:4–12 (de Crescenzo). Compared to the days in which claims were transmitted by paper or by

3

phone, EDI clearinghouses facilitate much faster processing and result in much less administrative waste. PX-820 ¶ 37. Some estimates suggest that manual claim submissions can cost health insurers over ten times as much as electronic submissions. *Id.* In 2021, 97 percent of medical claims were submitted electronically, and 95 percent of providers and 99 percent of insurers used EDI clearinghouses. *Id.* at ¶ 38. Overall, the EDI clearinghouse market is "extremely competitive." 8/3/22 AM Trial Tr. 128:23–129:9 (Peresie).

To send and receive a particular EDI transaction, a payer and provider must be connected to the same EDI clearinghouse. *Id.* at 54:7–55:20. But because no EDI clearinghouse has a direct connection with every payer and provider, *id.* at 60:10–16, an indirect connection is sometimes necessary to complete a transaction, *id.* at 54:16–20. On the provider side, such a connection can be established through channel partners, which are third-party vendors that submit claims on behalf of providers. *Id.* at 58:2–59:25. Channel partners are typically connected to multiple EDI clearinghouses, enabling them to redirect claims across clearinghouses with ease. *Id.* at 121:3–20. Providers can also establish an indirect connection through trading partners, which are EDI clearinghouses that route transactions between and among each other. *Id.* at 60:10–61:7. On the payer side, an indirect connection can be established through an "EDI gateway." *Id.* at 118:21–119:11. EDI gateway vendors consolidate claims from multiple clearinghouses into a single stream that flows to the payer. *Id.* at 56:7–11. Put another way, an EDI gateway can serve as an entry point for all of a particular payer's EDI transactions. *Id.*

As one might imagine, a substantial amount of data flows through EDI clearinghouses. *See* PX-820 ¶ 36. And these data cover the entire lifecycle of a claim—both pre- and post-adjudication. Pre-adjudicated claims data include details about the provider, the patient, the employer group, the location of care, the diagnosis, the services and procedures rendered, and the billed amounts.

8/1/22 AM Trial Tr. 132:13–133:7 (Garbee). Post-adjudicated claims data can include even more information, such as details about the provider-payer contract, the payer's claims edits, the medical policy and benefit design, the final paid amount, and adjudication decisions. *Id.* at 134:17–135:23.

### B. The Commercial Health Insurance Market

On to more familiar terrain—the commercial health insurance market. Most Americans obtain their health insurance through employer-sponsored plans. 8/10/22 AM Trial Tr. 105:16–19 (Schumacher). These plans are typically divided into two groups—small group and large group— based on the number of employees. PX-820 ¶ 89. In most states, small group employers have between two and fifty employees, while large group employers have more than fifty employees.[2] *Id.* Within the large group category, the industry refers to the largest employers as "national accounts." *Id.* at ¶ 90. National accounts are generally employers with over 5,000 employees spread out across multiple states. *Id.* The industry refers to the remaining employers—generally, those with between fifty and 5,000 employees and with a smaller geographic footprint—as large group employers. *Id.* ¶¶ 89–90.

Employers typically choose either a self-funded "administrative services only" ("ASO") plan or a fully insured plan. *Id.* ¶ 91. For ASO plans, the employer covers its members' medical costs and pays the insurer a fee to administer the plan and to access the insurer's provider network. PX-1013 at 55:25–56:24 (Golden). For fully insured plans, the employer pays a premium to the insurer, which in turn administers the plan *and* covers members' medical costs itself. *Id.* Large group employers, especially national accounts, tend to purchase ASO plans. *See id.* at 131:17– 132:21 ("[N]ational accounts works almost exclusively in self-funding."); 8/10/22 PM Trial Tr. 102:8–14 (Gelbach) (noting the increased popularity of ASO plans among large group employers).

---

[2] Four states set the cutoff at 100 employees. *See* PX-820 ¶ 89.

The markets for national accounts and other large group customers are highly competitive. *See* 8/9/22 PM Trial Tr. 85:21–86:3 (McMahon); 8/10/22 PM Trial Tr. 101:18–20 (Gelbach). To gain a competitive edge over rivals, insurers innovate across multiple dimensions, including premiums and fees, provider networks, cost-control strategies, utilization management, benefit design, claims processing, and underwriting methods. *See* Proposed Findings of Fact and Conclusions of Law of the United States ("Gov't Proposed Findings"), ECF No. 119 at ¶¶ 71–74.

## II.    The Parties and the Proposed Acquisition

### A.  UnitedHealth Group

UnitedHealth Group ("UHG") is a vertically integrated healthcare enterprise with two main subsidiaries. The first is UnitedHealthcare ("UHC"), which is the nation's largest commercial health insurer and UHG's benefits business. UHC offers health insurance plans for individuals, employers, and small businesses. *See* 8/4/22 AM Trial Tr. 95:14–97:2 (Wichmann). The company also provides Medicare and Medicaid services. *Id.* All told, UHC's insurance business covers approximately 50 million people. PX-820 ¶ 59.

UHG's second main subsidiary is Optum. Optum includes three companies—OptumHealth, OptumRx, and OptumInsight—that provide a broad range of healthcare-related services. OptumHealth offers care delivery and management, OptumRx offers a wide array of pharmacy services, and OptumInsight offers software solutions and services for healthcare business needs, including payment integrity services for payers and providers. *See* 8/4/22 AM Trial Tr. 96:13–97:5 (Wichmann). OptumInsight is also one of the two dominant players in the market for first-pass claims editing. PX-103 at 1.

Although UHC is Optum's largest customer, Optum also sells its services to non-UHC payers in all three lines of its business. *See* 8/4/22 PM Trial Tr. 23:5–25 (Wichmann) (Optum is

"fiercely multi-payer in orientation."); *id.* at 3:11–21 ("[F]iercely multipayer . . . mean[s] that [Optum's] business is organized to serve all payers."). Andrew Witty, the current CEO of UHG, testified that maintaining multi-payer relationships is key to preserving a competitive edge. 8/10/22 PM Trial Tr. 21:11–20 (Witty). Witty testified that Optum maintains a "strictly arm's length relationship[]" with UHC, *id.* at 22:12–15, while OptumInsight's Chief Operating Officer testified that Optum treats UHC as a customer "very similar to the way" it treats its other commercial customers, 8/5/22 AM Trial Tr. 22:9–16 (Yurjevich).

## B. Change Healthcare

Change Healthcare is a healthcare technology company that provides data solutions aimed at improving clinical decision-making and simplifying payment processes across the healthcare system. PX-195 at 31. In 2017, Change entered into a joint venture with McKesson Corp.'s Technology Solutions division to create the healthcare technology company that exists today. 8/2/22 AM Trial Tr. 92:20–94:7 (de Crescenzo).

Change has three main business units. First, its Software and Analytics business offers payers solutions aimed at improving, among other things, financial performance and payment accuracy. PX-195 at 33. One of these solutions is ClaimsXten—Change's first-pass claims editing product. *Id.*; 8/11/22 AM Trial Tr. 13:7–17 (Wukitch). Second, Change's Network Solutions business facilitates "financial, administrative and clinical transactions, electronic business-to-business and consumer-to-business payments," and aggregation and analytical data services. PX-195 at 34. Change provides these Network Solutions services, in part, through its EDI clearinghouse. *Id.* Finally, Change's Technology Enabled Services business provides services such as revenue cycle management, value-based care, pharmacy benefits administration, and healthcare consulting. *Id.*

Change's ClaimsXten is the market-leading product in first-pass claims editing. 8/11/22 AM Trial Tr. 15:1–14 (Wukitch). ClaimsXten "deploys automated rulesets to improve payment accuracy, reduce appeals and drive administrative savings." PX-195 at 33. McKesson released ClaimsXten in 2006, 8/11/22 AM Trial Tr. 8:1–5 (Wukitch), and the product became the "market leader" in first-pass claims editing before McKesson's joint venture with Change, *id.* at 17:8–18. That success continued after the joint venture, as reflected in ClaimsXten's near-70 percent market share for first-pass claims editing, as well as its 99 percent customer retention rate. 8/2/22 PM Trial Tr. 85:14–18 (Turner); 8/11/22 AM Trial Tr. 21:22–23 (Wukitch).

Change also operates the largest EDI clearinghouse in the United States. 8/4/22 PM Trial Tr. 55:1–25 (Hasslinger); 8/10/22 PM Trial Tr. 69:23–70:1 (Witty). Like other EDI clearinghouses, a substantial amount of claims data flows through Change's clearinghouse. PX-820 ¶ 183. Change's customers sometimes grant Change "secondary-use rights" to these data. 8/2/22 PM Trial Tr. 101:12–22 (Suther). This means that Change has the right to use the data for purposes beyond providing clearinghouse services, subject to certain legal and contractual restraints. *Id.*; 8/3/22 AM Trial Tr. 17:23–18:5 (Suther). Change may obtain secondary-use rights directly through a contract with the payer. 8/2/22 PM Trial Tr. 104:2–17 (Suther). Alternatively, Change can acquire secondary-use rights indirectly through channel and trading partners, so long as the payer has granted secondary-use rights to those intermediaries. *Id.* at 104:18–106:22.

Today, Change uses the data for which it has secondary-use rights in its Data Solutions business. *Id.* at 101:5–15. That business licenses de-identified data to third parties, including data aggregators and life sciences companies. *Id.* at 119:19–119:24. Change does not sell or share the data with other payers. *Id.* at 119:25–120:1.

## C.  The Proposed Acquisition

In January 2021, UHG announced its agreement to acquire Change for approximately $13 billion.  *See* Compl., ECF No. 1 at ¶ 26.  Following the proposed merger, OptumInsight will combine with Change for the stated purpose of "minimiz[ing] the amount of friction between payers and providers."  8/9/22 PM Trial Tr. 92:11–93:25 (McMahon).  UHG claims that by combining the service-oriented skill set of OptumInsight with the product-oriented skill set of Change, the proposed merger will generate significant benefits for the healthcare system through clinical alignment, claims accuracy, and payment simplification.  *See* 8/10/22 PM Trial Tr. 28:25–30:9 (Witty); PX-195 at 1; Defendants' Exhibit ("DX") 0748 at .0005.

UHG asserts that, on the claims accuracy front, the proposed acquisition can help to shore up holes in the claims payment process, which is still plagued by substantial administrative waste.  *See* DX-0748 at .0004.  UHG also asserts that Change's broad connectivity to payers and providers is complementary to Optum's payer integrity services and expertise.  *See* PX-195 at 1 ("[Change] brings a scaled transaction network built on extensive payer and provider connections, which complements Optum's advanced payment integrity analytics and content, as well as Optum's revenue cycle management solutions.").

UHG claims that the beneficiaries of the proposed acquisition will be "all constituents"—payers, providers, and patients.  8/4/22 PM Trial Tr. 11:10–12:2 (Wichmann).  "[B]y pursuing edits not previously deployed," UHG claims, the merged companies can improve payment accuracy and leave payers with lower administrative costs.  PX-004 at UHG-2R-0003249659.  UHG claims that providers would benefit from fewer denied claims and "accelerated cash flow from avoided denials."  *Id.*  And, it says, "improved claims accuracy will enhance the patient experience through clear communication of benefits, deductible status[,] and payer network

economics at point of referral." PX-195 at 1; *see also* 8/9/22 PM Trial Tr. 92:11–93:25 (McMahon) (combining the abilities of Change and Optum will "enable the patient at the point of service to be able to know what their obligation is right at the doctor's office").

## III. Procedural History

### A. The Complaint

In February 2022, after investigating the proposed acquisition for over a year, the United States, joined by the states of New York and Minnesota, sued to block the transaction. In its request for relief, the Government asks that the Court "adjudge and decree United's acquisition of Change to violate Section 7 of the Clayton Act, 15 U.S.C. § 18," and "permanently enjoin Defendants from consummating United's proposed acquisition of Change." Compl., ECF No. 1 at ¶ 129(a)–(b).

### B. Divestiture, Firewall Policy, and Customer Commitments

In January 2022, UHG announced its intention to divest Change's ClaimsXten upon consummation of the proposed acquisition. 8/11/22 AM Trial Tr. 61:1–62:10 (Wukitch); DX-0616 at .0001. And in April 2022, UHG entered a $2.2 billion purchase agreement with private-equity firm TPG Capital ("TPG") to carry out the divestiture. DX-0579 at .0001. All conditions of that agreement have been satisfied, except for those to be satisfied at closing or upon the resolution of this lawsuit. *See* 8/11/22 AM Trial Tr. 163:24–164:2 (Raj). The divestiture package includes all four of Change's current claims editing products. *Id.* at 13:8–20 (Wukitch).

In May 2022, UHG issued its "UnitedHealth Group Firewall Policy for Optum Insight and Change Healthcare," which addresses the sharing of customers' competitively sensitive information (CSI) following the transaction. PX-599 at -682. According to UHG, this firewall policy was issued to address the specific context of the Change transaction and does not represent

any shift in longstanding company policy on data sharing. *See* Proposed Findings of Fact of Defendants ("Defs.' Proposed Findings"), ECF No. 121 at ¶ 130.

Between May and June 2022, UHG sent letters to Change's EDI customers including certain statements regarding how those customers' CSI would be treated if the transaction closes. 8/2/22 AM Trial Tr. 130:24–135:6 (de Crescenzo).

### C. The Trial

Following substantial discovery, *see* Scheduling and Case Management Order, ECF No. 42, the trial began on August 1, 2022, and the Government completed its rebuttal case on August 15, 2022. Over two dozen witnesses testified. The Government called two expert witnesses in its case-in-chief—Dr. Benjamin Handel and Dr. Gautam Gowrisankaran. Defendants likewise called two expert witnesses—Dr. Catherine Tucker and Dr. Kevin Murphy. Dr. Gowrisankaran was the Government's sole rebuttal witness. On August 31, 2022, the parties filed post-trial briefs along with proposed findings of fact and conclusions of law. The Court heard closing arguments on September 8, 2022.

### IV.    Legal Standard

### A.  The Clayton Act

Section 7 of the Clayton Act prohibits mergers and acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. As the statutory text makes clear, Section 7 does not require the Government to prove that a merger is *certain* to cause competitive harm. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962) ("Congress used the words 'may be substantially to lessen competition' . . . to indicate that its concern was with probabilities, not certainties."). After all, Section 7 is a prophylactic

measure that "seeks to arrest restraints of trade in their incipiency[,] before they develop into full-fledged restraints violative of the Sherman Act." *Id.* at 323 n.39.

But just as Section 7 allows for less than absolute certainty of competitive harm, it also requires more than a "mere possibility" of such harm. *Id.*; *United States v. Baker Hughes Inc.*, 908 F.2d 981, 984 (D.C. Cir. 1990) ("Section 7 involves *probabilities*, not certainties or possibilities."). To prove a Section 7 violation, "the government must show," by a preponderance of the evidence, "that the proposed merger is likely to *substantially* lessen competition, which encompasses a concept of reasonable probability." *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (cleaned up); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 49 (D.D.C. 2011).

Under this standard, "antitrust theory and speculation cannot trump facts," and "the Government must make its case on the basis of the record evidence relating to the market and its probable future." *United States v. AT&T, Inc.*, 310 F. Supp. 3d 161, 190 (D.D.C. 2018) (cleaned up), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). "Only examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger." *Id.* (quoting *United States v. General Dynamics Corp.*, 415 U.S. 486, 498 (1974)) (cleaned up). In the end, the Court must make a "predictive judgment, necessarily probabilistic and judgmental rather than demonstrable," *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 719 (D.C. Cir. 2001) (quoting *Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986)), but that judgment must be informed by real-world evidence that the specific merger under review is likely to substantially lessen competition, *see generally AT&T*, 310 F. Supp. 3d 161.

## B. *Baker Hughes* Burden-Shifting Framework

Because Section 7 assigns courts the "uncertain task of assessing probabilities," the Court of Appeals has developed a burden-shifting framework to guide the inquiry. *Baker Hughes*, 908 F.2d at 991. Under that framework, "the government must first establish a *prima facie* case that the merger is likely to substantially lessen competition in the relevant market." *AT&T*, 916 F.3d at 1032. If the government establishes its *prima facie* case, "the burden shifts to the defendant to present evidence that the *prima facie* case inaccurately predicts the relevant transaction's probable effect on future competition, or to sufficiently discredit the evidence underlying the *prima facie* case." *Id.* (cleaned up).

Although a more compelling *prima facie* case calls for a more compelling rebuttal, the defendant need not "produce evidence 'clearly' disproving future anticompetitive effects," as such a requirement would force the defendant "to rebut a probability with a certainty" and free the government from its ultimate burden of persuasion. *Baker Hughes*, 908 F.2d at 991–92. Instead, if the defendant rebuts the *prima facie* case, "the burden of producing additional evidence of anticompetitive effects shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times." *AT&T*, 916 F.3d at 1032 (quoting *Baker Hughes*, 908 F.2d at 983). The Government's "failure of proof in any respect will mean the transaction should not be enjoined." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116 (D.D.C. 2004).

The Court of Appeals has not expressly held that the *Baker Hughes* framework applies to vertical mergers challenged under Section 7, but the Parties agree that the framework applies to all of the Government's theories here—with one caveat. In challenging a horizontal merger—that is, a merger between direct competitors—the government can establish its *prima facie* case simply

by showing that the "merger would produce a firm controlling an undue percentage share of the relevant market, and would result in a significant increase in the concentration of firms in that market." *Heinz*, 246 F.3d at 715 (cleaned up). Such a showing, which is typically made by presenting market-share statistics, triggers "a presumption that the merger will substantially lessen competition." *Id.* (quotations omitted). The burden then shifts to the defendant to rebut the presumption by showing "that the market-share statistics give an inaccurate account of the merger's probable effects on competition in the relevant market." *Id.* (cleaned up).

For a vertical merger—that is, a merger between companies that perform different supply chain functions for a common good or service—"there is no short-cut way to establish anticompetitive effects, as there is with horizontal mergers." *AT&T*, 310 F. Supp. 3d at 192 (quotations omitted). That is because "vertical mergers produce no immediate change in the relevant market share." *AT&T*, 916 F.3d at 1032. Accordingly, the government meets its *prima facie* burden in vertical merger cases by making a "fact-specific showing that the proposed merger is likely to be anticompetitive." *Id.* (quotations omitted).

## V.    Analysis

Before analyzing the Government's claims, the Court must define the relevant antitrust markets in which to conduct the analysis. *See FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 24 (D.D.C. 2015) ("Merger analysis starts with defining the relevant market."). A relevant market has two components: (1) a product and (2) geographic boundaries. *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 193 (D.D.C. 2017); *see also United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 618 (1974) ("Determination of the relevant product and geographic markets is a necessary predicate to deciding whether a merger contravenes the Clayton Act." (quotations omitted)).

Here, the Government defines three relevant antitrust markets: (1) the sale of first-pass claims editing solutions in the United States; (2) the sale of commercial health insurance to national accounts in the United States; and (3) the sale of commercial health insurance to large group employers in core-based statistical areas that are also metropolitan statistical areas (*i.e.*, cities and suburbs). Gov't Proposed Findings, ECF No. 119 at ¶¶ 77–83, 332. Defendants (hereafter, "UHG," "United," or Defendants) lodge no objection to these definitions; they assume those are relevant antitrust markets and contend that the Government has failed to show that the merger is likely to substantially lessen competition in each. The Court therefore accepts the Government's proposed market definitions.

The Government offers three independent theories of competitive harm—one horizontal and two vertical—and thus three independent reasons for why the proposed merger is illegal under Section 7. First, the Government argues that the proposed acquisition is an illegal horizontal merger because it would tend to create a monopoly in the sale of first-pass claims editing solutions in the United States. *Id.* at ¶ 8. Second, the Government argues that the proposed acquisition is an illegal vertical merger because UHG's control over a key input—Change's EDI clearinghouse[3]—would give it the ability and incentive to use rivals' CSI for its own benefit, which in turn would lessen competition in the markets for national accounts and large group commercial health insurance. *Id.* And third, the Government argues that the proposed acquisition is an illegal vertical merger because United's control over Change's EDI clearinghouse would give it the

---

[3] In vertical merger cases, the government will identify "a product or service that is supplied or controlled by the merged firm and is positioned vertically or is complementary to the products and services in the relevant market." U.S. Dep't of Justice & Fed. Trade Comm'n, Vertical Merger Guidelines 3 (2020). This item is called a "related product," and it "could be an input, a means of distribution, access to a set of customers, or a complement." *Id.* Here, the related product is EDI clearinghouse services. *See* 8/9/22 AM Trial Tr. 45:1–15 (Gowrisankaran).

ability and incentive to withhold innovations and raise rivals' costs to compete in those same markets for national accounts and large group plans. *Id.*

After review of the parties' arguments, the evidence presented at trial, the entire record, and the applicable law, the Court holds that the Government has failed to carry its burden on each of its theories of competitive harm.

### A. The Government Has Failed to Show That the Proposed Merger is Likely to Substantially Lessen Competition Under Its Horizontal Theory.

The Government's horizontal case is simple: The proposed acquisition would combine the first-pass claims editing solutions of the two largest competitors in the market—Change, which controls just under 70 percent of the market, and OptumInsight, which controls about a quarter of the market—and leave UHG with a market share above 90 percent. *Id.* at ¶ 35; 8/9/22 AM Trial Tr. 24:18–21 (Gowrisankaran). The acquisition would also result in a highly concentrated market, as measured by the Herfindahl-Hirschman Index ("HHI"). *See* 8/9/22 AM Trial Tr. 25:11–16, 26:9–18 (Gowrisankaran) (explaining that the proposed merger would produce a market with an HHI of 8,831, an increase in HHI of 3,577 over the pre-merger HHI). Defendants, for their part, do not dispute these market-share and concentration statistics. *See*, *e.g.*, 8/5/22 PM Trial Tr. 83:5–11 (Schmuker).

The Government also contends that the acquisition would eliminate head-to-head competition in the market for first-pass claims editing. Gov't Proposed Findings, ECF No. 119 at ¶¶ 344–50. The Government stresses that Change and OptumInsight engage in intense competition over the price and quality of their first-pass claims editing products, and the Government contends that this competition would end if the acquisition were to close, because no other player in the market can fill Change's shoes. *Id.* at ¶ 349. Indeed, OptumInsight views itself and Change as the "primary editors in the payer market," 8/5/22 PM Trial Tr. 86:12–20 (Schmuker), and Change

views OptumInsight's Claims Edit System as the only "major competitor" to ClaimsXten, 8/2/2022 PM Trial Tr. 79:7–24 (Turner).

UHG contends that the Government is at war with a post-merger world that will never come to be. That is because UHG has agreed to divest Change's claims editing business, ClaimsXten, to TPG upon consummation of the proposed acquisition. This divestiture, UHG says, rebuts the Government's market-share statistics. UHG also argues that TPG will preserve (if not enhance) the competitive environment that exists today. *See* Defs.' Proposed Findings, ECF No. 121 at ¶¶ 418–19, 440.

### 1. Legal Standard for Evaluating the Proposed Divestiture's Effect on Competition

Because UHG does not dispute the Government's pre-divestiture market-share statistics, the key question is whether the divestiture of ClaimsXten to TPG resolves the Government's horizontal claim. Before answering that question, however, the Court must consider a threshold matter: *Who* bears the burden of proving the competitive implications of the divestiture, *when* must that party satisfy its burden, and *what* exactly must that party prove?

The Government's briefs, and some of its arguments during trial, would require the acquisition and divestiture to be treated as separate transactions, *see* 9/8/22 PM Trial Tr. 26:18–27:2 (Gov't Closing), as a result of which the burden would fall on UHG to prove, as part of its rebuttal case under the *Baker Hughes* framework, that the divestiture will "replace the competitive intensity lost as a result of the merger," Gov't Proposed Findings, ECF No. 119 at ¶¶ 410–11 (quoting *United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 60 (D.D.C. 2017)) (cleaned up). This view has some support in District case law. *See Aetna*, 240 F. Supp. 3d at 60; *see also FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 304 (D.D.C. 2020) ("Defendants have the burden to show that a proposed divestiture will replace the merging firm's competitive intensity."); *Sysco*, 113 F. Supp.

3d at 73 (holding that defendants bear the burden of proving in rebuttal that the divestiture will "maintain the premerger level of competition" (cleaned up)). At other times, however, the Government seemed to concede that it bears the ultimate burden of proving that, even after the divestiture, there will likely be a substantial lessening of competition. *See* 9/8/22 PM Trial Tr. 163:20–23 (Gov't Closing) ("We have to persuade Your Honor at the end of the day, after they've come in with their divestiture evidence, that Your Honor believes that there's a *substantial* lessening of competition." (emphasis added)).

UHG counters that the Government's standard (at least as articulated in its briefs) contradicts the text of Section 7 and the *Baker Hughes* burden-shifting framework. *See* Proposed Conclusions of Law of Defendants ("Defs.' Proposed Conclusions"), ECF No. 121 at ¶ 29. It argues that the burden should be on the Government to prove, as part of its *prima facie* case, that the combined effect of the merger and the divestiture will likely lessen competition substantially. *See id.* at ¶¶ 26, 29; *see also FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 51 (D.D.C. 2002) (considering amended merger agreement as part of the government's *prima facie* case). UHG stresses that a transaction challenged under Section 7 can consist of multiple agreements, including a divestiture, and that the transaction being challenged here is really the proposed acquisition *together with* the divestiture. Defs.' Proposed Conclusions, ECF No. 121 at ¶¶ 22–24. On this view, the burden of proof regarding the acquisition—including the divestiture—remains on the Government at the *prima facie* stage. And whatever the *prima facie* standard, UHG argues, the Government still bears the ultimate burden of proving that the acquisition is likely to substantially lessen competition.

The Court agrees with UHG that the Government's proposed standard (at least the strongest version)—which admittedly finds support in this District's case law—contradicts the text of Section 7 and the *Baker Hughes* framework. As the Government would have it, UHG must prove

that the divestiture will maintain the *same* level of competition that existed in the pre-merger market.  But the text of Section 7 is concerned only with mergers that "*substantially* . . . lessen competition."  15 U.S.C. § 18 (emphasis added).  By requiring that UHG prove that the divestiture would preserve exactly the same level of competition that existed before the merger, the Government's proposed standard would effectively erase the word "substantially" from Section 7.[4]

The Government's standard (at least in its strongest form) is not only inconsistent with the text of Section 7 but would make a mess of the *Baker Hughes* framework and the ultimate burden of persuasion.  In the Government's view, a divestiture must be *ignored* at the *prima facie* stage— at least if the divestiture was not part of the original transaction—as a result of which the government can meet its *prima facie* burden with market-share statistics that have no connection to the post-acquisition world.  Then, in the Government's view, a defendant must prove that there is *no* lessening of competition.  This would allow the Government to rely on statistics that bear no relationship to the post-acquisition world and would shift the burden of persuasion to the defendant to prove that there is *no* competitive harm—rather than to require the government to prove that there is *substantial* competitive harm.  That approach cannot be squared with the text of Section 7 or with *Baker Hughes*.  *See Baker Hughes*, 908 F.2d at 992 ("Imposing a heavy burden of production on a defendant would be particularly anomalous where, as here, it is easy to establish

---

[4] To illustrate, suppose before a merger a market is highly competitive—to use overly simplified math, call it 50-50.  Further suppose that, following the merger and without the divestiture, the market would be highly anticompetitive—using the same simplified math, call it 95-5.  But also imagine that the divestiture would result in a market that is highly competitive, but just a little less competitive than the market before the merger and divestiture—call it 51-49.  Under the Government's proposed standard (or at least its most aggressive version), the merger would be enjoined because the companies would be unable to prove that the divestiture fully restored the pre-merger level competition.  That would be true even though the merger (with the divestiture) would cause only the slightest lessening of competition, not a substantial lessening.

a prima facie case. The government, after all, can carry its initial burden of production simply by presenting market concentration statistics. To allow the government virtually to rest its case at that point, leaving the defendant to prove the core of the dispute, would grossly inflate the role of statistics in actions brought under Section 7."); *see also id.* at 991 ("A defendant required to produce evidence 'clearly' disproving future anticompetitive effects must essentially persuade the trier of fact on the ultimate issue in the case.").

In any event, UHG contends—and the Court agrees—that the evidence leads to the same result under either standard. This is because the evidence demonstrates that the divestiture will restore the competitive intensity lost because of the acquisition. For purposes of the remaining analysis, then, the Court proceeds under the Government's proposed standard.[5]

### 2. The Government Has Satisfied Its *Prima Facie* Burden.

Under the *Baker Hughes* framework, the Government must first make its *prima facie* case that the proposed acquisition is likely to substantially lessen competition in the sale of first-pass claims editing solutions in the United States. Under the Government's preferred standard discussed above, based on the evidence presented at trial, that burden is easily met. The evidence established that the merging entities (absent the divestiture) would control over 90 percent of the relevant market. 8/9/22 AM Trial Tr. 24:18–21 (Gowrisankaran). The evidence also established that the merger (again, absent the divestiture) would produce a market with an HHI of 8,831, an

---

[5] The Court agrees with UHG that the relevant transaction here is the proposed acquisition agreement *including* the proposed divestiture. As discussed above, treating the acquisition and the divestiture as separate transactions that must be analyzed in separate steps allows the government to meet its *prima facie* burden based on a fictional transaction and fictional market shares. And here, without the benefit of the market-share presumption, the Government cannot meet its *prima facie* burden of proving that the combined effect of the proposed merger and the divestiture is likely to substantially lessen competition.

increase in HHI of 3,577 over the pre-merger HHI. *Id.* at 25:11–16, 26:9–18. The Government has thus shown that, absent the divestiture, the "merger would produce a firm controlling an undue percentage share of the relevant market, and would result in a significant increase in the concentration of firms in that market." *Heinz*, 246 F.3d at 715 (cleaned up). This showing triggers a presumption that the merger violates Section 7. *Id.*; *see FTC v. Swedish Match*, 131 F. Supp. 2d 151, 166 (D.D.C. 2000) (presumption triggered because merging entities controlled 60 percent of the market); *H & R Block*, 833 F. Supp. 2d at 72 (presumption triggered because post-merger HHI totaled 4,691, an HHI increase of around 400).

The evidence also established that the merger (again, absent the divestiture) would "eliminate head-to-head competition" in the market for first-pass claims editing solutions. *Aetna*, 240 F. Supp. 3d at 91 ("Mergers that eliminate head-to-head competition between close competitors often result in a lessening of competition." (quotations omitted)). Change and OptumInsight view each other as principal competitors in first-pass claims editing, *see* 8/5/22 PM Trial Tr. 86:12–20 (Schmuker), and that competition would end as a result of the proposed merger (again, assuming no divestiture).

Applying the Government's proposed standard as discussed above, the Government has made a *prima facie* showing that the proposed merger is likely to substantially lessen competition, having relied on both a presumption of harm and evidence of lost head-to-head competition. UHG's rebuttal case should be proportional in strength. *See Aetna*, 240 F. Supp. 3d at 91. UHG does not dispute the Government's market-share and concentration statistics, nor does it dispute the claim that Change and OptumInsight are head-to-head competitors. Instead, UHG argues that the proposed divestiture resolves the Government's concerns.

### 3. The Proposed Divestiture Resolves the Anticompetitive Concerns.

Again, applying the Government's burden-shifting framework, UHG must prove in rebuttal that the proposed divestiture to TPG will "restore the competition lost by the merger." *Id.* at 60 (cleaned up). To assess whether a divestiture will restore competition, courts consider several factors, including "the likelihood of the divestiture; the experience of the divestiture buyer; the scope of the divestiture[;] the independence of the divestiture buyer from the merging seller[;] and the purchase price." *RAG-Stiftung*, 436 F. Supp. 3d at 304. On each of these metrics, the trial evidence and the record demonstrated that the divestiture will preserve competition in the market for first-pass claims editing.

#### a. Likelihood of the Divestiture

The evidence established, and the Court finds, that UHG's divestiture of ClaimsXten to TPG is a virtual certainty. UHG and TPG have already entered a definitive purchase agreement, and all conditions of that agreement have been satisfied, except for those to be satisfied at closing or by the resolution of this lawsuit. *See* DX-0579 at .0064–66; 8/11/22 AM Trial Tr. 163:24–164:2 (Raj) ("Q. Mr. Raj, is this agreement from April 22 binding on TPG and UHG, as you understand it? A. It is. The only real contingency that I'm aware of is the outcome of this proceeding, but, otherwise, it's binding on us."). The Government, for its part, does not contest the likelihood of the divestiture.

#### b. Experience of TPG

The evidence demonstrated, and the Court finds, that TPG has the experience necessary to compete effectively in the claims editing market. TPG is one of the world's leading private-equity firms, with over $100 billion in assets under management. DX-0617 at .0009. Nehal Raj, TPG's co-managing partner, testified at trial about the firm's investment strategy: "[W]e are

fundamentally growth-oriented investors. . . . [W]e make money from growing the businesses that we invest in, so we have a growth-oriented philosophy." 8/11/22 AM Trial Tr. 148:9–21 (Raj). He explained that TPG accelerates growth in the businesses it acquires by investing in research and development ("R&D") and by pursuing add-on acquisitions. *Id.* at 149:8–20. As for returns, Raj testified that TPG earns almost all its profits by growing its businesses and then selling them for more than it paid, which aligns TPG's incentives with the performance of its investments. *Id.* at 150:20–151:7.

The evidence also established, and the Court finds, that TPG has significant experience with "carve-out investments," that is, investments in which TPG buys a division of a larger company and then operates it as a standalone business. *Id.* at 151:8–151:22 ("[Carve-out investments is] one of our most successful areas. Historically, it's one of the deal types that we enjoy doing the most because it aligns very well with this growth transformation thesis that we have, or investment philosophy that we have. So, we've done a number of carve-outs over the years."). The evidence established that TPG has completed successful carve-outs of Dell, AT&T, Pfizer, and Intel, among other companies. *See* DX-0619 at .0004–5.

The evidence also demonstrated that TPG has significant experience in the healthcare industry. Since 2003, TPG has deployed over $24 billion of total equity in the healthcare space. DX-0617 at .0010. TPG has invested in healthcare providers, medical products, and healthcare services and IT. *Id.* And it has invested in payer services. *Id.*; 8/11/22 PM Trial Tr. 9:25–10:5 (Raj). TPG has increased R&D spending in its healthcare companies by 156%, and it has contributed around $8 billion to mergers-and-acquisitions activity on behalf of those companies. DX-0617 at .0009. On average, TPG holds its healthcare investments for eight years before

exiting, which tends to be longer than the holding period for its other investments.  8/11/22 AM Trial Tr. 149:24–150:5 (Raj).

The evidence at trial established, and the Court finds, that TPG intends to invest substantially in the ClaimsXten business.  Under Change's ownership, ClaimsXten's R&D budget for fiscal year 2022 was $14 million.  8/11/22 PM Trial Tr. 34:20–35:4 (Raj); DX-0402 at .0020. The evidence establishes that TPG plans to increase that budget to $17 million in 2023, $26 million in 2024, $28 million in 2025, and $30 million in 2026.  8/11/22 PM Trial Tr. 35:20–37:18 (Raj); DX-0402 at .0020, .0031.  By doubling ClaimsXten's R&D budget within the next four years, TPG expects that it will be able to improve the product "and accelerate revenues as a result." 8/11/22 PM Trial Tr. 40:22–41:16 (Raj).

The Government contends that TPG's lack of experience in claims editing, as well as its status as a private-equity firm, doom any claim that TPG will be able to restore the competitive pressure that Change would have exerted on OptumInsight absent the merger.  Gov't Proposed Findings, ECF No. 119 at ¶ 36.  But as discussed below, the evidence established (and the Court finds) that the scope of the divestiture package includes ClaimsXten's current senior leadership and management team—including some of the same people who elevated ClaimsXten to the top of the claims editing market.  This approach is consistent with the Government's own Merger Remedies Manual, which recognizes that "[p]rivate equity purchasers often partner with individuals or entities with relevant experience, which may inform the Division's evaluation of whether the purchaser has sufficient experience to compete effectively in the market over the long term."  U.S. Dep't of Justice, Merger Remedies Manual 25 (2020).

Also misplaced is the Government's argument that ClaimsXten will be less competitive because TPG is a private-equity firm.  At trial, the Government stressed that "TPG . . . is a private

equity firm, and private equity firms can have incentives that run different to the strategic buyers here. Their incentives or commitments to innovation are not always aligned with those of the strategic buyers." 8/1/22 AM Trial Tr. 30:7–15 (Gov't Opening). But the evidence at trial established—and the Court finds—that TPG's incentives are geared toward preserving, and even improving, ClaimsXten's competitive edge. In response to a question from the Court, TPG's co-managing partner made clear that TPG's success turns on ClaimsXten's success: "[T]he better [a] company does between the time we buy it and the time we're ready to sell it, the more money someone will pay us for that asset." 8/11/22 PM Trial Tr. 90:15–18, 91:8–14 (Raj). Raj also testified why ownership of ClaimsXten by TPG may result in more ClaimsXten-related innovation than was achieved at Change: "[A] small division of a big company usually doesn't get the focus or the resource[s] that it may optimally need to be as successful as it can. . . . And so our belief is we'll be able to invest more in the product [than Change], make it better for customers, and accelerate revenues as a result." *Id.* at 40:22–41:16.

This testimony is borne out by the evidence at trial demonstrating TPG's concrete plans to more than double ClaimsXten's R&D budget. *Id.* at 35:20–37:18; DX-0402 at .0020, .0031. And it is consistent with the Government's Merger Remedies Manual, which recognizes that "in some cases a private equity purchaser may be preferred" to a strategic buyer because a private-equity firm has more "flexibility in investment strategy, [i]s committed to the divestiture, and [i]s willing to invest more when necessary." Merger Remedies Manual at 24–25.

To be sure, the question is whether TPG will preserve competition in the relevant market, not whether TPG has a general incentive to maximize its return on investment. *See Sysco*, 113 F. Supp. 3d at 73 (recognizing the buyer's "financial commitment" but still rejecting the proposed divestiture because the court was "not persuaded that" the buyer would "be able to step into [the

seller's] shoes to maintain . . . the pre-merger level of competition"). But based on the evidence discussed above and below, the Court finds that TPG is well-positioned to maintain, and perhaps even improve upon, ClaimsXten's performance in the claims editing market.

### c. Scope of the Divestiture

The evidence at trial established that the scope of the divestiture is also sufficient to preserve competition. The evidence established, and the Court finds, that a "core aspect of [TPG's] due diligence" was determining whether the divestiture package was "sufficient to operate ClaimsXten on a standalone basis." 8/11/22 AM Trial Tr. 160:11–14 (Raj). And TPG concluded that it was. *Id.* at 160:15–25 ("We came to the conclusion that what we were receiving was more than sufficient to succeed. As you can imagine, we have every incentive to analyze that and run that to ground."); *see also id.* at 161:10–13 ("Q. Okay. Is there any asset -- physical, human capital, intellectual property -- that TPG believes it needs to stand up ClaimsXten, but is not included in the asset package? A. There's not."). The evidence also demonstrated that TPG's conclusion that ClaimsXten is "a highly separable asset" capable of succeeding on its own was based on extensive due diligence, including conversations with ClaimsXten customers who explained that the product "was sold very independently to the market." *Id.* at 158:1–8, 160:15–25.

The evidence also established, and the Court finds, that a large team of individuals with extensive experience managing ClaimsXten will continue to work with the business post-divestiture. A core member of that team is Carolyn Wukitch, whose testimony at trial revealed the breadth of her experience with and knowledge of claims editing. Wukitch has worked with claims editing products since 1990, and she has performed managerial responsibilities since 2000. *Id.* at 10:8–13 (Wukitch). She currently serves as Change's Senior Vice President and General Manager

for Network and Finance Management. *Id.* at 6:21–23. In that role, Wukitch manages the ClaimsXten business, which has a 99 percent customer retention rate under her leadership. 8/2/22 AM Trial Tr. 105:14–25 (de Crescenzo); 8/11/22 AM Trial Tr. 21:22–23 (Wukitch). Before arriving at Change, Wukitch held the same position at McKesson, the company that first developed ClaimsXten. Post-divestiture, Wukitch will serve as CEO of the ClaimsXten business. 8/11/22 AM Trial Tr. 10:18–21 (Wukitch).

The evidence established that, along with Wukitch, around 375 other individuals will continue working with ClaimsXten as part of the divestiture. *Id.* at 47:12–18. This includes ClaimsXten's 70-person clinical-content team—the "clinicians or medical coders who have responsibility for defining the clinical content, or the edits, the rule library within the solution." *Id.* at 53:13–54:2. And it includes the 60-person software-and-engineering team, as well as the 200-person customer-success team. *Id.* at 54:3–22. Other employees were evaluated on a person-by-person basis, accounting for "their experience [and] their success record with claims editing." *Id.* at 45:12–46:1. For example, out of the fifteen sales employees that support Change's payment-accuracy products, seven will continue to work with the divested business. *Id.* at 45:18–23. Those seven sales employees were chosen because they "have a proven track record selling ClaimsXten." *Id.*

The evidence established, and the Court finds, that TPG is "very clear" that the above management team will run the business day-to-day. *Id.* at 150:6–19 (Raj) ("[O]ur role is really to put the right people in those seats and have the management team run the companies."). Post-divestiture, then, ClaimsXten will be managed by much of the same team that turned it into the market leader in first-pass claims editing.

Against the evidence demonstrating that TPG has the resources and incentives to preserve (and indeed expand) ClaimsXten's competitive edge post-divestiture, the Government claims that ClaimsXten will be less successful because it will not be sold alongside Change's other payment-accuracy products. The argument: Change currently markets ClaimsXten together with at least six other payment-accuracy products; these products address payment accuracy at various stages, from pre-submission to audit and recovery; the divestiture covers only one of these products (claims editing); and thus TPG cannot replicate how Change currently competes to sell ClaimsXen. *See* Gov't Proposed Findings, ECF No. 119 at ¶¶ 368–70.

The Court disagrees. The evidence established, and the Court finds, that before Change acquired ClaimsXten in 2017, it was sold as a standalone product by McKesson for approximately a decade.[6] During that time, ClaimsXten became the market leader in first-pass claims editing. 8/11/22 AM Trial Tr. 17:1–12 (Wukitch). The evidence further established that, since 2017, Change has continued to sell ClaimsXten to customers on a standalone basis, and it has continued to be the market leader. And the record is devoid of evidence that customers have purchased ClaimsXten from Change as part of a broader suite of payment-accuracy products. *Id.* at 38:15–18 ("Q. Are you aware of any instance where a customer purchased ClaimsXten because ClaimsXten was sold alongside another payment accuracy solution? A. No."); 8/2/22 PM Trial Tr. 95:22–25 (Turner) ("Q. Are you aware of any instances where Change won primary claims editing business from a customer because ClaimsXten was a part of an end-to-end suite? A. No.").

---

[6] The evidence established, and the Court finds, that ClaimsXten was a standalone product at McKesson and has continued to be a standalone product at Change. 8/11/22 AM Trial Tr. 17:1–18:22 (Wukitch). As Wukitch put it, ClaimsXten is not "technically integrated with any other products," and "[i]t doesn't require anything from another part of Change Healthcare to be successful in the market." *Id.* at 18:13–17. The evidence established, and the Court finds, that the divestiture package comprised "the full suite . . . needed to have a successful claims editing business" post-divestiture. *Id.* at 40:17–22.

To the contrary, the evidence established, and the Court finds, that no customer has ever bought ClaimsXten in conjunction with another payment-accuracy product. 8/11/22 AM Trial Tr. 132:7–10 (Wukitch). Nor has any customer ever, through separate transactions, bought the full suite of payment-accuracy products that the Government now claims is essential to preserving competition. *Id.* at 105:25–106:6.

The Government stresses that Change has historically touted—and marketed—ClaimsXten as being just a part of its end-to-end "payment accuracy suite." Gov't Proposed Findings, ECF No. 119 at ¶ 371 (citing PX-415 at -575). The Government offered evidence at trial that Change has pursued a corporate strategy of "moving from selling point solutions to selling *comprehensive*, *integrated solutions* to address more complex customer needs." *Id.* at ¶ 372 (citing PX-530 at 964). That strategy is reflected in recent business plans, which describe Change as "uniquely positioned to be the first and only vendor to deliver on a fully-integrated suite of end-to-end Payment Accuracy solutions, securing a differentiated and defensible position in a growing $4B market." PX-413 at 70. And it is reflected in what Change recently told a customer—that its end-to-end suite "provides the opportunity for a more cohesive strategy that optimizes for maximum savings" and that "[i]ndividual solutions and other vendors do not provide this additional level of optimization." PX-414 at -361.

The Court agrees with the Government that the evidence established that Change has attempted to market ClaimsXten together with other products—and that, post-divestiture, such marketing efforts will be impossible. But the evidence also established, and the Court finds, that

the success of ClaimsXten does not turn on its being part of a broader suite of payment-accuracy products. *See supra* at 28–29.[7]

In sum, the Government's central point is that post-divestiture, TPG will be unable to offer a full suite of payment accuracy products, which was Change's core strategy and marketing point pre-divestiture. But the applicable standard does not require TPG to become Change's alter ego; it merely requires TPG to preserve the level of competition that existed in the relevant market before the merger. All the evidence points in the same direction: The scope of the divestiture is likely to achieve that goal.

### d. Independence of TPG

The evidence demonstrated, and the Court finds, that TPG is an independent buyer and that it will be an independent competitor in the first-pass claims editing market. TPG's preexisting relationship with UHG consists of a few "heavily and hotly negotiated" deals that were each conducted "at arm's length." 8/11/22 PM Trial Tr. 5:3–9 (Raj). The evidence provided no serious reason to doubt that TPG will compete vigorously with UHG in the market for first-pass claims editing solutions. *See id.* at 5:16–22 (Raj) ("Q. Will the fact that TPG has done deals in the past with UnitedHealth Group in any way impact the vigor with which ClaimsXten will compete in the marketplace assuming the transaction goes forward? A. No, absolutely not. We're going to do the very best we can with this investment irrespective of any history.").

---

[7] TPG need not replicate exactly how Change goes about competing. The relevant antitrust market here is the market for *first-pass claims editing solutions*, not the market for *other* payment-accuracy products, and thus the analysis must focus on TPG's ability to replicate Change's competitive intensity in the market for first-pass claims editing. That TPG will be unable to replicate Change's broader "end-to-end" strategy is irrelevant; the Government has offered zero evidence that customers would be less likely to purchase ClaimsXten absent the option to purchase other payment accuracy products. Nor has it offered any other evidence that Change's bundled offering is what drives ClaimsXten's success.

### e. Purchase Price

Although the Government suggests that speed and certainty of closing were the primary factors driving UHG's selection of TPG as the buyer, *see* Gov't Proposed Findings, ECF No. 119 at ¶¶ 365–66, nothing in the record provided any reason to doubt the adequacy of the purchase price—and the Court finds that the purchase price here was adequate.

\* \* \*

"Ultimately, antitrust deals in probabilities, not certainties." *RAG-Stiftung*, 436 F. Supp. 3d at 308 (cleaned up). Even under the Government's proposed standard, then, UHG's "burden is only to show that the divestiture will likely replace" the competitive intensity lost because of the merger. *Id.* UHG has "far exceeded that threshold." *Id.* Indeed, the trial evidence shows—and the Court concludes—that competition in the post-divestiture market for first-pass claims editing will match, and perhaps even exceed, its current levels.

Under what the Court believes is the correct legal standard, that evidence prevents the Government from meeting its *prima facie* burden. Alternatively, under the Government's preferred standard, the evidence enables UHG to meet its burden at the rebuttal stage, and the Government provides no additional evidence to carry its burden of persuasion.

The Court therefore holds that the Government has failed to show that the proposed merger is likely to substantially lessen competition in the market for first-pass claims editing solutions in the United States. The Court will require UHG to divest ClaimsXten to TPG as proposed.[8]

---

[8] A divestiture ordered by a federal court "in an action brought by the Federal Trade Commission or the Department of Justice" is exempt from the filing requirements of the Hart-Scott-Rodino Antitrust Improvements Act. 16 C.F.R. § 802.70.

### B. The Government Has Failed to Show That the Proposed Merger is Likely to Substantially Lessen Competition Under Its Vertical Theories.

Turning to the Government's claims regarding the vertical components of the proposed transaction, the Government advances two theories of competitive harm.  First, the Government argues that United's control over Change's EDI clearinghouse would give United the ability and incentive to use rivals' CSI for its own benefit.  Second, the Government argues that United's control over Change's EDI clearinghouse would give United the ability and incentive to foreclose rivals' access to key inputs on competitive terms by withholding innovations, thereby raising those rivals' costs.  The effect of these actions, says the Government, would be to substantially lessen competition in the markets for national accounts and large group commercial health insurance.

### 1. The Government's Data-Misuse Theory Fails.

Consider, first, the Government's data-misuse argument.[9]  The claim starts by contending that Optum, through its post-acquisition control of Change's EDI clearinghouse, will gain broad access and use rights to the claims data of UHC's rivals.  The argument then posits that Optum will have an incentive to share the data—or at least the competitively sensitive insights that can be gleaned from the data—with UHC.  Knowing this, UHC's rivals will innovate less, out of fear that UHC will free ride off their innovations, thereby resulting in harm to competition in the relevant insurance markets.  In essence, then, this vertical theory can be distilled to four steps, each of which the Government must establish is likely:  (1) Optum will gain incremental access and use rights to the claims data of UHC's rivals; (2) Optum will have an incentive to share these data— or the competitively sensitive insights derived from the data—with UHC; (3) rival payers' fear of

---

[9] By "misuse," the Court means the claim that United would use its competitors' data for anticompetitive purposes.  The Court appreciates the Government's position that United need not violate applicable law or company policy to appropriate rival payers' claims data.

UHC using these data or insights will chill innovation; and (4) less innovation means less competition in the relevant markets.

The evidence at trial highlighted weaknesses in each of these steps. But the central problem with this vertical claim is that it rests on speculation rather than real-world evidence that events are likely to unfold as the Government predicts. Governing law requires the Court to "mak[e] a prediction about the future," and that prediction must be informed by "record evidence" and a "fact-specific showing" as to the proposed merger's likely effect on competition. *AT&T*, 310 F. Supp. 3d at 190–92 (quotations omitted). Under this standard, "antitrust theory and speculation cannot trump facts." *Id.* at 190 (quotations omitted).

The evidence adduced at trial established that, for it to be likely that the proposed acquisition would substantially lessen competition, United would have to uproot its entire business strategy and corporate culture; intentionally violate or repeal longstanding firewall policies; flout existing contractual commitments; and sacrifice significant financial and reputational interests. The Government has failed to show that United's post-merger incentives will lead it to take such extreme actions. Nor has the Government put forward real-world evidence that United's rivals are likely to innovate less out of fear that United will poach their data. No payer witness made that claim; in fact, all the payer witnesses testified to just the opposite. Although the Government's data-misuse argument has other shortcomings, these two defects stand out above the rest.

### a. Data Access and Use Rights

The Government contends that, if the acquisition closes, United will gain access to the huge cache of competitively sensitive claims data that passes through Change's EDI clearinghouse, along with accompanying rights to use those data for its own economic advantage. Gov't Proposed

Findings, ECF No. 119 at ¶ 94. These data cover the entire lifecycle of a claim—both pre- and post-adjudication.

The evidence at trial established, and the Court finds, that claims data can have competitive value. Pre-adjudicated claims data, for example, may provide insight into which markets and providers generate claims, which employer groups contract with specific payers, and which employer groups are the most and least healthy. 8/1/22 AM Trial Tr. 133:11–23 (Garbee). This information in turn can help a payer identify which employers a rival may want to pursue as potential customers. *Id.* at 133:14–134:9.

Post-adjudicated claims data generally have more proprietary information. PX-1013 at 395:1–24 (Golden). Such data can include information about payers' discounts, provider network contracts, benefits, claims edits, adjudication decisions, and final paid amounts. 8/1/22 AM Trial Tr. 135:12–23 (Garbee); *see also id.* at 134:17–135:23. This information reflects a payer's "adjudication logic," and a rival who gains access to it could learn that payer's "whole adjudication process." 8/10/22 PM Trial Tr. 158:19–25 (Gelbach); 8/1/22 AM Trial Tr. 135:12–23 (Garbee).

The evidence established that Change has secondary-use rights for around 50 percent of the claims data passing through its EDI clearinghouse. *See* 8/9/22 AM Trial Tr. 87:22–88:7 (Gowrisankaran). Because just over half of all commercial medical claims touch Change's EDI clearinghouse, *see* PX-820 ¶ 185, Change thus has use rights for about a quarter of all commercial claims data transmitted between payers and providers. The percentage is lower for many of UHC's primary competitors—Change has use rights for 12 to 21 percent of claims data for these payers. DX-0862 at .0027; 8/15/22 PM Trial Tr. 89:9–90:1 (Gowrisankaran). Optum will inherit these use rights after the proposed merger.

The Government contends that United, after gaining these data (and accompanying use rights) through the acquisition, will have the ability and incentive to use its rivals' claims data to discern and co-opt its rivals' competitive strategies and practices. One of the Government's expert witnesses—Dr. Handel—identified five potential "use cases" for these claims data. In particular, Dr. Handel testified that these claims data would allow United to learn valuable information about its rivals' utilization management practices, pricing and reimbursement strategies, provider network designs, claims adjudication processes, and underwriting techniques. 8/8/22 AM Trial Tr. 124:1–11 (Handel).

As noted above, the evidence established that Optum will acquire claims data (and some secondary-use rights) as a result of the proposed acquisition. The evidence also established, however, that Optum currently has access to claims data and CSI relating to UHC's payer competitors. Today, Optum receives proprietary information—including payer-specific adjudication rules, payment policies, and contract information—in connection with the services it renders to its non-UHC customers. DX-0862 at .0015. The evidence thus established (and the Court finds) that Optum already receives much of the same kinds of information that is included in the claims data that passes through Change's EDI clearinghouse. *See* 8/5/22 AM Trial Tr. 48:5–8 (Yurjevich) ("Q. Do you receive, for contracts and duplicates, the data that would be included in an EDI remittance? A. Yes, we do."). The evidence also established that Optum's external customers include some of UHC's chief competitors.

As a result, there is overlap between the types of data to which Optum already has access and the types of data passing over Change's EDI clearinghouse. The Government therefore could have strengthened its case by quantifying the *amount* of incremental (*i.e.*, new) data that would be available to Optum post-merger, as well as the value of that incremental data to UHC. But Dr.

Handel made no attempt to do so. *See* 8/8/22 PM Trial Tr. 38:16–22 (Handel). Nor could he—Dr. Handel did not review the claims data that Optum receives today, so he had no baseline against which to measure incremental increases in the amount and value of the data. *See id.* at 6:25–7:5 ("Q. And as you prepared your opinion in this case, you did not have a detailed understanding of which non-UHC payers provide claims data or other competitively sensitive information to Optum today in the course of a contractual relationship between that payer and Optum; isn't that correct? A. Yes."); *id.* 7:6–18 ("Q. As part of your work in this case, you also did not specifically quantify, by which I mean number of claims received over a period of time, the claims data that Optum currently has provided to it by non-UHC payers; isn't that correct? A. Yes, that's correct.").[10]

The Government makes much of the (admittedly valuable) secondary-use rights associated with Change's claims data—rights that Optum largely, but not completely, lacks today. *See* 8/15/22 PM Trial Tr. 33:7–16 (Gowrisankaran) (distinguishing access to data from rights to use data); PX-820 Ex. 10 (demonstrating that Optum may have secondary-use rights for up to 4.2 percent of claims data that pass through its EDI clearinghouse). But the Government never fully addressed Optum's ability (or lack thereof) to extract competitively sensitive insights from the data it already receives from non-UHC payers. *See*, *e.g.*, 8/8/22 PM Trial Tr. 9:20–25 (Handel) ("Q. Dr. Handel, you don't know whether the information that this payer provides to Optum today under this contract is sufficient for Optum to analyze that information and derive the types of competitive insights that you identified in your report; isn't that correct? A. I believe so, yeah. I don't know."); *id.* at 17:24–18:4 (same); *id.* at 18:12–23 (same). Put another way, the Government

---

[10] Dr. Gowrisankaran did quantify the percentage of post-acquisition data for which Change has (and Optum will have if the acquisition goes through) secondary-use rights. *See* PX-820 Ex. 10. But he did not quantify how much of the data would be new to Optum—that is, he did not quantify how much the data are different from what are already available to Optum.

never established that Optum cannot do now, at least in some degree, what the Government says it will do after the proposed acquisition.

This matters for two reasons. First, if United is already in possession of data from which competitively sensitive insights could be gleaned and shared with UHC, then there has to be something about the proposed acquisition that would change United's ability and incentive to do so with Change's data. And second, if the ability and incentive already exist, then present circumstances can serve as a natural experiment for what might occur in the post-acquisition world. Under Section 7 case law, courts must consult pre-merger conduct and history in making their predictive judgment about the state of post-merger competition. *See AT&T*, 916 F.3d at 1039 ("The district court had to determine whether the economic theory applied to the particular market by considering evidence about the structure, history, and probable future of the . . . industry." (quotations omitted)); *FTC v. Foster*, 2017 WL 1793441, at *38 (D.N.M. May 29, 2007) ("Natural experiments, *i.e.*, evidence that the posited harm has occurred under circumstances similar to the transaction, are relevant to the merger analysis." (cleaned up)). And as explained in more detail below, the record is devoid of any evidence that United has ever used its rivals' claims data to allow UHC to glean competitively sensitive insights from that data.

Nevertheless, it is clear from the record that Optum would acquire *some* incremental data (and some corresponding secondary-use rights) following the acquisition. And the evidence established that these data and rights could enable United to do *some* things that it cannot do today. The Court will therefore assume that the Government, for purposes of its *prima facie* case, has established the first step of its data-misuse theory.

### b. Sharing Data and CSI

Turning to step two of its data-misuse theory, the Government argues that Optum will have a strong incentive to share rival payers' data and CSI with UHC. In fact, the Government claims that Change's data rights are what motivated the proposed merger. Gov't Proposed Findings, ECF No. 119 at ¶ 135. It relies on the deposition testimony of David Wichmann, the former CEO of UHG, who stated that Change's data rights were the "foundation by which the business case was made . . . to pursue the transaction." PX-1009 at 6 (274:21–275:14) (Wichmann). The Government also points to several ordinary course documents in which United executives expressed interest in Change's "data" and "data rights." *See* Gov't Proposed Findings, ECF No. 119 at ¶¶ 135–42. In its closing argument, the Government said that these documents are "the best evidence of how the parties viewed the real world." 9/8/22 PM Trial Tr. 13:13–15 (Gov't Closing).

But mere references to data and data rights cannot prove this step of the Government's claim. After all, both Optum and Change are companies in the business of dealing with data, so the fact that Optum was discussing Change's data and data rights during due diligence is hardly a surprise. Far more relevant would have been evidence that United executives wanted to acquire Change's data and data rights for the purpose of equipping UHC with competitive intelligence about its rivals. But the exhibits and deposition testimony on which the Government relies do not reveal such an intention, and the trial testimony uniformly rejected any suggestion that the purpose of, or rationale for, the acquisition was to allow the use of claims data in this way. *See*, *e.g.*, 8/5/22 AM Trial Tr. 124:1–10 (Musslewhite) ("Q. Mr. Musslewhite, I just have a few more questions. We've heard a lot in this case about the deal rationale for the Change transaction is to gain access to Change's data and their data rights and use that to benefit UHC. As the executive sponsor for this deal, what's your reaction to that? A. We would never do that. We never talked about that.

It would never be something that OptumInsight could do as a functioning business entity."); 8/4/22 PM Trial Tr. 79:9–16 (Hasslinger) ("Q. And when the executives asked you to look more into Change's data rights or data assets, did you understand that they were interested in acquiring Change's data or data rights so that they could share that with UHC? A. No. Q. And did you understand that those executives wanted to use Change's data for competitive intelligence for UHC? A. No."); *id.* at 32:8–17 (Wichmann) ("Q. I think your testimony is that when you were considering the transaction as a whole, that you did not put any value on the possibility that UHC would have access to Change payer data for the purpose of competing against its payer competitors[?] A. Absolutely not. Q. You did not personally? A. I did not personally, and nobody I interacted with did either.").

More fundamentally, the evidence established, and the Court finds, that United's incentives are not nearly as one-sided as the Government suggests. To be sure, the evidence did establish that United has an incentive to arm UHC with valuable insights about its health insurance rivals. But the evidence also established that United has incentives to protect its external customers' (including its rival payers') claims data and CSI—incentives that are embodied in United's firewall policies and customer contracts. The question, then, is which set of incentives is most likely to drive United's post-acquisition behavior.

The Court finds, based on all the evidence presented at trial, that United's incentives to protect external customers' data outweigh its incentives to "misuse" that data. For starters, the evidence established that Optum currently pursues a multi-payer business strategy, and the success of that strategy turns on payers and providers trusting that their data will be protected. At trial, Witty explained the importance of this multi-payer strategy: "I strongly, strongly believe that being multi-payer is a key feature of Optum, a key feature, really, therefore, of UnitedHealth

Group." 8/10/22 PM Trial Tr. 21:7–13 (Witty). He went on: "[I]f you didn't have multi-payer relationships or relationships with competitors of different parts of the organization, it would be very easy to lose your edge." *Id.* at 21:16–19. Non-UHC payer revenue makes up a substantial portion of OptumInsight's total payer revenue, DX-0813 Ex. 2, and three of its top five external customers are among UHC's largest competitors, DX-0656A at .0004. The evidence thus established (and the Court finds) that Optum has strong incentives to preserve these relationships, and that doing so requires maintaining customers' trust that their data and CSI will not fall into the hands of UHC. *See* 8/10/22 PM Trial Tr. 28:18–21 (Witty) (stressing that misusing rivals' data "would be hugely destructive, not just to our reputation but to our economic interest, because customers are not going to come back to an organization which abuses their data in that way").

The evidence also demonstrated, and the Court finds, that United has developed a corporate culture consistent with upholding that trust. Witness after witness testified under oath that United has built a culture of trust and integrity around protecting the CSI of its external customers, including rival payers. Witty, for example, testified that data sharing "would be against the tone, the culture, the rules, everything we stand for in the organization." *Id.* at 28:2–24. Steve Yurjevich, the Chief Operating Officer of OptumInsight, likewise testified that the company's "culture" is to "treat customers' data as they would treat their data themselves." 8/5/22 AM Trial Tr. 64:11–14 (Yurjevich). And when asked by the Court what would happen if employees were instructed to share data with UHC, Peter Dumont—UHG's Chief Privacy Officer—firmly and credibly responded: "I honestly think you would see a lot of people quitting." 8/5/22 PM Trial Tr. 75:7–16 (Dumont).

Consistent with this testimony, the record contains no evidence that Optum has used *its* access to external payers' data for the purpose of sharing that data with UHC. *See*, *e.g.*, 8/10/22

AM Trial Tr. 73:14–74:16 (Schumacher) ("Q. Mr. Schumacher, are you personally aware of any instance in which a rival payer -- in which rival payer claims data or other rivals' CSI was passed from Optum to UnitedHealthcare? A. I am not. Q. Are you personally aware of any instance in which Optum analyzed rival payer claims data and provided UnitedHealthcare with competitive insight about its rivals? A. I am not."); 8/10/22 PM Trial Tr. 119:22–120:11 (Gehlbach) ("Q. In that time [at UHC], are you aware of any instance in which you or anyone else associated with UnitedHealthcare received from Optum competitively sensitive information about a rival payer? A. No."); 8/5/22 AM Trial Tr. 38:23–25 (Yurjevich) ("Q. Have you ever lost a customer because they thought OptumInsight was misusing or stealing their data? A. Absolutely not.").[11]

Also relevant are certain structural guarantees that exist to prevent CSI from being shared between Optum and UHC. The Court will discuss two of those structural protections: firewalls and customer contracts.

Start with United's firewall policies. The evidence established, and the Court finds, that firewalls are an industry standard means of protecting CSI in the vertically integrated healthcare space. 8/15/22 AM Trial Tr. 38:14–24 (Murphy) ("Firewalls in this industry for protecting CSI have been deemed to be effective."). The evidence also established that, for over a decade—beginning well before the proposed acquisition here—United has maintained a corporate antitrust firewall that expressly prohibits the sharing of CSI between business units. That policy provides: "You must not participate in or facilitate communications that may reduce or eliminate competition

---

[11] When asked whether United planned to reverse course and use Change's payer data to benefit UHC, every single witness answered—credibly and without equivocation—that United would never do so. *See*, *e.g.*, 8/10/22 PM Trial Tr. 28:2–24 (Witty); 8/4/22 PM Trial Tr. 31:4–7 (Wichmann); 8/5/22 AM Trial Tr. 13:23–14:16 (Yurjevich); 8/8/22 AM Trial Tr. 89:25–90:10 (Higday); 8/9/22 PM Trial Tr. 101:11–17 (McMahon); 8/10/22 AM Trial Tr. 73:14–74:16 (Schumacher); 8/10/22 PM Trial Tr. 119:22–120:11 (Gehlbach).

between another Business Unit and its competitor(s)." DX-0529 at .0002. The policy also requires employees to "[e]xercise caution when communicating with a customer or supplier who is a competitor of another UHG Business Unit," and to "[a]void serving as a conduit of information or an intermediary between the 'competitor' and the other Business Unit." *Id.* at .0003. The evidence does not reflect a single instance in which these firewalls have been breached. *See*, *e.g.*, 8/5/22 PM Trial Tr. 42:24–43:2 (Dumont) ("Q. Have there been any violations of United's firewall policies where a UnitedHealthcare employee actually accessed Optum external customer data? A. Not that I'm aware of."); 8/4/22 AM Trial Tr. 101:6–10 (Wichmann) ("Q. Were you aware of any employees of United across the business segments using competitively-sensitive information learned from one business segment and applying it to another? A. No.").

In May 2022, United took a related step by issuing guidance to address the Change transaction specifically and the data sharing principles that will apply post-merger. 8/5/22 PM Trial Tr. 40:1–4 (Dumont). The evidence established, and the Court finds, that this transaction-specific policy was not designed to alter United's longstanding approach to information sharing, but rather was intended to memorialize existing practices and to address specific concerns raised in relation to the proposed acquisition. *Id.* at 40:11–24; *see also* DX-0654 at .0001 ("This Policy sets forth specific guidelines consistent with the UHG antitrust compliance policy with respect to the use and disclosure of competitively sensitive information obtained from customers of Optum Insight or Change."). Among other things, the May 2022 policy provides:

- "The disclosure of External Customer CSI to UHG business units that are competitors of such External Customers is strictly prohibited."
- "The use of External Customer CSI to benefit UHG business units that are competitors of such External Customers is strictly prohibited."
- "UHG employees may not access External Customer CSI unless such access is necessary to perform their job responsibilities."

42

- "External Customer CSI shall be logically separated from other UHG business unit data within Electronic Data Sites. No employees of other UHG business units that are competitors of an External Customer shall have access to the locations where External Customer CSI is stored within such Electronic Data Sites."

DX-0654 at .0002.

The Government disputes the effectiveness of these policies. The Government argues that the terms of the May 2022 firewall do not cover payers' claims data that come from providers, channel partners, and trading partners, because those parties are not competitors of UHC. Gov't Proposed Findings, ECF No. 119 at ¶ 203. But by its terms the May 2022 policy protects the CSI of "External Customers," which include all "Optum Insight or Change customers who are not a UHG business unit." DX-0654 at .0002. The evidence established that nearly all payers in the United States are customers of OptumInsight. *See* 8/5/22 AM Trial Tr. 19:6–12 (Yurjevich) (explaining that around 220 of the 230 payers in the United States are OptumInsight customers, including many of UHC's main rivals). The evidence thus established, and the Court finds, that those customers' data are protected by this policy, even if the data are acquired by Optum indirectly through a provider or an intermediary. *See*, *e.g.*, 8/5/22 PM Trial Tr. 42:12–18 (Dumont) ("Q. So, just to walk that through with an example, if Optum receives data about a UnitedHealthcare competitor from a healthcare provider, could Optum share that data with UnitedHealthcare since it's not coming from a competitor directly? A. It could not. That would be against a number of our policies; [the May 2022] policy in particular.").

The Government also contends that the policies can be amended—or even repealed—in the future. Gov't Proposed Findings, ECF No. 119 at ¶ 202. That's theoretically true. But the Government does not explain how it can meet its burden of proof simply by asserting that "things may change." And the evidence demonstrated that United is likely to preserve its firewall policies

43

moving forward. Its corporate antitrust policy, after all, has been in place since 2007, and the evidence demonstrated that United has strong incentives to maintain its May 2022 firewall as well. *See*, *e.g.*, DX-0813 ¶ 147 (OptumInsight's "multi-payer business is predicated on payers and providers trusting that its firewalls will protect their data."). The Government has failed to show that United's incentives would change so drastically post-merger that it would abandon these comprehensive, industry-standard firewall protections.

Indeed, in assessing United's post-merger incentives, the Court must consider the financial and reputational costs to United if it were to breach or water down its firewall policies. *See* 8/12/22 AM Trial Tr. 95:13–22 (Tucker) ("Q. [Y]ou also have to think about the other incentives that would be pushing in the other direction, to include the firewall policies, reputational risk, and the like. Correct? A. Yes, that's precisely correct. And the way I might characterize it is to understand the dynamics of the incentives in this situation and the extent to which United and Optum can anticipate the very negative consequences of a breach of firewalls, for example."). The evidence established, and the Court finds, that those costs would be high. Last year, non-UHG customers accounted for around $63 billion in Optum revenue across all three business units. 8/10/22 AM Trial Tr. 71:9–22 (Schumacher). The evidence demonstrated that if those same customers stopped trusting OptumInsight to protect their data, then that "entire book of external business" would be "at risk," 8/5/22 AM Trial Tr. 71:6–14 (Yurjevich), because customers think of Optum as a single unit, *id.* at 31:24–32:11.

The evidence also demonstrated, and the Court finds, that UHC's rivals recognize Optum's strong incentives to comply with the firewalls and protect customers' data. One competitor, for example, noted that it was "highly confident and convinced" that Optum would not "share their Plan's information with UnitedHealthcare" because doing so would "risk [Optum's] credibility

and brand reputation." DX-0472 at .0004. The Government offered no conflicting testimony at trial—indeed, the Government did not call a single rival payer witness to testify against United's firewalls or any other aspect of its data protection measures.

On top of its firewalls, the evidence established that Optum's contracts require the protection of customer data. These contracts generally require that Optum use all "reasonable commercial means" to protect its external customers' data and prevent sharing of those data with UHC. *See, e.g.*, DX-0314 at .0012 ("Optum and its Affiliates in the health services line of business shall prevent and maintain commercially reasonable safeguards to prevent the disclosure of Customer Data to, and access or use of Customer's Data by, United Healthcare and/or any of its Affiliates."); DX-0468 at .0016 ("During the Term of this Agreement, each Party shall protect the other Party's Confidential Information using the same degree of care as it uses to protect its own Confidential Information of like nature."). What is more, the contracts typically permit payer customers to audit Optum's data protection measures. 8/5/22 AM Trial Tr. 71:15–72:4 (Yurjevich).

The evidence also established that, even when Optum receives payer data from providers and intermediaries, rather than from payers themselves, it treats the data as if they came directly from the payer and thus provides the contractually required protection. *Id.* at 15:4–22 ("Q. [S]o if Optum receives . . . claims data of [a rival] relating to [that rival's] national accounts, but it doesn't get that claims data from [the rival], it gets it from some other source, does Optum view its commitments to [the rival] in its contracts as covering that data or those data? A. Yes, absolutely."). In short, using rival payers' data to benefit UHC would conflict with Optum's contractual obligations to its payer customers. 8/4/22 PM Trial Tr. 31:23–32:7 (Wichmann).

The evidence established that, like Optum's contracts, Change's contracts protect the data and CSI of its customers. For example, Change's Master Relationship Agreements (MRAs) provide: "Each party will protect and safeguard the other party's Confidential Information with at least the same care used for its own Confidential Information of a similar nature, but no less than reasonable care." DX-0843 at .0004; *see also* 8/3/22 AM Trial Tr. 47:12–24 (Suther) ("[I]f we felt that a[n] interested health insurer were trying to, you know, reverse engineer the business practices of one of their competitors, that, in our mind, would be a violation of our confidentiality obligations under our agreement.").

The Government contends that Change's MRAs are subordinate to its Business Associate Agreements (BAAs), which specify that they "modif[y]" the underlying agreements and "govern in the event of conflict or inconsistency." Gov't Proposed Findings, ECF No. 119 at ¶ 196; PX-460 at -613. And, the Government argues, the BAAs confer broad secondary-use rights: "Change Healthcare . . . may Use or Disclose such de-identified data unless prohibited by applicable law." PX-460 at -610. According to the Government, this language would allow Optum to share rival payers' CSI with UHC.

But the evidence demonstrated, and the Court finds, that Change has never operated under this interpretation. Tim Suther, the Senior Vice President and General Manager of Change's Data Solutions business, testified that if a "payer wanted specific information about one of its competitors" from Change, then Change "would view that as a violation of [its] confidentiality obligations and . . . would turn that down." 8/3/22 AM Trial Tr. 46:13–24 (Suther). Consistent with that understanding, Change does not sell payers' claims data to other payers. 8/2/22 PM Trial Tr. 119:25–120:1 (Suther); 8/3/22 AM Trial Tr. 10:15–11:5 (Suther). And even when Change licenses de-identified data to third parties, its customer agreements often include "substantial"

restrictions, along with "significant contractual remedies" and even audit rights to ensure that third parties comply with Change's contractual restrictions. *See* 8/3/22 AM Trial Tr. 33:21–34:4 (Suther); PX-174 at -06.

These practices cast doubt on the Government's interpretation, and at the very least, suggest that there would be high costs to exploiting potential gray areas. *See* 8/3/22 AM Trial Tr. 44:2–5 (Suther) ("[Confidentiality is] oxygen to our business. Honoring the commitments that we've made to our customers is essential. As we mentioned earlier, doing otherwise would be catastrophic to the business."). What is more, it is far from clear that the BAAs even conflict with the MRAs. The BAAs confer use rights, and the MRAs impose a standard of care for handling confidential information. The contracts can thus be read in harmony to allow Change to use the data—by licensing it to data aggregators, for example—while at the same time prohibiting Change from sharing the data with rival payers. And, in any event, contracts are not the only layer of protection for CSI—United's firewalls can still serve as a backstop.

For all the above reasons, the evidence at trial established, and the Court finds, that United will have strong legal, reputational, and financial incentives to protect rival payers' CSI after the proposed merger. Still, the Government's expert, Dr. Gowrisankaran, says that the costs of data misuse would be "negligible" for United, because even though United may lose "some business" as a result of the merger, other customers will just "assume the risk," and those customers are unlikely to later leave because they will never know if United misuses their data. 8/9/22 PM Trial Tr. 55:3–56:10 (Gowrisankaran). This contention, in the Court's view, rests on speculation and is unsupported by any real-world evidence.

The Government and Dr. Gowrisankaran are on firmer ground when they argue that United is a vertically integrated firm with an incentive to maximize its overall profits, not just the profits

of an individual subsidiary like Optum. After all, it has long been "a principle of antitrust law" that "a business with multiple divisions will seek to maximize its total profits." *AT&T*, 916 F.3d at 1043. For this reason, "the operations of a corporate enterprise organized into divisions must be judged as the conduct of a single actor," with each division pursuing the common interests of the whole. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 770 (1984). Here, the Government contends that United's corporate-wide interests and incentives will be to share CSI with UHC, even if doing so hurts Optum, because that is the best way to maximize corporate-wide profits.

It is of course true that, in some cases, the optimal strategy for maximizing corporate-wide profits will be to leverage one division of the business to benefit another division. But it is also true that, in other cases, the best way to maximize corporate-wide profits will be for the first division to do business with as many customers as possible, including competitors of the sister division. *See AT&T*, 916 F.3d at 1043 (crediting the district court's conclusion that "Turner Broadcasting's interest in spreading its content among distributors . . . would redound to the merged firm's financial benefit"). It is consistent with the corporate-wide profit maximization principle to assess which strategy is "the best way to increase company wide profits . . . in a particular industry." *Id.* at 1044 (quotations omitted).

Witty, the CEO of UHG, explained all this in his deposition testimony. The Government seizes upon his statement "that UnitedHealth Group needs to think about United at an enterprise level," 8/9/22 AM Trial Tr. 90:4–18 (Gowrisankaran), while ignoring his observation that maximizing enterprise value "sometimes . . . would involve [separate business units'] assets being worked together," and "sometimes individually," subject to "the important caveat of all of the rule sets" that limit UHG's conduct, *see* DX-0852 at 296:1–297:17 (Witty).

And at trial, Witty testified that enterprise value would not be maximized—in fact, it would be harmed—if Optum shared competitively sensitive data with UHC. *See* 8/10/22 PM Trial Tr. 28:2–24 (Witty) ("Q. [The Government's] expert also testified that because of your enterprise approach, that that would cause people at OptumInsight to give data concerning UHC's rivals over to UHC so they could beat them in the marketplace. And what's your response to that? A. So again, first of all, that would be against the tone, the culture, the rules, everything that we stand for in the organization. . . . [And] it would be hugely destructive, not just to our reputation but to our economic interest."). The Government downplays the relative gains and losses between UHC and OptumInsight by focusing only on OptumInsight's revenue, rather than the revenue of Optum as a whole. But as the evidence demonstrated at trial, and as the Court finds, data misuse would place all of Optum's $63 billion in external revenue at risk, because customers think of Optum as a single unit. *See* 8/5/22 AM Trial Tr. 31:24–32:11 (Yurjevich). The trial evidence did not demonstrate that the potential gains to UHC would outweigh this potential loss.

In sum, the evidence established that the Government's claim fails to account for all of United's post-merger incentives, including its incentives to preserve its multi-payer business model, to maintain its internal culture, and, ultimately, to protect its financial and reputational interests. The Government, at most, presented evidence that United would have some incentive (and ability) to exploit competitors' competitively sensitive data for its own economic benefit following the acquisition. "But evidence . . . that it could be possible to act in accordance with the Government's theories of harm is a far cry from evidence that the merged company is likely to do so." *AT&T*, 310 F. Supp. 3d at 210. The Court must make a "predictive judgment" about the competitive effect of the proposed merger, *Heinz*, 246 F.3d at 719 (quotations omitted), and that prediction must be based on real-world evidence related to the "structure, history[,] and probable

future" of the relevant markets, *AT&T*, 310 F. Supp. 3d at 190. Here, that evidence—the widespread use of firewalls in the industry, United's history of compliance with its own firewalls, the customer contracts, and the convincing testimony from senior executives about United's practices and incentives—weighs strongly against the Government's position.

### c. Future Innovation

Even if the Government had established that United's post-merger incentives would drive it to "misuse" Change's claims data, the Government also had to demonstrate a likely substantial lessening of competition. The Government based its theory of competitive harm here on reduced innovation by other payers.[12]  *See* 8/9/22 AM Trial Tr. 75:5–17 (Gowrisankaran); *see also* Gov't Proposed Findings, ECF No. 119 at ¶¶ 188–89. This theory of harm does not necessarily depend on United's *actual* misuse of rivals' data for competitive insights—according to the Government, United's rivals will reduce innovation because "regardless of what United's going to do, United's rivals are going to *think* that United will act in its own interests." 8/9/22 AM Trial Tr. 91:13–92:25 (Gowrisankaran) (emphasis added); *see also* 9/8/22 PM Trial Tr. 45:4–16 (Gov't Closing Argument) ("[United's rivals] will *assume* that that data and those rights will be used. And, as a result, they will see that lessening [of innovation]." (emphasis added)).

Yet the Government provided zero real-world evidence that rival payers are likely to reduce innovation. The Government did not call a single rival payer to offer corporate testimony that it would innovate less or compete less aggressively if the proposed merger goes through. Nor did

---

[12] At trial, Dr. Gowrisankaran suggested that UHC may use its rivals' CSI to assist its underwriting practices, which may harm competition in ways other than reducing innovation. *See* 8/9/22 AM Trial Tr. 97:10–24 (Gowrisankaran). But for reasons discussed above, the Government has not proven that UHG is likely to misuse its rivals' CSI.

any of the rival payer employees who did testify support the Government's theory. To the contrary, all the payer witnesses rejected the notion that the proposed merger would harm innovation.

For example, a Cigna employee was asked, "You are not going to compete less aggressively after UnitedHealthcare acquires Change Healthcare?" Her answer: "So in my personal opinion, I don't think we ever compete less for any reason. We always go at it really hard. That's our job." PX-1005 at 169:14–16, 169:19–170:1 (Dill). An Aetna employee was likewise asked, "This transaction certainly won't cause your group at Aetna to innovate less, will it?" His answer: "It should not. . . . I'm not forecasting any [less innovation]." 8/1/22 PM Trial Tr. 94:23–95:2 (Lautzenhiser). An Anthem employee was also asked, "[A]ssuming that the transaction between Change and Optum moves forward and goes through, that's not going to stop Anthem from innovating its health plans, right?" His answer: "Yeah. Absolutely. We will continue to innovate." PX-1019 at 256:16–20, 256:24–25 (Chennuru). Finally, a former Cigna employee was asked, "After the United-Change transaction was announced, you don't recall Cigna competing less aggressively for employer business?" Her answer: "No. In innovating, though, they would be more careful where they put their edits. They would still innovate but be more careful about where they put it." 8/1/22 PM Trial Tr. 14:17–22 (Garbee). As Garbee later clarified, she was talking about keeping edits away from ClaimsXten—a concern solved by the divestiture. *See id.* at 15:22–16:12.

In short, the testimony from rival payers who were asked about innovation is inconsistent with the Government's theory of competitive harm, and the Government did not offer any other rival payer testimony on this score. The Government is thus left to rely solely on the testimony of one of its experts. *See* 8/9/22 AM Trial Tr. 75:5–17 (Gowrisankaran) ("Q. How would United gaining rights to its health insurer rivals' competitively-sensitive information affect those rivals'

incentives to invest in the competitive advantages you described a few minutes ago?  A.  Well, if United were able to appropriate or free-ride off of those innovations, then that's going to mean that these rivals are going to invest less in innovation.").  But "antitrust theory and speculation cannot trump facts; the Government must make its case on the basis of the record evidence relating to the market and its probable future."  *AT&T*, 310 F. Supp. 3d at 190 (quotations omitted).  Based on the record here, including the evidence from actual market participants, the Court concludes that the Government failed to establish that the acquisition would result in less innovation by rival payers.

### d.  Harm to Competition

Imagine, however, that rival payers did testify that they would scale back innovation.  Even then, the Government would still have to prove that that reduction in innovation would be likely to *substantially* lessen competition in the relevant markets.

The Government rests on the axiomatic truth that payers who are innovating less are also competing less.  But it made no attempt to show that the lessening of innovation and competition would be *substantial*.  In fact, the Government's own expert admitted that rival insurers would still innovate after the proposed merger.  Dr. Gowrisankaran was asked, "Does your opinion that post-merger United would use its health insurance rivals' competitively-sensitive information to copy rivals' innovations depend on United's rivals' stopping all innovations?"  8/9/22 AM Trial Tr. 96:9–12 (Gowrisankaran).  Dr. Gowrisankaran answered:  "Oh, no, it really doesn't. . . . Of course insurers are going to keep innovating even if this merger were to go forward.  They would just have less of an incentive to innovate and it would just lessen innovation.  It wouldn't remove it entirely."  *Id.* at 96:13–97:1.  But establishing that the proposed merger would "lessen innovation" (and thus competition) and that insurers would have "less of an incentive to innovate" (and thus

compete) does not establish that the proposed merger would *substantially* lessen competition. The Government failed to offer evidence demonstrating that that standard is met here. But the Court need not rest its holding on this point, as the Government failed to establish other steps in its theory.

*       *       *

In sum, based on the Court's review of all the evidence in this matter, the Court concludes that the Government has failed to make a *prima facie* case of a likely substantial lessening of competition under its data-misuse theory. Each step of the Government's argument must be true for its theory to work, yet each step suffers from serious flaws. The most serious flaws, however, are the failures to prove (1) that United is likely to misuse the data in the ways the Government contends and (2) that rival payers will innovate less as a result.

## 2. The Government's Foreclosure Theory Fails.

The Government's second vertical theory posits that United will have the ability and incentive to raise rival payers' costs by withholding or delaying the sale of EDI-related innovations—specifically, integrated platforms.[13] The Government stresses that Optum and Change have long competed to develop their own integrated platforms—Optum, through an idea called the Transparent Network, and Change, through a concept called Real-Time Settlement— and that if United acquires Change, United would control the development of the only integrated platform that is also scaled. Gov't Proposed Findings, ECF No. 119 at ¶ 266. And if that happens, the Government contends, rival payers would likely be stuck with United, because no other firm is well-suited to build a competing platform. *Id.* United could then foreclose access to the integrated platform, such as by withholding or delaying sales. *Id.* And more than that, United

---

[13] Integrated platforms are intended to reduce administrative waste and speed up payment to providers by shifting claims edits "to the left," *i.e.*, by applying edits earlier in the payment process. PX-820 ¶¶ 48–53.

would have an incentive to do so, because the downstream commercial health insurance markets are more lucrative than the upstream healthcare IT markets. *Id.* at ¶ 286.

The Government's foreclosure theory has significant flaws. To begin, the evidence overwhelmingly established, and the Court finds, that both Real-Time Settlement and Transparent Network are "concepts," *not* actual products. *See* 8/11/22 AM Trial Tr. 34:2–5 (Wukitch) ("Q. First of all, does Change Healthcare have an existing offering called Real-Time Settlement? A. No. It is a concept that's in development."); 8/3/22 PM Trial Tr. 57:1–10 (Joshi) ("So, Real-Time Settlement is a concept. It is not a product today. It is not close to being a product."); 8/5/22 PM Trial Tr. 120:25–122:11 (Schmuker) (noting that Optum cannot "say definitively" whether Transparent Network will ever be a marketable product). This fact puts the Government in an awkward position: It must prove that United will likely withhold from its rivals products that don't even exist. That may be why the Government did not define the relevant EDI-related innovation market. *See* 8/9/22 PM Trial Tr. 52:18–53:7 (Gowrisankaran) ("I didn't define the market for integrated platforms because these are products that are just being developed now.").

Moreover, the evidence did not establish that Optum will likely withhold Transparent Network or Real-Time Settlement (if either becomes a product) from external payers. The evidence established, and the Court finds, that Optum has never withheld a product from external payers—in fact, it currently markets all of its payment integrity products to UHC's biggest rivals. *See* 8/5/22 AM Trial Tr. 41:12–42:20 (Yurjevich). When asked for his reaction to the Government's claim that Optum will withhold innovations from rival payers, former United CEO Wichmann testified that the allegation was "without foundation" because "[t]he business is fiercely multi-payer." 8/4/22 PM Trial Tr. 6:3–9 (Wichmann). He also testified that in his 23 years at

United, he could not "think of any instance where OptumInsight withheld products and services to rivals of UHC[.]"  *Id.* at 6:13–16.

The evidence also established, and the Court finds, that Optum has never sold one version of a product to UHC while selling a degraded version to other customers.  *See id.* at 3:22–24 ("Q. Does OptumInsight ever favor UHC by not selling products and services to rival payers or selling them a degraded product?  A.  No."); *see also* 8/5/22 AM Trial Tr. 61:15–22 (Yurjevich) ("[I]t would be ridiculous for us to offer a different product in the commercial market than we do for United.  We have no incentive as OptumInsight to offer a different product.").

At trial, the Government's expert acknowledged that he mistakenly claimed in his deposition that Optum withholds two products—Group Risk Analytics and Portfolio Optimization—from external customers.  *See* 8/9/22 PM Trial Tr. 7:3–6 (Gowrisankaran) ("Q. And then you saw my opening statement and you realized Optum does, in fact, sell Group Risk Analytics to external payers, correct?  A.  That's right."); *id.* at 14:5–10 ("Q. And you understand Portfolio Optimization is marketed to external payers?  A.  I understand it now is, yes.").  Although no other payer uses Portfolio Optimization today, *see* 8/10/22 PM Trial Tr. 150:10–13 (Gehlbach), the version that Optum markets to other external customers is not a "degraded or lesser version" than the one used by UHC, 8/5/22 AM Trial Tr. 61:2–19 (Yurjevich).

To be sure, the evidence established that Optum has piloted some products with UHC before taking them to market, and there are plans to do the same with Transparent Network.  *See* 8/10/22 PM Trial Tr. 47:4–48:2 (Witty).  But there is no evidence in the record that the *purpose* of these pilot periods is to unfairly benefit UHC to the detriment of its rivals.  To the contrary, the evidence established, and the Court finds, that such pilots benefit the broader market because they allow Optum to "validat[e] that the thing we've developed is market tested, that we are pricing it

fairly, competitively, and we can stand behind it." *Id.* at 24:11–25:8. The evidence established that this is standard market practice. *See* 8/15/22 AM Trial Tr. 66:15–67:7 (Murphy) ("[H]aving a period where you use it internally before you make it available externally . . . is very consistent with the economics of vertical integration" because "it provides you an opportunity to develop things in-house, get it working, make it work in the way you think is useful, and then mak[e] it more broadly available in the marketplace.").

All of the foregoing aligns with Optum's multi-payer business strategy, and the evidence demonstrated that Optum has strong incentives to maintain that strategy. *See* 8/10/22 PM Trial Tr. 27:19–28:1 (Witty) ("And I would presume that if [we withheld products from non-UHC payers], ultimately, somebody else is going to develop a competitive product that is multi-payer and put me out of business. It makes no sense. So from my point of view, we are resolutely committed . . . to multi-payer as a key dimension of the economic model of the company."); *see also* 8/5/22 AM Trial Tr. 61:16–22 (Yurjevich) ("[I]t would be ridiculous for us to offer a different product in the commercial market than we do for United. We have no incentive as OptumInsight to offer a different product. In fact, you've heard me talk about how important a multi-payer business is. And so we want to deliver the best value we can for our external customers."). By making its innovations available exclusively to UHC, Optum would risk sales to over 80 percent of the market. 8/4/22 AM Trial Tr. 97:9–25 (Wichmann). And it would risk forgoing up to 40 percent of its total revenue—or $63.2 billion. 8/10/22 AM Trial Tr. 71:19–25 (Schumacher).

The Government contends that the incentives will change post-merger. This claim is based on Dr. Gowrisankaran's "vertical math" calculations, which found that if United forgoes all sales of Transparent Network to rival payers—thus incurring a loss of $█ million in profits in 2026—

that loss would likely be offset by downstream gains in commercial health insurance markets. *See* PX-820 ¶¶ 242–51.

Dr. Gowrisankaran's testimony, however, is at odds with the unrebutted testimony of various United executives, who stated consistently their view that it is not in United's interests for Optum to abandon its multi-payer strategy. Witty, the CEO of UHG, was expressly asked at trial about this theory, and stated: "[O]f course, my responsibility is to maximize UnitedHealth Group's performance. That is maximized by developing great products, not just to the benefit of UHC but to all of our other clients. And the idea . . . that we would develop something or acquire it, preclude its use from others, and then somehow expect it to stay a high-quality asset, I think, is nonsensical." 8/10/22 PM Trial Tr. 26:24–27:16 (Witty). He even stressed that leveraging Optum to increase UHC's profits "would be a destruction of my whole fiduciary responsibility." *Id.* at 26:1–9; *see also id.* at 26:16–20 ("To do anything which unbalances [our capacity to work with non-UHC partners] would bring to an end the strategic direction of the company, and . . . it would at no level be consistent with what I regard my fiduciary responsibility is to UnitedHealth Group."). The Court concludes that this testimony—and the similar testimony of a number of other United executives—is far more probative of post-merger behavior than Dr. Gowrisankaran's independent weighing of costs and benefits.

In sum, the Court concludes that the Government has failed to meet its *prima facie* burden under its foreclosure theory of vertical harm.

## VI.    Conclusion

For all the above reasons, the Court enters judgment for Defendants, denies the Government's request for a permanent injunction, and orders that ClaimsXten be divested to TPG. An Order will be issued contemporaneously with this Opinion.


DATE:  September 19, 2022                                   _____

CARL J. NICHOLS
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *et al.*,

      *Plaintiffs*,

    v.

UNITEDHEALTH GROUP INCORPORATED
and
CHANGE HEALTHCARE, INC.,

      *Defendants*.

Civil Action No. 1:22-cv-0481 (CJN)

## ORDER

    This matter is before the Court after a bench trial. Upon review of the entire record and for the reasons set forth in the accompanying memorandum opinion, it is

    **ORDERED** that the Government's request to enjoin the proposed merger of Defendant UnitedHealth Group Incorporated with Defendant Change Healthcare, Inc. is **DENIED**. It is further

    **ORDERED** that Defendants **DIVEST** ClaimsXten to TPG Capital as proposed. And it is further

    **ORDERED** that judgment be entered for Defendants.

    This is a final appealable order.

    The Clerk is directed to terminate this case.


DATE:  September 19, 2022

*Carl J. Nichols*

CARL J. NICHOLS
United States District Judge